**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Master Docket No. 09-md-02063-JLK-KMT (MDL Docket No. 2063)

IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION

This document relates to:   *In re Rochester National Municipal Fund*
09-CV-550-JLK-KMT (Bock)
09-CV-706-JLK-KMT (Stokar)
09-CV-927-JLK-KMT (Tackmann)
09-CV-1042-JLK-KMT (Krim)
09-CV-1060-JLK-KMT (Truman)
09-CV-1482-JLK-KMT (Laufer)
09-CV-1908-JLK-KMT (Lariviere)

---

**CONSOLIDATED CLASS ACTION COMPLAINT
AND JURY DEMAND**

---

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ............................................................................1

II.     JURISDICTION AND VENUE ......................................................................5

III.    PARTIES ........................................................................................................6

        Lead Plaintiff and Additional Plaintiffs ..................................................6

        Defendants ...............................................................................................6

IV.     SUBSTANTIVE ALLEGATIONS ...............................................................11

        A.      Introduction....................................................................................11

        B.      Defendants Negligently Understated the Percentage Of Fund Assets That
                Were Illiquid And Failed To Disclose That the Fund's Illiquid Assets
                Exceeded the Fund's Purported Limits On Illiquid Investments...........................14

        C.      Defendants Negligently Failed To Disclose the Extraordinary Volatility of
                the Fund's Investments in Complex Derivative Instruments................................18

        D.      Defendants Negligently Misrepresented How the Fund Would Seek its
                Investment Objective, and Failed to Disclose that its Strategy Was Wholly
                Inconsistent with its Investment Objective and Fundamental Policy ...................22

        E.      Defendants Negligently Overstated the Value of the Fund's Assets and Its
                NAV ....................................................................................................23

        F.      The Concealed Risks Materialized and Damaged Investors..................................24

V.      THE PROSPECTUSES CONTAINED MATERIALLY FALSE  AND MISLEADING
        STATEMENTS AND OMISSIONS ...............................................................26

i

A.    The Prospectuses Contained Materially False and Misleading Statements Regarding Liquidity ................................................................................ 27

B.    The Prospectuses Contained Materially False and Misleading Statements Regarding Inverse Floaters ..................................................................... 29

C.    The Prospectuses Contained Materially False and Misleading Statements Regarding the Fund's Investment Strategy ........................................... 32

D.    The Prospectuses Contained Materially False and Misleading Statements Regarding the Value of the Fund's Investments and the Fund's Net Asset Value ................................................................................................ 33

VI.    CLASS ACTION ALLEGATIONS ................................................................... 35

COUNT I: VIOLATIONS OF § 11 OF THE 1933 ACT AGAINST THE FUND TRUSTEES AND/OR SIGNATORIES OF THE REGISTRATION STATEMENTS, OPPENHEIMER MULTI-STATE TRUST, AND OPPENHEIMER DISTRIBUTOR ...................................................... 36

COUNT II: VIOLATIONS OF SECTION 12(a)(2) OF THE 1933 ACT AGAINST DEFENDANTS OPPENHEIMER MULTI-STATE TRUST, OPPENHEIMERFUNDS, AND OPPENHEIMER DISTRIBUTOR .................. 38

COUNT III: VIOLATIONS OF SECTION 15 OF THE 1933 ACT AGAINST THE INDIVIDUAL DEFENDANTS, MASS MUTUAL AND OPPENHEIMERFUNDS .................................................................. 40

COUNT IV: VIOLATIONS OF §13(a) OF THE INVESTMENT COMPANY ACT AGAINST DEFENDANT OPPENHEIMER MULTI-STATE TRUST .............. 41

VII.    PRAYER FOR RELIEF ................................................................................... 42

VIII.    DEMAND FOR TRIAL BY JURY ................................................................... 44

ii

Plaintiffs, by their attorneys, allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters allege the following upon information and belief based upon the investigation of their attorneys, including review and analysis of Oppenheimer Rochester National Municipal Fund's filings with the U.S. Securities and Exchange Commission ("SEC"), and review of published news reports and industry data. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      Lead Plaintiff, Peter Unanue ("Lead Plaintiff" or "Unanue"), and additional plaintiffs Barry Doyle, and Yolanda Pessina (together with Unanue, "Plaintiffs"), bring this securities action on behalf of themselves and all persons or entities who purchased or otherwise acquired shares of the Oppenheimer Rochester National Municipal Fund ("Rochester Nat'l Muni Fund" or the "Fund") during the period from March 13, 2006 through October 21, 2008, inclusive (the "Class Period").  Plaintiffs bring claims pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act" or the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o, and Section 13(a) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-13(a).

2.      Rochester Nat'l Muni Fund is an open-end mutual fund that, before and throughout the entire Class Period, explained its objective this way:  **"The Fund seeks a high level of current income exempt from federal income taxes for individual investors by investing in a diversified portfolio of high-yield municipal securities."**  Defendants claimed to achieve this objective through the "Rochester" style of investing that the Fund described as

"providing highly competitive yields from diverse portfolios of carefully assessed municipal bonds."

3.      Defendants, however, failed to disclose to investors the quantity or nature of the risks inherent in the Fund's strategies, particularly those related to inverse floaters.   The statements made in connection with selling the Fund were materially false and misleading because they:  (a) grossly understated the percentage of the Fund's illiquid assets and the Fund's above-average liquidity risk; (b) failed to disclose that the safeguards that purportedly limited the Fund's investment in illiquid assets were ineffective and that, consequently, the Fund's investment in illiquid assets exceeded its purported limits; (c) grossly overvalued the Fund's assets and overstated the Fund's NAV; (d) failed to disclose that the Fund's success depended on steady or falling interest rates and a robust market appetite for the risky securities in which the Fund was heavily invested; and (e) failed to disclose the extraordinary volatility of the Fund's investments in complex inverse floating rate securities ("inverse floaters").   Additionally, Defendants falsely stated that the Fund would seek its investment objective by attempting to invest 100 percent of its assets in municipal securities and, as a fundamental policy, invest at least 80 percent of its net assets in municipal securities.  In fact, however, Defendants improperly included highly volatile derivative securities known as "inverse floaters" in the category of municipal securities and invested up to 35 percent of the Fund's assets in such inverse floaters, leaving a maximum of 65 percent of Fund assets available for investment in municipal securities. Defendants thereby violated the Fund's fundamental policy of investing at least 80 percent of its assets in municipal securities.

4.      Inverse floaters, moreover, were a significant and dangerous feature of the Fund's investment strategy.  The coupon (or coupon rate) of an inverse floater varies inversely with the

2

level of specified short-term interest rates; as those rates rise, the payment made on the inverse floater falls (hence the name *inverse* floaters).  While this inverse coupon is the most noticeable feature of the inverse floater, and an important one, it is not the key feature.  Rather, the key feature of an inverse floater is that it is actually the equivalent, in terms of risk and payoff, of simultaneously borrowing short-term funds and using them to buy a long-term bond.  This strategy of "borrow short-lend long" has failed time and again, in many markets, over many decades, often with great damage to individual investors.  The main driver of this strategy's risk is the mismatch in the lives of assets and liabilities that constitute the combined position, and, as set forth herein, that mismatch is at the very center of an inverse floater.

5.       In this case, Plaintiffs and a class of similarly situated Fund investors were damaged when the undisclosed risks of the Fund's inherently and highly leveraged investments in inverse floaters were realized as the interest rates required of municipal securities began to increase in 2007 and, especially, late 2008.  The Fund's extensive investments in unrated, illiquid and BBB-rated securities made the Fund especially vulnerable to interest rate increases.  The increase in interest rates not only severely reduced the coupons and prices of the inverse floaters, but it also triggered obligations to counter-parties that had to be satisfied, which the Defendants could do only by selling at least some of the Fund's illiquid assets at fair market value prices that were far lower than the value attributed to them in the Fund's financial statements.  Concomitantly, Defendants were forced to write down the Fund's holdings, finally admitting to investors that those holdings were, and throughout the Class Period had been, worth far less than the value at which they were being carried on the Fund's financial statements.  Thus, the Net Asset Value ("NAV") of the Fund was damaged in two distinct but related ways:  (a) the Fund's assets, which were overstated throughout the Class Period, had to be written down to reflect their

3

proper values; and (b) what value the Fund's assets did have was further reduced by the materialization of previously concealed risks related to inverse floaters, which forced Defendants to sell Fund assets at fire-sale prices, *i.e.* the Fund sold assets at fair market prices that were lower than the overstated values reported by the Fund in its SEC filings.  Thus, investors were damaged by the very facts that Defendants misrepresented and/or concealed.

6.     The truth about the Fund's assets did not emerge until October 21, 2008 when Defendants issued a prospectus supplement ("Prospectus Supplement") that, as detailed herein, revealed the Fund's previously undisclosed liquidity and interest rate risks.  By then, however, these risks had come to pass, and the damage was almost entirely done: On October 21, 2008, as the Prospectus Supplement was issued, Rochester Nat'l Muni Fund shares had a stated NAV of about $6.59 per share, down from a high of $12.93 during the Class Period, and about 39.8 percent lower than the $10.95 per share stated NAV at the start of the year.  This decrease in NAV was dramatically greater than that experienced by comparable funds included in Morningstar's "High Yield Muni" category.[1]  In 2008, the Fund's stated NAV dropped between 53.05 percent and 53.06 percent (depending on share class) while other funds in the Morningstar High Yield Muni category dropped an average of 28.44 percent (class A shares), 28.09 percent (class B shares), and 28.57 percent (class C shares).  Attached as Exhibit A is a chart showing the percentage changes in the Fund's NAV (class A shares), and in those of other funds (class A shares) within the category.  Indeed, at returns of negative 10.3 to negative 11 percent (depending on the share class) in the year 2007 and of negative 48.9 to negative 49.4 percent in the year 2008, the Fund was by far the worst performer of any fund in the entire High Yield Muni category.

---

[1] Morningstar is an investment advisory service that specializes in rating mutual funds.

4

7.    The drop in the Fund's NAV was not caused by general economic decline or upheaval in the credit markets but, rather, by Defendant's risky failure to adhere to the Fund's fundamental investment policies and objectives.  This failure left the Fund extremely vulnerable to inevitable and frequent cycles of financial crisis.  In just the past 20 years, such crises include the 1994 devaluation of the Mexican Peso and ensuing credit tightening; the 1997 Asian financial crisis; Russia's 1998 default on government bonds resulting in Japanese and European bond market panics; and the deterioration of capital markets and crisis in confidence in interbank lending caused by the September 11, 2001 terrorist attacks.  Thus, the occurrence of another credit crisis was not an unforeseeable risk and, had Defendants' investment policies been truly guided by the Fund's purported investment objective, the Fund would have been protected from, instead of vulnerable to, such crises, including the crisis of 2007-2008.

## II.    JURISDICTION AND VENUE

8.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the 1933 Act and Section 13(a) of the ICA.  In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including without limitation the mails, interstate telephone communications and the facilities of the national securities markets.

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 22 of the 1933 Act, 15 U.S.C. § 77v, and Section 44 of the ICA, 15 U.S.C. § 80a-43.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as key defendants maintain their principal executive offices in this District, and many of the acts giving rise to the violations of law complained of herein occurred in substantial part in this District, and

5

some of the defendants maintain residences in this district.  Further, by order dated June 17, 2009, the Judicial Panel on Multidistrict Litigation transferred this action to this Court.

## III.     PARTIES

**Lead Plaintiff and Additional Plaintiffs**

11.     By order dated November 18, 2009, the Court appointed Peter Unanue Lead Plaintiff pursuant to 15 U.S.C. §77z-1(a)(3)(B). Peter Unanue purchased and held shares of the Fund during the Class Period pursuant or traceable to one or more of the registration statements and Prospectuses at issue in this complaint, and has been damaged thereby.

12.     Plaintiff Barry Doyle purchased shares of the Fund during the Class Period pursuant or traceable to one or more of the registration statements and Prospectuses at issue in this complaint, and has been damaged thereby.

13.     Plaintiff Yolanda Pessina purchased shares of the Fund during the Class Period pursuant or traceable to one or more of the registration statements and Prospectuses at issue in this complaint, and has been damaged thereby.

14.     Plaintiffs' Class Period transactions in Rochester Nat'l Muni Fund shares are identified in the certifications attached to this complaint as Exhibit B.

**Defendants**

15.     Defendant OppenheimerFunds, Inc. ("OppenheimerFunds" or "the Manager") is the manager and investment advisor of Rochester Nat'l Muni Fund.  It chooses the Fund's investments and controls its day-to-day business.  It is a holding company that engages in securities brokerage, banking services and related financial services through its subsidiaries. OppenheimerFunds is headquartered at Two World Financial Center, 225 Liberty Street, New York, New York 10281-1008.  The Manager carries out its duties, subject to the policies

6

established by the Fund's Board of Trustees, under an investment advisory agreement. OppenheimerFunds is owned by its senior management and Defendant Massachusetts Mutual Life Insurance Company.

16.     Defendant OppenheimerFunds Distributor, Inc. ("Oppenheimer Distributor" or the "Distributor") located at Two World Financial Center, 225 Liberty Street, New York, New York 10281-1008, is a subsidiary of the Manager and was, at all relevant times, the principal underwriter and distributor of shares of the Fund and was its agent for the purpose of the continuous public offering of the Fund's shares.

17.     Defendant Massachusetts Mutual Life Insurance Company ("Mass Mutual") describes itself as a global, diversified financial services organization that is organized as a mutual life insurance company.  Through its wholly owned subsidiary, Oppenheimer Acquisition Corp., Mass Mutual owns and controls OppenheimerFunds.  According to the Manager's current Form ADV (Uniform Application for Investment Advisor Registration) filed with the SEC, Mass Mutual is a "control person" of the Manager, meaning that Mass Mutual has the power to direct or cause the direction of the management or policies of the Manager, whether through ownership of securities, by contract or otherwise.   Mass Mutual is a Delaware corporation and is headquartered at 1295 State Street, Springfield, MA.

18.     Defendant Oppenheimer Multi-State Municipal Trust, a Massachusetts Business Trust, is registered under the ICA and is the registrant and issuer (the "Issuer") for each series of the Fund's shares and filed each one of the Fund registration statements alleged herein to be misleading.  The Issuer is headquartered at 6803 South Tucson Way, Centennial, Colorado.

19.     Defendant John V. Murphy ("Murphy") is, and at all relevant times was, President and Trustee of Rochester Nat'l Muni Fund.  Defendant Murphy is also Chairman,

Chief Executive Officer, Director and President of the Manager.  Defendant Murphy signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

20.      Defendant Matthew P. Fink ("Fink") was a Trustee of Rochester Nat'l Muni Fund from 2005, and signed, individually or through an agent, the registration statements issued by the Fund on March 9, 2007 and November 21, 2007.

21.      Defendant Robert G. Galli ("Galli") was a Trustee of Rochester Nat'l Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

22.      Defendant Phillip A. Griffiths ("Griffiths") was a Trustee of Rochester Nat'l Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

23.      Defendant Mary F. Miller ("Miller") was a Trustee of Rochester Nat'l Muni Fund from 2004, and signed, individually or through an agent, the registration statements issued by the Fund on March 9, 2007 and November 21, 2007.

24.      Defendant Joel W. Motley ("Motley") was a Trustee of Rochester Nat'l Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

25.      Defendant Kenneth A. Randall ("Randall") was a Trustee of Rochester Nat'l Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

499745_7.DOC

26.     Defendant Russell S. Reynolds, Jr. ("Reynolds") was a Trustee of Rochester Nat'l Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

27.     Defendant Joseph M. Wikler ("Wikler") was a Trustee of Rochester Nat'l Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

28.     Defendant Peter I. Wold ("Wold") was a Trustee of Rochester Nat'l Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

29.     Defendant Brian F. Wruble ("Wruble") was a Trustee of Rochester Nat'l Muni Fund during the Class Period and Chairman of the Board of Trustees since January 1, 2007, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

30.     Defendant Clayton K. Yeutter ("Yeutter") was Chairman of the Board of Trustees for Rochester Nat'l Muni Fund from the beginning of the Class Period through December 31, 2006.[2] Defendant Yeutter signed, individually or through an agent, the November 28, 2005 and September 27, 2006 registration statements issued by the Fund during the Class Period.

31.     Defendant David K. Downes ("Downes") was a Trustee of Rochester Nat'l Muni Fund from August 1, 2007, and signed, individually or through an agent, the registration statement issued on November 21, 2007 by the Fund during the Class Period.

_____

[2] Defendant Yeutter retired from his position as Chairman of the Board of Trustees effective December 31, 2006 and was replaced by Defendant Wruble on January 1, 2007.

32.     Defendant Brian W. Wixted ("Wixted") was Treasurer and Principal Financial and Accounting Officer of Rochester Nat'l Muni Fund during the Class Period.   Defendant Wixted signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

33.     Defendant Ronald H. Fielding ("Fielding") led the Rochester Team and was a Vice President and a Senior Portfolio Manager of the Fund during the Class Period.   In addition, Defendant Fielding has been a Senior Vice President of the Manager since January 1996 and Chairman of the Rochester Division of the Manager since January 1996.   He is a portfolio manager and officer of other Oppenheimer funds.   Defendant Fielding is the chief strategist and a trader for the Fund and other Oppenheimer funds.   He participated in the drafting of the Prospectuses pursuant to which the Fund was sold.

34.     Defendant Daniel G. Loughran ("Loughran") was a member of the Rochester Team and a Senior Portfolio Manager of the Fund during the Class Period.   He has been a Vice President of the Manager since April 2001.   He participated in the drafting of the Prospectuses pursuant to which the Fund was sold.

35.     Defendant Scott Cottier ("Cottier") was a member of the Rochester Team and a Portfolio Manager of the Fund during the Class Period.   He has been a Vice President of the Manager since 2002.   He participated in the drafting of the Prospectuses pursuant to which the Fund was sold.

36.     Defendant Troy E. Willis ("Willis") was a member of the Rochester Team and a Portfolio Manager of the Fund during the Class Period.   He has been an Assistant Vice President of the Manager since 2005.   He participated in the drafting of the Prospectuses pursuant to which the Fund was sold.

37.     The defendants referenced above in ¶¶ 19 - 36 are herein referred to as the "Individual Defendants."

38.     The defendants referenced above in ¶¶ 15 - 36 are collectively referred to as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Introduction

39.     Defendants described the Rochester Nat'l Muni Fund as an open-end non-diversified management investment company.  The Fund's objective, as Defendants stated it in Fund Prospectuses, is to seek "a high level of current income exempt from federal income taxes for individual investors by investing in a diversified portfolio of high-yield municipal securities." The Fund also purported to achieve this objective by attempting "to invest 100% of its assets in municipal securities that pay interest exempt from federal individual income tax, and as a fundamental policy, the Fund invests at least 80% of its net assets (plus borrowing for investment purposes) in municipal securities."

40.     Rochester Nat'l Fund is sold in three classes of shares, A, B, and C, under the ticker symbols ORNAX, ORNBX, and ORNCX, respectively, on the National Association of Securities Dealers Automated Quotations (NASDAQ) system.  All share classes were offered in the same Prospectuses, invested in the same portfolio, and traded at nearly identical prices at all relevant times.

41.     As an open-end mutual fund, the Fund allows for continuous sales and redemptions of its shares at a stated net asset value (NAV) that is determined by dividing the total stated value of assets held by the Fund by the total number of shares outstanding.  The offering or sales of the Fund's shares are pursuant to registration statements and Prospectuses

11

that Defendants amended periodically.  The shares were offered for sale by OppenheimerFunds, which also served as fund manager and investment advisor for the Fund, and Oppenheimer Distributor, which also served as the distributor of the Fund.

42.     The Fund's registration statements, Prospectuses, and statements of additional information ("SAI"), which were incorporated by reference into the registration statements and Prospectuses (collectively, "Prospectuses"), were issued on the following dates, among others:

    a.     Prospectus and SAI dated November 28, 2005 (filed with the U.S. Securities and Exchange Commission ("SEC") on SEC Form N-1A), supplemented on December 6, 2005 (filed on SEC Form 497);

    b.     Prospectus and SAI dated September 27, 2006 (filed on SEC Form N-1A);

    c.     revised Prospectus and revised SAI dated March 9, 2007 (filed on SEC Form N-1A); and

    d.     Prospectus and SAI dated November 28, 2007 (filed on SEC Form N-1A), supplemented on October 21, 2008 (filed on SEC Form 497).

43.     Each of the Prospectuses stated that the Fund cannot alter its fundamental investment policies without shareholder approval:

        Fundamental policies cannot be changed without the approval of a majority of the Fund's outstanding voting shares. The Fund's investment objective is a fundamental policy.

44.     The Prospectuses contained many materially false and misleading statements and omissions. Specifically, the Prospectuses were materially false and misleading, among other reasons, because they: (a) grossly understated the percentage of the Fund's illiquid assets and the Fund's above-average liquidity risk; (b) failed to disclose that the safeguards that purportedly limited the Fund's investment in illiquid assets were ineffective and that, consequently, the

12

Fund's investments in illiquid assets exceeded its purported limits; (c) grossly overvalued the Fund's assets and overstated the Fund's NAV; (d) failed to disclose that the Fund's success depended on steady or falling interest rates and a robust market appetite for the risky securities in which the Fund was heavily invested; and (e) failed to disclose the extraordinary volatility of the Fund's investments in inverse floating rate securities.  Additionally, Defendants falsely stated that the Fund would seek its investment objective by attempting to invest 100 percent of its assets in municipal securities and, as a fundamental policy, invest at least 80 percent of its net assets in municipal securities.  In fact, however, Defendants improperly included highly volatile derivative securities known as "inverse floaters" in the category of municipal securities and invested up to 35 percent of its assets in such inverse floaters, leaving a maximum of 65 percent of Fund assets available for investment in municipal securities.  Defendants thereby violated the Fund's fundamental policy of investing at least 80 percent of its assets in municipal securities.

45.    In reality, the Fund's exposure to serious losses from rises in interest rates, on the one hand, and its substantially illiquid portfolio, on the other hand, constituted a volatile mixture that ignited when counter-parties to the complex transactions that gave rise to the "inverse floaters" exercised a put option allowing them to sell their positions back to the Fund at par.  To meet this obligation, Defendants had to sell Fund assets at fair market prices that were materially less than their recorded value, thereby revealing that Defendants had materially overvalued Fund assets throughout the Class Period.

46.    At no time during the Class Period did the Fund seek, let alone obtain, shareholder approval to alter or modify its investment objective or any of its investment policies to invest heavily in inverse floaters, which are non-municipal derivative securities. Notwithstanding the Fund's failure to secure shareholder approval to change its fundamental

13

policies, the Fund embarked on risky investment strategies that were at odds with its purported strategy to achieve its investment objective by attempting to invest 100 percent of its assets in municipal securities.  Instead the Fund admittedly invested 35 percent of its assets in inverse floaters, thus, contradicting its purported strategy and fundamental policy alleged in the Prospectuses throughout the Class Period.

**B.**     **Defendants Negligently Understated the Percentage Of Fund Assets That Were Illiquid And Failed To Disclose That the Fund's Illiquid Assets Exceeded the Fund's Purported Limits On Illiquid Investments**

47.     In Prospectuses issued before and throughout the Class Period, Defendants made numerous materially false and misleading statements about the liquidity of the Fund's holdings, as more fully alleged herein.

48.     Liquidity is important for at least two reasons.  First, liquid assets can be sold on relatively short notice without taking a material discount from the values reported in financial statements filed just prior to the asset sale.  Second, because illiquid assets are not actively traded, they cannot be valued by reference to readily verifiable pricing data or other observable price inputs.  In both regards, illiquid assets radically differ from liquid securities.

49.     *Revision of Liquidity Test in Guidelines to Form N-1A*, promulgated by the SEC, limits mutual funds' holdings of illiquid assets.  This regulation defines an "illiquid asset" as "an asset which may not be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the mutual fund has valued the investment on its books." 17 CFR 239 and 274 [Fed.Reg. Vol. 57, No. 55 at 9829, Release No. 33-6927; IC-18612] (Mar. 20, 1992).

50.     Assets are considered liquid if they can be readily disposed of at a price reflecting the value attributed to the assets in the Fund's financial statements.  As the Fund's Prospectuses

14

state, "[i]nvestments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price."

51.     Similarly, in the analogous context of money market funds, which also purport to preserve capital, the SEC has stated that "[t]he term 'illiquid security' generally includes any security which cannot be disposed of promptly and in the ordinary course of business without taking a reduced price.  A security is considered illiquid if a fund cannot receive the amount at which it values the instrument within seven days."  *See* 51 FR 9773.

52.     Likewise, GAAP Statement of Financial Accounting Concepts No. 5 states that liquidity is tied to "financial flexibility," and that "[l]iquidity reflects an asset's or liability's nearness to cash.  Financial flexibility is the ability of an entity to take effective actions to alter amounts and timing of cash flows so it can respond to unexpected needs and opportunities."  In other words, liquidity is an important determinant of whether an entity can timely react to changing market conditions without incurring substantial harm.

53.     Throughout the Class Period, Defendants sought to reassure investors by purporting to identify, with specificity, which of the Fund's assets were illiquid.  Specifically, Defendants periodically issued Statements of Investments that were incorporated by reference in the Prospectuses. Certain of the investments in those Statements of Investments referenced a footnote that identified them as being illiquid and purported to provide the total dollar amount and percentage of the Fund's illiquid assets at a given date.  For example, the Statement of Investment incorporated as part of the March 9, 2007 Prospectus contained this passage:

> Illiquid security.  The aggregate value of illiquid securities as of July 31, 2006 was $34,913,315, which represents 0.66% of the Fund's net assets.  See Note 5 of Notes to Financial Statements.

15

54.     Many of the Fund's *illiquid* investments, however, did *not* receive the crucial footnote designation --- *i.e.,* they were *not* identified as being illiquid --- even though they went for months without being traded and carried other hallmarks of illiquidity.  This omission was misleading because: (a) once Defendants purported to identify all illiquid investments, investors reasonably believed that those not so identified were actually liquid, when in fact many of them were not and (b) by understating the Fund's illiquid securities, Defendants overstated the extent to which the Fund could react to changing market conditions and sell its securities for values it was claiming.  Both misleading actions made the Fund appear to be a far safer investment than it actually was.

55.     For example, Defendants stated in the Fund's Statement of Investments in the Prospectus dated November 28, 2007, that 3.43 percent of the Fund's net assets were invested in a bond issued by the Arizona Health Facilities Authority (Banner Health System) as of July 31, 2007.  Although not designated as such, that bond was illiquid.  Evidence of the illiquidity is that the security traded on the secondary market only 9 times during the 17 months between its issuance on May 10, 2007 and the end of the Class Period on October 21, 2008.

56.     Another example is a bond issued by Milledgeville-Baldwin County, GA Devel. Authority (Georgia College & State University Foundation).  This holding represented .58 percent of the Fund's net assets as of July 31, 2007, according to the Fund's Statement of Investments in the Prospectus dated November 28, 2007.  This bond, issued on June 15, 2007, was not designated as illiquid even though it traded *just three times* on the secondary market during the Class Period.  Still another example of the Fund's misleading activity in this regard was the Central Falls, RI Detention Facility bond, a holding which was not identified as illiquid despite the fact that it posted the extremely limited amount of trading that is characteristic of

16

illiquid securities.  As of July 31, 2007, this holding represented a value of .58 percent of the fund's net assets.  ***This bond traded on one day on the secondary market during the entire 2.5 year Class Period.***

57.    These assets, and others with similar trading and/or ownership patterns, are not liquid under any of the criteria for liquidity set forth above.  Indeed, they meet the Fund's own definition of "illiquid" assets because they "***do not have an active trading market***, making it difficult to value them or dispose of them promptly at an acceptable price."  [Emphasis added].

58.    Defendants stated in the Prospectuses that the Fund's Manager monitored the liquidity of the Fund's holdings but, unbeknownst to investors, this statement was materially false and misleading.  In fact, either the Fund Manager did not adequately monitor the liquidity of the Fund's holdings, as Defendants stated, or, it monitored its holdings but failed to classify certain obviously illiquid securities as such.  Based on a review of just the Fund's top 109 out of 1,441 holdings, the aggregate value of illiquid securities held as of July 31, 2008 represented at least 29 percent of the value of the Fund's net assets.  When combined with the 2.11 percent of the Fund's net assets that are correctly marked as illiquid holdings in the Certified Shareholder Report for the period ending July 31, 2008, the Fund held at least 31.11 percent of its net assets in illiquid securities as of July 31, 2008.  (The likelihood that some of its smaller holdings are also illiquid increases the Fund's failure in this critical regard.)  Clearly, the Fund's investments in illiquid assets substantially exceeds its purported 15 percent limit on such investments.  Therefore, Defendant's claim that --- as of July 31, 2008 --- the Fund's investment in illiquid assets was limited to 2.11 percent was materially false and misleading because a minimum of 30 percent of the Fund's assets were illiquid.

17

**C.    Defendants Negligently Failed To Disclose the Extraordinary Volatility of the Fund's Investments in Complex Derivative Instruments**

59.    In the Prospectus dated November 28, 2005, Defendants stated that the Fund would limit its investments in highly complex and volatile derivative instruments known as municipal inverse floating rate securities (inverse floaters) to 20 percent of total assets. Defendants increased the purported limit in the September 27, 2006 Prospectus to 35 percent, where it remained for the duration of the Class Period.  Municipal inverse floaters are securities that pay a tax-exempt coupon (or interest rate) that moves inversely with changes in a prominent and referenced short-term interest rate, such as an interest rate linked to the Bond Market Association Municipal Swap Index ("BMA Index") or some other short-term pricing mechanism. Most of the inverse floaters owned by the Fund were created by the Fund in a way to be described below; the Fund was also free to buy inverse floaters created or issued by other financial institutions.

60.    As illustrated by Exhibit C, attached hereto, the inverse floaters that the Fund tended to own typically arose from a cluster of interrelated transactions collectively referred to as a "tender option bond program" that usually is structured by an investment bank known, in this context, as a "Sponsor."  The Sponsor would create a Trust into which the Fund would place a long-term municipal bond that it had purchased.  Then the Trust would issue two classes of securities:

- **Floating rate securities (floaters)**: The Trust would sell these to third parties and use the proceeds of the sale to fund the position in the long-term municipal bond referenced above.  The floater pays coupons at a money market rate that varies positively with a referenced and prominent short-term interest rate. The Trust would pay the floater coupon from the periodic coupon paid on the

18

underlying long-term municipal bond.  Holders of the floaters have the right to periodically (typically every week, but daily in some cases) tender the floaters for redemption at par value.

- **Inverse floating rate securities (inverse floaters):** The Trust would also issue inverse floaters to the Fund.  The coupon received by the Fund on the inverse floaters is the difference between the long-term interest payments generated by the municipal bond and the short-term interest paid on the floaters. Because they receive all income not used to pay interest on the companion floaters (and some expenses), inverse floaters are sometimes referred to as "residuals."

61.     Different inverse floaters --- whether created or purchased by the Fund --- have different degrees of *leverage*, which is determined by the ratio of the dollar size of the floater to the dollar size of the inverse floater.  The sum of the floater and inverse equals the dollar value of the underlying municipal bond. As the ratio of the floater's dollar size to the inverse floater's dollar size increases, so does the leverage --- and, thus, the price volatility --- of the inverse floaters.  Notably, not one of the Prospectuses that the Fund issued during the Class Period discussed or even revealed the range (or average) of the leverage of the inverse floaters that the Fund created or purchased.

62.     More than simply failing to disclose the mathematically certain fact that inverse floaters are much more price-volatile than otherwise similar debt securities, the Prospectuses actually suggested that inverse floaters might ***not*** be more volatile.  For example, the November 21, 2007 Prospectuses states, misleadingly, that "The market value of inverse floaters ***can be*** more volatile than that of a conventional fixed-rate bond having similar credit quality,

19

redemption provisions, and maturity." [Emphasis added]. By stating that inverse floaters *can be* more volatile, Defendants concealed the fact that inverse floaters are *necessarily* more volatile than conventional bonds with similar maturities, credit quality, and other relevant provisions. By suggesting that some of its inverse floaters might have the same price stability as otherwise comparable bonds, Defendants, in the Prospectuses, falsely and misleadingly made the Fund appear to be a safer investment than it really was.

63.    The inverse floaters that the Fund created and owned carried additional material risks. The arrangements creating the inverse floaters allowed the holders of the floaters to "put" them back to the Trust at any time, usually with seven days' notice. (This characteristic met regulatory requirements for the floaters to be held by money-market mutual funds.) Using this put option, the holder of the floater could sell it back to the Trust and demand *par value or full and undiscounted face value in exchange*. If the Sponsor could not re-sell the tendered floaters, it had the right to collapse the Trust by causing all outstanding floaters to be tendered for par and selling the municipal bond held in the Trust to meet the Trust's outstanding obligations (*i.e.* to pay the holders of the floaters the par value to which their put option entitled them). If municipal rates were rising and bond prices falling --- which would likely result in widespread tendering of the floaters --- the Fund would be in the difficult position of liquidating the underlying bond at unfavorable prices.

64.    Another complicating and risk-enhancing practice of the Fund was to enter into "shortfall and forbearance" agreements with the Sponsor regarding the creation of a floater and an inverse floater. With this agreement, which was part of certain inverse floater agreements, the Fund obligated itself to reimburse the Sponsor (and, through it, the holder of the floater) for any

20

difference between the liquidation value of the underlying security and the par value of a tendered floater.

65.     In other words, a shortfall and forbearance agreement obligated the Fund to make up any difference between the market value of the collateral (*i.e.* long-term municipal bond originally placed in the Trust to create the floater and companion inverse floater) and the par value of the floater.  If such a situation were to arise, the Fund would be forced to sell the underlying bond as well as other securities from its portfolio to satisfy its contractual obligations, regardless of market conditions.  Thus, to raise the capital required to meet its obligations under these risky floater agreements, securities that the Fund may have intended to hold for long periods of time, or which were at any particular moment out of favor with the market and slipping in value, would nevertheless have to be sold at fair market values that were materially lower than the inflated values reported in the Fund's SEC filings.

66.     Thus, the supposedly long-term inverse floaters created by the Fund --- with reported maturities of 20 to 30 years --- were in reality short-term arrangements whereby the Fund purchased long-term bonds with revolving and potentially mercurial loans that the Fund could be forced to repay at any time, with only seven days notice.  The mismatched maturities of short-term borrowing and long-term assets exposed the Fund to massive risks, because the strategy effectively converted the stable, long-term bonds typically sought by investors in purported municipal bond funds into extremely volatile and leveraged short-term instruments.  In short, this undisclosed strategy traded the relative safety of conventional municipal bonds, which could be held for a long time and particularly through periods of market turbulence, for just the possibility of risk-induced higher returns in the short run.

67.     Additionally, unbeknownst to investors, even when the Fund had not entered into shortfall and forbearance agreements, the Sponsor had the right to --- and often did --- require the Fund to provide more collateral if the Sponsor believed that the underlying collateral was insufficient to meet the potential obligations that could arise to the holders of the floaters.

68.     Finally, the pervasive illiquidity of the Fund's portfolio actually served to augment the already large risks of the inverse floaters.  By layering risk upon risk, the Fund rendered itself completely ill-equipped to meet its contractual obligations related to inverse floaters, and placed itself entirely at the mercy of unpredictable movements in interest rates as well as recurring crises in capital markets.  This state of affairs, and the significant financial risk to which the Fund was exposed, were not disclosed.

**D.     Defendants Negligently Misrepresented How the Fund Would Seek its Investment Objective, and Failed to Disclose that its Strategy Was Wholly Inconsistent with its Investment Objective and Fundamental Policy**

69.     Throughout the Class Period, the Fund stated that its investment objective was to invest in municipal securities to seek current income exempt from federal income taxes for individual investments.

70.     Specifically, the Fund described how it would achieve its investment objective by attempting to invest 100 percent of its assets in municipal securities.  The Fund further asserted that as a Fundamental Policy, it had to invest a minimum of 80 percent of its net assets in municipal securities.

71.     As alleged more fully above, the Fund invested in volatile inverse floaters which is wholly inconsistent with the Fund's purported objective of investing in municipal securities.  Moreover, the Fund's involvement in these investments was not merely incidental, but rather, a

very significant part of the Fund's investment strategy as demonstrated by its own admission in the Prospectuses that the Fund invested up to 35 percent of its assets in inverse floaters.

72.     Thus, rather than attempting to "invest 100% of its assets in municipal securities" or to minimally invest 80 percent of its net assets in municipal securities, the Fund invested heavily in inverse floaters, which are not municipal securities. The Fund's investment strategy, therefore, was not consistent with its investment objective or fundamental policy.

**E.     Defendants Negligently Overstated the Value of the Fund's Assets and Its NAV**

73.     Throughout the Class Period, Defendants valued the Fund's assets and determined the Fund's NAV by reference to estimates of value based on the trading data of other securities they deemed to be "similar."  In fact, as was disclosed --- but only after the Class Period --- none of the Fund's investments were priced by reference to trading data.  Rather, the Manager valued the Fund's assets in an opaque process for which there was no market-price check.  In the absence of such a check, the Fund's assets were overvalued.  For example, because the Fund failed to properly characterize a substantial portion of its investments as illiquid, the Fund's pricing did not properly account for and disclose liquidity risk.

74.     A change in accounting rules ultimately, after the Class Period, forced the Fund to disclose that *every single one of its assets was valued on a basis other than the "last sale price."*  In September of 2006, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 157, which, among other things, requires entities to disclose the valuation inputs they use to measure the "fair value" of their assets. The additional disclosures mandated by SFAS 157 occurred for the first time in the Fund's Shareholder report filed on January 31, 2009.  In that document, the Fund acknowledged that its entire portfolio was valued based on "inputs other than quoted prices that are observable for the

23

asset (such as quoted prices for similar assets and market corroborated inputs such as interest rates, prepayment speeds, credit risks, etc.)." In other words, ***there was no ready and active trading market - and therefore no "bid" and "ask" to use in pricing - for a single security that the Fund held as of January 31, 2009.***

**F.     The Concealed Risks Materialized and Damaged Investors**

75.     In 2007 and 2008, municipal interest rates rose and many investors moved away from municipal securities. Thus, floaters based on municipal bonds with lower interest rates became decidedly less attractive, and holders of such floaters (predictably) tendered them to the Trusts, demanding par value in exchange. The Trusts' Sponsors, however, were unable to re-sell them to other investors.

76.     Consequently, the Trusts' Sponsors were forced to collapse the Trusts and sell the underlying securities to pay the holders of the floaters their par value. However, the Manager had not monitored the sufficiency of the segregated collateral. Nor had it monitored the Fund's exposure under the shortfall and forbearance agreements (despite statements in the Prospectuses that the Manager would do so). Consequently, the underlying securities that had been segregated as collateral were insufficient to meet this obligation, and the Sponsors, therefore, required that more collateral be provided, which in turn obligated the Fund to make up the difference between what the underlying collateral had sold for, and what was owed to the holders of the floaters. To do so, the Fund was forced to sell still more of its portfolio to raise the necessary capital. Because many of the Fund's assets were illiquid, or had been overvalued by the Fund, they could be sold only at steep discounts compared to the values reported by the Fund, if at all.

77.     After these events had occurred, the Fund's NAV dropped from $10.95 on January 2, 2008 to $6.59 on October 21, 2008. Likewise, the Fund's rate of return for the year

24

2008 ranged from -49.4 percent (for class B shares), -49.3 percent (for class C shares), to -48.9 percent (for class A shares).  This was a stark and disappointing contrast to the average rate of return for the rest of the Morningstar High Yield muni category, which ranged from -24.9 percent (for class C shares) to -24.4 percent (for class A and B shares).

78.     It was not until October 21, 2008, however, that the Fund belatedly disclosed the additional and serious risks associated with inverse floaters. Specifically those risks were that: (a) the collateral underlying the floaters was insufficient to cover the Fund's obligation under the floaters; (b) that the Fund would have to turn to its other investments to make up the difference; and (c) that those other investments, (presumably because they were illiquid) could be sold "at a disadvantageous time" to raise cash to meet that obligation.  In a Prospectus filed with the SEC on Form N-1A, replacing the Fund's previously issued disclosures relating to inverse floaters, Defendants stated, in relevant part:

> ...The Fund's investments in inverse floaters involve certain risks.  The market value of an inverse floater residual certificate can be more volatile than that of a conventional fixed-rate bond having similar credit quality, maturity and redemption provisions.  Typically, inverse floater residual certificates tend to underperform fixed rate bonds when long-term interest rates are rising but tend to outperform fixed rate bonds when long-term interest rates are stable or falling.  Inverse floater residual certificates entail a degree of leverage because the trust issues short-term securities in a ratio to the residual certificates with the underlying long-term bond providing collateral for the obligation to pay the principal value of the short-term securities if and when they are tendered.  ***If the Fund has created the inverse floater by depositing a long-term bond into a trust, it may be required to provide additional collateral for the short-term securities if the value of the underlying bond deposited in the trust falls.***
>
> An inverse floater that has a higher degree of leverage is typically more volatile with respect to its price and income than an inverse floater having a lower degree of leverage.  ***Under inverse floater arrangements, if the remarketing agent that offers the short term securities for sale is unable to sell them, or if the holders tender (or put) them for repayment of principal and the remarketing agent is unable to remarket them, the remarketing agent may cause the trust to be collapsed, and in the case of floaters created by the Fund, the Fund will then be required to repay the principal amount of the tendered securities.  During times***

25

*of market volatility, illiquidity or uncertainty, the Fund could be required to sell other portfolio holdings at a disadvantageous time to raise cash to meet that obligation.*

[Emphasis added].

79.     The risks that the Fund could be required to provide additional collateral or to sell other portfolio holdings at a disadvantageous time to raise cash as a result of its investments in inverse floaters had been a "main risk of investing in Rochester Nat'l Muni Fund" throughout the entire Class Period, but had not been adequately disclosed.

## V.     THE PROSPECTUSES CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

80.     Defendants issued Prospectuses throughout the Class Period that contained materially false and misleading statements and omissions.  Specifically, in the Prospectuses, Defendants negligently: (a) grossly understated the percentage of the Fund's illiquid assets and the Fund's above-average liquidity risk; (b) failed to disclose that the safeguards that purportedly limited the Fund's investment in illiquid assets were ineffective and that consequently, the Fund's investments in illiquid assets exceeded its purported limits; (c) grossly overvalued the Fund's assets and overstated the Fund's NAV; (d) failed to disclose that the Fund's success depended on steady or falling interest rates and a robust market appetite for the risky securities in which the Fund was heavily invested; and (e) failed to disclose the extraordinary volatility of the Fund's investments in inverse floating rate securities.  Additionally, Defendants falsely stated that the Fund would seek its investment objective by attempting to invest 100 percent of its assets in municipal securities and, as a fundamental policy, invest at least 80 percent of its net assets in municipal securities.  In fact, however, Defendants improperly included highly volatile derivative securities known as "inverse floaters" in the category of municipal securities and

26

invested up to 35 percent of its assets in such inverse floaters, leaving a maximum of 65 percent of Fund assets available for investment in municipal securities.  Defendants thereby violated the Fund's fundamental policy of investing at least 80 percent of its assets in municipal securities.

## A.     The Prospectuses Contained Materially False and Misleading Statements Regarding Liquidity

81.     Defendants stated throughout the Class Period that at least 85 percent of the Fund's assets were liquid.  For example, the Fund's November 28, 2005 Statement of Additional Information contained a Statement of Investments that showed the Fund's holdings as of that date.  Certain of those investments were footnoted as follows:

> As of July 31, 2005, investments in securities included issues that are illiquid.  A security may be considered illiquid if it lacks a readily available market or if its valuation has not changed for a certain period of time.  ***The Fund will not invest more than 15% of its net assets (determined at the time of purchase and reviewed periodically) in illiquid securities.  Securities that are illiquid are marked with the applicable footnote on the Statement of Investments.***

[Emphasis added].

82.     The Prospectuses further stated that the Fund would take appropriate steps to maintain liquidity.  For example, the Prospectus dated November 28, 2005 stated:

> Illiquid and Restricted Securities.  Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price. Restricted securities may have terms that limit their resale to other investors or may require registration under federal securities laws before they can be sold publicly. The Fund will not invest more than 15% of its net assets in illiquid securities and cannot invest more than 10% of its net assets in restricted securities. Certain restricted securities that are eligible for resale to qualified institutional purchasers may not be subject to those limits. ***The Manager monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to maintain adequate liquidity.***

[Emphasis added].

83.     These statements were, in sum and substance, repeated in the Fund's Prospectuses dated September 27, 2006, March 9, 2007, and November 28, 2007, and reinforced in the

Statements of Additional Information, each of which stated, "the Fund has percentage limitations that apply to purchases of illiquid and restricted securities, as stated in the Prospectus. The Manager determines the liquidity of certain of the Fund's investments."

84.     The statements identified in ¶¶ 81-83 were materially false and misleading for the following reasons, among others:

      a.     The footnotes described in ¶ 81 purported to identify *all* of the Fund's illiquid holdings, when in fact the Fund had numerous and substantial investments that were illiquid but not identified as such;

      b.     Based on a review of just the Fund's top 109 out of 1,441 holdings, the aggregate value of illiquid securities held as of July 31, 2008 represented at least 29 percent of the value of the Fund's net assets. When combined with the 2.11 percent of the Fund's net assets that are correctly marked as illiquid holdings in the Certified Shareholder Report for the period ending July 31, 2008, the Fund held at least 31.11 percent of its net assets in illiquid securities as of July 31, 2008, even before its smaller, and likely less liquid, holdings are taken into account. This is well in excess of the Fund's purported 15 percent limit on such investments.

      c.     Defendants failed to monitor or sell the Fund's illiquid holdings or otherwise take action that would have allowed the Fund to maintain adequate liquidity, which meant that the Fund was unable to meet its obligations related to inverse floaters, as described above.

      d.     In the class action lawsuit against Oppenheimer's Champion Fund pending before this Court, Defendants take the position that whether a

security is illiquid is "not a cut-and-dried question" but a "difficult and complicated assessment" that involves a "judgment call."  To the extent that this representation by Defendants is true, their prior repeated representations in the Prospectuses that the Fund would not exceed a 15 percent cap on investments in illiquid securities are necessarily false and misleading, and omitted to state other facts necessary to make the statement true; Defendants failed to inform investors that in promising to maintain a 15 percent cap on illiquid investments, the Fund's definition of illiquidity was merely a subjective assessment that could not be meaningfully enforced or even verified and monitored.

**B.** **The Prospectuses Contained Materially False and Misleading Statements Regarding Inverse Floaters**

85.     Throughout the Class Period, Defendants made materially false and misleading statements and omissions in the Prospectuses with respect to the risks arising from the Fund's investments in inverse floaters.

86.     In this regard, the Prospectus dated September 27, 2006, stated, in relevant part, as follows:

Inverse Floaters.  The Fund invests in "inverse floaters" which are derivative instruments that pay interest at rates that move in the opposite direction of yields on short-term securities.  As short-term interest rates rise, the interest rate on inverse floaters falls and they produce less current income.  As short-term interest rates fall, the interest rates on the inverse floaters increase and they pay more current income.  Their market value can be more volatile than that of a conventional fixed-rate security having similar credit quality, redemption provisions and maturity.  ***The Fund can invest up to 35% of its total assets (which includes the effects of leverage) in inverse floaters.***

[Emphasis added].

29

87.     The above statement was substantively repeated in the Fund's Prospectuses dated March 9, 2007 and November 28, 2007.

88.     The Prospectus dated September 27, 2006 further stated that "[w]hen the Fund invests in certain derivatives, for example, inverse floaters with 'shortfall' agreements [] and swaps, ***the Fund must segregate cash or readily marketable short-term debt instruments in an amount equal to the obligation.***"   [Emphasis added].   That statement was repeated in the Fund's Prospectuses dated March 9, 2007, and November 28, 2007.   The Statements of Additional Information filed with each of those three Prospectuses described the shortfall and forbearance agreements, in sum and substance, as follows (with only minor variations in language, such as using "reimburse" rather than "pay"):

> The Fund enters into shortfall and forbearance agreements with the sponsors of certain inverse floaters held by the Fund.  These agreements commit the Fund to pay the sponsor of the inverse floater, in certain circumstances, the difference between the liquidation value of the underlying security (which is the basis of the inverse floater) and the principal amount due to the holders of the floating rate security issued in conjunction with the inverse floater (the "shortfall").

89.     Further, each of those Statements of Additional Information stated that "[t]he Manager monitors the Fund's potential exposure with respect to these agreements on a daily basis and intends to take action to terminate the Fund's investment in the inverse floaters, as it deems appropriate."

90.     The statements identified in ¶¶ 86-89 were materially false and misleading for the following reasons, among others:

a.     They failed to disclose that, although the Fund may have limited its investment in inverse floaters to 35 percent of its assets, the inverse floaters were highly leveraged, and could cause the Fund to be forced to sell far more than 35 percent of its assets and, therefore, the Fund's

30

exposure was many times greater than 35 percent of the Fund's asset value.  Moreover, since the Fund materially overstated the reported values of its securities, Defendant's statement that the inverse floater concentration was limited to 35 percent of its assets was materially false and misleading because the actual percentage was higher;

b.      due to their inherent leverage, inverse floaters not only "can" be volatile, they are *certain* to be volatile;

c.      the Fund did not segregate cash or readily marketable short-term debt instruments sufficient to cover its obligations under the inverse floaters, and, therefore, faced the risk of selling, and indeed, to meet those obligations, was forced to sell other illiquid securities at fair market values that were significantly lower than the inflated values reported in the Fund's financial statements; and

d.      the Manager did not monitor the Fund's potential exposure to the shortfall and forbearance agreements, as evidenced by the Fund's failure to segregate liquid assets sufficient to meet its obligations under those agreements.

91.     Similarly, each of the Fund's Statements of Investments included in the Statements of Additional Information throughout the Class Period contained a list of the Fund's holdings, and purported to identify holdings which had been segregated as collateral obligations. These identifications were materially false and misleading for the following reasons, among others:

31

    a.      They materially overvalued the holdings that had been segregated, both disguising the risk to the Fund's other holdings and falsely inflating the net asset value of the Fund; and

    b.      They purported to identify *all* holdings which acted as collateral when in fact, because of the insufficiency of the holdings marked as collateral, other of the Fund's holdings also were at risk of forced sales.

**C.**    **The Prospectuses Contained Materially False and Misleading Statements Regarding the Fund's Investment Strategy**

92.     The Fund's registration statements and Prospectuses issued before and during the Class Period repeatedly misrepresented the fundamental nature of the Fund's investment strategy as "investing in . . . municipal securities." For example, the Fund's Prospectus issued on November 28, 2005 stated that "[t]o seek its investment objective, under normal market conditions, ***the Fund attempts to invest 100% of its assets in municipal securities*** that pay interest exempt from federal individual income tax, and ***as a fundamental policy, the Fund invests at least 80% of its net assets (plus borrowing for investment purposes) in municipal securities.***" [Emphasis added]. Each Prospectus issued during the Class Period contained this language. As demonstrated by the allegations above, these statements were materially false and misleading because the Fund's investment strategy was wholly *inconsistent* with the goal of investing 100 percent of its assets in municipal securities and its fundamental policy of investing a minimum of 80 percent of its net assets in municipal securities. Rather, the Fund had made large substantial investments in non-municipal securities, including by its own admission, investments constituting up to 35 percent of its assets in inverse floaters.

**D.    The Prospectuses Contained Materially False and Misleading Statements Regarding the Value of the Fund's Investments and the Fund's Net Asset Value**

93.    Throughout the Class Period, Defendants negligently stated that Fund securities were valued at "fair value" which was generally determined by one of several methods, such as a closing price on an exchange, the mean between the "bid" and "ask" prices recorded by an exchange, the best judgment of a pricing service, or procedures internal to the Fund and not revealed by the Prospectus.   For example, the Statement of Additional Information that accompanied the Fund's Prospectus filed November 28, 2005, stated:

> SECURITIES VALUATION.   The Fund calculates the net asset value of its shares as of the close of The New York Stock Exchange (the Exchange), normally 4:00 P.M. Eastern time, on each day the Exchange is open for business. *Securities listed or traded on National Stock Exchanges or other domestic exchanges are valued based on the last sale price of the security traded on that exchange prior to the time when the Fund's assets are valued.  Securities traded on NASDAQ are valued based on the closing price provided by NASDAQ prior to the time when the Fund's assets are valued.*   In the absence of a sale, the security is valued at the last sale price on the prior trading day, if it is within the spread of the closing "bid" and "asked" prices, and if not, at the closing bid price. . . .Securities may be valued primarily using dealer-supplied valuations or a portfolio pricing service authorized by the Board of Trustees.   *Securities (including restricted securities) for which market quotations are not readily available are valued at their fair value.*   Foreign and domestic securities whose values have been materially affected by what the Manager identifies as a significant event occurring before the Fund's assets are valued but after the close of their respective exchanges will be fair valued.   *Fair value is determined in good faith using consistently applied procedures under the supervision of the Board of Trustees.*   Short-term "money market type" debt securities with remaining maturities of sixty days or less are valued at amortized cost (which approximates market value).

[Emphasis added].

94.    That same document further stated that long-term debt securities held by the Fund (such as those used as collateral in the creation of inverse floaters) were valued as follows:

> Long-term debt securities having a remaining maturity in excess of 60 days are valued based on the mean between the "bid" and "asked" prices determined by a portfolio pricing service approved by the Fund's Board of

Trustees or obtained by the Manager from two active market makers in the security on the basis of reasonable inquiry.

Securities (including restricted securities) not having readily-available market quotations are valued at fair value determined under the Board's procedures. *If the Manager is unable to locate two market makers willing to give quotes, a security may be priced at the mean between the "bid" and "asked" prices provided by a single active market maker (which in certain cases may be the "bid" price if no "asked" price is available).*

In the case of municipal securities, when last sale information is not generally available, the Manager may use pricing services approved by the Board of Trustees. The pricing service may use "matrix" comparisons to the prices for comparable instruments on the basis of quality, yield and maturity. Other special factors may be involved (such as the tax-exempt status of the interest paid by municipal securities). *The Manager will monitor the accuracy of the pricing services. That monitoring may include comparing prices used for portfolio valuation to actual sales prices of selected securities.*

[Emphasis added].

95.     These statements were repeated in the Prospectuses dated September 27, 2006, March 9, 2007, and November 28, 2007.

96.     The statements identified in ¶¶ 93-95 were materially false and misleading, as evidenced by two separate events.

97.     First, as evidenced by the insufficiency of the Fund's assets that were purportedly segregated as collateral, the Manager did not "monitor the accuracy" of the pricing services the Fund used.  Rather, investments whose value should have been lowered in the Fund's books were not reduced, ultimately damaging the Fund when it lacked sufficient collateral to satisfy its other obligations.   In the course of selling those holdings, the Fund received their true "fair value," which was far less than the value Defendants reported in Fund financial statements that were filed with the SEC.

98.     Second, as the Fund was ultimately forced to disclose pursuant to SFAS 157, there was no ready and active trading market --- and therefore no "bid" and "ask" to use in

34

pricing --- for a single security that the Fund held as of January 31, 2009 and, moreover, contrary to Defendants' statement that "Securities traded on NASDAQ are valued based on the closing price provided by NASDAQ" (*see supra* ¶ 93) not a single of the Fund's holdings traded on NASDAQ or any other national securities exchange.

## VI.   CLASS ACTION ALLEGATIONS

99.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of the Fund traceable to the false and misleading registration statements during the period from March 13, 2006 through October 21, 2008 and were damaged by Defendants' violations of the 1933 Act and the ICA.  Excluded from the Class are Defendants, the Officers and Trustees of the Fund, OppenheimerFunds, Oppenheimer Distributor, and any of the other Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

100.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the OppenheimerFunds or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Fund has millions of outstanding shares.

101.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct as alleged herein.

35

102.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

103.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the 1933 Act was violated by Defendants' acts as alleged herein;

- whether statements contained in the Fund's Prospectuses, registration statements and other materials incorporated therein misrepresented or omitted material facts about the Fund;

- whether the members of the Class have sustained damages and, if so, the proper measure of such damages; and

- whether Defendants caused the Fund to deviate from a fundamental policy that could be changed by a shareholder vote.

104.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I:

### VIOLATIONS OF § 11 OF THE 1933 ACT AGAINST THE FUND TRUSTEES AND/OR SIGNATORIES OF THE REGISTRATION STATEMENTS, OPPENHEIMER MULTI-STATE TRUST, AND <u>OPPENHEIMER DISTRIBUTOR</u>

105.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

36

106.     This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. § 77k, against Defendants Yeutter, Fink, Galli, Griffiths, Miller, Motley, Randall, Reynolds, Jr., Wikler, Wold, Wruble, Downes, Murphy, and Wixted, who served as trustees and/or officers during the Class Period and/or signed one or more of the registration statements (collectively, the "Individual Section 11 Defendants").  It is also brought against Oppenheimer Multi-State Trust, which issued shares, and OppenheimerFunds and Oppenheimer Distributor, which underwrote shares, pursuant to the registration statements.

107.     This Count is not based on and does not sound in fraud.

108.     The Individual Section 11 Defendants signed at least one registration statement issued by Oppenheimer Multi-State Trust during the Class Period, and/or served as a director/trustee or in a similar capacity during the Class Period.  Oppenheimer Multi-State Trust issued securities pursuant to the registration statements issued during the Class Period. Oppenheimer Distributor and OppenheimerFunds underwrote securities pursuant to the registration statements issued during the Class Period.

109.     The registration statements for the Fund contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein.

110.     None of the Section 11 Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the registration statements were true and without omissions of any material facts and were not misleading.

111.     Plaintiffs and the Class acquired the Fund's shares pursuant to a materially false and misleading registration statement.

37

112.     Plaintiffs and the Class have sustained damages in that the value of the Fund's shares has declined substantially from the prices at which they were purchased.

113.     At the time of their purchases of the Fund's shares, Plaintiffs and other members of the Class were without knowledge of the facts concerning the untrue statements or omissions herein and could not have reasonably discovered those facts prior to the date of the filing of this Complaint.

114.     Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that the initial complaint in this action was filed.  Less than three years have elapsed from the time that Plaintiffs purchased the Fund shares upon which this Count is brought to the time the initial complaint was filed.

## COUNT II:

### VIOLATIONS OF SECTION 12(a)(2) OF THE 1933 ACT
### AGAINST DEFENDANTS OPPENHEIMER MULTI-STATE TRUST,
### OPPENHEIMERFUNDS, AND OPPENHEIMER DISTRIBUTOR

115.     Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

116.     This Count is brought pursuant to Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2), on behalf of Plaintiffs and other members of the Class who were offered or sold shares of the Fund as participants in the distribution of the Fund's shares against Defendants Oppenheimer Multi-State Trust, OppenheimerFunds, and Oppenheimer Distributor (the "Section 12(a)(2) Defendants").

117.     This Count is not based on and does not sound in fraud.

118.     The Section 12(a)(2) Defendants offered and sold a security, namely shares of the Fund, by means of the Prospectuses.  The Prospectuses contained untrue and/or misleading statements of material fact, contained material omissions, or omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, or contained material statements of fact that the Section 12(a)(2) Defendants in the exercise of reasonable care should have known were false.

119.     The Section 12(a)(2) Defendants actively solicited the sale of the Fund's shares through the Prospectuses, advertising, and other marketing efforts to serve their own financial interests and are liable to Plaintiffs and Class members pursuant to Section 12(a)(2) of the 1933 Act, as sellers of the shares of the Fund.

120.     At the time they purchased the Fund's shares from the Section 12(a)(2) Defendants, Plaintiffs and other members of the Class did not know that the representations made to them by the Section 12(a)(2) Defendants (in connection with the distribution of shares) and the matters described above were untrue, did not know the above described omitted material facts were not disclosed, and could not have reasonably discovered those facts.

121.     Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that the initial complaint in this action was filed.  Less than three years have elapsed from the time that Plaintiffs purchased the Fund shares upon which this Count is brought to the time the initial complaint was filed.

122.     Pursuant to Section 12(a)(2) of the 1933 Act, Plaintiffs and Class members are entitled to recover, upon tender of the Fund shares they purchased, the consideration paid for the

shares with interest thereon, less the amount of any income received thereon, or damages resulting from the Section 12(a)(2) Defendants' conduct.

123.    Putative Class members who still hold shares of the Fund that were damaged by Defendants' violation of Section 12(a)(2) of the 1933 Act hereby tender those shares in the Fund.

## COUNT III:

### VIOLATIONS OF SECTION 15 OF THE 1933 ACT AGAINST THE INDIVIDUAL DEFENDANTS, MASS MUTUAL AND OPPENHEIMERFUNDS

124.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

125.    This Count is brought pursuant to Section 15 of the 1933 Act against the Individual Defendants, Mass Mutual, and OppenheimerFunds as control persons of the Fund, who violated Sections 11 and Section 12, as described in Counts I and II (the "Section 15 Defendants").

126.    Each of the Individual Defendants was a control person of the Fund by virtue of his or her position as a trustee and/or senior officer of the Fund.  The Individual Defendants were in a position to, and did, control the Fund's operations and disclosures made by the Fund in the registration statements issued during the Class Period.

127.    OppenheimerFunds was a control person of the Fund by virtue of its position as the Fund manager responsible for, among other things, choosing the Fund's investments and handling its day-to-day business.  Mass Mutual was a control person of the Fund by virtue of its ownership of the Fund and ability to exercise control of the Fund.

128.    The Section 15 Defendants are liable, as control persons, for damages caused by the Fund's violations of Section 11 and Section 12.

40

129.     The Section 15 Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the registration statement and Prospectus were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

130.     This claim was brought within one year after the discovery of the untrue statements and omissions in the registration statement and Prospectus and within three years after the Fund's shares were sold to the Class.

131.     By reason of the misconduct alleged herein, for which the Fund is primarily liable, as set forth above, the Section 15 Defendants are jointly and severally liable with and to the same extent as the Fund pursuant to 1933 Act.

## COUNT IV:

## VIOLATIONS OF §13(a) OF THE INVESTMENT COMPANY ACT AGAINST DEFENDANT OPPENHEIMER MULTI-STATE TRUST

132.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

133.     This Count is brought pursuant to Section 13(a) of the Investment Company Act, 15 U.S.C. §80a-13(a), on behalf of the Class, against Oppenheimer Multi-State Trust.

134.     Oppenheimer Multi-State Trust is a registered investment company under the Investment Company Act.  It issued, and caused to be issued, the Relevant Period registration statements that disclosed such policies in respect of concentration of investment policies and investment objectives described herein.

135.     Section 13(a) of the Investment Company Act creates liability for any investment company that, without shareholder approval, "deviate[s] from its policy in respect of concentration of investments" and/or "deviate[s] from any investment policy which is

41

changeable only if authorized by shareholder vote, or deviate[s] from any policy recited in its registration statement….” 15 U.S.C. §80a-13(a).

136.    Defendant did not obtain authorization from a majority of the Fund's outstanding voting shares prior to deviating from the Fund's fundamental investment policies and investment policies that were recited in the Relevant Period registration statements.

137.    Defendant's deviation from the Fund's fundamental investment policies and investment policies that were recited in the Relevant Period registration statements exposed Plaintiffs and the Class to increased risks.

138.    Plaintiffs and the Class sustained damages in that the value of the Fund's shares has declined substantially as a result of the Fund's investments that were made in violations of the Fund's fundamental investment policies and investment policies that were recited in the Relevant Period registration statements and that have cause significant losses to the Fund's net asset value.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the Class, pray for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class with Lead Plaintiff as Class Representative and certifying Lead Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiffs and the other members of the Class damages against Defendants, jointly and severally, together with interest thereon;

42

C.      Awarding Plaintiffs and the other members of the Class rescission on Count II to the extent they still hold Fund shares that were damaged by Defendants' violation of Section 12(a)(2) of the 1933 Act;

D.      Awarding Plaintiffs and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees, experts' fees and other costs and disbursements; and

E.      Awarding Plaintiffs and the other members of this Class such other and further relief as the Court deems appropriate under the circumstances.

## VIII.   DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury.

Dated: January 15, 2010

Respectfully submitted,

/s/ Peter E. Seidman
Sanford P. Dumain (admitted 9/15/08)
Peter E. Seidman (admitted 12/3/09)
Roland W. Riggs (admitted 4/15/09)
Christopher J. Orrico
   (Admission to Bar of the Court Pending)
**MILBERG LLP**
One Pennsylvania Plaza
48th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
E-mail: sdumain@milberg.com
E-mail: pseidman@milberg.com
E-mail: rriggs@milberg.com
E-mail: corrico@milberg.com

*Attorneys for Lead Plaintiff Peter Unanue, Plaintiffs*
*Barry Doyle and Yolanda Pessina, and Lead*
*Counsel for the Class*


Kip B. Shuman
Rusty Glenn
**THE SHUMAN LAW FIRM**
885 Arapahoe Avenue
Boulder, Colorado 80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886
E-mail: kip@shumanlawfirm.com
E-mail: Rusty@shumanlawfirm.com

*Liaison Counsel for Lead Plaintiff*

44

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Consolidated Class Action Complaint and Jury Demand was filed with this Court on January 15, 2010 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies have been sent to those indicated as non-registered participants.

Roland W. Riggs