## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Master Docket No. 09-md-02063-JLK-KMT (MDL Docket No. 2063)

IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION

This document relates to:  *In re New Jersey Municipal Fund*
09-CV-01406-JLK-KMT (Unanue)
09-CV-01617-JLK-KMT (Baladi)
09-CV-01618-JLK-KMT (Seybold)
09-CV-01620-JLK-KMT (Trooskin)

---

## CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND

---

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION .........................................................................................1

II.   JURISDICTION AND VENUE ...................................................................................5

III.  PARTIES ....................................................................................................................6

      Lead Plaintiff ............................................................................................................6

      Defendants ................................................................................................................6

IV.   SUBSTANTIVE ALLEGATIONS ...........................................................................10

      A.    Introduction................................................................................................10

      B.    Defendants Negligently Understated the Percentage Of Fund
            Assets That Were Illiquid And Failed To Disclose That the Fund's
            Illiquid Assets Exceeded the Fund's Purported Limits On Illiquid
            Investments ................................................................................................14

      C.    Defendants Negligently Failed To Disclose the Extraordinary
            Volatility of the Fund's Investments in Complex Derivative
            Instruments................................................................................................18

      D.    Defendants Negligently Misrepresented the Fund's Risk Profile,
            and Failed to Disclose That It Was Wholly Inconsistent with the
            Preservation of Capital..............................................................................23

      E.    Defendants Negligently Overstated the Value of the Fund's Assets
            and Its NAV ...............................................................................................25

      F.    The Concealed Risks Materialized and Damaged Investors......................26

i

V.    THE PROSPECTUSES CONTAINED MATERIALLY FALSE AND MISLEADING
      STATEMENTS AND OMISSIONS .................................................................................28

      A.    The Prospectuses Contained Materially False and Misleading
            Statements Regarding Liquidity ................................................................29

      B.    The Prospectuses Contained Materially False and Misleading
            Statements Regarding Inverse Floaters.....................................................31

      C.    The Prospectuses Contained Materially False and Misleading
            Statements Regarding the Fund's Investment Strategy .............................34

      D.    The Prospectuses Contained Materially False and Misleading
            Statements Regarding the Value of the Fund's Investments and the
            Fund's Net Asset Value .............................................................................35

VI.   CLASS ACTION ALLEGATIONS ..................................................................................37

COUNT I: VIOLATIONS OF § 11 OF THE 1933 ACT AGAINST THE FUND
            TRUSTEES AND/OR SIGNATORIES OF THE REGISTRATION
            STATEMENTS, OPPENHEIMER MULTI-STATE TRUST, AND
            OPPENHEIMER DISTRIBUTOR .......................................................................39

COUNT II: VIOLATIONS OF SECTION 12(a)(2) OF THE 1933 ACT AGAINST
            DEFENDANTS OPPENHEIMER MULTI-STATE TRUST,
            OPPENHEIMERFUNDS, AND OPPENHEIMER DISTRIBUTOR ...................40

COUNT III: VIOLATIONS OF SECTION 15 OF THE 1933 ACT AGAINST THE
            INDIVIDUAL DEFENDANTS, MASS MUTUAL AND
            OPPENHEIMERFUNDS .....................................................................................42

COUNT IV: VIOLATIONS OF §13(a) OF THE INVESTMENT COMPANY ACT
            AGAINST DEFENDANT OPPENHEIMER MULTI-STATE TRUST...............43

VII.  PRAYER FOR RELIEF ....................................................................................................44

VIII. DEMAND FOR TRIAL BY JURY...................................................................................46

ii

iii

Lead Plaintiff, by his attorneys, alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters alleges the following upon information and belief based upon the investigation of his attorneys, including review and analysis of Oppenheimer New Jersey Municipal Fund's filings with the U.S. Securities and Exchange Commission ("SEC"), published news reports, analyst reports, press releases, and industry data. Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.   <u>NATURE OF THE ACTION</u>

1.      Lead Plaintiff, Victor Sasson ("Lead Plaintiff" or "Sasson"), brings this securities action on behalf of himself and all persons or entities who purchased or otherwise acquired shares of the Oppenheimer New Jersey Municipal Fund ("NJ Muni Fund" or the "Fund") during the period from April 24, 2006 through October 21, 2008, inclusive (the "Class Period").  Lead Plaintiff brings claims pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act" or the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o and Section 13(a) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-13(a) .

2.      NJ Muni Fund is an open-end mutual fund that, before and throughout the entire Class Period, explained its objective this way:  **"The Fund seeks as high a level of current interest income exempt from federal and New Jersey income taxes for individual investors as is consistent with preservation of capital."**  Elsewhere in its sales material, Defendants stated that "preservation of capital" was at all relevant times a "fundamental policy" of the Fund that could not be altered without shareholder approval.  Defendants characterized the Fund's risk profile as follows: "**In the OppenheimerFunds spectrum, the Fund is more conservative**

**than some types of taxable bond funds, such as high yield bond funds, but has greater risks than money market funds."**

3.      These and other statements that Defendants made in connection with selling the Fund were materially false and misleading because they:  (a) grossly understated the percentage of the Fund's illiquid assets and the Fund's above-average liquidity risk; (b) failed to disclose that the safeguards that purportedly limited the Fund's investment in illiquid assets were ineffective, and that, consequently, the Fund's investment in illiquid assets exceeded its purported limits; (c) grossly overvalued the Fund's assets and overstated the Fund's NAV; (d) failed to disclose that the Fund's success depended on steady or falling interest rates and a robust market appetite for the risky securities in which the Fund was heavily invested; (e) failed to disclose the extraordinary volatility of the Fund's investments in complex inverse floating rate securities ("inverse floaters"); and (f) stated that the Fund's investments were consistent with its attempt to preserve capital, when, in fact, the investments were un-hedged, highly leveraged bets against interest rate increases and were highly vulnerable to regularly occurring shifts in the capital market's willingness to take on risk.

4.      Inverse floaters, moreover, were a significant and dangerous feature of the Fund's investment strategy.  The coupon (or coupon rate) of an inverse floater varies inversely with the level of specified short-term interest rates; as those rates rise, the payment made on the inverse floater falls (hence the name *inverse* floaters).  While this inverse coupon is the most noticeable feature of the inverse floater, and an important one, it is not the key feature.  Rather, the key feature of an inverse floater is that it is actually the equivalent, in terms of risk and payoff, of simultaneously borrowing short-term funds and using them to buy a long-term bond.  This strategy of "borrow short-lend long" has failed time and again, in many markets, over many

2

decades, often with great damage to individual investors.  The main driver of this strategy's risk is the mismatch in the lives of assets and liabilities that constitute the combined position, and, as set forth herein, that mismatch is at the very center of an inverse floater.

5.       In this case, Lead Plaintiff and a class of similarly situated Fund investors were damaged when the undisclosed risks of the Fund's inherently and highly leveraged investments in inverse floaters were realized as the interest rates required of municipal securities began to increase in 2007 and, especially, late 2008.  The Fund's extensive investments in unrated, illiquid, and BBB-rated securities made the Fund especially vulnerable to credit contractions and concomitant interest rate increases. The increase in interest rates not only severely reduced the coupons and prices of the inverse floaters, but it also triggered obligations to counter-parties that had to be satisfied, which the Defendants could do only by selling at least some of the Fund's illiquid assets at fair market value prices that were far lower than the value attributed to them in the Fund's financial statements. Concomitantly, Defendants were forced to write down the Fund's holdings, finally admitting to investors that those holdings were, and throughout the Class Period had been, worth far less than the value at which they were being carried on the Fund's financial statements.  Thus, the Net Asset Value ("NAV") of the Fund was damaged in two distinct but related ways:  (a) the Fund's assets, which were overstated throughout the Class Period, had to be written down to reflect their proper values; and (b) what value the Fund's assets did have was further reduced by the materialization of previously concealed risks related to inverse floaters, which forced Defendants to sell Fund assets at fire-sale prices, *i.e.* the Fund sold assets at fair market prices that were lower than the overstated values reported by the Fund in its SEC filings.  Thus, investors were damaged by the very facts that Defendants misrepresented and/or concealed.

3

6.     The truth about the Fund's assets did not emerge until October 21, 2008 when Defendants issued a prospectus supplement ("Prospectus Supplement") that, as detailed herein, revealed the Fund's previously undisclosed liquidity and interest rate risks.  By then, however, these risks had come to pass, and the damage was almost entirely done: On October 21, 2008, as the Prospectus Supplement was issued, NJ Muni Fund shares had a stated NAV of about $7.90 per share, down from a high of $12.32 during the Class Period, and about 29 percent lower than the $11.17 per share stated NAV at the start of the year.  This decrease in NAV was dramatically greater than that experienced by comparable funds included in Morningstar's "Muni New Jersey" category.[1]  In 2008, the Fund's stated NAV dropped between 38.05 percent and 38.14 percent (depending on share class) while other funds in the Morningstar Muni New Jersey category dropped an average of 10.47 percent (class A shares), 9.17 percent (class B shares), and 11.39 percent (class C shares).  Attached as Exhibit A is a chart showing the percentage changes in the Fund's NAV (class A shares), and in those of other funds (class A shares) within the category.  Indeed, at returns of negative 4.7 to negative 5.6 percent (depending on the share class) in the year 2007 and of negative 34.2 to negative 34.7 percent in the year 2008, the Fund was by far the worst performer of the entire Muni New Jersey category.

7.     The drop in the Fund's NAV was not caused by general economic decline or upheaval in the credit markets but, rather, by Defendant's risky failure to adhere to the Fund's fundamental investment policies and objectives.  This failure left the Fund extremely vulnerable to inevitable and frequent cycles of financial crisis.  In just the past 20 years, such crises include the 1994 devaluation of the Mexican Peso and ensuing credit tightening; the 1997 Asian financial crisis; Russia's 1998 default on government bonds resulting in Japanese and European

---

[1] Morningstar is an investment advisory service that specializes in rating mutual funds.

bond market panics; and the deterioration of capital markets and crisis in confidence in interbank lending caused by the September 11, 2001 terrorist attacks.  Thus, the occurrence of another credit crisis was not an unforeseeable risk and, had Defendants' investment policies been truly guided by the Fund's purported investment objective, the Fund would have been protected from, instead of vulnerable to, such crises, including the crisis of 2007-2008.

## II.   JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the 1933 Act and Section 13(a) of the ICA.  In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including without limitation the mails, interstate telephone communications and the facilities of the national securities markets.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, § 22 of the 1933 Act, 15 U.S.C. § 77v, and Section 44 of the ICA, 15 U.S.C. § 80a-43.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as key defendants maintain their principal executive offices in this District, and many of the acts giving rise to the violations of law complained of herein occurred in substantial part in this District, and some of the defendants maintain residences in this district.  Further, by order dated June 17, 2009, the Judicial Panel on Multidistrict Litigation transferred this action to this Court.

### III.   PARTIES

**Lead Plaintiff**

11.   By order dated November 18, 2009, the Court appointed Victor Sasson Lead Plaintiff pursuant to 15 U.S.C. §77z-1(a)(3)(B).  Victor Sasson purchased and held shares of the Fund during the Class Period pursuant or traceable to one or more of the registration statements and Prospectuses at issue in this complaint, and has been damaged thereby.  Lead Plaintiff's Class Period transactions in NJ Muni Fund shares are identified in the certifications attached to this complaint as Exhibit B.

**Defendants**

12.   Defendant OppenheimerFunds, Inc. ("OppenheimerFunds" or "the Manager") is the manager and investment advisor of NJ Muni Fund.  It chooses the Fund's investments and controls its day-to-day business.  It is a holding company that engages in securities brokerage, banking services and related financial services through its subsidiaries.  OppenheimerFunds is headquartered at Two World Financial Center, 225 Liberty Street, New York, New York 10281-1008.  The Manager carries out its duties, subject to the policies established by the Fund's Board of Trustees, under an investment advisory agreement.  OppenheimerFunds is owned by its senior management and Defendant Massachusetts Mutual Life Insurance Company.

13.   Defendant Oppenheimer Multi-State Municipal Trust, a Massachusetts Business Trust, is registered under the ICA and is the registrant and issuer (the "Issuer") for each series of the Fund's shares and filed each one of the Fund registration statements alleged herein to be misleading.  The Issuer is headquartered at 6803 South Tucson Way, Centennial, Colorado.

14.   Defendant OppenheimerFunds Distributor, Inc. ("Oppenheimer Distributor" or the "Distributor") located at Two World Financial Center, 225 Liberty Street, New York, New

6

York 10281-1008, is a subsidiary of the Manager and was, at all relevant times, the principal underwriter and distributor of shares of the Fund and was its agent for the purpose of the continuous public offering of the Fund's shares.

15.     Defendant Massachusetts Mutual Life Insurance Company ("Mass Mutual") describes itself as a global, diversified financial services organization that is organized as a mutual life insurance company.  Through its wholly owned subsidiary, Oppenheimer Acquisition Corp., Mass Mutual owns and controls OppenheimerFunds.  According to the Manager's current Form ADV (Uniform Application for Investment Advisor Registration) filed with the SEC, Mass Mutual is a "control person" of the Manager, meaning that Mass Mutual has the power to direct or cause the direction of the management or policies of the Manager, whether through ownership of securities, by contract or otherwise.  Mass Mutual is a Delaware corporation and is headquartered at 1295 State Street, Springfield, MA.

16.     Defendant John V. Murphy ("Murphy") is, and at all relevant times was, President and Trustee of NJ Muni Fund.  Defendant Murphy is also Chairman, Chief Executive Officer, Director and President of the Manager.  Defendant Murphy signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

17.     Defendant Matthew P. Fink ("Fink") was a Trustee of NJ Muni Fund from 2005, and signed, individually or through an agent, the registration statements issued by the Fund on March 2, 2007 and November 21, 2007.

18.     Defendant Robert G. Galli ("Galli") was a Trustee of NJ Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

7

19.     Defendant Phillip A. Griffiths ("Griffiths") was a Trustee of NJ Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

20.     Defendant Mary F. Miller ("Miller") was a Trustee of NJ Muni Fund from 2004, and signed, individually or through an agent, the registration statements issued by the Fund on March 2, 2007 and November 21, 2007.

21.     Defendant Joel W. Motley ("Motley") was a Trustee of NJ Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

22.     Defendant Kenneth A. Randall ("Randall") was a Trustee of NJ Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

23.     Defendant Russell S. Reynolds, Jr. ("Reynolds") was a Trustee of NJ Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

24.     Defendant Joseph M. Wikler ("Wikler") was a Trustee of NJ Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

25.     Defendant Peter I. Wold ("Wold") was a Trustee of NJ Muni Fund during the Class Period, and signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

26.     Defendant Brian F. Wruble ("Wruble") was a Trustee of NJ Muni Fund during the Class Period and Chairman of the Board of Trustees since January 1, 2007, and signed,

8

individually or through an agent, the registration statements issued by the Fund during the Class Period.

27.     Defendant Clayton K. Yeutter ("Yeutter") was Chairman of the Board of Trustees for NJ Muni Fund from the beginning of the Class Period through December 31, 2006.[2] Defendant Yeutter signed, individually or through an agent, the November 28, 2005 and September 27, 2006 registration statements issued by the Fund during the Class Period.

28.     Defendant David K. Downes ("Downes") was a Trustee of NJ Muni Fund from August 1, 2007, and signed, individually or through an agent, the registration statement issued on November 21, 2007 by the Fund during the Class Period.

29.     Defendant Brian W. Wixted ("Wixted") was Treasurer and Principal Financial and Accounting Officer of NJ Muni Fund during the Class Period.  Defendant Wixted signed, individually or through an agent, the registration statements issued by the Fund during the Class Period.

30.     Defendant Ronald H. Fielding ("Fielding") led the Rochester Team and was a Vice President and a Senior Portfolio Manager of the Fund during the Class Period.  In addition, Defendant Fielding has been a Senior Vice President of the Manager since January 1996 and Chairman of the Rochester Division of the Manager since January 1996.  He is a portfolio manager and officer of other Oppenheimer funds.  Defendant Fielding is the chief strategist and a trader for the Fund and other Oppenheimer funds.  He participated in the drafting of the Prospectuses pursuant to which the Fund was sold.

---

[2] Defendant Yeutter retired from his position as Chairman of the Board of Trustees effective December 31, 2006 and was replaced by Defendant Wruble on January 1, 2007.

31.     Defendant Daniel G. Loughran ("Loughran") was a member of the Rochester Team and a Senior Portfolio Manager of the Fund during the Class Period.  He has been a Vice President of the Manager since April 2001.  He participated in the drafting of the Prospectuses pursuant to which the Fund was sold.

32.     Defendant Scott Cottier ("Cottier") was a member of the Rochester Team and a Portfolio Manager of the Fund during the Class Period.  He has been a Vice President of the Manager since 2002.  He participated in the drafting of the Prospectuses pursuant to which the Fund was sold.

33.     Defendant Troy E. Willis ("Willis") was a member of the Rochester Team and a Portfolio Manager of the Fund during the Class Period.  He has been an Assistant Vice President of the Manager since 2005.  He participated in the drafting of the Prospectuses pursuant to which the Fund was sold.

34.     The defendants referenced above in ¶¶ 16 - 33 are herein referred to as the "Individual Defendants."

35.     The defendants referenced above in ¶¶ 12 - 33 are collectively referred to as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Introduction

36.     Defendants described the NJ Muni Fund as an open-end non-diversified management investment company.  The Fund's objective, as Defendants stated it in Fund Prospectuses, is to seek "as high a level of current interest income exempt from federal and New Jersey income taxes for individual investors as is consistent with preservation of capital."

10

37.     The Fund invests in what Defendants label "New Jersey municipal securities." As defined by the Fund, "New Jersey municipal securities" includes securities issued by entities other than New Jersey.  In this regard, the Prospectus states:

> New Jersey municipal securities are municipal securities that are not subject to New Jersey personal income tax in the opinion of bond counsel to the issuer at the time the security is issued. They include obligations issued by the State of New Jersey and its political subdivisions. ***They also may include debt obligations of the governments of certain possessions, territories and commonwealths of the United States if the interest is not subject to New Jersey personal income tax. The Fund can also buy other municipal securities issued by the governments of the District of Columbia and of other states, as well as their political subdivisions, authorities and agencies, and securities issued by any commonwealths, territories or possessions of the United States, or their respective agencies, instrumentalities or authorities, if the interest paid on the security is not subject to federal personal income tax (in the opinion of bond counsel to the issuer at the time the security is issued).*** Municipal securities are issued to raise money for a variety of public or private purposes, including financing state or local governments, financing specific projects or financing public facilities.  [Emphasis added].

38.     The Fund represented that 75 percent of the securities it buys must be investment-grade.  The Prospectuses define "investment grade" as "those rated within the four highest rating categories of Moody's, Standard & Poor's, Fitch Inc. or another nationally recognized statistical rating organization."  According to the Prospectuses, however, the "Investment Grade" securities also include ***unrated*** securities that nevertheless were "judged by the Manager to be comparable to rated investment grade securities."   Neither the Prospectuses nor any other publication disclosed the Manager's method for making this crucial judgment.  And no record of the method's success in accurately evaluating the credit risks of the unrated bonds was ever produced, or even offered.

11

39.     NJ Muni Fund is sold in three classes of shares, A, B, and C, under the ticker symbols ONJAX, ONJBX, and ONJCX, respectively, on the National Association of Securities Dealers Automated Quotations (NASDAQ) system.  All share classes were offered in the same Prospectuses, invested in the same portfolio, and traded at nearly identical prices at all relevant times.

40.     As an open-end mutual fund, the Fund allows for continuous sales and redemptions of its shares at a stated net asset value (NAV) that is determined by dividing the total stated value of assets held by the Fund by the total number of shares outstanding.  The offering or sales of the Fund's shares are pursuant to registration statements and Prospectuses that Defendants amended periodically.  The shares were offered for sale by OppenheimerFunds, which also served as fund manager and investment advisor for the Fund, and Oppenheimer Distributor, which also served as the distributor of the Fund.

41.     The Fund's registration statements, Prospectuses, and statements of additional information ("SAI"), which were incorporated by reference into the registration statements and Prospectuses (collectively, "Prospectuses"), were issued on the following dates, among others:

  a.     Prospectus and SAI dated November 28, 2005 (filed with the U.S. Securities and Exchange Commission ("SEC") on SEC Form N-1A), supplemented on December 6, 2005 (filed on SEC Form 497);

  b.     Prospectus and SAI dated September 27, 2006 (filed on SEC Form N-1A);

  c.     revised Prospectus and revised SAI dated March 2, 2007 (filed on SEC Form N-1A); and

  d.     Prospectus and SAI dated November 28, 2007 (filed on SEC Form N-1A), supplemented on October 21, 2008 (filed on SEC Form 497).

12

42.     Each of the Prospectuses stated that the Fund cannot alter its fundamental investment policies without shareholder approval:

> Fundamental policies cannot be changed without the approval of a majority of the Fund's outstanding voting shares. The Fund's investment objective is a fundamental policy.

43.     The Prospectuses contained many materially false and misleading statements and omissions. Specifically, the Prospectuses were materially false and misleading, among other reasons, because they: (a) grossly understated the percentage of the Fund's illiquid assets and the Fund's above-average liquidity risk; (b) failed to disclose that the safeguards that purportedly limited the Fund's investment in illiquid assets were ineffective and that, consequently, the Fund's investments in illiquid assets exceeded its purported limits; (c) grossly overvalued the Fund's assets and overstated the Fund's NAV; (d) failed to disclose that the Fund's success depended on steady or falling interest rates and a robust market appetite for the risky securities in which the Fund was heavily invested; (e) failed to disclose the extraordinary volatility of the Fund's investments in inverse floating rate securities; and (f) stated that the Fund's investments were consistent with its commitment to preserve capital, when, in fact, the investments were highly leveraged bets against interest rate increases and highly vulnerable to regularly occurring shifts in the capital market's willingness to take on risk.

44.     In reality, the Fund's exposure to serious losses from rises in interest rates, on the one hand, and its substantially illiquid portfolio, on the other hand, constituted a volatile mixture that ignited when counter-parties to the complex transactions that gave rise to the "inverse floaters" exercised a put option allowing them to sell their positions back to the Fund at par.  To meet this obligation, Defendants had to sell Fund assets at fair market prices that were materially

less than their recorded value, thereby revealing that Defendants had materially overvalued Fund assets throughout the Class Period.

45.     At no time during the Class Period did the Fund seek, let alone obtain, shareholder approval to alter or modify its investment objective or any of its investment policies concerning leverage, liquidity, credit quality or investments in derivative securities, including inverse floaters.  Notwithstanding the Fund's failure to secure shareholder approval to change its fundamental policies, the Fund embarked on risky investment strategies that were at odds with its primary investment objective of preservation of capital, by investing in illiquid bonds and highly leveraged inverse floaters as speculative bets against rising interest rates. Moreover, the Fund's stated investment objective of preservation of capital implied that the Fund would assemble a portfolio of securities that was designed to weather what can only be termed the inevitable periods of turbulence in capital markets.  However, the Fund's investments in inverse floaters caused the Fund to be far more vulnerable to economic cycles than other mutual funds oriented to New Jersey tax-payers, which resulted in a material decline in the Fund's NAV.

**B.     Defendants Negligently Understated the Percentage Of Fund Assets That Were Illiquid And Failed To Disclose That the Fund's Illiquid Assets Exceeded the Fund's Purported Limits On Illiquid Investments**

46.     In Prospectuses issued before and throughout the Class Period, Defendants made numerous materially false and misleading statements about the liquidity of the Fund's holdings, as more fully alleged herein.

47.     Liquidity is important for at least two reasons.  First, liquid assets can be sold on relatively short notice without taking a material discount from the values reported in financial statements filed just prior to the asset sale.  Second, because illiquid assets are not actively

14

traded, they cannot be valued by reference to readily verifiable pricing data or other observable price inputs.  In both regards, illiquid assets radically differ from liquid securities.

48.     *Revision of Liquidity Test in Guidelines to Form N-1A*, promulgated by the SEC, limits mutual funds' holdings of illiquid assets.  This regulation defines an "illiquid asset" as "an asset which may not be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the mutual fund has valued the investment on its books." 17 CFR 239 and 274 [Fed.Reg. Vol. 57, No. 55 at 9829, Release No. 33-6927; IC-18612] (Mar. 20, 1992).

49.     Assets are considered liquid if they can be readily disposed of at a price reflecting the value attributed to the assets in the Fund's financial statements.  As the Fund's Prospectuses state, "[i]nvestments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price."

50.     Similarly, in the analogous context of money market funds, which also purport to preserve capital, the SEC has stated that "[t]he term 'illiquid security' generally includes any security which cannot be disposed of promptly and in the ordinary course of business without taking a reduced price.  A security is considered illiquid if a fund cannot receive the amount at which it values the instrument within seven days." *See* 51 FR 9773.

51.     Likewise, GAAP Statement of Financial Accounting Concepts No. 5 states that liquidity is tied to "financial flexibility," and that "[l]iquidity reflects an asset's or liability's nearness to cash.  Financial flexibility is the ability of an entity to take effective actions to alter amounts and timing of cash flows so it can respond to unexpected needs and opportunities."  In other words, liquidity is an important determinant of whether an entity can timely react to changing market conditions without incurring substantial harm.

52.     Throughout the Class Period, Defendants sought to reassure investors by purporting to identify, with specificity, which of the Fund's assets were illiquid.  Specifically, Defendants periodically issued Statements of Investments that were incorporated by reference in the Prospectuses. Certain of the investments in those Statements of Investments referenced a footnote that identified them as being illiquid and purported to provide the total dollar amount and percentage of the Fund's illiquid assets at a given date.  For example, the Statement of Investment incorporated as part of the March 2, 2007 Prospectus contained this passage:

> Illiquid security.  The aggregate value of illiquid securities as of July 31, 2006 was $20,225, which represents less than 0.005% of the Fund's net assets.  See Note 5 of Notes to Financial Statements.

53.     Many of the Fund's ***illiquid*** investments, however, did ***not*** receive the crucial footnote  designation --- *i.e.,* they were ***not*** identified as being illiquid --- even though they went for months without being traded and carried other hallmarks of illiquidity.  This omission was misleading because: (a) once Defendants purported to identify all illiquid investments, investors reasonably believed that those not so identified were actually liquid, when in fact many of them were not; and (b) by understating the Fund's illiquid securities, Defendants overstated the extent to which the Fund could react to changing market conditions and sell its securities for values it was claiming.  Both misleading actions made the Fund appear to be a far safer investment than it actually was.

54.     For example, Defendants stated in the Fund's Statement of Investments in the Prospectus dated November 28, 2007, that 4.32 percent of the Fund's net assets were invested in a bond issued by the NJ Health Care Facilities Financing Authority (Catholic Health East/Mercy Medical/McCauley Center Obligated Group) as of July 31, 2007.  Although not designated as such, that bond was illiquid.  Evidence of the illiquidity is that the security traded on the

16

secondary market only 15 times, and on just nine separate days, during the 18 months between its issuance on April 19, 2007 and the end of the Class Period on October 21, 2008. Similarly, Defendants did not identify the bond issued by Port Authority NY/NJ, 143rd Series as illiquid, even though this bond ***never*** traded between April 27, 2006 and the end of the Class Period on October, 21, 2008. According to the Fund's Statement of Investments found in the Prospectus dated November 28, 2007, this bond represents 1.2 percent of the value of the Fund's net assets as of July 31, 2007.

55.     Another example is the NJ Educational Facilities Authority (Fairleigh Dickinson University), Series D. This holding represented 1.8 percent of the Fund's net assets as of July 31, 2007 according to the Fund's Statement of Investments found in the Prospectus dated November 28, 2007. This bond was not designated as illiquid, even though it traded only 12 times on the secondary market, on just six separate days, during the entire 2.5-year Class Period. Still another example of the Fund's misleading activity in this regard was a bond issued by the NJ EDA (Pingry School). This holding represented .99 percent of the Fund's net assets as of July 31, 2007, based on the Fund's Statement of Investments found in the Prospectus dated November 28, 2007. This bond was not designated as illiquid, even though it ***never*** traded on the secondary market during the entire 2.5-year Class Period.

56.     These assets, and others with similar trading and/or ownership patterns, are not liquid under any of the criteria for liquidity set forth above. Indeed, they meet the Fund's own definition of "illiquid" assets because they "***do not have an active trading market***, making it difficult to value them or dispose of them promptly at an acceptable price." [Emphasis added].

57.     Defendants stated in the Prospectuses that the Fund's Manager monitored the liquidity of the Fund's holdings but, unbeknownst to investors, this statement was materially

17

false and misleading.  In fact, either the Fund Manager did not adequately monitor the liquidity of the Fund's holdings, as Defendants stated, or, it monitored its holdings but failed to classify certain obviously illiquid securities as such.  Based on a review of just the Fund's top 62 out of 338 holdings, the aggregate value of illiquid securities held as of July 31, 2008 represented at least 25.21 percent of the value of the Fund's net assets.  When combined with the 4.98 percent of the Fund's net assets that are correctly marked as illiquid holdings in the Certified Shareholder Report for the period ending July 31, 2008, the Fund held at least 30.19 percent of its net assets in illiquid securities as of July 31, 2008.  (The likelihood that some of its smaller holdings are also illiquid increases the Fund's failure in this critical regard.)  Clearly, the Fund's investments in illiquid assets substantially exceeds its purported 15 percent limit on such investments. Therefore, Defendants' claim that --- as of July 31, 2008 --- the Fund's investment in illiquid assets was limited to 4.98 percent was materially false and misleading because a minimum of 30 percent of the Fund's assets were illiquid.

**C.      Defendants Negligently Failed To Disclose the Extraordinary Volatility of the Fund's Investments in Complex Derivative Instruments**

58.      Defendants stated in the Prospectuses that, during the Class Period, the NJ Muni Fund would invest no more than 20 percent of its assets in highly complex and volatile derivative instruments known as municipal inverse floating rate securities ("inverse floaters").  Municipal inverse floaters are securities that pay a tax-exempt coupon (or interest rate) that moves inversely with changes in a prominent and referenced short-term interest rate, such as an interest rate linked to the Bond Market Association Municipal Swap Index ("BMA Index") or some other short-term pricing mechanism.  Most of the inverse floaters owned by the Fund were created by the Fund in a way to be described below; the Fund was also free to buy inverse floaters created or issued by other financial institutions.

18

59.     As illustrated by Exhibit C, attached hereto, the inverse floaters that the Fund tended to own typically arose from a cluster of interrelated transactions collectively referred to as a "tender option bond program" that usually was structured by an investment bank  known, in this context, as a "Sponsor."  The Sponsor would create a Trust into which the Fund would place a long-term municipal bond that it had purchased.  Then the Trust would issue two classes of securities:

- **Floating rate securities (floaters)**: The Trust would sell these to third parties and use the proceeds of the sale to fund the position in the long-term municipal bond referenced above.  The floater pays coupons at a money market rate that varies positively with a referenced and prominent short-term interest rate. The Trust would pay the floater coupon from the periodic coupon paid on the underlying long-term municipal bond.  Holders of the floaters have the right to periodically (typically every week, but daily in some cases) tender the floaters for redemption at par value.

- **Inverse floating rate securities (inverse floaters):** The Trust would also issue inverse floaters to the Fund.  The coupon received by the Fund on the inverse floaters is the difference between the long-term interest payments generated by the municipal bond and the short-term interest paid on the floaters. Because they receive all income not used to pay interest on the companion floaters (and some expenses), inverse floaters are sometimes referred to as "residuals."

60.     Different inverse floaters --- whether created or purchased by the Fund --- have different degrees of *leverage*, which is determined by the ratio of the dollar size of the floater to

19

the dollar size of the inverse floater.  The sum of the floater and inverse equals the dollar value of the underlying municipal bond.  As the ratio of the floater's dollar size to the inverse floater's dollar size increases, so does the leverage --- and, thus, the price volatility --- of the inverse floaters.  Notably, not one of the Prospectuses that the Fund issued during the Class Period discussed or even revealed the range (or average) of the leverage of the inverse floaters that the Fund created or purchased.

61.    More than simply failing to disclose the mathematically certain fact that inverse floaters are much more price-volatile than otherwise similar debt securities, the Prospectuses actually suggested that inverse floaters might *not* be more volatile.  For example, the November 21, 2007 Prospectuses states, misleadingly, that "The market value of inverse floaters *can be* more volatile than that of a conventional fixed-rate bond having similar credit quality, redemption provisions, and maturity." [Emphasis added].  By stating that inverse floaters *can be* more volatile, Defendants concealed the fact that inverse floaters are *necessarily* more volatile than conventional bonds with similar maturities, credit quality, and other relevant provisions.  By suggesting that some of its inverse floaters might have the same price stability as otherwise comparable bonds, Defendants, in the Prospectuses, falsely and misleadingly made the Fund appear to be a safer investment than it really was.

62.    The inverse floaters that the Fund created and owned carried additional material risks.  The arrangements creating the inverse floaters allowed the holders of the floaters to "put" them back to the Trust at any time, usually with seven days' notice.  (This characteristic met regulatory requirements for the floaters to be held by money-market mutual funds.)  Using this put option, the holder of the floater could sell it back to the Trust and demand *par value or full and undiscounted face value in exchange*.  If the Sponsor could not re-sell the tendered floaters,

20

it had the right to collapse the Trust by causing all outstanding floaters to be tendered for par and selling the municipal bond held in the Trust to meet the Trust's outstanding obligations (*i.e.* to pay the holders of the floaters the par value to which their put option entitled them).  If municipal rates were rising and bond prices falling --- which would likely result in widespread tendering of the floaters --- the Fund would be in the difficult position of liquidating the underlying bond at unfavorable prices.  Thus, the funding of a long-term bond with short-term financing (via the puttable floater) was a strategy that was starkly incompatible with the objective of "preserving capital."

63.     Another complicating and risk-enhancing practice of the Fund was to enter into "shortfall and forbearance" agreements with the Sponsor regarding the creation of a floater and an inverse floater.  With this agreement, which was part of certain inverse floater agreements, the Fund obligated itself to reimburse the Sponsor (and, through it, the holder of the floater) for any difference between the liquidation value of the underlying security and the par value of a tendered floater.

64.     In other words, a shortfall and forbearance agreement obligated the Fund to make up any difference between the market value of the collateral (*i.e.* long-term municipal bond originally placed in the Trust to create the floater and companion inverse floater) and the par value of the floater.  If such a situation were to arise, the Fund would be forced to sell the underlying bond as well as other securities from its portfolio to satisfy its contractual obligations, regardless of market conditions.  Thus, to raise the capital required to meet its obligations under these risky floater agreements, securities that the Fund may have intended to hold for long periods of time, or which were at any particular moment out of favor with the market and

21

slipping in value, would nevertheless have to be sold at fair market values that were materially lower than the inflated values reported in the Fund's SEC filings.

65.     Thus, the supposedly long-term inverse floaters created by the Fund --- with reported maturities of 20 to 30 years --- were in reality short-term arrangements whereby the Fund purchased long-term bonds with revolving and potentially mercurial loans that the Fund could be forced to repay at any time, with only seven days notice.  The mismatched maturities of short-term borrowing and long-term assets exposed the Fund to massive risks, because the strategy effectively converted the stable, long-term bonds typically sought by investors in purportedly capital-preserving municipal bond funds into extremely volatile and leveraged short-term instruments.  In short, this undisclosed strategy traded the relative safety of conventional municipal bonds, which could be held for a long time and particularly through periods of market turbulence, for just the possibility of risk-induced higher returns in the short run.

66.     Additionally, unbeknownst to investors, even when the Fund had not entered into shortfall and forbearance agreements, the Sponsor had the right to --- and often did --- require the Fund to provide more collateral if the Sponsor believed that the underlying collateral was insufficient to meet the potential obligations that could arise to the holders of the floaters.

67.     Finally, the pervasive illiquidity of the Fund's portfolio actually served to augment the already large risks of the inverse floaters.  By layering risk upon risk, the Fund rendered itself completely ill-equipped to meet its contractual obligations related to inverse floaters, and placed itself entirely at the mercy of unpredictable movements in interest rates as well as recurring crises in capital markets.  This state of affairs, and the significant financial risk to which the Fund was exposed, were not disclosed.

**D.    Defendants Negligently Misrepresented the Fund's Risk Profile, and Failed to Disclose That It Was Wholly Inconsistent with the Preservation of Capital**

68.    For investors, "preservation of capital" has a specific meaning: preventing loss of principal.  *Forbes Investopedia* defines "preservation of capital" as "[a]n investment strategy whose primary goal is to prevent the loss of an investment's total value."  Similarly, according to Bloomberg, "preservation of capital" refers to "[a]n investment with the goal of securing the value of the principle [sic] by avoiding speculative situations."

69.    *Standard & Poor's Guide to the Perfect Portfolio* recommends that investors employ capital preservation strategies, if "[y]ou do not want the principal in your accounts to decline in value."  For these investors, "[s]afety is your number one goal.  You sacrifice high returns to keep the value of your portfolio stable.  Your upside is very modest but your downside is also very modest.  Capital protection, not appreciation, is your motto."  *Standard & Poor's Guide* also describes critical features of a capital preservation strategy:  "Capital preservation and liquidity go hand in hand. . . . Any asset that can fall in value should not be included in this conservative strategy.  .  .  .  The appropriate [capital preservation] fund would have the characteristics of low positive returns, very low risk, and extremely low price fluctuations. . . . Any asset that is not guaranteed to maintain its value should not be held."

70.    Defendants held the Fund out to investors as a capital preservation fund.  The September 2006 Prospectus described the Funds' investment objective and strategies as follows:

> ABOUT THE FUND
>
> The Fund's Investment Objective and Principal Investment Strategies
>
> WHAT IS THE FUND'S INVESTMENT OBJECTIVE?   The Fund seeks as high a level of current interest income exempt from federal and New Jersey income taxes for individual investors as is consistent with preservation of capital.

23

71.     The September 2006 Prospectus stated, "The Fund's investment objective is a fundamental policy."   In accordance with Section 13(a) of the ICA, the September 2006 Prospectus explained, "Fundamental policies cannot be changed without the approval of a majority of the Fund's outstanding voting shares."

72.     Consistent with the Fund's investment objective, the September 2006 Prospectus represented that "[t]he Manager tries to reduce risks by selecting a wide variety of municipal investments and by carefully researching securities before they are purchased."   While acknowledging some risks associated with investing in the Fund, the September 2006 Prospectus emphasized its conservative nature:   "In the OppenheimerFunds spectrum, the Fund is more conservative than some types of taxable bond funds, such as high yield bond funds, but has greater risk than money market funds."

73.     The Fund's March 2007 Prospectus and November 2007 Prospectus contained identical statements about the Fund's investment objective and strategies, fundamental policies, and efforts to reduce risks as did the September 2006 Prospectus.

74.     As alleged more fully above, the Fund invested in volatile inverse floaters and in illiquid securities, both of which investments are wholly inconsistent with the Fund's purported objective of preserving capital in a mutual fund from which investors can and often must withdraw sums regularly.   Moreover, the Fund's exposure to these investments was not merely incidental, but rather, a very significant part of the Fund's investment strategy.

75.     Thus, rather than attempting to achieve as high an income as consistent with the preservation of capital, which would have entailed investing in "low volatility, highly liquid" assets, the Fund employed a strategy designed to enhance returns through risky investments in highly volatile and/or illiquid assets --- individually and in combination --- that created an

24

undisclosed risk of loss.  The Fund's investment strategy, therefore, was not consistent with the preservation of capital.

**E.      Defendants Negligently Overstated the Value of the Fund's Assets and Its NAV**

76.      Throughout the Class Period, the Defendants valued the Fund's assets and determined the Fund's NAV by reference to estimates of value based on the trading data of other securities they deemed to be "similar."   In fact, as was disclosed --- but only after the Class Period --- none of the Fund's investments were priced by reference to trading data.  Rather, the Manager valued the Fund's assets in an opaque process for which there was no market-price check.  In the absence of such a check, the Fund's assets were overvalued.  For example, because the Fund failed to properly characterize a substantial portion of its investments as illiquid, the Fund's pricing did not properly account for and disclose liquidity risk.

77.      A change in accounting rules ultimately, after the Class Period, forced the Fund to disclose that *every single one of its assets was valued on a basis other than the "last sale price."*  In September of 2006, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 157, which, among other things, requires entities to disclose the valuation inputs they use to measure the "fair value" of their assets.   The additional disclosures mandated by SFAS 157 occurred for the first time in the Fund's Shareholder report filed on January 31, 2009.  In that document, the Fund acknowledged that its entire portfolio was valued based on "inputs other than quoted prices that are observable for the asset (such as quoted prices for similar assets and market corroborated inputs such as interest rates, prepayment speeds, credit risks, etc.)."   In other words, *there was no ready and active trading market - and therefore no "bid" and "ask" to use in pricing - for a single security that the Fund held as of January 31, 2009.*

25

**F.      The Concealed Risks Materialized and Damaged Investors**

78.      In 2007 and 2008, municipal interest rates rose and many investors moved away from municipal securities.  Thus, floaters based on municipal bonds with lower interest rates became decidedly less attractive, and holders of such floaters (predictably) tendered them to the Trusts, demanding par value in exchange.   The Trusts' Sponsors, however, were unable to re-sell them to other investors.

79.      Consequently, the Trusts' Sponsors were forced to collapse the Trusts and sell the underlying securities to pay the holders of the floaters their par value.  However, the Manager had not monitored the sufficiency of the segregated collateral.  Nor had it monitored the Fund's exposure under the shortfall and forbearance agreements (despite statements in the Prospectuses that the Manager would do so).  Consequently, the underlying securities that had been segregated as collateral were insufficient to meet this obligation, and the Sponsors, therefore, required that more collateral be provided, which in turn obligated the Fund to make up the difference between what the underlying collateral had sold for, and what was owed to the holders of the floaters.  To do so, the Fund was forced to sell still more of its portfolio to raise the necessary capital.  Because many of the Fund's assets were illiquid, or had been overvalued by the Fund, they could be sold only at steep discounts compared to the values reported by the Fund, if at all.

80.      After these events had occurred, the Fund's NAV dropped from $11.17 on January 2, 2008 to $7.90 on October 21, 2008.  Likewise, the Fund's rate of return for the year 2008 ranged from -34.7 percent (for class B and C shares) to -34.2 percent (for class A shares).  This was a stark and disappointing contrast to the average rate of return for the rest of the Morningstar Muni New Jersey category, which ranged from -8 percent (for class C shares), -5.68 percent (for class A shares), to -5.67 percent (for class B shares).

26

81.     It was not until October 21, 2008, however, that the Fund belatedly disclosed the additional and serious risks associated with inverse floaters.  Specifically those risks were that: (a) the collateral underlying the floaters was insufficient to cover the Fund's obligation under the floaters; (b) the Fund would have to turn to its other investments to make up the difference; and (c) those other investments, (presumably because they were illiquid) could be sold "at a disadvantageous time" to raise cash to meet that obligation.  In a Prospectus filed with the SEC on Form N-1A, replacing the Fund's previously issued disclosures relating to inverse floaters, Defendants stated, in relevant part:

> ...The Fund's investments in inverse floaters involve certain risks. The market value of an inverse floater residual certificate can be more volatile than that of a conventional fixed-rate bond having similar credit quality, maturity and redemption provisions. Typically, inverse floater residual certificates tend to underperform fixed rate bonds when long-term interest rates are rising but tend to outperform fixed rate bonds when long-term interest rates are stable or falling.  Inverse floater residual certificates entail a degree of leverage because the trust issues short-term securities in a ratio to the residual certificates with the underlying long-term bond providing collateral for the obligation to pay the principal value of the short-term securities if and when they are tendered.  *If the Fund has created the inverse floater by depositing a long-term bond into a trust, it may be required to provide additional collateral for the short-term securities if the value of the underlying bond deposited in the trust falls.*
>
> An inverse floater that has a higher degree of leverage is typically more volatile with respect to its price and income than an inverse floater having a lower degree of leverage.  *Under inverse floater arrangements, if the remarketing agent that offers the short term securities for sale is unable to sell them, or if the holders tender (or put) them for repayment of principal and the remarketing agent is unable to remarket them, the remarketing agent may cause the trust to be collapsed, and in the case of floaters created by the Fund, the Fund will then be required to repay the principal amount of the tendered securities.  During times of market volatility, illiquidity or uncertainty, the Fund could be required to sell other portfolio holdings at a disadvantageous time to raise cash to meet that obligation.*

27

[Emphasis added].

82.     The risks that the Fund could be required to provide additional collateral or to sell other portfolio holdings at a disadvantageous time to raise cash as a result of its investments in inverse floaters had been a "main risk of investing in NJ Muni Fund" throughout the entire Class Period, but had not been adequately disclosed.

## V.     THE PROSPECTUSES CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

83.     Defendants issued Prospectuses throughout the Class Period that contained materially false and misleading statements and omissions.  Specifically, in the Prospectuses, Defendants negligently: (a) grossly understated the percentage of the Fund's illiquid assets and the Fund's above-average liquidity risk; (b) failed to disclose that the safeguards that purportedly limited the Fund's investment in illiquid assets were ineffective and that, consequently, the Fund's investments in illiquid assets exceeded its purported limits; (c) grossly overvalued the Fund's assets and overstated the Fund's NAV; (d) failed to disclose that the Fund's success depended on steady or falling interest rates and a robust market appetite for the risky securities in which the Fund was heavily invested; (e) failed to disclose the extraordinary volatility of the Fund's investments in inverse floating rate securities; and (f) stated that the Fund's investments were consistent with its commitment to preserve capital, when, in fact, the investments were highly leveraged bets against interest rate increases and highly vulnerable to regularly occurring shifts in the capital market's willingness to take on risk.   In short, Defendants' negligent, material misstatements and omissions led investors to believe that their principal was invested conservatively in investment grade municipal bonds, consistent with the Fund's stated objective of "preservation of capital," such that they could ride out a financial crisis without serious loss

28

even if they had to make withdrawals, as mutual fund investors may and typically do. In fact, Defendants invested their principal in un-hedged, high-risk bets against rising interest rates that left the Fund extraordinarily vulnerable to market conditions.

**A.     The Prospectuses Contained Materially False and Misleading Statements Regarding Liquidity**

84.     Defendants negligently stated throughout the Class Period that at least 85 percent of the Fund's assets were liquid.  For example, the Fund's November 28, 2005 Statement of Additional Information contained a Statement of Investments that showed the Fund's holdings as of that date.  Certain of those investments were footnoted as follows:

> As of July 31, 2005, investments in securities included issues that are illiquid.  A security may be considered illiquid if it lacks a readily available market or if its valuation has not changed for a certain period of time.  ***The Fund will not invest more than 15% of its net assets (determined at the time of purchase and reviewed periodically) in illiquid securities.  Securities that are illiquid are marked with the applicable footnote on the Statement of Investments.***

> [Emphasis added].

85.     The Prospectuses further stated that the Fund would take appropriate steps to maintain liquidity.  For example, the Prospectus dated November 28, 2005 stated:

> Illiquid and Restricted Securities.  Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price. Restricted securities may have terms that limit their resale to other investors or may require registration under federal securities laws before they can be sold publicly. The Fund will not invest more than 15% of its net assets in illiquid securities and cannot invest more than 10% of its net assets in restricted securities. Certain restricted securities that are eligible for resale to qualified institutional purchasers may not be subject to those limits. ***The Manager monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to maintain adequate liquidity.***

29

[Emphasis added].

86.     These statements were, in sum and substance, repeated in the Fund's Prospectuses dated September 27, 2006, March 2, 2007, and November 28, 2007, and reinforced in the Statements of Additional Information, each of which stated, "the Fund has percentage limitations that apply to purchases of illiquid and restricted securities, as stated in the Prospectus.  The Manager determines the liquidity of certain of the Fund's investments."

87.     The statements identified in ¶¶ 84-86 were materially false and misleading for the following reasons, among others:

    a.     The footnotes described in ¶ 84 purported to identify *all* of the Fund's illiquid holdings, when in fact the Fund had numerous and substantial investments that were illiquid but not identified as such;

    b.     Based on a review of just the Fund's top 62 out of 338 holdings, the aggregate value of illiquid securities held as of July 31, 2008 represented at least 25.21 percent of the value of the Fund's net assets.  When combined with the 4.98 percent of the Fund's net assets that are correctly marked as illiquid holdings in the Certified Shareholder Report for the period ending July 31, 2008, the Fund held at least 30.19 percent of its net assets in illiquid securities as of July 31, 2008, even before its smaller, and likely less liquid, holdings are taken into account.  This is well in excess of the Fund's purported 15 percent limit on such investments.

    c.     Defendants failed to monitor or sell the Fund's illiquid holdings or otherwise take action that would have allowed the Fund to maintain

adequate liquidity, which meant that the Fund was unable to meet its obligations related to inverse floaters, as described above.

d.    In the class action lawsuit against Oppenheimer's Champion Fund pending before this Court, Defendants take the position that whether a security is illiquid is "not a cut-and-dried question" but a "difficult and complicated assessment" that involves a "judgment call."  To the extent that this representation by Defendants is true, their prior repeated representations in the Prospectuses that the Fund would not exceed a 15 percent cap on investments in illiquid securities are necessarily false and misleading, and omitted to state other facts necessary to make the statement true;  Defendants failed to inform investors that in promising to maintain a 15 percent cap on illiquid investments, the Fund's definition of illiquidity was merely a subjective assessment that could not be meaningfully enforced or even verified and monitored.

**B.    The Prospectuses Contained Materially False and Misleading Statements Regarding Inverse Floaters**

88.    Throughout the Class Period, Defendants negligently made materially false and misleading statements and omissions in the Prospectuses with respect to the risks arising from the Fund's investments in inverse floaters.

89.    In this regard, the Prospectus dated November 28, 2005, stated, in relevant part, as follows:

> Inverse Floaters Have Special Risks.  Variable rate bonds known as "inverse floaters" pay interest at rates that move in the opposite direction of yields on short-term bonds in response to market changes.  As interest rates rise, inverse floaters produce less current income, and ***their market value can become volatile.***   . . .

31

> **The Fund will not invest more than 20% of its total assets in inverse floaters.**

[Emphasis added].

90.     The above statement was substantively repeated in the Fund's Prospectuses dated September 27, 2006; March 2, 2007; and November 28, 2007.

91.     The Prospectus dated September 27, 2006 further stated that "[w]hen the Fund invests in certain derivatives, for example, inverse floaters with 'shortfall' agreements [] and swaps, *the Fund must segregate cash or readily marketable short-term debt instruments in an amount equal to the obligation.*" [Emphasis added]. That statement was repeated in the Fund's Prospectuses dated March 2, 2007, and November 28, 2007.  The Statements of Additional Information filed with each of those three Prospectuses described the shortfall and forbearance agreements, in sum and substance, as follows (with only minor variations in language, such as using "reimburse" rather than "pay"):

> The Fund enters into shortfall and forbearance agreements with the sponsors of certain inverse floaters held by the Fund.  These agreements commit the Fund to pay the sponsor of the inverse floater, in certain circumstances, the difference between the liquidation value of the underlying security (which is the basis of the inverse floater) and the principal amount due to the holders of the floating rate security issued in conjunction with the inverse floater (the "shortfall").

92.     Further, each of those Statements of Additional Information stated that "[t]he Manager monitors the Fund's potential exposure with respect to these agreements on a daily basis and intends to take action to terminate the Fund's investment in the inverse floaters, as it deems appropriate."

93.     The statements identified in ¶¶ 89-92 were materially false and misleading for the following reasons, among others:

32

500846_7.DOC

a.      They failed to disclose that, although they Fund may have limited its investment in inverse floaters to 20 percent of its assets, the inverse floaters were highly leveraged, and could cause the Fund to be forced to sell far more than 20 percent of its assets and, therefore, the Fund's exposure was many times greater than 20 percent of the Fund's asset value.  Moreover, since the Fund materially overstated the reported values of its securities, Defendant's statement that the inverse floater concentration was limited to 20 percent of its assets was materially false and misleading because the actual percentage was higher;

b.      due to their inherent leverage, inverse floaters not only "can" be volatile, they are *certain* to be volatile;

c.      the Fund did not segregate cash or readily marketable short-term debt instruments sufficient to cover its obligations under the inverse floaters, and, therefore, faced the risk of selling, and indeed, to meet those obligations, was forced to sell other illiquid securities at fair market values that were significantly lower than the inflated values reported in the Fund's financial statements; and

d.      the Manager did not monitor the Fund's potential exposure to the shortfall and forbearance agreements, as evidenced by the Fund's failure to segregate liquid assets sufficient to meet its obligations under those agreements.

94.     Similarly, each of the Fund's Statements of Investments included in the Statements of Additional Information throughout the Class Period contained a list of the Fund's

33

holdings, and purported to identify holdings which had been segregated as collateral obligations. These identifications were materially false and misleading for the following reasons, among others:

> a.   They materially overvalued the holdings that had been segregated, both disguising the risk to the Fund's other holdings and falsely inflating the net asset value of the Fund; and
>
> b.   They purported to identify *all* holdings which acted as collateral when in fact, because of the insufficiency of the holdings marked as collateral, other of the Fund's holdings also were at risk of forced sales.

## C.   The Prospectuses Contained Materially False and Misleading Statements Regarding the Fund's Investment Strategy

95.   In the Fund's registration statements and Prospectuses issued before and during the Class Period, Defendants negligently misrepresented the fundamental nature of the Fund's investment strategy as "consistent with the preservation of capital."  For example, the Fund's Prospectus of November 28, 2005 stated that "[t]he Fund seeks as high a level of current interest income exempt from federal and New Jersey income taxes for individual investors ***as is consistent with preservation of capital.***"  [Emphasis added].  Each Prospectus issued during the Class Period contained this language and, furthermore, stated: "In the OppenheimerFunds spectrum, the Fund is more conservative than some types of taxable bond funds, such as high yield bond funds, but has greater risks than money market funds."  As demonstrated by the allegations above, these statements were materially false and misleading because the Fund's investment strategy was wholly *inconsistent* with the goal of preservation of capital in a mutual fund.  Rather, the Fund had made large, leveraged (and ultimately ill-advised) bets on the

34

direction of interest rates --- bets which it could not afford to lose, in large part because of the illiquidity of its holdings.

**D.      The Prospectuses Contained Materially False and Misleading Statements Regarding the Value of the Fund's Investments and the Fund's Net Asset Value**

96.      Throughout the Class Period, Defendants negligently stated that Fund securities were valued at "fair value" which was generally determined by one of several methods, such as a closing price on an exchange, the mean between the "bid" and "ask" prices recorded by an exchange, the best judgment of a pricing service, or procedures internal to the Fund and not revealed by the Prospectus.   For example, the Statement of Additional Information that accompanied the Fund's Prospectus filed November 28, 2005, stated:

> SECURITIES VALUATION.  The Fund calculates the net asset value of its shares as of the close of The New York Stock Exchange (the Exchange), normally 4:00 P.M. Eastern time, on each day the Exchange is open for business.  ***Securities listed or traded on National Stock Exchanges or other domestic exchanges are valued based on the last sale price of the security traded on that exchange prior to the time when the Fund's assets are valued.  Securities traded on NASDAQ are valued based on the closing price provided by NASDAQ prior to the time when the Fund's assets are valued.***  In the absence of a sale, the security is valued at the last sale price on the prior trading day, if it is within the spread of the closing "bid" and "asked" prices, and if not, at the closing bid price. . . .Securities may be valued primarily using dealer-supplied valuations or a portfolio pricing service authorized by the Board of Trustees.  ***Securities (including restricted securities) for which market quotations are not readily available are valued at their fair value.***  Foreign and domestic securities whose values have been materially affected by what the Manager identifies as a significant event occurring before the Fund's assets are valued but after the close of their respective exchanges will be fair valued.  ***Fair value is determined in good faith using consistently applied procedures under the supervision of the Board of Trustees.***  Short-term "money market type" debt securities with remaining maturities of sixty days or less are valued at amortized cost (which approximates market value).

> [Emphasis added].

35

97.     That same document further stated that long-term debt securities held by the Fund (such as those used as collateral in the creation of inverse floaters) were valued as follows:

> o     Long-term debt securities having a remaining maturity in excess of 60 days are valued based on the mean between the "bid" and "asked" prices determined by a portfolio pricing service approved by the Fund's Board of Trustees or obtained by the Manager from two active market makers in the security on the basis of reasonable inquiry.
>
> Securities (including restricted securities) not having readily-available market quotations are valued at fair value determined under the Board's procedures.  ***If the Manager is unable to locate two market makers willing to give quotes, a security may be priced at the mean between the "bid" and "asked" prices provided by a single active market maker (which in certain cases may be the "bid" price if no "asked" price is available).***
>
> In the case of municipal securities, when last sale information is not generally available, the Manager may use pricing services approved by the Board of Trustees.  The pricing service may use "matrix" comparisons to the prices for comparable instruments on the basis of quality, yield and maturity.  Other special factors may be involved (such as the tax-exempt status of the interest paid by municipal securities).  ***The Manager will monitor the accuracy of the pricing services.  That monitoring may include comparing prices used for portfolio valuation to actual sales prices of selected securities.***
>
> [Emphasis added].

98.     These statements were repeated in the Prospectuses dated September 27, 2006, March 2, 2007, and November 28, 2007.

99.     The statements identified in ¶¶ 96-98 were materially false and misleading, as evidenced by two separate events.

100.    First, as evidenced by the insufficiency of the Fund's assets that were purportedly segregated as collateral, the Manager did not "monitor the accuracy" of the pricing services the Fund used.  Rather, investments whose value should have been lowered in the Fund's books

36

were not reduced, ultimately damaging the Fund when it lacked sufficient collateral to satisfy its other obligations.  In the course of selling those holdings, the Fund received their true "fair value," which was far less than the value Defendants reported in Fund financial statements that were filed with the SEC.

101.   Second, as the Fund was ultimately forced to disclose pursuant to SFAS 157**,** there was no ready and active trading market --- and therefore no "bid" and "ask" to use in pricing --- for a single security that the Fund held as of January 31, 2009 and, moreover, contrary to Defendants' statement that "Securities traded on NASDAQ are valued based on the closing price provided by NASDAQ" (*see supra* ¶ 96) not a single of the Fund's holdings traded on NASDAQ or any other national securities exchange.

## VI.   <u>CLASS ACTION ALLEGATIONS</u>

102.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of the Fund traceable to the false and misleading registration statements during the period from April 24, 2006 through October 21, 2008 and were damaged by Defendants' violations of the 1933 Act and the ICA.  Excluded from the Class are Defendants, the Officers and Trustees of the Fund, OppenheimerFunds, Oppenheimer Distributor, and any of the other Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

103.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of members in the proposed Class.  Record owners and other members of

37

the Class may be identified from records maintained by the OppenheimerFunds or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Fund has millions of outstanding shares.

104.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct as alleged herein.

105.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

106.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the 1933 Act was violated by Defendants' acts as alleged herein;

- whether statements contained in the Fund's Prospectuses, registration statements and other materials incorporated therein misrepresented or omitted material facts about the Fund;

- whether the members of the Class have sustained damages and, if so, the proper measure of such damages; and

- whether Defendants caused the Fund to deviate from a fundamental policy that could only be changed by a shareholder vote.

107.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

38

## COUNT I:

### VIOLATIONS OF § 11 OF THE 1933 ACT AGAINST THE FUND TRUSTEES AND/OR SIGNATORIES OF THE REGISTRATION STATEMENTS, OPPENHEIMER MULTI-STATE TRUST, AND <u>OPPENHEIMER DISTRIBUTOR</u>

108.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

109.    This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. § 77k, against Defendants Yeutter, Fink, Galli, Griffiths, Miller, Motley, Randall, Reynolds, Jr., Wikler, Wold, Wruble, Downes, Murphy, and Wixted, who served as trustees and/or officers during the Class Period and/or signed one or more of the registration statements (collectively, the "Individual Section 11 Defendants").  It is also brought against the Oppenheimer Multi-State Trust, which issued shares, and OppenheimerFunds and Oppenheimer Distributor, which underwrote shares, pursuant to the registration statements.

110.    This Count is not based on and does not sound in fraud.

111.    The Individual Section 11 Defendants signed at least one registration statement issued by Oppenheimer Multi-State Trust during the Class Period, and/or served as a director/trustee or in a similar capacity during the Class Period.  Oppenheimer Multi-State Trust issued securities pursuant to the registration statements issued during the Class Period. Oppenheimer Distributor and OppenheimerFunds underwrote securities pursuant to the registration statements issued during the Class Period.

112.    The registration statements for the Fund contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein.

39

113.     None of the Section 11 Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the registration statements were true and without omissions of any material facts and were not misleading.

114.     Lead Plaintiff and the Class acquired the Fund's shares pursuant to a materially false and misleading registration statement.

115.     Lead Plaintiff and the Class have sustained damages in that the value of the Fund's shares has declined substantially from the prices at which they were purchased.

116.     At the time of their purchases of the Fund's shares, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the untrue statements or omissions herein and could not have reasonably discovered those facts prior to the date of the filing of this Complaint.

117.     Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that the initial complaint in this action was filed.  Less than three years have elapsed from the time that Lead Plaintiff purchased the Fund shares upon which this Count is brought to the time the initial complaint was filed.

## COUNT II:

## VIOLATIONS OF SECTION 12(a)(2) OF THE 1933 ACT AGAINST DEFENDANTS OPPENHEIMER MULTI-STATE TRUST, OPPENHEIMERFUNDS, AND OPPENHEIMER DISTRIBUTOR

118.     Lead Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

119.     This Count is brought pursuant to Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2), on behalf of Lead Plaintiff and other members of the Class who were offered or sold

shares of the Fund as participants in the distribution of the Fund's shares against Defendants Oppenheimer Multi-State Trust, OppenheimerFunds, and Oppenheimer Distributor (the "Section 12(a)(2) Defendants").

120.    This Count is not based on and does not sound in fraud.

121.    The Section 12(a)(2) Defendants offered and sold a security, namely shares of the Fund, by means of the Prospectuses.  The Prospectuses contained untrue and/or misleading statements of material fact, contained material omissions, or omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, or contained material statements of fact that the Section 12(a)(2) Defendants in the exercise of reasonable care should have known were false.

122.    The Section 12(a)(2) Defendants actively solicited the sale of the Fund's shares through the Prospectuses, advertising, and other marketing efforts to serve their own financial interests and are liable to Lead Plaintiff and Class members pursuant to Section 12(a)(2) of the 1933 Act, as sellers of the shares of the Fund.

123.    At the time they purchased the Fund's shares from the Section 12(a)(2) Defendants, Lead Plaintiff and other members of the Class did not know that the representations made to them by the Section 12(a)(2) Defendants (in connection with the distribution of shares) and the matters described above were untrue, did not know the above described omitted material facts were not disclosed, and could not have reasonably discovered those facts.

124.    Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that the initial complaint in this action was filed.  Less than three years have elapsed from the time

that Lead Plaintiff purchased the Fund shares upon which this Count is brought to the time the initial complaint was filed.

125.    Pursuant to Section 12(a)(2) of the 1933 Act, Lead Plaintiff and Class members are entitled to recover, upon tender of the Fund shares they purchased, the consideration paid for the shares with interest thereon, less the amount of any income received thereon, or damages resulting from the Section 12(a)(2) Defendants' conduct.

126.    Lead Plaintiff and putative Class members who still hold shares of the Fund that were damaged by Defendants' violation of Section 12(a)(2) of the 1933 Act hereby tender those shares in the Fund.

## COUNT III:

### VIOLATIONS OF SECTION 15 OF THE 1933 ACT AGAINST THE INDIVIDUAL DEFENDANTS, MASS MUTUAL AND OPPENHEIMERFUNDS

127.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

128.    This Count is brought pursuant to Section 15 of the 1933 Act against the Individual Defendants, Mass Mutual, and OppenheimerFunds as control persons of the Fund, who violated Sections 11 and Section 12, as described in Counts I and II (the "Section 15 Defendants").

129.    Each of the Individual Defendants was a control person of the Fund by virtue of his or her position as a trustee and/or senior officer of the Fund.  The Individual Defendants were in a position to, and did, control the Fund's operations and disclosures made by the Fund in the registration statements issued during the Class Period.

130.    OppenheimerFunds was a control person of the Fund by virtue of its position as the Fund manager responsible for, among other things, choosing the Fund's investments and

42

handling its day-to-day business.  Mass Mutual was a control person of the Fund by virtue of its ownership of the Fund and ability to exercise control of the Fund.

131.    The Section 15 Defendants are liable, as control persons, for damages caused by the Fund's violations of Section 11 and Section 12.

132.    The Section 15 Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the registration statement and Prospectus were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

133.    This claim was brought within one year after the discovery of the untrue statements and omissions in the registration statement and Prospectus and within three years after the Fund's shares were sold to the Class.

134.    By reason of the misconduct alleged herein, for which the Fund is primarily liable, as set forth above, the Section 15 Defendants are jointly and severally liable with and to the same extent as the Fund pursuant to 1933 Act.

## COUNT IV:

### VIOLATIONS OF §13(a) OF THE INVESTMENT COMPANY ACT AGAINST DEFENDANT OPPENHEIMER MULTI-STATE TRUST

135.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

136.    This Count is brought pursuant to Section 13(a) of the Investment Company Act, 15 U.S.C. §80a-13(a), on behalf of the Class, against  Oppenheimer Multi-State Trust.

137.    Oppenheimer Multi-State Trust is a registered investment company under the Investment Company Act.  It issued, and caused to be issued, the Relevant Period registration

statements that disclosed such policies in respect of concentration of investment policies and investment objectives described herein.

138.    Section 13(a) of the Investment Company Act creates liability for any investment company that, without shareholder approval, "deviate[s] from its policy in respect of concentration of investments" and/or "deviate[s] from any investment policy which is changeable only if authorized by shareholder vote, or deviate[s] from any policy recited in its registration statement…." 15 U.S.C. § 80a-13(a).

139.    Defendant did not obtain authorization from a majority of the Fund's outstanding voting shares prior to deviating from the Fund's fundamental investment policies and investment policies that were recited in the Relevant Period registration statements.

140.    Defendant's deviation from the Fund's fundamental investment policies and investment policies that were recited in the Relevant Period registration statements exposed Lead Plaintiff and the Class to increased risks.

141.    Lead Plaintiff and the Class sustained damages in that the value of the Fund's shares has declined substantially as a result of the Fund's investments that were made in violations of the Fund's fundamental investment policies and investment policies that were recited in the Relevant Period registration statements and that have cause significant losses to the Fund's net asset value.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiff, on behalf of himself and the other members of the Class, pray for judgment as follows:

44

A.    Declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class with Lead Plaintiff as Class Representative and certifying Lead Plaintiff's counsel as Class Counsel;

B.    Awarding Lead Plaintiff and the other members of the Class damages against Defendants, jointly and severally, together with interest thereon;

C.    Awarding Lead Plaintiff and the other members of the Class rescission on Count II to the extent they still hold Fund shares that were damaged by Defendants' violation of Section 12(a)(2) of the 1933 Act;

D.    Awarding Lead Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees, experts' fees and other costs and disbursements; and

E.    Awarding Lead Plaintiff and the other members of this Class such other and further relief as the Court deems appropriate under the circumstances.

## VIII.   DEMAND FOR TRIAL BY JURY

Lead Plaintiff demands a trial by jury.

Dated:  January 15, 2010                    Respectfully submitted,


/s/ Peter E. Seidman
Sanford P. Dumain (admitted 9/15/08)
Peter E. Seidman (admitted 12/3/09)
Roland W. Riggs (admitted  4/15/09)
Christopher J. Orrico
   (Admission to Bar of the Court Pending)
**MILBERG LLP**
One Pennsylvania Plaza
48th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
E-mail: sdumain@milberg.com
E-mail: pseidman@milberg.com
E-mail: rriggs@milberg.com
E-mail: corrico@milberg.com

*Attorneys for Victor Sasson and Lead Counsel for the Class*


Howard P. Longman
**STULL, STULL & BRODY LLP**
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022
E-mail: jasondag@ssbny.com

*Counsel for Victor Sasson*


Kip B. Shuman
Rusty Glenn
**THE SHUMAN LAW FIRM**
885 Arapahoe Avenue
Boulder, Colorado 80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886
E-mail: kip@shumanlawfirm.com

46

E-mail: Rusty@shumanlawfirm.com

*Liaison Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Consolidated Class Action Complaint and Jury Demand was filed with this Court on January 15, 2010 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies have been sent to those indicated as non-registered participants.

Roland W. Riggs