# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Master Docket No. 09-md-02063-JLK-KMT (MDL Docket No. 2063)

IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION

*This document relates to:*   *OPPENHEIMER PENNSYLVANIA MUNICIPAL FUND*
09-cv-00514-JLK-KMT (*WOODS*)
09-cv-01368-JLK-KMT (*EGTS*)
09-cv-00772-JLK-KMT (*WUNDERLY*)

## CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................... 1

II.    SUMMARY OF THE CLAIMS .............................................................................. 1

III.   PARTIES ................................................................................................................. 7

       A.     The Plaintiffs ............................................................................................... 7

       B.     The Defendants ............................................................................................ 8

              1.     The Fund Defendants ......................................................................... 8

              2.     The Individual Defendants ................................................................. 9

              3.     MassMutual ..................................................................................... 12

IV.    CONTROL ALLEGATIONS ................................................................................ 12

V.     SUBSTANTIVE ALLEGATIONS ....................................................................... 14

       A.     Background Regarding Municipal Securities and the Oppenheimer Pennsylvania
              Municipal Fund ........................................................................................... 14

       B.     The Fund's Class Period Registration Statements and Prospectus Materials ....... 17

       C.     Defendants' Class Period Material Misstatements and Omissions ..................... 19

              1.     Defendants Negligently Misrepresented the Fund's Risk Profile, and
                     Failed to Disclose That It Was Wholly Inconsistent with the Fund's Fundamental
                     Objective of Preservation of Capital .................................................. 19

              2.     Defendants Negligently Understated the Percentage Of Fund Assets That
                     Were Illiquid And Failed to Disclose That Its Illiquid Assets Exceeded the Fund's
                     Limits On Illiquid Investments ........................................................... 22

              3.     Defendants Negligently Misrepresented that the Fund Was Buying At
                     Least 75% Investment Grade Securities and Was Holding Less Than 25% of Its
                     Assets in Junk Bonds .......................................................................... 28

              4.     Defendants Negligently Overstated the Value of the Fund's Assets and Its
                     NAV   32

              5.     Defendants Negligently Failed To Disclose the Extraordinary Volatility of
                     the Fund's Investments in Complex Derivative Instruments, and the Fund's
                     Statements Regarding Inverse Floaters Were Misleading and Incomplete ......... 35

i

D.      Defendants' Misstatements and Omissions Were Material ................................. 46

E.      The Truth Begins To Emerge ............................................................... 47

F.      Defendants' Misstatements and Omissions Caused the Fund's Investors Losses 51

VI.     CLASS ALLEGATIONS ............................................................... 56

VII.    COUNT I  -- Against the Fund Defendants and the Individual Defendants for Violations of Section 11 of the Securities Act ............................................................... 58

VIII.   COUNT II – Against the Fund Defendants for Violations of §12(a)(2) of the Securities Act ............................................................... 59

IX.     COUNT III – Against Defendants MassMutual, OppenheimerFunds, Inc., OppenheimerFunds Distributor, Inc., and the Individual Defendants for Violations of §15 of the Securities Act ............................................................... 60

X.      COUNT IV – Against Defendant Oppenheimer Multi-State Municipal Trust for Violations of §13(a) of the Investment Company Act ................................................. 62

XI.     JURY TRIAL DEMANDED ............................................................... 64

Lead Plaintiff Dharamvir Bhanot, and additional plaintiffs William E. Miles, Jr. and John P. Galganovicz, (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys, including, *inter alia*, review and analysis of documents filed with the U.S. Securities and Exchange Commission ("SEC") on behalf of or by the Oppenheimer Pennsylvania Municipal Fund, published news reports, industry data, other publicly available materials, and consultation with industry experts. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      Plaintiffs bring this action on behalf of themselves and a "Class" of all other persons similarly situated who bought any of the three classes of shares in the Oppenheimer Pennsylvania Municipal Fund (the "Fund") during the period from September 27, 2006 through November 26, 2008, inclusive (the "Class Period"). The Fund is an open-end mutual fund that issued three classes of shares, A, B, and C, which traded under the NASDAQ ticker symbols OPATX, OPABX and OPACX, respectively. Plaintiffs bring claims pursuant to Section 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k,77l and 77o, and Section 13(a) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-13(a).

## II.      SUMMARY OF THE CLAIMS

2.      Plaintiffs allege that Defendants OppenheimerFunds, Inc., OppenheimerFunds Distributor, Inc., Massachusetts Mutual Life Insurance Company, Oppenheimer Multi-State

- 1 -

Municipal Trust, and the Fund's Trustees and Managers violated the federal securities laws in registering, marketing and selling shares of the Fund based on its purported "conservative" investment strategy that was supposed to be consistent with the Fund's primary investment objective of "preservation of capital."  In fact, the Fund's investment strategy was extremely risky and volatile and was based on investment in low quality, unrated, and/or illiquid bonds and complex, highly-leveraged derivative instruments known as "inverse floaters."

3.      Both before and throughout the Class Period, the Fund's Registration Statements, Prospectuses and Statements of Additional Information ("SAI"), as well as other prospectus materials such as annual and semi-annual reports, notes, circulars, and other written communications, made representations concerning the Fund's fundamental investment principles and investment objectives, claiming that, "The Fund seeks as high a level of current interest income exempt from federal and Pennsylvania personal income taxes as is available from municipal securities, **consistent with preservation of capital.**" (Emphasis added.)  The Defendants claimed the Fund would implement this fundamental investment objective by investing mainly in Pennsylvania municipal securities that were "investment grade," and that the Fund would only hold a small percentage of junk bonds in its portfolio. Defendants also represented that the Fund would limit its investments in illiquid securities.

4.      As shown below, each of these representations about how the Fund would be managed, and how limits on risk would be built into the Fund's portfolio, was materially false and misleading, because such statements: (a) failed to disclose that the Fund was not adhering to its conservative investment objective of preserving capital, but instead was engaged in a plan to achieve greater yields by purchasing riskier and more leveraged investments; (b) understated the percentage of the Fund's illiquid assets and the Fund's above-average liquidity risk; (c) failed to

- 2 -

disclose that the safeguards that purportedly limited the Fund's investment in illiquid assets were ineffective and that, consequently, the Fund's investment in illiquid assets exceeded its purported limits; (d) failed to disclose the extent to which the Fund's portfolio contained junk bonds and/or unrated bonds; (e) failed to disclose the extraordinary volatility of the Fund's investments in complex inverse floating rate securities ("inverse floaters"); (f) failed to disclose that, due to the large exposure to inverse floaters, the Fund's success depended on steady or falling interest rates; and (g) overvalued the Fund's assets and overstated the Fund's Net Asset Value ("NAV").  More generally, Defendants failed to disclose the risk created by the great extent to which they were "making things up;" that is, the risk that Defendants' characterization of unrated and infrequently-traded bonds – categories that made up huge percentages of the portfolio – would be incorrect, in some cases wildly so, to the great detriment of the Fund and its shareholders.

5.     For example, notwithstanding the Fund's stated investment objective of "preservation of capital," which was at all relevant times a "fundamental policy" that could not be altered without shareholder approval, according to Morningstar, by 2008, over 70% of the Fund's bonds were rated BBB or lower, *i.e.*, below investment grade.  Indeed, an analysis of the Fund's portfolio revealed that by July 2008 approximately one-third of the Fund's total assets was invested in junk bonds.  In addition, despite the fact that Defendants represented the Fund could not invest more than 15% of its net assets in illiquid bonds, throughout the entire Class Period more than 15% of the Fund's net assets were held in bonds that had traded fewer than 3 times per year.  Such inactive trading is a hallmark of illiquidity.  Worse still, the Defendants concentrated the Fund's holdings in such illiquid bonds by often owning more than half, and sometimes all, of the principal amount of the entire issuance of a particular bond.  Defendants nevertheless characterized such bonds as "liquid," despite the fact that the Fund would have

extreme difficulty in quickly unloading such large positions without taking a material discount from the values reported in the Fund's financial statements.

6.       The Defendants also invested the Fund's assets in risky derivatives known as "inverse floaters" (debt instruments whose coupon rate has an inverse relationship to short-term interest rates), but failed to disclose in a complete and adequate fashion all material facts relating to the risks built into these highly-leveraged derivatives.

7.       Inverse floaters were a significant feature of the Fund's hedge fund-like investment strategy.  The coupon (or coupon rate) of an inverse floater varies inversely with the level of specified short-term interest rates; as those rates rise, the payment made on the inverse floater falls (hence the name *inverse* floaters).  While this inverse coupon is the most noticeable feature of the inverse floater, and an important one, it is not the key feature. Rather, the key feature of an inverse floater is that it is actually the equivalent, in terms of risk and payoff, of simultaneously borrowing short-term funds and using them to buy a long-term bond.  This strategy of "borrow short-lend long" has failed time and again, in many markets, over many decades, often with great damage to individual investors.  Defendants had the Fund take on an additional, unnecessary risk by leveraging its assets to raise money to pursue these high-risk investments in an attempt to increase yields.

8.       Plaintiffs and the Class were damaged when the undisclosed risks of these risky and highly-leveraged investments in inverse floaters and illiquid and/or unrated or junk bonds were realized.  As interest rates required of municipal securities began to increase in 2007 and, especially, late 2008, the coupons and prices of the inverse floaters were severely reduced.  In addition, the rise in interest rates triggered obligations to counter-parties that had to be satisfied immediately, which forced the Defendants to sell the Fund's illiquid assets at prices that were far

lower than the value attributed to them in the Fund's financial statements.  Concomitantly, Defendants were forced to write down the Fund's holdings, finally admitting to investors that throughout the Class Period those holdings were worth far less than the value at which they were being carried on the Fund's financial statements.

9.      The NAV of the Fund was damaged when the materialization of previously concealed risks related to inverse floaters forced Defendants to sell the Fund's assets.  Because the Fund held only a limited number of highly-rated bonds and those bonds had been the first assets sold, the Defendants were forced to sell the Fund's illiquid and unrated or low-rated bonds at fire-sale prices, *i.e.*, the Fund sold those assets at prices that were greatly reduced as the result of the fact the illiquid, unrated, and/or low-rated assets were difficult to sell all at once.  Thus, the prices Defendants were able to get for these assets was far lower than the overstated values reported by the Defendants in the Fund's SEC filings, despite the fact that Defendants had improperly characterized many of them as "liquid" or "investment grade."  The NAV suffered further diminution in value when the Fund's remaining assets, which were overstated throughout the Class Period – particularly other (mischaracterized) illiquid, unrated and/or low-rated bonds – had to be written down to reflect their proper values.  Thus, Plaintiffs and the Class were damaged by the very facts that Defendants misrepresented and/or concealed.

10.      The truth about the nature of the Fund's overstated assets and undisclosed high-risk investment strategy did not emerge until November 28, 2008, when Defendants were forced to issue a prospectus supplement that, as detailed herein, partially revealed the Fund's previously undisclosed liquidity and interest rate risks.  By then, however, these risks had come to pass, and the damage was almost entirely done.

506448

11.     During the entire Class Period, the Fund lost approximately 35% of its NAV, declining from $12.95 per share on September 27, 2006 to $8.34 per share on November 28, 2008.  By comparison, during this same period, the JP Morgan Municipal Bond Index lost 6.54%, and the average of 23 Pennsylvania Municipal Bond Funds (excluding the Fund) lost only 10.88%; the Fund's loss was nearly 4.5 standard deviations from the average.  Moreover, for 2008, Fund shares declined approximately 37.9%, from $12.21 per share on January 2, 2008, to a low of $7.42 per share on December 17, 2008, before finishing 2008 at an abysmal $7.58 per share.  The Fund's performance during the Class Period was one of the worst, if not the worst, in its class.

12.     As evidenced by the absence of comparable losses in other Pennsylvania municipal bond mutual funds, the dramatic decline of the Fund's NAV was not the result of a general economic decline or upheaval in the credit markets.  Rather, the diminution in value suffered by Plaintiffs and the Class was a direct result of the Defendants' failure to adhere to the Fund's stated fundamental investment policies and objectives, a failure that left the Fund extremely vulnerable to turbulence in the capital markets.

13.     Simply put, Defendants' misstatements and material omissions led investors to believe that most of the Fund's assets were invested conservatively in investment grade municipal bonds in keeping with the Fund's stated objective of "preservation of capital," when in actuality the Fund was nothing more than a highly-leveraged, high-risk, and illiquid junk bond fund.

14.     The Defendants' promise to preserve investors' capital and its investment policies should have guided Defendants to make investments that protected Plaintiffs and the Class from the inevitable cycles of financial crisis in the capital markets which have occurred frequently

- 6 -

over the past 20 years, such as the stock market crash of 1987, the spike of interest rates in 1994, the Russian default and the collapse of Long-term Capital Management in 1998, and the recession of 2001-2002, to name a few.  Instead, the Defendants issued misstatements and omissions of material fact concerning the Fund's adherence to its investment objectives and policies, and failed to disclose in an accurate and complete manner its inappropriate and risky policies.

**III.**      **JURISDICTION AND VENUE**

15.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act and Section 13(a) of the ICA.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act and §44 of the ICA.

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District.

18.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

19.     Further, by Order dated June 17, 2009, the Judicial Panel on Multidistrict Litigation transferred this action to this Court.

**III.**     **PARTIES**

**A.**      **The Plaintiffs**

20.     Lead Plaintiff Dharamvir Bhanot acquired and owned shares of the Fund during the Class Period pursuant to or traceable to a registration statement and prospectus at issue in this

complaint, as demonstrated by his certification previously filed with this Court at docket number 11 (09-md-2063), and has been damaged as a result.

21.     In its November 18, 2009 Order, the Court appointed Dharamvir Bhanot Lead Plaintiff pursuant to 15 U.S.C. §77z-1(a)(3)(B).

22.     Additional Plaintiff William E. Miles, Jr. acquired and owned shares of the Fund during the Class Period pursuant to or traceable to a registration statement and prospectus at issue in this complaint, as demonstrated by his certification previously filed with this Court at docket number 11 (09-md-2063), and has been damaged as a result.

23.     Additional Plaintiff John P. Galganovicz acquired and owned shares of the Fund during the Class Period pursuant to or traceable to a registration statement and prospectus at issue in this complaint, as demonstrated by his certification previously filed with this Court at docket number 11 (09-md-2063), and has been damaged as a result.

**B.     The Defendants**

24.     The Defendants are all affiliated with each other and conduct business under the umbrella of the "Oppenheimer" name, and are part of one of the largest asset management companies in the United States.

**1.     The Fund Defendants**

25.     Defendant OppenheimerFunds, Inc. ("OppenheimerFunds" or the "Manager") is the manager and investment adviser of the Fund and chooses the Fund's investments and handles its day-to-day business.  It is a holding company that engages in securities brokerage, banking services and related financial services through its subsidiaries.  OppenheimerFunds is headquartered at Two World Financial Center, 225 Liberty Street, New York, NY 10281-1008. OppenheimerFunds carries out its duties, subject to policies established by the Fund's Board of

Trustees, under an investment advisory agreement.  As compensation for its services, OppenheimerFunds receives a management fee.

26.     Defendant OppenheimerFunds Distributor, Inc. (the "Distributor"), also located at Two World Financial Center, 225 Liberty Street, New York, NY 10281-1008, is a subsidiary of OppenheimerFunds and was, during the Class Period, the principal underwriter and distributor of the Fund, was the Trust agent for the purpose of the continuous public offering of the Fund's shares, and helped draft and disseminate the offering documents.

27.     Defendant Oppenheimer Multi-State Municipal Trust (the "Issuer"), a Massachusetts Business Trust, is the registrant and issuer for each series of the Fund's shares and filed each one of the Class Period Registration Statements for the Fund which are alleged herein to be materially misleading.  The Issuer is headquartered at 6803 South Tucson Way, Centennial Colorado 80112.

28.     Defendants listed in paragraphs 25-27 are collectively referred to herein as the "Fund Defendants."

### 2.     The Individual Defendants

29.     Defendant John V. Murphy ("Murphy") was, at all relevant times, President and Director/Trustee of the Fund.  Defendant Murphy signed or authorized the signing of each Registration Statement effective during the Class Period.  In addition, Defendant Murphy has been Chairman of OppenheimerFunds since June 2001 and has also served as President from August 2000 to March 2007 and as Chief Executive Officer from June 2001 until December 2008.

30.     Defendant Clayton K. Yeutter ("Yeutter") was Chairman of the Board of Trustees of Oppenheimer Multi-State Municipal Trust at all relevant times until his retirement on or about

- 9 -

December 31, 2006.  Defendant Yeutter signed or authorized the signing of the September 27,

2006 Registration Statement.

31.     Defendant Brian F. Wruble ("Wruble") was, at all relevant times, a Trustee of the

Oppenheimer Multi-State Municipal Trust and became Chairman of the Board of Trustees

effective January 1, 2007.  Defendant Wruble signed or authorized the signing of the March 5,

2007 and the November 28, 2007 Registration Statements.

32.     Defendant Brian W. Wixted ("Wixted") was, at all relevant times, Treasurer and

Principal Financial Officer of the Fund.  Defendant Wixted signed or authorized the signing of

each Registration Statement effective during the Class Period.

33.     Defendant David K. Downes ("Downes") was, since 2007, a Trustee of the

Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Downes signed or

authorized the signing of the November 28, 2007 Registration Statement and Prospectus.

34.     Defendant Matthew P. Fink ("Fink") was, at all relevant times, a Trustee of the

Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Fink signed or authorized

the signing of each Registration Statement effective during the Class Period.

35.     Defendant Robert G. Galli ("Galli") was, at all relevant times, a Trustee of the

Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Galli signed or authorized

the signing of each Registration Statement effective during the Class Period.

36.     Defendant Phillip A. Griffiths ("Griffiths") was, at all relevant times, a Trustee of

the Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Griffiths signed or

authorized the signing of each Registration Statement effective during the Class Period.

506448

37.     Defendant Mary F. Miller ("Miller") was, at all relevant times, a Trustee of the Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Miller signed or authorized the signing of each Registration Statement effective during the Class Period.

38.     Defendant Joel W. Motley ("Motley") was, at all relevant times, a Trustee of the Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Motley signed or authorized the signing of each Registration Statement effective during the Class Period.

39.     Defendant Kenneth A. Randall ("Randall") was, at all relevant times, a Trustee of the Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Randall signed or authorized the signing of each Registration Statement effective during the Class Period.

40.     Defendant Russell S. Reynolds, Jr. ("Reynolds") was, at all relevant times, a Trustee of the Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Reynolds signed or authorized the signing of each Registration Statement effective during the Class Period.

41.     Defendant Joseph M. Wilker ("Wilker") was, at all relevant times, a Trustee of the Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Wilker signed or authorized the signing of each Registration Statement effective during the Class Period.

42.     Defendant Peter I. Wold ("Wold") was, at all relevant times, a Trustee of the Oppenheimer Multi-State Municipal Trust and the Fund.  Defendant Wold signed or authorized the signing of each Registration Statement effective during the Class Period.

43.     Defendant Ronald H. Fielding ("Fielding") was, at all relevant times, Senior Portfolio Manager of the Fund and a Senior Vice President of OppenheimerFunds.

44.     Defendant Daniel G. Loughran ("Loughran") was, at all relevant times, a Portfolio Manager of the Fund and a Vice President of OppenheimerFunds.

- 11 -

45.    Defendant Scott S. Cottier ("Cottier") was, at all relevant times, a Portfolio Manager of the Fund and a Vice President of OppenheimerFunds.

46.    Defendant Troy E. Willis ("Willis") was, at all relevant times, a Portfolio Manager of the Fund and a Vice President of OppenheimerFunds.

47.    Defendants listed in paragraphs 29-46 are collectively referred to herein as the "Individual Defendants."

### 3.    MassMutual

48.    Defendant Massachusetts Mutual Life Insurance Company ("MassMutual") is a mutually owned financial protection, accumulation and income management company.  Through its wholly owned subsidiary, Oppenheimer Acquisition Corp., MassMutual owns and controls OppenheimerFunds.  According to OppenheimerFunds' current Form ADV (Uniform Application for Investment Advisor Registration) filed with the SEC, MassMutual is a "control person" of the Manager, meaning that MassMutual has the power to direct or cause the direction of the management or policies of the Manager, whether through ownership of securities, by contract or otherwise. MassMutual is located at 1295 State Street, Springfield, Massachusetts 01111.

49.    The Fund Defendants, the Individual Defendants, and MassMutual are collectively referred to herein as "Defendants."

### IV.    CONTROL ALLEGATIONS

50.    At all times during the Class Period, Defendant OppenheimerFunds controlled the Issuer, the Distributor and the Fund as investment advisor and Manager of the Fund. OppenheimerFunds selects the securities for the Fund's portfolio and handles the day-to-day business of the Issuer, the Distributor and the Fund.  Additionally, OppenheimerFunds supervised the activities of all of the administrative and clerical personnel required for the

- 12 -

corporate administration of the Issuer, the Distributor and the Fund.  Those responsibilities included: (i) the compilation and maintenance of records with respect to the Fund's operations; (ii) preparing, filing with the SEC, and disseminating to investors all reports; and (iii) composing proxy materials and registration statements for the continuous public sale and offering of shares of the Fund.

51.     During the Class Period most of the Fund's investments traded infrequently, or not at all, and many were not rated by any recognized rating agency.  As a result, OppenheimerFunds set the value and ratings applied to these investments.  In the absence of established frequent and liquid trading activity or third-party ratings, OppenheimerFunds had a major role is establishing the NAV of the Fund's shares, and thus, controlled the price at which investors, including Plaintiffs and members of the Class, could purchase or sell any of the Fund's shares.

52.     At all times during the Class Period, Defendant OppenheimerFunds controlled Defendant OppenheimerFunds Distributor, Inc., the Fund's and Issuer's principal underwriter in the continuous public offering of the Fund's shares.

53.     At all times during the Class Period, Defendant OppenheimerFunds Distributor, Inc., controlled both the Issuer and the Fund as the Issuer's and the Fund's principal underwriter in the continuous public offering of the Fund's shares, which included paying the expenses for sales, including advertising and the cost of printing and mailing prospectuses.

54.     The Individual Defendants controlled both the Issuer and the Fund by virtue of their officer or trustee positions.  As the Statements of Additional Information dated September 27, 2006, March 5, 2007 and November 28, 2007 admit, "The Fund is governed by a Board of Trustees, which is responsible for protecting the interests of shareholders under Massachusetts

- 13 -

law.  The Trustees meet periodically throughout the year to oversee the Fund's activities, review its performance, and review the actions of the Manager."  In addition to being Trustees, Defendants Murphy and Wixted also controlled both the Issuer and the Fund in their capacities as President and Chief Executive Officer of the Issuer and the Fund, and Treasurer and Principal Financial and Accounting Officer of the Issuer and Fund, respectively.

55.    At all times during the Class Period, Defendant MassMutual controlled Defendant OppenheimerFunds.  OppenheimerFunds lists MassMutual as a "control person" on Form-ADV, which OppenheimerFunds files with the SEC.  In addition, MassMutual markets itself and its financial subsidiaries as one entity, the "MassMutual Financial Group."  MassMutual, as the ultimate parent company to OppenheimerFunds, had the power to exercise complete control over OppenheimerFunds with respect to the latter's exercise of its professional responsibilities as Manager of the Fund.  At all relevant times, OppenheimerFunds was controlled by Mass Mutual and acted as its agent.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background Regarding Municipal Securities and the Oppenheimer Pennsylvania Municipal Fund

56.    The Oppenheimer Pennsylvania Municipal Fund is a separate series of the Oppenheimer Multi-State Municipal Trust, a non-diversified, open-ended mutual fund registered under the ICA and managed by Defendant OppenheimerFunds.  During the Class Period, the Fund issued three classes of shares, A, B and C, under the NASDAQ ticker symbols OPATX, OPABX and OPACX, respectively.  Class A shares of the Fund were first publicly offered on September 18, 1989; Class B shares were first publicly offered on May 3, 1993; and Class C shares were first publicly offered on August 29, 1995.

- 14 -

57.     The Fund's stated investment objective is to seek "as high a level of current interest income exempt from federal and Pennsylvania personal income taxes as is available from municipal securities, **consistent with preservation of capital**." (Emphasis added.)  This has always been the Fund's stated investment objective both before and at all times during the Class Period.  The Fund seeks to achieve this objective by investing in municipal securities issued by the Commonwealth of Pennsylvania and its political subdivisions, as well as other municipal securities.

58.     Municipal securities are fixed-income securities primarily issued by states, cities, counties and other governmental entities to finance the development of local communities.  The interest received from most municipal bonds is exempt from federal, state or local income taxes in the municipalities where the bonds are issued.  Municipal securities are considered to be either "general obligations" (*i.e.*, secured by the issuer's pledge of its full faith and credit and taxing power) or "revenue bonds" (*i.e.*, secured by revenue derived from a particular facility or class of facilities or revenue source).  Revenue bonds tend to have a greater risk of default than general obligation bonds.

59.     Despite the Fund's clearly stated investment objective regarding preservation of capital, throughout the Class Period Defendants caused the Fund to make progressively riskier investments in an attempt to obtain high yields.  These investments included taking large positions in illiquid bonds, inverse floaters, junk bonds and unrated bonds, and thus were in direct conflict with the Fund's primary investment objective of preserving capital.  As described in detail below, the overall risk faced by the Fund was amplified further by the Fund's piling on the riskiest segments of the municipal securities market, and then leveraging these already risky investments.  Although the Fund had limitations on its concentrations of illiquid bonds (15% of

the Fund's assets) and junk bonds (25% of the Fund's assets), as shown below, and unbeknownst to Plaintiffs and the Class and undisclosed by Defendants, the Fund regularly and systematically exceeded these limitations.

60.     First, the Fund invested a large portion of its assets in illiquid bonds.  Throughout the entire Class Period, more than 15% of the Fund's net assets were held in bonds that traded on average between zero and three times per year.  Indeed, at various points during the Class Period, more than 22% to 26% of the Fund's net assets were held in bonds that had traded fewer than 6 times during the Class Period.  Such inactive trading is a classic hallmark of a security's illiquidity.  Worse still, the Defendants concentrated the Fund's holdings in such illiquid bonds by often owning more than half, and sometimes all, or nearly all, of the principal amount of the entire issuance of a particular bond.  Defendants nevertheless characterized such bonds as "liquid," despite the fact that the Fund would have – and eventually did have – extreme difficulty in quickly unloading such large positions at prices approximating their carrying values on the Fund's financial statements.

61.     The Fund also invested a large portion of its assets in low-rated "junk" bonds and/or unrated bonds.  Throughout the Class Period, the Fund was investing primarily in municipal securities that were in the lowest investment-grade rating, BBB, or were unrated but were assigned inflated ratings by Defendants, or were below investment-grade at the time of purchase.  As Morningstar reported on October 21, 2008, "[N]early 70% of the fund was in bonds rated BBB and below (including nonrated bonds) as of June 30, 2008..."  Indeed, as shown below, an analysis of the Fund's portfolio reveals that the Fund had invested approximately one third of its assets in junk bonds and unrated bonds during the Class Period.

62.     The Fund further invested in inverse floaters, which are variable rate derivative securities whose coupon rate moves in the opposite direction from the change in the reference rate used to calculate the coupon rate.  Typically, inverse floaters are issued in conjunction with floating rate securities ("floaters"), with the variable rate on the inverse floater equal to a fixed percentage rate less the then-current rate (*i.e.*, the reference rate) on the floater.  Thus, the rate on the inverse floater increases as the rate on the floater decreases, and vice versa.  While this inverse coupon is the most noticeable feature of the inverse floater, and an important one, it is not the key feature.  Rather, the key feature of an inverse floater is that it is equivalent, in risk and payoff, to simultaneously borrowing short-term funds (through the companion floater) and using them to buy a long-term bond.  This strategy of "borrow short-lend long" is an un-hedged and high risk bet against rising interest rates.  It is a high risk strategy that has failed time and again, in many markets, over many decades, often with great damage to individual investors as a result of the mismatch in the lives of assets and liabilities.

## B.     The Fund's Class Period Registration Statements and Prospectus Materials

63.     Pursuant to the requirements of the Securities Act, the ICA, and implementing regulations promulgated by the SEC, including 17 CFR §§239.15A, 230.495(a), mutual funds must register their shares on Forms N-1A filed with the SEC.  These Registration Statements are comprised of a Prospectus and a Statement of Additional Information, which is incorporated by reference in the Prospectus.

64.     In connection with the continuous offerings of the Fund's shares, on an annual or semi-annual basis throughout the Class Period, Defendants, on behalf of the Fund, caused the Issuer to file with the SEC Forms N-1A that included substantially similar Prospectuses.

65.     On or about September 27, 2006, Oppenheimer Multi-State Municipal Trust filed with the SEC a Registration Statement on Form N-1A, which became effective on September 27,

2006.  The September 27, 2006 Registration Statement included a Prospectus for the Fund dated September 27, 2006 and Statement of Additional Information (collectively, the "September 27, 2006 Prospectus").  From the September 27, 2006 Prospectus onward through the entire Class Period, Defendants issued and offered for sale shares of the Fund.  Defendants continuously filed nearly identical Registration Statements and Prospectuses throughout the Class Period and continued to offer newly issued securities.

66.     In addition to the September 27, 2006 Prospectus, these include the following:

a.     the Registration Statement on Form N-1A, Prospectus and Statement of Additional Information that Oppenheimer Multi-State Municipal Trust and Defendants filed with the SEC on or about March 5, 2007 (collectively, the "March 5, 2007 Prospectus"), which was then disseminated to current and prospective investors in the Fund; and

b.     the Registration Statement on Form N-1A, Prospectus and Statement of Additional Information that Oppenheimer Multi-State Municipal Trust and Defendants filed with the SEC on or about November 28, 2007 (collectively, the "November 28, 2007 Prospectus"), which was then disseminated to current and prospective investors in the Fund.

67.     The Fund's shares were marketed and sold to investors pursuant to the Prospectuses dated September 27, 2006, revised as of March 5, 2007, and November 28, 2007. Each of these Prospectuses explicitly incorporated by reference a Statement of Additional Information and the Fund's Annual and Semi-Annual Reports and quarterly reports for that year, each of which provided investors with additional guidance about, in pertinent part, the Fund's management, investment strategies, policies and limitations.

506448

68.     While the Prospectuses and Statements of Additional Information issued during the Class Period were not exactly identical, they each contained many substantially similar materially untrue statements and were rendered materially misleading by the same omissions, as alleged herein. Each of the foregoing documents issued by the Defendants was materially misleading or omitted to state material facts necessary to make the statements therein not misleading, or omitted material facts required to be stated, as set forth below.

### C.     Defendants' Class Period Material Misstatements and Omissions

#### 1.     Defendants Negligently Misrepresented the Fund's Risk Profile, and Failed to Disclose That It Was Wholly Inconsistent with the Fund's Fundamental Objective of Preservation of Capital

69.     The Registration Statements, Prospectuses and Statements of Additional Information issued throughout the Class Period to register and offer the Fund's shares to Plaintiffs and the Class contained untrue statements of a material facts and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

70.     First, each and every one of the prospectuses issued during the Class Period represented that "preservation of capital" was the primary and fundamental objective of the Fund, stating:

> What Is The Fund's Investment Objective? The Fund seeks as high a level of current interest income exempt from federal and Pennsylvania personal income taxes as is available from municipal securities, **consistent with preservation of capital.**

(Emphasis added.)

71.     For investors, "preservation of capital" has a specific meaning: preventing loss of principal. *Forbes Investopedia* defines "preservation of capital" as "[a]n investment strategy whose primary goal is to prevent the loss of an investment's total value."  Similarly, according to

- 19 -

Bloomberg, "preservation of capital" refers to "[a]n investment with the goal of securing the value of the principle [sic] by avoiding speculative situations."

72.   *Standard & Poor's Guide to the Perfect Portfolio* recommends that investors employ capital preservation strategies, if "[y]ou do not want the principal in your accounts to decline in value."  For these investors, "[s]afety is your number one goal.  You sacrifice high returns to keep the value of your portfolio stable.  Your upside is very modest but your downside is also very modest.  Capital protection, not appreciation, is your motto."  *Standard & Poor's Guide* also describes critical features of a capital preservation strategy: "Capital preservation and liquidity go hand in hand.... Any asset that can fall in value should not be included in this conservative strategy.... The appropriate [capital preservation] fund would have the characteristics of low positive returns, very low risk, and extremely low price fluctuations.... Any asset that is not guaranteed to maintain its value should not be held."

73.   As explained in greater detail below, this statement was untrue and materially misleading when made because, throughout the Class Period, the Fund was investing primarily in municipal securities that were in the lowest investment-grade rating, BBB, or were unrated but were assigned inflated ratings by Defendants, or were below investment-grade at the time of purchase.  As Morningstar reported on October 21, 2008, "[N]early 70% of the fund was in bonds rated BBB and below (including nonrated bonds) as of June 30, 2008…."  Moreover, the Fund was investing heavily in risky, low-grade, or unrated revenue bonds, including tobacco bonds and industrial development bonds, that exposed the Fund to high levels of volatility, which was contrary to the objective of preserving investors' capital.  The Fund also utilized risky derivatives, including highly-leveraged and highly-volatile inverse floaters, in an attempt to increase yields, which further exposed the Fund to the risk of declining asset values and was

- 20 -

contrary to the objective of preserving capital.  Thus, while each of these prospectuses represented that the Fund was investing in municipal securities that would preserve capital, in reality the Fund was a risky junk bond fund.

74.     To further buttress it statements regarding the objective of preserving capital, each of the Fund's Prospectuses issued during the Class Period represented in identical language that although the Fund was non-diversified, in that the "Fund focuses its investments in Pennsylvania Municipal Securities" and was, therefore, vulnerable to economic factors affecting Pennsylvania governmental securities issuers, it was more conservative than some taxable bond funds, including high yield bond funds.  Indeed, each of these prospectuses stated:

> In the OppenheimerFunds spectrum, the **Fund is more conservative than some types of taxable bond funds, such as high yield bond funds**, but has greater risks than money market funds.

 (Emphasis added.)

75.     As explained in greater detail below, this statement, repeated in each prospectus, was untrue and materially misleading when made because, at all relevant times, the Fund was not "conservative," but rather was a highly volatile and risky fund that invested heavily in illiquid bonds, junk bonds, and risky, low-grade, or unrated revenue bonds such as industrial development bonds and tobacco bonds.  The Fund also utilized leverage and highly volatile derivatives like inverse floaters in an attempt to increase yields.  It was not, by any definition, "conservative."

76.     Thus, rather than attempting to achieve as high an income as consistent with the preservation of capital, which would have entailed investing in "low volatility, highly liquid" assets, the Fund employed a strategy designed to enhance returns through risky investments in highly volatile and/or illiquid assets – individually and in combination – that created an

- 21 -

undisclosed risk of loss.  The Fund's investment strategy, therefore, was not consistent with the

preservation of capital.

> **2.**      **Defendants Negligently Understated the Percentage Of Fund Assets That Were Illiquid And Failed to Disclose That Its Illiquid Assets Exceeded the Fund's Limits On Illiquid Investments**

77.      The September 27, 2006 Prospectus stated that the Fund was restricted from

investing more than 15% of the Fund's assets in "illiquid securities," *i.e.*, securities that cannot

be easily sold because "because of the absence of an active  trading  market" in the securities:

> Illiquid and Restricted Securities.  Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price. Restricted securities may have terms that limit their resale to other investors or may require registration under federal securities laws before they can be sold publicly. **The Fund will not invest more than 15% of its net assets in illiquid securities and cannot invest more than 10% of its net assets in restricted securities.**  Certain restricted securities that are eligible for resale to qualified institutional purchasers may not be subject to those limits. **The Manager monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to maintain adequate liquidity**.

(Emphasis added.)

78.      The March 5, 2007, Prospectus and the November 28, 2007 Prospectus contained

nearly identical language regarding illiquid securities.

79.      Liquidity is important for at least two reasons.  First, liquid assets can be sold on

relatively short notice without taking a material discount from the values reported in financial

statements filed just prior to the asset sale.  Second, because illiquid assets are not actively

traded, they cannot be valued by reference to readily verifiable pricing data or other observable

price inputs.  In both regards, illiquid assets radically differ from liquid securities.

80.      *Revision of Liquidity Test in Guidelines to Form N-1A*, promulgated by the SEC,

limits mutual funds' holdings of illiquid assets.  This regulation defines an "illiquid asset" as "an

asset which may not be sold or disposed of in the ordinary course of business within seven days

- 22 -

506448

at approximately the value at which the mutual fund has valued the investment on its books." 17 CFR 239 and 274 [Fed.Reg. Vol. 57, No. 55 at 9829, Release No. 33-6927; IC-18612] (Mar. 20, 1992).

81.     Assets are generally considered liquid if they can be readily disposed of at a price reflecting the value attributed to the assets in the Fund's financial statements.  As the Fund's Prospectuses state, "[i]nvestments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price."

82.     Similarly, in the analogous context of money market funds, which also purport to preserve capital, the SEC has stated that "[t]he term 'illiquid security' generally includes any security which cannot be disposed of promptly and in the ordinary course of business without taking a reduced price.  A security is considered illiquid if a fund cannot receive the amount at which it values the instrument within seven days."  *See* 51 FR 9773.

83.     Likewise, GAAP Statement of Financial Accounting Concepts No. 5 states that liquidity is tied to "financial flexibility," and that "[l]iquidity reflects an asset's or liability's nearness to cash.  Financial flexibility is the ability of an entity to take effective actions to alter amounts and timing of cash flows so it can respond to unexpected needs and opportunities."  In other words, liquidity is an important determinant of whether an entity can timely react to changing market conditions without suffering substantial harm.

84.     Throughout the Class Period, Defendants purported to identify, with specificity, which of the Fund's assets were illiquid.  Specifically, Defendants periodically issued Statements of Investments that were incorporated by reference in the Prospectuses.  Certain of the investments in those Statement of Investments referenced a footnote that purported to provide the total dollar amount and percentage of the Fund's illiquid assets at a given date.

85.     In each of the Fund's Statement of Investments issued during the Class Period, including those set out in the Fund's registration statements and the Fund's annual, semi-annual and quarterly reports incorporated into the Fund registration statements and prospectuses, a footnote code was assigned to those bonds that Defendants identified as being illiquid.  Since so few bonds were assigned this footnote code, and for the reasons set forth below, the Fund under-reported its illiquid investments as follows:

| Date | Amount | Percentage of Net Assets |
|------|--------|--------------------------|
| 7/31/06 | $34,913,315 | 3.43% |
| 1/31/07 | $     15,955 | 0.001% |
| 7/31/07 | $     16,500 | 0.001% |
| 1/31/08 | $      3,495 | 0.0003% |
| 7/31/08 | $54,438,746 | 4.434% |

86.     Indeed, contrary to the small number of bonds identified as illiquid by the footnote designation described above, the percentage of the Fund's net assets that should have been designated as illiquid was in excess of the 15% threshold throughout the Class Period, and at times was above 25% to 40% of net asset value as indicated below.[1]

---

[1] The source for all trading records cited in this Complaint is EMMA – acronym for Electronic Municipal Market Access – which is a function of the Municipal Securities Rulemaking Board, the Congressionally authorized regulator of many aspects of the market for municipal securities. Moreover, if bonds are sold by one customer and acquired by a second customer, EMMA reports that as two separate trades.  Thus, annual trading of 3 to 7 times a year means a range of from nearly 2 to nearly 4 matched purchases and sales in a year.  In addition, certain of the data was cross-checked via the Bloomberg data service.

- 24 -

**Percentage of Net Assets with Average Reported Annual Trading of Fewer Than:**

| Period Ending | Zero to 1 Times | 1 - 3 Times | 3-7 Times | Cumulative 0 to 7 Times |
|---|---|---|---|---|
| 07/31/06 | 16.1% | 2.5% | 10.5% | 29.1% |
| 01/31/07 | 14.7% | 2.0% | 10.8% | 27.5% |
| 07/31/07 | 16.3% | 2.0% | 11.3% | 29.6% |
| 01/31/08 | 19.8% | 2.3% | 11.2% | 33.3% |
| 07/31/08 | 23.1% | 3.5% | 13.0% | 39.6% |
| 01/31/09 | 23.9% | 3.9% | 18.2% | 46.0% |

87.    Moreover, not only did the bonds making up the percentages of net assets shown in the chart trade so infrequently or not at all, but in many cases the Fund owned between 85% and 100% of the entire bond issue (from approximately 5% to 11% of the Fund's net assets, if not more) or at least half of the entire bond issue (from approximately 17% to 40% of the Fund's net assets, if not more).

88.    The figures in paragraphs 86 and 87 above are even more remarkable and understate the true percentage of net assets that were illiquid for two reasons:  First, the analysis of the Fund's portfolio was conservative and resolved any vagaries in the Fund's reporting the bonds held in its portfolio in favor of a finding of liquidity.  Thus, for example if a bond from the same issuer, same interest rate, same maturity date, and same guarantor of the revenue stream matched more than one CUSIP number, and one CUSIP number had little to no trading, while a second CUSIP had more active trading, the analysis performed for this Complaint assumed that the Fund held the actively traded bond.   Similarly if the bond description was not specific enough to identify any CUSIP number, that bond was also assumed to be liquid.  Secondly, the figures in this chart for July 31, 2008 (and also January 31, 2009 representing the period just

- 25 -

after the end of the Class Period) do not include the impact of those additional bonds (representing between 1% and 6% of net assets) that in fact did trade more frequently than 7 times a year but were in default and thus the Fund had footnoted these bonds as being illiquid.

89.     For example, Defendants stated in the Fund's shareholder report filed with the SEC on March 30, 2007, that the aggregate value of illiquid or restricted securities as of January 31, 2007 was $15,955, which represented 0.01% of the Fund's net assets.  However, that same report stated that the Fund held $12,000,000 of bonds issued by Pennsylvania Economic Development Finance Authority (Northampton Generating), which the Fund held throughout the Class Period.  Although there is no indication that these unrated bonds ever traded on the secondary market after being offered on January 1, 1994, and are thus illiquid under any of the above definitions, the Fund failed to designate these bonds as illiquid in any of its Class Period shareholder reports.  Similarly, throughout the Class Period, the Fund held $6,720,000 of bonds issued by Philadelphia, Pennsylvania Authority for Industrial Development (Aero Philadelphia), representing approximately 87% of the entire issue, that Defendants did not designate as illiquid, despite the fact that that there is no evidence that these bonds ever traded on the secondary market after being offered on April 1, 1999.

90.     Throughout the Class Period, the Fund also failed to disclose as illiquid its holdings of $7,545,000 of bonds issued by Allegheny County Redevelopment Authority (Robinson Mall), despite the fact that these bonds (rated BBB-) did not trade on the secondary market since being offered on August 1, 2000.  Likewise, the Fund did not inform investors that its $4,100,000 holdings of bonds issued by Philadelphia Redevelopment Authority (Pavilion Apartments) were illiquid, despite the fact that the Fund held 100% of the entire issue and these bonds never traded on the secondary market.  Throughout the Class Period, the Fund also held

100% ($3,925,000) of the BBB rated Pennsylvania Higher Education Facilities Authority (St. Francis University) 6.25% interest rate bonds that matured on November 1, 2018.  Although these bonds do not appear to have traded on the secondary market since being issued on October 15, 2003, the Fund failed to report that they were illiquid.  The Fund also did not provide footnote treatment indicating the illiquidity of its $3,905,000 of bonds issued by Northumberland County IDA (NHS Youth Services), despite the fact that there is no evidence that these bonds traded on the secondary market after the December 15, 2002 offering date.

91.     Other bonds held by the Fund throughout the Class Period that were not designated as illiquid and did not trade on the secondary market include: $3,840,000 of bonds issued by Montgomery County, PA IDA (Wordsworth Academy); $3,600,000 of bonds issued by Lehigh County, PA GPA (Kidspeace Obligated Group); $3,000,000 of bonds issued by Pennsylvania Economic Development Finance Authority (Northwestern Human Services); and $2,580,000 of bonds issued by Philadelphia, PA Redevelopment Authority (Pavilion Apartments), to name but a few.

92.     These assets, and others with similar trading and/or ownership patterns, are not liquid under any of the definitions of liquidity set forth above.  Indeed, they meet the Fund's own definition of "illiquid" assets because they "do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price."

93.     Each of the statements and figures regarding liquidity described above was untrue and materially misleading in failing to disclose that in actuality there was so little trading on many of the Fund's holdings that they had to be considered illiquid securities under the SEC and GAAP definitions of liquidity applicable to mutual funds as well as other accepted definitions of liquid securities.

506448

94.     Defendants further stated in the Prospectuses that the Fund's Manager monitored the liquidity of the Fund's holdings. Unbeknownst to investors, this statement also was materially false and misleading.  In fact, the Fund's Manager failed to monitor the liquidity of the Fund's holdings, or otherwise ensure that the Fund had adequate liquidity to meet its various obligations related to inverse floaters.  As a consequence, the percentage of the Fund's assets that were illiquid was far in excess of the 15% of its net assets, as indicated above.

95.     As a result, during the Class Period, more than 15% of the Fund's holdings were illiquid under any objective standard for liquidity as there was no active or developed market for such securities, some of which never traded or traded only a few times in a given year.  Thus, these securities could not be sold by the Fund in the ordinary course of business within seven days at approximately the values at which the Fund had valued these securities on its books.

**3.      Defendants Negligently Misrepresented that the Fund Was Buying At Least 75% Investment Grade Securities and Was Holding Less Than 25% of Its Assets in Junk Bonds**

96.     The September 27, 2006 Prospectus represented that the Fund primarily buys investment-grade securities and that it would not invest more than 25% of the Fund's total assets in municipal securities rated below "investment grade":

> Ratings of Municipal Securities the Fund Buys.  **Most of the municipal securities the Fund buys are "investment grade" at the time of purchase. The Fund can invest up to 25% of its total assets in municipal securities that at the time of purchase are not "investment-grade."** Securities that are rated below "investment-grade" are those rated below "Baa" by Moody's, or lower than "BBB" by Standard & Poor's Rating Services, or comparable ratings by other nationally recognized rating organizations, or (if unrated) judged by the Manager to be comparable to securities rated below investment grade.  Rating categories are described in the SAI. If the rating of a security is reduced after the Fund buys it, the Fund is not required automatically to dispose of that security.  However, the Manager will evaluate those securities to determine whether to keep them in the Fund's portfolio.

(Emphasis added.)

97.     The September 27, 2006 Prospectus also stated that the Fund could *hold* no more

than 25% of its total assets in junk bonds:

> What Does the Fund Mainly Invest In?  The Fund invests mainly in Pennsylvania
> municipal securities that pay interest that, in the opinion of counsel to the issuer
> of each security, is exempt from federal and Pennsylvania personal income taxes,
> and from the investment income tax of the school district of Philadelphia…. **Most
> of the securities the Fund buys must be "investment grade"** (securities rated in
> one of the four highest rating categories of national rating organizations, such as
> Moody's Investors Services "Moody's")), **although the Fund also can hold up
> to 25% of its total assets in lower-grade securities (sometimes called "junk
> bonds").**  Under normal market conditions, the Fund attempts to invest 100% of
> its assets in municipal securities, and as a fundamental policy invests at least 80%
> of its net assets (plus borrowings for investment purposes) in Pennsylvania
> municipal securities.

(Emphasis added.)

98.     The March 5, 2007 Prospectus reiterated that the Fund primarily buys investment-

grade securities and that it would not invest more than 25% of the Fund's total assets in

municipal securities rated below "investment grade":

> Ratings  of  Municipal  Securities  the Fund  Buys.   **Most of the municipal
> securities the Fund buys are "investment  grade" at the time of purchase.
> The Fund can invest up to 25% of its total assets in municipal securities that
> at the time of purchase are not "investment-grade."** Securities that are rated
> below "investment-grade"  are those rated below "Baa" by Moody's, or lower
> than "BBB" by  Standard & Poor's Rating Services, or comparable ratings by
> other nationally recognized statistical rating organizations, or (if unrated) judged
> by the Manager to be comparable to securities rated below investment grade.
> Rating  categories are described in the SAI.  If the rating of a security  is reduced
> after  the Fund buys it, the Fund is not required automatically to dispose of that
> security. However, the Manager will evaluate those securities to determine
> whether to keep them in the Fund's portfolio.

(Emphasis added.)

99.     The March 5, 2007 Prospectus also stated that the Fund could *hold* no more than

25% of its total assets in junk bonds:

> What  Does  the  Fund  Mainly  Invest  In?  The Fund invests mainly in
> Pennsylvania municipal securities that pay interest  that, in the opinion of counsel

- 29 -

to the issuer of each security, is exempt from federal and Pennsylvania personal income taxes, and from the investment income tax of the school district of Philadelphia…. **Most of the securities the Fund buys must be "investment grade"** (securities rated in one of the four highest rating categories of national rating organizations, such as Moody's Investors Services ("Moody's")), **although the Fund also can hold up to 25% of its total assets in lower-grade securities (sometimes called "junk bonds").** Under normal market conditions, the Fund attempts to invest 100% of its assets in municipal securities, and as a fundamental policy invests at least 80% of its net assets (plus borrowings for investment purposes) in Pennsylvania municipal securities.

(Emphasis added.)

100.    The November 28, 2007 Prospectus reiterated that the Fund primarily buys

investment-grade securities and that it would not invest more than 25% of the Fund's total assets

in municipal securities rated below "investment grade":

Ratings of Municipal Securities the Fund Buys. **Most of the municipal securities the Fund buys are "investment-grade" at the time of purchase. However, the Fund can invest as much as 25% of its total assets in securities that are not "investment-grade" (measured at the time of purchase) to seek higher income.** While securities rated "Baa" by Moody's, or "BBB" by Standard & Poor's are considered "investment grade," they have some speculative characteristics. "Investment grade" securities are those rated within the four highest rating categories of Moody's, Standard & Poor's, Fitch Inc. or another nationally recognized statistical rating organization, or (if unrated) judged by the Manager to be comparable to rated investment grade securities…. A reduction in the rating of a security after the Fund buys it will not automatically require the Fund to dispose of that security. However, the Manager will evaluate those securities to determine whether to keep them in the Fund's portfolio.

(Emphasis added.)

101.    The November 28, 2007 Prospectus also stated that the Fund could **hold** no more

than 25% of its total assets in junk bonds:

What Does the Fund Mainly Invest In?  The Fund invests mainly in Pennsylvania municipal securities that pay interest that, in the opinion of counsel to the issuer of each security, is exempt from federal and Pennsylvania personal income taxes, and from the investment income tax of the school district of Philadelphia…. **Most of the securities the Fund buys must be "investment grade"** (securities rated in one of the four highest rating categories of national rating organizations, such as Moody's Investors Services ("Moody's")), **although the Fund also can hold up**

- 30 -

**to 25% of its total assets in lower-grade securities (sometimes called "junk bonds").**  Under normal market conditions, the Fund attempts to invest 100% of its assets in municipal securities, and as a fundamental policy invests at least 80% of its net assets (plus borrowings for investment purposes) in Pennsylvania municipal securities.

(Emphasis added.)

102.   The statements set out in paragraphs 96-101 above were untrue and materially misleading when made because, throughout the Class Period, the Fund was investing primarily in municipal securities that were below investment grade.  Moreover, a material portion of the bonds purchased by the Fund were unrated by any nationally recognized rating agency, but were treated as investment grade by the Fund where "in the Manager's judgment" such bonds were deemed to be "comparable" to "securities rated by a rating agency in the same category." (*See, e.g.*, Form N-CSRS filed with the SEC on March 30, 2007).  The Fund's internal rating methodology, however, overstated the bond's ratings on the assumption of "comparability" with rated bonds.  Indeed, since unrated bonds typically reflect smaller issues that are expected to be thinly traded, as well as lower quality bonds, such bonds should have been considered below investment grade.  As a result, the Fund did invest and/or hold more than 25% of its assets in municipal securities below investment grade, in violation of the Fund's fundamental investment policies.

103.   For example, the Fund represented in its Shareholder Report filed with the SEC on September 28, 2007 that for the period ended July 31, 2007, approximately 81.9% of the Fund's total assets was invested in "investment grade" municipal securities (*i.e.*, bonds rated in the four highest rating categories of national rating organizations) and that only 18.1% of the Fund's assets were invested in junk bonds.  However, an analysis of the bond portfolio reveals that approximately 63% of the Fund's total assets were actually rated by independent ratings

506448

agencies as investment grade.  Thus, approximately 37% of the Fund's total assets had been invested in bonds that were either rated as junk or were unrated by any nationally recognized rating agency.  The Fund was only able to report its compliance with its 25% limitation on junk bond holdings by assigning investment grade ratings to the majority of its unrated bonds, which then comprised 16.78% of the Fund's total assets.  In fact, the Fund assigned unrated bonds representing approximately 10% of its total assets to the top two ratings categories, *i.e.*, AAA and AA.  Thus, for the period ended July 31, 2007, the Fund was in violation of its 25% limit on investments in junk bonds.

104.    Similarly, the Fund represented in its Shareholder Report filed with the SEC on September 25, 2008, that for the period ended July 31, 2008, approximately 79.5% of the Fund's total assets was invested in "investment grade" municipal securities, and that only 20.5% of the Fund's assets were invested in junk bonds.  However, an analysis of the bond portfolio reveals that approximately 63%-67% of the Fund's total assets were actually rated by independent ratings agencies as investment grade.  Thus, at least 33% of the Fund's total assets had been invested in bonds that were either rated as junk or were unrated by any nationally recognized rating agency.  The Fund was only able to report its compliance with its 25% limitation on junk bond holdings by assigning investment grade ratings to the vast majority of its unrated bonds, which then comprised 17.02% of the Fund's total assets.

### 4.    Defendants Negligently Overstated the Value of the Fund's Assets and Its NAV

105.    Throughout the Class Period, Defendants claimed the Fund valued its assets and determined the Fund's NAV by using pricing services that purported to provide estimates of value based on the trading data of other, comparable securities.  For example, the Statement of Additional Information that accompanied the Fund's March 5, 2007 Prospectus stated:

SECURITIES VALUATION.  The Fund calculates the net asset value of its shares as of the close of The New York Stock Exchange (the Exchange), normally 4:00 P.M. Eastern time, on each day the Exchange is open for business. ***Securities listed or traded on National Stock Exchanges or other domestic exchanges are valued based on the last sale price of the security traded on that exchange prior to the time when the Fund's assets are valued.  Securities traded on NASDAQ are valued based on the closing price provided by NASDAQ prior to the time when the Fund's assets are valued.***  In the absence of a sale, the security is valued at the last sale price on the prior trading day, if it is within the spread of the closing "bid" and "asked" prices, and if not, at the closing bid price.... Securities may be valued primarily using dealer-supplied valuations or a portfolio pricing service authorized by the Board of Trustees. ***Securities (including restricted securities) for which market quotations are not readily available are valued at their fair value.***  Foreign and domestic securities whose values have been materially affected by what the Manager identifies as a significant event occurring before the Fund's assets are valued but after the close of their respective exchanges will be fair valued. ***Fair value is determined in good faith using consistently applied procedures under the supervision of the Board of Trustees.***  Short-term "money market type" debt securities with remaining maturities of sixty days or less are valued at amortized cost (which approximates market value).

(Emphasis added).

106.    That same document further stated that long-term debt securities held by the Fund

(such as those used as collateral in the creation of inverse floaters) were valued as follows:

Long-term debt securities having a remaining maturity in excess of 60 days are valued based on the mean between the "bid" and "asked" prices determined by a portfolio pricing service approved by the Fund's Board of Trustees or obtained by the Manager from two active market makers in the security on the basis of reasonable inquiry.

Securities (including restricted securities) not having readily-available market quotations are valued at fair value determined under the Board's procedures. ***If the Manager is unable to locate two market makers willing to give quotes, a security may be priced at the mean between the "bid" and "asked" prices provided by a single active market maker (which in certain cases may be the "bid" price if no "asked" price is available).***

In the case of municipal securities, when last sale information is not generally available, the Manager may use pricing services approved by the Board of Trustees.  The pricing service may use "matrix" comparisons to the prices for comparable instruments on the basis of quality, yield and maturity.  Other special factors may be involved (such as the tax-exempt status of the interest paid by municipal securities). ***The Manager will monitor the accuracy of the pricing***

- 33 -

> *services.  That monitoring may include comparing prices used for portfolio valuation to actual sales prices of selected securities.*

(Emphasis added.)

107.     In fact, as was disclosed – but only after the Class Period – none of the Fund's investments were priced by reference to trading data.  Rather, the Manager valued the Fund's assets in an opaque process for which there was no market-price check.  In the absence of such a check, the Fund's assets were overvalued and the Fund's NAV was also overvalued.  For example, for the reasons set forth above, because the Fund failed to properly characterize a substantial portion of its investments as illiquid and/or unrated or junk bonds, the Fund's pricing did not properly account for and disclose the impact of these factors on its valuation.

108.     A change in accounting rules ultimately forced the Fund to disclose that *every single one of its assets was valued on a basis other than the "last sale price."*  In September 2006, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 157, which, among other things, requires entities to disclose the valuation inputs they use to measure the "fair value" of their assets.

109.     The additional disclosures mandated by SFAS 157 occurred for the first time in the Fund's shareholder report for the period ended January 31, 2009.  In that document, the Fund acknowledged that its entire portfolio was valued based on "inputs other than quoted prices that are observable for the asset (such as quoted prices for similar assets and market-corroborated inputs such as interest rates, prepayment speeds, credit risks, etc.)."  In other words, *there was no ready and active trading market – and therefore no "bid" and "ask" to use in pricing – for a single security that the Fund held as of January 31, 2009.*  Although not disclosed prior to the January 31, 2009 semi-annual report filed on March 25, 2009, this undisclosed method of

- 34 -

506448

valuing each security applied to the portfolio of investments held by the Fund throughout the Class Period.

110.    Defendants' statements regarding Fund valuation were materially false and misleading, as evidenced by two separate events.

111.    First, as evidenced by the insufficiency of the Fund's assets that were purportedly segregated as collateral, the Manager did not "monitor the accuracy" of the pricing services the Fund used.  Rather, investments whose value should have been lowered in the Fund's books were not reduced, ultimately damaging the Fund when it lacked sufficient collateral to satisfy its other obligations.  In the course of selling those holdings, the Fund received their true "fair value," which was far less than the value Defendants reported in Fund financial statements that were filed with the SEC.

112.    Second, as the Fund was ultimately forced to disclose pursuant to SFAS 157, there was no ready and active trading market - and therefore no "bid" and "ask" to use in pricing - for a single security that the Fund held as of January 31, 2009 and, moreover, contrary to Defendants' statement that "Securities traded on NASDAQ are valued based on the closing price provided by NASDAQ," not a single of the Fund's holdings traded on NASDAQ or any other national securities exchange.

### 5.    Defendants Negligently Failed To Disclose the Extraordinary Volatility of the Fund's Investments in Complex Derivative Instruments, and the Fund's Statements Regarding Inverse Floaters Were Misleading and Incomplete

113.    The Fund also failed to truthfully, accurately and completely disclose the risks created by its increasingly large investments in derivative securities called inverse floaters, which comprised 6.58% of the Fund's total assets as of January 31, 2006 and 5.22% as of January 31, 2007, but swelled to 11.55% of the Fund's total assets by January 31, 2008, and a

whopping 13.82% of the Fund's assets as of July 31, 2008.  While the Fund touted its superior returns, which allowed it to attract new investors and grow into a multi-billion dollar fund during the Class Period, it failed to disclose that its strategy of using inverse floaters to generate these outsized returns was totally inconsistent with the Fund's clearly stated investment objective of preserving capital.  This is because the Fund's inverse floaters, as explained below, were drastically more volatile, and hence riskier, than the fixed income municipal securities that were supposed to account for at least 80% of the Fund's total assets.  Moreover, as shown below, the figures disclosed by the Fund regarding its exposure to inverse floaters were misleading and gave an incomplete picture of the extent of the Fund's exposure to these risky derivatives.

114.    The September 27, 2006 Prospectus represented that the Fund could invest in derivatives, including inverse floaters, to increase returns or for hedging purposes.  However, in order to preserve capital, the Fund was limited in the amount of certain derivative instruments it could hold:

> The Fund can use derivatives to seek increased returns or to try to hedge investment  risks. In general  terms, a derivative investment is an investment contract whose value  depends on (or is derived from) the value of an underlying asset, interest rate or index. "Inverse floaters" are examples of derivatives the Fund can use.
>
> If the issuer of the derivative investment does not pay the amount due, the Fund can lose money on its  investment. Also, the underlying security or investment on which the derivative is based, and the derivative itself, may not perform the way the Manager expected it to perform. If that happens, the Fund will get less income than expected or its share price could  decline. **To try to preserve capital, the Fund has limits on the amount of particular types of derivatives it can hold.**

(Emphasis added.)

115.    Among the  restrictions on investments in derivatives, the September 27, 2006 Prospectus stated that the Fund could not invest more than 20% of its total assets in inverse floaters:

Inverse floaters are a type of "derivative security." Some have a "cap," so that if interest rates rise above the "cap," the security pays additional interest income.  If rates do not rise above the "cap," the Fund will have paid an additional amount for a feature that proves worthless…. **The Fund can invest up to 20% of its total assets in inverse floaters.**

*       *       *

INVERSE FLOATING RATE SECURITIES. The Fund invests in inverse floating rate securities that pay interest at a rate that varies inversely with short-term interest rates. Certain of these securities may be leveraged, whereby the interest rate varies inversely at a multiple of the change in short-term rates. As interest rates rise, inverse floaters produce less current income. The price of such securities is more volatile than comparable fixed rate securities. **The Fund will not invest more than 20% of its total assets in inverse floaters.** Inverse floaters amount to $64,720,873 as of July 31, 2006, which represents 6.09% of the Fund's total assets.

(Emphasis added.)

116.    With respect to monitoring the Fund's exposure to inverse floaters, the September 27, 2006 Prospectus stated:

The Manager monitors the Fund's potential exposure with respect to these agreements on a daily basis and intends to take action to terminate the Fund's investment in the inverse floaters, as it deems appropriate. As of July 31, 2006, the Fund has not made any payments related to such agreements and it expects the risk of material future payments required under these agreements to be remote.

117.    The September 27, 2006 Prospectus further represented that the Fund could  not invest in derivatives or hedging instruments for "speculative purposes":

The Fund can purchase and sell derivatives for use as "hedging instruments." **The  Fund does not use hedging instruments for speculative purposes**, and has limits on its use of them.  The Fund does not use hedging instruments to a substantial [degree and is not required to use them in seeking its investment objective.][2]

(Emphasis added.)

---

[2] The September 27, 2006 Prospectus ends this sentence after "substantial."  However, earlier and later Prospectuses continue the sentence as in the brackets above.

506448

118.     These statements, as well as similar statements appearing in the other

prospectuses issued during the Class Period, were untrue and materially misleading because, as

shown below, the Fund was using its investments in inverse floaters for purely speculative

purposes in order to obtain big returns, rather than merely using them as a hedge against rising

interest rates.

119.     The March 5, 2007 Prospectus reiterated that the Fund could not invest more than

20% of its total assets in inverse floaters:

> Inverse Floaters.  **The Fund may invest up to 20% of its total assets in
> "inverse floaters" to seek greater income and total return.** An inverse floater
> typically is a derivative instrument created by a trust that divides a fixed-rate
> municipal security into two securities: a short-term tax free floating rate security
> and a long-term tax free floating rate security (the inverse floater) that pays
> interest at rates that move in the opposite direction of the yield on the short-term
> floating rate security.  As short-term interest rates rise, inverse floaters produce
> less current income (and, in extreme cases, may pay no income) and as short-term
> interest rates fall, inverse floaters produce more current income.

(Emphasis added.)

120.     The November 28, 2007 Prospectus reiterated that the Fund could not invest more

than 20% of its total assets in inverse floaters:

> INVERSE FLOATERS. **The Fund may invest up to 20% of its total assets
> (which includes the effects of leverage) in "inverse floaters"** to seek greater
> income and total return. An inverse floater typically is a derivative instrument
> created by a trust that divides a fixed-rate municipal security into two securities: a
> short-term tax free floating rate security and a long-term tax free floating rate
> security (the inverse floater) that pays interest at rates that move in the opposite
> direction of the yield on the short-term floating rate security. As short-term
> interest rates rise, inverse floaters produce less current income (and, in extreme
> cases, may pay no income) and as short-term interest rates fall, inverse floaters
> produce more current income.

(Emphasis added.)

121.     The Fund's inverse floaters typically arose from a complex series of transactions

(that often goes by the name of a "tender option bond program").  First, the Fund transfers a

- 38 -

long-term municipal bond that is has purchased to an investment bank retained by the Fund (who then sponsors or creates a trust), and the sponsor sells to the trust the long-term municipal bond purchased by the Fund.  During the Class Period, the Fund transferred bonds with a value of between $228 million and $355 million to the trust, representing over 16% to over 21% of the Fund's total investments.  After acquiring these bonds, the trust then issued two separate classes of securities, as follows:

a.   **Floating rate securities (floaters**): The trust issues these to third parties and uses the proceeds of the sale to fund the purchase of the long-term municipal bonds referenced above.  The floater pays coupons at a money market rate up to a ceiling rate that varies positively with a referenced and prominent short-term interest rate.  Periodically (typically every week but daily in some cases), the holders or owners of the floaters have the contractual right to tender them for redemption at par value.  The trust pays the floater coupon from the periodic coupon paid on the underlying long-term municipal bond.

b.   **Inverse floating rate securities (inverse floaters):** The trust issues inverse floaters to the Fund.  The coupon received by the Fund on the inverse floaters is the difference between the long-term interest payments generated by the municipal bond and the short-term interest paid on the floaters.  Because they receive all income not used to pay interest on the companion floaters, inverse floaters are sometimes referred to as "residuals."

122.   Inverse floaters do not have a uniform degrees of *leverage*.  Rather, any inverse floater's leverage is determined by the ratio of the dollar size of the floater to the dollar size of its companion inverse floater (with the sum of the two normally equaling the value, in dollars, of the

underlying municipal bond).  As the ratio of the floater's size to the inverse floater's size

increases, so does the leverage of the inverse floater.  Notably, not one of the Fund's

prospectuses issued during the Class Period revealed or even discussed the range of leverages in

the Fund's inverse floaters, and the resulting risk to the Fund's performance and NAV inherent

in such leverage.

123.    This omission is material because the impact of the leverage from the inverse

floaters is not simply a matter of the balance sheet values or source of funding.  Rather, leverage

affects the price volatility of the inverse floater and, hence, the exposure of the Fund's NAV to

such risks.  Although not disclosed in the Fund's SEC filings, municipal bond experts recognize

that the price risk of an inverse floater is a leverage-based multiple of the volatility of the

underlying bond.  For example, if the Fund purchased a bond, which the Fund transfers to the

trust, and if the underlying bond would lose 4% of its value if its yield were to rise 1% (because

of capital market events, for example), and if the trust generates an inverse floater with a

leverage of 3, (as defined in the prior paragraph), the inverse floater would lose approximately

16% of its value with that 1% increase in yield.  In this example, the price of the inverse floater

is 400% more volatile than and sensitive to increase in price volatility: 4% for the bond

compared to 16% for the inverse floater based on the same bond (1 plus the leverage ratio of 3

times, or 4 times the price sensitivity of the underlying bond).

124.    Indeed, in at least one example, Defendants created an inverse floater with a

leverage ratio of an astounding 9 to 1.  The Fund created a $1.5 million inverse floater from its

ownership of $15 million of a Puerto Rico Sales Tax Financing Corp, Series A bond that was due

to mature on August 1, 2057.  With a floater of $13.5 million and an inverse floater of $1.5

million, the leverage ratio is 9, meaning that the inverse floater was 1,000% [or 10 times] as

volatile and sensitive to price fluctuations than the underlying $15 million bond.  Moreover, in this example, the underlying bond was itself already very volatile because its maturity was approximately 50 years in the future, as price risk and volatility increases the longer the time span until the eventual maturity of the bonds.

125.     Another example from the January 31, 2008 Statement of Investments was a $4.17 million inverse floater due on July 1, 2031 created from the Fund's ownership of $31.89 million in Puerto Rico Electric Power Authority bonds due to mature on July 1, 2031, with a leverage ratio of 6.65, except that this inverse floater may also have been paired with a floater issued on $9.8 million in additional Puerto Rico Electric Power Authority bonds due to mature on July 1, 2025.  In addition to any undisclosed risks caused by the mismatching of the maturities between the floaters and the inverse floaters, this means that the two seemingly small inverse floaters of $5.67 million (or less than 0.5% of net assets)actually exposed the Fund to price volatility equivalent to a leveraged investment of $56.7 million, representing 4.6% of net assets.

126.     Moreover, the risk associated with these particular inverse floaters were further compounded by being subject to "shortfall and forbearance" agreements described below.  Although the above represent just two examples, they demonstrate the degree to which the Fund and its NAV were exposed to undisclosed substantial volatility and very risky bets that interest rates would not rise.

127.     These are not isolated examples.  Indeed, during the Class Period, the Fund's inverse floaters had an average price volatility of between 344% and nearly 600% of the price sensitivity and risk compared than if the Fund had just held the underlying bonds, resulting in a leveraged exposure that at times during the Class Period was in excess of 20% of total assets.

506448

128.    The Prospectuses negligently failed to disclose the mathematically certain fact that inverse floaters are much more price-volatile than otherwise similar debt securities.  For example, both the March 5, 2007 Prospectus and the November 27, 2007 Prospectus offers this misleading assessment of the price risk of inverse floaters: "The market value of inverse floaters **can be** more volatile than that of a conventional fixed-rate bond having similar credit quality, redemption provisions, and maturity." (Emphasis added.)  By stating that inverse floaters "can be" more volatile, this statement conceals the fact that inverse floaters **are guaranteed to be far** more volatile than bonds with similar credit quality, redemption provisions, and maturities.

129.    The inverse floaters that the Fund created through floating-rate financing had another risky characteristic.  The arrangements creating the inverse floaters actually allowed the holders of the floaters to "put" them back to the trust at any time, usually with seven days' notice.  Thus, the holder could sell the floater back to the trust and demand par value or full and undiscounted face value in exchange.  If the sponsor could not re-sell the tendered floaters, it had the right to collapse the trust by causing all outstanding floaters to be tendered for par and selling the municipal bond held in the trust to meet the trust's outstanding obligations (*i.e.*, to pay the holders of the floaters the par value to which their put option entitled them).

130.    Furthermore, because the Fund had in some cases entered into "shortfall and forbearance" agreements with the sponsor, the Fund took on the obligation to reimburse the holder of the floater for the difference between the liquidation value of the underlying security and the par value of the tendered floaters.  In other words, a shortfall and forbearance agreement obligated the Fund to make up any difference between the market value of the collateral (*i.e.*, long-term municipal bond originally placed in the trust to create the floater and companion inverse floater) and the par value of the floater.  Whenever that would happen, the Fund would

- 42 -

be forced to sell other securities from its portfolio to satisfy its contractual obligations, regardless of market conditions.  Therefore, securities that the Fund may have intended to hold for long periods of time, or which were at any particular moment out of favor with the market, would nevertheless have to be sold at fire-sale prices in order to raise capital.

131.    Thus, the Fund's purported "long-term" inverse floaters – with recorded maturities of 20, 30 years or even 50 years – were in reality nothing more than short-term arrangements whereby the Fund would purchase the bonds with revolving loans that the Fund could be forced to repay in full at any time, and with only seven days' notice.  The mismatched maturity of these loans (*i.e.*, the fact that the floaters were very short-term, but the underlying bonds were frequently very long-term) exposed a material portion of the Fund's assets to massive risks that were not disclosed and also were inconsistent with the Fund's preservation of capital objective.  Indeed, the creation of two securities, a floater and inverse floater, effectively converted the fixed income stable bonds that investors in municipal funds typically seek into extremely volatile and leveraged short-term instruments.  This strategy traded the relative safety of conventional municipal bonds, which could be held for a long time and through periods of market turbulence, for the possibility of risk-induced higher returns in the short run.

132.    In addition to the undisclosed risks described above, the undisclosed risks of the Fund's investments in inverse floaters also include, among others, the following:

a.    Under inverse floater agreements, if the re-marketing agent that offers the short-term security is unable to sell them, the re-marketing agent may cause the trust to be collapsed and the Fund is then required to repay the principal amount of the tendered securities.  In order to do so the Fund is forced to sell the security from its portfolio regardless of market conditions.  In fact, Defendants acknowledged

506448

their failure to disclose this material risk (which was present at all times during the Class Period) when, on November 28, 2008, they filed with the SEC a Registration Statement and Prospectus that modified the Fund's existing disclosures concerning inverse floaters and for the first time added the following:

> An inverse floater that has a higher degree of leverage is typically more volatile with respect to its price and income than an inverse floater having a lower degree of leverage. **Under inverse floater arrangements, if the remarketing agent that offers the short-term securities for sale is unable to sell them, or if the holders tender (or put) them for repayment of principal and the remarketing agent is unable to remarket them, the remarketing agent may cause the trust to be collapsed, and in the case of floaters created by the Fund, the Fund will then be required to repay the principal amount of the tendered securities. During times of market volatility, illiquidity or uncertainty, the Fund could be required to sell other portfolio holdings at a disadvantageous time to raise cash to meet that obligation.**

(Emphasis added.)

b.   Toward the end of the Class Period, such collapses of inverse floaters forced the Fund to rapidly sell large blocks of securities held in its portfolio in order to satisfy its contractual obligations under its inverse floater agreements.  In order to provide the liquidity necessary to honor the Fund's contractual obligations, the Fund first sold its limited number of AAA rated bonds, making the remaining mix of bonds far more speculative and with a greater portion of junk bonds.  The Fund then was forced to sell its remaining illiquid and low-quality or unrated bonds, accepting prices significantly below the values at which the bonds were carried on its books.

c.   **Shortfall and Forbearance Agreements** – Under these agreements, the Fund promises to make up the difference between the value of the collateralizing bond

- 44 -

506448

and the value of the inverse floater that has been issued by the trust.  As a result, under such agreements the Fund could have been on the hook for as much as $75 million as of July 31, 2008, or 7% of the Fund's total assets.

133.   The statements identified above regarding inverse floaters were materially false and misleading for the following reasons, among others:

a.   Defendants failed to disclose that, although the Fund may have limited its investment in inverse floaters to 20 percent of its assets, the inverse floaters were highly leveraged, and their use could cause the Fund to be forced to sell far more than 20 percent of its assets and, therefore, the Fund's exposure was many times greater than 20 percent of the Fund's asset value.  Moreover, since the Fund materially overstated the reported values of its securities, Defendant's statement that the inverse floater concentration was limited to 20 percent of its assets was materially false and misleading because the actual percentage was higher.

b.   due to their inherent leverage, inverse floaters not only "can" be volatile, they are in fact *certain* to be volatile;

c.   the Fund did not segregate cash or readily marketable short-term debt instruments sufficient to cover its obligations under the inverse floaters, and, therefore, faced the risk of selling, and indeed, to meet those obligations, was forced to sell other illiquid securities at fair market values that were significantly lower than the inflated values reported in the Fund's financial statements; and

d.   the Manager did not monitor the Fund's potential exposure to the shortfall and forbearance agreements, as evidenced by the Fund's failure to segregate liquid assets sufficient to meet its obligations under those agreements.

506448

134.     Similarly, each of the Fund's Statements of Investments included in the Statements of Additional Information throughout the Class Period contained a list of the Fund's holdings, and purported to identify holdings which had been segregated as collateral obligations. These identifications were materially false and misleading for the following reasons, among others:

      a.     They materially overvalued the holdings that had been segregated, both disguising the risk to the Fund's other holdings and falsely inflating the net asset value of the Fund, and

      b.     They purported to identify *all* holdings which acted as collateral when in fact, because of the insufficiency of the holdings marked as collateral, other of the Fund's holdings also were at risk of forced sales.

### D.     Defendants' Misstatements and Omissions Were Material

135.     The foregoing untrue statements and omissions are at odds with Defendants' representations that the Fund's fundamental investment objective was "preservation of capital" and that the Fund was a more conservative investment than "taxable bond funds, such as high yield bond funds."

136.     A reasonable investor would have viewed these undisclosed facts, severally and jointly, as having altered the total mix of information available to him or her.  Moreover, a reasonable investor would understand that the facts described herein, but never disclosed to the investing public, would cause the Fund to undertake materially increased investment risk during the Class Period because the Fund was investing in securities that were materially more risky than disclosed.

137.     Each of the Prospectuses identified above stated that the Fund cannot alter its fundamental investment policies without shareholder approval:

- 46 -

Fundamental policies cannot be changed without the approval of a majority of the Fund's outstanding voting shares. The Fund's investment objective is a fundamental policy.

138.    At no time during the Class Period did the Fund seek, let alone obtain, shareholder approval to alter or modify its investment objective or any of the investment policies concerning leverage, liquidity, credit quality and bond ratings, or investments in derivative securities, including inverse floaters. Notwithstanding the Fund's failure to secure shareholder approval to change its fundamental policies regarding its investment objective and investment policies, the Fund embarked on risky investment strategies that were at odds with its primary investment objective of preserving capital, by investing in unrated illiquid bonds and in progressively larger proportions of highly leveraged inverse floaters as speculative bets against rising interest rates. Indeed, the Fund's stated investment objective of preserving capital implied that the Fund would assemble a portfolio of securities that was designed to weather turbulence in the capital markets. However, the Fund's investments in inverse floaters and junk bonds cause the Fund to be more vulnerable to economic cycles than other mutual funds in its sector, which resulted in a substantial decline in the Fund's NAV when that turbulence appeared in 2008.

### E.    The Truth Begins To Emerge

139.    On November 28, 2008, the Fund issued an updated Registration Statement, Prospectus and Statement of Additional Information (the "November 28, 2008 Prospectus"), in which Defendants began to reveal the true risks of investing in the Fund's shares. The new risk disclosures in the November 28, 2008 Prospectus partially revealed the falsity of the Fund's prior disclosures. Among other things, the November 28, 2008 Prospectus modified the Fund's existing disclosures regarding the risks and volatility created by its large positions in inverse floaters, stating:

**SPECIAL RISKS OF DERIVATIVE INVESTMENTS**. The Fund can invest in different types of "derivative" investments that are consistent with its investment strategies. A derivative is an investment whose value depends on (or is derived from) the value of an underlying security, asset, interest rate, index or currency. Inverse floaters are the primary type of derivative the Fund can use.

The Fund may use derivatives to seek income or capital gain or to hedge against the risks of other investments. Derivatives may allow the Fund to increase or decrease its exposure to certain markets or risks very quickly. The Fund may also use derivatives for hedging purposes. Examples include, but are not limited to, interest rate swaps or municipal bond swaps. The Fund typically does not use hedging instruments, such as options, to hedge investment risks.

Derivatives may be volatile and may involve significant risks. Derivative transactions may require the payment of premiums. **Certain derivative investments held by the Fund may be illiquid, making it difficult to close out an unfavorable position.** The underlying security or other reference rate on which a derivative is based, or the derivative itself, may not perform the way the Manager expects it to. As a result, the Fund could realize little or no income or lose principal from the investment, or a hedge might be unsuccessful. The Fund may also lose money on a derivative investment if the issuer fails to pay the amount due.

Inverse Floaters. The Fund may invest in inverse floaters to seek greater income and total return. An inverse floater is a derivative instrument, typically created by a trust that divides a fixed-rate municipal security into two securities: a short-term tax-exempt floating rate security (sometimes referred to as a "tender option bond") and a long-term tax-exempt floating rate security (referred to as a "residual certificate" or "inverse floater") that pays interest at rates that move in the opposite direction of the yield on the short-term floating rate security. The purchaser of a "tender option bond" has the right to tender the security periodically for repayment of the principal value. As short-term interest rates rise, inverse floaters produce less current income (and, in extreme cases, may pay no income) and as short-term interest rates fall, inverse floaters produce more current income.

To facilitate the creation of inverse floaters, the Fund may purchase a fixed-rate municipal security and subsequently transfer it to a broker-dealer (the sponsor), which deposits the municipal security in a trust. The trust issues the residual certificates and short-term floating rate securities. The trust documents enable the Fund to withdraw the underlying bond to unwind or "collapse" the trust (upon tendering the residual certificate and paying the value of the short-term bonds and certain other costs). The Fund may also purchase inverse floaters created by municipal issuers directly or by other parties that have deposited municipal bonds into a sponsored trust.

- 48 -

The Fund's investments in inverse floaters involve certain risks. **The market value of an inverse floater residual certificate can be more volatile than that of a conventional fixed-rate bond having similar credit quality, maturity and redemption provisions.** Typically, inverse floater residual certificates tend to underperform fixed-rate bonds when long-term interest rates are rising but tend to outperform fixed-rate bonds when long-term interest rates are stable or falling. Inverse floater residual certificates entail a degree of leverage because the trust issues short-term securities in a ratio to the residual certificates with the underlying long-term bond providing collateral for the obligation to pay the principal value of the short-term securities if and when they are tendered. If the Fund has created the inverse floater by depositing a long-term bond into a trust, it may be required to provide additional collateral for the short-term securities if the value of the underlying bond deposited in the trust falls.

An inverse floater that has a higher degree of leverage is typically more volatile with respect to its price and income than an inverse floater having a lower degree of leverage. **Under inverse floater arrangements, if the remarketing agent that offers the short-term securities for sale is unable to sell them, or if the holders tender (or put) them for repayment of principal and the remarketing agent is unable to remarket them, the remarketing agent may cause the trust to be collapsed, and in the case of floaters created by the Fund, the Fund will then be required to repay the principal amount of the tendered securities. During times of market volatility, illiquidity or uncertainty, the Fund could be required to sell other portfolio holdings at a disadvantageous time to raise cash to meet that obligation.**

Some inverse floaters may have a "cap," so that if interest rates rise above the cap, the security pays additional interest income. If rates do not rise above the cap, the Fund will have paid an additional amount for that feature that has proved worthless.

(Emphasis added.)

140.    The statement, "The market value of an inverse floater residual certificate ***can be*** more volatile than that of a conventional fixed-rate bond," was itself untrue and materially misleading because an inverse floater is always going to be more volatile than a fixed rate bond. Defendants also failed to disclose the Fund's massive exposure to shortfall and forbearance agreements on its inverse floaters.  Under these agreements, the Fund promises to make up the difference between the value of the collateralizing bond and the value of the inverse floater that

has been issued by the trust.  As a result, under such agreements the Fund could have been on the hook for as much as $75 million as of July 31, 2008, or 7% of the Fund's NAV.

141.    The November 28, 2008 Prospectus also contained modified disclosures about the lack of liquidity of its investments and the risks of volatility and illiquidity to the Fund, including the fact that sales of large blocks of the Fund's bonds and/or unwinding its inverse floaters within a short period of time could materially and adversely affect the price of the very securities the Fund is attempting to sell, which corrected prior disclosures, stating:

> **UNUSUAL VOLATILITY AND LACK OF LIQUIDITY IN THE MUNICIPAL BOND MARKETS**. Municipal bonds are traded in the "over-the-counter" market among dealers and other large institutional investors. In late 2008, the municipal market entered a period of greater volatility than it had historically experienced. Liquidity in the municipal bond market (the ability to buy and sell bonds readily) was reduced in response to overall economic conditions and credit tightening. **During times of reduced market liquidity, the Fund may not be able to sell bonds readily at prices reflecting the values at which the bonds are carried on the Fund's books. Sales of large blocks of bonds by market participants, such as the Fund, that are seeking liquidity can further reduce bond prices in an illiquid market. The Fund may seek to make sales of large blocks of bonds to meet shareholder redemption requests, or it may be required to raise cash to re-collateralize, unwind or "collapse" trusts that issued inverse floaters to the Fund or to make payments to such trusts to enable them to pay for tenders of the short-term securities they have issued, if the remarketing agents for those securities are unable to sell those short-term securities in the marketplace to other buyers (typically tax exempt money market funds).** It is not possible to predict whether such cycles of market illiquidity are short-term or may continue over a protracted period of time.

(Emphasis added.)

142.    The November 28, 2008 Prospectus also contained modified risk disclosures concerning the Fund's use of leverage, in which Defendants admitted that using leverage to purchase securities made the price of the Fund's shares more volatile and sensitive to interest rate changes, and exaggerate the effects of any increase or decrease in the value of the Fund's assets, stating:

506448

**BORROWING AND LEVERAGE.** The Fund can borrow from banks, a technique referred to as "leverage," in amounts up to one-third of the Fund's total assets (including the amount borrowed) less all liabilities and indebtedness other than borrowings. The Fund can use those borrowings for investment-related purposes such as purchasing securities believed to be desirable by the Manager when available, funding amounts necessary to unwind or "collapse" trusts that issued "inverse floaters" to the Fund (an investment technique used by the Fund as described in this prospectus), or to contribute to such trusts to enable them to meet tenders of their other securities by the holders. The Fund currently participates in a line of credit with other Oppenheimer funds for those purposes. The Fund may also borrow to meet redemption obligations or for temporary and emergency purposes.

Borrowing for leverage will subject the Fund to greater costs (for interest payments to the lender, origination fees and related expenses) than funds that do not borrow for leverage and these other purposes. The interest on borrowed money is an expense that might reduce the Fund's yield, especially if the cost of borrowing to buy securities exceeds the yield on the securities purchased with the proceeds of a loan**. Using leverage may also make the Fund's share price more sensitive, i.e. volatile, to interest rate changes than if the Fund did not use leverage due to the tendency to exaggerate the effect of any increase or decrease in the value of the Fund's portfolio securities. The use of leverage may also cause the Fund to liquidate portfolio positions when it may not be advantageous to do so to satisfy its obligations or meet segregation requirements under the Investment Company Act.**

(Emphasis added.)

### F.   Defendants' Misstatements and Omissions Caused the Fund's Investors Losses

143.   Due to Defendants' positive, but misleading or untrue statements, and the omissions of material facts described herein, billions of dollars were invested in the Fund.

144.   For 2008, Fund shares declined approximately 37.9%, from $12.21 per share on January 2, 2008, to a low of $7.42 per share on December 17, 2008, before finishing 2008 at an abysmal $7.58 per share.

145.   This drop was not the result of a general economic decline, but a direct result of Defendants' misstatements and omissions of material fact concerning the Fund's adherence to its investment objectives and policies.  Defendants' violations of the federal securities laws by

- 51 -

disseminating untrue statements and omitting material facts concerning the Fund's investments caused the net asset value of the Fund to plummet. Simply put, Defendants' misstatements and material omissions led investors to believe that most of the Fund's assets were invested conservatively in investment grade municipal bonds in keeping with the Fund's stated objective of "preservation of capital," when in actuality it was nothing more than a risky junk bond fund.

146.    To put the Fund's 2008 performance in context, the average Pennsylvania municipal bond fund experienced a decline of only a few percentage points for 2008, as reflected in the following table comparing the Fund to 23 other Pennsylvania Municipal Bond Funds:

506448

## Comparing OPATX Change in NAV to that of 23 Other PA Bond Funds[3]

| Fund Family | Symbol | Percentage Change of NAV in 3 Periods | | |
|---|---|---|---|---|
| | | % Change in Class Period | % Change from 1/2/08 to 11/26/08 | % Change from 1/2/08 to 12/31/08 |
| **J. P Morgan Muni. Bond Index** | JMBINDEX | -6.54% | -10.50% | -7.42% |
| **Oppenheimer PA** | OPATX | -35.60% | -31.70% | -37.92% |
| **Other  Pennsylvania Tax Exempt Bond Funds** | | | | |
| 1  Allegiant | APMRX | -1.27% | -1.94% | -0.97% |
| 2  AllianceBern | APAAX | -11.13% | -9.77% | -11.49% |
| 3  BlackRock | MDPYX | -14.50% | -11.71% | -11.98% |
| 4  BNY Mellon | MIPAX | -7.45% | -6.71% | -7.03% |
| 5  Delaware | DELIX | -11.72% | -10.04% | -10.29% |
| 6  Dreyfus | PTPAX | -10.71% | -9.38% | -9.38% |
| 7  Eaton Vance Ltd Maturity | EXPNX | -9.51% | -7.92% | -8.02% |
| 8  Eaton Vance Income | ETPAX | -25.54% | -22.40% | -25.28% |
| 9  Evergreen | EKVAX | -14.06% | -11.41% | -13.13% |
| 10  Federated | PAMFX | -17.48% | -14.02% | -15.00% |
| 11  Fidelity | FPXTX | -5.49% | -5.40% | -4.93% |
| 12  First Investors | FTPAX | -7.16% | -6.36% | -3.92% |
| 13  Franklin | FRPAX | -11.98% | -11.13% | -10.75% |
| 14  Glenmede | GTCMX | -2.21% | -2.31% | -0.77% |
| 15  Legg Mason | SBPAX | -7.07% | -7.36% | -7.05% |
| 16  Lord Abbett | LAPAX | -15.24% | -13.09% | -14.26% |
| 17  MFS | MFPAX | -12.65% | -11.09% | -11.09% |
| 18  MTB | APARX | -6.51% | -5.95% | -5.26% |
| 19  Nuveen | FPNTX | -12.55% | -11.37% | -12.81% |
| 20  Putnam | PTEPX | -9.95% | -9.05% | -10.04% |
| 21  SEI | SEPAX | -5.54% | -4.91% | -5.49% |
| 22  Van Kampen | VKMPX | -20.37% | -16.36% | -18.79% |
| 23  Vanguard | VPAIX | -10.14% | -8.61% | -8.16% |
| Average Excluding OPATX | | -10.88% | -9.49% | -9.82% |
| Standard Deviation Excl. OPATX | | 5.59% | 4.52% | 5.54% |
| No. of Std. Dev's in OPATX Variance from Avg. | | 4.43 | 4.91 | 5.07 |

---

[3]  Returns are for Class A shares, excluding any load, or investor class shares.

147.   In an October 21, 2008 report[4] entitled, "Oppenheimer Pennsylvania Municipal's recent plummet Illustrates its risks well," *Morningstar* stated that 70% of the Fund's assets were invested in bonds rated BBB and below as compared to an average of 19% for other funds in its category:

> This gutsy fund's performance has been hard to swallow lately. **With a loss of more than 27% for the year to date as of October 17, 2008, it's the worst-performing fund in the Pennsylvania municipal category and trails its typical peer by nearly 19 percentage points.**
>
> Periods of extreme performance are nothing new for this fund given its unconventional approach.  Its experienced management team, headed by veteran Ron Fielding and managed on a day-to-day basis by Troy Willis, tries to take advantage of pricing inefficiencies in the bond market, as many funds do, but pursues current income more aggressively than most. That means the fund has a bigger stake invested in lower end of the credit spectrum, where more-speculative bonds tend to compensate investors for their added risk by offering higher yields. **Indeed, nearly 70% of the fund was in bonds rated BBB and below (including nonrated bonds) as of June 30, 2008, a far greater position than the category median of 19%.** Such a large stake in low-quality fare makes the fund more volatile in general and is particularly costly in times like these, when there has been a flight to high-quality bonds.
>
> There have been notable periods of success for the fund, which boasted category-topping performance when lower-quality bonds were in favor from 2003-06, with annual returns as high as 10.9%. **However, the fund's recent woes have started to drag down its long-term track record; its annualized 10-year return ranked in the top 39% of the category on September 30, 2008, but dropped to the bottom 11% by Oct. 17, 2008. Such a rapid plunge suggests that the fund's risks may not pay off in the long run**.

(Emphasis added.)

148.   In a March 18, 2009 report entitled, "Oppenheimer Pennsylvania Municipal's risk-taking has hurt it," *Morningstar* stated that the Fund's performance in 2008 made it the worst in its category for the year:

---

[4] The Morningstar reports referenced in this and the following paragraphs are available only as a premium service to paid subscribers, and were not available to the general public during the Class Period.

The fund's huge stake in mid- and low-quality bonds also hurt in 2008 as investors fled to high-quality fare.  As of Feb. 28, 2009, the fund had 68% in bonds rated BBB and below (including nonrated issues), a much larger dose than its typical peer (19%). Throw in the fund's exposure to risky tobacco-settlement bonds, and 2008 spelled disaster. Between its leverage and sector bets, **the fund suffered a gut-wrenching 34% loss for the year—nearly 6 times worse than the category median.**

Of course, the fund has been on top plenty of times before and is showing signs of rebounding in 2009, up 8.5% through March 17, 2009, but it still has a lot of ground to make up.  **The damage has tarnished its once-stellar 10-year record, which is now the worst in the category.**  And while outflows have not been a problem, we're concerned the fund could be in trouble if investors were to flee en masse. **We'd steer clear of this highly unpredictable fund.**

(Emphasis added.)

149.    This pursuit of outsized yields and the concomitant assumption of outsized risks was common to many if not all of the municipal bond funds managed by OppenheimerFunds, including the Fund.  Indeed, a May 25, 2009 article in *Forbes.com* entitled, "Guidelines for Municipal Bonds Investing," reported on the massive losses suffered by the municipal bond funds managed by OppenheimerFunds as a result of their huge bets on these risky securities, stating:

> **You can't trust the pros to steer clear of bad munis. A dozen OppenheimerFunds tax-exempt funds, with combined assets of $25 billion at the end of 2007, lost 30% to 48% last year.** Investors have filed a spate of lawsuits accusing the company of disguising the funds' true risks.
>
> During the good times investors and the portfolio managers they hired stretched for yield and glossed over risks. **With munis the toxic result includes dirt bonds, tobacco bonds and revenue bonds with sketchy revenue streams**.
>
> *    *    *
>
> **Rochester Fund Municipals imperiled its investors by splitting munis in two and creating derivative securities. The idea was for the fund to sell the piece it didn't want and hold on to what is known as an "inverse floater." It was supposed to act like a bit of leverage, goosing yields when short rates fell and hurting them when they rose.**

> **Unfortunately for Rochester investors, the other securities came with a put option, which gave holders the right to sell them back to the fund, which they did in large numbers when the financial crisis hit. As the Rochester fund discussed in an October amendment to its prospectus, "During times of market volatility, illiquidity or uncertainty, the fund could be required to sell other portfolio holdings at a disadvantageous time to raise cash."** The fund lost 26% in the past year, not counting its 4.75% front-end load.

(Emphasis added.)

## VI.    CLASS ALLEGATIONS

150.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class comprised of all persons or entities who acquired shares of the Fund between September 27, 2006 and November 26, 2008, inclusive, pursuant or traceable to a materially misleading Registration Statements and Prospectuses for the Fund and who were damaged thereby.

151.    Excluded from the Class are Defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

152.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands if not tens-of-thousands of members of the proposed Class.  Indeed, the total assets of the Fund were well over $1 billion throughout the Class Period, and approximately 78 million new shares were sold to investors in the Fund and approximately 8 million additional shares were purchased with reinvested dividends during the Class Period.  Record owners and other members of the Class may be identified from records maintained by the Fund, the Issuer, or their transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar and customarily used in securities class actions.

- 56 -

153.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

154.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

155.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.    Whether the Securities Act was violated by Defendants' acts as alleged;

    b.    Whether the Investment Company Act was violated by Defendants' acts as alleged;

    c.    Whether the statements made by Defendants to the investing public in the Registration Statements, Prospectuses, and the materials incorporated or referenced therein misrepresented or omitted material facts; and

    d.    Whether Plaintiffs and members of the Class have sustained damages and, if so, what is the proper measure of those damages.

156.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

- 57 -

506448

## VII.   COUNT I -- Against the Fund Defendants and the Individual Defendants for Violations of Section 11 of the Securities Act

157.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

158.   This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons or entities who purchased or otherwise acquired Fund shares pursuant to or traceable to the Registration Statements alleged herein to be materially misleading.

159.   For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as sounding in fraud or concerning any state of mind of the Fund Defendants or Individual Defendants other than strict liability or negligence.

160.   The Registration Statements for the Fund contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, or omitted to state facts required to be stated therein.

161.   The Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

162.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

163.   By reason of the conduct alleged herein, each Defendant named herein violated, or controlled a person who violated Section 11 of the Securities Act.

164.   Plaintiffs and the Class purchased or acquired Fund shares pursuant to the Registration Statements.

165.   Plaintiffs and the Class have sustained damages.  The value of the Fund shares has declines substantially subsequent to and due to Defendants' violations.

- 58 -

166.     At the time of their purchases of the Fund's shares, Plaintiffs and other members of the Class were without knowledge of the facts concerning the untrue statements of omissions alleged herein and could not have reasonably discovered those facts prior to April 2009.

167.     Less that one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the original complaint in this action was filed in April 2009.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time at which the original complaint in this action was filed in April 2009.

## VIII.   COUNT II – Against the Fund Defendants for Violations of §12(a)(2) of the Securities Act

168.     Plaintiffs repeat and re-allege each and every allegation contained above, as if fully set forth herein.

169.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. § 77l, against the Fund Defendants because they were all participants in the offering and distribution of the Funds' shares.

170.     For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as sounding in fraud or concerning any state of mind of the Fund Defendants other than strict liability or negligence.

171.     The Defendants named in this Count "solicited" purchases of the Fund's shares by means of a prospectus or were controlling persons of the Fund or of those who solicited purchases of the Fund's shares. Thus, the Defendants named in this Count are sellers of the Fund's shares.

172.     The Prospectuses contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under

- 59 -

which they were made, not misleading, which statements and omissions Fund Defendants knew, or in the exercise of reasonable care Fund Defendants would have known, were materially false or were material facts which were required to be disclosed to avoid the representations which were made from being misleading.

173.    Plaintiffs and the additional plaintiffs did not know that the representations made in connection with the prospectus distributed to him by Fund Defendants regarding the matters described above were untrue and did not know the above described material facts were not disclosed.

174.    Less than one year has elapsed from discovery of the violations and facts upon which this Complaint is based to the time of filing of this action.  Less than three years has elapsed from the time that the Fund's shares were offered bona fide to the public to the time of filing of the action.

175.    By virtue of the foregoing, the Fund Defendants violated §12(a)(2) of the Securities Act.

176.    As a result of the matters set forth herein, pursuant to §12(a)(2) of the Securities Act, Plaintiffs and the Class are entitled to recover the consideration paid for their Fund shares with interest thereon, less the amount of any income received thereon, upon the tender of such Fund shares, or for damages if they no longer own such Fund shares.

177.    Plaintiffs and Class members, hereby tender any and all shares in the Fund that were damaged by Fund Defendants' violation of §12(a)(2) of the Securities Act.

IX.    **COUNT III – Against Defendants MassMutual, OppenheimerFunds, Inc., OppenheimerFunds Distributor, Inc., and the Individual Defendants for Violations of §15 of the Securities Act**

178.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

- 60 -

179.     This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all persons or entities who purchased or otherwise acquired Fund shares pursuant to or traceable to the Registration Statements and Prospectuses alleged herein to be materially misleading.

180.     For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as sounding in fraud or concerning any state of mind of the Section 15 Defendants other than strict liability or negligence.

181.     Each of the Defendants named in this Count was a control person of OppenheimerFunds or the Distributor, by virtue of, in the case of MassMutual and OppenheimerFunds, its corporate control, or, in the case of the Individual Defendants, his or her position as a trustee and/or senior officer of the Fund or the Fund Defendants.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other Trustees and/or Officers and/or major shareholders of OppenheimerFunds or the Distributor.

182.     Each of the Individual Defendants was a culpable participant in the violations of Sections 11of the Securities Act alleged above, based on their having signed or authorized the signing of the Registration Statements and Prospectuses alleged herein to be materially misleading and having otherwise participated in the process that allowed the offerings to be successfully completed, or having participated in the offer or sale of the shares of the Fund. Accordingly, MassMutual, OppenheimerFunds, the Distributor, and the Individual Defendants are jointly and severally liable to Plaintiffs and the other members of the Class as a result of the wrongful conduct alleged herein.

**X.**     **COUNT IV – Against Defendant Oppenheimer Multi-State Municipal Trust for Violations of §13(a) of the Investment Company Act**

183.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

184.    This Count is brought pursuant to Section 13(a) of the Investment Company Act, 15 U.S.C. §80a-13(a), on behalf of the Class, against Oppenheimer Multi-State Municipal Trust.

185.    Oppenheimer Multi-State Municipal Trust (the "Issuer") is a registered investment company under the Investment Company Act.  It issued, and caused to be issued, the Class Period registration statements that disclosed such policies in respect of the fundamental investment polices and investment objectives described herein.

186.    Section 13(a) of the Investment Company Act creates liability for any investment company that, without shareholder approval, "deviate[s] from its policy in respect of concentration of investments" and/or "deviate[s] from any investment policy which is changeable only if authorized by shareholder vote, or deviate[s] from any policy recited in its registration statement…."  15 U.S.C. §80a-13(a).

187.    The Issuer's conduct, as described herein, deviated from the Fund's stated fundamental investment policies that were changeable only by a shareholder vote, and deviated from investment policies that were recited in the Class Period registration statements, in violation of Section 13(a) of the Investment Company Act, 15 U.S.C. §80a-13(a).

188.    The Issuer did not obtain authorization from a majority of the Fund's outstanding voting shares prior to deviating from the Fund's fundamental investment policies and investment policies that were recited in the Class Period registration statements.

506448

189.    The Issuer's deviation from the Fund's fundamental investment policies and investment policies that were recited in the Class Period registration statements exposed Plaintiffs and the Class to increased risks.

190.    Plaintiffs and the Class sustained damages in that the value of the Fund's shares has declined substantially as a result of the Fund's investments that were made in violations of the Fund's fundamental investment policies and investment policies that were recited in the Class Period registration statements and that have cause significant losses to the Fund's net asset value.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.    Declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Lead Plaintiff and the additional plaintiffs as Class Representatives, and certifying Lead Counsel as Class Counsel;

b.    Awarding compensatory and/or recissory damages in favor of Lead Plaintiff and the other Class members against all Defendants jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d.    Entry of such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of unlawful business acts and practices; and

e.    Such other and further relief as the Court may deem just and proper.

506448

XI.    **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: January 15, 2010                    Respectfully submitted,

                                             /s/ Kip B. Shuman
                                           Kip B. Shuman
                                           Rusty Glenn
                                           885 Arapahoe Avenue
                                           Boulder, Colorado 80302
                                           Telephone: (303) 861-3003
                                           Facsimile: (303) 484-4886
                                           E-mail: kip@shumanlawfirm.com

                                           *Liaison Counsel for Plaintiffs*

                                           Sherrie R. Savett
                                           Gary E. Cantor
                                           Glen L. Abramson
                                           Eric Lechtzin
                                           **BERGER & MONTAGUE, P.C.**
                                           1622 Locust Street
                                           Philadelphia, Pennsylvania 19103
                                           Phone: (215) 875-3000
                                           Facsimile: (215) 875-4604

                                           *Counsel for Plaintiffs*

                                           Charles J. Piven
                                           Yelena Trepetin
                                           **BROWER PIVEN**
                                             **A Professional Corporation**
                                           1925 Old Valley Road
                                           Stevenson, Maryland  21153
                                           Telephone: (410) 332-0030

                                           David A.P. Brower
                                           Jessica Sleater
                                           **BROWER PIVEN**
                                             **A Professional Corporation**
                                           488 Madison Avenue, 8th Floor
                                           New York, New York 10022
                                           Telephone: (212) 501-9000

                                           *Of Counsel*

- 64 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Consolidated Class Action Complaint And Jury Demand was filed with this Court on January 15, 2010 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

   /s/ Kip B. Shuman   
Kip B. Shuman

506448