**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Master Docket No. 09-md-02063-JLK-KMT (MDL Docket No. 2063)

IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION

This document relates to:  *In re California Municipal Fund*
                           09-cv-01484-JLK-KMT (Lowe)
                           09-cv-01485-JLK-KMT (Rivera)
                           09-cv-01486-JLK-KMT (Tackmann)
                           09-cv-01487-JLK-KMT (Milhem)

_____

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE**
**FEDERAL SECURITIES LAWS AND DEMAND FOR JURY TRIAL**

_____

# TABLE OF CONTENTS

I.   SUMMARY OF THE ACTION.............................................................................. 1

    A.   Misstatements and Omissions in the Registration Statements and Prospectuses......... 1

    B.   Violations of the Investment Company Act ............................................... 5

    C.   Violations of California Business & Professions Code Sections 17200, Et. Seq. ....... 6

    D.   Breaches Of Fiduciary Duty ................................................................ 6

    E.   The Huge Losses Suffered By The Fund ................................................ 6

II.  JURISDICTION AND VENUE.......................................................................... 6

III. PARTIES ............................................................................................... 7

    A.   Plaintiff. ................................................................................... 7

    B.   Defendants. ................................................................................ 8

IV.  FACTUAL ALLEGATIONS ............................................................................. 12

    A.   Introduction To The Fund.................................................................. 12

    B.   Misstatements Relating To The Fund's "Preservation Of Capital" Fundamental
Investment Policy.......................................................................... 13

    C.   Misstatements Relating To The Fund's Over-Concentration In The California Real
Estate Industry. .......................................................................... 20

    D.   Misstatements Relating To The Fund's Over-Concentration In Junk Bonds And
Unrated Bonds. ............................................................................ 27

    E.   Misstatements Relating To The Fund's Investments In Illiquid Securities............... 30

    F.   Misstatements Relating To The Fund's Investment In Inverse Floaters. .................. 42

    G.   Misstatements Relating To The Value Of The Fund's Assets And Its NAV............. 54

    H.   The Concealed Risks Materialized And Damaged Investors. .................................. 57

V.   CLASS ACTION ALLEGATIONS ........................................................................ 58

VI.   CAUSES OF ACTION ....................................................................................... 62

    COUNT I – Violation Of Section 11 Of the Securities Act Against The Fund, The
    Manager, The Distributor, And The Trustee Defendants ................................................. 62

    COUNT II – Violations Of Section 12(A)(2) Of The Securities Act Against The Fund,
    The Manager And The Distributor ................................................................................... 63

    COUNT III – Violations Of Section 15 Of The Securities Act  Against The Manager, The
    Trustee Defendants, The Officer Defendants, And MassMutual ..................................... 66

    COUNT IV – Violation Of Section 13(A) Of The Investment Company Act Against
    The Fund ........................................................................................................................... 67

    COUNT V – Violation Of California Business & Professions Code §§ 17200, *Et. Seq.*
    Against All Defendants ..................................................................................................... 68

    COUNT VI – Breach Of Fiduciary Duty Against The Trustee Defendants ..................... 70

VII.   PRAYER FOR RELIEF ..................................................................................... 71

VIII.  DEMAND FOR JURY TRIAL ........................................................................... 72

## I.      SUMMARY OF THE ACTION

1.      Lead Plaintiff Joseph Stockwell, individually and on behalf of all other persons similarly situated, alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their undersigned Counsel, which included, *inter alia*, review of Securities and Exchange Commission ("SEC") filings, the Defendants' sales materials, various websites and Internet information sources (including the Oppenheimer Funds website) press releases, analyst reports, news articles, bond issues, trading reports, and other publicly available materials.

2.      This is a class action on behalf of persons and entities who, between September 27, 2006 and November 28, 2008 (the "Class Period"), purchased A, B and C shares of Oppenheimer California Municipal Bond Fund (the "Fund") (Ticker Symbols: OPCAX (A shares), OCABX (B shares), OCACX (C shares)), pursuant or traceable to one of the Fund's registration statements or prospectuses, or who held A, B or C shares of the Fund.

3.      Lead Plaintiff alleges that the Fund, its investment advisor, underwriter, trustees, officers, and other Defendants violated the Securities Act of 1933 ("Securities Act") by registering, offering, and selling shares of the Fund pursuant to false and misleading registration statements and prospectuses.  Lead Plaintiff also alleges that Defendants violated the Investment Company Act of 1940 ("ICA") and California's Unfair Competition Law, and breached their fiduciary duties to investors by causing the Fund to deviate from its fundamental investment policies without a required shareholder vote.

### A.      Misstatements And Omissions In The Registration Statements and Prospectuses.

4.      The Fund's Registration Statements, Prospectus, Statements of Additional Information ("SAIs"), Annual Reports, Semi-Annual Reports and Forms N-Q issued and filed with the SEC during the relevant period (collectively "Prospectuses") contained untrue

statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  The misstatements and omissions are summarized below.

**1.      Misstatements Relating To "Preservation Of Capital" Fundamental Investment Policy.**

5.      The Prospectuses falsely stated that the Fund "seeks as high a level of current interest income … as is consistent with preservation of capital."  This was a "fundamental investment policy" that could not be changed without a shareholder vote.  In fact, the Fund's investments were formulated and its operations were conducted virtually in complete disregard for preservation of capital.  The Fund:  (1) was over-concentrated in the California real estate development industry including speculative "Dirt Bonds," which are secured only by bare, undeveloped land; (2) was over-concentrated in below investment-grade securities many of which were not even rated by an independent ratings agency; (3) was over-concentrated in illiquid securities including Tobacco Bonds; and (4) used excessive leverage and speculative borrowing strategies, including investment in "inverse floaters" to enhance returns.

**2.      Misstatements Relating To Industry Concentration Fundamental Investment Policy.**

6.      The Prospectuses stated as another "fundamental investment policy" that the Fund would not "invest 25% or more of its total assets in any one industry."

7.      The industry classifications that the Prospectuses used were misleading in that they were so narrow that the primary economic characteristics of investments in nominally different "industries" were materially the same.  The Prospectuses' unreasonably narrow classifications therefore violated SEC guidelines that required industry classifications be reasonable and further required specific disclosures regarding the risks of materially similar investments.

8.      The Prospectuses failed to disclose that the Fund's investments in "Dirt Bonds" (bonds that are secured only by bare, undeveloped land rather than municipal general obligation funds), single-family housing and multifamily housing, as well as certain other industry categories were actually investments in a single "industry"—the California real estate development industry.  The Prospectuses also failed to disclose that these investments had materially similar primary economic characteristics and that a downturn in the California real estate market would cause many of these securities in supposedly different industries to lose value simultaneously.

9.      During the Class Period, the Fund invested far more than 25% in the California real estate development industry.

10.     The November 28, 2008 Prospectus belatedly disclosed some of the risks associated with the Fund's over-concentration in the California real estate development industry.  Even then, rather than reduce its concentration, Defendants instead announced that Dirt Bonds would no longer be considered to be part of any industry for purposes of the Fund's policy against concentration.

**3.      Misstatements Relating To Over-Concentration In Junk Bonds And Unrated Bonds.**

11.     The Prospectuses stated that the Fund "can invest as much as 25% of its total assets in municipal securities that are not 'investment-grade'" and defined "investment grade" securities as those "rated within the four highest rating categories of Moody's, Standard & Poor's, Fitch or another nationally recognized rating organization, or (if unrated) judged by the Manager to be comparable to rated investment grade securities."

12.     The representation that the Manager's rating system would assign ratings to the Fund's bonds comparable to the ratings that would have been assigned by independent ratings

-3-

agencies was false or misleading.  Independent ratings agencies generally do not assign Dirt Bonds a rating of "investment grade" unless such projects have at least a 10:1 value-to-lien ratio.  By the end of 2008, over 60% of the Fund's bonds were not rated by any independent rating agency, and a large portion of this 60% were Dirt Bonds with less than the required value-to-lean ratio.  The overwhelming majority of the Dirt Bonds in the Fund's portfolio could not legitimately have been given an investment grade rating by the Manager.

13.     The statement that the Fund would not invest more than 25% of its assets in below investment grade bonds likewise was false and misleading.  A review of the Fund's bonds has revealed that the Fund invested more than 25% in below investment grade bonds according to the criteria used by nationally recognized ratings agencies.

**4.     Misstatements Relating To The Fund's Over-Concentration In Illiquid Securities.**

14.     The Prospectuses falsely and misleadingly claimed that the Fund would "not invest more than 15% of its net assets … in illiquid securities."

15.     In fact, a review of the trading activity for the Fund's top 25 securities demonstrates that, throughout the Class Period, the Fund invested more than 15% of its net assets in securities that were illiquid under the Fund's own definition of illiquidity.

16.     The Prospectuses also falsely and misleadingly claimed that it would identify any illiquid securities that it held and would monitor its holdings for illiquidity.

17.     A review of the Fund's top holdings likewise reveals that the Fund failed to classify as illiquid many securities that had little or no trading activity during the Class Period.

**5.     Misstatements Relating To The Fund's Use Of Inverse Floaters.**

18.     Defendants invested a significant portion of the Fund's assets in "inverse floaters," derivative instruments that pay interest at rates that move in the opposite direction of

19.     The Prospectuses' disclosures regarding the risks of inverse floaters were inadequate in that they failed to inform investors that the investments in inverse floaters put the Fund at risk of forced liquidation of large bond positions at a steep discount to their reported value.

20.     In October 2008, it was disclosed for the first time that the owners of the short-term securities sold by the trust created to issue the inverse floaters had the right to collapse the trust and require the underlying securities to be sold immediately, forcing the Fund to sell other holdings at a disadvantageous time and steep discount.

**6.      Misstatements Relating To The Value Of The Fund's Assets.**

21.     The Prospectuses falsely and misleadingly claimed that the Fund would value its securities at "fair value" and would monitor the accuracy of the pricing services that it used.  In fact, the Fund's assets were greatly overvalued, inflating its NAV and causing the Fund to lack sufficient collateral to satisfy its obligations without selling other assets at an unfavorable price.

**B.      Violations Of The Investment Company Act.**

22.     The Fund violated the ICA by deviating from its fundamental investment policies, which could not be waived or changed without approval of a majority of shareholders of the Fund.  The Fund's total investment profile was inconsistent with the fundamental investment policy that required preservation of capital.  In addition, the Fund's investments in Dirt Bonds and other bonds tied to the California real estate development industry in excess of 25% of the total assets of the Fund also constituted an unlawful deviation from the fundamental policy against concentration in a single industry.

**C.**     **Violations Of California Business & Professions Code Sections 17200, Et Seq.**

23.     Defendants' violations of the requirements of the ICA are also violations of California's Unfair Competition Law.  In other words, the Fund's deviations from its fundamental investment policies were unlawful within the meaning of California's Unfair Competition Law.

**D.**     **Breaches Of Fiduciary Duty.**

24.     The Fund's deviations from its fundamental investment policies also constitute breaches of fiduciary duty by the Fund's trustees based upon the failure to give notice, conduct a vote and obtain shareholder approval before the Fund's investment policies were changed.

**E.**     **The Huge Losses Suffered By The Fund.**

25.     The undisclosed and misstated risks described above ultimately were realized triggering huge losses in the net asset value of the Fund.  The NAV of the Fund was approximately $11.44 per share at the beginning of the Class Period, declining thereafter to as low as $6.36 per share on November 28, 2008.

26.     During the class period, the decline in NAV of the Fund's shares represents a loss of over 46%.  By comparison, the average loss for supposedly similar funds in the same Lipper Classification during the same period was only approximately 11.53%.

## II.     JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§77k, 77i, 77o), Section 13(a) of the ICA, California Business & Professions Code §§17200, *et seq.*, and the common law.

28.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, Section 44 of the ICA, 15 U.S.C. §80a-43, 28 U.S.C. §§1331, 1332(d), 1367, and the principles of pendent and supplemental jurisdiction.

29.     These consolidated cases were originally filed in the United States District Court for the Northern District of California.  Venue was proper in that District under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in that District, Defendants transact a substantial amount of business in that District, or Defendants otherwise have sufficient contacts with that District to justify them being fairly brought into court in that District.

30.     On June 17, 2009, the Judicial Panel on Multidistrict Litigation ("JPML") granted Defendants' motion to transfer these and other actions to the United States District Court for the District of Colorado for coordinated pretrial proceedings pursuant to 28 U.S.C. §1407.  Lead Plaintiff reserves the right to move for remand to the United States District Court for the Northern District of California for trial.

31.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.     PARTIES

**A.     Plaintiff.**

32.     Joseph Stockwell is a citizen of California who, during the Class Period, purchased shares of the Fund from Defendants pursuant or traceable to a registration statement and prospectus at issue in this complaint, and was damaged thereby.  By order entered November 18, 2009, the Court appointed Mr. Stockwell as the Lead Plaintiff for this consolidated litigation.  Lead Plaintiff's Class Period transactions in Fund shares are identified in the certification previously submitted in support of his motion for Lead Plaintiff and incorporated by reference herein.

**B.    Defendants.**

33.    The Defendants are affiliated with each other and conduct business under the umbrella of the "Oppenheimer" name as one of the largest asset management organizations in the United States.

34.    Defendant Oppenheimer California Municipal Fund is registered under the ICA as a non-diversified, open-ended management investment company. The Fund describes its investment objective as "seek[ing] as high a level of current interest income exempt from federal and California income taxes for individual investors as is consistent with preservation of capital." The Fund was organized as a Massachusetts business trust in 1988 and is headquartered at 6803 South Tucson Way, Centennial, Colorado 80112.

35.    Defendant OppenheimerFunds, Inc. (the "Manager") is the manager and investment advisor of the Fund. The Manager chooses the Fund's investments and controls its day-to-day business. The Manager is a holding company that engages in securities brokerage, banking services and related financial services through its subsidiaries. The Manager is a Colorado corporation headquartered at Two World Financial Center, 225 Liberty Street, New York, New York 10281-1008. The Manager is wholly-owned by Oppenheimer Acquisition Corp., a holding company controlled by Defendant Massachusetts Mutual Life Insurance Company. The Manager carries out its duties, subject to the policies established by the Fund's Board of Trustees, under an investment advisory agreement. As compensation for its services, OppenheimerFunds, Inc. receives a management fee.

36.    Defendant OppenheimerFunds Distributor, Inc. (the "Distributor") is a subsidiary of the Manager and was, during the relevant time period, the principal underwriter and distributor for shares of the Fund. The Distributor also served as the Trust's agent for the purpose of the continuous public offering of the Fund's shares. The Distributor is a New York

-8-

corporation and is also located at Two World Financial Center, 225 Liberty Street, New York, New York 10281-1008.

37.     Defendant Massachusetts Mutual Life Insurance Company ("MassMutual") describes itself as a leading mutual life insurance company that is run for the benefit of its members and participating policyholders.   MassMutual's subsidiaries provide insurance, real estate management, investment advisory, and asset management services.  MassMutual is the ultimate parent of the Manager.  According to the Manager's current Form ADV (Uniform Application for Investment Advisor Registration) filed with the SEC, MassMutual is a "control person" of the Manager, meaning that MassMutual has the power to direct or cause the direction of the management or policies of the Manager, whether through ownership of securities, by contract, or otherwise.  MassMutual is a Delaware corporation and is headquartered at 1295 State Street, Springfield, Massachusetts 01111-0001.

38.     Defendant Brian F. Wruble ("Wruble") is the Chairman of the Board of Trustees of the Fund and signed each registration statement effective during the Class Period through November 28, 2008.

39.     Defendant John V. Murphy ("Murphy") is President and Principal Executive Officer and a Fund Trustee, and signed each registration statement effective during the Class Period through November 28, 2008.

40.     Defendant Brian W. Wixted ("Wixted") is Treasurer and Principal Financial and Accounting Officer of the Fund and signed each registration statement effective during the Class Period through November 28, 2008.

41.     Defendant David K. Downes ("Downes") is a Trustee of the Fund and signed each registration statement effective during the Class Period through November 28, 2008.

42.     Defendant Matthew P. Fink ("Fink") is a Trustee of the Fund and signed each

registration statement effective during the Class Period through November 28, 2008.

43.     Defendant Robert G. Galli ("Galli") is a Trustee of the Fund and signed each registration statement effective during the Class Period through November 28, 2008.

44.     Defendant Phillip A. Griffiths ("Griffiths") is a Trustee of the Fund and signed each registration statement effective during the Class Period through November 28, 2008.

45.     Defendant Mary F. Miller ("Miller") is a Trustee of the Fund and signed each registration statement effective during the Class Period through November 28, 2008.

46.     Defendant Joel W. Motley ("Motley") is a Trustee of the Fund and signed each registration statement effective during the Class Period through November 28, 2008.

47.     Defendant Russell S. Reynolds, Jr. ("Reynolds") is a Trustee of the Fund and signed each registration statement effective during the Class Period through November 28, 2008.

48.     Defendant Peter I. Wold ("Wold") is a Trustee of the Fund and signed each registration statement effective during the Class Period through November 28, 2008.

49.     Defendant Clayton K. Yeutter ("Yeutter") was a Trustee and the Chairman of the Board of Trustees of the Fund through December 31, 2006.  Defendant Yeutter signed the registration statement that became effective September 27, 2006.

50.     Defendant Joseph M. Wikler ("Wikler") is a Trustee of the Fund and signed each registration statement effective during the Class Period through March 8, 2007.

51.     Defendant Kenneth A. Randall ("Randall") was a Trustee of the Fund until 2007 and signed each registration statement effective during the Class Period through March 8, 2007.

52.     Defendant Ronald H. Fielding ("Fielding") has been a Vice President and Senior Portfolio Manager of the Fund during the Class Period.  Fielding is also the chief strategist, a Senior Portfolio Manager, an officer, and a trader for the Fund and other Oppenheimer funds.

-10-

Fielding participated in the drafting of the prospectuses pursuant to which the Fund was sold.

53.    Defendant Daniel G. Loughran ("Loughran") has been a Vice President of the Fund since October 2005 and a Senior Portfolio Manager of the Fund since April 2001.  Mr. Loughran has been a Portfolio Manager of the Fund since April 2001 and has been a Vice President of the Manager since 1999.  During the Class Period, he was team leader, a Senior Portfolio Manager, an officer and a trader for the Fund and other Oppenheimer funds. Loughran participated in the drafting of the prospectuses pursuant to which the Fund was sold.

54.    Defendant Scott S. Cottier ("Cottier") has been a Vice President of the Fund since October 2005 and a Senior Portfolio Manager of the Fund since 2002.  Mr. Cottier has been a Vice President of the Manager since 2002, and during the Class Period was a Senior Portfolio Manager, an officer and a trader for the Fund and other Oppenheimer funds.  Cottier participated in the drafting of the prospectuses pursuant to which the Fund was sold.

55.    Defendant Troy E. Willis ("Willis") has been a Vice President of the Fund since October 2005 and a Senior Portfolio Manager of the Fund since January 2006.  During the Class Period, Mr. Willis was a Senior Portfolio Manager, an officer and a trader for the Fund and other Oppenheimer funds.  Willis participated in the drafting of the prospectuses pursuant to which the Fund was sold.

56.    This complaint refers to Defendants Wruble, Murphy, Downes, Fink, Galli, Griffiths, Miller, Motley, Reynolds, Wold, Yeutter, Wikler and Randall collectively as the "Trustee Defendants."

57.    This complaint refers to Defendants Murphy, Wixted, Fielding, Loughran, Cottier and Willis collectively as the "Officer Defendants."

## IV.    FACTUAL ALLEGATIONS

**A.    Introduction To The Fund.**

58.    The Fund is an open-ended, fixed income mutual fund managed and marketed by Defendant OppenheimerFunds, Inc.  The Fund sold three classes of shares, A, B and C, under the NASDAQ ticker symbols OPCAX, OCABX and OCACX.

59.    The Fund's shares were issued to investors pursuant to the following series of Registration Statements, Prospectuses, and Statements of Additional Information ("SAIs") filed with the SEC and made effective during the Class Period:

- Registration Statement filed pursuant to Form N-1A, Prospectus, and SAI incorporated in the Prospectus by reference on September 27, 2006 (collectively "September 2006 Prospectus");

- Registration Statement filed pursuant to Form N-1A, Prospectus, and SAI incorporated in the Prospectus by reference on March 8, 2007 (collectively "March 2007 Prospectus");

- Registration Statement filed pursuant to Form N-1A, Prospectus, and SAI incorporated in the Prospectus by reference on October 31, 2007 (collectively "October 2007 Prospectus"); and

60.    Each of the foregoing documents was negligently prepared and contained untrue statements of material fact and/or omitted to state other facts necessary to make the statements made not misleading, as described below.  While the documents were not identical, they contained many substantially similar untrue statements and were rendered misleading by substantially similar omissions of material fact.

61.    A reasonable investor would have viewed the undisclosed facts described herein, jointly and severally, as having altered the total mix of available information.  A reasonable

investor also would understand that the undisclosed facts would cause the Fund to undertake materially increased investment risk during the Class Period because the Fund was investing in a manner that was of materially greater risk than had been disclosed.

**B.      Misstatements Relating To The Fund's "Preservation Of Capital" Fundamental Investment Policy.**

62.      For investors, "preservation of capital" has a specific meaning:  preventing loss of principal.  *Forbes Investopedia* defines "preservation of capital" as "[a]n investment strategy whose primary goal is to prevent the loss of an investment's total value."  Similarly, according to *Bloomberg*, "preservation of capital" refers to "[a]n investment with the goal of securing the value of the principle [sic] by avoiding speculative situations."

63.      Preservation of capital is achieved through investments in highly liquid, low-volatility securities.  According to the CFA Institute, preservation of capital is best "accomplished with a diversified portfolio primarily committed to relatively low volatility, highly liquid and high quality assets."

64.      *Standard & Poor's Guide to the Perfect Portfolio* recommends that investors employ capital preservation strategies, if "[y]ou do not want the principal in your accounts to decline in value."  For these investors, "[s]afety is your number one goal.  You sacrifice high returns to keep the value of your portfolio stable.  Your upside is very modest but your downside is also very modest.  Capital protection, not appreciation, is your motto."  *Standard & Poor's Guide* also describes critical features of a capital preservation strategy:  "Capital preservation and liquidity go hand in hand. . . .  Any asset that can fall in value should not be included in this conservative strategy. . . . The appropriate [capital preservation] fund would have the characteristics of low positive returns, very low risk, and extremely low price fluctuations. . . . Any asset that is not guaranteed to maintain its value should not be held."

-13-

65.     Defendants held the Fund out to investors as a capital preservation fund.  The September 2006 Prospectus described the Fund's investment objective and strategies as follows:

"ABOUT THE FUND

"The Fund's Investment Objective and Principal Investment Strategies

"WHAT IS THE FUND'S INVESTMENT OBJECTIVE?  The Fund seeks as high a level of current interest income exempt from federal and California income taxes for individual investors as is consistent with preservation of capital."

66.     The September 2006 Prospectus stated, "The Fund's investment objective is a fundamental policy."  In accordance with Section 13(a) of the ICA, the September 2006 Prospectus explained, "Fundamental policies cannot be changed without the approval of a majority of the Fund's outstanding voting shares."

67.     Consistent with the Fund's investment objective, the September 2006 Prospectus represented that "[t]he Manager tries to reduce risks by selecting a wide variety of municipal investments and by carefully researching securities before they are purchased."  While acknowledging some risks associated with investing in the Fund, the September 2006 Prospectus emphasized its conservative nature:  "In the OppenheimerFunds spectrum, the Fund is more conservative than some types of taxable bond funds, such as high yield bond funds, but has greater risk than money market funds."

68.     The Fund's March 2007 Prospectus and October 2007 Prospectus contained identical statements about the Fund's investment objective and strategies, fundamental policies, and efforts to reduce risks, as did the September 2006 Prospectus.

69.     With respect to the statements describe above, the September 2006 Prospectus, the March 2007 Prospectus and the October 2007 Prospectus were negligently prepared and

-14-

contained untrue statements of material fact and/or omitted to state other facts necessary to make the statements made not misleading.  These Prospectuses failed to disclose that the Fund's investment strategy deviated in the following ways from its investment objective of seeking interest income consistent with preservation of capital:

        (a)      The Fund's holdings were over-concentrated in the California real estate development industry including Mello-Roos industrial development bonds, known as "Dirt Bonds," which are secured only by bare, undeveloped land rather than municipal general obligation funds;

        (b)      The Fund's holdings were over-concentrated in below investment-grade securities many of which were not rated by an independent ratings agency;

        (c)      The Fund's holdings were over-concentrated in illiquid securities including Tobacco Bonds; and

        (d)      The Fund used excessive leverage and speculative borrowing strategies, including inverse floaters, to enhance returns.

        70.      Contrary to the express statements in the Prospectuses, each of these strategies exposed investors to an increased risk that capital would not be preserved.  By employing these strategies in combination, Defendants caused the Fund to deviate from its investment objective without prior approval by a majority vote of the Fund's shareholders.

        71.      First, the Fund's investment in Dirt Bonds was inconsistent with preservation of capital.  An article published by *Bloomberg* on June 12, 2008, titled, "'Dirt Bonds' Soil Oppenheimer in Gambits Gone Awry," began to disclose the extent of the Fund's exposure to Dirt Bonds.  According to the article:

> "The $1.9 billion Oppenheimer California Municipal Fund owns more than $665 million of dirt bonds sold in California, including Elk Grove, said Scott Cottier, a money manager at

-15-

> OppenheimerFunds Inc. in Rochester, New York. The fund lost about 14 percent the past year, compared with an average gain of 1.3 percent for the 419 municipal bond mutual funds tracked by Bloomberg."

> "Dirt bonds are a bargain because investors will eventually be paid, even if some borrowers miss payments, Cottier said.

> "'The only people that lose money are the people who sell their bonds,' Cottier said. 'Demand for real estate in California over the long-term is very high.'"

72.     Defendant Cottier's comments in the *Bloomberg* article demonstrate that Defendants engaged in risky investment strategies at the expense of the Fund's stated investment goal of "preservation of capital." Notably, the September 2006 Prospectus, the March 2007 Prospectus, and the October 2007 Prospectus each failed to disclose that the Fund's investment strategies depended upon holding Dirt Bonds for the long-term while risking non-payment of periodic interest. These Prospectuses also failed to disclose that any investment in the Fund was subject to increased risk that the Fund would be forced to sell these illiquid securities at a loss in order to meet shareholder redemption requests or other Fund obligations.

73.     A report for the period ended January 31, 2009 by Lipper Analytical Services ("Lipper") revealed that the Fund's holdings had been far more concentrated in a limited set of investments (including Dirt Bonds) than were the holdings of similar mutual funds in the same peer group. According to Lipper:

> "The Limited Tax Obligations, Miscellaneous Revenue Bonds, and Housing Revenue Bonds represent the fund's three largest issue types. Assets in these securities represent 76.6% of the fund's portfolio and over-weights the fund's investment in these types relative to the California Municipal Debt Funds classification [an average of 124 similarly classified mutual funds] by 52.8%. The fund's holdings in Limited Tax Obligations represent 40.2%, while the average fund in this class holds 7.8%. Miscellaneous Revenue Bonds represent 26.6 versus 13.3% for the class average and Housing Revenue Bonds, 9.8% compared to 2.6%."

-16-

As a result, the Fund did not "reduce risks by selecting a wide variety of municipal investments," contradicting the representations in the September 2006 Prospectus, the March 2007 Prospectus, and the October 2007 Prospectus.

74.     Second, Defendants also violated the Fund's primary investment objective of preservation of capital by increasing the Fund's investment in securities with low credit quality. According to a report published by Morningstar on October 16, 2008:

> "*Oppenheimer California Municipal's volatility hasn't paid off in the long run.*
>
> "This gutsy fund's performance has been hard to swallow lately.  With a loss of 32.4% through the year to date (as of Oct. 15, 2008), it's the worst-performing fund in the municipal California long category and significantly trails its typical peer by nearly 21 percentage points.
>
> "Periods of extreme performance are not new for this fund given its unconventional approach.  Its experienced management team—managed on a day-to-day basis by Scott Cottier—tries to take advantage of pricing inefficiencies in the bond market, as many funds do, but pursues current income more aggressively than most.  That means the fund has a bigger stake invested at the lower end of the credit spectrum, where more-speculative bonds can compensate investors for their added risk by offering higher yields. *Indeed, the fund had roughly 78% in bonds rated BBB and below (including nonrated bonds) as of June 30, 2008, which is 5 times more than the category median.  Such a large stake in low-quality fare makes the fund more volatile in general and is particularly costly in times like these when there has been a flight to high-quality bonds.*"  (Emphasis added)

75.     BBB is Standard & Poor's lowest investment grade category.  Any step down results in "junk bond" status.  Each of the Prospectuses acknowledged that, according to Standard & Poor's, a BBB rated bond is susceptible to:  "adverse economic conditions or changing circumstances [that] are more likely to lead to a weakened capacity of the obligor to

meet its financial commitment on the obligation."  Nonetheless, Defendants exposed investors to an excessive risk of loss of principal by causing the Fund to hold a large portion of its portfolio—78% of its investments—in securities rated BBB or below, including securities whose rating was assigned by Oppenheimer and not by an independent ratings agency.

76.     Third, the Fund's concentration of holdings in illiquid investments was contrary to its capital preservation policy.  Following steep declines in the Fund's NAV, on October 21, 2008, Defendants caused the Fund to file with the SEC a Prospectus Supplement ("October 2008 Supplement"), which acknowledged additional risks posed by illiquid holdings in the Fund that had not been previously disclosed to investors.  In a section titled, "UNUSUAL VOLATILITY AND LACK OF LIQUIDITY IN THE MUNICIPAL BOND MARKETS IN 2008," the October 2008 Supplement stated:

> "Municipal bonds are traded in the "over-the-counter" market among dealers and other large institutional investors.  In the latter months of 2008 that market has been subject to greater volatility than it has historically experienced.  Liquidity in the municipal bond market (the ability to buy and sell bonds readily) has been reduced, as it has been in other fixed income markets, in response to overall economic conditions and credit tightening.  *During times of reduced market liquidity, such as at the present, the Fund may not be able to sell bonds readily at prices reflecting the values at which the bonds are carried on the Fund's books.  Sales of large blocks of bonds by market participants, such as the Fund, that are seeking liquidity can further reduce bond prices in an illiquid market.*  The Fund may seek to make sales of large blocks of bonds to meet shareholder redemption requests, or it may be required to raise cash to re-collateralize, unwind or "collapse" trusts that issued inverse floaters to the Fund or to make payments to such trusts to enable them to pay for tenders of the short-term securities they have issued, if the remarketing agents for those securities are unable to sell those short-term securities in the marketplace to other buyers (typically tax exempt money market funds)." (Emphasis added)

-18-

77.     Fourth, Defendants' use of leverage, including risky derivatives such as "inverse floaters," to increase returns was inconsistent with preservation of capital.  According to a report published by Morningstar on March 5, 2009, Defendants' use of leverage caused the Fund to be exposed to the market by a factor almost one-third greater than the actual Fund's holdings, creating excessive risk to investors' principal:

> *"Oppenheimer California Municipal's risk-taking has hurt it.*
>
> "Leverage was a 2008 buzzword as [overleveraged] banks imploded and deepened the financial crisis.  But the concept is nothing new for this fund, which has used it to generate extra income for years.  The fund can both borrow to create leverage and employ "internally leveraged" inverse floating-rate notes, which are highly sensitive to interest-rate shifts.  *Manager Ron Fielding is drawn to the outsized tax-free income these instruments generate, but that brings outsized volatility, too.  As of July 31, 2008, the fund was exposed to the market by a factor of 129% via both conventional leverage and inverse floaters.  While that magnifies gains in good times, it can also prove disastrous when the market is stressed, as it was in 2008.  As liquidity dried up and hedge funds began selling in earnest, long-dated munis got pummeled.  The leverage inherent in the fund's borrowing and inverse floaters meant the damage was amplified*."   (Emphasis added)

78.     Each of the four investment strategies adopted by Defendants is described in greater detail below in Sections C through F.  The cumulative impact of these four strategies was to effect a sea change in the Fund's fundamental objective from preserving capital to something far riskier.  As a result, the Fund performed more poorly not only than other capital preservation funds, but also than the Lipper High Current Yield Funds Index, which is made up of funds that invest mainly in below-investment grade, or junk bonds.  In 2008, the Fund's NAV declined by 41.31%, while the Lipper High Current Yield Funds Index lost only 28.84%.

79.     The financial press has recognized that Defendants' investment strategies were

inconsistent with the preservation of capital.  For example, an article published on May 25, 2009 in *Forbes.com* entitled, "Guidelines for Municipal Bonds Investing" reported on losses in the Fund and other municipal bond funds managed by OppenheimerFunds, Inc.:

> "You can't trust the pros to steer clear of bad munis.  A dozen OppenheimerFunds tax-exempt funds, with combined assets of $25 billion at the end of 2007, lost 30% to 48% last year.  Investors have filed a spate of lawsuits accusing the company of disguising the funds' true risks.
>
> "During the good times investors and the portfolio managers they hired stretched for yield and glossed over risks.  With munis the toxic result includes dirt bonds, tobacco bonds and revenue bonds with sketchy revenue streams.
>
> *        *        *        *
>
> "Who bought dirt bonds?  Yield-hungry investors like the Oppenheimer California Municipal Fund, which managed to lose 31% in the last 12 months, even as most muni funds broke even.  That despite the usual talk in the prospectus about 'preservation of capital.'"

80.     Following the Fund's steep declines in 2008, Defendants effectively acknowledged that the September 2006 Prospectus, the March 2007 Prospectus, and the October 2007 Prospectus had inaccurately described the risk characteristics of the Fund.  As noted above, those Prospectuses had consistently described the level of risk of investing in the Fund as follows:  "In the OppenheimerFunds spectrum, the Fund is more conservative than some types of taxable bond funds, such as high yield bond funds, but has greater risk than money market funds."  This statement is notably absent from the November 2008 Prospectus.

**C.     Misstatements Relating To The Fund's Over-Concentration In The California Real Estate Industry.**

81.     The Prospectuses falsely stated that the Fund would not concentrate more than 25% of its holdings in a single industry.  In fact, the Fund's total investment in the California

-20-

real estate development industry well exceeded this limitation during the Class Period.

82.     Since 1983, the SEC has stated in its guidelines for use in the preparation and filing of registration statements that while a mutual fund may use its own industry classifications, "such classifications must be reasonable" so that entities with similar "economic characteristics" are classified together.  Registration Form Used by Open-End Management Companies; Guidelines, Exchange Act Release No. IC-13436, 1983 SEC LEXIS 1030 (Aug. 12, 1983).  More specifically, the SEC requires that "[w]hen a substantial amount of the assets of a tax-exempt bond fund are invested in securities which are related in such a way that an economic, business, or political development or change affecting one such security would likewise affect the other securities, appropriate disclosure in the fund's prospectus . . . is necessary." *Id.*  For tax exempt bond funds like the Fund, which "may invest 25 percent or more of its assets in securities the interest upon which is paid from revenues of similar type projects, it should disclose this fact, identify the type or types of projects and briefly discuss any economic, business, or political developments or changes which would most likely affect all projects of that type or types." *Id.*

83.     Defendants violated the SEC's guidelines by using unreasonably narrow industry classifications and by failing to make the required disclosures.  Defendants thereby obscured the fact that far more than 25% of its assets were invested in bonds subject to the same economic risk—a downturn in California's real estate market.

84.     The September 2006 Prospectus described the Fund's industry concentration policy as follows:

- "The Fund cannot invest 25% or more of its total assets in any one industry."

- This is a fundamental investment policy of the Fund that "can be changed only by vote of a "majority" of the Fund's outstanding voting securities."

- "Concentration.  In implementing the Fund's policy not to concentrate its investments, the Manager will consider a non-governmental user of facilities financed by industrial development bonds as being in a particular industry.  That is done even though the bonds are municipal securities, as to which the Fund has no concentration limitation.  Although this application of the concentration restriction is not a fundamental policy of the Fund, it will not be changed without shareholder approval."

- "For the purposes of the Fund's policy not to concentrate in securities of issuers as described in the investment restrictions listed in the Prospectus and this Statement of Additional Information, the Fund has adopted the industry classifications set forth in Appendix B to this Statement of Additional Information.  This is not a fundamental policy."

85.     Appendix B to the September 2006 SAI also listed the following industry classifications:

- Adult Living Facilities; Airlines; Education; Electric Utilities; Gas Utilities; General Obligation; Higher Education; Highways/Railways; Hospital/Healthcare; Hotels, Restaurants & Leisure; Manufacturing, Durable Goods; Manufacturing, Non Durable Goods; Marine/Aviation Facilities; Multi-Family Housing; Municipal Leases; Non Profit Organization; Paper, Containers & Packaging; Parking Fee Revenue; Pollution Control; Resource Recovery; Sales Tax Revenue; Sewer Utilities; Single Family Housing; Special Assessment; Special Tax; Sports Facility Revenue; Student Loans; Telephone Utilities; Tobacco; Water Utilities.

86.     The March 2007 Prospectus described the Fund's industry concentration policy as follows:

- "The Fund cannot invest 25% or more of its total assets in any one industry.  That limit does not apply to securities issued or guaranteed by the U.S. government or its agencies and instrumentalities or securities issued by investment companies.  Nor does that limit apply to municipal securities in general or to California Municipal Securities."

- This is a fundamental investment policy of the Fund that "can be changed only by vote of a "majority" of the Fund's outstanding voting securities."

-22-

- "Concentration.  In implementing the Fund's policy not to concentrate its investments, the Manager will consider a non-governmental user of facilities financed by industrial development bonds as being in a particular industry.  That is done even though the bonds are municipal securities, as to which the Fund has no concentration limitation.  Although this application of the concentration restriction is not a fundamental policy of the Fund, it will not be changed without shareholder approval."

- "For the purposes of the Fund's policy not to concentrate in securities of issuers as described in the investment restrictions listed in the Prospectus and this Statement of Additional Information, the Fund has adopted the industry classifications set forth in Appendix B to this Statement of Additional Information. This is not a fundamental policy."

87.   Appendix B to the March 2007 SAI also listed the following industry classifications:

- Adult Living Facilities; Airlines; Education; Electric Utilities; Gas Utilities; General Obligation; Higher Education; Highways/Railways; Hospital/Healthcare; Hotels, Restaurants & Leisure; Manufacturing, Durable Goods; Manufacturing, Non Durable Goods; Marine/Aviation Facilities; Multi-Family Housing; Municipal Leases; Non Profit Organization; Paper, Containers & Packaging; Parking Fee Revenue; Pollution Control; Resource Recovery; Sales Tax Revenue; Sewer Utilities; Single Family Housing; Special Assessment; Special Tax; Sports Facility Revenue; Student Loans; Telephone Utilities; Tobacco; Water Utilities.

88.   The October 2007 Prospectus described the Fund's industry concentration policy as follows:

- "The Fund cannot invest 25% or more of its total assets in any one industry.  That limit does not apply to securities issued or guaranteed by the U.S. government or its agencies and instrumentalities or securities issued by investment companies.  Nor does that limit apply to municipal securities in general or to California Municipal Securities."

- This is a fundamental investment policy of the Fund that "can be changed only by vote of a "majority" of the Fund's outstanding voting securities."

-23-

- "Concentration.  In implementing the Fund's policy not to concentrate its investments, the Manager will consider a non-governmental user of facilities financed by revenue bonds as being in a particular industry.  That is done even though the bonds are municipal securities, as to which the Fund has no concentration limitation."

89.     With respect to the statements described above, the September 2006 Prospectus, the March 2007 Prospectus and the October 2007 Prospectus were negligently prepared and contained untrue statements of material fact and/or omitted to state other facts necessary to make the statements made not misleading.  The true material facts, or material facts omitted necessary to make the  representations in these Prospectuses not misleading include the following:

(a)     While the Prospectuses stated that the Fund had a fundamental policy against investing 25% or more in a single industry, the definition of a "single industry" used was unreasonably narrow and violated the SEC's guidelines;

(b)     Defendants invested 25% or more of the Fund's total assets in bonds based on similar types of projects involving California residential, commercial and industrial real estate projects;

(c)     These similar types of projects are related in such a way that economic, business or political developments tend to have the same impact on each project;

(d)     Market or economic changes that affect a bond connected to one project would affect bonds issued in connection with similar types of projects;

(e)     Dirt Bonds in general are exposed to real estate development-related risks and can have more taxpayer concentration risk;

(f)      Dirt Bonds share the feature that the fees, special taxes, or tax allocations and other revenues that are established to secure Dirt Bonds generally are limited as to the rate or amount that may be levied; and

(g)   Dirt Bonds have a greater risk of default than other municipal bonds during a general downturn in the real estate market, because in such a downturn, development is more likely to fail to progress as anticipated and taxpayers are more likely to fail to pay the assessments, fees and taxes as provided in the financing plans of the projects.

90.   A June 12, 2008 Bloomberg article titled, "'Dirt Bonds' Soil Oppenheimer in Gambits Gone Awry," began to disclose the extent of the Fund's exposure to the California real estate development industry. According to the article, "The $1.9 billion Oppenheimer California Municipal Fund owns more than $665 million of dirt bonds sold in California." approximately 35% of the Fund's holdings.

91.   Late in the Class Period, Defendants had little choice but to acknowledge that the Fund had deviated from its industry concentration policy by investing more than 25% of its assets in the California real estate development industry. Defendants had not obtained a vote of a majority of the Fund's outstanding shares before causing the Fund to breach its industry concentration limits. By failing to obtain shareholder approval, the Fund violated one of its fundamental policies and contravened the Section 13(a) of the ICA.

92.   Rather than concede the violation, Defendants sought to sidestep the Fund's industry concentration policy and its obligations under the ICA by revising the definition of a "single industry" in its industry concentration policy. In November 2008, Defendants caused the Fund to re-define "single industry," as used in the Fund's industry concentration policy, to exclude California real estate development. Defendants acted without a vote of a majority of the Fund's outstanding securities, again in violation of the ICA.

93.   Defendants announced the revisions to the Fund's industry concentration policy in the November 2008 Prospectus. The November 2008 Prospectus for the first time disclosed that

-25-

the Fund had been concentrating far more than 25% of its assets in the California real estate

development industry and the risks inherent in that strategy:

- "*Municipal Sector Concentration*. While the Fund's fundamental policies
  do not allow it to concentrate its investments (that is, to invest more than
  25% of its total assets) in a single industry, certain types of municipal
  securities are not considered a part of any 'industry' under that policy.
  Examples of these types of municipal securities include: general
  obligation, general appropriation, municipal leases, special assessment and
  special tax bonds.  Therefore, the Fund may invest more than 25% of its
  total assets in these types of municipal securities, which may finance
  similar types of projects or from which the interest is paid from revenues
  of similar types of projects.  'Similar types of projects' are projects that
  are related in such a way that economic, business or political
  developments tend to have the same impact on each similar project.  For
  example, a change that affects one project, such as proposed legislation on
  the financing of the project, a shortage of the materials needed for the
  project, or a declining economic need for the project, would likely affect
  all similar projects, thereby increasing market risk.  Thus, market or
  economic changes that affect a security issued in connection with one
  project also would affect securities issued in connection with similar types
  of projects.

- "Although these types of municipal securities may be related to certain
  industries, because they are issued by governments or their political
  subdivisions, these types of municipal securities are not considered a part
  of any industry for purposes of the Fund's industry concentration policy."

- "*Special Tax or Special Assessment Bonds (Land-Secured or 'Dirt'
  Bonds)*.  As discussed above, the Fund can invest more than 25% of its
  total assets in municipal securities for similar types of projects that are
  issued in connection with special taxing districts that are organized to plan
  and finance infrastructure development to induce residential, commercial
  and industrial growth and redevelopment.  The bonds financed by these
  methods, such as tax assessment, special tax or tax increment financing
  generally are payable solely from taxes or other revenues attributable to
  the specific projects financed by the bonds without recourse to the credit
  or taxing power of related or overlapping municipalities.  These projects
  often are exposed to real estate development-related risks and can have
  more taxpayer concentration risk than general tax-supported bonds, such
  as general obligation bonds.  Further, the fees, special taxes, or tax

allocations and other revenues that are established to secure such financings generally are limited as to the rate or amount that may be levied or assessed and are not subject to increase pursuant to rate covenants or municipal or corporate guarantees.  The bonds could default if development failed to progress as anticipated or if larger taxpayers failed to pay the assessments, fees and taxes as provided in the financing plans of the projects."

- "*Applying the Restriction Against Concentration*.  In implementing the Fund's policy not to concentrate its investments, the Manager will consider a non-governmental user of facilities financed by private activity bonds as being in a particular industry.  That is done even though the bonds are municipal securities, as to which the Fund has no concentration limitation."

- "Other types of municipal securities that are not considered a part of any '*industry*' under the Fund's industry concentration policy include: general obligation, general appropriation, municipal leases, special assessment and special tax bonds.  Although these types of municipal securities may be related to certain industries, because they are issued by governments or their political subdivisions rather than non-governmental users, these types of municipal securities are not considered a part of an industry for purposes of the Fund's industry concentration policy."

94.     These new disclosures—which *Forbes.com* described on May 25, 2009 as "disconcerting"—confirm that the prior statements regarding industry concentration were materially misleading and inadequately disclosed the true industry concentration risks of the Fund.

**D.     Misstatements Relating To The Fund's Over-Concentration In Junk Bonds And Unrated Bonds.**

95.     The Prospectuses falsely stated that the Fund would invest at least 75% of its holdings in investment grade securities.  In fact, the Fund's total investment in below investment-grade securities, many of which were not rated by an independent ratings agency, well exceeded this limitation during the Class Period.

96.     The September 2006 Prospectus described the Fund's policies for investing in creditworthy securities as follows:

- "Most of the securities the Fund buys must be 'investment grade' (the four highest rating categories of national rating organizations, such as Moody's)";

- "[T]he Fund can invest as much as 25% of its total assets in municipal securities that are not 'investment-grade' at the time of purchase";

- "'Investment grade' securities are those rated within the four highest rating categories of Moody's, Standard & Poor's, Fitch or another nationally recognized rating organization, or (if unrated) judged by the Manager to be comparable to rated investment grade securities"; and

- "A reduction in the rating of a security after the Fund buys it will not automatically require the Fund to dispose of that Security.  However, the Manager will evaluate those securities to determine whether to keep them in the Fund's portfolio."

97.     These same representations were made in each of the subsequent Prospectuses during the Class Period.

98.     With respect to the statements describe above, the September 2006 Prospectus, the March 2007 Prospectus and the October 2007 Prospectus were negligently prepared and contained untrue statements of material fact and/or omitted to state other facts necessary to make the statements made not misleading.  The Prospectuses:

(a)     failed to disclose that, as a result of the Fund's substantial investment in self-rated securities, even minor errors or slightly optimistic projections in the Manager's self-rating methodology would cause the Fund to invest more than 25% of its total assets in below-investment grade securities;

(b)      falsely stated that the Manager's rating system would assign ratings to the Fund's investments comparable to the ratings that would have been assigned by independent ratings agencies; and

(c)      falsely stated that the Fund would invest at least 75% of its assets in investment grade bonds.

99.      As of December 31, 2008, Lipper estimated that 60.27% of the Fund's bonds were not rated by any independent rating agency.  As a result, the Fund's compliance with the prohibition against over-concentrating investments in junk bonds depended heavily on the Manager's methodology for self-rating securities.

100.      Not only was the Fund concentrated in self-rated bonds, but the ratings that the Manager assigned to many of these bonds were only slightly above junk.  According to Morningstar, as of June 30, 2008 the Fund held 78% of its assets in BBB bonds and below.  In addition, the Fund acknowledged that as of July 2008, approximately 20% of its bonds were below investment grade.  If the Manager's self-rating system included minor errors or slightly optimistic projections as to the bonds it rated BBB (the lowest investment grade rating), the Fund would end up holding significantly more than 25% of its total assets in junk bonds.

101.      Defendants exacerbated this risk by not disclosing the Manager's credit rating methodology, precluding even the most sophisticated investors from understanding how the Manager rated bonds and whether those ratings were accurate.

102.      In addition, Defendants' claim that the Manager would assign ratings to unrated securities in a manner "comparable to rated investment grade securities" was itself false. Although Defendants have not disclosed the Manager's credit rating methodology, a detailed analysis of the Fund's holdings demonstrates that the rating system was not consistent with those employed by nationally recognized rating organizations.

103.     Nationally recognized rating agencies, such as Moody's, Standard & Poor's, and Fitch, usually will not assign investment grade ratings to Dirt Bonds unless they are well seasoned (that is, have an established payment history) and have a very high value to loan ratio.  The ratings agencies generally do not assign investment grade ratings to special assessment Dirt Bonds, such as those held by the Fund, unless such projects have at least a 10:1 value-to-lien ratio.

104.     A detailed review of the available issuance material published for each bond held by the Fund as of July 31, 2008 reveals that more than 27% of the bonds in the Fund's portfolio either were Dirt Bonds that did not have a value-to-lien ratio of at least 10:1, or were rated junk by a nationally recognized rating agency.  This calculation likely significantly underestimates the percentage of below investment grade bonds as it excludes approximately $295 million worth of bonds (over 10% of the Fund's total assets) which could not be analyzed because records were unavailable.

105.     This extensive review of the Fund's holdings required a detailed analysis of the issuance materials for more than 600 bonds, undertaken over a period of many weeks.  No reasonable investor could be expected to undertake such an analysis to confirm prior to investing that the Fund's holdings did not conform to representations in the Prospectuses that the Fund would not over-concentrate its total assets in non-creditworthy securities.

**E.     Misstatements Relating To The Fund's Investments In Illiquid Securities.**

106.     The Prospectuses falsely stated that the Fund would not invest more than 15% of its net assets in illiquid securities.  In fact, the Fund exceeded the cap on illiquid securities throughout the Class Period.

107.     Liquidity is important for at least two reasons.  First, liquid assets can be sold on relatively short notice without taking a material discount from the values reported in financial

-30-

statements filed just prior to the asset sale.  Second, liquid assets are actively traded and accordingly can be valued by reference to readily verifiable pricing data or other observable price inputs.  In both regards, illiquid assets radically differ from liquid securities.

108.    *Revision of Liquidity Test in Guidelines to Form N-1A*, promulgated by the SEC, limits mutual funds' holdings of illiquid assets.  This regulation defines an "illiquid asset" as "an asset which may not be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the mutual fund has valued the investment on its books."  Exchange Act Release No. 33-6927; IC-18612, 57 Fed. Reg. 9828 (Mar. 20, 1992)

109.    In the analogous context of money market funds, which also purport to preserve capital, the SEC has stated that "[t]he term 'illiquid security' generally includes any security which cannot be disposed of promptly and in the ordinary course of business without taking a reduced price.  A security is considered illiquid if a fund cannot receive the amount at which it values the instrument within seven days."  Acquisition and Valuation of Certain Portfolio Instruments by Registered Investment Companies, Exchange Act Release No. IC-14983; File No. S7-30-85, 51 Fed. Reg. 9773 (Mar. 21, 1986).

110.    Likewise, GAAP Statement of Financial Accounting Concepts No. 5 states that liquidity is tied to "financial flexibility", and that "[l]iquidity reflects an asset's or liability's nearness to cash.  Financial flexibility is the ability of an entity to take effective actions to alter amounts and timing of cash flows so it can respond to unexpected needs and opportunities."  In other words, liquidity is an important determinant of whether an entity can timely react to changing market conditions without incurring substantial harm.

111.    During the Class Period, the Prospectuses made the following representations about the Fund's investments in illiquid securities:

- "The Fund will not invest more than 15% of its net assets (determined at

the time of purchase and reviewed periodically) in illiquid securities."

- "Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price."

- "A security may be considered illiquid if it lacks a readily available market or if its valuation has not changed for a certain period of time."

- "Floating rate or variable rate obligations that do not provide for the recovery principal and interest within seven (7) days are subject to the Fund's limitations on investments in illiquid securities."

- "The Manager monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to maintain adequate liquidity…. The Manager takes into account the trading activity for such securities and the availability of reliable pricing information, among other factors."

- "Securities that are illiquid are marked with the applicable footnote on the Statement of Investments."

112.     Substantially similar representations were made in the September 2006 Prospectus, the March 2007 Prospectus and the October 2007 Prospectus.

113.     Defendants listed the Fund's securities that they identified as illiquid in each of the Fund's Prospectuses, Annual Reports, Semi-Annual Reports and Form N-Qs.  During the Class Period, the identified securities usually comprised less than 2% of the Fund's net assets and never comprised more than 5% of the Fund's net assets.  The following chart lists the Fund's holdings identified as illiquid in its 2006, 2007 and 2008 Annual Reports and the corresponding Prospectuses:

| July 31, 2006 Annual Report (also in Prospectuses dated September 27, 2006 and March 8, 2007) | |
| --- | --- |
| Name of Illiquid Security | Value |
| Anaheim Public Financing Authority RITES | $4,438,200 |
| Chula Vista Redevelopment Agency (Bayfront) | $510,225 |
| Hawthorne Community Redevelopment Agency Special Tax | $1,706,138 |
| Hawthorne Community Redevelopment Agency Special Tax | $1,201,936 |
| Huntington Park Public Financing Authority, Series A | $3,093,210 |
| San Bernardino Joint Powers Financing Authority | $2,006,695 |
| Trinity County COP | $4,594,793 |
| Vallejo COP (Marine World Foundation) | $875,543 |
| Vallejo COP (Marine World Foundation) | $1,029,900 |
| Total | $19,456,640 |
| As % of Net Assets | 1.29% |

| July 31, 2007 Annual Report (also in Prospectus dated October 31, 2007) | |
| --- | --- |
| Name of Illiquid Security | Value |
| Anaheim Public Financing Authority RITES | $4,231,480 |
| CA Statewide CDA (Kaiser Permanente) | $99,500,000 |
| Huntington Park Public Financing Authority, Series A | $3,064,740 |
| Los Banos COP | $25,021 |
| San Bernardino Mountains Community Hospital District COP | $1,367,968 |
| San Bernardino Mountains Community Hospital District COP | $3,070,241 |
| Trinity County COP | $4,621,013 |
| Total | $115,880,463 |
| As % of Net Assets | 4.72% |

| July 31, 2008 Annual Report (also in Prospectus dated November 26, 2008) | |
| --- | --- |
| Name of Illiquid Security | Value |
| CA Valley Health System, Series A | $25,683 |
| Los Banos, CA COP | $25,001 |
| Northern CA Gas Authority | $32,400 |
| Northern CA Gas Authority | $21,450,000 |
| San Bernardino, CA Mountains Community Hospital District COP | $1,120,569 |
| San Bernardino, CA Mountains Community Hospital District COP | $2,358,380 |
| Trinity County, CA COP | $4,290,504 |
| Total | $29,302,537 |
| As % of Net Assets | 1.70% |

114.    With respect to the statements describe above, the September 2006 Prospectus, the March 2007 Prospectus and the October 2007 Prospectus were negligently prepared and contained untrue statements of material fact and/or omitted to state other facts necessary to make the statements made not misleading.  The Prospectuses:

(a)    falsely stated that the Fund would not invest more than 15% of its net assets in illiquid securities;

(b)    failed to disclose that the Fund did not classify as illiquid certain securities that lacked an active trading market, that lacked a readily available market, or whose valuation

-33-

had not changed for a certain period of time;

(c)     failed to disclose that the Fund's substantial investments in particular securities issues contributed to the illiquidity of those holdings;

(d)     failed to disclose that the Fund's sizeable investment in Tobacco Bonds contributed to the lack of liquidity in those particular holdings; and

(e)     failed to disclose that the market for the Fund's ordinary municipal bond holdings could turn illiquid in times of market volatility.

### 1.     Investments That Were Illiquid Due To The Lack Of An Active Trading Market.

115.    According to Defendants' own disclosures, the lack of an active trading market makes it difficult to sell securities promptly at an acceptable price.  That is, lack of an active trading market can make a security illiquid.  The low trading frequency and low trading volume of the securities identified by Defendants as illiquid confirms this.

116.    For example, in the Fund's 2006, 2007 and 2008 Annual Reports, Defendants classified as illiquid a Trinity County California CTFS bond that did not post a single trade during the Class Period.  Defendants also listed as illiquid certain securities with higher trading frequency and volume, including a Northern California Gas Authority bond that posted dozens of trades during the Class Period, including some trades for hundreds of millions of dollars worth of the security.

117.    Thus, while Defendants' own benchmark examples indicate that Defendants applied a relatively broad definition of illiquidity to the Fund's holdings, the manner in which Defendants actually classified securities as illiquid was not consistent with that broad definition.

118.    Applying Defendants' benchmark for liquidity as shown above to its top 25 securities holdings demonstrates that the Fund invested more than 15% of its net assets in

-34-

illiquid securities throughout the Class Period.  Comparing the Fund's top 25 holdings to the specific securities Defendants identified as illiquid confirms that the Fund invested more than 15% of its net assets in illiquid securities throughout the Class Period.

119.    A detailed examination of the trading history for the Fund's top holdings reveals, for example, that the security that comprised the Fund's ninth largest holding as of July 2008, the Virgin Island Public Finance Authority bond (Hovensa Coker), did not post a single trade in 2006, 2007 or 2008.  Despite the lack of trading activity for this security and despite the fact that its trading volume was lower than the trading volume for securities Defendants classified as illiquid, Defendants did not classify this security as illiquid during the Class Period.

120.    Similarly, the California Statewide CDA (Kaiser Permanente) bond, the Fund's third largest holding as of July 2008, posted only infrequent, low volume trades in 2007 and 2008.  The bond's trades during this period amounted to less than 3% of the maturity issue size—while the Fund held approximately 30% of the bond's maturity issue size as of July 2008. Defendants listed the Kaiser Permanente bond as illiquid only once during the Class Period, in the July 31, 2007 Annual Report, despite continuous low-volume, low-frequency trading throughout 2007 and 2008.

121.    Defendants' failure to identify as illiquid many securities that had little or no trading activity during the Class Period reveals either that the Prospectuses' statements that the Manger would monitor the Fund's holdings was false or misleading, or that the Manager monitored the Fund's holdings but failed to classify certain illiquid securities as such.  In either case, the statements in the Prospectuses were false or misleading.

122.    In the class action lawsuit against Oppenheimer's Champion Fund currently pending before this Court, Defendants now take the position that whether a security is illiquid is "not a cut-and-dried question" but a "difficult and complicated assessment[]" that involves a

"judgment call."  To the extent that this current representation by Defendants is true, their prior repeated representation in the Prospectuses that the Fund would not exceed a 15% cap on investments in illiquid securities is necessarily false and misleading, and omitted to state other facts necessary to make the statement true.  Defendants failed to inform investors that while promising to maintain a 15% cap on illiquid investments, the Fund's definition of illiquidity incorporated a subjective assessment that could not be meaningfully applied.

### 2.    Investments That Were Illiquid Due To The Size Of The Fund's Position.

123.    In addition, the Prospectuses were false or misleading because they failed to disclose that the Fund's substantial investments in certain issuances contributed to the illiquidity of those holdings.  Absent sales by the Fund, little or no market for those securities existed, rendering the securities difficult to accurately value.

124.    For example, as of July 2008, the Fund held 81.2% of the California Rural Home Mortgage Finance Authority bond's 2043 maturity tranche, leaving less than 20% of the issuance to trade on the market.  Likewise, in July 2008, the Fund held 68.7% of the Lathrop Special Tax Community Facilities District No. 06-11 bond's 2036 maturity tranche.  If the Fund had attempted to liquidate its positions in these securities, it inevitably would have crashed the price.  In other words, the Fund's large position in these securities made it, in the words of the Prospectuses, difficult to "dispose of them promptly at an acceptable price."  Nonetheless, the Fund failed to classify either of these securities as illiquid.

### 3.    Illiquid Tobacco Bonds.

125.    The Prospectuses were also false or misleading because they failed to disclose that the Fund's investments in Tobacco Bonds further contributed overall illiquidity in excess of the 15% cap.

126.    During the Class Period, the Fund invested nearly 25% of its total assets in two different types of Tobacco Bonds.  Defendants described these Tobacco Bonds in the September 2006 Prospectus as follows:

> "TOBACCO RELATED BONDS.  The Fund may invest in two types of tobacco related bonds: (i) tobacco settlement revenue bonds, for which payments of interest and principal are made solely from a state's interest in the Master Settlement Agreement ("MSA") described below, and (ii) tobacco bonds subject to a state's appropriation pledge, for which payments may come from both the MSA revenue and the applicable state's appropriation pledge."

Defendants made substantially similar statements about Tobacco Settlement Revenue Bonds in the March 2007 Prospectus and the October 2007 Prospectus.

127.    The first of the two types of Tobacco Bonds, MSA Tobacco Bonds, are described in the September 2006 Prospectus as follows:

> "Tobacco Settlement Revenue Bonds.  The Fund may invest a significant portion of its assets in tobacco settlement revenue bonds. Tobacco settlement revenue bonds are secured by an issuing state's proportionate share in the MSA.  The MSA is an agreement reached out of court in November 1998 between 46 states and six other U.S. jurisdictions (including Puerto Rico and Guam) and the four largest U.S. tobacco manufacturers (Phillip Morris, RJ Reynolds, Brown & Williamson, and Lorillard). Subsequently, a number of smaller tobacco manufacturers signed on to the MSA, bringing the current combined market share of participating tobacco manufacturers to approximately 92%.  The MSA provides for payments annually by the manufacturers to the states and jurisdictions in perpetuity, in exchange for releasing all claims against the manufacturers and a pledge of no further litigation.  The MSA established a base payment schedule and a formula for adjusting payments each year.  Tobacco manufacturers pay into a master escrow trust based on their market share and each state receives a fixed percentage of the payment as set forth in the MSA.

"A number of states have securitized the future flow of [MSA] payments by selling bonds pursuant to indentures, some through distinct governmental entities created for such purpose. The bonds are backed by the future revenue flow that is used for principal and interest payments on the bonds. Annual payments on the bonds, and thus the risk to the Fund, are highly dependent on the receipt of future settlement payments to the state or its governmental entity, as well as other factors. The actual amount of future settlement payments is dependent on many factors including, but not limited to, annual domestic cigarette shipments, cigarette consumption, inflation and the financial capability of participating tobacco companies. As a result, payments made by tobacco manufacturers could be reduced if the decrease in tobacco consumption is significantly greater than the forecasted decline.

"Because tobacco settlement bonds are backed by payments from the tobacco manufacturers, and generally not by the credit of the state or local government issuing the bonds, their creditworthiness depends on the ability of tobacco manufacturers to meet their obligations. A market share loss by the MSA companies to non-MSA participating tobacco manufacturers could cause a downward adjustment in the payment amounts. A participating manufacturer filing for bankruptcy also could cause delays or reductions in bond payments, which could affect the Fund's net asset value.

"The MSA and tobacco manufacturers have been and continue to be subject to various legal claims. An adverse outcome to any litigation matters relating to the MSA or affecting tobacco manufacturers could adversely affect the payment streams associated with the MSA or cause delays or reductions in bond payments by tobacco manufacturers. The MSA itself has been subject to legal challenges and has, to date, withstood those challenges. The Statement of Additional Information contains more detailed information about the litigation related to the tobacco industry and the MSA."

128.   Defendants made substantially similar statements about MSA Tobacco Bonds in the March 2007 Prospectus and the October 2007 Prospectus.

129.   Although these disclosures describe certain risks of investing in MSA Tobacco Bonds related to general creditworthiness and periodic interest payments, they do not identify any risk of illiquidity.

130.   The Fund also held a second type of Tobacco Bond that was "subject to appropriation" ("STA Tobacco Bonds").  The September 2006 Prospectus, the March 2007 Prospectus and the October 2007 Prospectus disclosed less about the risk of illiquidity for STA Tobacco Bonds, which relied on both the MSA and state appropriation pledges for revenue:

> "Subject to Appropriation" (STA) Tobacco Bonds. In addition to the tobacco settlement bonds discussed above, the Fund also may invest in tobacco related bonds that are subject to a state's appropriation pledge ('STA Tobacco Bonds').   STA Tobacco Bonds rely on both the revenue source from the MSA and a state appropriation pledge.
>
> "These STA Tobacco Bonds are part of a larger category of municipal bonds that are subject to state appropriation. Although specific provisions may vary among states, 'subject to appropriation bonds' (also referred to as 'appropriation debt') are typically payable from two distinct sources: (i) a dedicated revenue source such as a municipal enterprise, a special tax or, in the case of tobacco bonds, the MSA funds, and (ii) from the issuer's general funds.  Appropriation debt differs from a state's general obligation debt in that general obligation debt is backed by the state's full faith, credit and taxing power, while appropriation debt requires the state to pass a specific periodic appropriation to pay interest and/or principal on the bonds as the payments come due. The appropriation is usually made annually.   While STA Tobacco Bonds offer an enhanced credit support feature, that feature is generally not an unconditional guarantee of payment by a state and states generally do not pledge the full faith, credit or taxing power of the state.  The Fund considers the STA Tobacco Bonds to be 'municipal securities' for purposes of its concentration policies."

131.   Defendants omitted to state that the Fund's holdings in both MSA and STA Tobacco Bonds were, as a general matter, illiquid or at significant risk of illiquidity.  For

example, the Fund held more than 80% of an issuance of the California Statewide Financing Authority Tobacco Settlement bond—which was the Fund's tenth largest holdings as of July 2008—and the average volume per trade for this security over the Class Period was only $22,212 (compared to a $33,095,000 tranche issuance) and included no large institutional trades. Similarly, as of July 2008, the Fund held $18,568,564 in the California County Tobacco Securitization Agency bond. According to trading activity reports, this security posted no trades at all in 2007 and 2008. Trading was thin in 2006: the average trade in 2006 accounted for less than 2.6% of the maturity issue, while the Fund held over 11% of the maturity issue as of July 2008. Despite such minimal trading activity, Defendants did not classify either the California Statewide Financing Authority Tobacco Settlement Bond or the California County Tobacco Securitization Agency bond as illiquid.

132.    During the Class Period, the Fund invested nearly 25% of its total assets in MSA Tobacco Bonds, and approximately 1% of its total assets in STA Tobacco Bonds. Comparable California capital preservation municipal bond funds, in contrast, invested far smaller percentages of their assets in tobacco bonds. The Fidelity California Municipal Income Fund, for example, had invested only 2.97% of its total assets in Tobacco Bonds as of February 2008. The Lord Abbott California Tax-Free Fund likewise invested only 3.19% of its assets in Tobacco Bonds as of September 2008.

**4.      The Fund Failed To Identify Market Volatility As A Factor Impacting Liquidity, Particularly Given Its Over-Concentration In Below Investment Grade Securities.**

133.    Finally, the Prospectuses were false and misleading because they failed to disclose that the market for ordinary municipal bonds held by the Fund could turn illiquid in times of increased market volatility, and that its substantial holdings in below investment grade securities rendered the Fund particularly vulnerable to this risk.

134.    Credit crises have occurred routinely over the past two decades, including the 1994 devaluation of the Mexican peso and ensuing credit tightening; the 1997 Asian financial crisis; Russia's 1998 default on government bonds resulting in Japanese and European bond market panics; and the deterioration of capital markets and crisis in confidence in interbank lending caused by the September 11, 2001 terrorist attacks on American soil.  Thus, the occurrence of another credit crunch—and its consequent impact on the market for ordering municipal bonds—was not an unforeseeable risk.

135.    Defendants failed to disclose this risk, however, until after it had already occurred.  In the October 2008 Supplement, Defendants described additional risks of investing in the Fund that had not been previously disclosed.  In a section titled, "UNUSUAL VOLATILITY AND LACK OF LIQUIDITY IN THE MUNICIPAL BOND MARKETS IN 2008," the October 2008 Supplement stated:

> "Municipal bonds are traded in the "over-the-counter" market among dealers and other large institutional investors.  In the latter months of 2008 that market has been subject to greater volatility than it has historically experienced.  Liquidity in the municipal bond market (the ability to buy and sell bonds readily) has been reduced, as it has been in other fixed income markets, in response to overall economic conditions and credit tightening.  During times of reduced market liquidity, such as at the present, the Fund may not be able to sell bonds readily at prices reflecting the values at which the bonds are carried on the Fund's books.  Sales of large blocks of bonds by market participants, such as the Fund, that are seeking liquidity can further reduce bond prices in an illiquid market."

136.    The Fund's over-concentration in junk bonds, unrated bonds and self-rated bonds exacerbated the Fund's liquidity risks.  According to an October 16, 2008 article entitled, "Oppenheimer California Municipal's volatility hasn't paid off in the long run, " published by Morningstar, as of June 30, 2008, the Fund held 78% of its assets in bonds rated BBB and

below.  Given their volatile and risky nature, these below investment-grade bonds are less likely to be actively traded than are investment-grade securities, and thus often lack readily available market or valuation methods.  In a March 5, 2009 article entitled, "Oppenheimer California Muncipal's risk-taking has hurt it,"  Morningstar further observed that the Fund's "huge stake in mid- and low-quality bonds also hurt in 2008 as investors fled to high-quality fare."  Flight to high-quality fare leaves the lower quality bonds difficult to sell or value—that is, illiquid.

137.    The November 2008 Prospectus belatedly acknowledged that lower-grade securities were particularly vulnerable to market volatility:  "The market for lower-grade securities may be less liquid and therefore may be harder to value or to sell at an acceptable price, especially during times of market volatility or decline."

138.    Although the risk that liquidity could disappear for ordinary municipal bonds or lower-grade securities was a "main risk of investing in the Fund" in 2006, 2007 and throughout 2008, Defendants failed to disclose that risk in the relevant Prospectuses.

**F.      Misstatements Relating To The Fund's Investment In Inverse Floaters.**

139.    Defendants stated in the Prospectuses that the Fund would invest no more than 20% of its assets in highly complex and volatile derivative instruments known as municipal inverse floating rate securities ("inverse floaters").  Municipal inverse floaters are securities that pay a tax-exempt coupon (or interest rate) that moves inversely with certain referenced changes in a short-term interest rate, such as an interest rate linked to the Bond Market Association Municipal Swap Index ("BMA Index") or some other short-term pricing mechanism.

140.    Some of the inverse floaters that the Fund owned were created as one element in a "tender option bond program" structured by an investment bank (the "Sponsor").  The Sponsor forms a Special Purpose Trust ("Trust") into which the Fund places long-term municipal bonds ("underlying bonds") that it has purchased.  The Trust then issues two classes of securities:

- **Floating rate securities (floaters)**: The Trust sells the floaters to third parties seeking cash equivalent securities paying a referenced and prominent short-term coupon interest rate just above money market levels.  Holders of the floaters have the right to periodically (typically every week) tender the floaters for redemption at par value.  The Trust uses the proceeds from selling floaters to fund the purchase of the underlying bonds and pays the floater coupon from the periodic coupon paid on the underlying bonds.

- **Inverse floating rate securities (inverse floaters):** The Trust also issues "inverse floaters" to the Fund.  The coupon received by the Fund on the inverse floaters is the difference between the long-term interest payments generated by the underlying bonds and the short-term interest paid on the floaters.  For this reason, the return on the inverse floaters move in the opposite direction from the return on the floaters, *i.e.*, as the short term interest rate paid on the floaters goes up, the return on the inverse floaters goes down.  Because the inverse floaters receive all income not used to pay interest on the companion floaters, inverse floaters are sometimes referred to as "residuals."

141.    The key feature of investing in inverse floaters is that it is the equivalent, in terms of risk, of borrowing short-term funds and using them to buy long-term bonds, a mismatch of the assets and liabilities that constitute the total position.

142.    Inverse floaters provided the Fund with an opportunity to use leverage, which added significantly to the risk of the portfolio.  Inverse floaters have leverage determined by the ratio of the total dollar size of the underlying municipal bond to the total dollar size of the inverse floater issue.  As the ratio of the municipal bond's dollar size to the inverse floater's dollar size increases, so does the leverage—and, thus, the price volatility—of the inverse

floaters.  Notably, not one of the Prospectuses that the Fund issued during the Class Period

discussed or even revealed the total of the leverage of the inverse floaters that the Fund created

and purchased.

143.    Below is a typical inverse floating rate security structure that the Fund created.

The example is said to have 4:1 leverage because the fund's net investment in the Special

Purpose Trust of $15 million ($60 million of underlying long-term bonds deposited minus the

$45 million received from the floating rate certificate holders) allows it to secure "assets" of $60

million—a 4:1 ratio.



144.    The price of the type of inverse floater created by the Fund is more volatile than

typical municipal bonds with the same maturity because of at least two factors:  (1) the leverage

of the inverse floater, reflected in the ratio of the total assets controlled to the inverse floater (in this example 4:1); and (2) the leveraged exposure of the inverse floater to changes in the credit quality of the underlying assets in the Trusts.

145.    The arrangements creating the inverse floaters in which the Fund invested carried additional risk: the holders of the floaters held a right to "put" them back to the Trust at any time, with as little as seven days' notice.  (This characteristic satisfied certain regulatory requirements for the floaters to be held by money-market mutual funds.)  Using this put option, the floater holder can sell the floater back to the trust and demand payment at *par value or full and undiscounted face value in exchange*.  If the Sponsor cannot re-sell the tendered floaters, it has the right to collapse the Trust by causing all outstanding floaters to be tendered for par and selling the underlying bonds held in the Trust to meet the Trust's outstanding obligations (*i.e.*, to pay the holders of the floaters the par value to which their put option entitled them).  This predictable sequence of events can (and did) require the Fund to liquidate the underlying bonds placed in the Trust at unfavorable prices.  In this way, funding of a long-term bond with short-term financing is a strategy whose risks are starkly incompatible with the objective of "preserving capital."

146.    Finally, the Fund piled on one more additional risk by entering into "shortfall and forbearance" agreements with the Sponsor of the Trust that issued the floaters and inverse floaters.  With such agreements, the Fund obligates itself to reimburse the Sponsor (and, through it, the holder of the floater) for any difference between the liquidation value of the underlying bonds and the par value of tendered floaters.  In the event of such a shortfall, the Fund can be forced to sell other securities from its portfolio to satisfy its contractual obligations, regardless of market conditions.  Moreover, the same conditions that would lead to exposure

under the shortfall and forbearance agreements will predictably and simultaneously create a severe decline in the value of the Fund's other assets.

147.    In short, the Fund's exposure to inverse floaters together with the shortfall and forbearance agreements exposed its long-term debt securities to short-term market volatility. The impact required not only that the Fund sell the collateral for its inverse floater holdings under unfavorable conditions, but that it also sell other securities in its portfolio intended to be held for long periods at prices that are materially lower than the values reported in the Fund's SEC filings.  These risks were not disclosed in the Prospectuses.

148.    During the Class Period, the Prospectuses stated that:

- "Inverse floaters all entail some degree of leverage.  An inverse floater that has a higher degree of leverage usually is more volatile with respect to its price and income than an inverse floater that has a lower degree of leverage."

- "The market value of inverse floaters can be more volatile than that of a conventional fixed-rate bond having similar credit quality, redemption provisions and maturity."

- "Some derivatives [including inverse floaters] may be illiquid, making it difficult for the Fund to sell them quickly at an acceptable price."

- "The Fund may also enter into 'shortfall and forbearance' agreements [which commit the Fund] to pay the trust the difference between the liquidation value of the underlying municipal bond on which the inverse floater is based and the principal amount payable to the holders of the short-term floating rate security ...."

- "When the Fund invests in certain derivatives, for example, inverse floaters with 'shortfall' agreements … and swaps, the Fund must segregate cash or readily marketable short-term debt instruments in an amount equal to the obligation."

- "The Manager monitors the Fund's potential exposure with respect to [its 'shortfall'] agreements on a daily basis and intends to take action to terminate the Fund's investment in the inverse floaters, as it deems appropriate."[1]

149.    Substantially similar representations were made in the September 2006 Prospectus, the March 2007 Prospectus and the October 2007 Prospectus.

150.    With respect to the statements describe above, the September 2006 Prospectus, the March 2007 Prospectus and the October 2007 Prospectus were negligently prepared and contained untrue statements of material fact and/or omitted to state other facts necessary to make the statements made not misleading for the reasons set forth below.  The Prospectuses:

(a)    failed to fully disclose the significant risks of the Fund's investments in inverse floaters;

(b)    failed to disclose the significant leverage inherent in the Fund's use of inverse floaters;

(c)    failed to disclose that the Trust Sponsor had the right to collapse the Trusts if it became unable to sell or remarket the short-term floater securities;

(d)    falsely stated that the Fund segregated cash or readily marketable short-term debt instruments sufficient to cover its obligations under the inverse floaters;

(e)    failed to disclose that the Manager did not monitor the Fund's potential exposure to the shortfall and forbearance agreements;

(f)    failed to disclose that, in the event that the Special Purpose Trusts were

---

[1]This representation was made only in the October 2007 Prospectus.

collapsed and the floaters tendered at par, the losses suffered by the Fund would be increased because of its overconcentration in illiquid securities;

   (g) falsely suggested the Fund's inverse floaters might not be more volatile than fixed-rate bonds with similar credit quality, redemption provisions, and maturity, when this was mathematically certain; and

   (h) failed to disclose the considerable correlation risk created by its holdings of inverse floaters.

   **1.**  **Undisclosed Leverage.**

   151. Defendants failed to disclose the magnitude of the leverage created by the Fund's use of inverse floaters.  Instead, the discussion of leverage was vague and the extent of leverage was left undefined in the Prospectuses.  For instance, each Prospectus stated that the Fund would not expose more than 20% of its total assets to the "effects of leverage" from its investment in inverse floaters.  Yet Defendants never disclosed how they calculate "effects of leverage," and whether their leverage calculations included the additional volatility from both purchased and created inverse floaters.  Moreover, because Defendants materially overstated the reported values of the Fund's illiquid long term securities, and because the shortfall and forbearance agreements created open-ended obligations, Defendants' statement that the inverse floater concentration was limited to 20% of its assets was materially false and misleading.

   152. As of July 31, 2008, municipal bonds with a value of $504 million had been deposited by the Fund into special purpose trusts to create inverse floaters and $442 million in floating rate securities had been issued.  Defendants valued the Fund's  inverse floaters at approximately $62 million.  Accordingly, Defendants appear  to have created a minimum of approximately 8 times leverage ($504 million divided by $62 million), with their use of created

inverse floaters.  However, the amount of leverage relating to the Fund's purchased inverse floaters remained undisclosed.

153.    After the fact, industry commentators noted that the Fund's undisclosed use of internal leverage and traditional leverage explain the Fund's significant underperformance with the Fund's comparative index.  In an April 1. 2009 article entitled "Where Leverage Lurks," Morningstar wrote:

> "We have uncovered a number of fixed-income mutual funds that made unusually concentrated or reckless sector bets, borrowed money to create investment leverage, or have used derivatives in very speculative ways.  In many cases, funds' terrible returns just haven't made sense in the context of readily available fund information or their managers' comments to analysts.  After going much deeper into SEC filings, we've found levels of portfolio risk that we've rarely ever seen used before in open-end mutual funds."

> $*$ $*$ $*$ $*$

> "If a conventional, high-quality bond fund lost more than 10% in 2008, there's a reasonable chance that it did something atypically risky.  After all, the Barclays U.S. Universal Bond Index returned 2.4% in 2008, and that isn't even a plain-vanilla benchmark.  It holds nearly 10% in sectors more volatile than most, such as high-yield and foreign bonds.  Even if you strip out its hot-performing Treasury bonds, the Universal Bond Index would have suffered only a 0.92% loss.  To generate a double-digit loss of more than 10%, a high-quality fund likely used leverage or derivatives of some type.  Or it made concentrated bets in sectors either lightly represented or completely absent from the common core indexes.  With some exceptions, losing more than 10% in 2008 meant poor portfolio diversification at best and a woeful disregard for the risks of concentration and leverage at worst."

**2.    Undisclosed Right of Counterparties to Collapse the Trust and Call Fund Collateral.**

154.    The short term floating rate certificates could be tendered back to the Trust on as little as seven days' notice at par value.  However, the Prospectuses for the Fund did not

disclose that if the Sponsor could not re-sell the tendered floaters, it had the right to collapse the Trust by causing all outstanding floaters to be tendered for par and selling the underlying bonds held in the Trust.  As a result, the Fund was required to liquidate the underlying bonds placed in the Trust at unfavorable prices.

155.    Defendants belatedly issued a corrective disclosure relating to the Fund's inverse floaters in the October 2008 Supplement.  Specifically, the disclosure for the first time acknowledged the risk that the collateral underlying the floaters was insufficient to cover the Fund's obligation under the floaters, admitted that the Fund would have to sell other investments to make up the difference, and disclosed that those other investments (presumably because they were illiquid), could be sold at a discounted price to raise cash to meet that obligation, and acknowledged the right of the Sponsor to collapse the Trust.  A Prospectus Filing with the SEC on Form N1-A, replacing its previously issued disclosures relating to inverse floaters, stated, in relevant part:

> "The Fund's investments in inverse floaters involve certain risks. The market value of an inverse floater residual certificate can be more volatile than that of a conventional fixed-rate bond having similar credit quality, maturity and redemption provisions. Typically, inverse floater residual certificates tend to underperform fixed rate bonds when long-term interest rates are rising but tend to outperform fixed rate bonds when long-term interest rates are stable or falling.  Inverse floater residual certificates entail a degree of leverage because the trust issues short-term securities in a ratio to the residual certificates with the underlying long-term bond providing collateral for the obligation to pay the principal value of the short-term securities if and when they are tendered.  *If the Fund has created the inverse floater by depositing a long-term bond into a trust, it may be required to provide additional collateral for the short-term securities if the value of the underlying bond deposited in the trust falls.*
>
> "An inverse floater that has a higher degree of leverage is typically more volatile with respect to its price and income than an

inverse floater having a lower degree of leverage.  *Under inverse floater arrangements, if the remarketing agent that offers the short-term securities for sale is unable to sell them, or if the holders tender (or put) them for repayment of principal and the remarketing agent is unable to remarket them, the remarketing agent may cause the trust to be collapsed, and in the case of floaters created by the Fund, the Fund will then be required to repay the principal amount of the tendered securities.  During times of market volatility, illiquidity or uncertainty, the Fund could be required to sell other portfolio holdings at a disadvantageous time to raise cash to meet that obligation.*"  (Emphasis added)

156.   The risks that the Fund could be required to provide additional collateral or to sell other portfolio holdings at a disadvantageous time to raise cash as a result of its investments in inverse floaters had been a main risk of investing in the Fund throughout the entire Class Period, but had not been adequately disclosed.

**3.    Readily Marketable Securities Were Insufficient to Satisfy Obligations Under the Shortfall Agreements.**

157.   The September 2006 Prospectus stated that "[w]hen the Fund invests in certain derivatives, for example, inverse floaters with 'shortfall' agreements … *the Fund must segregate cash or readily marketable short-term debt instruments in an amount equal to the obligation*" (emphasis added).  That statement was repeated in the Fund's March 2007 Prospectus and the October 2007 Prospectus.

158.   Each of the Fund's Statements of Investments included in the Statements of Additional Information throughout the Class Period contained a list of the Fund's holdings, and purported to identify holdings which had been segregated as collateral obligations.  These identifications were materially false and misleading because they materially overvalued the holdings that had been segregated, both disguising the risk to the Fund's other holdings and falsely inflating the net asset value of the Fund.  These identifications also were materially false and misleading because they purported to identify all holdings which acted as collateral when in

fact, because of the insufficiency of the holdings, other of the Fund's holdings also were at risk of forced sales.

159.     There is no indication that the Fund segregated cash or readily marketable securities in an amount sufficient to meet its obligations under the shortfall agreements.  As a result, the Fund faced the risk of selling, and indeed, to meet those obligations, was forced to sell other illiquid securities at fair market values that were significantly lower than the inflated values reported in the Fund's financial statements.

160.     In fact, the October 2008 Supplement revealed that the Fund increased its permitted borrowing over 300% to $3 billion under a credit line in which it participated with other Oppenheimer funds.  Defendants also disclosed for the first time that amounts borrowed under the credit line could be used "to unwind or 'collapse' trusts that issued 'inverse floaters' to the Fund . . . , or to contribute to such trusts to enable them to meet tenders of their short-term securities by the holders of those securities."  This disclosure is further acknowledgement of the Fund's need to raise additional cash in late 2008 to meet obligations under shortfall and forbearance agreements because of its failure to maintain sufficient short-term marketable securities to otherwise cover these obligations.

161.     The Prospectuses also represented that the Manager would monitor the Fund's potential exposure to the shortfall and forbearance agreements, but this clearly did not occur as evidenced by the Fund's failure to segregate liquid assets sufficient to meet its obligations under those agreements.

**4.       The Forced Sale of Illiquid Securities Aggravated Portfolio Losses.**

162.     Defendants failed to disclose that the Fund's use of inverse floaters increased the risks arising from its excessive holdings in illiquid securities.  The Fund's inverse floater positions required it to maintain in the ability to repay the holders of the floaters on short notice.

This in turn meant that the Fund needed the flexibility to dispose of other bonds in its portfolio at times of market volatility without incurring additional losses.  But the Fund's over-concentration in illiquid securities left it ill-equipped to meet its contractual obligations related to inverse floaters, and placed it entirely at the mercy of unpredictable movements in interest rates as well as recurring crises in capital markets. This state of affairs, and the significant financial risk to which the Fund was exposed, were not disclosed.

     **5.**      **The Volatility of the Inverse Floaters Was Understated and Misrepresented.**

163.     Instead of disclosing the mathematical fact that inverse floaters are more price-volatile than otherwise similar debt securities, the Prospectuses actually suggested that inverse floaters might *not* be more volatile.  For example, the October 31, 2007 Prospectuses states, misleadingly, that "[t]he market value of inverse floaters *can be* more volatile than that of a conventional fixed-rate bond having similar credit quality, redemption provisions and maturity" (emphasis added).  By stating that inverse floaters *can be* more volatile, Defendants concealed the fact that inverse floaters are *necessarily* more volatile than conventional bonds with similar maturities, credit quality, and other relevant provisions.  By suggesting that some of its inverse floaters might have the same price stability as otherwise comparable bonds, Defendants, in the Prospectuses, falsely and misleadingly made the Fund appear to be a safer investment than it really was.

     **6.**      **Defendants Failed to Disclose the Significant Correlation Risk Created By Its Holdings of Inverse Floaters.**

164.     The Fund used the proceeds received from the issuance of the short term floating rate certificates to increase its already considerable stakes in mid to low quality Tobacco and Dirt Bonds.  At the end of the Class Period, Tobacco and Dirt Bonds each accounted for over 25% of the Fund's holdings.  Leveraging the most non-diversified positions of the Fund, which

also had questionable credit qualities, only amplified the significant losses of the Fund during the class period.

165.    After the fact, industry commentators attributed the Fund's dismal performance to this excessive leverage combined with the Fund's substantial investment in poor quality bonds. A report published by Morningstar on March 5, 2009 stated:

> *"Oppenheimer California Municipal's risk-taking has hurt it.*
>
> "Leverage was a 2008 buzzword as [overleveraged] banks imploded and deepened the financial crisis.  But the concept is nothing new for this fund, which has used it to generate extra income for years.  The fund can both borrow to create leverage and employ "internally leveraged" inverse floating-rate notes, which are highly sensitive to interest-rate shifts.  Manager Ron Fielding is drawn to the outsized tax-free income these instruments generate, but that brings outsized volatility, too.  As of July 31, 2008, the fund was exposed to the market by a factor of 129% via both conventional leverage and inverse floaters.  While that magnifies gains in good times, it can also prove disastrous when the market is stressed, as it was in 2008.  As liquidity dried up and hedge funds began selling in earnest, long-dated munis got pummeled.  The leverage inherent in the fund's borrowing and inverse floaters meant the damage was amplified."

## G.    Misstatements Relating To The Value Of The Fund's Assets And Its NAV.

166.    The Prospectuses falsely stated that Fund securities were valued at "fair value," which was generally determined by one of several methods, such as a closing price on an exchange, the mean between the "bid" and "ask" prices recorded by an exchange, the best judgment of a pricing service, or procedures internal to the Fund and not revealed by the Prospectus.  In fact, as was disclosed only on January 31, 2009, none of the Fund's investments were priced by reference to trading data.  Rather, the Manager valued the Fund's assets in an opaque process for which there was no market-price check.  In the absence of such a check, the Fund's assets were overvalued.  Because the Fund failed to properly characterize a substantial

-54-

portion of its investments as illiquid, the Fund's pricing also did not properly account for and disclose the significant discounted value of these investments were the Fund to sell them on short notice.

167.   The September 2006 Prospectus stated:

> "SECURITIES VALUATION.  The Fund calculates the net asset value of its shares as of the close of The New York Stock Exchange (the 'Exchange'), normally 4:00 P.M. Eastern time, on each day the Exchange is open for business.  Securities may be valued primarily using dealer-supplied valuations or a portfolio pricing service authorized by the Board of Trustees.  Securities listed or traded on National Stock Exchanges or other domestic exchanges are valued based on the last sale price of the security traded on that exchange prior to the time when the Fund's assets are valued.  Securities traded on NASDAQ are valued based on the closing price provided by NASDAQ prior to the time when the Fund's assets are valued.  *In the absence of a sale, the security is valued at the last sale price on the prior trading day, if it is within the spread of the closing 'bid' and 'asked' prices, and if not, at the closing bid price…. Securities (including restricted securities) for which market quotations are not readily available are valued at their fair value*.  Foreign and domestic securities whose values have been materially affected by what the Manager identifies as a significant event occurring before the Fund's assets are valued but after the close of their respective exchanges will be fair valued.  *Fair value is determined in good faith using consistently applied procedures under the supervision of the Board of Trustees*.  Short-term 'money market type' debt securities with remaining maturities of sixty days or less are valued at amortized cost (which approximates market value)."  (Emphasis added)

168.   That same document further stated that long-term debt securities held by the Fund (such as those used as collateral in the creation of inverse floaters) were valued as follows:

> "Long-term debt securities having a remaining maturity in excess of 60 days are valued based on the mean between the 'bid' and 'asked' prices determined by a portfolio pricing service approved by the Fund's Board of Trustees or obtained by the

Manager from two active market makers in the security on the basis of reasonable inquiry.

*       *       *       *

"Securities (including restricted securities) not having readily-available market quotations are valued at fair value determined under the Board's procedures.  *If the Manager is unable to locate two market makers willing to give quotes, a security may be priced at the mean between the 'bid' and 'asked' prices provided by a single active market maker (which in certain cases may be the 'bid' price if no 'asked' price is available).*

"In the case of municipal securities, when last sale information is not generally available, the Manager may use pricing services approved by the Board of Trustees.  The pricing service may use 'matrix' comparisons to the prices for comparable instruments on the basis of quality, yield and maturity.  Other special factors may be involved (such as the tax-exempt status of the interest paid by municipal securities).  *The Manager will monitor the accuracy of the pricing services.  That monitoring may include comparing prices used for portfolio valuation to actual sales prices of selected securities*."  **(Emphasis added)**

169.   These statements were repeated in the March 2007 Prospectus and the October 2007 Prospectus.

170.   A change in accounting rules ultimately forced Defendants to disclose that *every single one of the Fund's* assets was valued on a basis other than the "last sale price."  In September 2006, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 157, which, among other things, requires entities to disclose the valuation inputs they use to measure the "fair value" of their assets.

171.   The additional disclosures mandated by SFAS 157 occurred for the first time in the Fund's Shareholder report filed on January 31, 2009.  In that document, Defendants acknowledged for the first time that its entire portfolio was valued based on "inputs other than quoted prices that are observable for the asset (such as quoted prices for similar assets and

-56-

market corroborated inputs such as interest rates, prepayment speeds, credit risks, etc.)."  In other words, at least at that time, there was no ready and active trading market—and therefore no "bid" and "ask" to use in pricing—for a single security that the Fund held as of January 31, 2009.

172.    The statements that the securities would be priced at "fair value" and the Manager would monitor the accuracy of the pricing services were materially false and misleading.  As evidenced by the insufficiency of the Fund's assets that were purportedly segregated as collateral, the securities were overvalued and the Manager did not "monitor the accuracy" of the pricing services the Fund used.  Rather, investments whose value should have been lowered in the Fund's books were not reduced, ultimately damaging the Fund when it lacked sufficient collateral to satisfy its other obligations.  In the course of selling those holdings, the Fund received their true "fair value," which was far less than the value Defendants reported in Fund financial statements that were filed with the SEC.

## H.    The Concealed Risks Materialized And Damaged Investors.

173.    The Fund's NAV declined precipitously as the risks concealed by Defendants' misstatements and omissions disclosed above materialized.  These concealed risks materialized before a reasonable investor could have discovered the true facts.

174.    The NAV of the Fund was approximately $11.44 per share at the beginning of the Class Period.  As shown in the chart below, almost immediately thereafter, the NAV began to

decline, plummeting to as low as $6.36 per share on November 28, 2008.



175.     During the Class Period, the decline in NAV of the Fund's shares represents a loss of over 46%.  The Fund lost 41.31% in 2008 alone.  By comparison, the average loss for bond funds in Lipper's California Municipal Debt Fund category during the same period was only approximately 11.53%.  The Fund performed worse than high yield funds over the same time frame.  Lipper's High Current Yield Bond Funds Index of supposedly riskier bond funds fell only approximately 28.84% in the same period.

## V.     CLASS ACTION ALLEGATIONS

176.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following classes of persons:

a.     The "Securities Class" consisting of all persons and entities who, between September 27, 2006 and November 28, 2008, acquired shares of any class of the Fund pursuant or traceable to a false or misleading Registration Statement or Prospectus, and who were damaged thereby.

b.     The "Holder Class" consisting of all persons and entities who owned

shares of any class of the Fund, and who were damaged thereby.

        c.     The "California Class" consisting of all persons and entities residing in the State of California who owned shares of any class of the Fund, and who were damaged thereby.

177.    Excluded from the Securities Class, the Holder Class, and the California Class are Defendants, the officers and directors of any Defendant, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which Defendants have or had a controlling interest, the judge to whom this case is assigned and his or her immediate family.

178.    The Securities Class, the Holder Class, and the California Class are collectively referred to as the "Classes" in this Complaint.

179.    Lead Plaintiff reserves the right to modify the proposed class definitions based on information obtained during discovery.

180.    **Numerosity of the Classes** – Fed. R. Civ. P. 23(a)(1):  Members of the Classes are so numerous that their individual joinder herein is impracticable.  Throughout the Class Period, shares of the Fund were actively traded.  Although the precise number of members of the Classes and their addresses are unknown to Lead Plaintiff at this time, Lead Plaintiff believes there to be, at a minimum, thousands of members in the proposed Classes.  According to the Fund's Annual Report for the period ending July 31, 2008, the Fund had 149,070,765 Class A shares outstanding, 4,435,049 Class B shares outstanding, and 38,125,711 Class C shares outstanding.  Members of the Classes are readily ascertainable from Defendants' records and may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

181.    **Existence and Predominance of Common Questions of Law and Fact** – Fed. R. Civ. P. 23(a)(2), (b)(3):  Common questions of law and fact exist as to all members of the

Classes.  These questions predominate over the questions affecting only individual members of the Classes.  These common legal and factual questions include:

      a.      Whether Defendants violated the federal securities laws;

      b.      Whether Defendants made untrue statements and/or omissions of material fact in the Registration Statements and Prospectuses during the Class Period;

      c.      Whether Defendants caused the Fund to deviate from a fundamental policy that could only be changed by a shareholder vote;

      d.      Whether Defendants engaged in unlawful acts and practices in violation of California's Unfair Competition Law, Business & Professions Code Sections 17200, *et seq.*;

      e.      Whether Defendants breached their fiduciary duties; and

      f.      Whether members of the Classes sustained damages and the proper measure of damages.

182.   **Typicality** – Fed. R. Civ. P. 23(a)(3):  Lead Plaintiff's claims are typical of the claims of members of the Classes because Defendants wrongful and unlawful conduct, as alleged herein, similarly affected all members of the Classes.

183.   **Adequacy** – Fed. R. Civ. P. 23(a)(4):  Lead Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the members of the Classes he seeks to represent.  Lead Plaintiff has retained counsel competent and experienced in complex class action litigation, and Lead Plaintiff intends to prosecute this action vigorously.  The interest of members of the Classes will be fairly and adequately protected by Lead Plaintiff and his counsel.

184.   **Superiority** – Fed. R. Civ. P. 23(b)(3):  The class action is superior to other available means for the fair and efficient adjudication of the claims alleged in this Complaint.  The damages suffered by each individual member of the Classes may be limited.  Damages of

such magnitude are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Further, it would be virtually impossible for the members of the Classes individually to redress effectively the wrongs done to them. Even if the members of the Classes themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

185. **<u>Certification under Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2)</u>** – Certification may also be appropriate under Federal Rule of Civil Procedure 23(b)(1) and/or (b)(2) on the following grounds:

a. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes which would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

# VI.   CAUSES OF ACTION

## COUNT I

### Violation Of Section 11 Of The Securities Act
### Against The Fund, The Manager, The Distributor, And The Trustee Defendants

186.   Lead Plaintiff repeats and realleges each and every allegation contained above. For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

187.   Lead Plaintiff bring this Count pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of himself and other members of the Securities Class against the Fund, the Manager, the Distributor, and the Trustee Defendants.

188.   The Registration Statements that became effective September 27, 2006, March 8, 2007 and October 31, 2007 (collectively, the "Registration Statements") were false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein.

189.   The Fund is the registrant for the share offering.  As issuer of the shares, the Fund is strictly liable to Lead Plaintiff and the Securities Class for the misstatements and omissions.

190.   The Manager was responsible for the contents and dissemination of the Registration Statements.

191.   The Distributor served as the Fund's principal underwriter of the Fund's shares, and was responsible for the contents and dissemination of the Registration Statements.

192.     The Trustee Defendants were responsible for the contents and dissemination of the Registration Statements.  Each of the Trustee Defendants signed or authorized the signing of the Registration Statements and/or was identified in the Prospectuses.

193.     None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

194.     By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

195.     Lead Plaintiff and other members of the Securities Class acquired shares of the Fund pursuant and/or traceable to the Registration Statements.

196.     Lead Plaintiff and other members of the Securities Class sustained damages.  At the time of their purchases of shares of the Fund, Lead Plaintiff and other members of the Securities Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

197.     Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time the original complaint in this consolidated litigation was filed.  Less than one year elapsed between the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based and the time the original complaint in this consolidated litigation was filed.

## COUNT II

### Violations Of Section 12(A)(2) Of The Securities Act
### Against The Fund, The Manager And The Distributor

198.     Lead Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, Lead Plaintiff expressly excludes and disclaims any

allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

199.     Lead Plaintiff brings this Count pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of himself and other members of the Securities Class against the Fund, the Manager and the Distributor.

200.     Each of the Defendants named in this Count offered and sold securities, namely shares of the Fund, to Lead Plaintiff and other members of the Securities Class by means of the September 2006 Prospectus, the March 2007 Prospectus, and the October 2007 Prospectus. (collectively, the "Prospectuses"), or controlled a person who offered and sold shares of the Fund by means of the Prospectuses.

201.     The Fund, as the issuer of the securities, solicited purchases of the securities by means of the Prospectuses, motivated at least in part by a desire to serve its own financial interests.

202.     The Manager, which provided investment advisory and management services to the Fund, selected the securities for the Fund's portfolio, and handled the Fund's day-to-day business, solicited purchases of the securities by means of the Prospectuses, motivated at least in part by a desire to serve its own financial interests.

203.     The Distributor, as the principal underwriter in the continuous public offering of the Fund's classes of shares, solicited purchases of the securities by means of the Prospectuses, motivated at least in part by a desire to serve its own financial interests.

204.     As detailed above, the Prospectuses contained untrue statements of material fact, and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.  Each of the Defendants named in this Count owed Lead Plaintiff and the other members of the Securities Class who purchased

shares of the Fund pursuant to the Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Each of the Defendants named in this Count, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

205.    Lead Plaintiff and other members of the Securities Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time they purchased shares of the Fund.

206.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 12(a)(2) of the Securities Act.  As a result of such violations, Lead Plaintiff and other members of the Class sustained substantial damages in connection with their purchases of shares of the Fund.  Accordingly, Lead Plaintiff and other members of the Class who hold such shares have the right to rescind and recover the consideration paid for their shares with interest thereon, less the amount of income received thereon, upon the tender of the shares.  Lead Plaintiff and members of the Securities Class hereby tender any and all shares that were damaged by Defendants' violation of Section 12(a)(2) of the Securities Act.  Lead Plaintiff and other members of the Securities Class who have sold their shares seek damages to the extent permitted by law.

207.    Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time the original complaint in this consolidated litigation was filed.  Less than one year elapsed between the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based and the time the original complaint in this consolidated litigation was filed.

-65-

## COUNT III

### Violations Of Section 15 Of The Securities Act
### Against The Manager, The Trustee Defendants, The Officer Defendants, And MassMutual

208.     Lead Plaintiff repeats and realleges each and every allegation contained above. For purposes of this Count, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

209.     Lead Plaintiff brings this Count pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of himself and other members of the Securities Class against the Manager, the Trustee Defendants, the Officer Defendants, and MassMutual.

210.     As alleged in Counts I and II, the Fund, the Manager, and the Distributor violated Sections 11 and 12(a)(2) of the Securities Act.

211.     The Manager was a control person of the Fund and the Distributor.  By virtue of its responsibilities for providing investment advisory and management services to the Fund, selecting the securities for the Fund's portfolio, and handling the Fund's day-to-day business, the Manager had the power to control the general affairs of the Fund.  By virtue of its ownership of the Distributor, the Manager had the power to control the general affairs of the Distributor

212.     Each of the Trustee Defendants and the Officer Defendants was a control person of the Fund, the Manager, and/or the Distributor.  As a trustee, director and/or senior officer of the Fund and/or the Manager, each of the Trustee Defendants and the Officer Defendants had the power to control the general affairs of the Fund, the Manager, and the Distributor.

213.     MassMutual was a control person of the Manager.  In addition, as a majority owner of the Manager, MassMutual had the power to control the general affairs of the Manager.

-66-

## COUNT IV

### Violation Of Section 13(A) Of The Investment Company Act Against The Fund

214. Lead Plaintiff repeats and realleges each and every allegation contained above.

215. Lead Plaintiff brings this cause of action pursuant to Section 13(a) of the ICA, 15 U.S.C. §80a-13(a), on behalf of himself and the Holder Class against the Fund.

216. The Fund is a registered investment company pursuant to the ICA.

217. The Fund's investment objective is to "seek[] as high a level of current interest income … as is consistent with preservation of capital."

218. The Prospectuses described Fund's investment objective as a "fundamental policy" that could not be changed without the vote of a majority of the Fund's outstanding shares in accordance with the ICA.

219. The Fund deviated from its investment objective by investing in securities in a manner that was inconsistent with the policy of preservation of capital, and did so without obtaining a vote of a majority of the Fund's outstanding shares.

220. The Prospectuses stated that the "Fund cannot invest 25% or more of its total assets in any one industry."

221. The Prospectuses described the Fund's industry concentration policy as a "fundamental policy" that could not be changed without the approval of a majority of the Fund's outstanding shares in accordance with the ICA.

222. The Fund deviated from its industry concentration policy (a) by investing more than 25% of its total assets in the real estate development industry, and (b) in the November 2008 Prospectus, by reclassifying "dirt bonds" as not constituting a part of any "industry" for purposes of the Fund's industry concentration policy. The Fund deviated from these fundamental policies without obtaining a vote of a majority of the Fund's outstanding shares.

-67-

223.    The Fund's deviation from its investment objective and its industry concentration policy caused the Fund to lose capital.  As a result of the Fund's deviation from its investment objective and its industry concentration policy, Plaintiff and other members of the Holder Class sustained damages when the value of the assets of the Fund depreciated.

## COUNT V

### Violation Of California Business & Professions Code §§17200, *Et Seq.* Against All Defendants

224.    Lead Plaintiff repeats and realleges each and every allegation contained above. Any allegation relating to the misstatements and omissions made in connection with the Fund are not incorporated into this Count, which only encompasses deviations from the Fund's fundamental investment policies.

225.    Lead Plaintiff brings this cause of action pursuant to California's Unfair Competition Law ("UCL"), California Business & Professions Code Sections 17200, *et seq.*, on behalf of himself and the California Class against all Defendants.

226.    Defendants engaged in "unlawful" business acts and practices in violation of the UCL by violating Section 48(a) of the ICA, 15 U.S.C. §80a-47(a), and by causing the Fund to violate Section 13(a) of the ICA.  Lead Plaintiff reserves the right to identify additional violations of law by Defendants as further investigation and discovery warrants.

227.    As described in Count IV above, the Fund violated Section 13(a) of the ICA by deviating from its investment objective and its industry concentration policy without obtaining a vote of a majority of the Fund's outstanding shares in accordance with the ICA.  All other Defendants named in this Count violated Section 48(a) of the ICA by causing the Fund to violate Section 13(a) of the ICA.

-68-

228.    Defendants' conduct was directed toward and affected California residents who owned shares of the Fund.  According to the Prospectuses, the Fund was designed for investors who sought income exempt from federal and California income taxes.

229.    Defendants' conduct occurred in part in California.  The Fund invested primarily in California municipal securities.  Defendants engaged in unlawful business acts and practices by causing the Fund to invest in California municipal securities in a manner that deviated from its investment objective and its industry concentration policy.

230.    Defendants' wrongful conduct impacts the public interest, because it is part of a pattern or generalized course of conduct that has been repeated in California on a continuing basis.

231.    Defendants' unlawful conduct, as described in this Count, occurred and continues to occur in the conduct of the Fund's business.  There is no indication that Defendants will not continue such activity into the future.

232.    As a result of Defendants' unlawful conduct, as described in this Count, Lead Plaintiff and other members of the California Class suffered injury in fact and lost money or property.

233.    Lead Plaintiff and other members of the California Class are entitled to full restitution of all benefits that may have been obtained by Defendants as a result of their illegal business acts or practices as alleged here.

234.    Lead Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unlawful practices, to restore to him and other members of the California Class any money that may have been unjustly acquired by Defendants by means of their unfair competition, and for such other relief as set forth in the Prayer for Relief.

## COUNT VI

### Breach Of Fiduciary Duty Against The Trustee Defendants

235.    Lead Plaintiff repeats and realleges each and every allegation contained above. Any allegation relating to the misstatements and omissions made in connection with the Fund are not incorporated into this Count, which only encompasses deviations from the Fund's fundamental investment policies.

236.    Lead Plaintiff brings this cause of action for breach of fiduciary duty on behalf of himself and the Holder Class against the Trustee Defendants.

237.    Each of the Trustee Defendants was a controlling person of the Fund and a fiduciary to Lead Plaintiff and other members of the Holder Class.  As fiduciaries, the Trustee Defendants had a duty to act in good faith and with utmost loyalty to Lead Plaintiff and other members of the Holder Class.

238.    The Trustee Defendants breached their fiduciary duties by violating the voting rights of Lead Plaintiff and other members of the Holder Class by deviating from the Fund's investment objective and its industry concentration policy without obtaining a vote of a majority of the Fund's outstanding shares in accordance with the ICA.  These breaches of fiduciary duty caused Lead Plaintiff and other members of the Holder Class to suffer an individual injury distinct from any injury to the Fund itself.

239.    Lead Plaintiff and other members of the Holder Class sustained damages as a result of the Trustee Defendants' breaches of fiduciary duty.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiff as representative of each of the Classes alleged herein, and appointing his attorneys as counsel for the Classes under Federal Rule of Civil Procedure 23;

B.    Awarding compensatory and rescissionary damages in favor of Lead Plaintiff and other members of the Classes against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Enjoining Defendants from continuing to engage in the violations of law, as alleged herein;

D.    Awarding Lead Plaintiff and other members of the Classes pre-judgment and post-judgment interest;

E.    Awarding Lead Plaintiff and other members of the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

F.    Awarding such equitable, injunctive or other relief as deemed appropriate by the Court; and

G.    Awarding such other and further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Lead Plaintiff demands a trial by jury on all counts so triable.

Dated:  January 15, 2010

Respectfully submitted,

SPARER LAW GROUP

By:  _____ */s/ Alan W. Sparer*_____
                    ALAN W. SPARER

Attorneys for Lead Plaintiff Joseph Stockwell
and the Class

100 Pine Street, 33rd Floor
San Francisco, CA 94111
(415) 217-7300 (telephone)
(415) 217-7307 (facsimile)
asparer@sparerlaw.com

GIRARD GIBBS LLP

By:  _____ */s/ Daniel C. Girard*_____
                    DANIEL C. GIRARD

Additional Counsel for Lead Plaintiff Joseph
Stockwell and the Class

601 California Street, 14th Floor
San Francisco, CA 94108
(415) 981-4800 (telephone)
(415) 981-4846 (facsimile)
dcg@girardgibbs.com

JEFFREY A. CHASE
BARBARA A. GRANDJEAN
JACOBS CHASE FRICK KLEINKOPF &
KELLEY, LLC


By: _____ /s/ *Jeffrey A. Chase* _____
          JEFFREY A. CHASE

1050 Seventeenth Street, #1500
Denver, CO  80265-2078
Telephone:  303/685-4800
Facsimile:   303/685-4869
jchase@jcfkk.com

**Local Counsel**

KIP B. SHUMAN
RUSTY GLENN
THE SHUMAN LAW FIRM


By: _____ /s/ *Kip B. Shuman* _____
          KIP B. SHUMAN

885 Arapahoe Avenue
Boulder, CO  80302
Telephone:  303/861-3003
Facsimile:   303/484-4886
kip@shumanlawfirm.com

**Liaison Counsel**

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2010, I electronically filed a true and correct copy of

the foregoing documents with the Clerk of the Court using the CM/ECF system:

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE**

**FEDERAL SECURITIES LAWS AND DEMAND FOR JURY TRIAL**, which will send

notification of such filing to the following email addresses:

Aaron Michael Sheanin      amv@girardgibbs.com, ams@girardgibbs.com

Alan I. Ellman      aellman@labaton.com, electroniccasefiling@labaton.com

Alan W. Sparer      asparer@sparerlaw.com, dcorkran@sparerlaw.com, nblake@sparerlaw.com,
playzer@sparerlaw.com

Andrei V. Rado      arado@milberg.com, MAOffice@milberg.com

Anne Marie Vu      avu@milberg.com, MAOffice@milberg.com

Arthur H. Aufses , III      aaufses@kramerlevin.com

Barbara Ann Grandjean      bgrandjean@jcfkk.com, lchandler@jacobschase.com

Catherine J. Kowalewski      katek@csgrr.com, hdemag@csgrr.com

Charles J. Piven      piven@browerpiven.com

Charles Michael Plavi , II      cmp@classactionlaw.com, anv@classactionlaw.com

Charles Walter Lilley      clilley@lilleylaw.com

Christina H.C. Sharp      chc@girardgibbs.com, ale@girardgibbs.com, amv@girardgibbs.com,
as@girardgibbs.com, sfs@girardgibbs.com

Christopher J. Keller      ckeller@labaton.com, electroniccasefiling@labaton.com

Daniel Charles Girard      dcg@girardgibbs.com, sfs@girardgibbs.com

Daniel Ellis McKenzie      dmckenzie@burgsimpson.com, kwilson@burgsimpson.com

Darren A. Natvig      dnatvig@irwin-boesen.com

Darren J. Robbins      darrenr@csgrr.com, e_file_sd@csgrr.com

-1-

David C. Walton      davew@csgrr.com, hdemag@csgrr.com

Douglas S. Wilens      dwilens@csgrr.com, e_file_fl@csgrr.com

Edward Thomas Lyons , Jr      elyons@joneskeller.com

Eric Lechtzin      elechtzin@bm.net

Francis A. Bottini , Jr      frankb@johnsonbottini.com, paralegal@johnsonbottini.com

Gary S. Graifman      ggraifman@kgglaw.com, ccornfield@kgglaw.com

Glen L. Abramson      gabramson@bm.net, gelliott@bm.net

Gordon W. Netzorg      gnetzorg@shermanhoward.com, cdias@shermanhoward.com, efiling@shermanhoward.com, shood@shermanhoward.com

Howard T. Longman      Tsvi@aol.com, jasondag@ssbny.com

Jack G. Fruchter      jfruchter@aftlaw.com

James S. Nabwangu      jnabwangu@sparerlaw.com

Jeffrey A. Chase      jchase@jcfkk.com, vlsanders@jcfkk.com

Jeffrey Allen Berens      jeff@dyerberens.com, jeffreyberens@comcast.net

Jeffrey Robert Krinsk      jrk@classactionlaw.com, anv@classactionlaw.com

Jeffrey S. Abraham      jabraham@aftlaw.com

John K. Grant      johnkg@csgrr.com, jdecena@csgrr.com

Jonathan Krasne Levine      jkl@girardgibbs.com, amv@girardgibbs.com

Joseph H. Weiss      jweiss@weisslurie.com, infony@weisslurie.com

Joseph J. Tabacco , Jr      jtabacco@bermandevalerio.com, stuiasosopo@bermandevalerio.com, ysoboleva@bermandevalerio.com

Karen Jean Cody-Hopkins      kjch@lilleylaw.com, rbyers@lilleylaw.com

Kevin Harvey Lewis      klewis@sparerlaw.com

Kip Brian Shuman      kip@shumanlawfirm.com, rusty@shumanlawfirm.com

Kirk Douglas Tresemer      ktresemer@irwin-boesen.com

Kristin A. Martinez    kristin@dyerberens.com

Lawrence D. Levit    llevit@aftlaw.com

Lionel Z. Glancy    lglancy@glancylaw.com, info@glancylaw.com

Marc C. Haber    mhaber@sparerlaw.com

Mark David Smilow    msmilow@weisslurie.com

Matthew D. Pearson    mpearson@bermandevalerio.com, ysoboleva@bermandevalerio.com

Matthew L. Larrabee    matthew.larrabee@dechert.com, alice.jensen@dechert.com, david.burkhart@dechert.com, michael.doluisio@dechert.com, muriel.korol@dechert.com, reginald.zeigler@dechert.com, will.rehling@dechert.com

Michael W. Byrne    mbyrne@bhfs.com, mpincock@bhfs.com, rbower@bhfs.com

Nicole C. Lavallee    nlavallee@bermandevalerio.com, stuiasosopo@bermandevalerio.com, ysoboleva@bermandevalerio.com

Olimpio Lee Squitieri    Lee@sfclasslaw.com, cathy@sfclasslaw.com

Patrick V. Dahlstrom    pdahlstrom@pomlaw.com

Paul J. Geller    pgeller@csgrr.com, e_file_fl@csgrr.com

Peter E. Seidman    pseidman@milberg.com

Peter George Koclanes    pkoclanes@shermanhoward.com, cgreen@shermanhoward.com, efiling@sah.com

Phillip C. Kim    pkim@rosenlegal.com

Robert J. Dyer , III    bob@dyerberens.com

Robert Nolen Miller    rmiller@perkinscoie.com, rmiller-efile@perkinscoie.com

Roland W. Riggs , IV    rriggs@milberg.com

Samuel H. Rudman    srudman@csgrr.com, dgonzales@csgrr.com

Seth Alan Katz    skatz@burgsimpson.com, bgeorge@burgsimpson.com

Shawn A. Williams    shawnw@csgrr.com, jdecena@csgrr.com

Sherrie R. Savett    ssavett@bm.net, mgatter@bm.net

Stephanie Erin Dunn     sdunn@perkinscoie.com, sdunn-efile@perkinscoie.com

Stephen D. Bunch     dbunch@cohenmilstein.com, efilings@cohenmilstein.com

Steven J. Toll     stoll@cohenmilstein.com, efilings@cohenmilstein.com

Timothy R. Beyer     tbeyer@bhfs.com, breinhardt@bhfs.com, rbower@bhfs.com

William H. Garvin , III     wgarvin@garvinlawfirm.com

William K. Dodds     william.dodds@dechert.com, luis.lopez@dechert.com

Yehudis S. Lewis     ylewis@kramerlevin.com,

and I hereby certify that I have mailed or served the document or paper to the following non

CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's

name:

Catherine H. McElveen
Daniel Oakes Myers
Richardson, Patrick, Westbrook &
Brickman, LLC-Mt. Pleasant
1037 Chuck Dawley Boulevard
Building A
Mount Pleasant, SC 29464


    I declare under penalty of perjury that the foregoing is true and correct.  Executed at San

Francisco, California on January 15, 2010.

/s/ *Philip Layzer*
PHILIP LAYZER