**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Master Docket No. **09-md-02063-JLK-KMT** (MDL Docket No. 2063)

**IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION**

This document relates to all the MDL actions.

---

**DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED COMPLAINTS
IN THE ROCHESTER FUNDS GROUP SECURITIES LITIGATION**

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

FACTS ...............................................................................................................................6

I.     OVERVIEW OF THE ROCHESTER FUNDS ...........................................................6

     A.    Mutual Fund Disclosure Requirements................................................6

     B.    The Defendants ...................................................................................7

     C.    The Rochester Investment Style:  "No Guts, No Glory" ...................9

     D.    The Funds' Performance ...................................................................12

II.     THE FUNDS' DISCLOSURES......................................................................14

     A.    Investment Objectives ......................................................................14

     B.    Inverse Floaters ................................................................................16

          1.    Creation and Collapse of Inverse Floaters ...........................16

          2.    Value and Yield of Inverse Floaters.....................................17

          3.    Accounting for Inverse Floaters...........................................19

     C.    Illiquid Assets ..................................................................................20

     D.    Securities Valuation .........................................................................21

III.     THE FINANCIAL CRISIS OF 2008 ..............................................................24

     A.    Unprecedented Economic Conditions...............................................24

     B.    The October 2008 Supplemental Disclosure ...................................25

IV.     THE COMPLAINTS .....................................................................................29

ARGUMENT ....................................................................................................................31

I.     LEGAL STANDARDS......................................................................................31

     A.    Plaintiffs Must Allege Untrue Statements of Material Facts
          or a Duty to Disclose Allegedly Omitted Material Facts.................31

     B.    Plaintiffs May Not Plead Falsity Using Hindsight...........................32

II.     PLAINTIFFS FAIL TO PLEAD THAT DEFENDANTS MADE
     ANY UNTRUE STATEMENTS OF MATERIAL FACT........................................33

     A.    Plaintiffs' Investment Objective Allegations Fail To State a Claim...............33

56855-0005/LEGAL18027345.1

      1.      Aspirational Expressions of Investment Goals Cannot Be Untrue Statements of Material *Fact* ................................... 34

      2.      The Objectives Were Not Misleading Because the Registration Statements Explained How the Funds Would Pursue Their Goals ................................... 35

B.      Plaintiffs' Inverse Floater Allegations Fail To State a Claim ......................... 39

      1.      Defendants Disclosed All Material Facts about Inverse Floaters. ....... 39

            a.      Defendants Disclosed the Riskiness of Inverse Floaters and Listed Their Specific Inverse Floater Holdings ............... 39

            b.      Defendants Disclosed the Volatility and Interest Rate Risks of Inverse Floaters ........................................... 42

            c.      Defendants Had No Duty To Calculate the Leverage Ratio and Disclosed All of the Underlying Facts.................... 45

            d.      The Funds Did Not Violate Their Asset Limits on Inverse Floater Investments ................................ 46

      2.      Plaintiffs' Allegations Based on Additional Details from the October 2008 Supplement Fail To State a Claim.......................... 47

            a.      Defendants Disclosed the Risk of Being Forced To Sell Assets at Disadvantageous Times ............................... 48

            b.      Defendants Had No Duty To Guess the Market Conditions That Might Lead to the Materialization of Disclosed Risks ......................... 49

            c.      Plaintiffs' Allegations about Shortfall and Forbearance Agreements Identify No Untrue Statement of Material Fact........................... 51

            d.      Plaintiffs' Allegations about Collateral Fail To State a Claim............................................. 53

      3.      The National Fund Plaintiff's Assertion That Inverse Floaters Are Not Municipal Securities Is Wrong. ............................... 54

C.      Plaintiffs' Illiquidity Allegations Fail To State a Claim ................... 56

      1.      Trading Activity Is Only One Factor in Determining Whether a Security Is Illiquid. ........................................... 57

      2.      As Regulatory Standards and the Funds' Disclosures Explain, Determining Whether an Asset Is Illiquid Involves Discretion. .......... 59

D.      Plaintiffs' Valuation Allegations Fail To State a Claim ................... 60

      1.      The Funds' Valuation Process Was Not Misleading .......................... 61

ii

        2.      Plaintiffs Do Not Allege That the Funds
              Overvalued Any of Their Securities ......................................... 61

        3.      Defendants Disclosed Their Securities Valuation Process
              Before and After FAS 157 Became Effective. ...................................... 65

III.    PLAINTIFFS CANNOT BRING AN ACTION FOR MISMANAGEMENT
      UNDER THE FEDERAL SECURITIES LAWS ......................................... 65

      A.    Allegations of Corporate Mismanagement Are Not Actionable
          under the Securities Act ........................................................ 66

      B.    Plaintiffs' Allegations Challenge the Management of the Funds ................... 66

IV.    PLAINTIFFS' CLAIMS REGARDING INVESTMENT OBJECTIVES
      AND INVERSE FLOATERS ARE TIME-BARRED .................................. 68

      A.    Securities Act Claims Must Be Brought Within One Year
          After a Plaintiff Is on Notice of Them ............................................ 69

      B.    Plaintiffs Should Have Discovered the Facts Underlying
          Their Investment Objective Claims Years Ago ................................. 71

      C.    Plaintiffs Were on Notice of the Facts Underlying
          Their Inverse Floater Claims Years Ago ...................................... 73

V.     PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE
      THE DECLINE IN THE FUNDS' NAVS DID NOT "RESULT FROM"
      THE ALLEGED MISREPRESENTATIONS OR OMISSIONS ............................... 75

VI.    PLAINTIFFS' SECTION 12(a)(2) CLAIMS SHOULD BE DISMISSED
      BECAUSE THEY DO NOT ALLEGE THAT OFI OR THE FUNDS
      WERE "SELLERS" OF SECURITIES ...................................................... 77

VII.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15 OF
      THE SECURITIES ACT ................................................................. 80

VIII.  THERE IS NO PRIVATE RIGHT OF ACTION UNDER SECTION 13(a) OF
      THE INVESTMENT COMPANY ACT ..................................................... 82

IX.    TWO INVIDIVDUAL DEFENDANTS HAVE SPECIFIC DEFENSES ................... 85

      A.    Certain Plaintiffs Lack Standing To Assert Claims Against Yeutter .............. 85

      B.    The Claims Asserted Against Clinton Should Be Dismissed ....................... 87

**CONCLUSION** .......................................................................................... 87

**APPENDIX A:  COMPLAINT SUMMARY TABLES** ..................................... 90

iii

# TABLE OF AUTHORITIES

*Abrams v. Van Kampen Funds, Inc.*,
No. 01-7538, 2004 WL 1433620 (N.D. Ill. June 25, 2004) .............................................. 36

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ........................................................................................ 81

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........................................................................................... 82, 83, 84

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007) .......................................................................... 53, 66

*Anixter v. Home-Stake Prod. Co.*,
977 F.2d 1549 (10th Cir. 1992) ........................................................................................ 69

*Ash v. LFE Corp.*,
525 F.2d 215 (3d Cir 1975) .............................................................................................. 46

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ............................................................................................... 32, 64

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988) ......................................................................................................... 31

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................... 32, 64

*Bellikoff v. Eaton Vance Corp.*,
481 F.3d 110 (2d Cir. 2007) ............................................................................................. 84

*Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt.*,
435 F.3d 396 (3d Cir. 2006) ............................................................................................... 9

*Benzon v. Morgan Stanley Distrib., Inc.*,
420 F.3d 598 (6th Cir. 2005) ............................................................................................ 32

*Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*,
No. 07-10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ................................. 42, 52, 75

*Boswell v. Skywest Airlines, Inc.*,
361 F.3d 1263 (10th Cir. 2004) ........................................................................................ 83

*Brumbaugh v. Princeton Partners*,
985 F.2d 157 (4th Cir. 1993) ............................................................................................ 70

iv

*Chiarella v. United States*,
    445 U.S. 222 (1980) ................................................................................................. 31

*City of Philadelphia v. Fleming Cos.*,
    264 F.3d 1245 (10th Cir. 2001) ........................................................................ 31, 50

*DeBenedictis v. Merrill Lynch & Co.*,
    492 F.3d 209 (3d Cir. 2007) ..................................................................................... 70

*DeBruyne v. Equitable Life Assurance Soc'y of the United States*,
    920 F.2d 457 (7th Cir. 1990) ..................................................................................... 72

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978) ...................................................................................... 32

*Field v. Trump*,
    850 F.2d 938 (2d Cir.1988) ....................................................................................... 46

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005) ..................................................................... 63

*Friedlob v. Trustees of the Alpine Mut. Fund Trust*,
    905 F. Supp. 843 (D. Colo. 1995) ..................................................................... 80, 84

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ...................................................................................... 32

*Garcia v. Cordova*,
    930 F.2d 826 (10th Cir. 1991) ................................................................................... 50

*Great N. Ry. Co. v. Weeks*,
    297 U.S. 135 (1936) ..................................................................................................... 9

*Greenapple v. Detroit Edison Co.*,
    618 F.2d 198 (2d Cir. 1980) ...................................................................................... 49

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ............................................................. 31, 32, 34, 35

*Grubka v. WebAccess Int'l, Inc.*,
    445 F. Supp. 2d 1259 (D. Colo. 2006) .................................................................... 70

*Hein v. Freedom from Religion Found., Inc.*,
    551 U.S. 587 (2007) ................................................................................................... 85

v

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ............................................................................... 77

*In re AES Corp. Sec. Litig.*,
    825 F. Supp. 578 (S.D.N.Y. 1993) ........................................................ 50

*In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*,
    No. 95-330, 1996 WL 551732 (S.D.N.Y. Sept. 27, 1996) ................... 34

*In re Cable & Wireless, PLC Sec. Litig.*,
    321 F. Supp. 2d 749 (E.D. Va. 2004) ................................................... 66

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009) .......................................................... 75

*In re CIT Group, Inc. Sec. Litig.*,
    349 F. Supp. 2d 685 (S.D.N.Y. 2004) ................................................... 51

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
    No. 08-11064, 2010 WL 1253114 (D. Mass. Mar. 31, 2010) ....... 35, 75

*In re Harmonic, Inc., Sec. Litig.*,
    No. 00-2287, 2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ............... 60

*In re Lehman Bros. Sec. & ERISA Litig.*,
    No. 09-2017, 2010 WL 545992 (S.D.N.Y. Feb. 17, 2010) ................. 59

*In re MBIA Inc. Sec. Litig.*,
    No. 05-3514, 2007 WL 473708 (S.D.N.Y. Feb. 14, 2007) ................. 10

*In re Merrill Lynch & Co.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd sub nom.*,
    *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ............. 68

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 429 (S.D.N.Y. 2003) ................................................... 75

*In re Metropolitan Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007) ............................................. 79

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) .................................................................. 36

*In re Novagold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) ................................................... 50

*In re Polaroid Corp. Sec. Litig.*,
  465 F. Supp. 2d 232 (S.D.N.Y. 2006) .................................................................. 70, 71

*In re RAC Mortgage Inv. Corp. Sec. Litig.*,
  765 F. Supp. 860 (D. Md. 1991) .................................................................. 42, 44, 49

*In re The Reserve Fund Sec. & Deriv. Litig.*,
  No. 09-4346, 2009 WL 4249128 (S.D.N.Y. Nov. 25, 2009) ................................... 24

*In re Salomon Analyst Level 3 Litig.*,
  373 F. Supp. 2d 248 (S.D.N.Y. 2005) ................................................................... 63

*In re Sonus Networks, Inc. Sec. Litig.*,
  No. 04-10294, 2006 WL 1308165 (D. Mass. May 10, 2006) ................................. 80

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*,
  941 F. Supp. 326 (S.D.N.Y. 1996) ....................................................................... 34

*In re Thornburg Mortgage, Inc., Sec. Litig.*,
  No. 07-0815, 2010 WL 378300 (D.N.M. Jan. 27, 2010) ................................... 44, 54

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
  259 F.R.D. 490 (W.D. Wash. 2009) ................................................................ 85, 86

*In re Worlds of Wonder Sec. Litig.*,
  814 F. Supp 850 (N.D. Cal. 1993) ....................................................................... 50

*In re XM Satellite Radio Holdings Sec. Litig.*,
  479 F. Supp. 2d 165 (D.D.C. 2007) ..................................................................... 42

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
  32 F.3d 697 (2d Cir. 1994) ................................................................................... 68

*Koke v. Stifel, Nicolaus & Co.*,
  620 F.2d 1340 (8th Cir. 1980) .............................................................................. 75

*Kramer v. Time Warner, Inc.*,
  937 F.2d 767 (2d Cir. 1991) ................................................................................... 9

*Lewis v. Casey*,
  518 U.S. 343 (1996) ............................................................................................. 86

*Maher v. Durango Metals, Inc.*,
  144 F.3d 1302 (10th Cir. 1998) .......................................................... 78, 79, 80, 81

vii

*Manasfi v. Malone*,
No. 06-280, 2007 WL 891871 (D. Colo. Mar. 22, 2007) ...................................................68

*McDonald v. Kidder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002).........................................................................................54

*Mitzelfelt v. Dep't of Air Force*,
903 F.2d 1293 (10th Cir. 1990)........................................................................................84

*Mutchka v. Harris*,
373 F. Supp. 2d 1021 (C.D. Cal. 2005) ...........................................................................84

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
609 F. Supp. 2d 938 (N.D. Cal. 2009) ............................................................................84

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
No. 08-4119, 2009 WL 1126854 (N.D. Cal. Apr. 27, 2009) ...........................................84

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
98 F.3d 2 (2d Cir. 1996)............................................................................................36, 42

*Olmsted v. Pruco Life Ins. Co.*,
283 F.3d 429 (2d Cir. 2002)......................................................................................82, 84

*Ong v. Sears Roebuck & Co.*,
388 F. Supp. 2d 871 (N.D. Ill. 2004) ..............................................................................85

*Panter v. Marshall Field & Co.*,
646 F.2d 271 (7th Cir. 1981)...........................................................................................66

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*,
No. 08-3398, 2009 WL 2959883 (2d Cir. Sept. 17, 2009) .........................................32, 51

*Pinter v. Dahl*,
486 U.S. 622 (1988).......................................................................................................78

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
658 F. Supp. 2d 299 (D. Mass. 2009) ..............................................................................86

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003)...........................................................................................79

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009)....................................................................................59, 63

viii

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) ...................................................................................................66

*SEC v. C. Jones & Co.*,
   No. 03-636, 2009 WL 321696 (D. Colo. Feb. 10, 2009) ......................................9

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ................................................................................79

*Sheppard v. TCW/DW Term Trust 2000*,
   938 F. Supp. 171 (S.D.N.Y. 1996) ......................................................................42

*Smith v. United States*,
   561 F.3d 1090 (10th Cir. 2009), *cert. denied*,
   No. 09-549, 2010 WL 154973 (Jan. 19, 2010) .....................................................7

*Sterlin v. Biomune Sys.*,
   154 F.3d 1191 (10th Cir. 1998) ............................................................................70

*Tabankin v. Kemper Short-Term Global Income Fund*,
   No. 93-5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994) .......................................36

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ..............................................................................................31

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   No. 08-10637, 2010 WL 816623 (S.D.N.Y. Mar. 11, 2010) .........................61, 63

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ......................................................................................60, 63

*Washington Ass'n for Television & Children v. FCC*,
   712 F.2d 677 (D.C. Cir. 1983) ...............................................................................9

*Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*,
   532 U.S. 588 (2001) ..............................................................................................56

*Wielgos v. Commonwealth Edison Co.*,
   892 F.2d 509 (7th Cir. 1989) ................................................................................31

*Yu v. State Street Corp.*,
   No. 08-8235, 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010) ...........................*passim*

56855-0005/LEGAL18027345.1

# STATUTES/RULES

15 U.S.C § 77k ..................................................................................................31, 75, 86

15 U.S.C § 77*l* ..................................................................................................31, 75, 77

15 U.S.C. § 77m ..................................................................................................68, 69

15 U.S.C. § 78c(a)(29) ..........................................................................................8, 55

15 U.S.C. § 78t(a) ..............................................................................................69, 80

15 U.S.C. § 80a-2(a)(1)(41) .........................................................................................62

15 U.S.C. § 80a-13(a) .........................................................................................82, 83

15 U.S.C. § 80a-24(e) .................................................................................................68

15 U.S.C. § 80a-35(b) .................................................................................................84

15 U.S.C. § 80a-41(a) .................................................................................................83

Fed. R. Civ. P. 4(m) ...................................................................................................87

# REGULATORY AUTHORITIES

17 C.F.R. § 270.2a(4)(a)(1) ....................................................................................21, 62

17 C.F.R. § 230.485(b) ...............................................................................................68

*Accounting for Investment Securities by Registered Investment Companies*,
   Inv. Co. Act Rel. No. 6295, 35 Fed. Reg. 19986 (Dec. 23, 1970) ............................22, 62

*Form N-7 for Registration of Unit Investment Trusts under the Securities Act
   of 1933 and the Investment Company Act of 1940*, Rel. No. 35-6580,
   50 Fed. Reg. 21282 (proposed May 14, 1985) ...................................................62

*Registration Form Used by Open-End Management Investment Companies;
   Guidelines*, Inv. Co. Act Rel. No. 13436, 48 Fed. Reg. 37928 (Aug. 22, 1983) ................7

*Resale of Restricted Securities; Changes to Method of Determining
   Holding Period of Restricted Securities under Rules 144 and 145*,
   Inv. Co. Act Rel. No. 17452, 55 Fed. Reg. 17933 (Apr. 30, 1990) ......................20, 57, 59

*Revision to Guidelines to Form N-1A*,
   Inv. Co. Act Rel. No. 17452, 57 Fed. Reg. 9828 (Mar. 20, 1992) ....................................20

*Statement Regarding Restricted Securities*,
    Inv. Co. Act Rel. No. 5847, 35 Fed. Reg. 19989 (Oct. 21, 1969)......................................22

## OTHER AUTHORITIES

Aaron Pressman, *Oppenheimer's Contrarian in Municipal Bonds*,
    BUSINESSWEEK, Oct. 9, 2008........................................................................10, 12

Alan Greenspan, former Chairman of the Federal Reserve, Testimony before H.
    Comm. on Oversight and Government Reform, 110th Cong. (2008), *available at*
    http://oversight.house.gov/images/stories/documents/20081023100438.pdf ...................24

Andrew Gunter, *For both better and worse, Oppenheimer PA Municipal
    is very different from its peers,* MORNINGSTAR'S TAKE, Feb. 15, 2007 ......................11, 72

Andrew Gunter, *Oppenheimer CA Municipal is a well-run fund, but its
    strong returns need some context*, MORNINGSTAR'S TAKE, July 13, 2007 .......................11

Andrew Gunter, *Oppenheimer PA Municipal plays the humbler or the
    humbled, depending on the year,* MORNINGSTAR'S TAKE, Dec. 18, 2007 .........................11

Andrew Gunter, *Oppenheimer PA Municipal's high-risk, high-return look
    isn't for most investors,* MORNINGSTAR'S TAKE, Sept. 25, 2006 ................................10, 11

Andrew Gunter, *Potential investors in Oppenheimer AMT-Free NY Municipals
    must understand that this is not your typical tax-exempt fund*,
    MORNINGSTAR'S TAKE, July 11, 2007 ...........................................................10

Andrew Gunter, *Rochester Fund Municipals is good, but beware its risks*,
    MORNINGSTAR'S TAKE, Sept. 13, 2006............................................................11

Daniel Kruger, *News and Trends: Investors' Need for Yield
    Helps Propel Quarter's Top Funds*, THE BOND BUYER, Jan. 15. 1997 ...........................11

Deborah Solomon et al., *Shock Forced Paulson's Hand – A Black Wenesday
    on Credit Markets; "Heaven Help Us All,"* WALL ST. J., Sept. 20, 2008 ........................25

Dieter Owen Bardy, *Rochester Fund Municipals has enjoyed a long hot streak, but
    it's still not the right fund for everyone*, MORNINGSTAR'S TAKE, Apr. 13, 2006...........9, 11

Dieter Owen Bardy, *Rochester Fund Municipals' willingness to take risks
    explains its relative success well*, MORNINGSTAR'S TAKE, Nov. 14, 2005....................9, 10

Diya Gullapalli, *Monthly Mutual Funds Review: Looking for Diamonds
    Amid the Junk – Seeking Better Returns, Retirees Buy Risky Debt;
    Scrutinizing the Turbines*, WALL ST. J., Mar. 6. 2006 ........................................72

xi

Eric Baum, *Mutual Funds Report; With Rates Low, Riskier Bond Funds Beckon*,
     N.Y. TIMES, Apr. 7, 2002, *available at* 2002 WLNR 4442855 .........................................74

FASB Staff Position, *Statement No. 157-3; Determining the Fair Value of a
     Financial Asset When the Market for That Asset Is Not Active*, Oct. 10, 2008,
     *available at* http://www.fasb.org/pdf/fsp_fas157-3.pdf ....................................................65

Ilana Polyak, *Fund Performance: New York Provides Varied Game for
     Adventurous Fund Managers*, THE BOND BUYER, Nov. 19, 1997 .....................................10

IMF Global Financial Stability Report (Oct. 2008), *available at*
     http://www.imf.org/external/pubs/ft/gfsr/2008/02/pdf/text.pdf. ........................................24

Jacob Fine, *Funds Pick Up the Pace: Municipal Assets Grew 6.6% in 2005*,
     THE BOND BUYER, Vol. 355 No. 32334, Mar. 8, 2006 ......................................................11

Jacob Fine & Matthew Johnson, *Benefits of Hazard Play: Bond Funds That Took
     Chances in 2Q Did Well*, THE BOND BUYER, Vol. 353 No. 32170, July 8, 2005 ..............10

Jennifer Ablan, *No Plain Vanilla: Rochester Fund gets higher yields
     from an exotic muni mix*, BARRON'S, May 6, 2002..................................................9, 11, 72

Mary L. Schapiro, SEC Chairman, Testimony Concerning the State of the Financial
     Crisis Before the Financial Crisis Inquiry Commission (Jan. 14, 2010),
     *available at* http://www.fcic.gov/hearings/pdfs/2010-0114-Schapiro.pdf.........................25

Michael A. Pollock, *Monthly Mutual Funds Review – Fundamentals: Your
     Bond Fund May Hold a Surprise – Derivatives Gain Big Role For Ability
     to Lift Returns; Are They "Devil's Spawn"?*, WALL ST. J., Mar. 6, 2006 .........................74

MSRB, Glossary of Municipal Securities Terms (2d ed. Jan. 2004),
     *available at* http://www.msrb.org/msrb1/glossary/glossary_db.asp?sel=b .......................10

Municipal Securities Rule Making Board, *MSRB Notice 2009-38*, June 30, 2009,
     *available at* http://www.msrb.org/MSRB1/archive/2009/2009-38.asp .............................58

Paul Krugman, *How Did Economists Get It So Wrong?*,
     N.Y. TIMES, Sept. 6, 2009, *available at* 2009 WLNR 17481383 ......................................24

Statement of Financial Accounting Standards No. 157, Fair Value Measurements
     (Sept. 2006), *available at* http://www.fasb.org/pdf/fas157.pdf .........................................23

SEC Office of Economic Analysis, *Report on Transactions in Municipal Securities*,
     July 1, 2004, *available at* http://www.sec.gov/news/studies/munireport2004.pdf ......55, 58

56855-0005/LEGAL18027345.1

For the convenience of the Court and because all of the Rochester Funds Group Complaints are legally insufficient for common reasons, Defendants submit this joint brief in support of their motion to dismiss the core common claims of all seven Complaints (the "Consolidated Brief").  Defendants are also simultaneously filing a separate brief that addresses a few additional allegations unique to the California and Pennsylvania Complaints (the "CA and PA Brief").

## INTRODUCTION

The seven Oppenheimer municipal bond funds that are the subject of this MDL proceeding (the "Funds") are among a larger group of "Rochester Funds" that have been managed for a quarter of a century out of Rochester, New York by one of the most widely known portfolio management teams in the industry.  Founded and led by senior portfolio manager Ronald Fielding, the team gained national distinction for its self-described "Rochester style" of municipal bond investing.  Their approach, in a nutshell, centers on identifying municipal bonds that are undervalued in the marketplace and that may provide high yields for the risks that they present.  Almost by definition, this approach means that the team has long specialized, and gained unusual expertise, in market segments most other municipal bond funds choose to avoid.  The team has stayed true to their contrarian style, in good times and in bad, up through and including today.

The Funds' investors, including Plaintiffs, have benefited enormously from the long-term success of the Rochester investment team.  As discussed below, the Funds' performance has routinely ranked the Funds at the very top of the industry – including in 2009, when all seven Funds were ranked in the top seven percent of their peers for performance and five of

the seven were ranked first in the country.  It is axiomatic that these extraordinary returns would produce periodic volatility.  The Rochester style therefore was equally well known for its riskier approach – and indeed, 2007-08 was not the first time during the last decade that one or more of the Funds declined significantly in value and in the performance rankings – in a couple of instances to the very bottom.  When market conditions normalize, however, the Funds have repeatedly rebounded to industry leading performance.  In the words of one noted industry observer, while many municipal bond funds focus on "plain vanilla," the Rochester team goes for "the rocky road."

Little has changed over the years in the Funds' general investment approach, the risks they take, or their disclosures to investors.  Plaintiffs nonetheless have chosen to focus attention narrowly on losses allegedly suffered during the most recent period of Fund volatility – to be more precise, during the brief but intense downside of that cycle during the fall of 2008.  To be sure, that year was worse than most, but that is, of course, the consequence of the worst market conditions in a generation, which created the now widely noted "flight to quality" that punished investments seeking higher yields.  Inevitably, the Rochester Funds were among the victims of that punishment.  The common core of Plaintiffs' disclosure claims – which are the leading subject of this motion – rests heavily on the improbable foundation that the Rochester style and its related risks purportedly were not disclosed to the public.  To be blunt, this is nonsense.

Specifically, Plaintiffs allege four central misrepresentations in all seven Complaints: (1) the Funds' investment objectives were inconsistent with their actual investment strategies; (2) Defendants misrepresented the Funds' exposure to inverse floater investments; (3)

Defendants failed to designate certain assets as illiquid; and (4) Defendants misrepresented their securities valuation process and reported erroneous valuations. All of these allegations are flatly contradicted by the Funds' disclosures and widespread industry reporting about the Funds. They also are plainly wrong as a matter of law, regulatory guidance, and logic.

Plaintiffs' claims about the Funds' investment objectives exemplify the deficient nature of their allegations overall and, as a result, the broader, fatal problems with their entire case. Specifically, Plaintiffs allege that Defendants misrepresented the Funds' investment objective, which was to maximize tax-exempt interest income for investors – the major benefit of municipal bond investments – "consistent with the preservation of capital." First of all, abundant case law holds that aspirational goals like this – in plain English, a goal of trying to earn the most tax-free income possible without losing investors' money – are not misrepresentations of *fact* that can support a securities claim. But even more telling, Plaintiffs allege that the reason the investment objective is a misrepresentation is because the Fund selected investments that were too risky to achieve this goal. Incredibly, each and every one of the investments they point to as inconsistent with the goal was specifically identified and described in detail by the Funds, along with their respective principal risks, as the *very means* by which the Funds were going to pursue the goal. This was and remains the distinctive "Rochester style." In other words, Plaintiffs are suing because the Funds invested in just the way they told Plaintiffs they would and just as the whole industry and investing public had known for more than two decades. No securities claim is even conceivable on such facts.

The second major focus of all seven Complaints is the Funds' longstanding commitment to "inverse floaters," which also dates back two decades. But the Registration

3

Statements explained in detail the Funds' focus on inverse floaters – leveraged derivative products based on long-term municipal bonds – including the principal investment risks (which include interest rate risk, potential volatility, and potential illiquidity).  The Funds described, in equal detail, all of their inverse floater holdings and related risks.  Plaintiffs' inverse floater claim turns largely on a supplemental disclosure the Funds made in October 2008.[1]  Contrary to Plaintiffs' allegations, that supplement did not disclose new or different material risks or facts with respect to inverse floaters.  Instead, it appropriately alerted shareholders to the unprecedented market conditions, the current potential impact on the inverse floaters, and the Funds' plans to provide additional liquidity to avoid these effects and manage their portfolios through this tumultuous period.  That the Funds succeeded in this effort, and preserved their holdings, such that investors could enjoy rebound returns of 40% to 50% in early 2009, has not deterred Plaintiffs from suing.  But, it would subvert the purposes of the securities laws and chill supplemental disclosures generally to punish Defendants for updating their disclosures to explain to investors how the crisis might have affected their investments.

Third, Plaintiffs allege that the footnotes to Fund financial statements should have attached asterisks denoting as "illiquid" a greater number of Fund bonds than those actually noted by the Funds.  But this claim reflects only Plaintiffs' after-the-fact opinion about the liquidity of Fund assets; such differences of opinion cannot turn the actual statements in the Registration Statements into untrue statements of material fact.  Moreover, Plaintiffs' opinion about how to identify illiquid municipal bonds is facially incorrect.  Plaintiffs' illiquidity

---

[1]   October 2008 Supplement (10/21/08) (Declaration of Matthew L. Larrabee ("Larrabee Decl."), Ex. A-1).

allegations hinge on the assertion that low trading volume in a bond is synonymous with illiquidity.  This is wrong for municipal bonds, just as it is for jewelry, art, or any other assets that are liquid, but do not trade frequently.  Determining whether a security is illiquid involves a judgment based on various factors, only one of which is trading activity.  The Funds made those judgments in good faith according to the procedures they disclosed and properly disclosed their results.  The law does not require more.

Finally, Plaintiffs' contention that the Funds used an "opaque process" to overvalue their portfolio securities is also erroneous.  The Registration Statements explained that for municipal securities, which do not trade on an exchange, the Manager may rely on third-party pricing services for valuation information – and did so throughout the class period.  While the 2007 adoption of new financial accounting standards for fair value determinations required funds to categorize their assets based on the kind of data used for valuation purposes, the Rochester Funds' valuation practices themselves did not change at any point during the putative Class Periods.  The Funds accurately disclosed that process, both before and after these accounting changes.  In short, the Funds' assets were fairly valued throughout the putative Class Periods using a consistent process that met all regulatory standards, as accurately described in the Registration Statements.  The securities laws do not require more here either.

The simple truth is that the Rochester team and its funds have had a consistent investment style, focused on the same types of investments, and taken the same risks, for decades.  That approach and the specific investments it involves are not only well described in the Registration Statements, but also are well known in the investment community.  A virtual

5

library of secondary source material describes the investments and their risks in English, both plain and colorful.  Those well-known risks certainly included the interest rate, volatility, and liquidity risks that form the foundation of Plaintiffs' disclosure claims, and there is no basis for any misrepresentation or omission claim against any of the Funds.

The remainder of this Consolidated Brief addresses a range of additional legal deficiencies that are common to all seven Complaints, each of which provides independent grounds for dismissing Plaintiffs' claims.  In particular, Defendants explain below that (1) Plaintiffs' claims are barred by the statute of limitations for Securities Act claims because investors may not buy shares and then wait until after losing money in a global financial crisis to bring suit; (2) Plaintiffs' losses were not caused by statements in the Funds' offering documents; (3) Plaintiffs fail to allege facts sufficient to state claims for either "seller liability" under section 12(a)(2) or "control person" liability under section 15; and (4) there is no private right of action to support Plaintiffs' claims under section 13(a) of the Investment Company Act.  More than a year after the first Rochester Fund Complaint was filed, Plaintiffs' consolidated Complaints still struggle to state a single cognizable claim.  That struggle should end now.  For all of the reasons explained below, along with others that are set out in Defendants' CA and PA Brief, the Complaints should be dismissed with prejudice.

## FACTS

## I.   OVERVIEW OF THE ROCHESTER FUNDS

### A.   Mutual Fund Disclosure Requirements

Mutual funds are subject to extensive reporting requirements under the federal securities laws.  In 1983, the SEC adopted Form N-1A, which sets forth the requirements for

mutual fund registration statements.[2]  The registration statement includes the prospectus and statement of additional information (the "SAI").  The prospectus is designed to provide "essential information about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares." *Id*.  The SAI is incorporated into the prospectus and provides "additional information that the Fund believes may be of interest to some investors." *Id*.  Among the information included in the SAI is a "Statement of Investments" that lists each of the Fund's investments.[3]  In addition to the Registration Statement, the Funds file quarterly listings of their portfolio holdings and certified shareholder reports.  These shareholder reports are sent to investors along with Management Commentaries and provide a host of information about the Funds, including detailed listings of their investment portfolios.

### B.      The Defendants

Plaintiffs have sued OppenheimerFunds, Inc. ("OFI" or the "Manager"), the investment manager for the seven Funds at issue here (Oppenheimer AMT-Free Municipals ("AMT-Free Fund"); Oppenheimer AMT-Free New York Municipals ("AMT-Free NY

---

[2]     *Registration Form Used by Open-End Management Investment Companies; Guidelines*, Inv. Co. Act Rel. No. 13436, 48 Fed. Reg. 37928 (Aug. 22, 1983); *see also* Form N-1A, General Instructions, Preparation of the Registration Statement, *available at* http://www.sec.gov/about/forms/formn-1a.pdf.

[3]     To avoid burdening the Court with voluminous and duplicative materials, this Brief refers to language in Registration Statements from 2007, all of which were operative during each Plaintiff's putative Class Period.  The Court may consider documents that are either "referred to in the complaint" or "incorporated into the complaint by reference."  *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), *cert. denied*, No. 09-549, 2010 WL 154973 (Jan. 19, 2010).  For readability, we provide citations to the public disclosures in footnotes. The documents are attached as exhibits to the Larrabee Declaration.  The first 15 exhibits are the October 2008 Supplement, *see* Ex. A-1, and the Prospectus and SAI for each of the 7 Funds, *see* Ex. A-2 to A-15, which, for simplicity, we refer to hereinafter by the document's name only and without reference to the Declaration (*e.g.*, AMT-Free Prospectus (10/26/07)).

Fund"); Oppenheimer California Municipal Fund ("California Fund"); Oppenheimer

Rochester National Municipals ("National Fund"); Oppenheimer New Jersey Municipal Fund

("New Jersey Fund"); Oppenheimer Pennsylvania Municipal Fund ("Pennsylvania Fund");

and Rochester Fund Municipals ("Rochester Fund") (collectively, the "Funds")).  Plaintiffs

also have sued OppenheimerFunds Distributor, Inc. ("OFDI"), the Funds' distributor; the

Oppenheimer Multi-State Municipal Trust, which issues shares of the New Jersey,

Pennsylvania, and National Funds; various OFI Officers and Trustees of the Funds; and

Massachusetts Mutual Life Insurance Company.  We refer to these parties collectively as

"Defendants."[4]

All seven Funds invest in municipal securities.  The Securities Exchange Act of 1934

defines municipal securities as "securities which are direct obligations of, or obligations

guaranteed as to principal or interest by, a State or any political subdivision thereof, or any

agency or instrumentality of a State or any political subdivision thereof, or any municipal

corporate instrumentality of one or more States, or any security which is an industrial

development bond."  15 U.S.C. § 78c(a)(29).

The most significant feature of municipal securities is that they pay interest that is

exempt from federal and/or state personal income taxes.  Thus, municipal bond funds are

most attractive to individuals who seek tax-exempt income.  Moreover, the issuers of

municipal securities pay investors a regular stream of interest income, along with a promise to

---

[4]     For the convenience of the Court, Defendants have prepared and attached as Appendix A
        Complaint Summary Tables, the second of which identifies the legal claims asserted against
        the different Defendants.

8

pay back the principal amount of the loan at maturity.  Thus, municipal bonds are generally

"buy-and-hold" investments that are traded far less actively than equities.

### C.    The Rochester Investment Style:  "No Guts, No Glory"

All seven Funds are managed using a common "Rochester style"[5] of fund

management, which is self-described as "contrarian" and "value-based."[6]  The "yield-driven"

Rochester style involves finding "advantageous lower-rated, unrated and generally

underappreciated municipal securities."  *Id*. at 12, 13.  The approach is designed to "capture

market inefficiencies" and "create highly attractive, yield-driven total returns over the long

term."  *Id*. at 7, 13.

For many years, publications have described the high-risk, high-reward Rochester

style.[7]  Even the titles of these articles make clear the risks associated with the Rochester

style:  "No Plain Vanilla: Rochester Fund gets higher yields from an exotic muni mix,"

*Barron's*, May 6, 2002; "Rochester Fund Municipals' willingness to take risks explains its

relative success well," *Morningstar's Take*, Nov. 14, 2005; "Rochester Fund Municipals has

enjoyed a long hot streak, but it's still not the right fund for everyone," *Morningstar's Take*,

---

[5]    In 1996, OFI acquired The Rochester Funds, which was a fund company based in Rochester, New York.  After the acquisition, the Rochester team took over management of Oppenheimer's own municipal bond funds.

[6]    *See, e.g.*, Rochester Management Commentaries and Semiannual Report ("MCSR") (6/30/07) at 1 (Larrabee Decl., Ex. A-16).

[7]    The Court may take judicial notice of newspaper articles and press releases, *see, e.g.*, *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006); speeches by government officials, *see, e.g.*, *Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 683 n.12 (D.C. Cir. 1983); stock quotes, *see, e.g.*, *SEC v. C. Jones & Co.*, No. 03-636, 2009 WL 321696, at *1 (D. Colo. Feb. 10, 2009); and market phenomena, *see, e.g.*, *Great N. Ry. Co. v. Weeks*, 297 U.S. 135, 149 (1936); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).  The Court may take judicial notice of such facts where their accuracy cannot reasonably be questioned or for the existence of the information, but not for the truth of the statements asserted.

Apr. 13, 2006; "Rochester Fund Municipals is good, but beware its risks," *Morningstar's Take*, Sep. 13, 2006; "Oppenheimer PA Municipal's high-risk, high-return look isn't for most investors," *Morningstar's Take*, Sept. 25, 2006.  *See* Larrabee Decl., Ex. B-1 to B-5.

"No guts, no glory," Ronald Fielding, architect of the Rochester style, told *The Bond Buyer*[8] in 2005.[9]  Indeed, for more than ten years, financial publications have noted that the Funds take "calculated risks on credits that . . . others try to avoid."[10]  *Morningstar* stated in 2005 that the Rochester Fund "outpaces by sticking its neck out" and warned that the Fund "is only suitable as a supporting player for risk-tolerant income seekers."[11]  It also warned that the Rochester style "is built on an investing philosophy drastically different from that of most peers, one we urge potential shareholders to get to know before investing here."[12]  Similarly, in 2006, *Morningstar* stated that the Funds balance "on the precipice between great gains and great losses.  Investors who cannot handle short-term capital losses will want to look

---

[8]     *The Bond Buyer* is a widely circulated publication covering the municipal securities industry. The MSRB defines it as "[a] trade paper of the municipal securities industry published each business day that contains . . . articles relating to financial markets and public finance." MSRB, Glossary of Municipal Securities Terms (2d ed. Jan. 2004), *available at* http://www.msrb.org/msrb1/glossary/glossary_db.asp?sel=b; *see also In re MBIA Inc. Sec. Litig.*, No. 05-3514, 2007 WL 473708, at *7 (S.D.N.Y. Feb. 14, 2007) (finding that public sources, including *The Bond Buyer*, put plaintiffs on inquiry notice).

[9]     Jacob Fine & Matthew Johnson, *Benefits of Hazard Play: Bond Funds That Took Chances in 2Q Did Well*, THE BOND BUYER, Vol. 353 No. 32170, July 8, 2005 (Larrabee Decl., Ex. B-6).

[10]    Ilana Polyak, *Fund Performance: New York Provides Varied Game for Adventurous Fund Managers*, THE BOND BUYER, Nov. 19, 1997 (Larrabee Decl., Ex. B-7); *see also* Aaron Pressman, *Oppenheimer's Contrarian in Municipal Bonds*, BUSINESSWEEK, Oct. 9, 2008 (Larrabee Decl., Ex. B-8) ("Show me the stuff that's ugly, and let me decide if there's a valid reason for why everyone finds it disgusting.").

[11]    Dieter Owen Bardy, *Rochester Fund Municipals' willingness to take risks explains its relative success well*, MORNINGSTAR'S TAKE, Nov. 14, 2005 (Larrabee Decl., Ex. B-2).

[12]    Andrew Gunter, *Potential investors in Oppenheimer AMT-Free NY Municipals must understand that this is not your typical tax-exempt fund*, MORNINGSTAR'S TAKE, July 11, 2007 (Larrabee Decl., Ex. B-9).

elsewhere."[13] *Morningstar* repeatedly warned that the Funds' "[e]xtreme credit and interest-rate positions make [them] suitable at the fringes of one's portfolio."[14]

Commentators have explained that the Funds' returns "continue to be tied to the fate of riskier fare, for better or worse,"[15] which makes their returns "bipolar, though strong long-term."[16] "The funds produce returns well in excess of their closest competitors by investing in individual bonds or sectors considered too risky or illiquid by other firms."[17] Articles about the Funds have long discussed their investments in inverse floaters, unrated securities, and other "rocky road" securities.[18]

---

[13] Dieter Owen Bardy, *Rochester Fund Municipals has enjoyed a long hot streak, but it's still not the right fund for everyone*, MORNINGSTAR'S TAKE, Apr. 13, 2006 (Larrabee Decl., Ex. B-3).

[14] *See, e.g.*, Andrew Gunter, *Oppenheimer PA Municipal's high-risk, high-return look isn't for most investors*, MORNINGSTAR'S TAKE, Sept. 25, 2006 (Larrabee Decl., Ex. B-5).

[15] Andrew Gunter, *Rochester Fund Municipals is good, but beware its risks*, MORNINGSTAR'S TAKE, Sept. 13, 2006 (Larrabee Decl., Ex. B-4) (noting that "its aggressive sector positioning courts volatility").

[16] Andrew Gunter, *For both better and worse, Oppenheimer PA Municipal is very different from its peers*, MORNINGSTAR'S TAKE, Feb. 15, 2007 (Larrabee Decl., Ex. B-10) (warning that the Fund "won't suit investors seeking constant principal protection alongside steady income"); *see also* Andrew Gunter, *Oppenheimer PA Municipal plays the humbler or the humbled, depending on the year*, MORNINGSTAR'S TAKE, Dec. 18, 2007 (Larrabee Decl., Ex. B-11) ("When the market goes against such bold investing via a flight to quality, this team has few hiding spots for waiting out the storm.").

[17] Jacob Fine, *Funds Pick Up the Pace: Municipal Assets Grew 6.6% in 2005*, THE BOND BUYER, Vol. 355 No. 32334, Mar. 8, 2006 (Larrabee Decl., Ex. B-12); *see also* Andrew Gunter, *Oppenheimer CA Municipal is a well-run fund, but its strong returns need some context*, MORNINGSTAR'S TAKE, July 13, 2007 (Larrabee Decl., Ex. B-13) ("And this team has proved skilled at finding these opportunities large and small. Its drawback: Such bonds can be hard to sell if there's a credit crunch – conventional buyers approach them with much more caution.").

[18] *See, e.g.*, Daniel Kruger, *News and Trends: Investors' Need for Yield Helps Propel Quarter's Top Funds*, THE BOND BUYER, Jan. 15. 1997, at 8 (Larrabee Decl., Ex. B-14) ("The portfolio [of the Rochester Fund] contains . . . much nonrated and triple-B paper, inverse floaters . . ."); Jennifer Ablan, *No Plain Vanilla: Rochester Fund gets higher yields from an exotic muni mix*, BARRON'S, May 6, 2002 (Larrabee Decl., Ex. B-1) ("While everybody else sticks to plain-

### D.     The Funds' Performance

The high-risk, high-reward Rochester style generated strong positive (and sometimes negative) returns for many years.[19]  In the fall of 2008, as a result of unprecedented global economic conditions, investors became unwilling to invest in anything other than the safest of investments, causing liquidity to evaporate, particularly in high-yield bonds.  As a result of these unprecedented market conditions, the Funds' investments fell markedly in value.  Plaintiffs allege that throughout the putative Class Periods, the Funds' share prices declined a total of between 30% and 49%.[20]

Although the Funds' net asset values ("NAVs") declined sharply during this period, the Funds advised investors that "the inherent creditworthiness of the underlying municipal bonds was largely unchanged."[21]  They noted that "[w]hile some investors may be worried that what happened in the sub-prime mortgage market and the bond insurance industry was somehow related to the creditworthiness of municipal bonds, we believe these concerns are and will remain unfounded."  *Id.* at 11.  The Manager thus remained "optimistic" about the long-term performance of the Funds.

---

vanilla bonds, Fielding, 53, and his crew go for the rocky road.  Their favorite varieties include things like inverse-floating-rate securities . . . and unrated issues.").

[19]     *See, e.g.*, Pressman, *supra* at 10 n.10 (Larrabee Decl., Ex. B-8) ("Fielding built up a 20% stake in 'inverse floaters,' notoriously volatile securities whose yields rise when interest rates decline.  And as the post-Enron panic subsided and rates on munis fell, yields on the bonds jumped and the fund performed magnificently from 2003 through 2006, beating the average of its peers by almost four percentage points a year and outperforming at least 97% of its competitors in each of those four years.").

[20]     AMT-Free Compl. ¶87 (42% loss); AMT-Free NY Compl. ¶79 (30% loss); Cal. Compl. ¶175 (41% loss); Nat'l Compl. ¶77 (49% loss); NJ Compl. ¶80 (34% loss); Pa. Compl. ¶144 (38% loss); Rochester Compl. ¶82 (31% loss).

[21]     Rochester Management Commentaries and Annual Report ("MCAR") (12/31/08) at 16 (Larrabee Decl., Ex. A-17).

12

By sticking to their Rochester style through the crisis, the Funds enjoyed stunning recoveries in 2009 as their share prices increased between 41% and 51%, quickly recouping prior losses, just as they had in earlier volatile markets.[22]  Shown below is a graph of the Funds' performance from 2000 through 2009.



### The Funds' Net Asset Value [1]
### (1/1/00 – 1/1/10)
Source:  Bloomberg; Complaints

[1] The chart plots the net asset value ("NAV") of Class A shares, adjusted for dividends.
[2] For simplicity, we have marked the earliest start date and the latest end date of the seven putative class periods (2/26/06 – 11/28/08).

As the graph illustrates, 2008 was a historically extreme year, which reflects the unprecedented economic conditions the world witnessed that year.  The graph also depicts the unsurprising fact – noted by commentators for many years – that the Funds' investment

---

[22]  AMT-Free (43% gain); AMT-Free NY (41% gain); California (49% gain); National (51% gain); New Jersey (50% gain); Pennsylvania (48% gain); Rochester (45% gain).

strategy yields above-market gains in good times, like 2009, and below-market losses in bad times, like 2008.  The Funds' Morningstar total return rankings from 2000 through 2009 also make this point:

Total Return Percentile Rankings by Morningstar[23]

| Fund | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| AMT-Free | 10 | 98 | 19 | 22 | 12 | 8 | 34 | 94 | 95 | 7 |
| AMT-Free NY | 62 | 12 | 92 | 6 | 17 | 3 | 1 | 95 | 93 | 5 |
| California | 53 | 50 | 36 | 2 | 1 | 1 | 1 | 96 | 98 | 1 |
| National | 2 | 36 | 62 | 2 | 4 | 1 | 3 | 97 | 98 | 1 |
| New Jersey | 80 | 56 | 16 | 2 | 1 | 1 | 2 | 96 | 96 | 1 |
| Pennsylvania | 98 | 5 | 2 | 2 | 1 | 1 | 1 | 97 | 97 | 1 |
| Rochester | 45 | 6 | 98 | 3 | 2 | 2 | 3 | 92 | 97 | 1 |

As the rankings show, the Funds consistently have been among the best, and the worst, of their peer groups year after year.  This directly reflects the volatility inherent in the high-risk, high-reward Rochester investment style that the Funds have consistently and repeatedly disclosed to investors.

## II.     THE FUNDS' DISCLOSURES

### A.     Investment Objectives

As required by Form N-1A, the Registration Statements identified the investment objective of each Fund.  Six of the seven Funds stated that their objective was to "seek" as high a level of current interest income exempt from federal and state income taxes as is consistent with "preservation of capital," or "while attempting to preserve capital."[24]  The

---

[23]     Morningstar Mutual Fund Reports (2009) (Larrabee Decl., Ex. B-15 to B-21).

[24]     AMT-Free Prospectus (10/26/07) at 3; AMT-Free NY Prospectus (12/28/07) at 3; Cal. Prospectus (10/31/07) at 3; NJ Prospectus (11/28/07) at 3; Pa. Prospectus (11/28/07) at 3.  The

National Fund, in stark contrast, announced the more aggressive objective of seeking a high level of tax exempt income "by investing in a diversified portfolio of high-yield municipal securities." Nat'l Prospectus (11/28/07) at 3. Because the National Fund can invest up to 100% of its assets in junk bonds, its investment objective is not at issue here.

To pursue these investment objectives, the Registration Statements disclosed that the Manager would look for certain types of securities that offer "high current income," including "special situations that provide opportunities for value" or securities "of smaller issues that might be overlooked by other investors or funds."[25] More specifically, each Fund explained in a section entitled "Main Risks of Investing in the Fund" that it would invest in high-income municipal securities such as junk bonds, unrated bonds, tobacco bonds, and inverse floaters.[26]

Defendants advised investors that each Fund "focuses on longer-term securities to seek higher yields."[27] Accordingly, the Funds encouraged shareholders to maintain a long-term perspective. As the Funds stated, "we think it is a mistake for investors to try to 'time' municipal bond market movements, particularly when it comes to interest rates. . . . The more rational approach, we believe, is to stick with the time-tested Rochester style of fund

---

Rochester Fund's slightly different formulation is to seek high tax-exempt income "consistent with its investment policies and prudent investment management while seeking preservation of shareholders' capital." Rochester Prospectus (2/21/07) at 3.

[25] AMT-Free Prospectus (10/26/07) at 3; AMT-Free NY Prospectus (12/28/07) at 4; Cal. Prospectus (10/31/07) at 4; NJ Prospectus (11/28/07) at 4; Pa. Prospectus (11/28/07) at 4; Rochester Prospectus (2/21/07) at 4.

[26] *See* AMT-Free Prospectus (10/26/07) at 4-6; AMT-Free NY Prospectus (12/28/07) at 4-9; Cal. Prospectus (10/31/07) at 4-9; NJ Prospectus (11/28/07) at 4-9; Pa. Prospectus (11/28/07) at 4-9; Rochester Prospectus (2/21/07) at 4-9.

[27] AMT-Free NY Prospectus (12/28/07) at 4; Cal. Prospectus (10/31/07) at 3; NJ Prospectus (11/28/07) at 3; Pa. Prospectus (11/28/07) at 3; *see also* AMT-Free Prospectus (10/26/07) at 3; Rochester Prospectus (2/21/07) at 3.

15

management, which is designed to create highly attractive, yield-driven total returns over the long term."[28]

### B.   Inverse Floaters

Inverse floaters are derivative securities that represent an interest in a long-term municipal security.  The Registration Statements explained that six of the Funds could invest up to 20% of their assets in inverse floaters "to seek greater income and total return" – the more aggressive National Fund could invest up to 35%.[29]

#### 1.   Creation and Collapse of Inverse Floaters

An inverse floater is created in several steps.  First, a "Fund purchases a fixed-rate municipal security and subsequently transfers it to a broker-dealer (the sponsor).  The sponsor sells the municipal security to a trust."  *Id*.  The trust then creates and issues two types of derivative securities:  (1) short-term tax free floating rate securities (the "floaters"), and (2) a long-term tax free floating rate security (the "inverse floater").  *See id*.[30]  The original municipal security is held in the trust and serves as collateral for the two derivatives.

The inverse floater is then purchased and held by the Fund.  The floaters, which are highly rated and liquid, are sold by a remarketing agent, typically to money market funds.

---

[28]   *See, e.g.*, Rochester MCSR (6/30/07) at 7 (Larrabee Decl., Ex. A-16).

[29]   AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7; Cal. Prospectus (10/31/07) at 8; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 7.

[30]   *See also* AMT-Free Compl. ¶64; AMT-Free NY Compl. ¶58; Cal. Compl. ¶140; Nat'l Compl. ¶60; NJ Compl. ¶59; Pa. Compl. ¶121; Rochester Compl. ¶59.

16

These floater holders "have the option to tender their investment, to the sponsor . . . for redemption at par at each reset date" which usually occurs weekly.[31]

This entire trust structure may be "collapsed."[32] Collapsing a trust simply reverses the process of creating it. Specifically, the Fund can withdraw the underlying bond and pay the floater holders the par value of the floaters (in addition to certain costs). *Id.* In return, the floater holders tender their floaters. *Id.*

### 2. Value and Yield of Inverse Floaters

Because the floater and the inverse floater are created from a single underlying municipal bond, the value of the floaters and inverse floater together equals the value of the bond. As a simple example, if an underlying bond is worth $1200, a trust hypothetically could issue $800 in floaters and $400 in inverse floaters.[33] Thus, the value of inverse floaters is represented by the following formula:

$$\textit{Value of Inverse Floater} = \textit{Value of Underlying Municipal Bond} - \textit{Value of Floaters}$$

---

[31] AMT-Free SAI (10/26/07) at 151; AMT-Free NY SAI (12/28/07) at 124; Cal. SAI (10/31/07) at 135; Nat'l SAI (11/28/07) at 161; NJ SAI (11/28/07) at 132; Pa. SAI (11/28/07) at 130; Rochester SAI (2/21/07) at 160. In light of these disclosures, any implication that Defendants did not disclose the floater-holders' right to "put" floaters back to the trust, *see* Cal. Compl. ¶145; Pa. Compl. ¶129, should fail as a matter of law. *See* AMT-Free SAI (10/26/07) at 10-11; AMT-Free NY SAI (12/28/07) at 18-19; Cal. SAI (10/31/07) at 17; Nat'l SAI (11/28/07) at 11; NJ SAI (11/28/07) at 24; Pa. SAI (11/28/07) at 18; Rochester SAI (2/21/07) at 30.

[32] AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 8.

[33] When a trust issues a higher value of floaters than inverse floaters, it creates what Plaintiffs define to be a "leverage ratio." *See* AMT-Free Compl. ¶65; AMT-Free NY Compl. ¶58; Nat'l Compl. ¶60; NJ Compl. ¶59; Rochester Compl. ¶60; *see also* Cal. Compl. ¶142; Pa. Compl. ¶122. Thus, if a trust issued $800 in floaters and $400 in inverse floaters, the leverage ratio would be 2:1.

Similarly, because both the floater and inverse floater are derived from one underlying bond, their returns must add up to the return on the underlying bond, less certain expenses.[34] Floaters earn the prevailing short-term interest rate.  Inverse floaters earn the difference between the yield on the underlying bond and the amount paid on the floaters.[35]  Thus, if the interest paid on the hypothetical $1200 underlying bond was 10%, the underlying bond would have a yearly return of $120.  If the $800 worth of floaters hypothetically earned 2% ($16), then the $400 worth of inverse floaters would earn $104 ($120 minus $16), a 26% return. Thus:

*Interest on Inverse Floater = Long Term Interest Earned on Underlying Bond –*
*Short Term Interest Paid to Floaters*

As the Funds explained, in light of this structure, an inverse floater "pays interest at rates that move in the opposite direction of the yield on the short-term floating rate security."[36]  Accordingly, "[a]s short-term interest rates rise, inverse floaters produce less current income (and, in extreme cases, may pay no income) and as short-term interest rates fall, inverse floaters produce more current income."  *Id*.  When "short-term rates remain low

---

[34]     AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7; Cal. Prospectus (10/31/07) at 8; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 9; Pa. Prospectus (11/28/07) at 9; Rochester Prospectus (2/21/07) at 7.

[35]     AMT-Free SAI (10/26/07) at 11; AMT-Free NY SAI (12/28/07) at 19; Cal. SAI (10/31/07) at 17; Nat'l SAI (11/28/07) at 11; NJ SAI (11/28/07) at 24; Pa. SAI (11/28/07) at 18; Rochester SAI (2/21/07) at 30.

[36]     AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7; Cal. Prospectus (10/31/07) at 8; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 7.

relative to long-term rates, owners of inverse floaters will have the opportunity to earn interest at above-market rates."[37]

As the Funds noted, "[i]nverse floaters all entail some degree of leverage."[38] Specifically, by investing in inverse floaters, the Funds were exposed to changes in the value of the entire underlying bond.  If, for instance, the value of the hypothetical underlying bond fell from $1200 to $1000, the inverse floater would fall in value from $400 to $200.  However, if the value of the underlying bond increased from $1200 to $1400, the inverse floater would increase from $400 to $600.

### 3.   Accounting for Inverse Floaters

As discussed above, if an inverse floater trust were collapsed, the Fund would recover the underlying bond but would be required to make a payment equal to the par value of the floaters.  Accordingly, consistent with industry accounting practices, the Funds recorded and disclosed the marked-to-market value of the underlying bond as an asset on their financial statements, but also disclosed the marked-to-market value of the floaters as liabilities.[39]  The value of the inverse floaters, as the residual, was reflected in the Fund financial statements, representing the value of the underlying bond less the value of the floaters.

---

[37]   AMT-Free SAI (10/26/07) at 11; AMT-Free NY SAI (12/28/07) at 19; Cal. SAI (10/31/07) at 18; Nat'l SAI (11/28/07) at 12; NJ SAI (11/28/07) at 24; Pa. SAI (11/28/07) at 19; Rochester SAI (2/21/07) at 30.

[38]   AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 8; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 9; Pa. Prospectus (11/28/07) at 9; Rochester Prospectus (2/21/07) at 8.

[39]   AMT-Free SAI (10/26/07) at 141, 151; AMT-Free NY SAI (12/28/07) at 114, 127; Cal. SAI (10/31/07) at 126, 135-36; Nat'l SAI (11/28/07) at 151, 161; NJ SAI (11/28/07) at 122, 132; Pa. SAI (11/28/07) at 120, 130; Rochester SAI (2/21/07) at 144, 155.

In light of this accounting and the Funds' disclosures, it is clear that a collapse of the trust would have no effect on a Fund's NAV.  Prior to a collapse, the net asset value of an inverse floater investment equals the value of the underlying bond minus the value of the floaters.  After a collapse, the Fund owns the underlying bond, but must pay out the value of the floaters.  Accordingly, a collapse does not affect NAV.

### C.    Illiquid Assets

The SEC has defined "illiquid securities" as securities "that *cannot* be disposed of in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment."  *Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145*, Inv. Co. Act Rel. No. 17452, 55 Fed. Reg. 17933 (Apr. 30, 1990) (emphasis added).  SEC guidelines provide that mutual funds may not hold more than 15% of their net assets in illiquid securities.  *See Revision to Guidelines to Form N-1A*, Inv. Co. Act Rel. No. 17452, 57 Fed. Reg. 9828 (Mar. 20, 1992).  Thus, the Funds disclosed that they may invest in illiquid securities, subject to a 15% limit, and explained that the "Manager monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to maintain adequate liquidity."[40]

The Funds warned investors about illiquidity risk:  "Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price."  *Id.*  The Registration Statements also explained that

---

[40]     AMT-Free Prospectus (10/26/07) at 15; AMT-Free NY Prospectus (12/28/07) at 16; Cal. Prospectus (10/31/07) at 16; Nat'l Prospectus (11/28/07) at 15; NJ Prospectus (11/28/07) at 15; Pa. Prospectus (11/28/07) at 15; Rochester Prospectus (2/21/07) at 15.

the "Manager determines the liquidity of certain of the Fund's investments," and in doing so, takes into account "the trading activity for such securities and the availability of reliable pricing information, among other factors."[41]

In addition to warning investors about illiquidity risk, the Funds designated with a footnote each security listed in their Statements of Investments that was illiquid.[42] Nevertheless, Plaintiffs complain that more of the Funds' municipal securities should have been designated illiquid because they did not trade regularly. As discussed below, Plaintiffs' argument erroneously equates illiquid securities (which *cannot* be disposed of in the ordinary course) with municipal securities (which can be sold via a huge network of brokers and dealers, but which are often held by investors until maturity and therefore may not trade for months or years at a time).

### D.    Securities Valuation

Mutual funds must value the securities held in their portfolios on a daily basis. The basic standards governing the valuation of portfolio securities are set forth in section 2(a)(41) of the Investment Company Act of 1940 (the "ICA"), which divides securities into two categories. First, with respect to securities "for which market quotations are readily available," the value of a security equals its "market value"; second, "with respect to other securities and assets," the value of a security equals its "fair value . . . as determined in good faith by the board of directors." ICA § 2(a)(1)(41)(A); *see also* 17 C.F.R. § 270.2a(4)(a)(1).

---

[41]    AMT-Free SAI (10/26/07) at 15; AMT-Free NY SAI (12/28/07) at 23; Cal. SAI (10/31/07) at 22; Nat'l SAI (11/28/07) at 16; NJ SAI (11/28/07) at 27; Pa. SAI (11/28/07) at 22; Rochester SAI (2/21/07) at 39.

[42]    AMT-Free SAI (10/26/07) at 90-138; AMT-Free NY SAI (12/28/07) at 99-112; Cal. SAI (10/31/07) at 100-24, 143; Nat'l SAI (11/28/07) at 92-148; NJ SAI (11/28/07) at 107-20; Pa. SAI (11/28/07) at 101-18; Rochester SAI (2/21/07) at 108-41.

21

Discussing the "fair value" standard, the SEC has explained that there can be no "automatic formula" by which an investment company must value the securities in its portfolio. *Statement Regarding Restricted Securities*, Inv. Co. Act Rel. No. 5847, 35 Fed. Reg. 19989 (Oct. 21, 1969); *see also Accounting for Investment Securities by Registered Investment Companies*, Inv. Co. Act Rel. No. 6295, 35 Fed. Reg. 19986 (Dec. 23, 1970) ("No single standard for determining 'fair value . . . in good faith' can be laid down, since fair value depends upon the circumstances of each individual case").

Here, the Funds invested in municipal securities, which are not exchange-traded and do not typically have readily available market quotations.  Thus, the Funds could not value the securities by simply looking up their prices in the *Wall Street Journal*.  Rather, the Funds were required to determine the "fair value" of the securities.  As the Funds disclosed, where "market quotations are not readily available . . . [the] security may be valued by another method that the Board of Trustees believes accurately reflects the fair value."[43]  The Registration Statements explained the Funds' valuation procedures in some detail.[44]  Most relevant here, the Funds disclosed that "[i]n the case of municipal securities, when last sale information is not generally available, the Manager may use pricing services approved by the Board of Trustees.  The pricing service may use 'matrix' comparisons to the prices for comparable instruments on the basis of quality, yield and maturity."  *Id*.  The Funds also

---

[43]     AMT-Free Prospectus (10/26/07) at 19; AMT-Free NY Prospectus (12/28/07) at 20; Cal. Prospectus (10/31/07) at 20; Nat'l Prospectus (11/28/07) at 20; NJ Prospectus (11/28/07) at 20; Pa. Prospectus (11/28/07) at 20; Rochester Prospectus (2/21/07) at 20.

[44]     AMT-Free SAI (10/26/07) at 73-74; AMT-Free NY SAI (12/28/07) at 80-81; Cal. SAI (10/31/07) at 81-82; Nat'l SAI (11/28/07) at 74-75; NJ SAI (11/28/07) at 88-89; Pa. SAI (11/28/07) at 81-82; Rochester SAI (2/21/07) at 88-89.

stated that the Manager "will monitor the accuracy of the pricing services" and that the "monitoring may include comparing prices used for portfolio valuation to actual sales prices of selected securities." *Id.*

In September 2006, the Financial Accounting Standards Board ("FASB") issued Statements of Financial Accounting Standards No. 157, Fair Value Measurements ("FAS 157").[45] FAS 157 requires funds, among other things, to divide their assets into three levels, based on the type of data used for valuation of those assets: Level 1 assets have "quoted prices in active markets for identical assets"; Level 2 assets are based on "inputs other than quoted prices that are observable for the asset"; and Level 3 assets are valued based on "unobservable inputs (including the Manager's own judgments about assumptions that market participants would use in pricing the asset)."[46]

Consistent with FAS 157, the Funds timely disclosed that almost all of their assets fall into Level 2. This means that the valuation of these assets – conducted daily by an independent pricing service – is based on observable inputs, namely, "'matrix' comparisons to the prices for comparable instruments on the basis of quality, yield and maturity." *Id.* That no assets fell into Level 1 is hardly surprising given the Funds' focus on municipal securities, which are not exchange traded. Thus, FAS 157 did not result in any change in how the Funds valued their securities; nor did it alter the Funds' disclosure that municipal securities were

---

[45]     Statement of Financial Accounting Standards No. 157, Fair Value Measurements (Sept. 2006), *available at* http://www.fasb.org/pdf/fas157.pdf.

[46]     *See, e.g.*, Rochester MCSR (6/30/08) at F36 (Larrabee Decl., Ex. A-18).

23

valued by pricing services using the prices of comparable securities.[47]  It merely required the

Funds to categorize their assets as falling primarily under the new "Level 2."

## III.   THE FINANCIAL CRISIS OF 2008

### A.   Unprecedented Economic Conditions

The financial crisis of 2008 has been described as "a period of enormous turmoil in the

credit markets that resulted in a near freeze of trading."  *In re The Reserve Fund Sec. & Deriv.

Litig.*, No. 09-4346, 2009 WL 4249128, at *2 (S.D.N.Y. Nov. 25, 2009).  "In the days and

weeks following the Lehman collapse [in September 2008], the United States and the global

economy stood on the precipice of an outright collapse.  The credit markets were frozen,

consumers stopped spending, businesses started to contract, and we saw the first electronic

run on financial institutions."  *Id.* at *2 n.9 (citation omitted).

Numerous public sources have described the unprecedented nature of this turmoil and

its effects on financial markets.[48]  The collapse of Lehman Brothers caused a market-wide

increase of default risk, "sharply reducing liquidity in derivatives markets."[49]  As a result,

investors fled even money-market mutual funds, long considered one of the safest

---

[47]   AMT-Free SAI (10/26/07) at 73-74; AMT-Free NY SAI (12/28/07) at 80-81; Cal. SAI (10/31/07) at 81-82; Nat'l SAI (11/28/07) at 74-75; NJ SAI (11/28/07) at 88-89; Pa. SAI (11/28/07) at 81-82; Rochester SAI (2/21/07) at 88-89.

[48]   *See, e.g.*, Paul Krugman, *How Did Economists Get It So Wrong?*, N.Y. TIMES, Sept. 6, 2009, at 1, *available at* 2009 WLNR 17481383 ("Few economists saw our current crisis coming," and "[t]here was nothing in the prevailing models suggesting the possibility of the kind of collapse that happened last year."); Alan Greenspan, former Chairman of the Federal Reserve, Testimony before H. Comm. on Oversight and Government Reform, 110th Cong. (2008), *available at* http://oversight.house.gov/images/stories/documents/20081023100438.pdf (referring to the global financial crisis as a "once-in-a century credit tsunami" that policymakers did not anticipate).

[49]   *See, e.g.*, IMF Global Financial Stability Report, at 6 (Oct. 2008), *available at* http://www.imf.org/external/pubs/ft/gfsr/2008/02/pdf/text.pdf.

56855-0005/LEGAL18027345.1

investments, and "[f]or some assets, there were no buyers at any price."[50]  Markets "were

frozen and many different types of assets had become illiquid, or untradeable."  *Id.*

The Funds themselves described the crisis as "the most challenging economic and

market environment of our generation."[51]  "Liquidity basically disappeared, lending came to a

standstill, and many leading financial institutions failed."  *Id.*  "In this environment, investors

pulled back from risk-taking, funding markets for terms beyond overnight largely ceased to

function at times, credit risk spreads rose sharply, and equity prices registered steep declines."

*Id.*  In short, because credit markets seized up, transactions at many leading financial

institutions came to a standstill.  As SEC Chairman Mary Schapiro testified earlier this year,

"assets that were considered liquid prior to the crisis proved not to be so under duress," and

"during the height of the crisis, it was very difficult for some firms to obtain secured funding

even when using assets that had been considered highly liquid."[52]

### B.       The October 2008 Supplemental Disclosure

In response to these unprecedented economic circumstances, on October 21, 2008 –

while the markets were still reeling from the shock of the collapse of Lehman Brothers – the

Funds supplemented their Registration Statements.  The supplemental disclosure described in

greater detail how illiquidity and credit risks might materialize in certain circumstances,

---

[50]     Deborah Solomon et al., *Shock Forced Paulson's Hand – A Black Wednesday on Credit Markets; "Heaven Help Us All*,*"* Wall St. J., Sept. 20, 2008 (Larrabee Decl., Ex. B-22).

[51]     *See, e.g.*, AMT-Free MCAR (7/31/09) at 4 (Larrabee Decl., Ex. A-19).

[52]     Mary L. Schapiro, SEC Chairman, Testimony Concerning the State of the Financial Crisis Before the Financial Crisis Inquiry Commission, at 11 (Jan. 14, 2010), *available at* http://www.fcic.gov/hearings/pdfs/2010-0114-Schapiro.pdf.

25

namely, the extreme market conditions during that time.  The October 2008 Supplement modified the Registration Statements in three ways.

First, it added a new section entitled "Unusual Volatility and Lack of Liquidity in the Municipal Bond Markets in 2008."  This section described the unusual market conditions and general liquidity problems at the time.  It explained that in 2008, liquidity in the municipal bond market had "been reduced, as it has been in other fixed-income markets, in response to overall economic conditions and credit tightening."  October 2008 Supplement, at 1 (Larrabee Decl., Ex. A-1).  The Funds also disclosed that they might need to sell large blocks of bonds "to meet shareholder redemption requests" or "to raise cash to re-collateralize, unwind or 'collapse' trusts that issued inverse floaters to the Fund or to make payments to such trusts to enable them to pay for tenders of the short-term securities they have issued, if the remarketing agents for those securities are unable to sell those short-term securities in the marketplace to other buyers."  *Id*.  As a result, the Funds reinforced their illiquidity warnings that they "may not be able to sell bonds readily at prices reflecting the values at which the bonds are carried on the Fund's books."  *Id*.  Although the Funds warned of these general risks previously, the Supplement discussed their special relevance in light of the extreme market conditions at the time.

Second, the Supplement modified a section entitled "Borrowing and Leverage."  Previously, the section had stated that the Funds may borrow from banks to purchase securities or for "temporary or emergency purposes."  The Supplement explained that the Funds had secured an increase in their credit line with Citibank to $3 billion and that such additional liquidity might be used to meet redemption requests and to fund the potential

26

collapse of inverse floater trusts – in other words, to protect the Funds from the credit crisis, which was then at its worst. *Id.* at 4. The Supplement specified that such purposes might include borrowing to fund "amounts necessary to unwind or 'collapse' trusts that issued 'inverse floaters' to the Fund, or to contribute to such trusts to enable them to pay for tenders of their short-term securities by the holders." *Id.* Although Plaintiffs baldly allege that the Funds engaged in "fire sales" of unspecified assets, the Funds disclosed that they "used [this] line of credit at times to *avoid* having to sell tax-free assets at lower-than-acceptable prices."[53] (emphasis added)

Finally, the Supplement updated the Funds' disclosures about inverse floaters to add details about how the credit crisis could affect those investments. Although the Supplement replaced the entire inverse floater section with new language, only a few sentences from the Supplement were not included in prior disclosures. First, the Supplement stated that "[u]nder inverse floater arrangements, if the remarketing agent that offers the short term securities for sale is unable to sell them, or if the holders tender (or put) them for repayment of principal and the remarketing agent is unable to remarket them, the remarketing agent may cause the trust to be collapsed, and in the case of floaters created by the Fund, the Fund will then be required to repay the principal amount of the tendered securities." October 2008 Supplement, at 2 (Larrabee Decl., Ex. A-1). Although the Funds had not previously stated that the "remarketing agent" could cause a collapse of the Trust or enumerated other situations in which a collapse could occur, the Registration Statements had described the risk that an inverse floater trust could be collapsed, in which case the underlying short-term security

---

[53]     *See, e.g.*, AMT-Free MCAR (7/31/09) at 17 (Larrabee Decl., Ex. A-19).

would be tendered and the Funds would pay the value of the short-term bonds.[54]  Thus, the new information was that another party – the remarketing agent – also may exercise a right that would cause the same event that the Funds had already warned about, *i.e.*, collapse.  In other words, the Supplement merely disclosed a new way in which the previously disclosed risk of collapse could materialize in the wake of the credit crisis.  No such disclosure had been warranted before the crisis because that specific scenario had never been a realistic possibility and because, as noted above, a collapse of a trust does not affect the NAV.

Second, the October 2008 Supplement stated that "[d]uring times of market volatility, illiquidity or uncertainty, the Fund could be required to sell other portfolio holdings at a disadvantageous time to raise cash" to satisfy obligations arising in connection with the collapse of the Trust.  Although this statement was new to the inverse floater section of the Prospectus, its basic substance had been disclosed repeatedly in prior Registration Statements.  The Funds had stated previously that they could be liable to pay for the floaters and that the Fund might need to "dispose of securities prior to their maturity . . . for liquidity purposes, or because of other factors affecting the issuer that cause the Manager to sell the particular security."[55]  It is axiomatic, as a matter of market principles, that some times are better than others for buying and selling assets.  But after the collapse of Lehman Brothers and the unprecedented convergence of increased desire to collapse inverse floater trusts and depressed

---

[54]     AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 8.

[55]     AMT-Free SAI (10/26/07) at 2; AMT-Free NY SAI (12/28/07) at 2; Cal. SAI (10/31/07) at 2; Nat'l SAI (11/28/07) at 2; NJ SAI (11/28/07) at 2; Pa. SAI (11/28/07) at 2; Rochester SAI (2/21/07) at 2.

28

market demand for most types of securities, it became more important to focus on this specific risk.  Thus, the Funds supplemented their prior disclosures to emphasize the risk of disadvantageous sales.

## IV.      THE COMPLAINTS

The similarities and differences among the seven Complaints against the Funds are best understood by noting their respective drafters, the four law firms representing the Lead Plaintiffs.[56]  Cohen Milstein and Milberg have filed the five Complaints relating to the AMT-Free, AMT-Free NY, National, New Jersey, and Rochester Funds, and all of these contain essentially the same legal claims and factual allegations.  Berger & Montague has filed the Pennsylvania Complaint, which includes some additional allegations, but also contains mostly the same content and raises the same legal claims as the others.  The Sparer Law Group has filed the California Complaint, which also contains the same legal claims, but adds a number of unique factual allegations and state law causes of action.

Plaintiffs are investors who complain of losing money in the Funds in 2008.  They purport to bring their cases on behalf of all persons who acquired shares of the Funds "traceable" to allegedly false and misleading Registration Statements and were thereby damaged.  The putative Class Periods differ for each Fund, but begin between February and September 2006 and end in October or November 2008.

Plaintiffs claim that Defendants violated sections 11, 12(a)(2), and 15 of the Securities Act and section 13(a) of the Investment Company Act because, among other things, Defendants allegedly:  (1) misrepresented the Funds' investment objectives; (2) failed to

---

[56]       *See* Appendix A, Complaint Summary Tables (identifying Plaintiff, counsel, putative Class Period, share purchase dates, Defendants, and legal claims asserted).

56855-0005/LEGAL18027345.1

disclose the extraordinary volatility of investments in complex derivative instruments like inverse floaters[57]; (3) misrepresented the percentage of Fund assets that were illiquid and the Funds' above-average illiquidity risk, and (4) misrepresented their valuation process, which overstated the value of Fund assets.[58]

Plaintiffs allege that the Funds' NAVs declined because Fund assets, "which were overstated throughout the Class Period, had to be written down to reflect their proper value."[59] Tellingly, however, Plaintiffs identify no such write-downs or overvalued assets in any of the Funds.  They also allege that the value of Fund assets was "further reduced by the materialization of previously concealed risks related to inverse floaters, which forced Defendants to sell Fund assets at fire-sale prices."  *Id*.  But again, they identify no such sales or assets in any Fund.  Finally, Plaintiffs allege the incredible conclusion that the drop in the Funds' NAVs "was not caused by general economic decline or upheaval in the credit markets," and "had Defendants' investment policies been truly guided by the [Funds'] purported investment objective, the Fund[s] would have been protected from, instead of vulnerable to" the crisis in 2008.[60]

---

[57]     The National Complaint does not make this allegation, but raises the different claim that "Defendants improperly included highly volatile derivative securities known as 'inverse floaters' in the category of municipal securities."  Nat'l Compl. ¶3.

[58]     AMT-Free Compl. ¶3; AMT-Free NY Compl. ¶3; Nat'l Compl. ¶3; NJ Compl. ¶3; Rochester Compl. ¶3; *see also* Cal. Compl. ¶¶5-21; Pa. Compl. ¶4.

[59]     AMT-Free Compl. ¶5; AMT-Free NY Compl. ¶5; Nat'l Compl. ¶5; NJ Compl. ¶5; Rochester Compl. ¶5; *see also* Cal. Compl. ¶5; Pa. Compl. ¶4.

[60]     AMT-Free Compl. ¶8; AMT-Free NY Compl. ¶7; Nat'l Compl. ¶7; NJ Compl. ¶7; Rochester Compl. ¶8; *see also* Pa. Compl. ¶14.

## ARGUMENT

I.   **LEGAL STANDARDS.**

A.   **Plaintiffs Must Allege Untrue Statements of Material Facts
or a Duty to Disclose Allegedly Omitted Material Facts.**

To state a claim under either section 11 or 12(a)(2) of the Securities Act, Plaintiffs

must allege that the Registration Statements "contained an untrue statement of a material fact

or omitted to state a material fact . . . necessary to make the statements therein not

misleading."  15 U.S.C. § 77k(a); *see also* § 77*l*(a)(2).  "A statement or omission is only

material if a reasonable investor would consider it important in determining whether to buy or

sell," *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997), and if it would

"significantly alter[] the 'total mix' of information made available," *TSC Indus., Inc. v.

Northway, Inc.*, 426 U.S. 438, 449 (1976).

The Supreme Court has warned against setting "too low a standard of materiality" and

burying shareholders "in an avalanche of trivial information – a result that is hardly conducive

to informed decisionmaking."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (citation

omitted); *see also City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1266 (10th Cir. 2001)

(noting a "proper balance between the need to insure adequate disclosure and the need to

avoid the adverse consequences of setting too low a threshold for civil liability").

"[R]easonable investors do not want to know everything that could go wrong."  *Wielgos v.

Commonwealth Edison Co.*, 892 F.2d 509, 517-18 (7th Cir. 1989).

An omission is actionable only if there is a duty to disclose the allegedly omitted

information.  *See* 15 U.S.C §§ 77k, 77*l*; *Chiarella v. United States*, 445 U.S. 222, 235 (1980).

Absent a statutory or regulatory obligation, a mutual fund has a duty to disclose information

31

only if necessary to prevent another statement from being materially misleading.  *See, e.g.*, *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 608, 612 (6th Cir. 2005).  The ICA and the SEC prescribe what mutual fund registration statements must disclose, and Plaintiffs do not contest that the Funds completely fulfilled their regulatory disclosure obligations.  Thus, to establish a duty to disclose omitted information, Plaintiffs must allege that the information was necessary in order to prevent other statements from being misleading.  And only well-pleaded and plausible allegations of fact are accepted as true for purposes of this motion.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**B.      Plaintiffs May Not Plead Falsity Using Hindsight.**

Plaintiffs may not plead materiality using hindsight.  *See, e.g.*, *Grossman*, 120 F.3d at 1124 (noting that securities claims may not be based on "fraud by hindsight"); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 165 (2d Cir. 2000) ("The determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20-20 hindsight view long after the event.") (internal citations omitted).  Thus, plaintiffs may not engage in "retrospective pleading" by "question[ing] the accuracy of the offering statement in light of the much-later materialization" of a risk.  *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669, 672 (S.D.N.Y. 2008), *aff'd*, No. 08-3398, 2009 WL 2959883 (2d Cir. Sept. 17, 2009).  Instead, Plaintiffs must plead why prior disclosures were actionable under the securities laws *at the time they were made*.  *See, e.g.*, *Grossman*, 120 F.3d at 1124; *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.) (affirming dismissal of

56855-0005/LEGAL18027345.1

complaint because "plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones").

## II.   PLAINTIFFS FAIL TO PLEAD THAT DEFENDANTS MADE ANY UNTRUE STATEMENTS OF MATERIAL FACT.

All seven Complaints include four core categories of allegations about the Funds' investment strategies:  (1) investment objectives, (2) inverse floaters, (3) illiquid securities, and (4) securities valuation.  As shown below, Plaintiffs do not plead any specific misstatements of material fact about the Funds' objectives or investments; nor do they plead that Defendants had a duty to disclose any material facts that were omitted.  For these reasons and others, the Court should dismiss these claims in their entirety.

### A.   Plaintiffs' Investment Objective Allegations Fail To State a Claim.

Aside from the National Fund, all of the Funds stated that they "seek" as high a level of current interest income exempt from federal and state income taxes "as is consistent with preservation of capital" or "while attempting to preserve capital."[61]  Notwithstanding the robust disclosures in the Registration Statements regarding the Funds' specific investment strategies and risks, Plaintiffs spend much of their Complaints alleging that the Funds' one-sentence investment objectives were rendered misleading by the fact that the Funds followed the very strategy they had disclosed.  Plaintiffs claim that Defendants misrepresented the

---

[61]   AMT-Free Prospectus (10/26/07) at 3; AMT-Free NY Prospectus (12/28/07) at 3; Cal. Prospectus (10/31/07) at 3; NJ Prospectus (11/28/07) at 3; Pa. Prospectus (11/28/07) at 3; *see also* Rochester Prospectus (2/21/07) at 3.  The National Fund's investment objective does not mention preservation of capital, but instead, explicitly announces its intent to invest in "a diversified portfolio of high-yield municipal securities."  Nat'l Prospectus (11/28/07) at 3.  Thus, this argument does not apply to the National Complaint.

Funds' risk profile and failed to disclose that it was "wholly inconsistent with the . . . purported objective of preserving capital."[62]

These claims fail to allege "an untrue statement of material fact" for two reasons. First, courts consistently have held that investors cannot base a securities law claim simply on aspirational expressions of investment goals. Second, the surrounding context, which detailed how the Funds intended to achieve their goals, demonstrates that there was nothing misleading about the investment objectives.

> 1.   Aspirational Expressions of Investment Goals
>       Cannot Be Untrue Statements of Material *Fact*.

Several courts have rejected the exact claim Plaintiffs bring here. For example, in *In re Alliance North America Government Income Trust, Inc. Sec. Litig.*, No. 95-330, 1996 WL 551732 (S.D.N.Y. Sept. 27, 1996), the court dismissed plaintiffs' complaint, explaining:

> The investment objective announces the goal of the Fund, rather than a promise to investors. The investment objective is not the type of statement that a reasonable investor would consider important in deciding whether or not to invest. . . . Such general, forward looking statements, which make no promise to investors, are not actionable under the securities laws.

*Id.* at *4; *see also In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 338 (S.D.N.Y. 1996) (finding not misleading a mutual fund's statement that its investment objective "is to earn a high level of current income while maintaining relatively low volatility of principal"). The Tenth Circuit similarly has held that "generalized statements of optimism that are not capable of objective verification" are not actionable under the securities laws. *Grossman*, 120 F.3d at 1119.

---

[62]   AMT-Free Compl. ¶80; AMT-Free NY Compl. ¶73; NJ Compl. ¶74; Rochester Compl. ¶75; *see also* Cal. Compl. ¶5; Pa. Compl. ¶59.

Thus, claims based on investment objectives fail as a matter of law.  The reason for this is that investment objectives are forward-looking statements that broadly describe what the Funds hope to accomplish.  They are not promises or guarantees.  Indeed, the Funds expressly warned investors that there is "the risk that poor security selection by [the Manager] will cause the Fund to underperform other funds having a similar objective"[63]; that "there is no assurance that the Fund will achieve its investment objective"[64]; and that the Funds' "*risks mean that you can lose money by investing in the Fund*."  *Id*. (emphasis in original).[65]

> 2.    The Objectives Were Not Misleading Because the Registration Statements Explained How the Funds Would Pursue Their Goals.

Plaintiffs' investment objective claim also fails because Plaintiffs improperly seek to wrench one particular phrase – "preservation of capital" – out of context.  The entire content of the Registration Statements informs the meaning of the Funds' investment objectives.  As shown below, the objectives are not misleading when read in context with the total mix of the Funds' disclosures about their investment strategies.

To assess whether statements are materially misleading, they must be considered in "the context in which the statements were made."  *Grossman*, 120 F.3d at 1121.  Thus, the

---

[63]    AMT-Free Prospectus (10/26/07) at 4; AMT-Free NY Prospectus (12/28/07) at 4; Cal. Prospectus (10/31/07) at 4; Nat'l Prospectus (11/28/07) at 4; NJ Prospectus (11/28/07) at 4; Pa. Prospectus (11/28/07) at 4; Rochester Prospectus (2/21/07) at 4.

[64]    AMT-Free Prospectus (10/26/07) at 6; AMT-Free NY Prospectus (12/28/07) at 9; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 9; NJ Prospectus (11/28/07) at 9; Pa. Prospectus (11/28/07) at 9; Rochester Prospectus (2/21/07) at 8.

[65]    The District of Massachusetts recently issued a decision that is at odds with both *Alliance* and *TCW/DW*.  *See In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. 08-11064, 2010 WL 1253114 (D. Mass. Mar. 31, 2010).  Even the *Evergreen* court recognized, however, that an investment objective must be considered in context with the fund's other statements. *See id*. at *4.  As discussed above, the other statements the Funds made here give meaning to the investment objectives and make clear that the objectives were not materially misleading.

Registration Statements "must be read as a whole" and the central issue "is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the [securities]."  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of 'defendants' representations, taken together and in context.'") (citation omitted).

In *Tabankin v. Kemper Short-Term Global Income Fund*, No. 93-5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994), for instance, the court held that a "securities fraud claim [based] on a general statement of the Fund's objective" fails "when the Prospectus clearly states that there is no assurance that the objective will be achieved, goes on to list specific risks associated with the particular Fund, and plaintiffs' loss results from those risks."  *Id.* at *5.  The *Tabankin* court held that the investment objective was not misleading because "other statements in the Prospectus give meaning to the general 'prudent investment management' standard."  *Id.* at *4.  Similarly, in *Yu v. State Street Corp.*, No. 08-8235, 2010 WL  668645 (S.D.N.Y. Feb. 25. 2010), the court recently dismissed plaintiffs' claim based on the investment objective, explaining that "plaintiffs have failed to allege that this general statement was material in light of the context of the totality of the information disclosed in the prospectus and available in the marketplace."  *Id*. at *5; *see also Abrams v. Van Kampen Funds, Inc*., No. 01-7538, 2004 WL 1433620, at *9 (N.D. Ill. June 25, 2004) (noting that the investment objective of "preservation of capital" was not misleading because "plaintiffs point

36

to no evidence that, contrary to a goal of preserving capital, Defendants invested in riskier loans than had been represented").

Here, the Registration Statements described each of the principal strategies the Funds used to pursue their investment objectives, as required by Form N-1A.  The Prospectuses announced that the Funds would pursue their investment objective by seeking out municipal securities offering high current income, including junk bonds, unrated bonds,[66] tobacco bonds, inverse floaters, and other opportunities for value.[67]  The Registration Statements described not only these various strategies, but also listed each investment they selected.  Far from misleading investors about the Funds' goals, taken together, all of these disclosures defined and explained in detail the specific means by which the Funds' pursued their investment objectives.

In the hopes of creating a claim, Plaintiffs simply assert that the Funds should have chosen dramatically different strategies of Plaintiffs' choosing.  To their eye, the phrase "preservation of capital" necessarily implied that "the Fund would assemble a portfolio of securities that was designed to weather what can only be termed the inevitable periods of turbulence in capital markets."[68]  Plaintiffs' desired portfolio, built in hindsight, would have

---

[66]    The Complaints also mention the Funds' investments in unrated bonds, although they do not connect them with any alleged misrepresentation.  *See* AMT-Free Compl. ¶44; AMT-Free NY Compl. ¶37; Cal. Compl. ¶12; NJ Compl. ¶38; Rochester Compl. ¶39.  The Funds had no limit on the amount of unrated bonds they could hold.  For this and other reasons set out in the CA and PA Brief, Defendants made no untrue statements of material fact regarding their investments in unrated bonds.

[67]    *See* AMT-Free Prospectus (10/26/07) at 3-5; AMT-Free NY Prospectus (12/28/07) at 3-8; Cal. Prospectus (10/31/07) at 3-8; NJ Prospectus (11/28/07) at 3-8; Pa. Prospectus (11/28/07) at 3-8; Rochester Prospectus (2/21/07) at 3-8.

[68]    AMT-Free Compl. ¶50; AMT-Free NY Compl. ¶44; NJ Compl. ¶45; Rochester Compl. ¶45; *see also* Cal. Compl. ¶63; Pa. Compl. ¶138.

been comprised entirely of "low volatility, highly liquid" assets.[69]  But Plaintiffs do not get to choose or define the Funds' goals or their holdings based on their subjective opinions; the Funds clearly chose very different strategies and investments, which embodied the best means, in their judgment, to achieve their goals.  Plaintiffs' convenient, backward-looking opinion that other strategies would have been better does nothing to undermine the truthfulness of the Registration Statements.  Nor can they assert a claim by offering their own abstract definition of "capital preservation," which entirely ignores both the remainder of the investment objective – to maximize tax-exempt income – as well as the specific strategies and risks the Funds disclosed.  In the end, there was no secret about the Funds' goals or their approach, as attested to by (1) the Funds' performance; (2) the extensive press commentary discussed above that repeatedly *contrasted* the Funds' unique holdings and risks with Plaintiffs' proposed "low volatility, highly liquid" portfolio; and (3) the Funds' own repeated warnings of volatility risk.  *See infra* Arg. II.B.1.b.

Had Plaintiffs truly wanted to forego high income to pursue their desired approach to capital preservation, they could have invested elsewhere; money-market funds and Oppenheimer's less risky variety of municipal bond funds[70] are but two examples among hundreds that Plaintiffs could have chosen, but did not.  Having opted to enjoy the upsides of

---

[69]     AMT-Free Compl. ¶81; AMT-Free NY Compl. ¶74; Cal. Compl. ¶63; NJ Compl. ¶75; Pa. Compl. ¶76; Rochester Compl. ¶76.

[70]     The Funds advised investors that the Oppenheimer fund complex includes a less risky variety of municipal bond funds exempt from California, New York, and federal taxes.  *See* AMT-Free NY MCAR (9/30/07) at 14 (Larrabee Decl., Ex. A-20); Cal. MCAR (7/31/07) at 13 (Larrabee Decl., Ex. A-21).  These "limited term" funds invest more of their assets in investment-grade municipal bonds and are managed to limit volatility.  *Id*.  The existence of these alternatives with comparable but less risky goals further illuminates the meaning of the Funds' investment objectives.  *See, e.g., Yu*, 2010 WL 668645, at *5.

38

a well-described, higher risk investment, Plaintiffs may not now pursue a claim complaining about those risks after they materialized.

**B.      Plaintiffs' Inverse Floater Allegations Fail To State a Claim.**

Plaintiffs allege several misrepresentations about inverse floaters, but they fail to state a claim for three reasons.  First, Defendants' disclosures provided both general information about the Funds' inverse floater holdings and their risks, as well as detailed and specific warnings about volatility and leverage.  Second, Plaintiffs' allegations based on the October 2008 Supplement fail to identify any untrue statements of material fact in the Funds' earlier public filings.  Finally, the National Fund Plaintiff's allegation that inverse floaters are not municipal securities is misguided.

1.      Defendants Disclosed All Material Facts about Inverse Floaters.

a.      *Defendants Disclosed the Riskiness of Inverse Floaters and Listed Their Specific Inverse Floater Holdings.*

The Funds disclosed the principal risks of inverse floaters.  As an initial matter, they prominently described the "Main Risks" of municipal securities generally.  For instance, the Funds disclosed that their investments are subject to "credit risk," *i.e.*, the "risk that the issuer of a municipal security might not make interest and principal payments on the security as they become due."[71]  Likewise, the Funds disclosed that their investments are subject to "interest rate risk."  They stated that municipal securities are "subject to changes in value when prevailing interest rates change.  When prevailing interest rates fall, the values of already-issued municipal securities rise.  When prevailing interest rates rise, the value of already-

---

[71]      AMT-Free Prospectus (10/26/07) at 4; AMT-Free NY Prospectus (12/28/07) at 5; Cal. Prospectus (10/31/07) at 5; Nat'l Prospectus (11/28/07) at 4-5; NJ Prospectus (11/28/07) at 4-5; Pa. Prospectus (11/28/07) at 4-5; Rochester Prospectus (2/21/07) at 4-5.

39

issued municipal securities generally fall and the securities may sell at a discount from their face amount." *Id.*

In addition, the Funds described the risks associated with derivatives, including inverse floaters. Their disclosures included the following:

> If the issuer of the derivative instrument does not pay the amount due, the Fund can lose money on its investment. Also, *the underlying security or instrument on which the derivative is based, and the derivative itself, may not perform the way the Manager expected it to perform.* If that happens, the Fund will get less income than expected or its share price could decline. . . . *[U]sing derivatives can increase the volatility of the Fund's share prices. Some derivatives may be illiquid, making it difficult for the Fund to sell them quickly at an acceptable price.*[72] (emphases added).

The Funds also described the specific risks of inverse floaters in a prominent section entitled in all capital letters: "INVERSE FLOATERS." The Funds disclosed, for instance, that inverse floaters "pay interest that moves in the opposite direction of the yield on the short-term floating rate security."[73] Thus, "as short-term interest rates rise, inverse floaters produce less current income (and, in extreme cases, may pay no income) and as short-term interest rates fall, inverse floaters produce more current income." *Id.*

The Funds also disclosed that their "investments in inverse floaters may involve additional risks," including: (1) volatility ("the market value of inverse floaters can be more volatile than that of a conventional fixed-rate bond"); (2) sensitivity to long term interest-rates ("inverse floaters tend to underperform fixed rate bonds in a rising long-term interest rate

---

[72]     AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7; Cal. Prospectus (10/31/07) at 8; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 7-8.

[73]     AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7-8; Cal. Prospectus (10/31/07) at 8-9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8-9; Pa. Prospectus (11/28/07) at 8-9; Rochester Prospectus (2/21/07) at 7.

environment, but tend to outperform fixed rate bonds in a falling or stable long-term interest rate environment"); and (3) leverage. *Id*.  With respect to leverage, the Funds disclosed:

> *Inverse floaters all entail some form of leverage*.  An inverse floater that has a higher degree of leverage usually is *more volatile* with respect to its price and income than an inverse floater that has a lower degree of leverage. *Id*. (emphases added).

Beyond disclosing the risks associated with inverse floaters, the Registration Statements provided detailed information about the Funds' inverse floater holdings.  The Statements of Investments listed the individual and total dollar amounts of the Funds' inverse floater investments. *See, e.g*., AMT-Free SAI (10/26/07) at 141, 150-52 (listing the total value of inverse floater investments of $143 million out of a total of $3.2 billion in Fund assets).[74]  These Statements also listed the amounts of the corresponding short-term floater liabilities and the value of the underlying municipal bonds. *See, e.g*., *id*. at 151 ("At July 31, 2007, municipal bond holdings with a value of $645,439,588 shown on the Fund's Statement of Investments are held by such Trusts and serve as collateral for the $502,650,000 in short-term floating rate notes issued and outstanding at that date.").  And consistent with accounting guidelines, the amounts payable for short-term floaters are listed in the Statement of Liabilities.[75]

---

[74]     We use the AMT-Free Fund for illustrative purposes only.  All of the Registration Statements contain the same information. *See* AMT-Free NY SAI (12/28/07) at 124-25; Cal. SAI (10/31/07) at 135-36; Nat'l SAI (11/28/07) at 160-64; NJ SAI (11/28/07) at 131-32; Pa. SAI (11/28/07) at 129-31; Rochester SAI (2/21/07) at 155-57.

[75]     AMT-Free SAI (10/26/07) at 141; AMT-Free NY SAI (12/28/07) at 114; Cal. SAI (10/31/07) at 126; Nat'l SAI (11/28/07) at 151; NJ SAI (11/28/07) at 122; Pa. SAI (11/28/07) at 120; Rochester SAI (2/21/07) at 144.

   b.  *Defendants Disclosed the Volatility and*
     *Interest Rate Risks of Inverse Floaters.*

  Despite these extensive disclosures, Plaintiffs allege that Defendants failed to

characterize "the extraordinary volatility" of inverse floaters and to disclose that the "success

[of inverse floaters] depended on steady or falling interest rates."[76] Plaintiffs' allegations are

refuted by the numerous, prominent risk disclosures in the Funds' Registration Statements.

*See, e.g.*, *Olkey*, 98 F.3d at 5, 9 (affirming dismissal of Securities Act claims where a

"reasonable investor could not have read the prospectus without realizing" the risks of

mortgage-backed securities); *Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*, No. 07-

10528, 2010 WL 148617, at *8 (S.D.N.Y. Jan. 14, 2010) (finding that the "disclosure of

information alleged in the Complaint to have been withheld" renders the claims "insufficient

as a matter of law"); *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 176-77

(S.D.N.Y. 1996) (dismissing securities claims based on an alleged failure to disclose inverse

floater risks where volatility and interest rate risks were disclosed).

  For instance, Plaintiffs' allegation that the Funds failed to disclose the "extraordinary

volatility" of inverse floaters is refuted by the Funds' disclosures:[77]

- "The market value of inverse floaters can be *more volatile* than that of a conventional fixed-rate bond having similar credit quality, redemption provisions and maturity."[78] (emphasis added).

---

[76] AMT-Free Compl. ¶¶48, 90; AMT-Free NY Compl. ¶¶42, 82; Nat'l Compl. ¶¶44, 80; NJ Compl. ¶¶43, 83; Rochester Compl. ¶¶43, 85; *see also* Cal. Compl. ¶147; Pa. Compl. ¶4.

[77] Plaintiffs' claim also fails because funds need not use pejorative language, *e.g.*, "extraordinary volatility." *See, e.g.*, *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 181 (D.D.C. 2007); *In re RAC Mortgage Inv. Corp. Sec. Litig.*, 765 F. Supp. 860, 864 (D. Md. 1991).

- "Inverse floaters all entail some degree of leverage.  An inverse floater that has a higher degree of leverage usually is *more volatile* with respect to its price and income than an inverse floater that has a lower degree of leverage."  *Id*. (emphasis added).

- "The interest rate on inverse floaters varies inversely at a pre-set multiple of the change in short-term rates.  An inverse floater that has a higher multiple, and therefore more leverage, will be *more volatile* with respect to both price and income than an inverse floater with a lower degree of leverage or than the underlying security."[79] (emphasis added).

- "An additional risk of investing in municipal securities that are derivative instruments is that their *market value could be expected to vary to a much greater extent* than the market value of municipal securities that are not derivative instruments but have similar credit quality, redemption provisions and maturities."[80] (emphasis added).

The Registration Statements likewise refute Plaintiffs' claim that the Funds failed to disclose that inverse floaters' "success" depended upon steady or falling interest rates:

- "When prevailing interest rates rise, the value of already-issued municipal securities generally fall and the securities may sell at a discount from their face amount."[81]

- "As short-term interest rates rise, inverse floaters produce less current income (and in extreme cases, may produce no income)."[82]

---

[78]     AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7-8; Cal. Prospectus (10/31/07) at 8-9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8-9; Pa. Prospectus (11/28/07) at 8-9; Rochester Prospectus (2/21/07) at 7-8.

[79]     AMT-Free SAI (10/26/07) at 10-11; AMT-Free NY SAI (12/28/07) at 18-19; Cal. SAI (10/31/07) at 17-18; Nat'l SAI (11/28/07) at 11-12; NJ SAI (11/28/07) at 24-25; Pa. SAI (11/28/07) at 18-19; Rochester SAI (2/21/07) at 30-31.

[80]     AMT-Free SAI (10/26/07) at 17; AMT-Free NY SAI (12/28/07) at 25; Cal. SAI (10/31/07) at 24; Nat'l SAI (11/28/07) at 17; NJ SAI (11/28/07) at 30; Pa. SAI (11/28/07) at 24; Rochester SAI (2/21/07) at 31.

[81]     AMT-Free Prospectus (10/26/07) at 4; AMT-Free NY Prospectus (12/28/07) at 5; Cal. Prospectus (10/31/07) at 5; Nat'l Prospectus (11/28/07) at 5; NJ Prospectus (11/28/07) at 5; Pa. Prospectus (11/28/07) at 5; Rochester Prospectus (2/21/07) at 5.

[82]     AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7-8; Cal. Prospectus (10/31/07) at 8-9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8-9; Pa. Prospectus (11/28/07) at 8-9; Rochester Prospectus (2/21/07) at 7-8.

43

- "Inverse floaters tend to underperform fixed rate bonds in a rising long-term interest rate environment, but tend to outperform fixed rate bonds in a falling or stable long-term interest rate environment." *Id.*

Hoping to avoid dismissal outright, Plaintiffs are left clinging to the argument that the Funds misstated that the market value of inverse floaters "*can* be more volatile" than conventional bonds and "concealed the fact that inverse floaters are *necessarily* more volatile" than conventional bonds.[83] This argument fails as a matter of fact and law.

As an initial matter, the Statement of Investments stated that the price of inverse floaters "*is* more volatile than comparable fixed rate securities."[84] (emphasis added). Thus, the Funds used the very words that Plaintiffs claim were omitted. Moreover, Plaintiffs may not base a securities claim on the Funds' use of "can" instead of "is." The use of the auxiliary verb "can" does not alter the meaning of the disclosure. *See In re RAC Mortgage Inv. Corp.*, 765 F. Supp. at 864 ("[T]he choice of verbs [can or shall] cannot be said to have been false or misleading."). In context, the use of "can" is immaterial. *See In re Thornburg Mortgage, Inc. Sec. Litig.*, No. 07-0815, 2010 WL 378300, at *42 (D.N.M. Jan. 27, 2010) (stating that a company "may" be subject to margin calls when it already had been is not misleading). Here, Defendants disclosed that inverse floaters can be volatile; that they are derivatives, which have volatility risks; and that they all have leverage, and those with more leverage are more volatile. In this context, the use of the word "can" is immaterial as a matter of law.

---

[83]   AMT-Free Compl. ¶¶67, 100(b); AMT-Free NY Compl. ¶¶60, 92(b); Nat'l Compl. ¶¶62, 90(b); NJ Compl. ¶¶61, 93(b); Rochester Compl. ¶¶62, 96(b); *see also* Cal. Compl. ¶¶150, 163; Pa. Compl. ¶¶128, 133, 140.

[84]   *See, e.g.*, AMT-Free SAI (10/26/07) at 150; AMT-Free NY SAI (12/28/07) at 123; Cal. SAI (10/31/07) at 135; Nat'l SAI (11/28/07) at 160; NJ SAI (11/28/07) at 131; Pa. SAI (11/28/07) at 129; Rochester SAI (2/21/07) at 154.

c.    *Defendants Had No Duty To Calculate the Leverage Ratio and Disclosed All of the Underlying Facts.*

Plaintiffs next allege that none of the Registration Statements "discussed or even revealed the range (or average) of the leverage of the inverse floaters that the Fund created or purchased."[85]  This allegation fails for two separate reasons.

First, mutual funds have no duty to calculate and disclose their leverage ratios. Plaintiffs point to no law, regulation, or SEC guidance mandating any such disclosure in connection with inverse floater investments or any other investment.  Nor do they claim that any statement the Funds made was rendered misleading by the Funds' failure to calculate and disclose their leverage ratios.  Absent such allegations, this claim fails.

Second, the claim fails because the Funds provided investors with all the facts they needed to figure out the precise extent of leverage in each Fund's inverse floater portfolio. Plaintiffs state that leverage is "the ratio of the dollar size of the floater to the dollar size of the inverse floater."[86]  The Statements of Investments provided investors with this very information.  They disclosed the total dollar amount of each Fund's inverse floaters and floaters, and an investor easily could divide the two numbers to get the overall leverage ratio of the Fund's inverse floater investments.[87]  *See, e.g.*, AMT-Free SAI (10/26/07) at 151-52

---

[85]    AMT-Free Compl. ¶66; AMT-Free NY Compl. ¶59; Nat'l Compl. ¶61; NJ Compl. ¶60; Rochester Compl. ¶61; *see also* Cal. Compl. ¶142; Pa. Compl. ¶122.

[86]    AMT-Free Compl. ¶65; AMT-Free NY Compl. ¶59; Nat'l Compl. ¶61; NJ Compl. ¶60; Rochester Compl. ¶60; *see also* Cal. Compl. ¶142; Pa. Compl. ¶122.

[87]    Similarly, Defendants disclosed the information necessary to calculate the leverage ratio for individual inverse floater investments.  The Statement of Investments itemized inverse floater investments, listing the values of each inverse floater and the corresponding underlying bonds. *See, e.g.*, AMT-Free SAI (10/26/07) at 138; AMT-Free NY SAI (12/28/07) at 112; Cal. SAI (10/31/07) at 124; Nat'l SAI (11/28/07) at 148; NJ SAI (11/28/07) at 120; Pa. SAI (11/28/07)

45

(the Fund had a total of $143 million in inverse floaters and had issued a total of $503 million in floaters – dividing these numbers yields a leverage ratio of 3.52 for its inverse floater investments).[88]

Because the Funds disclosed this information, Plaintiffs' allegations boil down to a claim that the Funds should have "done the math" for investors. Any such theory fails as a matter of law. *See, e.g.*, *Field v. Trump*, 850 F.2d 938, 949 (2d Cir.1988) ("failure to perform . . . calculation for investors" does not materially alter the total mix of information); *Ash v. LFE Corp.*, 525 F.2d 215, 219 (3d Cir 1975) (omitting the difference between old and new numbers in a proxy solicitation is not material; holding otherwise would require one to "assume that stockholders cannot perform simple subtraction").

### d.  The Funds Did Not Violate Their Asset Limits on Inverse Floater Investments.

Plaintiffs also allege that the leverage associated with the inverse floaters caused the Funds to exceed their limit on inverse floater holdings.[89] Specifically, Plaintiffs claim that the Funds' statements that they "may invest up to 20% of [their] assets in 'inverse floaters'" were

---

at 118; Rochester SAI (2/21/07) at 141. An investor needed only to subtract the value of the inverse floater from the value of the underlying bond to get the value of the floaters and the corresponding leverage ratio. The Pennsylvania Plaintiff appears to have performed this very exercise to get the figures cited in that Complaint. *See* Pa. Compl. ¶¶124-25.

[88]  We use the AMT-Free Fund for illustrative purposes, but all seven Funds provide investors with the same information. *See* AMT-Free NY SAI (12/28/07) at 124-25; Cal. SAI (10/31/07) at 135-36; Nat'l SAI (11/28/07) at 160-64; NJ SAI (11/28/07) at 131-32; Pa. SAI (11/28/07) at 129-31; Rochester SAI (2/21/07) at 155-57.

[89]  AMT-Free Compl. ¶100; AMT-Free NY Compl. ¶92; Nat'l Compl. ¶91; NJ Compl. ¶93; Rochester Compl. ¶96; *see also* Cal. Compl. ¶151; Pa. Compl. ¶133.

56855-0005/LEGAL18027345.1

misleading.[90]  Plaintiffs assert that the actual "exposure" was "many times greater" than 20% due to leverage.[91]  These allegations fail for two reasons.

First, Plaintiffs admit that each Fund complied with the stated terms of their policy when they acknowledge that each Fund "may have limited its investment in inverse floaters to 20% of its assets."  *Id.*  This concession wholly undermines Plaintiffs' claim that the Funds misrepresented that they would limit their inverse floater investments to 20% of assets.  Second, Plaintiffs' claim fails because it wrongly tries to re-characterize the Funds' limit of 20% of *assets* as a limit on the Funds' *exposure*.  The Funds clearly defined the 20% limit as a percentage of total *assets*.  Because Plaintiffs' allegations regarding the Funds' exposure relate to the Fund's *liabilities*, they do not state a claim.  *See supra*, Facts II.B.3.

> 2.  Plaintiffs' Allegations Based on Additional Details from the October 2008 Supplement Fail To State a Claim.

Plaintiffs assert several other allegations related to inverse floaters based on statements from the October 2008 Supplement.[92]  Specifically, Plaintiffs allege that until October 2008, Defendants failed to disclose that they could be required to "provide additional collateral or to sell other portfolio holdings at a disadvantageous time to raise cash as a result of [their]

---

[90]  The limit on inverse floaters was 20% of assets for six of the Funds.  *See* AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7; Cal. Prospectus (10/31/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 7.  The limit on inverse floaters was 35% of assets for the National Fund.  *See* Nat'l Prospectus (11/28/07) at 8.

[91]  AMT-Free Compl. ¶100(a); AMT-Free NY Compl. ¶92(a); Nat'l Compl. ¶90(a); NJ Compl. ¶93(a); Rochester Compl. ¶96(a); *see also* Cal. Compl. ¶151; Pa. Compl. ¶133(a).

[92]  AMT-Free Compl. ¶88; AMT-Free NY Compl. ¶80; Nat'l Compl. ¶78; NJ Compl. ¶81; Rochester Compl. ¶83; *see also* Cal. Compl. ¶155 (referring to the California Fund's Nov. 28, 2008 registration statement, which incorporated the information disclosed in the Oct. 21, 2008 supplement); Pa. Compl. ¶139 (same for Pennsylvania Fund).

47

investments in inverse floaters."[93]  Improvising from this allegation of forced sales, Plaintiffs make essentially the same claim with respect to a subset of inverse floaters that involved agreements called "shortfall and forbearance agreements."

These allegations fail to state a claim for three general reasons.  First, the October 2008 Supplement merely explained in greater detail how previously disclosed risks, including the possibility of forced sales, could materialize in unprecedented economic conditions.  Second, Defendants had no duty to disclose every scenario that could lead to disadvantageous sales.  Finally, Plaintiffs' other inverse floater allegations about shortfall and forbearance agreements or additional collateral requirements identify no untrue statements of material fact.

a.    *Defendants Disclosed the Risk of Being Forced To Sell Assets at Disadvantageous Times.*

Plaintiffs allege that until October 2008, Defendants failed to disclose that "[d]uring times of market volatility, illiquidity or uncertainty, the Fund[s] could be required to sell other portfolio holdings at a disadvantageous time to raise cash to meet [their] obligation" to floater holders if an inverse floater trust were collapsed.  This allegation fails to state a claim because the Registration Statements had already disclosed this very risk.  Specifically, the Funds had disclosed that they do "not usually intend to dispose of securities prior to their maturity, but may do so for liquidity purposes, or because of other factors affecting the issuer that cause the

---

[93]      AMT-Free Compl. ¶89; AMT-Free NY Compl. ¶81; Nat'l Compl. ¶79; NJ Compl. ¶82; Rochester Compl. ¶84; *see also* Cal. Compl. ¶19; Pa. Compl. ¶132.

48

Manager to sell the particular security."[94]  In addition, the Funds had disclosed the risk that

inverse floater trusts could be collapsed, in which case the Funds would have to pay the value

of the short-term bonds.[95]  Thus, the Registration Statements warned of the same risks that the

October 2008 Supplement merely described in greater detail in light of the financial crisis.

Even if the October 2008 Supplement portrayed these risks more clearly than prior filings,

that would not be sufficient to state a claim.  *See Greenapple v. Detroit Edison Co.*, 618 F.2d

198, 211 (2d Cir. 1980) (although "the quality of the disclosure could have been improved,"

this "does not render what was done deceptive or misleading"); *In re RAC Mortgage*, 765 F.

Supp. at 864 (rejecting the argument that a clearer revision rendered an earlier disclosure

misleading).  Accordingly, Plaintiffs' allegations should be dismissed.

> **b.**  **Defendants Had No Duty To Guess the Market Conditions That Might Lead to the Materialization of Disclosed Risks.**

Plaintiffs next allege that Defendants should have disclosed prior to October 2008 the

risk that a remarketing agent may collapse an inverse floater trust.  This allegation fails for

two reasons.

First, the Funds had already disclosed the relevant risks.  Specifically, they had

disclosed that a trust might be collapsed, that the Funds had liabilities equal to the value of the

floaters, that upon collapse they might have to pay some of those liabilities, and that the Finds

might need to sell assets to generate liquidity.  The Funds were not required to disclose every

---

[94]    AMT-Free SAI (10/26/07) at 2; AMT-Free NY SAI (12/28/07) at 2; Cal. SAI (10/31/07) at 2; Nat'l SAI (11/28/07) at 2; Pa. SAI (11/28/07) at 2; Rochester SAI (2/21/07) at 2; *see also* NJ SAI (11/28/07) at 2.

[95]    AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 8.

way in which these risks might materialize.  As the Southern District of New York has explained, "when defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves."  *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 588 (S.D.N.Y. 1993); *see also In re Worlds of Wonder Sec. Litig.*, 814 F. Supp 850, 861 (N.D. Cal. 1993) (finding no duty to disclose "every possible risk, no matter how slight, that may have arisen in the future").  Indeed, if the Funds were required to disclose every way in which the various disclosed risks might come to pass, then the prospectus would become a meaningless "avalanche" of speculation that would "bury stockholders" in an excess of soft information.  *Garcia v. Cordova*, 930 F.2d 826, 829 (10th Cir. 1991); *see also In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) (registration statement "need not predict all of the detail of the contingency that came to pass" because "[s]uch an approach would be impractical").

Second, Plaintiffs' allegations fail because they amount to nothing more than impermissible pleading by hindsight.  Specifically, Plaintiffs point to the Supplement and essentially assert that it should have been issued earlier.  But the Tenth Circuit requires more than comparisons of "before" and "after" disclosures.  Rather, "a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*."  *City of Philadelphia*, 264 F.3d at 1260 (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548-49 (9th Cir. 1994)) (emphasis in original); *see also Yu*, 2010 WL 668645, at *6 ("Of course, from our vantage point on the other side of the financial crisis, it is conventional wisdom that highly rated, investment grade securities were exposed to risks that the rating agencies did not perceive.").

50

Here, Plaintiffs do not explain how the earlier disclosures were misleading.[96] They merely allege – based solely on hindsight – that disclosures made in October 2008 should have been made earlier. Because Plaintiffs' allegations are nothing more than pleading by hindsight, they fail to state a claim. Moreover, it would subvert the purpose of the securities laws to allow suits against the Funds based upon allegations like these. To impose liability based on the Supplement would do nothing but chill subsequent disclosures and deter investment companies from explaining how already-disclosed risks could materialize in new ways. *See In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 691 n.6 (S.D.N.Y. 2004) (drawing a negative inference based on "subsequent remedial measures would do nothing but dissuade restatements and corrections of financial data").

   c. *Plaintiffs' Allegations about Shortfall and Forbearance Agreements Identify No Untrue Statement of Material Fact.*

Next, Plaintiffs allege that Defendants entered into certain agreements, called shortfall and forbearance agreements, but failed to disclose that "the Fund would be forced to sell the underlying bond as well as other securities from its portfolio to satisfy its contractual obligations, regardless of market conditions."[97] As an initial matter, this allegation ignores

---

[96] "The securities laws do not require clairvoyance in the preparation of offering documents." *Panther Partners*, 538 F. Supp. 2d at 664. Here, Plaintiffs fault Defendants for failing to disclose a possibility – the collapse of a trust by a remarketing agent – that was unforeseeable prior to 2008. Indeed, collapse by a remarketing agent would occur only if the highly-liquid market for the short-term floaters suddenly dried up and remarketing agents were unable to resell the floaters. Until the fall of 2008, there is no evidence that these events were anything but unforeseeable. Although Plaintiffs strain credulity by suggesting that the 2008 market crisis was foreseeable because the world has gone through financial crises in the past, they do not allege that the Funds knew or should have known that the highly liquid floater market would dry up or that trading in short-term floating rate securities would cease entirely.

[97] AMT-Free Compl. ¶70; AMT-Free NY Compl. ¶63; Nat'l Compl. ¶65; NJ Compl. ¶64; Rochester Compl. ¶65; *see also* Pa. Compl. ¶130.

the fact that such a scenario did not, and would not, occur "regardless of market conditions," but only in extraordinary circumstances comparable to the 2008 credit crisis.  In any event, Plaintiffs' claims again are refuted by the Funds' disclosures.

Defendants repeatedly disclosed the risks associated with shortfall and forbearance agreements.  In fact, the Registration Statements used the same language as the Supplement to disclose that the Funds could be liable for the shortfall between the amount due to short-term floater holders and the value of the trust's underlying bond:

> The Fund may also enter into "shortfall and forbearance" agreements with respect to inverse floaters.  Under those agreements, on liquidation of the trust, the Fund is committed to pay the difference between the liquidation value of the underlying municipal [security] on which the inverse floater is based and the principal amount payable to the holders of the short-term floating rate security that is based on the same underlying municipal security.[98]

Defendants explained that they took this "risk" because shortfall and forbearance agreements "may offer higher interest payments than a standard inverse floater."[99]  *See Blackmoss Invs.*, 2010 WL 148617, at *6.

Having failed to allege that the Funds failed to disclose any untrue fact about the risks of shortfall and forbearance agreements, Plaintiffs' allegations reduce to opinions that the Funds did not segregate cash (or readily marketable securities) sufficient to cover their obligations under the agreements and that the Manager failed to monitor the potential

---

[98]   AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7-8; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 8.

[99]   AMT-Free SAI (10/26/07) at 11-12; AMT-Free NY SAI (12/28/07) at 19; Cal. SAI (10/31/07) at 18; Nat'l SAI (11/28/07) at 12; NJ SAI (11/28/07) at 25; Pa. SAI (11/28/07) at 19; Rochester SAI (2/21/07) at 31.

exposure.[100]  But these allegations also fail to state a disclosure claim.  As an initial matter, the allegations are unsupported by any factual allegations.  Plaintiffs do not identify any particular floater arrangement that allegedly was unsupported by sufficient cash or any other facts to support their bald assertion.  Nor do they allege facts that would make plausible their conclusory allegation that the Manager failed to monitor the Funds' obligations.

More significantly, Plaintiffs cannot base a disclosure claim on the Funds' alleged failure to segregate sufficient assets or the Manager's allegedly poor job of monitoring.  As discussed more fully below, *see infra* Arg. III.A, Plaintiffs cannot recover under federal securities laws for purported mismanagement and "may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach." *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007).  But Plaintiffs seek to do just that.  Accordingly, their claims fail.

### d.      Plaintiffs' Allegations about Collateral Fail To State a Claim.

Finally, Plaintiffs allege that "unbeknownst to investors," the sponsor of the inverse floater trust "had the right to – and often did – require the Fund at any time to provide additional collateral if the Sponsor believed that the underlying collateral was insufficient to meet the potential obligations that could arise to the holders of the floaters."[101]  Once again, Plaintiffs fail to state a claim.

---

[100]      AMT-Free Compl. ¶100(d); AMT-Free NY Compl. ¶92(d); Cal. Compl. ¶150; Nat'l Compl. ¶90(d); NJ Compl. ¶93(d); Pa. Compl. ¶133; Rochester Compl. ¶96(c).

[101]      AMT-Free Compl. ¶72; AMT-Free NY Compl. ¶65; Nat'l Compl. ¶67; NJ Compl. ¶66; Rochester Compl. ¶67; *see also* Cal. Compl. ¶156; Pa. Compl. ¶134.

53

As an initial matter, Defendants had no duty to disclose that the Funds might be required to add collateral to the inverse floater trusts. Plaintiffs identify no statute or regulation that mandated that disclosure. Nor do they identify any statement that was rendered misleading by this alleged omission. *See McDonald v. Kidder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002). To state a claim, Plaintiffs would have needed to allege that because the Registration Statements did not discuss the possibility that additional collateral might be needed in inverse floater trusts, the message of the disclosures that were made became materially misleading. Plaintiffs do not, and cannot, plausibly make such an allegation.

In any event, the potential need for additional collateral in an inverse floater trust is not material. The contract provisions relating to trust collateral are themselves lengthy and detailed, and they are merely some of many groups of provisions in inverse floater agreements. Those agreements "contain dozens – if not hundreds – of individual provisions," and there is no liability under the Securities Act for "failure to disclose the entire content of its contracts." *In re Thornburg*, 2010 WL 378300, at *49. Finally, Plaintiffs do not allege, because they cannot,[102] that adding collateral to an inverse floater trust would affect a Fund's NAV.

> 3. The National Fund Plaintiff's Assertion That Inverse Floaters Are Not Municipal Securities Is Wrong.

Lastly, the National Fund Plaintiff alleges that the National Fund violated its fundamental investment policy of investing 80% of assets in municipal securities by investing

---

[102] For similar reasons described earlier in the context of the collapse of an inverse floater trust, *see supra* Facts II.B.3, using Fund assets to improve a trust's collateral protection has no impact on the net assets of the Fund.

56855-0005/LEGAL18027345.1

"heavily in inverse floaters, which are not municipal securities." Nat'l Compl. ¶¶72, 92. This claim is meritless.

The Securities Exchange Act defines municipal bonds as "securities which are direct obligations of, or obligations guaranteed as to principal or interest by, a State or any political subdivision thereof." 15 U.S.C. § 78c(a)(29). As discussed above, an inverse floater is one of two securities created from an underlying municipal bond. Specifically, it is the residual interest in the underlying bond itself, net of liabilities to floater holders. Thus, an inverse floater shares with the underlying bond the fundamental characteristic that it is a "direct obligation" or an "obligation guaranteed as to principal or interest by" a State or municipality. An inverse floater also continues to pay interest that is tax free. For these reasons, the inverse floater itself is a municipal security, albeit a derivative one.[103] Indeed, this is why the Funds themselves referred to inverse floaters as "municipal securities that are derivative instruments."[104] The National Plaintiff cites no authority to the contrary. The allegation that inverse floaters are not municipal securities should be dismissed.

---

[103]  *See, e.g.*, SEC Office of Economic Analysis, *Report on Transactions in Municipal Securities*, July 1, 2004, at B-7, *available at* http://www.sec.gov/news/studies/munireport2004.pdf ("Derivative municipal securities can be created in the secondary market. For example, a securities firm might use a fixed coupon security to create a floating rate instrument and an inverse floater.").

[104]  AMT-Free SAI (10/26/07) at 17; AMT-Free NY SAI (12/28/07) at 34; Cal. SAI (10/31/07) at 24; Nat'l SAI (11/28/07) at 17; NJ SAI (11/28/07) at 30; Pa. SAI (11/28/07) at 24; Rochester SAI (2/21/07) at 31.

56855-0005/LEGAL18027345.1

C.     **Plaintiffs' Illiquidity Allegations Fail To State a Claim.**

Plaintiffs claim that certain of the Funds' holdings should have been identified by footnotes in the Registration Statements as illiquid, but were not.[105]  Plaintiffs' opinion that these assets actually were illiquid rests solely on the fact that they "went for months without being traded."  *Id.*  Based on this cramped redefinition of illiquidity, Plaintiffs allege that Defendants understated the percentage of the Funds' assets that were illiquid and that the Funds violated their limits on illiquid investments.[106]

These allegations fail to state a claim for two reasons.  First, Plaintiffs' reliance on low trading volume as the exclusive test for illiquidity is contrary to SEC guidance and betrays a fundamental misunderstanding of the municipal bond market.  Second, consistent with regulatory guidance, Defendants explained how they would determine whether securities are illiquid and that such decisions require the Manager to exercise judgment.  Under relevant case law, Plaintiffs cannot recover unless they allege that the Manager did not believe its own illiquidity determination when made.  Because Plaintiffs do not allege this or that the Funds failed to adhere to their own standards for illiquidity,[107] their claim fails.

---

[105]   AMT-Free Compl. ¶¶58, 93(a); AMT-Free NY Compl. ¶¶52, 86(a); Nat'l Compl. ¶¶54, 84(a); NJ Compl. ¶¶53, 87(a); Rochester Compl. ¶¶53, 90(a); *see also* Cal. Compl. ¶¶16-17, 114(b); Pa. Compl. ¶¶60, 85.

[106]   AMT-Free Compl. ¶¶48, 90; AMT-Free NY Compl. ¶¶42, 92; Cal. Compl. ¶¶14-15, 114; Nat'l Compl. ¶¶44, 82; NJ Compl. ¶¶43, 83; Pa. Compl. ¶¶85-86, 94; Rochester Compl. ¶¶43, 85.

[107]   They suffer from the additional defect that Defendants' promises to monitor were not untrue at the time the statements were made.  If they were, Plaintiffs' allegations sound in fraud because a claim that the Funds told investors they would do something other than what they actually intended would be a textbook allegation of fraud, *see, e.g.*, *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596 (2001), and Plaintiffs would have to satisfy the heightened pleading requirements of Rule 9(b).

56

1.      Trading Activity Is Only One Factor in Determining
        Whether a Security Is Illiquid.

To support their illiquidity allegations, Plaintiffs list examples of the Funds' securities that traded infrequently during the putative Class Periods.[108]  But Plaintiffs' illiquidity claims fail because they wrongly equate low trading volume with illiquidity.  Plaintiffs' theory is wrong as a matter of law and logic.

Although trading volume is an important factor in determining whether an asset is illiquid, there are other important considerations as well.  The SEC has made clear that the determination whether an asset is illiquid depends on various factors, including, "among others: (1) the frequency of trades and quotes for the security; (2) the number of dealers willing to purchase or sell the security and the number of other potential purchasers; (3) dealer undertakings to make a market in the security; and (4) the nature of the security and the nature of the marketplace trades (*e.g.*, the time needed to dispose of the security, the method of soliciting offers, and the mechanics of transfer)."  *Resale of Restricted Securities*, 55 Fed. Reg. at 17933.

In the face of this regulatory guidance, Plaintiffs' illiquidity claims fail because they rely on a legally erroneous definition of illiquidity and improperly focus on trading volume to the exclusion of the other determinants of liquidity.[109]  Although there are various factors that

---

[108]    AMT-Free Compl. ¶¶59-60; AMT-Free NY Compl. ¶¶53-54; Cal. Compl. ¶¶119-20; Nat'l Compl. ¶¶55-56; NJ Compl. ¶¶54-55; Pa. Compl. ¶¶89-91; Rochester Compl. ¶¶54-55.

[109]    The California and Pennsylvania Plaintiffs raise the additional, but equally meritless allegation that certain assets were illiquid because of the large size of the Funds' position.  Cal. Compl. ¶123 (alleging that the Prospectuses "failed to disclose that the Fund's substantial investments in certain issuances contributed to the illiquidity of those holdings.  Absent sales by the Fund, little or no market for those securities existed."); Pa. Compl. ¶87 (similar).  These allegations fail for the same reasons.

are relevant to the determination of whether a security is liquid, Plaintiffs ignore the other factors and the context in which they apply, and as a result, their claims are flawed on their face.

Moreover, Plaintiffs' claims are based upon a fundamental misunderstanding of the municipal bond market.  Unlike equity securities, which are usually purchased and sold for capital appreciation, municipal bonds typically are held until maturity because they provide a tax-free income stream and the return of principal at maturity.  Thus, many municipal bond investors take a buy-and-hold approach to their investments.  Indeed, the Funds' Manager took this very approach, disclosing that it does "not usually intend to dispose of securities prior to their maturity."[110]  The buy-and-hold approach to municipal bond investing explains the low number of transactions in particular bonds and in the municipal bond market generally.[111]

Thus, Plaintiffs' *post hoc* narrowing of the liquidity determination to a single factor – trading volume in a specific period – is unsupported by any law and is inconsistent with the fundamental operation of the market at issue here.  The lack of trading activity says nothing about whether an asset *could have been* sold.  For example, the fact that a piece of jewelry or fine art changes hands only once over many years does not necessarily mean that it is an

---

[110]   AMT-Free SAI (10/26/07) at 2; AMT-Free NY SAI (12/28/07) at 2; Cal. SAI (10/31/07) at 2; Nat'l SAI (11/28/07) at 2; NJ SAI (11/28/07) at 2; Pa. SAI (11/28/07) at 2; Rochester SAI (2/21/07) at 2.

[111]   S*ee, e.g.*, Municipal Securities Rule Making Board, *MSRB Notice 2009-38*, June 30, 2009, *available at* http://www.msrb.org/MSRB1/archive/2009/2009-38.asp ("The current market value of a municipal bond may be hard to determine because many municipal bonds trade infrequently"); SEC Office of Economic Analysis, *Report on Transactions in Municipal Securities*, *supra*, at 16 (noting that about "70% of municipal securities did not trade during [a] ten and a half month period [in the year 2000].  Another 15% traded five of fewer times.  Less than 1% of securities . . . accounted for about half of the principal amount traded.").

58

illiquid asset; it means only that it is an asset that the owner intended to buy and hold over the long-term, rather than trade or sell.

All of Plaintiffs' illiquidity allegations – footnote designations in the Statement of Investments, violations of the 15% limit on illiquid assets, and inadequate monitoring to maintain liquidity – rest on the conclusory and incorrect assertion that certain illiquid assets were not designated properly. As a result, the legal, factual, and logical fallacy of conflating "not actively traded" with "cannot be traded" is fatal to all of Plaintiffs' illiquidity claims.

> 2. As Regulatory Standards and the Funds' Disclosures Explain, Determining Whether an Asset Is Illiquid Involves Discretion.

The SEC has defined "illiquid securities" as securities "that *cannot* be disposed of in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment." *Resale of Restricted Securities*, 55 Fed. Reg. at 17940 (emphasis added). Consistent with this guidance, the Funds disclosed that the "Manager determines the liquidity of certain of the Fund's investments," and in doing so, takes into account "the trading activity for such securities and the availability of reliable pricing information, among other factors."[112] These disclosures make clear that determining whether a particular security without an active trading market is, in fact, illiquid required the Manager to make judgment calls.

To state a misrepresentation claim regarding discretionary judgments like these, Plaintiffs must allege "with particularity that the statements were both objectively and subjectively false or misleading." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th

---

[112]   AMT-Free SAI (10/26/07) at 15; AMT-Free NY SAI (12/28/07) at 23; Cal. SAI (10/31/07) at 22; Nat'l SAI (11/28/07) at 16; NJ SAI (11/28/07) at 27; Pa. SAI (11/28/07) at 22; Rochester SAI (2/21/07) at 39.

Cir. 2009) (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991)). The Supreme Court explained in *Virginia Bankshares* that a representation about what a defendant "believes" is actionable only if it is objectively false *and* the defendant did not subjectively believe what he said at the time he made the statement. 501 U.S. at 1093-98; *see also In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-2017, 2010 WL 545992, at *6 (S.D.N.Y. Feb. 17, 2010); *In re Harmonic, Inc., Sec. Litig.*, No. 00-2287, 2006 WL 3591148, at *16 (N.D. Cal. Dec. 11, 2006). Thus, to state a claim about illiquidity, Plaintiffs must allege that Defendants both made objective errors in determining that certain assets were liquid *and* subjectively believed those assets to be illiquid. But Plaintiffs do not even attempt to make allegations regarding the Defendants' subjective beliefs. That omission dooms their claims.[113]

**D.      Plaintiffs' Valuation Allegations Fail To State a Claim.**

Plaintiffs claim that the Funds used an "opaque process" to value their assets "on a basis other than the 'last sale price.'"[114] They allege further that, in the absence of this "market-price check," the Funds' assets were overvalued. *Id.* Finally, Plaintiffs state that the Funds ultimately were forced to disclose pursuant to FAS 157 that none of their holdings

---

[113]      Plaintiffs also claim that "Defendants failed to inform investors that in promising to maintain a 15% cap on illiquid investments, the Fund's definition of illiquidity was merely a subjective assessment that could not be meaningfully enforced or even verified and monitored."  AMT-Free Compl. ¶94(d); AMT-Free NY Compl. ¶86(d); Nat'l Compl. ¶84(d); NJ Compl. ¶87(d); Rochester Compl. ¶90(d).  As discussed above, SEC guidance makes clear that the determination of illiquidity depends on the exercise of judgment, and the Funds themselves disclosed that the Manager would need to take into account various "factors."  Thus, this claim also fails.

[114]      AMT-Free Compl. ¶83; AMT-Free NY Compl. ¶76; Cal. Compl. ¶170; Nat'l Compl. ¶74; NJ Compl. ¶77; Pa. Compl. ¶108; Rochester Compl. ¶78.

60

traded on a national securities exchange or was valued based on the last sale price.[115]   These

allegations are meritless because the Funds accurately and truthfully disclosed the process

they used to value securities and Plaintiffs point to no statement of untrue fact, either before

or after the adoption of FAS 157.

          1.          The Funds' Valuation Process Was Not Misleading.

Plaintiffs allege that the Funds' valuation process was "opaque" because the Funds did

not disclose that the Funds' assets were valued on a basis other than the last sales price.[116]

This theory is flatly contradicted by the Funds' disclosures.  The Funds stated that "last sale

information is not generally available" for municipal securities; that the Manager "may use a

pricing service approved by the Board of Trustees" to value the securities; and that the

"pricing service may use 'matrix' comparisons to the prices for comparable securities on the

basis of quality, yield and maturity."[117]  Any investor who read these disclosures would have

known that the Funds' municipal securities, like municipal securities in the market in general,

were not valued using daily trading prices but, instead, were being valued by a third-party

pricing service via comparisons to similar securities.  The Funds had no duty to disclose more,

*see Tsereteli v. Residential Asset Securitization Trust 2006-A8*, No. 08-10637, 2010 WL

---

[115]      AMT-Free Compl. ¶108; AMT-Free NY Compl. ¶100; Nat'l Compl. ¶98; NJ Compl. ¶101; Rochester Compl. ¶104; *see also* Pa. Compl. ¶112.

[116]      AMT-Free Compl. ¶82; AMT-Free NY Compl. ¶75; Cal. Compl. ¶166; Nat'l Compl. ¶73; NJ Compl. ¶76; Pa. Compl. ¶107; Rochester Compl. ¶77.

[117]      AMT-Free SAI (10/26/07) at 73; AMT-Free NY SAI (12/28/07) at 80; Cal. SAI (10/31/07) at 81; Nat'l SAI (11/28/07) at 74; NJ SAI (11/28/07) at 89; Pa. SAI (11/28/07) at 82; Rochester SAI (2/21/07) at 89.

816623, at *5 (S.D.N.Y. Mar. 11, 2010), and their valuation practices were consistent with regulatory guidance.[118]

2.   <u>Plaintiffs Do Not Allege That the Funds Overvalued Any of Their Securities.</u>

Plaintiffs next allege that, because the Funds did not use sales prices to value their securities, the Funds' assets were overvalued.  Plaintiffs' theory fails for three reasons.

As an initial matter, Plaintiffs claim fails because they do not allege facts showing that the Funds' valuation determinations were not honestly believed when made.  The ICA provides that the "value" of securities for which market prices are not available is their "fair value as determined in good faith by the board of directors."  15 U.S.C. § 80a-2(a)(1)(41); *see also* 17 C.F.R. § 270.2a(4)(a)(1).  The SEC has made clear that there is no single valuation method for such securities and that valuation must be based on all relevant factors.  In 1970, for example, the SEC stated that "[n]o single standard for determining 'fair value . . . in good faith' can be laid down, since fair value depends upon the circumstances of each individual case."[119]

Consistent with this guidance, the Funds disclosed that, when market quotations are not readily available, securities may be "valued by another method that the Board of Trustees

---

[118]   "Registrants often value their debt securities by reference to other securities which are considered comparable in rating, interest rate, due date, etc. (often called 'matrix pricing') or rely on pricing services which use matrix pricing for valuation of these securities. Responsibility for making sure that a pricing method is proper rests with the registrant." *Form N-7 for Registration of Unit Inv. Trusts under the Securities Act of 1933 and the Inv. Co. Act of 1940*, Rel. No. 35-6580, 50 Fed. Reg. 21282, 21300 n.33 (proposed May 14, 1985) (guide to proposed registration form for unit investment trusts).

[119]   *Accounting for Inv. Sec. by Registered Inv. Cos.*, 35 Fed. Reg. at 19986 (providing a lengthy, non-exhaustive list of context-specific factors that can affect security valuation).

56855-0005/LEGAL18027345.1

believes accurately reflects the fair value."[120]  The Funds also warned investors that they "may not always be able to accurately determine such values.  There can be no assurance that the Fund could obtain the fair value assigned to a security if it were to sell the security at the same time at which the Fund determines its net asset value per share."  *Id*.

In light of the ICA, SEC guidance, and the Funds' own disclosures, it is beyond dispute that the valuation of securities "involve[s] the exercise of judgment."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 376 F. Supp. 2d 385, 396 (S.D.N.Y. 2005).  As the Southern District of New York has explained, "[l]ike other opinions, some valuation models may be more or less reliable than other models, have more or less predictive power, or hew more or less closely to the conventional wisdom on a subject, but they are nonetheless opinions and not objective facts."  *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005); *see also Tsereteli*, 2010 WL 816623, at *5.  Accordingly, to plead that the Fund misrepresented the value of its assets, Plaintiffs must allege facts sufficient to show that the valuations were not honestly believed when made.  *See Virginia Bankshares*, 501 U.S. 1083 at 1095-96; *Rubke*, 551 F.3d at 1162.  Here, Plaintiffs make no such allegations.

Moreover, Plaintiffs' overvaluation claims fail because they do not allege that the Funds failed to follow their disclosed valuation methodology – *i.e.*, a third-party pricing service and matrix pricing – or that any specific valuation deviated from this method.  In *Yu v. State Street Corporation*, the Southern District of New York recently dismissed Securities Act claims brought against a mutual fund.  There, as here, Plaintiffs alleged that the fund

---

[120]   AMT-Free Prospectus (10/26/07) at 19; AMT-Free NY Prospectus (12/28/07) at 20; Cal. Prospectus (10/31/07) at 20; Nat'l Prospectus (11/28/07) at 20; NJ Prospectus (11/28/07) at 20; Pa. Prospectus (11/28/07) at 20; Rochester Prospectus (2/21/07) at 20.

63

overvalued assets, but did not allege that the fund failed to follow its disclosed valuation methodology. The court dismissed the complaint, explaining:

> [I]f the stated valuations complied with the disclosed methods, they would not be actionable as "false or misleading" because they would correspond to the values that the offering document led investors to expect.
>
> Plaintiffs' over-valuation claims fail because the Complaint does not aver a single concrete fact to suggest that defendants deviated from the prescribed valuation methods. . . . There are no averments about which securities were overvalued or how any valuation conflicted with the procedures set out in the Registration Statements.

2010 WL 668645, at *8-9. Here, as in *Yu*, Plaintiffs do not allege that the Funds failed to follow their own methodology. Accordingly, the stated values were not false, because they "correspond to the values that the offering document led investors to expect." *Id.*

Lastly, Plaintiffs' valuation allegations fail because they are just as consistent with proper valuation as they are with alleged improper valuation. *See Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 570. The sole allegation Plaintiffs muster in support of their valuation claim is that, because the Funds did not use daily trading data, the securities were overvalued.[121] But Plaintiffs do not (and cannot) aver that such data were available. The fact that market prices were not available hardly means that the assets were overvalued; otherwise, all municipal bond funds necessarily would be overvalued. The ICA makes clear that securities are to be valued using market prices when they are available and other valuation methods when they are not. Thus, it is not enough for Plaintiffs simply to say that trading prices were not available; they must go further and allege facts showing that overvaluation is

---

[121]    AMT-Free Compl. ¶103; AMT-Free NY Compl. ¶100; Nat'l Compl. ¶98; NJ Compl. ¶101; Rochester Compl. ¶79; *see also* Pa. Compl. ¶112.

more likely than proper valuation.  This they do not do.  Accordingly, for this additional reason, their valuation claims fail.

>   3.  Defendants Disclosed Their Securities Valuation Process
>       Before and After FAS 157 Became Effective.

Plaintiffs allege that the Funds "ultimately" were forced to disclose pursuant to FAS 157 that "not a single one of [their] holdings traded on the NASDAQ or any other national securities exchange" and that the securities were therefore not valued based on "last sale price" or "bid" and "ask" price.  *Id.*  Plaintiffs' allegations regarding FAS 157 fail to identify a misstatement of material fact.

Defendants never stated that they would value municipal securities based on "last sale price."  Indeed, such a statement would make no sense given that municipal bonds are not exchange-traded and do not have readily available market quotations.  To the contrary, the Funds always disclosed that last sales prices were "generally not available" for municipal securities.  In fact, it was the very unavailability of market prices that caused the Funds to use the third-party pricing service described in their disclosures.  In short, Plaintiffs' allegation that the Funds failed to disclose that they were not using last sales prices is refuted by the Funds' disclosures.[122]

---

[122]   Plaintiffs allege that Defendants did not comply with FAS 157 until 2009 (or June 30, 2008 in the case of the Rochester Fund).  But FAS 157 became effective only "for financial statements issued for fiscal years beginning after November 15, 2007."  FASB Staff Position, *Statement No. 157-3; Determining the Fair Value of a Financial Asset When the Market for That Asset Is Not Active*, Oct. 10, 2008, *available at* http://www.fasb.org/pdf/fsp_fas157-3.pdf.  The Funds' fiscal years begin in January (for the Rochester Fund), August (for the AMT-Free, California, National, New Jersey, and Pennsylvania Funds), and October (for the AMT-Free NY Fund).  Thus, the Funds were not required to comply with FAS 157 until the first interim report in the 2008 fiscal year starting with reports filed in May 2008 for the Rochester Fund; December 2008 for the AMT-Free, California, National, New Jersey, and Pennsylvania Funds; and February 2009 for the AMT-Free NY Fund.  The Funds complied with those timelines,

III.    **PLAINTIFFS CANNOT BRING AN ACTION FOR MISMANAGEMENT UNDER THE FEDERAL SECURITIES LAWS.**

Although the Complaints are styled as disclosure claims, Plaintiffs' underlying allegations accuse Defendants of poorly executing their professional responsibilities in managing the Funds.  But it is well established that claims for mismanagement are not actionable under the Securities Act.

A.    **Allegations of Corporate Mismanagement Are Not Actionable under the Securities Act.**

The Supreme Court has held that federal securities laws do not create a remedy for "transactions which constitute no more than internal corporate mismanagement."  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478-79 (1977).  Thus, courts have made clear that if "the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law."  *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir. 1981); *see also In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004).  Moreover, "a plaintiff may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach."  *Andropolis*, 505 F. Supp. 2d at 682.

B.    **Plaintiffs' Allegations Challenge the Management of the Funds.**

All of Plaintiffs' core allegations are directed at the Funds' business judgments.  Essentially, Plaintiffs complain that the Funds failed to attain their stated goals and used overly risky strategies in pursuit of them.  But failing to achieve an objective, or pursuing a

---

and Plaintiffs cannot seriously contend otherwise.  *See, e.g.*, Rochester Form N-Q (5/29/08) at 32 (Larrabee Decl., Ex. A-22).

goal poorly, is not the same thing as misstating it.  And at bottom, these are challenges to Defendants' investment decisions, which are not actionable under the Securities Act.

Plaintiffs accuse Defendants of excessive risk-taking and failures to monitor in each of the four core areas of their Complaints.  Specifically, they allege the following:

- *Investment objective*.  "[T]he Fund embarked on risky investment strategies that were at odds with its primary investment objective of preservation of capital, by investing in illiquid bonds and highly leveraged inverse floaters as speculative bets against rising interest rates."[123]

- *Inverse floaters*.  "[T]he Manager had not monitored the sufficiency of the segregated collateral.  Nor had it monitored the Fund's exposure under the shortfall and forbearance agreements (despite statements in the Prospectuses that the Manager would do so) . . . as evidenced by the Fund's failure to meet its obligations under those agreements."[124]

- *Illiquidity*.  "[E]ither the Fund Manager did not adequately monitor the liquidity of the Fund's holdings, as Defendants stated, or, it monitored its holdings but failed to classify certain obviously illiquid securities as such." Defendants "failed to monitor or sell the Fund's illiquid holdings or otherwise take action that would have allowed the Fund to maintain adequate liquidity."[125]

- *Securities valuation*.  "[T]he Manager did not 'monitor the accuracy' of the pricing services the Fund used" and overvalued the Funds' assets.[126]

These allegations concern the very type of "review of management practices" that courts have found are not actionable under federal securities laws.  Because the crux of

---

[123]   AMT-Free Compl. ¶50; AMT-Free NY Compl. ¶44; Nat'l Compl. ¶46; NJ Compl. ¶45; Rochester Compl. ¶45; *see also* Cal. Compl. ¶5; Pa. Compl. ¶13.

[124]   AMT-Free Compl. ¶¶86, 100(d); AMT-Free NY Compl. ¶¶78, 92(d); Nat'l Compl. ¶¶76, 90(d); NJ Compl. ¶¶79, 93(d); Rochester Compl. ¶¶81, 96(d); *see also* Cal. Compl. ¶150(e); Pa. Compl. ¶94.

[125]   AMT-Free Compl. ¶¶62, 94(c); AMT-Free NY Compl. ¶¶56, 86(c); Nat'l Compl. ¶¶58, 84(c); NJ Compl. ¶¶57, 87(c); Rochester Compl. ¶¶57, 90(c); *see also* Cal. Compl. ¶16; Pa. Compl. ¶94.

[126]   AMT-Free Compl. ¶107; AMT-Free NY Compl. ¶99; Nat'l Compl. ¶97; NJ Compl. ¶100; Rochester Compl. ¶103; *see also* Cal. Compl. ¶21; Pa. Compl. ¶111.

Plaintiffs' allegations concerns the Funds' management, their claims are not actionable under federal law and should be dismissed.

## IV.   PLAINTIFFS' CLAIMS REGARDING INVESTMENT OBJECTIVES AND INVERSE FLOATERS ARE TIME-BARRED.

Plaintiffs' claims regarding the investment objectives and inverse floaters should be dismissed for the independent reason that they are barred by the statute of limitations.[127] Under the Securities Act, plaintiffs must sue within one year of when they should have been aware of the facts underlying their claims.  Courts "routinely dismiss securities fraud claims on statute of limitations grounds at the pleading stage where . . . the facts necessary to trigger inquiry notice are apparent from the face of the complaint, the documents cited therein and other public documents."  *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003), *aff'd sub nom.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005); *see also Manasfi v. Malone*, No. 06-280, 2007 WL 891871, at *2 (D. Colo. Mar. 22, 2007).  The earliest suit against any of the Funds was filed on February 6, 2009.[128]  Thus, the Complaints

---

[127]   Some of Plaintiffs' claims also are barred by the Securities Act's three-year statute of repose, which "is an absolute limitation which applies whether or not the investor could have discovered the violation."  *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir. 1994).  The Registration Statements became effective immediately upon filing, *see* 17 C.F.R. § 230.485(b), so the repose period for each began to run on the day they were filed, *see* 15 U.S.C. §§ 77m, 80a-24(e).  Plaintiffs allege that four Registration Statements filed in 2005 (for the AMT-Free, National, NJ, and Rochester Funds) and one filed in January 2006 (for the AMT-Free NY Fund) were misleading.  The three-year repose period for all of these filings expired by January 2009.  Thus, all claims relating to these five Registration Statements are barred.

[128]   For the purposes of this motion, Defendants use the February 6, 2009 filing date because it is the earliest date for all of the Funds.  Defendants do not waive the argument that the relevant limitations period for each Fund is one year prior to the date on which the earliest lawsuit was filed *for that Fund*.  Although the Pennsylvania Plaintiff first purchased shares on April 11, 2008, the first lawsuit involving the Pennsylvania Fund was not filed until April 28, 2009, so the claims in that case also are barred because they were filed more than a year after Plaintiff was on notice of his claims.  In addition, Defendants do not waive statute of limitations

68

should be dismissed if Plaintiffs should have discovered the facts underlying their claims by February 6, 2008.

In fact, Plaintiffs were on notice of their claims well before February 2008. The Complaints allege that the Funds' investments were inconsistent with their investment objectives and that the Funds failed to disclose the risks inherent in inverse floaters. But the Funds followed the same investment strategy for years, and that strategy was always fully disclosed. Likewise, the Registration Statements explained the risks of inverse floaters, which have not changed over time, and those same risks were reported in numerous articles published well before February 2008. Thus, Plaintiffs were on notice of the facts underlying their claims at the time they first purchased their shares in the Funds. *See* Appendix A: Complaint Summary Tables. Accordingly, Plaintiffs' claims regarding investment objectives and inverse floaters should be dismissed.

### A.     Securities Act Claims Must Be Brought Within One Year After a Plaintiff Is on Notice of Them.

Claims under sections 11 and 12(a)(2) of the Securities Act must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The one-year limitations period also applies to claims under section 15. *See id.* § 78t(a). It is the "discovery of the untrue statement or omission" that triggers the one-year limitations period, not the decline in value of a plaintiff's investment. Thus, the statute of limitations can begin to run even *before* a plaintiff suffers the injury alleged in his complaint. *See Anixter v. Home-*

---

arguments that may be particular to any individual Defendants based on when they were first named or served. January 15, 2010 is the operative date for statute of limitations purposes for Defendants who were not served with the initial complaints within 120 days of filing.

*Stake Prod. Co.*, 977 F.2d 1549, 1551-52 (10th Cir. 1992).  In other words, a plaintiff cannot adopt a "wait-and-see approach," enjoying the upside of a disclosed investment strategy, but then suing when that same investment strategy later results in losses.  *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1202 (10th Cir. 1998); *see also Brumbaugh v. Princeton Partners*, 985 F.2d 157, 163 (4th Cir. 1993).

Under Tenth Circuit precedent, inquiry notice "triggers an investor's duty to exercise reasonable diligence." *Sterlin*, 154 F.3d at 1201.  "[T]he concept of inquiry notice is hostile to the notion that the plaintiff be allowed leisurely discovery of the full details of the alleged [misstatements]." *In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 243 n.2 (S.D.N.Y. 2006) (quotation marks and citation omitted).  Thus, a public disclosure "need not discuss each and every aspect" of the alleged wrongdoing to put a plaintiff "on notice of the need to inquire further." *Sterlin*, 154 F.3d at 1204.  Instead, a disclosure is sufficient to trigger the duty of reasonable diligence if it would "alert a reasonable investor to the *possibility*" of a misstatement.  *Id.* at 1204 (emphasis added).

Whether a plaintiff "was on inquiry notice is judged by an objective standard." *Id.* at 1204 n.22.  For statute of limitations purposes, "investors are presumed to have read prospectuses, quarterly reports, and other information related to their investments," and the court determines what a reasonable investor would glean from those documents. *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 216 (3d Cir. 2007); *see, e.g.*, *Grubka v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d 1259, 1266 (D. Colo. 2006) (offering documents themselves can put a plaintiff on inquiry notice of his claims).  Where the facts purportedly showing the misstatement are in the very disclosure documents that plaintiffs allege were

70

misleading, a reasonably diligent plaintiff should discover them at the time of his investment.

*See, e.g.*, *In re Polaroid Corp.*, 465 F. Supp. 2d at 243.

### B.      Plaintiffs Should Have Discovered the Facts Underlying Their Investment Objective Claims Years Ago.

The investment objectives for all of the Funds except the National Fund provided that they were "attempting to preserve capital" or seeking investments that were "consistent with preservation of capital."[129]  Here, Plaintiffs assert that "preservation of capital" has a "specific meaning," and that, in their view, the Funds' strategies were "not consistent" with that meaning.[130]  Specifically, Plaintiffs allege the Funds' investments were improper because they caused the Funds to be "far more vulnerable to economic cycles than other mutual funds" in their sectors.[131]

This claim is time-barred because Defendants disclosed for many years the risks associated with their strategies, and those strategies did not change.  Likewise, Defendants explained that they invested in inverse floaters – the very investments that Plaintiffs now claim were inconsistent with the Funds' investment objectives.  In light of the Funds' own disclosures, these claims are time-barred.

---

[129]    The National Plaintiff alleges that inverse floaters are not municipal securities and that the Fund's investments in them violated the statement that the Fund would attempt to invest 100% of its assets in municipal securities.  *See* Nat'l Compl. ¶51.  Plaintiffs were always on notice that the National Fund invested in inverse floaters.  Therefore, this claim is time-barred as well.

[130]    AMT-Free Compl. ¶¶74, 81; AMT-Free NY Compl. ¶¶67, 74; NJ Compl. ¶¶68, 75; Pa. Compl. ¶¶71, 76; Rochester Compl. ¶¶69, 76; *see also* Cal. Compl. ¶¶62, 71.

[131]    AMT-Free Compl. ¶50; AMT-Free NY Compl. ¶44; NJ Compl. ¶45; Rochester Compl. ¶45; *see also* Pa. Compl. ¶¶11, 146; Cal. Compl. ¶¶73, 78.

The volatility in the Funds' performance over the years reflected the risks inherent in the Funds' strategy; not surprisingly then, numerous articles, of which Defendants have cited only a small sampling from the *Wall Street Journal*, *Barron's*, *Morningstar*, and *The Bond Buyer*, warned for years that the Funds' investment strategies exposed investors to more risks than other municipal bond funds.  For example, a May 2002 article in *Barron's* explained that the Rochester investment team takes the "rocky road" and is "willing to do things that conventional managers aren't willing to do, which is the secret to their success."[132]  Similarly, *Morningstar* warned investors that the Funds are "built on an investing philosophy that's drastically different from that of most competitors, and one we urge potential shareholders to get to know before investing."[133]  "This strategy's main drawback," *Morningstar* continued, "is that it courts risk by emphasizing total return . . . over shorter-term principal protection." *Id.*  And the *Wall Street Journal* reported in 2006 on Mr. Fielding's investments in "speculative" and "funky" bonds.[134]

In light of this publicly available information, investors have been on notice for many years of the Funds' unique investment strategies and the risks those strategies entailed.  If Plaintiffs thought the Funds' investment strategies were inconsistent with the goal of preserving capital, they should have filed their lawsuits long ago.  *See, e.g.*, *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 466-67 (7th Cir. 1990).

---

[132]   Ablan, *supra*, at 11 n.18 (Larrabee Decl., Ex. B-1).

[133]   Gunter, *supra*, at 11 n.16 (Larrabee Decl., Ex. B-10).

[134]   Diya Gullapalli, *Monthly Mutual Funds Review: Looking for Diamonds Amid the Junk – Seeking Better Returns, Retirees Buy Risky Debt; Scrutinizing the Turbines*, WALL ST. J., Mar. 6. 2006 (Larrabee Decl., Ex. B-23).

56855-0005/LEGAL18027345.1

Instead, they chose to "wait and see" through the good times enjoyed by the Funds; but as a result, their investment-objective claims are now time-barred.

> **C.    Plaintiffs Were on Notice of the Facts Underlying Their Inverse Floater Claims Years Ago.**

Plaintiffs' claims about inverse floaters fail for the same reasons.  Plaintiffs complain about (1) the volatility risks of inverse floaters; (2) the interest rate risks of inverse floaters; (3) the leverage inherent in inverse floaters; (4) the fact that inverse floater trusts could be collapsed; and (5) shortfall and forbearance agreements.[135]  But Defendants disclosed all of those risks years ago:

- *Volatility Risk.*  "The market value of inverse floaters can be more volatile than that of a conventional fixed-rate bond having similar credit quality, redemption provisions and maturity."[136]

- *Interest Rate Risk.*  "As short term interest rates rise, inverse floaters produce less current income (and, in extreme cases, may pay no income). . . .  Typically, inverse floaters tend to underperform fixed rate bonds in a rising long-term interest rate environment."[137]

- *Leveraging Effects.*  "Inverse floaters all entail some degree of leverage. An inverse floater that has a higher degree of leverage usually is more volatile with respect to its price and income than an inverse floater that has a lower degree of leverage."[138]

- *Collapse of Trusts.*  "The trust creates the inverse floater, pursuant to an arrangement that enables the Fund to withdraw the underlying bond to

---

[135]    AMT-Free Compl. ¶¶66-70; AMT-Free NY Compl. ¶¶59-63; Cal. Compl. ¶¶142, 150, 157-61; Nat'l Compl. ¶¶61-65; Pa. Compl. ¶¶122-29; Rochester Compl. ¶¶61-65.

[136]    AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 8; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 8.

[137]    AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 7; Cal. Prospectus (10/31/07) at 8; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 9; Pa. Prospectus (11/28/07) at 9; Rochester Prospectus (2/21/07) at 7-8.

[138]    AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 8; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 8.

73

collapse the inverse floater (upon the payment of the value of the short-term security and certain costs)."  *Id.*

- *Shortfall and Forbearance Agreements*.  "The Fund may also enter into 'shortfall and forbearance' agreements with respect to inverse floaters. Under those agreements, . . . the Fund is committed to pay the trust the difference between the liquidation value of the underlying municipal bond . . . and the principal amount payable to the holders of the short-term floating rate security."  *Id.*

In addition, press reports have long noted that inverse floaters carry significant risks. For example, eight years ago, a *New York Times* article stated that inverse floaters are "not the friendly little puppies people think they are."[139]  Nevertheless, funds use them because "the only way you're going to get a higher yield is to take more risk," and if "you're not prepared to do that, you probably shouldn't."  *Id.*  In March 2006, the *Wall Street Journal* explained that inverse floaters pay "a handsome reward when interest rates are steady or falling, but . . . could plunge if bond yields surged."[140]  The article also explained that inverse floaters "can add more volatility to mutual fund share prices."  *Id.*

Despite all of these statements explaining the risks of inverse floaters, Plaintiffs contend that they were misled because the Funds never "discussed or even revealed the range (or average) of the leverage of the inverse floaters."[141]  As explained above, the Funds had no obligation to provide this calculation.  But in any event, investors could have determined these numbers for themselves by applying basic mathematics to the facts disclosed in the

---

[139]    Eric Baum, *Mutual Funds Report; With Rates Low, Riskier Bond Funds Beckon*, N.Y. TIMES, Apr. 7, 2002, *available at* 2002 WLNR 4442855.

[140]    Michael A. Pollock, *Monthly Mutual Funds Review – Fundamentals: Your Bond Fund May Hold a Surprise – Derivatives Gain Big Role For Ability to Lift Returns; Are They "Devil's Spawn"?*, WALL ST. J., Mar. 6, 2006 (Larrabee Decl., Ex. B-24).

[141]    AMT-Free Compl. ¶66; AMT-Free NY ¶59; Cal. Compl. ¶142; Nat'l Compl. ¶61; NJ Compl. ¶60; Pa. Compl. ¶122; Rochester Compl. ¶61.

Statements of Investments.  Plaintiffs cannot avoid the statute of limitations by failing to do

the "simple arithmetic" that would have revealed the basis of their claim.  *Koke v. Stifel,*

*Nicolaus & Co.*, 620 F.2d 1340, 1344 (8th Cir. 1980).

## V.      PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE THE DECLINE IN THE FUNDS' NAVS DID NOT "RESULT FROM" THE ALLEGED MISREPRESENTATIONS OR OMISSIONS.

Although lack of causation is an affirmative defense under the Securities Act, "a

negative causation defense may be considered on a dismissal motion where the absence of

loss causation is apparent on the face of the complaint."  *Blackmoss Invs.*, 2010 WL 148617,

at *11; *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429,

437 (S.D.N.Y. 2003).  For the reasons discussed in Part III of the Champion Fund Motion to

Dismiss, Plaintiffs' allegations fit this mold.

The share price for an open-end mutual fund is determined not by trading on

secondary markets, but by summing up the value of the fund's assets.  Investor expectations,

and the information that shapes those expectations, have no impact on a mutual fund's NAV.

As a result, there is no way an alleged misrepresentation about the riskiness of the Funds

could affect their share prices.  Any "depreciation in value" of the Funds' shares can be

caused only by market forces that affect the value of the assets and liabilities in the Funds'

portfolios.  Such losses are not recoverable under the Securities Act.  15 U.S.C. §§ 77k(e);

77l(b); *see also In re Merrill Lynch & Co. Research Reports*, 289 F. Supp. 2d at 437.[142]

---

[142]      To be sure, *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009), and *In re Evergreen Ultra Short Opportunities Fund* recently held that misstatements about the riskiness of a mutual fund could lead to compensable damages under the Securities Act.  But this Court should not follow those decisions because they failed to analyze properly the plain

Far from contesting these points in their Complaints, Plaintiffs essentially concede them by admitting that the "depreciation in value" they complain about occurred *before* the October 2008 Supplement, which they allege was the first revelation of risks the Fund faced all along, but failed to disclose.[143]  This illustrates well Defendants' argument that, because of the way mutual fund shares are priced, no purported misrepresentations or omissions of Fund risks could have inflated the Funds' NAVs, and no related revelations could cause Fund shares to decline.  Therefore, Plaintiffs cannot satisfy the Securities Act's definition of compensable harm.

Plaintiffs' Complaints offer only two theories of damages, but neither could plausibly demonstrate losses resulting from alleged misstatements or omissions in the Registration Statements.  First, Plaintiffs allege that the value of the Funds' assets was "reduced by the materialization of previously concealed risks related to inverse floaters, which forced Defendants to sell Fund assets at fire-sale prices."[144]  Even passing the fact, as discussed above, that Defendants disclosed their focus on inverse floaters and all related material risks for many years, this allegation does not demonstrate cognizable damages.  Even assuming, erroneously, that "fire-sales" did occur, that means nothing more than that the Funds sold assets at a time when market conditions had eroded their value due to the credit crisis.  No

---

language of the statute, the relevant legislative history, or caselaw recognizing that the value of a mutual fund share is not affected by alleged misstatements.

[143]   AMT-Free Compl. ¶6; AMT-Free NY Compl. ¶6; Nat'l Compl. ¶6; NJ Compl. ¶6; Pa. Compl. ¶10; Rochester Compl. ¶6; *see also* Cal. Compl. ¶174.

[144]   AMT-Free Compl. ¶5; AMT-Free NY Compl. ¶5; Nat'l Compl. ¶5; NJ Compl. ¶5; Rochester Compl. ¶5; *see also* Cal. Compl. ¶5; Pa. Compl. ¶4.

76

misrepresentation or belated risk disclosure affected Fund assets' market values, their

purported sale prices, or Fund NAV.  Thus, this theory fails on its face.

Second, Plaintiffs' other theory of damages is that the Funds' NAVs "had to be written

down" because the Funds overvalued their assets.[145]  This allegation also fails because it does

not identify how the alleged inflation "resulted from" a misrepresentation in the Registration

Statements themselves.  *See, e.g.*, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382

(1983) (holding that a section 11 claim "must be based on misstatements or omissions in a

registration statement").  The Registration Statements explained the process the Funds use to

value their assets over the next year.  The Funds calculated their NAVs on a daily basis

throughout the putative Class Periods, as required by federal law.  Plaintiffs do not allege that

the Funds failed to follow their valuation process in making those calculations; nor do they

allege that the Funds did not believe those valuations.  So, even assuming Plaintiffs

adequately pleaded that the Funds' NAVs were inflated, which they have not, any inflation

would have "resulted from" flaws in the Funds' daily NAV calculations, not from any

purported misstatements in the Registration Statements made weeks or months earlier.

## VI.    PLAINTIFFS' SECTION 12(a)(2) CLAIMS SHOULD BE DISMISSED BECAUSE THEY DO NOT ALLEGE THAT OFI OR THE FUNDS WERE "SELLERS" OF SECURITIES.

Plaintiffs raise section 12(a)(2) claims against OFDI, OFI, and the Funds, but such

claims may be asserted only against a person who directly or indirectly "sells" a security.  *See*

15 U.S.C. § 77*l*(a)(2).  A direct seller is an "owner who passed title," while an indirect seller

is a "person who successfully solicits the purchase, motivated at least in part by a desire to

---

[145]    AMT-Free Compl. ¶5; AMT-Free NY Compl. ¶5; Cal. Compl. ¶21; Nat'l Compl. ¶5; NJ Compl. ¶5; Pa. Compl. ¶9; Rochester Compl. ¶5.

serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).  For an indirect seller to face solicitation liability under section 12(a)(2), an allegation of "'direct and active participation in the solicitation of the immediate sale is necessary.'" *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998) (citation omitted).

Aside from OFDI, it is apparent that Defendants are not securities sellers.  As Plaintiffs allege, OFDI was "the principal underwriter and distributor of shares of the Fund."[146]  But Plaintiffs do not and cannot allege that OFI or any of the Funds passed title to Fund shares.[147]  Plaintiffs instead raise only conclusory allegations that the section 12 Defendants "offered and sold," "controlled a person who offered and sold," "offered solicited, distributed and/or sold," or "solicited" Fund shares.[148]  But such allegations are insufficient to state a claim, and the only non-conclusory allegations on this point indicate that OFDI, and not OFI or the Funds, would have conducted any alleged solicitation of purchasers and acted as the "seller's seller."  As illustrated in analogous cases involving firm commitment underwritings of public company shares, the presence of the underwriter defeats a claim that the issuer was liable under section 12(a)(2) as a direct seller.  *Cf. Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (holding that "in a firm commitment underwriting . . . the public cannot ordinarily hold the issuers liable under section 12, because the public does not

---

[146]   AMT-Free Compl. ¶16; AMT-Free NY Compl. ¶14; Cal. Compl. ¶36; Nat'l Compl. ¶16; NJ Compl. ¶14; Rochester Compl. ¶16.

[147]   The Pennsylvania Complaint does not even purport to allege that any of the section 12 Defendants sold Fund shares.  *See* Pa. Compl. ¶¶168-77.

[148]   AMT-Free Compl. ¶129; AMT-Free NY Compl. ¶120; Cal. Compl. ¶200; Nat'l Compl. ¶118; NJ Compl. ¶121; Pa. Compl. ¶171; Rochester Compl. ¶125.

56855-0005/LEGAL18027345.1

purchase from the issuers.  Rather, the public purchases from the underwriters, and suing the

issuers is an attempt to 'recover against [the] seller's seller.'") (citation omitted).  There is

thus no basis for holding OFI or the Funds liable as direct sellers.

In addition, the Complaints fail to make out a claim that OFI or the Funds were even

indirect sellers of Fund shares.  Plaintiffs allege conclusorily that OFI and the Funds "solicited

purchases of the securities by means of the Prospectuses, advertising, and other marketing

efforts to serve their own financial interests."[149]  But these allegations fail for two reasons.

First, such conclusory allegations cannot survive.  "Given that solicitation of a sale is a

necessary element of a claim brought under Section 12, the contention that 'the defendant

solicited the sale' must be supported by factual allegations at the pleading stage."  *In re*

*Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1296 (E.D. Wash. 2007) (rejecting as

insufficient an allegation that defendants "used the prospectuses to solicit the purchase of

these securities"); *see also Maher,* 144 F.3d at 1307 (holding that a "'bald and factually

unsupported allegation that [the defendants] 'solicited' the plaintiff's securities purchases is

not, standing alone, sufficient'" to state a section 12 claim) (quoting *Shaw v. Digital Equip.*

*Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996)).

Second, even if the Court were to credit such threadbare allegations, the claim still

would fail because "neither involvement in [the] preparation of a registration statement or

prospectus nor participation in 'activities' relating to the sale of securities, standing alone,

demonstrate the kind of *relationship between defendant and plaintiff* that could establish

statutory seller status."  *Shaw*, 82 F.3d at 1216 (emphasis in original); *see also Rosenzweig*,

---

[149]   AMT-Free Compl. ¶130; AMT-Free NY Compl. ¶121; Nat'l Compl. ¶119; NJ Compl. ¶122; Rochester Compl. ¶126; *see also* Cal. Compl. ¶¶201-03; Pa. Compl. ¶171.

332 F.3d at 871 (holding that a finding of "solicitation" requires a showing that the statutory seller communicated directly with the purchaser). This rule applies with as much force to an issuer of securities as it does to others who participated in the preparation and signing of a prospectus or registration statement. *See, e.g.*, *In re Sonus Networks, Inc. Sec. Litig.*, No. 04-10294, 2006 WL 1308165, at *10 (D. Mass. May 10, 2006) (dismissing a section 12(a)(2) claim against an issuer for failure to plead solicitation liability where the only allegation was that the issuer had prepared the prospectus).

## VII. PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15 OF THE SECURITIES ACT.

All but two of the Complaints contend that the Officer Defendants, the Independent Trustees, and OFI are liable under section 15 of the Securities Act as "control persons" of the Funds.[150] To state a *prima facie* claim of control liability, a complaint "must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher*, 144 F.3d at 1305. The Complaints fail on both counts.[151]

First, Plaintiffs fail to allege a primary violation. Control person liability requires a proper allegation of a primary violation under section 11 or 12(a)(2). *See id.* For the reasons

---

[150]    AMT-Free Compl. ¶¶136-40; AMT-Free NY Compl. ¶¶127-31; Cal. Compl. ¶¶211-12; Nat'l Compl. ¶¶125-29; NJ Compl. ¶¶128-32; Pa. Compl. ¶¶181-82; Rochester Compl. ¶¶132-36. The Pennsylvania Complaint asserts a section 15 claim against the Officer Defendants, the Independent Trustees, OFI, and the Distributor as control persons of OFI or the Distributor. *See* Pa. Compl. ¶181. The California Complaint asserts a section 15 claim against OFI as a control person of the Fund and of the Distributor, and against the Officer Defendants and the Independent Trustees as control persons of the Fund, OFI "and/or the Distributor." Cal. Compl. ¶¶211-21. The Complaints also purport to assert section 15 claims against Mass Mutual, which is addressed separately in Mass Mutual's brief.

[151]    The one-year statute of limitations period for Securities Act claims applies to section 15, *see* 15 U.S.C. § 78t(a), so Plaintiffs' control person allegations also are time-barred for the reasons discussed above. *See, e.g.*, *Friedlob v. Trustees of the Alpine Mut. Fund Trust*, 905 F. Supp. 843, 851 (D. Colo. 1995).

set forth above, Plaintiffs have failed to allege a primary violation by any Defendant.  Thus the section 15 claims against all Defendants must be dismissed as a matter of law.

Second, even if Plaintiffs had established a primary violation, they nonetheless fail adequately to allege control by the Officer or Independent Trustee Defendants.  To establish "control," a plaintiff must "point to *facts* which indicate that the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003) (emphasis added) (quoting *Maher*, 144 F.3d at 1305).

To suggest that the Independent Trustees controlled the Funds, OFI, and the Distributor, Plaintiffs note only that the Trustees were just that – trustees of the Funds.  But mere titles are not enough to make out a claim of control.  As the Tenth Circuit has observed: "merely refer[ing] to [a person's] position within [a] company . . . would not likely be enough satisfactorily to allege control." *Adams*, 340 F.3d at 1109.  Put another way, the "assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person." *Id.* at 1108.  Thus, Plaintiffs do not (and cannot) allege that the Independent Trustees controlled the Funds' disclosures or investment strategies.  Similarly, the fact that the Officer Defendants held their titles does not adequately allege actual control.[152]  At a minimum, Plaintiffs' section

---

[152]   In addition, the Pennsylvania Plaintiff fails to allege any facts to indicate that the Distributor controlled OFI.  In fact, the Complaint alleges the opposite – that OFI owns and controls the

15 claims should be dismissed with prejudice as to the Independent Trustee Defendants and

dismissed without prejudice as to the Officer Defendants.

## VIII.   THERE IS NO PRIVATE RIGHT OF ACTION UNDER SECTION 13(a) OF THE INVESTMENT COMPANY ACT.

Section 13(a) of the Investment Company Act of 1940 provides that no registered

investment company may deviate from investment policies that are changeable only by

shareholder vote.  *See* 15 U.S.C. § 80a-13(a).  Plaintiffs allege that the Funds violated section

13(a) by deviating from their fundamental investment policies without obtaining shareholder

approval, and that the Funds' NAVs declined as a result.[153]  This claim fails because it is clear

from the text and structure of the ICA and the virtually unanimous weight of case law that

there is no private right of action under section 13(a).

Section 13(a) contains no express private right of action.  This omission creates a

"strong presumption" that Congress did not intend for one, which "places a heavy burden on

the plaintiffs to demonstrate otherwise."  *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 432-

33 (2d Cir. 2002).  Plaintiffs here cannot meet that burden.  To determine whether Congress

intended to create a private right of action in a statute, but failed to express that intent

explicitly, a court must interpret the statute "to determine whether it displays an intent to

create not just a private right but also a private remedy."  *Alexander v. Sandoval*, 532 U.S.

275, 286 (2001).  Without such an intent, "a cause of action does not exist and courts may not

create one, no matter how desirable that might be as a policy matter, or how compatible with

---

Distributor.  *See* Pa. Compl. ¶¶26, 181.  Such confused and conclusory allegations must be dismissed.

[153]   AMT-Free Compl. ¶¶147-49; AMT-Free NY Compl. ¶¶138-40; Cal. Compl. ¶¶222-23; Nat'l Compl. ¶¶136-38; NJ Compl. ¶¶139-41; Pa. Compl. ¶¶187-90; Rochester Compl. ¶¶143-45.

the statute." *Id.* at 286-87; *see also Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1267 (10th Cir. 2004) ("This circuit's decisions have emphasized that Congressional intent is determinative.").

In determining congressional intent, the Tenth Circuit has instructed courts to "examine the statute for 'rights-creating language'" that "'explicitly confers a right directly on a class of persons that includes the plaintiff,'" and to "consider the relation between the specific provision at issue and the related statutory scheme." *Boswell*, 361 F.3d at 1267 (citations omitted). Section 13(a) creates no such rights. It describes only the conduct in which registered investment companies may not engage. *See* 15 U.S.C. § 80a-13(a). Thus, the statute itself contains no evidence of congressional intent to create an implied private right of action. *See Sandoval*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'") (citation omitted).

The statutory scheme of the ICA likewise displays no intent to create a private right of action. To the contrary, section 42 of the ICA authorizes the SEC to enforce all ICA provisions, including section 13(a). 15 U.S.C. § 80a-41(a). "Congress's creation of specific means of enforcing the statute indicates that it did not intend to allow an additional remedy – a private right of action – that it did not expressly mention at all." *Boswell*, 361 F.3d at 1270; *see also Sandoval*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). As important, "Congress explicitly provided a private right of action to enforce" another section of the ICA,

15 U.S.C. § 80a-35(b), which "suggests that omission of an explicit private right to enforce" section 13(a) was "intentional." *Olmsted*, 283 F.3d at 433.

For these reasons, with a single, outlier exception,[154] all courts to consider the question since *Sandoval* have found that the ICA does not provide an implied private right of action. *See, e.g.*, *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1026 (C.D. Cal. 2005) ("cases decided after *Sandoval* have refused to find an implied private right of action in the ICA"); *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 117 (2d Cir. 2007) (finding no private right of action under §§ 34(b), 36(a), and 48(a) of the ICA); *Olmsted*, 283 F.3d at 433.  In the face of the text, structure, and purpose of the ICA, as well as the overwhelming weight of case law, Plaintiffs may not bring a claim under the ICA.[155]

---

[154]    The exception is the ruling in *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 609 F. Supp. 2d 938 (N.D. Cal. 2009).  That exception has no bearing on the outcome here.  First, the court followed a broad, policy-based analysis that is inconsistent with the Tenth Circuit approach described above.  Second, the court itself recognized that "there is substantial ground for difference of opinion" on the question and certified the decision for interlocutory appeal, which the Ninth Circuit has accepted.  *See Northstar Fin. Advisors Inc. v. Schwab Invs.*, No. 08-4119, 2009 WL 1126854, at *1 (N.D. Cal. Apr. 27, 2009).  There is every reason to expect that the decision will be reversed.  It is based almost entirely on the recent addition of § 13(c) to the ICA, as part of the Sudan Accountability and Divestment Act of 2007, which provides that no "person" may bring any claim of any kind based upon the divesture of investments in Sudan.  The Sudan Act was plainly intended to *limit* the potential liability of investment companies and advisors, not to expand it to create private rights of action in a specific class of people where none existed.  Moreover, legislation enacted in 2007 says nothing about Congress's intent in 1940.  *See, e.g.*, *Sandoval*, 532 U.S. at 287-88; *Mitzelfelt v. Dep't of Air Force*, 903 F.2d 1293, 1296 n.1 (10th Cir. 1990).

[155]    Alternatively, the Court could bypass the implied private right of action issue by finding that even if such a right were to exist, it would be time-barred, along with Plaintiffs' Securities Act claims.  *See Friedlob*, 905 F. Supp. at 855.

84

## IX.   TWO INVIDIVDUAL DEFENDANTS HAVE SPECIFIC DEFENSES.

### A.   Certain Plaintiffs Lack Standing To Assert Claims Against Yeutter.

The AMT-Free, AMT-Free New York, and California Plaintiffs lack standing to assert claims based on the 2005 and 2006 Registration Statements or to assert any claim against Clayton K. Yeutter.  Both Article III of the Constitution and the Exchange Act require a plaintiff to trace his purchase to an allegedly defective registration statement and/or prospectus.  *See, e.g.*, *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 598 (2007); *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 504 (W.D. Wash. 2009) (finding that a named plaintiff has standing under section 12 "only as to the prospectus . . . governing his purchase").

The AMT-Free, AMT-Free New York, and California Plaintiffs allege that the 2005 and 2006 Registration Statements for their respective Funds contained material misrepresentations or omissions.  Each of these Plaintiffs, however, made his respective initial purchases of Fund shares after the 2007 Registration Statement for each Fund was filed.[156] Accordingly, none of these Plaintiffs can trace his respective Fund purchases to the 2005 and 2006 Registration Statements and, as a result, none of them has standing to assert claims based on those Registration Statements against any Defendant.  *See, e.g.*, *Ong v. Sears Roebuck & Co.*, 388 F. Supp. 2d 871, 891 (N.D. Ill. 2004) (holding that plaintiffs "lack

---

[156]   Specifically, according to Plaintiffs' certifications, the AMT-Free Plaintiff made his first purchase of Fund shares on August 13, 2007, five months after the March 8, 2007 Registration Statement was filed.  The AMT-Free NY Plaintiff made his first purchase of Fund shares on August 29, 2007, eight months after the January 26, 2007 Registration Statement was filed.  And the California Plaintiff made his first purchase of Fund shares on May 23, 2007, over two months after the March 8, 2007 Registration Statement was filed.  *See* Appendix A.

85

standing to sue on their own behalf with respect to the 3/12/02 and 5/21/02 Offerings since they never purchased any securities in those offerings").

Moreover, the claims asserted by these Plaintiffs against Defendant Yeutter are based solely on the 2005 and 2006 Registration Statements, as Mr. Yeutter signed only those disclosures and was no longer a trustee when the 2007 Registration Statements were filed. These claims must be dismissed because these Plaintiffs cannot trace their respective Fund purchases to the 2005 or 2006 Registration Statements.[157] *See* 15 U.S.C. § 77k(a) (limiting section 11 liability of corporate insiders to persons who were directors at the time of the challenged offering or personally signed the registration statement at issue). *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 304 (D. Mass. 2009).

The fact that Plaintiffs seek to represent other investors who did purchase pursuant to the 2006 Registrations Statements and who may possess section 11 and 12 claims against Mr. Yeutter does not change the standing analysis. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing.") (citation omitted); *In re Washington Mut.*, 259 F.3d at 504 (because named plaintiff purchased pursuant to a single offering document, "the plaintiff class currently has Section 11 standing as to the October 2007 offering only"). "To hold otherwise would shunt aside the inevitable risk that 'any plaintiff could sue a defendant against whom the plaintiff has no claim in a putative class action, on the theory that some member of the hypothetical class, if a class were certified, might have a claim.'" *Plumbers' Union Local No. 12*, 658 F. Supp. 2d at 304

---

[157]    AMT-Free Compl. ¶29; AMT-Free NY Compl. ¶27; Cal. Compl. ¶49.

(citation omitted).  Thus, the claims in the AMT-Free, AMT-Free New York, and California Complaints must be dismissed against Yeutter as to all claims and against all Defendants to the extent that they are based on the 2005 and 2006 Registration Statements.

**B.     The Claims Asserted Against Clinton Should Be Dismissed.**

The Rochester Plaintiff is the only one to assert claims against Defendant Paul Y. Clinton.  Mr. Clinton is alleged to have been "a Trustee of the Rochester Fund from 1995 until he retired in 2006." Rochester Compl. ¶25.  During the putative Class Period, he signed only the Fund's April 29, 2005 and April 28, 2006 Registration Statements. *Id*.  Mr. Clinton was first named as a Defendant in the Rochester Complaint on March 30, 2009.  But there is no evidence that he was served with any complaint other than the Amended Consolidated Complaint, which was filed on January 15, 2010.

If a summons and complaint is not served on a defendant within 120 days after the filing of the complaint, a court, "upon motion or on its own initiative . . . shall dismiss the action without prejudice as to that defendant." Fed. R. Civ. P. 4(m).  The Rochester Plaintiff did not serve Mr. Clinton within 120 days after the initial complaint was filed.  Therefore, the filing of the initial complaint did not toll the statute of limitations on the Rochester Plaintiff's claims against Mr. Clinton.  Because the Rochester Plaintiff filed his claims against Mr. Clinton more than three years after the last registration statement he allegedly signed, the claims against Mr. Clinton are time-barred and should be dismissed with prejudice.

## CONCLUSION

For the reasons discussed above, Defendants respectfully request that the Court dismiss all seven Plaintiffs' Complaints with prejudice.

56855-0005/LEGAL18027345.1

Dated this 5th day of April, 2010.

Respectfully submitted,

*s/ Robert N. Miller*
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO 80202-1043
Tel:  (303) 291-2300
Fax:  (303) 291-2400
E-mail:  rmiller@perkinscoie.com

-And-

*s/ William K. Dodds*
William K. Dodds
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Tel:  (212) 698-3500
Fax:  (212) 698-3599
E-mail:  william.dodds@dechert.com

Matthew L. Larrabee
Dechert LLP
One Maritime Plaza, Suite 2300
San Francisco, CA 94111
Tel:  (415) 262-4500
Fax:  (415) 262-4555
E-mail:  matthew.larrabee@dechert.com

Michael S. Doluisio
Dechert LLP
Cira Center
2929 Arch Street
Philadelphia, PA 19104
Tel:  (215) 994-2325
Fax:  (215) 994-2222
E-mail:  michael.doluisio@dechert.com

Attorneys for Defendants
OppenheimerFunds, Inc.,

OppenheimerFunds Distributor, Inc.,
Scott Cottier, Ronald H. Fielding,
Daniel G. Loughran, John V. Murphy,
Troy Willis, and Brian W. Wixted

-And-

s/ Edward T. Lyons
Edward T. Lyons, Jr.
Jones & Keller
1999 Broadway, Suite 3150
Denver, CO 80202
Tel:  (303) 573-1600
Fax:  (303) 573-8133
E-mail:  elyons@joneskeller.com

-And-

s/ Arthur H. Aufses
Arthur H. Aufses III
Yehudis Lewis
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000
E-mail:  aaufses@kramerlevin.com

Attorneys for Defendants
Oppenheimer AMT-Free Municipals,
Oppenheimer AMT-Free New York Municipals,
Oppenheimer California Municipal Fund,
Rochester Fund Municipals, Oppenheimer
Multi-State Municipal Trust, John Cannon, Paul
Y. Clinton, Thomas W. Courtney, David K.
Downes, Matthew P. Fink, Robert G. Galli,
Phillip A. Griffiths, Lacy B. Herrmann, Mary F.
Miller, Joel W. Motley, Kenneth A. Randall,
Russell S. Reynolds, Jr., Joseph M. Wikler, Peter
I. Wold, Brian F. Wruble, Clayton K. Yeutter

## APPENDIX A:  COMPLAINT SUMMARY TABLES

| Case | Lead Plaintiff | Lead Counsel | Putative Class Period | Plaintiff's Purchase Dates | Filing Date of Initial Complaint |
|---|---|---|---|---|---|
| AMT-Free | Leonard Klorfine | Cohen Milstein | 5/13/06 - 10/21/08 | 8/13/07 - 9/24/08 | 5/13/09 |
| AMT-Free NY | John Vazquez | Milberg | 5/21/06 - 10/21/08 | 8/29/07 | 5/20/09 |
| California | Joseph Stockwell | Sparer Law Group | 9/27/06 - 11/28/08 | 5/23/07 - 12/30/08 | 2/6/09 |
| National | Peter Unanue | Milberg | 3/13/06 - 10/21/08 | 3/28/06 - 10/15/08 | 3/13/09 |
| New Jersey | Victor Sasson | Milberg | 4/24/06 - 10/21/08 | 1/25/07 - 6/5/07 | 4/24/09 |
| Pennsylvania | Dharamvir Bhanot | Berger & Montague | 9/27/06 - 11/26/08 | 4/11/08 - 11/26/08 | 4/28/09 |
| Rochester | Stuart & Carole Krosser | Cohen Milstein | 2/26/06 - 10/21/08 | 7/12/06, 10/18/07, 10/19/07 | 2/25/09 |

## LEGAL CLAIMS BY DEFENDANT

| Defendant | Securities Act §11 | Securities Act §12(a)(2) | Securities Act §15 | ICA §13(a) | UCL §17200 | Cal. Fiduciary Duty |
|---|---|---|---|---|---|---|
| OFI | X | X | X | | X | |
| OFDI | X | X | X | | X | |
| MassMutual | | | X | | X | |
| Funds[158] | X | X | | X | X[159] | |
| Individual Trustees[160] | X | | X | | X | X |
| Portfolio Managers[161] | X[162] | | X | | X | |
| Other Officers[163] | X | | X | | X | |

---

[158]   Multi-State Trust (National, New Jersey, and Pennsylvania Funds), and AMT-Free, AMT-Free NY, California, and Rochester Funds.

[159]   California Fund only.

[160]   John Cannon, Paul Y. Clinton, Thomas W. Courtney, David K. Downes, Matthew P. Fink, Robert G. Galli, Phillip A. Griffiths, Lacy B. Herrmann, Mary F. Miller, Joel W. Motley, Kenneth A. Randall, Edward V. Regan, Russell S. Reynolds Jr., Joseph M. Wikler, Peter I. Wold, and Clayton K. Yeutter,

[161]   Scott Cottier, Ronald H. Fielding, Daniel G. Loughran, and Troy Willis.

[162]   Pennsylvania Complaint only.

[163]   John V. Murphy (former OFI president), Brian W. Wixted (Chairman of Trustees), and Brian F. Wruble (OFI treasurer).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of April, 2010, I filed a true and correct copy of the foregoing **DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED COMPLAINTS IN THE ROCHESTER FUNDS GROUP SECURITIES LITIGATION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Jeffrey S. Abraham**
  jabraham@aftlaw.com
- **Glen L. Abramson**
  gabramson@bm.net,gelliott@bm.net
- **Arthur H. Aufses , III**
  aaufses@kramerlevin.com
- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net
- **Francis A. Bottini , Jr**
  frankb@johnsonbottini.com,paralegal@johnsonbottini.com
- **Stephen D. Bunch**
  dbunch@cohenmilstein.com,efilings@cohenmilstein.com
- **Gary E. Cantor**
  gcantor@bm.net
- **Jeffrey A. Chase**
  jchase@jcfkk.com,vlsanders@jcfkk.com
- **Karen Jean Cody-Hopkins**
  kjch@lilleylaw.com,rbyers@lilleylaw.com
- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com
- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com
- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com,sdunn-efile@perkinscoie.com
- **Robert J. Dyer , III**
  bob@dyerberens.com
- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com
- **John Givens Emerson**
  jemerson@emersonpoynter.com,tanya@emersonpoynter.com
- **Jack G. Fruchter**
  jfruchter@aftlaw.com
- **William H. Garvin , III**
  wgarvin@garvinlawfirm.com

56855-0005/LEGAL18027345.1

- **Paul J. Geller**
  pgeller@rgrdlaw.com,e_file_fl@rgrdlaw.com
- **Daniel Charles Girard**
  dcg@girardgibbs.com,akl@girardgibbs.com
- **Lionel Z. Glancy**
  lglancy@glancylaw.com,info@glancylaw.com
- **Gary S. Graifman**
  ggraifman@kgglaw.com,ccornfield@kgglaw.com
- **Barbara Ann Grandjean**
  bgrandjean@jcfkk.com,lchandler@jacobschase.com
- **John K. Grant**
  johnkg@csgrr.com,jdecena@csgrr.com
- **Marc C. Haber**
  mhaber@sparerlaw.com
- **Patrick John Kanouff**
  pkanouff@davisandceriani.com,jboom@davisandceriani.com
- **Christopher J. Keller**
  ckeller@labaton.com,electroniccasefiling@labaton.com
- **Phillip C. Kim**
  pkim@rosenlegal.com
- **Lawrence L. Klayman**
  lklayman@nasd-law.com
- **Peter George Koclanes**
  pkoclanes@shermanhoward.com,cgreen@shermanhoward.com,efiling@sah.com
- **Catherine J. Kowalewski**
  katek@csgrr.com,hdemag@csgrr.com
- **Jeffrey Robert Krinsk**
  jrk@classactionlaw.com,anv@classactionlaw.com
- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,michael.doluisio@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com
- **Nicole C. Lavallee**
  nlavallee@bermandevalerio.com,stuiasosopo@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Eric Lechtzin**
  elechtzin@bm.net
- **Jonathan Krasne Levine**
  jkl@girardgibbs.com,amv@girardgibbs.com
- **Lawrence D. Levit**
  llevit@aftlaw.com
- **Kevin Harvey Lewis**
  klewis@sparerlaw.com

92

- **Yehudis S. Lewis**
  ylewis@kramerlevin.com
- **Charles Walter Lilley**
  clilley@lilleylaw.com
- **Howard T. Longman**
  Tsvi@aol.com,jasondag@ssbny.com
- **Edward Thomas Lyons , Jr**
  elyons@joneskeller.com
- **Kristin A. Martinez**
  kristin@dyerberens.com
- **Catherine H. McElveen**
  kmcelveen@rpwb.com
- **Robert Nolen Miller**
  rmiller@perkinscoie.com,rmiller-efile@perkinscoie.com
- **Daniel Oakes Myers**
  dmyers@rpwb.com
- **James S. Nabwangu**
  jnabwangu@sparerlaw.com
- **Darren A. Natvig**
  dnatvig@irwin-boesen.com
- **Gordon W. Netzorg**
  gnetzorg@shermanhoward.com,shood@shermanhoward.com,cdias@shermanhoward.com,efiling@shermanhoward.com
- **Matthew D. Pearson**
  mpearson@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Charles J. Piven**
  piven@browerpiven.com
- **Charles Michael Plavi , II**
  cmp@classactionlaw.com,anv@classactionlaw.com
- **Scott E. Poynter**
  scott@emersonpoynter.com,swilson@emersonpoynter.com
- **Andrei V. Rado**
  arado@milberg.com,MAOffice@milberg.com
- **Roland W. Riggs , IV**
  rriggs@milberg.com
- **Darren J. Robbins**
  darrenr@csgrr.com,e_file_sd@csgrr.com
- **Samuel H. Rudman**
  srudman@csgrr.com,dgonzales@csgrr.com
- **Sherrie R. Savett**
  ssavett@bm.net,mgatter@bm.net
- **Peter E. Seidman**
  pseidman@milberg.com

56855-0005/LEGAL18027345.1

- **Christina H.C. Sharp**
  chc@girardgibbs.com,as@girardgibbs.com,sfs@girardgibbs.com,amv@girardgibbs.com,ale@girardgibbs.com
- **Aaron Michael Sheanin**
  amv@girardgibbs.com,ams@girardgibbs.com
- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com
- **Mark David Smilow**
  msmilow@weisslurie.com
- **Alan W. Sparer**
  asparer@sparerlaw.com,nblake@sparerlaw.com,dcorkran@sparerlaw.com,playzer@sparerlaw.com
- **Olimpio Lee Squitieri**
  Lee@sfclasslaw.com,cathy@sfclasslaw.com
- **Joseph J. Tabacco , Jr**
  jtabacco@bermandevalerio.com,stuiasosopo@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Steven J. Toll**
  stoll@cohenmilstein.com,efilings@cohenmilstein.com
- **Kirk Douglas Tresemer**
  ktresemer@coloradolawyers.com
- **Anne Marie Vu**
  avu@milberg.com,MAOffice@milberg.com
- **David C. Walton**
  davew@csgrr.com,hdemag@csgrr.com
- **Joseph H. Weiss**
  jweiss@weisslurie.com,infony@weisslurie.com
- **Douglas S. Wilens**
  dwilens@rgrdlaw.com,e_file_fl@rgrdlaw.com
- **Shawn A. Williams**
  shawnw@csgrr.com,jdecena@csgrr.com

_s/ Robert N. Miller_
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO  80202-1043
Tel:  303.291.2300
Fax:  303.291.2400
Email:  rmiller@perkinscoie.com

Attorneys for Defendants
OppenheimerFunds, Inc.,
OppenheimerFunds Distributor, Inc.,
Scott Cottier, Ronald H. Fielding,
Daniel G. Loughran, John V. Murphy,
Troy Willis, and Brian W. Wixted

95