**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Master Docket No. **09-md-02063-JLK-KMT** (MDL Docket No. 2063)

**IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION**

This document relates to:     *In re California Municipal Fund*

                                      09-cv-01484-JLK-KMT (Lowe)
                                      09-cv-01485-JLK-KMT (Rivera)
                                      09-cv-01486-JLK-KMT (Tackmann)
                                      09-cv-01487-JLK-KMT (Milhem)

                                      *In re Oppenheimer Pennsylvania Municipal Fund*

                                      09-cv-01483-JLK-KMT (Woods)
                                      09-cv-01368-JLK-KMT (Egts)
                                      09-cv-01765-JLK-KMT (Wunderly)

---

**DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED COMPLAINTS
FOR THE CALIFORNIA AND PENNSYLVANIA MUNICIPAL FUNDS**

---

# **TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

ARGUMENT .....................................................................................................................1

I.   THE CALIFORNIA AND PENNSYLVANIA PLAINTIFFS' JUNK BOND
     ALLEGATIONS FAIL TO STATE A CLAIM ........................................................1

     A.   Defendants Disclosed All Material Facts about
          Their Junk Bond Investments ......................................................................2

     B.   The Pennsylvania Plaintiff Erroneously Equates
          Unrated Bonds with Junk Bonds..................................................................3

     C.   Plaintiffs' Allegations Amount to Nothing More Than a Difference of
          Opinion That Is Not Actionable under the Federal Securities Laws. ...............5

II.  THE CALIFORNIA PLAINTIFF'S DIRT BOND ALLEGATIONS
     FAIL TO STATE A CLAIM ...................................................................................7

     A.   The California Fund Disclosed the Risks and Amounts of
          Its Investments in Dirt Bonds......................................................................8

     B.   The California Plaintiff's Allegation That Dirt Bonds Are Necessarily
          Part of a "California Real Estate Development Industry" Is Meritless..............9

     C.   The California Plaintiff's Allegation That Dirt Bonds Should
          Have Been Rated as Junk Bonds Fails To State a Claim ...............................11

III. THE CALIFORNIA PLAINTIFF'S TOBACCO BOND ALLEGATIONS
     FAIL TO STATE A CLAIM .................................................................................13

IV.  PLAINTIFFS' CLAIMS ARE TIME-BARRED.......................................................14

     A.   The Pennsylvania Plaintiff Was on Notice of His Claims
          about Unrated Bonds..................................................................................15

     B.   The California Plaintiff Was on Notice of His Claims
          about Dirt and Tobacco Bonds....................................................................16

V.   THE CALIFORNIA PLAINTIFF'S STATE LAW CLAIMS
     SHOULD BE DISMISSED ...................................................................................17

     A.   The State Law Claims Are Preempted by SLUSA .........................................17

     B.   The State Law Claims Are Derivative ..........................................................20

     C.   The California Plaintiff Fails To State a Claim under the
          California Business and Professions Code....................................................22

          1.   The UCL Does Not Apply to Securities Transactions .........................22

2.      The California Plaintiff Lacks Standing To Assert a
        Claim under the UCL .......................................................................23

D.      The Breach of Fiduciary Duty Claim Should Be Dismissed ...........................24

E.      The State Law Claims Asserted Against the Independent
        Trustees Are Barred by the Declaration of Trust .............................................25

**CONCLUSION** ...........................................................................................................................27

# TABLE OF AUTHORITIES

*Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
 521 F.3d 1278 (10th Cir. 2008).................................................................................18

*Appert v. Morgan Stanley Dean Witter, Inc.*,
 No. 08-7130, 2009 WL 3764120 (N.D. Ill. Nov. 6, 2009) ...............................................18

*Bank of the West v. Superior Court*,
 2 Cal. 4th 1254 (1992) ...............................................................................................24

*Barron v. Igolnikov*,
 No. 09-4471, 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010) ..............................................18

*Bellikoff v. Eaton Vance Corp.*,
 481 F.3d 110 (2d Cir. 2007)........................................................................................22

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
 No. 07-10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...............................................9

*Boston Safe Deposit & Trust Co. v. Lewis*,
 57 N.E.2d 638 (Mass. 1944) ........................................................................................25

*Bowen v. Ziasun Techs., Inc.*,
 116 Cal. App. 4th 777 (Ct. App. 2004).........................................................................22

*Buckland v. Threshold Enter., Ltd.*,
 155 Cal. App. 4th 798 (Ct. App. 2007).........................................................................23

*Day v. AT&T Corp.*,
 63 Cal. App. 4th 325 (Ct. App. 1998)...........................................................................24

*Dietrich v. Bauer*,
 76 F. Supp. 2d 312 (S.D.N.Y. 1999).............................................................................22

*Dolan v. Rothschild Reserve Int'l, Inc.*,
 No. 90-1003, 1991 WL 155770 (S.D.N.Y. Aug. 8, 1991)................................................14

*Forsythe v. Sun Life Fin., Inc.*,
 417 F. Supp. 2d 100 (D. Mass. 2006) ...........................................................................20

*Great W. Producers Co-op. v. Great W. United Corp.*,
 613 P.2d 873 (Colo. 1980) ..........................................................................................19

*Grossman v. Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) ..................................................................................12

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
   No. 04-4885, 2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005) ..............................................20

*In re Charles Schwab Corp. Sec. Litig.*,
   257 F.R.D. 534 (N.D. Cal. 2009) ..........................................................................19, 23

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
   No. 98-4318, 2000 WL 10211 (S.D.N.Y. Jan. 6, 2000) ....................................................21

*In re ms55, Inc.*,
   420 B.R. 806 (Bankr. D. Colo. 2009) ..........................................................................20

*Kainos Labs., Inc. v. Beacon Diagnostics, Inc.*,
   No. 97-4618, 1998 WL 2016634 (N.D. Cal. Sept. 14, 1998) ...........................................21

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (Ct. App. 2003) ........................................................................23, 24

*Marsman v. Nasca*,
   573 N.E.2d 1025 (Mass. App. Ct. 1991) .......................................................................26

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006) ..............................................................................................17

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
   151 Cal. App. 4th 688 (Ct. App. 2007) ......................................................................23

*Phillips v. Morgan Stanley Dean Witter High Income Advantage Trust III*,
   No. 01-8139, 2002 WL 31119441 (S.D.N.Y. Sept. 25, 2002) ...........................................10

*Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*,
   290 F.3d 1055 (9th Cir. 2002) ...............................................................................22

*Rowinski v. Salomon Smith Barney Inc.*,
   398 F.3d 294 (3d Cir. 2005) ..................................................................................18

*Scanlan v. W.C. Canniff & Sons, Inc.*,
   No. 94-6722, 1996 WL 490170 (Mass. Super. Ct. Aug. 29, 1996) ....................................21

*Scognamillo v. Credit Suisse First Boston LLC*,
   No. 03-2061, 2005 WL 2045807 (N.D. Cal. Aug. 25, 2005), *aff'd*,
   254 F. Appx. 669 (9th Cir. 2007) ..............................................................................22

*Segal v. Fifth Third Bank, N.A.*,
  581 F.3d 305 (6th Cir. 2009)........................................................................18

*Shearson Lehman Brothers, Inc. v. Greenberg*,
  No. 93-623, 1993 WL 144856 (C.D. Cal. Mar. 15, 1993), *aff'd*,
  60 F.3d 834 (9th Cir. 1995).........................................................................22

*Spinner Corp. v. Princeville Dev. Corp.*,
  849 F.2d 388 (9th Cir. 1988)........................................................................22

*Stegall v. Ladner*,
  394 F. Supp. 2d 358 (D. Mass. 2005) ...........................................................19

*Stoody-Broser v. Bank of America, N.A.*,
  No. 08-2705, 2009 WL 2707393 (N.D. Cal. Aug. 25, 2009) ...........................18

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008).......................................................................24

*Williams v. Deutsche Bank Sec., Inc.*,
  No. 04-7588, 2005 WL 1414435 (S.D.N.Y. June 13, 2005) ...........................23

## STATUTES

15 U.S.C. § 78bb(f)(1) ............................................................................16, 17

15 U.S.C. § 80a-47(a) ..............................................................................21, 22

Cal. Bus. & Prof. Code § 17200 *et seq.* .................................................21, 22, 23

Cal. Gov't Code § 53312.7 ............................................................................8, 10

Colo. Rev. Stat. § 7-90-805(4) ...........................................................................19

Mass. Gen. Laws ch.156D, § 7.42 .......................................................................21

## OTHER AUTHORITIES

California Debt and Investment Advisory Commission,
  *Appraisal Standards for Land-Secured Financings*, July 2004 (rev.),
  *available at* http://www.treasurer.ca.gov/cdiac/reports/appraisalStds.pdf .......................12

*Investment Companies Investing in Tax-Exempt Securities*,
  Inv. Co. Act Rel. No. 9785, 42 Fed. Reg. 29130 (June 7, 1977) ......................................10

*Registration Form Used by Open-End Management Investment Companies;*
   *Guidelines*, Inv. Co. Act Rel. No. 13436, 48 Fed. Reg. 37928 (Aug. 22, 1983) .........10, 11

*Registration Form Used by Open-End Management Investment Companies*,
   63 Fed. Reg. 13916 (Mar. 23, 1998) ................................................................................11

SEC Office of Economic Analysis, *Report on Transactions in Municipal Securities*,
   July 1, 2004, *available at* http://www.sec.gov/news/studies/munireport2004.pdf ..............4

W. STERN, BUS. & PROF. C. § 17200 PRACTICE ¶ 3:24 (2008) ................................................22

## INTRODUCTION

In addition to asserting the same common allegations addressed in Defendants' Joint Motion to Dismiss the Consolidated Complaints (the "Consolidated Brief"), Plaintiffs in the California Fund and Pennsylvania Fund actions pursue several theories that the other Plaintiffs either have abandoned or have chosen not to raise. Individually and in the aggregate, these claims suffer from a remarkable number of legal and logical flaws, any one of which is fatal. For the reasons discussed below, these afterthought claims fail as a matter of law and should be dismissed in their entirety.

## ARGUMENT

**I. THE CALIFORNIA AND PENNSYLVANIA PLAINTIFFS' JUNK BOND ALLEGATIONS FAIL TO STATE A CLAIM.**

Although all seven of the Rochester Funds invested in junk bonds, only the California and Pennsylvania Plaintiffs purport to assert misrepresentation claims relating to them. These Plaintiffs' allegations boil down to the single theory that the Funds invested in too many junk bonds and therefore violated their stated 25% limit on investments in below-investment grade securities. Specifically, they claim that the Funds undercounted their junk bond holdings because they failed to count as junk bonds securities that were not rated by national ratings agencies.[1] As discussed below, Plaintiffs' claims fail because: (1) the Funds disclosed that they would invest in junk bonds and described their risks; (2) the Pennsylvania Plaintiff's contention that all unrated bonds constitute junk bonds subject to the 25% limit is wrong; and (3) at bottom, Plaintiffs' allegations amount to nothing more than an after-the-fact difference of opinion, which does not state a claim under the federal securities laws.

---

[1]      Cal. Compl. ¶¶4-5, 98-99; Pa. Compl. ¶¶59, 102, 105.

### A.    Defendants Disclosed All Material Facts about Their
####      Junk Bond Investments.

As the Funds made clear, "junk bonds" are securities that are rated "below investment

grade."[2]  Bonds are "investment grade" if they are rated at least "BBB" by Standard & Poor's

or "Baa" by Moody's.  Cal. SAI (10/31/07) at A-1.  Accordingly, BBB-rated bonds are

investment grade, not junk bonds.

Consistent with the aggressive Rochester style of investing, the California and

Pennsylvania Funds disclosed that they would seek out investments in junk bonds.  Both

Funds stated within the first few pages of their Prospectuses that they "can hold up to 25% of

[their] total assets in lower-grade securities (sometimes called 'junk bonds')" and that they

invest in junk bonds "to seek higher income."[3]

The Funds clearly and concisely disclosed the risks associated with junk bonds.  A

section of the Prospectuses entitled "Special Credit Risks of Lower-Grade Securities"

explained that junk bonds usually offer higher yields than investment-grade securities but are

"subject to greater price fluctuations and risks of loss of income and principal than

investment-grade municipal securities."  *Id*.  This section went on to explain that junk bonds

"have a greater risk that the issuers might not meet their debt obligations."  *Id*.  These points

were echoed in the Funds' SAIs, which stated that junk bonds "may be subject to a greater

degree of credit risk, market fluctuations and loss of income and principal, and may be more

---

[2]    Cal. Prospectus (10/31/07) at 5 (Larrabee Decl., Ex. C-1); Pa. Prospectus (11/28/07) at 4
(Larrabee Decl., Ex. C-3).  Hereinafter, as in the Consolidated Brief, citations to the
Prospectus and SAI for the two Funds will refer to the document's name only and not to
the Larrabee Declaration.

[3]    Cal. Prospectus (10/31/07) at 3-4; Pa. Prospectus (11/28/07) at 3-4.

sensitive to economic conditions than lower-yielding, higher-rated fixed-income securities."[4] Beyond disclosing the risks of junk bonds, the Funds disclosed the percentages of their portfolios that junk bonds represented. For instance, during the putative Class Periods, the California and Pennsylvania Funds disclosed that they held up to 20.2% and 22.8% of their total assets in junk bonds, respectively.[5]

**B.      The Pennsylvania Plaintiff Erroneously Equates
          Unrated Bonds with Junk Bonds.**

Throughout his Complaint, the Pennsylvania Plaintiff claims that junk bonds and unrated bonds are one and the same. For instance, Plaintiff alleges that the Fund violated its 25% limit on investments in junk bonds as of July 31, 2007 because "37% of the Fund's total assets had been invested in bonds that were either junk bonds or were unrated by any nationally recognized rating agency." Pa. Compl. ¶103; *see also id.* ¶104 (alleging that the Fund violated its 25% limit as of July 31, 2008 because "33% of the Fund's total assets had been invested in bonds that were either rated as junk or were unrated").

The Pennsylvania Plaintiff's theory fails because it improperly equates unrated bonds with junk bonds. Unrated bonds are exactly what their name suggests: bonds that have not been rated by a ratings agency and that mutual funds therefore must rate themselves. Consistent with the "rocky road" Rochester style, the Pennsylvania Fund disclosed that it "look[s] for . . . [u]nrated bonds that might provide high income" and that it "can invest a significant portion of its assets in unrated securities." Pa. Prospectus (11/28/07) at 4, 14.

---

[4]      Cal. SAI (10/31/07) at 137; Pa. SAI (11/28/07) at 131.

[5]      Cal. MCAR (7/31/08) at 15 (Larrabee Decl., Ex. C-5); Pa. MCSR (1/31/08) at 17 (Larrabee Decl., Ex. C-6).

Indeed, the Fund had no limitation on the amount of unrated bonds it could hold and disclosed, for example, that it held about 20% of its total assets in unrated bonds as of January 31, 2008.  *See* Pa. MCSR (1/31/08) at 17 (Larrabee Decl., Ex. C-6).

The fact that a rating agency has not rated a bond says nothing about the bond's quality.  If rated by a rating agency, the bond may have received a AAA rating or it may have been rated as junk.  Similarly, the absence of any rating does not imply a specific rating or quality; rather, it informs investors only that the issuer of the bond – for whatever reason – did not want to have its securities rated.[6]  One reason issuers do not obtain ratings is to save money.  As the SEC's Office of Economic Analysis and Office of Municipal Securities have explained:  "There is a cost to having a security rated.  If the benefits of rating do not exceed those costs, the issuer generally will not pay to have the security rated."[7]  Thus, bonds issued in smaller offerings tend to be unrated more often than bonds issued in larger offerings.  *Id.*

In short, unrated bonds may be junk or they may be investment grade.  But there is no way to make this determination without analyzing the particular bond and issuer.  Because the Pennsylvania Plaintiff's theory is based upon no more than the simplistic and erroneous notion that all unrated bonds are junk, his claims fail.

---

[6]      Plaintiffs also point to the Funds' holdings in BBB-rated bonds as evidence of an overconcentration in junk bonds.  Like their mistaken theory regarding unrated bonds, Plaintiffs' BBB theory fails because BBB bonds are not junk bonds – they are investment grade.  For this reason, there was no stated limit on investments in BBB-rated bonds.  In fact, the Funds disclosed repeatedly – before, during, and after the putative Class Periods – that BBB-rated bonds comprised a substantial portion of their portfolios.  *See, e.g.*, Cal. MCAR (7/31/08) at 15 (Larrabee Decl., Ex. C-5) (BBB-rated bonds comprised 39.5% of the California Fund's assets); Pa. MCSR (1/31/08) at 17 (Larrabee Decl., Ex. C-6) (BBB-rated bonds comprised 38.5% of the Pennsylvania Fund's assets).

[7]      SEC Office of Economic Analysis, *Report on Transactions in Municipal Securities*, July 1, 2004, at 23, *available at* http://www.sec.gov/news/studies/munireport2004.pdf.

C.      **Plaintiffs' Allegations Amount to Nothing More Than a Difference of
Opinion That Is Not Actionable under the Federal Securities Laws.**

Once Plaintiffs' ineffective attempt to equate unrated bonds with junk bonds is

rejected, all that remains is a belated difference of opinion.  Specifically, Plaintiffs claim that

the Funds should have treated more of their unrated bonds as junk bonds.  But Plaintiffs do

not allege that Defendants did not believe their own internal ratings of unrated bonds at the

time those ratings were made.  Accordingly, Plaintiffs have not alleged that the Funds made

any material misstatement.

The Funds made clear that the Manager would be exercising its business judgment

when rating unrated bonds.  They explained that "[i]f a security the Fund buys is not rated, the

Manager will use its judgment to assign a rating that it believes is comparable to that of a

rating organization."[8]  The SAIs reiterated this point by stating that the Manager "will make

its own assessment of the credit quality of unrated issues the Fund buys."[9]  In such a situation,

the Manager "will use criteria similar to those used by the rating agencies, and [assign] a

rating category to a security that is comparable to what the Manager believes a rating agency

would assign to that security."  *Id*.  These rating standards are detailed in an appendix to the

SAIs entitled "Ratings Definitions."[10]  The Funds also made clear that ratings do not

"constitute a guarantee" and that "[t]here are variations in the credit quality of municipal

securities, both within a particular rating classification and between classifications."[11]

---

[8]      Cal. Prospectus (10/31/07) at 15; Pa. Prospectus (11/28/07) at 14.

[9]      Cal. SAI (10/31/07) at 10; Pa. SAI (11/28/07) at 10.

[10]     Cal. SAI (10/31/07) at A–1–A–7; Pa. SAI (11/28/07) at A–1–A–7.

[11]     Cal. SAI (10/31/07) at 2, 10; Pa. SAI (11/28/07) at 2, 10.

Plaintiffs do not challenge the truthfulness of any of these disclosures.[12]   In particular, they do not allege that Defendants failed to exercise their judgment as described, nor do they allege that ratings were not made pursuant to the disclosed process.  Rather, they merely claim that they would have reached different conclusions with the benefit of hindsight than those the Funds reached in real time.

But Plaintiffs cannot state a misrepresentation claim unless they allege that the Funds did not believe their ratings at the time they were made.  *See* Consol. Br. Arg. II.C.2.  For instance, to state a claim, Plaintiffs would need to allege that Defendants rated a bond as investment grade, even though they subjectively believed that it was junk.  Because Plaintiffs make no such allegations, they plead no untrue statement or omission of a material fact.[13]  Accordingly, Plaintiffs' allegations that the Funds misrepresented their junk bond holdings fail as a matter of law.

---

[12]   Plaintiffs do allege that the Funds failed to disclose the risk of error in connection with their internal ratings.  *See* Cal. Compl. ¶98(a); Pa. Compl. ¶102.  But this charge is squarely contradicted by the Funds' disclosures, which noted that a rating assigned by the Manager "does not constitute a guarantee of the quality of a particular issue."  Cal. SAI (10/31/07) at 10; Pa. SAI (11/28/07) at 10.  The Funds also disclosed that they "might have difficulty valuing [unrated securities] and selling them promptly at an acceptable price," and that "[m]any factors affect an issuer's ability to make timely payments, and the credit risks of a particular security may change over time."  Cal. Prospectus (10/31/07) at 15; Pa. Prospectus (11/28/07) at 14.

[13]   Had Defendants "optimistically" rated their assets, as Plaintiffs suggest, one would expect to see an unusually high default rate in the Funds' investments.  To the contrary, default rates for Fund assets remained exceptionally low throughout the putative Class Periods, and they never spiked during or after the credit crisis.  *See, e.g.*, Cal. SAI (10/31/07) at 137 (0.12%); Pa. SAI (11/28/07) at 131 (0.07%).  This undermines the plausibility of Plaintiffs' conclusory assertions that the Funds inflated the credit ratings of their assets.

II.     **THE CALIFORNIA PLAINTIFF'S DIRT BOND ALLEGATIONS FAIL TO STATE A CLAIM.**

Since 1994, the California Fund has made significant investments in California "dirt bonds," which at times comprised roughly a third of its assets. The California Plaintiff tries to manufacture a disclosure claim from this publicly known fact in two ways. First, he alleges a violation of the Fund's policy not to "concentrate more than 25% of its holdings in a single industry," Cal. Compl. ¶¶9, 81, by inventing a new industry definition. Specifically, he alleges that all dirt bonds fall within his self-styled "California real estate development industry," which he claims the Fund should have adopted. Second, he alleges that the "overwhelming majority" of dirt bonds in the Fund's portfolio should have been rated as junk. *Id*. ¶12.

Plaintiff's dirt bond allegations fail to state a claim. As an initial matter, the claim that the Fund violated its concentration policy fails as a matter of law because certain types of municipal securities – including dirt bonds – are not subject to the Fund's concentration policy and, in any event, the Fund never classified "California real estate development" as an industry. Plaintiff's allegations that dirt bonds were junk reflect a fundamental misunderstanding of dirt bonds and fail to state a misrepresentation of fact. Accordingly, the California Plaintiff's dirt bond allegations should be dismissed.

A.     **The California Fund Disclosed the Risks and Amounts of Its Investments in Dirt Bonds.**

California dirt bonds generally are issued under the Mello-Roos Community Facilities Act of 1982 by governmental agencies called community facilities districts. *See* Cal. Gov't

Code § 53312.7.  Money raised from dirt bond sales can be used to "to finance infrastructure projects, such as roads or sewage treatment plants."  Cal. SAI (10/31/07) at 3.

As the Fund disclosed, dirt bonds are municipal securities "secured by real estate taxes levied on property located in the same community as the project." *Id.*  Thus, as the Registration Statement explained, the "bonds do not constitute an obligation of a municipal government"; rather, "[t]imely payment of principal and interest depends on the ability of the developer of the project or other property owners to pay their real estate taxes." *Id.* Accordingly, the Fund warned that payments on the bonds could be adversely affected by a "general economic decline or decline in the real estate market." *Id.*

Notwithstanding these risks, the Fund invested in dirt bonds because they "can provide significant yield advantages for Fund investors."  Cal. MCAR (7/31/08) at 18-19 (Larrabee Decl., Ex. C-5).  The Fund explained that "for every financially troubled developer who might have to walk away from a half-built project, there are countless others who are eager to . . . resume the work and assume the debt-service obligations." *Id.*

The Fund also disclosed throughout the putative Class Period that it invested approximately one third of its assets in dirt bonds.[14]  Moreover, the Fund's Statement of Investments listed each dirt bond in the Fund's portfolio, including the principal value, coupon rate, maturity date, and current market value of the bond.  Cal. SAI (10/31/07) at 100-

---

[14]     *See, e.g.*, Cal. MCSR (1/31/07) at 8 (Larrabee Decl., Ex. C-7) ("These Special Tax and Special Assessment bonds, sometimes known as dirt bonds, represented more than one-third of the portfolio's market value as of January 31, 2007."); Cal. MCAR (7/31/08) at 18 (Larrabee Decl., Ex. C-5) ("These [dirt bond] Special Tax and Special Assessment holdings represented about one-third of the Fund's market value as of July 31, 2008.").  Plaintiff's allegation that the "November 2008 Prospectus for the first time disclosed that the Fund had been concentrating far more than 25% of its assets in the California real estate development industry and the risks inherent in that strategy" is thus demonstrably false.  Cal. Compl. ¶93.

25.  In short, the Fund disclosed its dirt bond investments and their risks in great detail and no reasonable investor could have been misled into believing that dirt bonds represented less than 25% of the Fund's assets.  Regardless of the Fund's concentration policy, Plaintiff therefore cannot state a misrepresentation or omission claim.  *See Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07-10528, 2010 WL 148617, at *8 (S.D.N.Y. Jan. 14, 2010) ("The Prospectus's disclosure of information alleged in the Complaint to have been withheld from prospective investors renders the Complaint insufficient as a matter of law.").

**B.      The California Plaintiff's Allegation That Dirt Bonds Are Necessarily Part of a "California Real Estate Development Industry" Is Meritless.**

Plaintiff's basic allegation on this issue is that the Fund's dirt bond investments should have been classified within a single, putative "California real estate development industry" – and therefore should have comprised no more than 25% of Fund assets (and certainly less than a third).  Cal. Compl. ¶¶8, 89.  This claim fails for two reasons.

First, the claim fails because the Fund's industry concentration policy simply does not apply, by its own terms, to dirt bonds or to Plaintiff's proposed "California real estate development industry."  Throughout the putative Class Period, the Fund disclosed that its 25% industry concentration limit generally did not apply to "municipal securities in general or to California Municipal Securities."[15]  Cal. SAI (10/31/07) at 32; *see also id.* at 33 (stating

---

[15]      An exception was made for municipal securities issued by a "non-governmental user of facilities financed by revenue bonds," which the Fund stated that it did monitor for compliance with the 25% limit.  Cal. SAI (10/31/07) at 33.  For this reason, similar types of these "revenue bonds," like tobacco settlement bonds, were subject to the industry concentration limit even though they are a form of municipal securities.

that "the Fund has no concentration limitation" as to "municipal securities").[16]  Dirt bonds are

"municipal securities" because they are issued by a governmental agency.  *See* Cal. Gov't

Code § 53312.7.  Thus, the 25% limit does not apply to them.[17]

Second, even if dirt bonds were subject to the Fund's industry classification policy,

Plaintiff's claim would fail because the Fund's industry classifications did not include a

"California real estate development" industry.  It is the legal prerogative of the *Fund* – not

disappointed investors who sue after the fact – to determine industry classifications.  The SEC

has explained that a fund "may select its own industry classifications" so long as the

classifications are "reasonable" and not "so broad that the primary economic characteristics of

the companies in a single class are materially different."[18]

Simply put, the Fund did not, and had no obligation to, select a "California real estate

development" industry as one of its chosen industry classifications.  Accordingly, Plaintiff's

claim fails.  *See, e.g.*, *Phillips v. Morgan Stanley Dean Witter High Income Advantage Trust*

*III*, No. 01-8139, 2002 WL 31119441, at *3-4 (S.D.N.Y. Sept. 25, 2002) (dismissing an

---

[16]    This Fund policy is consistent with SEC guidance stating that industry concentration policies are "not applicable to investments in tax-exempt securities issued by governments or political subdivisions of governments since such issuers are not members of any industry."  *Investment Companies Investing in Tax-Exempt Securities*, Inv. Co. Act Rel. No. 9785, 42 Fed. Reg. 29130 (June 7, 1977).

[17]    Plaintiff claims that the Fund did not disclose until November 2008 that its concentration policy did not apply to municipal securities.  *See* Cal. Compl. ¶10.  As the Funds' 2007 disclosures make plain, this claim is wrong.

[18]    *Registration Form Used by Open-End Management Investment Companies; Guidelines*, Inv. Co. Rel. No. 13436, 48 Fed. Reg. 37928, 37956 (Aug. 22, 1983).  The passages from these guidelines quoted by Plaintiff pertain to municipal securities that are "paid from revenues of similar types of projects" – *i.e.*, revenue bonds.  *See id.*; Cal. Compl. ¶82.  As discussed above, dirt bonds are paid from taxes, not from project revenues and therefore are considered "special tax" or "special assessment" bonds.  Furthermore, the Fund did in fact treat revenue bonds financing non-governmental users of facilities as subject to its concentration policy.

industry concentration claim based on a plaintiff-created "group of industries" classification).

Indeed, if the Fund had lumped into a single industry every company that developed property

in California, it very well may have violated the SEC's guidelines that industry classifications

"should not be so broad that the primary economic characteristics of the companies in a single

class are materially different."[19]

### C.    The California Plaintiff's Allegation That Dirt Bonds Should Have Been Rated as Junk Bonds Fails To State a Claim.

Plaintiff asserts that the "overwhelming majority" of the dirt bonds in the California

Fund's portfolio should have been considered below-investment grade.  Cal. Compl. ¶12.

Plaintiff's only support for this claim is his self-serving adoption of "value-to-lien ratio" as

the sole measure of the creditworthiness of dirt bonds.  Specifically, Plaintiff alleges that

ratings agencies typically rate dirt bonds with a value-to-lien ratio of less than 10-to-1 as junk

and that "more than 27% of the bonds in the Fund's portfolio were either Dirt Bonds that did

not have a value-to-lien ratio of at least 10:1, or were [already] rated junk by a nationally

recognized rating agency."  *Id*. ¶¶103-04.  This claim is flawed for several reasons.

First, Plaintiff confuses the value-to-lien ratio of the bond at the time it was *issued*

with the ratio at the time it was *rated*.  As the Complaint makes clear, Plaintiff relies on value-

to-lien information from the "issuance material" for the bonds.  *Id*. ¶104.  At the time a dirt

bond is issued, however, the value of the property backing the bond is at its lowest; the

property typically is just "dirt."  But as the land is developed, the value-to-lien ratio changes

---

[19]    *Registration Form*, 48 Fed. Reg. at 37956.  Although this guidance from the SEC was superseded in 1998, the SEC has not provided alternative guidance as to what should constitute an industry for purposes of a mutual fund's policies.  *See* Final Rule, *Registration Form Used by Open-End Mgmt. Inv. Cos.*, 63 Fed. Reg. 13916, 13940 (Mar. 23, 1998).

dramatically, which is why it matters whether a dirt bond is "well seasoned," as Plaintiff acknowledges. *Id*. ¶103. Thus, Plaintiff's entire theory is based upon a value-to-lien ratio that does not correspond to the time the bonds are actually rated. Using the original ratio as of the time of issuance to rate bonds regardless of their actual "seasoning" over time would mistakenly mislead investors. Plaintiff thus fails to state a claim that any of the Fund's ratings were untrue *at the time they were made*. *See, e.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997).

Second, Plaintiff's claim fails because it improperly relies on the value-to-lien ratio to the exclusion of all other factors that are relevant to the rating of securities. As even the Treasurer of California has advised, "credit analysts should not focus exclusively on value-to-lien ratios, but also review the adequacy of reserve funds, capitalized interest accounts, special tax coverage, the track record and financial resources of the developer, and other security features of the bonds."[20] Plaintiff does not suggest, and it would be implausible if he did, that rating agencies would not similarly consider other factors like these. Indeed, Plaintiff seems to recognize that the 10-to-1 ratio is not a *per se* rule. *See* Cal. Compl. ¶103 (rating agencies "*usually* will not assign investment grade ratings to Dirt Bonds" and "*generally* do not assign investment grade ratings to special assessment Dirt Bonds . . . unless such projects have at least a 10:1 value-to-lien ratio"). Thus, because Plaintiff's theory improperly considers only one factor to the exclusion of all other relevant factors, it does not even rise to a plausible opinion to contradict the judgments inherent in the ratings – or rating method – employed by the Fund.

---

[20]   Cal. Debt & Inv. Advisory Comm'n, *Appraisal Standards for Land-Secured Financings*, July 2004 (rev.), at 5, *available at* http://www.treasurer.ca.gov/cdiac/reports/appraisalStds.pdf.

Finally, Plaintiff fails to allege that Defendants did not believe the ratings they assigned to the dirt bonds.  As discussed above, the rating of securities requires the exercise of business judgment.  As such, Plaintiff cannot allege that the Fund made a material misstatement of fact without alleging that Defendants did not believe the Fund's ratings at the time they were made.  Because Plaintiff makes no such allegations, his claim fails.

### III.   THE CALIFORNIA PLAINTIFF'S TOBACCO BOND ALLEGATIONS FAIL TO STATE A CLAIM.

All other Plaintiffs have abandoned allegations about tobacco bonds, a judgment that almost certainly reflects the market reality that tobacco bonds are in fact among the more liquid municipal securities.  Undeterred by this reality, the California Plaintiff persists in pursuing the meritless claim that Defendants omitted to state that the Fund's tobacco bond holdings "were, as a general matter, illiquid or at significant risk of illiquidity," which "further contributed to overall illiquidity in excess of the 15% cap" on illiquid assets.  Cal. Compl. ¶¶114, 125, 131.

Plaintiff's claim fails as a matter of law for the same reasons as the illiquidity claims addressed in the Consolidated Brief.  First, the Fund clearly disclosed the illiquidity risks of all of its municipal securities holdings, which of course include tobacco bonds.  *See* Consol. Br. Arg. II.C.  Second, the Fund disclosed how it determines whether securities are illiquid and that such decisions require the exercise of judgment.  Thus, Plaintiff's failure to allege that the Fund identified particular securities as being liquid when Defendants subjectively believed that they were illiquid is fatal to his claim.  *Id.*  Finally, repeating the same flawed reasoning of Plaintiffs' common illiquidity claims, the California Plaintiff hangs his hat on allegations about low trading volumes and large holdings in tobacco bonds.  *See* Cal. Compl.

¶¶131, 132.  But as discussed in the Consolidated Brief, neither low trading volume nor a large holding in a particular municipal bond means that the bond *cannot* readily be sold.  Nor can such limited theoretical constructs substitute for either the Fund's multi-faceted judgments or actual averments of fact to demonstrate plausibly that the tobacco bonds held in the California Fund's portfolio were in fact illiquid.  *See* Consol. Br. Arg. II.C.2.  For all these reasons, Plaintiff's allegations about tobacco bonds fail to state a disclosure claim under the federal securities laws.

## IV.    PLAINTIFFS' CLAIMS ARE TIME-BARRED.

Plaintiffs' claims about unrated, junk, dirt, and tobacco bonds also should be dismissed because they are barred by the statute of limitations.  The Securities Act requires plaintiffs to sue within one year of when a reasonably diligent investor would have discovered the facts underlying his claims.  *See* Consol. Br. Arg. IV.A.  In this case, the Registration Statements themselves put Plaintiffs on notice of the facts underlying their claims, so the one-year limitations period began running as soon as they purchased shares in the Funds.  *See, e.g.*, *Dolan v. Rothschild Reserve Int'l, Inc.*, No. 90-1003, 1991 WL 155770, at *1 (S.D.N.Y. Aug. 8, 1991).  But the California and Pennsylvania Plaintiffs did not file their lawsuits until over a year after making their investments.[21]  Thus, their claims are time-barred and should be dismissed with prejudice.

---

[21]    The California Plaintiff first purchased shares on May 23, 2007, but did not file a lawsuit until February 6, 2009.  The Pennsylvania Plaintiff first purchased shares on April 11, 2008, but did not file a lawsuit until April 28, 2009.  *See* Consol. Br. App. A.

### A.  The Pennsylvania Plaintiff Was on Notice of His Claims about Unrated Bonds.

The Pennsylvania Plaintiff alleges that the Pennsylvania Fund's investments in unrated and junk bonds violated the Fund's policy of investing at least 75% of its assets in investment-grade securities.  As discussed above, this claim is based upon Plaintiff's erroneous assertion that all of the Fund's unrated bonds "should have been considered below investment grade."  Pa. Compl. ¶102.  It also is time-barred.  If the Pennsylvania Plaintiff truly believed that all unrated securities are junk bonds, then he had all the information needed to assert such a claim more than one year before the first Pennsylvania Fund complaint was filed.  Specifically, he knew that the Fund's junk bond and unrated bond holdings exceeded 25% of the Fund's assets.  *See* Pa. MCSR (1/31/08) at 17 (Larrabee Decl., Ex. C-6).  Thus, because the Pennsylvania Plaintiff failed to file suit within one year of being put on notice of the claim, his claim is untimely as a matter of law.

### B.  The California Plaintiff Was on Notice of His Claims about Dirt and Tobacco Bonds.

The California Plaintiff alleges that the California Fund's investments in dirt and tobacco bonds violated the Fund's stated investment policies.  These claims also are time-barred because the Fund's disclosures revealed all of the facts underlying them.

First, Plaintiff alleges that the Fund's investments in dirt bonds violated the Fund's industry concentration policy.  *See* Cal. Compl. ¶89.  This claim is based on the bald assertion that the Fund should have grouped all dirt bonds into a single industry, even though they are municipal securities repaid by entities in radically different industries.  But well over a year

before this case began, the Fund stated that more than 25% of its assets were dirt bonds.[22] Thus, Plaintiff's belated complaints about allegedly excessive dirt-bond investments are time-barred.

Second, Plaintiff alleges that tobacco bonds are "as a general matter, illiquid or at a significant risk of illiquidity," and thus the Fund violated its 15% limit on illiquid securities by investing too heavily in tobacco bonds.  Cal. Compl. ¶131.  This claim also is raised too late because the Fund disclosed all along that it invested more than 15% of its assets in tobacco bonds.[23]  Moreover, the Fund typically did not label tobacco bonds as illiquid in its Statements of Investments.  Thus, if Plaintiff believed tobacco bonds almost always are illiquid, he was on notice of the facts underlying the liquidity allegations as soon as he purchased his shares.  Suing in 2009, after the economic crisis, is exactly the type of "wait and see" approach that is not permitted under the statute of limitations.

## V.      THE CALIFORNIA PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED.

The California Plaintiff alone asserts two state law claims – a claim against all Defendants under California's Unfair Competition Law § 17200, and a breach of fiduciary duty claim against the Independent Trustees (together, the "State Law Claims").  These claims should be dismissed for at least five reasons.  First, they are preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f)(1).  Second, the claims are derivative, and therefore belong to the Fund, but the California Plaintiff purports to bring

---

[22]     *See, e.g.*, Cal. MCSR (1/31/07) at 8 (Larrabee Decl., Ex. C-7) ("Special Tax and Special Assessment bonds, sometimes known as dirt bonds, represented more than one-third of the portfolio's market value as of January 31, 2007.").

[23]     *See, e.g.*, Cal. MCSR (1/31/07) at 15 (Larrabee Decl., Ex. C-7) (stating that "Tobacco Settlement" securities comprised 18.4% of the Fund's portfolio).

them as direct shareholder claims and without making demand on the board.  Third, California's Unfair Competition Law ("UCL") does not apply to securities transactions, and even if it did, the California Plaintiff has no standing to assert a claim under that statute. Fourth, the breach of fiduciary duty allegations fail to state an actionable claim.  And finally, the State Law Claims against the Independent Trustees are barred by the exculpatory provisions contained in the Fund's Declaration of Trust.

### A.    The State Law Claims Are Preempted by SLUSA.

After Congress passed the Private Securities Litigation Reform Act ("PSLRA") in 1995, plaintiffs tried to avoid the pleading requirements and the automatic stay of discovery under the PSLRA by asserting their securities claims under state law.  Congress enacted SLUSA in 1998 in an effort to curtail this practice.  *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81-83 (2006) (describing the legislative history of PSLRA and SLUSA).  SLUSA apples to "covered class actions" and preempts claims that are based on state law and allege a misrepresentation or omission of material fact "in connection with the purchase or sale" of a "covered security."  15 U.S.C. § 78bb(f)(1)(A).

Here, the State Law Claims are premised on the Fund's alleged deviation from its investment objective and thus rest on the same factual allegations as Plaintiff's federal Securities Act claims.  In setting forth its misrepresentation claims under the Securities Act, the Complaint alleges that the Registration Statements "failed to disclose that the Fund's investment strategy deviated . . . from its investment objective of seeking interest income consistent with preservation of capital."  Cal. Compl. ¶69.  It also alleges that those same

deviations "were unlawful within the meaning of California's Unfair Competition Law [and] also constitute breaches of fiduciary duty by the Fund's trustees." *Id.* ¶¶23-24.

Where, as here, a state law claim is based on the same facts as a federal securities claim in a covered class action, SLUSA preempts the state law claim. *See, e.g.*, *Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1285 (10th Cir. 2008) (affirming dismissal of breach of fiduciary duty claim as preempted by SLUSA); *Stoody-Broser v. Bank of America, N.A.*, No. 08-2705, 2009 WL 2707393 (N.D. Cal. Aug. 25, 2009) (finding breach of fiduciary duty and UCL claims preempted by SLUSA); *Barron v. Igolnikov*, No. 09-4471, 2010 WL 882890, at *4-5 (S.D.N.Y. Mar. 10, 2010).

Plaintiff tries to avoid SLUSA preemption by declaring at the start of each state law count that "[a]ny allegation relating to the misstatements and omissions made in connection with the Fund are not incorporated in this Count, which only encompasses deviations from the Fund's fundamental investment policies." Cal. Compl. ¶¶224, 235. But, incorporated or not, Plaintiff cannot plead around the clear substance of his own Complaint. The Court is to be "guided by the substance rather than the form of a claim." *Appert v. Morgan Stanley Dean Witter, Inc.*, No. 08-7130, 2009 WL 3764120, at *5 (N.D. Ill. Nov. 6, 2009). Thus, the "question is not whether a plaintiff pleads or omits certain key words or legal theories, but rather whether a reasonable reading of the complaint evidences allegations of 'a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security.'" *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 304 (3d Cir. 2005); *see also Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 311 (6th Cir. 2009) ("The Act does not ask whether the complaint makes 'material' or 'dependent' allegations of

misrepresentation in connection with buying or selling securities.  It asks whether the complaint includes these types of allegations, pure and simple.").

These authorities mandate dismissal of the State Law Claims.  Specifically, the California Plaintiff alleges that Defendants made misrepresentations or omissions of material fact to the purchasers of Fund shares about the Fund's investment objective and its strategies. Cal. Compl. ¶4.  According to the Complaint, Defendants said that the California Fund has one kind of investment policy, but carried out another.  *Id.* ¶22.  This is the basis of both the Securities Act claims and the State Law Claims, and these therefore are precisely the types of claims that SLUSA preempts.[24]

### B.      The State Law Claims Are Derivative.

Even assuming that the State Law Claims were not preempted by SLUSA, they still fail because they may be asserted only derivatively on behalf of the California Fund.  To determine whether a claim is direct or derivative, Massachusetts law focuses on the injury suffered – it asks whether "the shareholder's injury is different from the injury suffered generally by the shareholders as owners of the corporate stock."  *Stegall v. Ladner*, 394 F. Supp. 2d 358, 364 (D. Mass. 2005).[25]  In other words, if the plaintiff shareholder was harmed

---

[24]      To be sure, *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 551 (N.D. Cal. 2009), held that SLUSA did not preempt certain claims brought under California's Unfair Competition Law.  But the *Schwab* plaintiffs did not allege, as the California Plaintiff alleges here, that the defendants had misrepresented the fund's investment policy.  Rather, the plaintiffs there "readily agree[d] that Schwab properly disclosed the change in its [investment] policy but argue[d] that the change was nevertheless improper."  *Id.*

[25]      Colorado accepts the "internal affairs doctrine," under which the law of the state of incorporation or organization applies to Plaintiff's claims.  Colo. Rev. Stat. § 7-90-805(4) (2004) ("As to any foreign entity transacting business or conducting activities in this state, the law of the jurisdiction under the law of which the foreign entity is formed shall govern the organization and internal affairs of the foreign entity and the liability of its owners and of its owners and managers.").  *See also Great W. Producers Co-op. v. Great W. United Corp.*, 613

"only because the corporate entity has been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause of action is derivative." *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 112 (D. Mass. 2006).

Here, the State Law Claims are derivative because the alleged harm was suffered by the Fund. Both claims rest on allegations that the *Fund* made investments that were inconsistent with its stated investment policies, which led to declines in the *Fund's* NAV. Even accepting that allegation as true, the Fund would be the party that was injured directly. Indeed, any injury suffered by the shareholders would reflect the fact that the Fund itself suffered direct injury as a result of its investments purportedly falling in value. Plaintiff admits as much by alleging, in connection with his section 13(a) claim – which, tellingly, is based on the same facts as the State Law Claims – that "[a]s a result of the Fund's deviation from its investment objective and its industry concentration policy, [he] and other members of the . . . *Class sustained damages when the value of the assets of the Fund depreciated.*" Cal. Compl. ¶223 (emphasis added).

Thus, Plaintiff clearly is complaining about the decline in the value of Fund assets, and any damages suffered by shareholders derive from their indirect ownership of those assets. As such, they may seek relief only *on behalf of* the Fund and not on behalf of themselves. *See In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04-4885, 2005 WL 2677753, at *4 (S.D.N.Y. Oct. 19, 2005) ("For standard equity dilution claims, it is 'the corporation that is the injured party, and it alone may sue the wrongdoer for the damage

P.2d 873, 875 n.2, 878 n.4 (Colo. 1980); *In re ms55, Inc.*, 420 B.R. 806, 821 (Bankr. D. Colo. 2009). The California Fund, like all of the Funds, is a Massachusetts business trust.

caused.'") (citation omitted); *accord Scanlan v. W.C. Canniff & Sons, Inc.*, No. 94-6722, 1996 WL 490170, at *5 (Mass. Super. Ct. Aug. 29, 1996).  Because Plaintiff asserts direct claims, rather than derivative claims, the State Law Claims should be dismissed.[26]

Moreover, under Massachusetts law, a derivative plaintiff must always show that he made a demand on his organization to assert the claim on its behalf, and this requirement is never excused, for futility or for any other reason.  *See* Mass. Gen. Laws ch.156D, § 7.42 (2006).  The California Complaint does not plead that a demand was made on the Board of Trustees.  Because Massachusetts law permits no exception to the requirement of a derivative demand, the State Law Claims should be dismissed.

## C.   The California Plaintiff Fails To State a Claim under the California Business and Professions Code.

California's Unfair Competition Law prohibits unlawful, unfair, or fraudulent business practices.  Cal. Bus. & Prof. Code § 17200; *Kainos Labs., Inc. v. Beacon Diagnostics, Inc.*, No. 97-4618, 1998 WL 2016634, at *16 (N.D. Cal. Sept. 14, 1998).  Plaintiff alleges that by deviating from the Fund's fundamental investment objective without holding a shareholder vote, Defendants violated sections 13(a) and 48(a) of the ICA and thereby engaged in "unlawful" conduct that gives rise to a state law claim under the UCL.[27]  This claim should be dismissed for two additional, independent reasons.

---

[26]   For the same reason, Plaintiff's section 13(a) claim, which is based on the same alleged conduct as the State Law Claims, also must be asserted derivatively.  *See In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-4318, 2000 WL 10211, at *4 (S.D.N.Y. Jan. 6, 2000) (holding that claims brought under the ICA must be asserted derivatively because the injury is no different from the harm suffered by other shareholders and is derived from harm to the fund itself).

[27]   Plaintiff alleges that "Defendants engaged in 'unlawful' business acts and practices in violation of the UCL by violating Section 48(a) of the ICA, 15 U.S.C. § 80a-47(a), and by

1.      The UCL Does Not Apply to Securities Transactions.

The UCL "is known as California's 'little FTC Act,' which mirrors its federal counterpart, the Federal Trade Commission (FTC) Act." *Bowen v. Ziasun Techs, Inc.*, 116 Cal. App. 4th 777, 786 (Ct. App. 2004).  The issue presented in *Bowen* was whether the UCL applies to securities transactions.  The *Bowen* court held that it did not because (1) federal cases have held that the UCL does not apply to securities transactions, *see, e.g.*, *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 351 (S.D.N.Y. 1999); *Shearson Lehman Brothers, Inc. v. Greenberg*, No. 93-623, 1993 WL 144856, at *1 (C.D. Cal. Mar. 15, 1993), *aff'd*, 60 F.3d 834, 834 (9th Cir. 1995) (holding that the UCL is "not applicable to securities transactions"); (2) the federal "FTC Act has never been applied to securities transactions"; and (3) "federal and state authority from 15 other jurisdictions have held that their little FTC Acts do not apply to securities transactions."  116 Cal. App. 4th at 790; *see also Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388 (9th Cir. 1988).  The majority rule is that states' little FTC acts "do not cover securities laws violations."  *See* W. Stern, *Bus. & Prof. C. § 17200 Practice* ¶ 3:24 (2008).  This rule should be followed here.  *See Scognamillo v. Credit Suisse First Boston LLC*, No. 03-2061, 2005 WL 2045807, at *12 (N.D. Cal. Aug. 25, 2005), *aff'd*, 254 F. Appx.

---

causing the Fund to violate Section 13(a) of the ICA."  Cal. Compl. ¶226.  Section 48(a) of the ICA makes it unlawful "for any person, directly or indirectly to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter [15 U.S.C. §§ 80a-1 *et seq.*] or any rule, regulation, or order thereunder."  15 U.S.C. § 80a-47(a).  Like section 13(a), there is no private right of action under section 48(a).  *See Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 117 (2d Cir. 2007).  Because Plaintiff fails to state a claim under section 13(a), *see* Consol. Br. Arg. VIII, his UCL claim also fails.  *See Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, 290 F.3d 1055, 1057 (9th Cir. 2002) (denying a UCL claim premised on a dismissed federal claim).

669 (9th Cir. 2007); *Williams v. Deutsche Bank Sec., Inc.*, No. 04-7588, 2005 WL 1414435, at *10 (S.D.N.Y. June 13, 2005).[28]

### 2. The California Plaintiff Lacks Standing To Assert a Claim under the UCL.

Under the UCL, standing is limited to "individuals who suffer losses of money or property that [is] eligible for restitution." *Buckland v. Threshold Enter., Ltd.*, 155 Cal. App. 4th 798, 817 (Ct. App. 2007); Cal. Bus. & Prof. Code § 17204. California courts define "restitution" as the "return [of] money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (Ct. App. 2003) (citation and internal quotations omitted). Here, Defendants have not obtained money from Plaintiff through any of the allegedly unlawful conduct, and therefore have nothing to return to him; he therefore lacks standing under the UCL.

Plaintiff claims to be entitled to "full restitution of all benefits that may have been obtained by Defendants as a result of" the Fund's alleged deviations of its investment policies without shareholder approval. Cal. Compl. ¶233. But the Complaint nowhere identifies any

---

[28]   To be sure, some courts have interpreted *Bowen* narrowly as applying only to cases where securities transactions are at issue. *See, e.g.*, *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688 (Ct. App. 2007) (distinguishing *Bowen* because plaintiff's claims "do not arise from any stock transactions between the parties"); *In re Charles Schwab Corp.*, 257 F.R.D. at 553. Even under a narrow interpretation of *Bowen*, however, Plaintiff's claims in this case clearly arise from securities transactions – the purchase of shares in the Fund – and are premised on misrepresentations and omissions regarding the Fund's investment objective and fundamental investment policies.

such "benefits" that Defendants "obtained" because there are none.[29]  Thus, Plaintiff has no

standing to assert a claim under the UCL, because his Complaint does not allege that

Defendants wrongfully obtained any monetary benefit as a result of the alleged deviations or

that any such benefit came at Plaintiff's expense.  *See, e.g., Day v. AT&T Corp.*, 63 Cal. App.

4th 325, 339 (Ct. App. 1998) ("section 17203 operates only to return to a person those

measurable amounts which are wrongfully taken by means of an unfair business practice");

*Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (the only monetary relief

available under UCL is "disgorgement of money that has been wrongfully obtained"); *Theme*

*Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1009 (9th Cir. 2008).

> **D.**     **The Breach of Fiduciary Duty Claim Should Be Dismissed.**

The Complaint alleges that the "Fund's deviations from its fundamental investment

policies . . . constitute[d] breaches of fiduciary duty by the Fund's trustees based upon the

failure to give notice, conduct a vote and obtain shareholder approval before the Fund's

investment policies were changed."  Cal. Compl. ¶24.  But a trustee's only fiduciary duties

are to act in good faith and with loyalty, and the conduct Plaintiff complains of does not

breach either.

---

[29]     As noted above, the purportedly unlawful conduct at issue involves investing in assets that were inconsistent with the Fund's stated investment objective, without obtaining a shareholder vote.  No Defendant obtained money by this conduct, and the lack of any allegations to the contrary is therefore unsurprising.  The failure to hold a vote could have no direct financial consequence.  As for the investment process itself, the Individual Trustees, for example, could not have received any financial benefit from Plaintiff and thus have none of his property to return.  The same is true for OFI, the Manager, the officers, and the Fund itself.  As for the Fund, it would have been *damaged, not benefitted by* the alleged misconduct.  Thus, at a minimum, the UCL claim must be dismissed because "any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff."  *Korea Supply Co.*, 29 Cal. 4th at 1149.

Under Massachusetts law, a "trustee must exercise good faith and act solely in the interests of the beneficiaries in administering the trust.  He must lay aside self-interest when it becomes adverse to the rights of the *cestui que* trust, for the office of trustee cannot be subverted to fostering the personal advantage or individual gain of the incumbent." *Boston Safe Deposit & Trust Co. v. Lewis*, 57 N.E.2d 638, 640 (Mass. 1944).  The California Plaintiff does not allege that the Independent Trustees acted in bad faith or that they engaged in any self-dealing.  Absent any such allegations, the Independent Trustees cannot be liable for breach of fiduciary duty under Massachusetts law.  Accordingly, the breach of fiduciary duty claim should be dismissed.

### E.    The State Law Claims Asserted Against the Independent Trustees Are Barred by the Declaration of Trust.

The Declaration of Trust for the California Fund expressly limits a shareholder's recovery rights against a trustee.  It states that all persons "asserting any claim against the [Fund] or the Trustees shall look only to the assets of the . . . [Fund] for payment under any such credit, transaction, contract or claim; and neither . . . the Trustees, nor any of their agents . . . shall be personally liable therefor."[30]  It also "expressly disclaim[s] Shareholder and Trustee liability for the acts and obligations" of the Fund." *Id.*  The Declaration, however, does not protect a Trustee "against any liability to which such Trustee . . . would otherwise be

---

[30]    Amended and Restated Declaration of Trust of Oppenheimer California Municipal Fund, Article Ninth, § 2 (filed with SEC as EX-99 to Cal. Prospectus (9/28/2004)) (Larrabee Decl., Ex. C-8).

subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of the office of Trustee." *Id.*[31]

The exculpatory provisions in the Declaration bar the State Law Claims asserted against the Independent Trustees for two reasons.  First, the Complaint does not allege gross negligence, and it "expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct." Cal. Compl. ¶¶186, 198, 208.[32]  This, of course, allows the California Plaintiff to avoid the more stringent pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, but it also exculpates the Independent Trustees of any personal liability for the alleged conduct underlying the State Law Claims. *See Marsman v. Nasca*, 573 N.E.2d 1025, 1032 (Mass. App. Ct. 1991) ("Although exculpatory clauses are not looked upon with favor and are strictly construed, such 'provisions inserted in the trust instrument without any overreaching or abuse by the trustee or of any fiduciary or confidential relationship to the settlor are generally held effective except as to breaches of trust committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary.'") (citation omitted).

Second, Plaintiff purports to seek common law redress for an alleged violation of section 13(a) of the ICA.  Section 13(a) makes it unlawful for a *fund* to change its

---

[31]   The California Plaintiff was on notice of these provisions. *See* Cal. SAI (10/31/07) at 38-39 ("The Fund's Declaration of Trust contains an express disclaimer of shareholder or Trustee liability for the Fund's obligations. . . . The Fund's contractual arrangements state that any person doing business with the Fund (*and each shareholder of the Fund*) agrees under its Declaration of Trust to look solely to the assets of the Fund for satisfaction of any claim or demand that may arise out of any dealings with the Fund. Additionally, the Trustees shall have no personal liability to any such person, to the extent permitted by law.") (emphasis added).

[32]   The State Law Claims "repeat and reallege each and every allegation above," which includes the federal Securities Act allegations, except for "allegations relating to the misstatements and omissions made in connection with the Fund." Cal. Compl. ¶¶224, 235.

fundamental investment policies without obtaining shareholder approval.  But Plaintiff may not seek redress from the Independent Trustees because, under the Declaration of Trust, they are not liable for any of the obligations or actions of the Fund.

<u>**CONCLUSION**</u>

For the reasons discussed above, Defendants respectfully request that the Court dismiss Plaintiffs' Complaints with prejudice.

Dated this 5th day of April, 2010.

Respectfully submitted,

*s/ Robert N. Miller*
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO 80202-1043
Tel:  (303) 291-2300
Fax:  (303) 291-2400
E-mail:  rmiller@perkinscoie.com

-And-

*s/ William K. Dodds*
William K. Dodds
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Tel:  (212) 698-3500
Fax:  (212) 698-3599
E-mail:  william.dodds@dechert.com

Matthew L. Larrabee
Dechert LLP
One Maritime Plaza, Suite 2300
San Francisco, CA 94111
Tel:  (415) 262-4500
Fax:  (415) 262-4555
E-mail:  matthew.larrabee@dechert.com

Michael S. Doluisio
Dechert LLP
Cira Center
2929 Arch Street
Philadelphia, PA 19104
Tel:  (215) 994-2325
Fax:  (215) 994-2222
E-mail:  michael.doluisio@dechert.com

Attorneys for Defendants
OppenheimerFunds, Inc.,
OppenheimerFunds Distributor, Inc.,
Scott Cottier, Ronald H. Fielding,
Daniel G. Loughran, John V. Murphy,
Troy Willis, and Brian W. Wixted

-And-

*s/ Edward  T. Lyons*
Edward T. Lyons, Jr.
Jones & Keller
1999 Broadway, Suite 3150
Denver, CO 80202
Tel:  (303) 573-1600
Fax:  (303) 573-8133
E-mail:  elyons@joneskeller.com

-And-

*s/ Arthur H. Aufses*
Arthur H. Aufses III
Yehudis Lewis
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000
E-mail:  aaufses@kramerlevin.com

Attorneys for Defendants
Oppenheimer AMT-Free Municipals,
Oppenheimer AMT-Free New York Municipals,
Oppenheimer California Municipal Fund,
Rochester Fund Municipals, Oppenheimer

Multi-State Municipal Trust, John Cannon, Paul
Y. Clinton, Thomas W. Courtney, David K.
Downes, Matthew P. Fink, Robert G. Galli,
Phillip A. Griffiths, Lacy B. Herrmann, Mary F.
Miller, Joel W. Motley, Kenneth A. Randall,
Russell S. Reynolds, Jr., Joseph M. Wikler, Peter
I. Wold, Brian F. Wruble, Clayton K. Yeutter

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of April, 2010, I filed a true and correct copy of the foregoing **DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED COMPLAINTS FOR THE CALIFORNIA AND PENNSYLVANIA MUNICIPAL FUNDS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Jeffrey S. Abraham**
  jabraham@aftlaw.com
- **Glen L. Abramson**
  gabramson@bm.net,gelliott@bm.net
- **Arthur H. Aufses , III**
  aaufses@kramerlevin.com
- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net
- **Francis A. Bottini , Jr**
  frankb@johnsonbottini.com,paralegal@johnsonbottini.com
- **Stephen D. Bunch**
  dbunch@cohenmilstein.com,efilings@cohenmilstein.com
- **Gary E. Cantor**
  gcantor@bm.net
- **Jeffrey A. Chase**
  jchase@jcfkk.com,vlsanders@jcfkk.com
- **Karen Jean Cody-Hopkins**
  kjch@lilleylaw.com,rbyers@lilleylaw.com
- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com
- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com
- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com,sdunn-efile@perkinscoie.com
- **Robert J. Dyer , III**
  bob@dyerberens.com
- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com
- **John Givens Emerson**
  jemerson@emersonpoynter.com,tanya@emersonpoynter.com
- **Jack G. Fruchter**
  jfruchter@aftlaw.com
- **William H. Garvin , III**
  wgarvin@garvinlawfirm.com
- **Paul J. Geller**
  pgeller@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Daniel Charles Girard**
  dcg@girardgibbs.com,akl@girardgibbs.com
- **Lionel Z. Glancy**
  lglancy@glancylaw.com,info@glancylaw.com
- **Gary S. Graifman**
  ggraifman@kgglaw.com,ccornfield@kgglaw.com
- **Barbara Ann Grandjean**
  bgrandjean@jcfkk.com,lchandler@jacobschase.com
- **John K. Grant**
  johnkg@csgrr.com,jdecena@csgrr.com
- **Marc C. Haber**
  mhaber@sparerlaw.com
- **Patrick John Kanouff**
  pkanouff@davisandceriani.com,jboom@davisandceriani.com
- **Christopher J. Keller**
  ckeller@labaton.com,electroniccasefiling@labaton.com
- **Phillip C. Kim**
  pkim@rosenlegal.com
- **Lawrence L. Klayman**
  lklayman@nasd-law.com
- **Peter George Koclanes**
  pkoclanes@shermanhoward.com,cgreen@shermanhoward.com,efiling@sah.com
- **Catherine J. Kowalewski**
  katek@csgrr.com,hdemag@csgrr.com
- **Jeffrey Robert Krinsk**
  jrk@classactionlaw.com,anv@classactionlaw.com
- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,michael.doluisio@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com
- **Nicole C. Lavallee**
  nlavallee@bermandevalerio.com,stuiasosopo@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Eric Lechtzin**
  elechtzin@bm.net
- **Jonathan Krasne Levine**
  jkl@girardgibbs.com,amv@girardgibbs.com
- **Lawrence D. Levit**
  llevit@aftlaw.com
- **Kevin Harvey Lewis**
  klewis@sparerlaw.com
- **Yehudis S. Lewis**
  ylewis@kramerlevin.com

- **Charles Walter Lilley**
  clilley@lilleylaw.com
- **Howard T. Longman**
  Tsvi@aol.com,jasondag@ssbny.com
- **Edward Thomas Lyons , Jr**
  elyons@joneskeller.com
- **Kristin A. Martinez**
  kristin@dyerberens.com
- **Catherine H. McElveen**
  kmcelveen@rpwb.com
- **Robert Nolen Miller**
  rmiller@perkinscoie.com,rmiller-efile@perkinscoie.com
- **Daniel Oakes Myers**
  dmyers@rpwb.com
- **James S. Nabwangu**
  jnabwangu@sparerlaw.com
- **Darren A. Natvig**
  dnatvig@irwin-boesen.com
- **Gordon W. Netzorg**
  gnetzorg@shermanhoward.com,shood@shermanhoward.com,cdias@shermanhoward.com,efiling@shermanhoward.com
- **Matthew D. Pearson**
  mpearson@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Charles J. Piven**
  piven@browerpiven.com
- **Charles Michael Plavi , II**
  cmp@classactionlaw.com,anv@classactionlaw.com
- **Scott E. Poynter**
  scott@emersonpoynter.com,swilson@emersonpoynter.com
- **Andrei V. Rado**
  arado@milberg.com,MAOffice@milberg.com
- **Roland W. Riggs , IV**
  rriggs@milberg.com
- **Darren J. Robbins**
  darrenr@csgrr.com,e_file_sd@csgrr.com
- **Samuel H. Rudman**
  srudman@csgrr.com,dgonzales@csgrr.com
- **Sherrie R. Savett**
  ssavett@bm.net,mgatter@bm.net
- **Peter E. Seidman**
  pseidman@milberg.com
- **Christina H.C. Sharp**
  chc@girardgibbs.com,as@girardgibbs.com,sfs@girardgibbs.com,amv@girardgibbs.com,ale@girardgibbs.com

- **Aaron Michael Sheanin**
  amv@girardgibbs.com,ams@girardgibbs.com
- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com
- **Mark David Smilow**
  msmilow@weisslurie.com
- **Alan W. Sparer**
  asparer@sparerlaw.com,nblake@sparerlaw.com,dcorkran@sparerlaw.com,playzer@sparerlaw.com
- **Olimpio Lee Squitieri**
  Lee@sfclasslaw.com,cathy@sfclasslaw.com
- **Joseph J. Tabacco , Jr**
  jtabacco@bermandevalerio.com,stuiasosopo@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Steven J. Toll**
  stoll@cohenmilstein.com,efilings@cohenmilstein.com
- **Kirk Douglas Tresemer**
  ktresemer@coloradolawyers.com
- **Anne Marie Vu**
  avu@milberg.com,MAOffice@milberg.com
- **David C. Walton**
  davew@csgrr.com,hdemag@csgrr.com
- **Joseph H. Weiss**
  jweiss@weisslurie.com,infony@weisslurie.com
- **Douglas S. Wilens**
  dwilens@rgrdlaw.com,e_file_fl@rgrdlaw.com
- **Shawn A. Williams**
  shawnw@csgrr.com,jdecena@csgrr.com

_s/ Robert N. Miller_____
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO  80202-1043
Tel:  303.291.2300
Fax:  303.291.2400
Email:  rmiller@perkinscoie.com

Attorneys for Defendants
OppenheimerFunds, Inc.,
OppenheimerFunds Distributor, Inc.,
Scott Cottier, Ronald H. Fielding,
Daniel G. Loughran, John V. Murphy,
Troy Willis, and Brian W. Wixted