**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Master Docket No. 09-md-02063-JLK-KMT (MDL Docket No. 2063)

**IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION**

This document relates to all the MDL actions.

---

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT
MOTION TO DISMISS**

---

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 6

I.     STANDARD OF LAW............................................................................ 6

     A.    Rule 8(a)(2)'s Notice Pleading Standard Governs This Motion............................ 6

     B.    Pleading Requirements For Section 11 and 12(a)(2) Claims................................ 7

II.    DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS ........................ 8

     A.    The Funds' Capital Preservation Investment Objectives Were Materially False and Misleading In Light of the Funds' Undisclosed "No Guts, No Glory" Style and "High-Risk, High-Return" Strategy........................................... 8

          1.    A Reasonable Investor Would Consider the Funds' Capital Preservation Investment Objectives To Be Important In Deciding Whether To Invest.................................................................................. 13

          2.    Boilerplate Warnings, Disclosure of the Funds' Investments and Statements To the Press Do Not Render Defendants' Misstatements Immaterial as a Matter of Law......................................... 15

               a.    Boilerplate Warnings Are Not Sufficient ................................... 16

               b.    Listing the Funds' Securities Portfolio Is Not Sufficient............. 18

               c.    Disclosing the Funds' High-Risk Strategy To Trade Publications Is Not Sufficient ...................................................... 19

               d.    That Defendants Sold Other, Potentially Less-Risky Funds Is Irrelevant ................................................................... 22

     B.    Defendants' Statements Regarding Inverse Floaters Were Materially False and Misleading ....................................................................... 24

          1.    The Prospectuses Failed to Adequately Disclose Inverse Floater Volatility ................................................................................ 24

               a.    The Prospectuses Failed To Disclose the Inverse Floaters' Leverage Ratios ...................................................... 24

               b.    The Prospectuses' Vague Disclosures of Potential Risks Regarding Inverse Floater Volatility Were Insufficient As a Matter of Law......................................................... 30

2.      The Prospectuses' Disclosures Regarding the Collapse of the Trusts Were Insufficient .......................................................................... 35

3.      The Prospectuses' Disclosures Concerning Collateral Were Misleading................................................................................................ 38

4.      The Prospectuses' Disclosures Regarding the Shortfall and Forbearance Agreements Were Insufficient ............................................ 40

5.      The Prospectuses' Statements Regarding Limitations On Investments In Inverse Floaters Were Materially Misleading ................. 42

6.      The National Fund Prospectus Falsely Stated That the National Fund Mainly Invests In Municipal Securities.......................................... 44

7.      Lead Plaintiffs Adequately Allege That the Prospectus Statements About the Inverse Floaters Were False and Misleading When Made .......................................................................... 47

        a.      The Prospectus Supplements Disclosed Important New Information; They Were Not Just More Detailed Descriptions of Previously Disclosed Risks ................................ 47

        b.      Lead Plaintiffs Have Not Pleaded Falsity By Hindsight ............. 49

8.      The Fact That the National Fund Describes Itself as Speculative Does Not Immunize Defendants From Liability for Materially False and Misleading Statements and Omissions Regarding Inverse Floaters and Liquidity ................................................................ 49

        a.      Warnings That the Fund Was Speculative Were Misleading.................................................................................... 49

        b.      The "Speculative" Risk Warnings Were Incomplete, Vague and, Therefore, Did Not Bespeak Caution ....................... 50

C.      Defendants' Statements Regarding the Liquidity of Assets Were Materially False and Misleading............................................................ 52

1.      Defendants' Liquidity Determinations Were Statements of Purported Fact, Not Opinions or Discretionary Judgments..................... 54

2.      Assets That the Funds Designated as Liquid Were Really Illiquid By Defendants' Own Definition ............................................................. 55

D.      Defendants' Statements Regarding the Value of the Funds' Investments and the Funds' Net Asset Values Were Materially False and Misleading ......... 59

III.     LEAD PLAINTIFFS' CLAIMS DO NOT SOUND IN MISMANAGEMENT ............. 63

IV.     LEAD PLAINTIFFS' CLAIMS REGARDING INVESTMENT OBJECTIVES AND INVERSE FLOATERS ARE TIMELY................................................................ 66

A.     The Tenth Circuit's Inquiry Notice Standard ...................................................... 66

B.     Defendants Have Failed to Demonstrate That a Reasonably Diligent Investor Would Have Discovered the Falsity of Defendants' Statements With Respect to the Funds' Investment Objectives............................................. 69

C.     Defendants Have Failed to Demonstrate That a Reasonably Diligent Investor Would Have Discovered the Falsity of Defendants' Statements With Respect to the Inverse Floaters .................................................... 73

V.     LEAD PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION ........................ 75

VI.     LEAD PLAINTIFFS ADEQUATELY PLEAD SECTION 12(a)(2) CLAIMS UNDER THE SECURITIES ACT .................................................................................. 80

A.     Oppenheimer Distributor Is a Statutory Seller Under Section 12(a)(2) .............. 81

B.     The Funds and OppenheimerFunds Are Also Statutory Sellers Under Section 12(a)(2) .................................................................................. 81

VII.     LEAD PLAINTIFFS ADEQUATELY PLEAD SECTION 15 "CONTROL PERSON" CLAIMS UNDER THE SECURITIES ACT ................................................ 86

VIII.     LEAD PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION UNDER INVESTMENT COMPANY ACT SECTION 13(a)........................................................ 89

A.     The Analytical Framework ................................................................................... 90

B.     Section 13(a)'s "Rights-Creating Language" and the "Related Statutory Scheme" Show Congress's Intent To Create a Private Right of Action.............. 90

C.     The Sudan Act Confirms Congress' Intent......................................................... 92

D.     The Investment Company Act's Legislative History Confirms That Congress Intended a Private Right of Action ...................................................... 93

IX.     THE COURT HAS JURISDICTION OVER THE CLAIMS AGAINST DEFENDANT YEUTTER AND THE CLAIMS ARISING OUT OF THE 2005 AND 2006 REGISTRATION STATEMENTS............................................................. 95

CONCLUSION.................................................................................................................... 97

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)........................................................................75, 76

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) .............................................................87, 88, 89

*In re Adolor Corp. Sec. Litig.*,
616 F. Supp. 2d 551 (E.D. Pa. 2009) ...........................................................68

*Alexander v. Sandoval*,
532 U.S. 275 (2001)...................................................................................90, 91

*Allred v. Chynoweth*,
990 F.2d 527 (10th Cir. 1993) ......................................................................67

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007)............................................................64

*Ash v. LFE Corp.*,
525 F.2d 215 (3d Cir. 1975)...........................................................................29

*Asp v. Toshiba Am. Consumer Prods., LLC*,
616 F. Supp. 2d 721 (S.D. Ohio 2008) .........................................................42

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................6, 7, 41, 63

*Bellikoff v. Eaton Vance Corp.*,
481 F.3d 110 (2d Cir. 2007)............................................................................92

*In re Bestline Prods. Sec. & Antitrust Litig.*,
No. MDL 162-Civ-JLK, 1975 WL 386 (S.D. Fla. Mar. 21, 1975).........................67

*Blackmoss Inv., Inc. v. ACA Capital Holdings, Inc.*,
No. 07-CV-10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ......................32, 76

*Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
916 F. Supp. 1343 (D.N.J. 1996) ...................................................................90

*Boswell v. Skywest Airlines, Inc.*,
　361 F.3d 1263 (10th Cir. 2004) ................................................................90

*Brumbaugh v. Princeton Partners*,
　985 F.2d 157 (4th Cir. 1993) ...................................................................73

*In re Cable & Wireless, PLC Sec. Litig.*,
　321 F. Supp. 2d 749 (E.D. Va. 2004) .......................................................64

*In re Caere Corporate Sec. Litig.*,
　837 F. Supp. 1054 (N.D. Cal. 1993) .........................................................42

*In re Charles Schwab Corp. Sec. Litig.*,
　257 F.R.D. 534 (N.D. Cal. 2009) ....................................................... *passim*

*In re Charles Schwab Corp. Sec. Litig.*,
　No. 08-CV-01510, 2010 WL 1463490 (N.D. Cal. Apr. 8, 2010) ....................78, 94

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
　No. 08-CV-3612, 2010 WL 1172647 (S.D.N.Y. Mar. 26, 2010) ...........................81

*In re Countrywide Fin. Corp. Sec. Litig.*,
　588 F. Supp. 2d 1132 (C.D. Cal. 2008) .....................................................80

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
　No. 99-CV-12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ...........................34

*In re Daou Sys. Inc. Sec. Litig.*,
　411 F.3d 1006 (9th Cir. 2005) .................................................................79

*DeBenedictis v. Merrill Lynch & Co.*,
　492 F.3d 209 (3d Cir. 2007)................................................................72, 73

*DeBruyne v. Equitable Life Assurance Soc'y*,
　920 F.2d 457 (7th Cir. 1990) ...................................................................73

*Diskin v. Lomasney & Co.*,
　452 F.2d 871 (2d Cir. 1971)....................................................................67

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
　305 F. Supp. 2d 658 (E.D. Tex. 2004)........................................................86

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
　No. 08-cv-11064, 2010 WL 1253114 (D. Mass. Mar. 31, 2010) .................... *passim*

*Field v. Trump*,
   850 F.2d 938 (2d Cir. 1988)...........................................................................................29

*First Interstate Bank v. Pring*,
   969 F.2d 891 (10th Cir. 1992), *rev'd on other grounds sub nom. Central Bank v.*
   *First Interstate Bank*, 511 U.S. 164 (1994) ..............................................................86

*Fisher v. The Plessey Co., Ltd.*,
   559 F. Supp. 442 (S.D.N.Y. 1983)...............................................................................21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   411 F. Supp. 2d 377 (S.D.N.Y. 2006) ..........................................................................80

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009)...............................................................28, 32, 48

*Fogel v. Chestnutt*,
   668 F.2d 100 (2d Cir. 1981), *cert. denied*, 459 U.S. 828 (1982).......................92, 94

*In re Ford Motor Co. Sec. Litig.*,
   184 F. Supp. 2d 626 (E.D. Mich. 2001)........................................................................50

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
   376 F. Supp. 2d 385 (S.D.N.Y. 2005)...........................................................................62

*Freudenberg v. E*Trade Fin. Corp.*,
   No. 07-Civ-8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010) ..........................79

*Fujisawa Pharm. Co. v. Kapoor*,
   115 F.3d 1332 (7th Cir. 1997) ......................................................................................68

*In re Giant Interactive Group, Inc. Sec. Litig.*,
   643 F. Supp. 2d 562 (S.D.N.Y. 2009)....................................................................34, 76

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985)......................................................................................8, 9

*Green v. Brown*,
   398 F.2d 1006 (2d Cir. 1968)...................................................................................91, 94

*Green v. Brown*,
   276 F. Supp. 753 (S.D.N.Y. 1967), *rev'd on other grounds*, 398 F. 2d 1006 ........94

*Greenapple v. Detroit Edison Co.*,
   618 F.2d 198 (2d Cir. 1980)..........................................................................................48

*Grossman v. Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) ...................................................16, 17, 30, 50

*Grubka v. WebAccess Int'l, Inc.*,
   445 F. Supp. 2d 1259 (D. Colo. 2006) ...................................................73

*Gustafson v. Alloyd Co., Inc.*,
   513 U.S. 561 (1995)...................................................7

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)...................................................7

*Hicks v. Morgan Stanley & Co.*,
   No. 01-CV-10071, 2003 WL 21672085 (S.D.N.Y. July 16, 2003)...................................................96

*Hunt v. Alliance N. Am. Gov't Income Trust*,
   159 F.3d 723 (2d Cir. 1998)...................................................17, 18, 31, 50

*Karpus v. Hyperion Capital Mgmt., Inc.*,
   No. 96-CV-4671, 1996 WL 668860 (S.D.N.Y. Nov. 18, 1996)...................................................90

*Koke v. Stifel, Nicolaus & Co.*,
   620 F.2d 1340 (8th Cir. 1980) ...................................................73

*Kronfeld v. Trans World Airlines, Inc.*,
   832 F.2d 726 (2d Cir. 1987)...................................................20

*Lane v. Page*,
   581 F. Supp. 2d 1094 (D.N.M. 2008) ...................................................64

*Lapidus v. Hecht*,
   232 F.3d 679 (9th Cir. 2000) ...................................................91

*Leighton v. One William St. Fund, Inc.*,
   No. 64-CV-2547, 1965 U.S. Dist. LEXIS 9430 (S.D.N.Y. July 2, 1965) ...................................................94

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
   238 F.3d 363 (5th Cir. 2001) ...................................................82

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...................................................95

*Lyne v. Arthur Andersen & Co.*,
   772 F. Supp. 1064 (N.D. Ill. 1991)...................................................75

*Maher v. Durango Metals, Inc.,*
    144 F.3d 1302 (10th Cir. 1998) ............................................................... passim

*Maughan v. S.W. Servicing Inc.,*
    758 F.2d 1381 (10th Cir. 1985) .............................................................67

*Maywalt v. Parker & Parsley Petro. Co.,*
    147 F.R.D. 51 (S.D.N.Y. 1993) .............................................................96

*McMahan & Co. v. Wherehouse Entm't, Inc.,*
    900 F.2d 576 (2d Cir. 1990).............................................................35

*In re Merck & Co. Inc. Sec., Deriv., & ERISA Litig.,*
    543 F.3d 150 (3d Cir. 2008), *aff'd* ___ S. Ct. ___, No. 08-CV-905,
    2010 WL 1655827 .............................................................67, 68, 69

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
    289 F. Supp. 2d 429 (S.D.N.Y. 2003).............................................................76

*In re Metro. Sec. Litig.,*
    532 F. Supp. 2d 1260 (E.D. Wash. 2007) .............................................................84

*Miller v. Thane Int'l, Inc.,*
    519 F.3d 879 (9th Cir. 2008), *cert denied*, 129 S. Ct. 161 (2008)............................................7

*Mitchell v. Texas Gulf Sulphur Co.,*
    446 F.2d 90 (10th Cir. 1971) .............................................................50

*In re ML-Lee Acquisition Fund II, L.P.,*
    848 F. Supp. 527 (D. Del. 1994).............................................................96

*Mutchka v. Harris,*
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) .............................................................92

*Newman v. Warnaco Group, Inc.,*
    335 F.3d 187 (2d Cir. 2003).............................................................74

*Northstar Fin. Advisors, Inc. v. Schwab Invs.,*
    609 F. Supp. 2d 938 (N.D. Cal. 2009) .............................................................93, 94

*Olkey v. Hyperion 1999 Term Trust,*
    98 F.3d 2 (2d Cir. 1996).............................................................32

*Olmsted v. Pruco Life Ins. Co.,*
    283 F.3d 429 (2d Cir. 2002).............................................................92

*Panter v. Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981) .............................................................64

*Pinter v. Dahl*,
    486 U.S. 622 (1988)..............................................................80, 82

*In re RAC Mortgage Inv. Corp. Sec. Litig.*,
    765 F. Supp. 860 (D. Md. 1991) ................................................32, 33, 48

*Ray v. Citigroup Global Markets, Inc.*,
    482 F.3d 991 (7th Cir. 2007) .............................................................78

*In re Real Estate Assoc. Ltd. P'ship Litig.*,
    223 F. Supp. 2d 1109 (C.D. Cal. 2002) ......................................19, 28

*Resolution Trust Corp. v. Heiserman*,
    839 F. Supp. 1457 (D. Colo. 1993)..................................................37

*In re Rhythms Sec. Litig.*,
    300 F. Supp. 2d 1081 (D. Colo. 2004)..............................................75

*Ribozyme Pharms. Inc. Sec. Litig*,
    119 F. Supp. 2d 1156 (D. Colo. 2000)..........................................86, 87

*Rodney v. KPMG Peat Marwick*,
    143 F.3d 1140 (8th Cir. 1998) .............................................................34

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................31

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) .............................................................83

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)......................................................................63

*Schaffer v. Evolving Sys., Inc.*,
    29 F. Supp. 2d 1213 (D. Colo. 1998)..........................................81, 84

*Schwartz v. Celestial Seasonings*,
    124 F.3d 1246 (10th Cir. 1997) ...........................................................7

*SEC v. Mozilo*,
    No. 09-CV-3994, 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009)............................28

*SEC v. Wolfson*,
   539 F.3d 1249 (10th Cir. 2008) ..............................................................8, 38

*Seibert v. Sperry Rand Corp.*,
   586 F.2d 949 (2d Cir. 1978).................................................................20, 22

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996)........................................................................85

*Sheppard v. TCW/DW Term Trust 2000*,
   938 F. Supp. 171 (S.D.N.Y. 1996)..............................................................32

*Silverman v. Motorola, Inc.*,
   No. 07-CV-4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ...............79

*Slayton v. Am. Express Co.*,
   No. 08-CV-5442, 2010 WL 1960019 (2d Cir. May 18, 2010) ..............17, 31, 51

*Spielman v. Gen. Host Corp.*,
   538 F.2d 39 (2d Cir. 1976)..........................................................................20

*Staehr v. Hartford Fin. Servs. Group*,
   547 F.3d 406 (2d Cir. 2008)...................................................................70, 72

*Sterlin v. Biomune Sys.*,
   154 F.3d 1191 (10th Cir. 1998) ...........................................................67, 69, 75

*In re Storage Tech. Corp. Sec. Litig.*,
   630 F. Supp. 1072 (D. Colo. 1986)...............................................................89

*Tabankin v. Kemper Short-Term Global Income Fund*,
   No. 93-CV-5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994) .......................18

*In re Thornburg Mortgage, Inc. Sec. Litig.*,
   No. 07-CV-0815, 2010 WL 378300 (D.N.M. Jan. 27, 2010)................32, 33

*In re Thornburg Mortgage, Inc. Sec. Litig.*,
   No. 07-CV-815, 2010 WL 445047 (D.N.M. Jan. 27, 2010)........................95

*TSC Indus. v. Northway, Inc.*,
   426 U.S. 438 (1976).................................................................................8, 62

*Univ. of Colo. Hosp. Auth. v. Denver Publ'g Co.*,
   340 F. Supp. 2d 1142 (D. Colo. 2004)..........................................................90

*Va. Bankshares v. Sandberg*,
   501 U.S. 1083 (1990).........................................................................................19

*In re Washington Mut., Inc. Sec. Litig.*,
   259 F.R.D. 490 (W.D. Wash. 2009) ................................................................97

*In re Westar Energy, Inc. ERISA Litig.*,
   No. 03-CV-4032, 2005 WL 2403832 (D. Kan. Sept. 29, 2005)........................37

*Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*,
   No. 10-CV-1399, 2010 WL 1404208 (S.D.N.Y. Apr. 6, 2010) ........................93

*White v. Heartland High-Yield Mun. Bond Fund*,
   237 F. Supp. 2d 982 (E.D. Wis. 2002)............................................................31

*In re WorldCom, Inc. Sec. Litig.*,
   346 F. Supp. 2d 628 (S.D.N.Y. 2004)..............................................................20

*Yu v. State Street Corp.*,
   No. 08-CV-8235, 2010 WL 668645 (S.D.N.Y. Feb. 22, 2010)....................... *passim*

## STATUTES

15 U.S.C. § 77f ........................................................................................................88

15 U.S.C. § 77k .....................................................................................................7, 75

15 U.S.C. § 77l.........................................................................................................7

15 U.S.C. § 77m.......................................................................................................67

15 U.S.C. § 80a-1 ...................................................................................................91

15 U.S.C. § 80a-2 ...................................................................................................93

15 U.S.C. § 80a-13.............................................................................................90, 92, 93

15 U.S.C. § 80a-32 ...................................................................................................92

15 U.S.C. § 80a-43 ...................................................................................................92

Pub. L. No. 91-547, §§ 3(c) & (d), 84 Stat. 1414-15 (1970) ...................................94

Pub. L. No. 110-174, 121 Stat. 2516 (2007)............................................................92

OTHER AUTHORITIES

17 C.F.R. § 230.159A .....................................................................................................83

17 C.F.R. § 230.421 .......................................................................................................29

Resale of Restricted Secs.; Changes to Method of Determining Holding Period of Restricted
 Secs. Under Rules 144 and 145, Inv. Co. Act Rel. No. 17452, 55 Fed. Reg. 17933
 (Apr. 30, 1990)..........................................................................................................97, 98

SEC Office of Economic Analysis, *Report on Transactions in Municipal Securities*,
 July 1, 2004 ...............................................................................................................47

Sylvan G. Feldstein & Frank J. Fabozzi, *The Handbook of Municipal Bonds* 297 (2008) ...........37

Lead Plaintiffs respectfully submit the following joint brief in opposition to Defendants' Joint Motion to Dismiss the Consolidated Complaints in the Rochester Funds Group Securities Litigation ("Def. Br.") (Docket No. 285).[1]

## INTRODUCTION

The seven consolidated complaints (the "Complaints") concerning investments in seven Oppenheimer municipal bond funds (the "Funds") detail multiple misstatements and omissions in the Prospectuses for each Fund over a multi-year period.  These misstatements and omissions concealed risks that were fully realized in 2007-2008, resulting in billions of dollars of losses to investors.  Common to all seven Funds are misrepresentations as to:  (1) the level of exposure and risks of the Funds' investment in a type of speculative derivative known as "inverse floaters"; (2) the percentage of Fund assets that would be held in illiquid securities; and (3) the true net asset value ("NAV") of each Fund.  Significantly, six of the seven Funds also explicitly articulated "preservation of capital" as the primary investment objective, when in fact, as Defendants now concede, the Funds utilized a "No Guts, No Glory," "high-risk, high-return" strategy that was incompatible with capital preservation.  After the concealed risks came to pass, each Fund grossly underperformed the other municipal bond funds in its respective peer group, demonstrating that the losses resulted from Defendants' acts and not the credit crisis of 2008. The NAVs of the seven Funds fell approximately 30-50% during 2008, while similar municipal bond funds that did not use Defendants' excessively risky strategy weathered the credit crisis with losses of only 10-15% during the same period.

---

[1]      Lead Plaintiffs are concurrently filing a separate joint brief in opposition to Defendant Massachusetts Mutual Life Insurance Company's ("MassMutual") Motion to Dismiss (Docket No. 284).  The California and Pennsylvania Lead Plaintiffs are also concurrently filing an additional brief in opposition to Defendants' Joint Motion to Dismiss the Consolidated Complaints for the California and Pennsylvania Municipal Funds (Docket No. 286).

Based on these misrepresentations, Lead Plaintiffs for each of the seven consolidated municipal fund cases ("Lead Plaintiffs")[2] have brought claims pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o, and Section 13(a) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-13(a)[3] against defendants OppenheimerFunds, Inc. ("OppenheimerFunds"); OppenheimerFunds Distributor, Inc. ("Oppenheimer Distributor"); the Oppenheimer Multi-State Municipal Trust; Oppenheimer officers (the "Officer Defendants") and trustees (the "Trustee Defendants"); and Massachusetts Mutual Life Insurance Company ("MassMutual") (collectively, "Defendants").

Sections 11 and 12 of the Securities Act were enacted specifically to protect investors by ensuring that prospectuses fully and truthfully disclose all of the material facts related to an investment in an offered security. Claims under Sections 11 and 12 are subject only to the Rule 8(a) notice pleading standard and not the heightened pleading requirements applied to securities fraud claims.

Despite this, running throughout Defendants' one-hundred page motion to dismiss is an approach that is totally at odds with the stringent disclosure requirements and relaxed pleading standards applicable to Sections 11 and 12. Many of Defendants' arguments, which are addressed in detail below, rest on three fundamentally false assumptions: (1) that certain statements in the Prospectuses cannot be held to what they say because they had little meaning in the first place; (2) that investors have a duty to look behind the representations of the Prospectuses by performing their own detailed financial analysis or investigation; and (3) that

---

[2]      The Court appointed Lead Plaintiffs in the consolidated municipal fund actions on November 18, 2009. Docket No. 223.

[3]      The California and Pennsylvania Fund cases allege additional violations of Sections 11 and 12 of the Securities Act and the California Fund cases also allege state law causes of action.

generic and boilerplate warnings are sufficient even in the face of known specific risks, and with regard to specific misrepresentations and omissions in a prospectus.  Merely stating these assumptions shows how far Defendants have strayed from the common sense idea of full and fair disclosure embodied in Sections 11 and 12.

As discussed in Section II.A, *infra*, the Prospectuses state that the objective of the Funds was to generate income "consistent with preservation of capital."  This was clearly false, as even Defendants now acknowledge that the Funds were "high-risk, high-return."  In response, Defendants argue that these claims should be dismissed because the Funds' investment objectives were only "aspirational," and therefore not important enough for a purchaser of securities to legitimately rely upon.  Recent court decisions have rejected this same argument, holding that mutual fund investment objectives are material statements.  Defendants also urge that it was sufficient to itemize the hundreds of investments made by each Fund and leave it to investors to determine whether the bonds and derivatives, selected by Defendants, collectively made up a capital preservation portfolio.  A handful of articles in financial trade journals likewise are supposed to have been enough to warn investors that the Funds employed high-risk "No Guts, No Glory," strategies despite the conservative investment objectives stated in the Prospectuses.  These arguments also fail.  The law does not require investors to act as sophisticated financial analysts or study the trade journals to find the true, hidden risks of an investment.

The Prospectuses' statements regarding the Funds' investments in inverse floaters failed to disclose the true risks of these derivatives, including the leverage ratios of the inverse floaters, their resulting high volatility, and the ability of third parties to force the liquidation of the

securities underlying the inverse floaters under circumstances likely to most disadvantage the Funds.  Defendants respond that it was up to investors to calculate the leverage ratios of inverse floaters by collecting disparate pieces of information scattered among hundreds of pages of prospectuses, statements of additional information, and reports.  But such calculations were beyond the abilities of most investors.  Defendants also contend that they did not have to disclose the magnitude of the volatility risk inherent in the Funds' inverse floaters or the risk that third parties could force liquidations.  According to Defendants, it was sufficient for them to say only that inverse floaters can be volatile and that the Trusts containing the inverse floaters could be collapsed.  Courts have consistently found that such generalized warnings are inadequate in the face of known specific risks.  *See* Section II.B, *infra*.

The Prospectuses also falsely stated that the Funds would limit their investments in illiquid securities to 15% of the Funds' assets.  Lead Plaintiffs' counsels' independent review of each of the Fund's holdings has revealed that the Funds greatly exceeded this limit.  In response, Defendants now claim that "illiquidity" is too subjective a concept to be meaningfully applied to their assets.  However, if the promises made to limit the Funds' holdings in illiquid assets were not intended to be taken as meaningful, that was one more disclosure missing from the Prospectuses.  In addition, Defendants challenge the Complaints' definition of liquidity and the methodology of the review set forth in the Complaints.  Yet, such a factual dispute cannot be resolved on a motion to dismiss.  *See* Section II.C, *infra*.

The Prospectuses' statements regarding the Funds' NAVs likewise were false or misleading in that they represented that the Funds used trade-related data in calculating the NAVs.  The Funds did not do so, and as a result, the NAVs were overvalued until they were

forced to sell assets.  In a circular (at best) argument, Defendants claim that the truth of the statements does not matter as they honestly believed them when they were made.  Defendants' subjective belief is irrelevant, because the valuation model they used is not the one they represented they used.  *See* Section II.D, *infra*.

Further, Defendants' arguments with respect to the ICA claims and loss causation seek to substantially preclude the application of the securities laws to mutual fund prospectuses.  The statutory text and legislative history of the ICA demonstrate that Congress intended to allow investors to obtain relief directly where, as here, the investment manager disregards its own investment objectives and asset allocation restrictions reported in the Prospectuses.  Defendants also attempt to limit loss causation to damages resulting from concealment and subsequent disclosure of material information on the model of a "stock drop" case.  But courts have consistently recognized that investors may recover under Sections 11 and 12 where the concealed risks produce losses in an underlying mutual fund asset.  Those are precisely the losses suffered by Lead Plaintiffs and Class members here.  *See* Sections V, VIII, *infra*.

Thus, Defendants misrepresented every important element of the investments made by Lead Plaintiffs and Class members.  Defendants controlled and were responsible for the information and representations made in the Prospectuses, and for the management of the Funds; they did not reveal or they materially misrepresented important information in the Prospectuses, and did not invest or manage Class members' investments as they said they would.  Defendants' attempts to avoid liability now, in their motions to dismiss, are contrived or based on arguments that cannot be supported by the facts or law.  For the reasons set forth above, and on the specific

grounds set forth in the detailed discussion of Defendants' arguments, their motion for dismissal under Rule 12(b)(6) should be denied.

## ARGUMENT

### I.     STANDARD OF LAW

#### A.     Rule 8(a)(2)'s Notice Pleading Standard Governs This Motion

Because the Complaints do not allege fraud, the "notice pleading" requirement of Rule 8(a)(2) of the Federal Rules of Civil Procedure governs Lead Plaintiffs' claims.  According to Rule 8(a)(2), Lead Plaintiffs' Complaints must contain no more than a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court held that Rule 8(a) does not require "detailed factual allegations."  550 U.S. 544, 555 (2007).  Rather, a complaint must plead "enough facts to state a claim that is plausible on its face."  *Id.* at 570.

The Supreme Court clarified the contours of the "plausibility" requirement in *Ashcroft v. Iqbal*, holding that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  ____ U.S. ____, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Notably, a court cannot at this stage dismiss a complaint simply because it does not *believe* a plaintiff's allegations.  *Twombly*, 550 U.S. at 556 (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations").  Indeed, even if a complaint "strikes a savvy judge that actual proof of [its] facts is improbable" and "that a recovery is very remote and

unlikely," all *Twombly* requires is "enough fact to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing.  *Id.*  Plaintiffs must only "nudge[] their claims across the line from conceivable to plausible."  *Id.* at 570.

### B.  Pleading Requirements For Section 11 and 12(a)(2) Claims

Section 11 of the Securities Act imposes liability on the issuer of a security, as well as any person who signed the registration statement and/or served as a director of the issuer or performed similar functions, if, as of its effective date, the registration statement:  (1) contained an untrue statement of a material fact, (2) failed to state a required material fact, or (3) failed to state a material fact necessary to make the statements therein not misleading.  *See* 15 U.S.C. §77k(a).  To establish a "*prima facie* case" of a Section 11 violation, a plaintiff "'need only show a material misstatement or omission.'"  *Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1251 (10th Cir. 1997) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (footnote omitted)).  Under Section 11, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence."  *Herman & MacLean*, 459 U.S. at 381-82.

Similarly, Section 12(a)(2) provides a cause of action to a purchaser of a security against anyone who offers or sells a security "by means of a prospectus or oral communication" which includes an untrue statement or omission of a material fact.  15 U.S.C. § 77l; *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561 (1995).  Like Section 11, "Section 12(a)(2) is a virtually absolute liability provision," even for innocent misstatements.  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008), *cert denied*, 129 S. Ct. 161 (2008).

For both Sections 11 and 12(a)(2), "[a] misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider the information significant when making an investment decision."  *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  Materiality is a mixed question of law and fact that under most circumstances cannot be resolved on a motion to dismiss.  *See TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  Determining whether a misrepresentation or omission is material "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."  *Id.*  Courts should not grant a motion to dismiss "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

## II.   DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS

Lead Plaintiffs have alleged that Defendants made material misstatements and omissions relating to, among other things, the Funds' investment objectives, the value of the Funds' investments and the Funds' NAVs, the Funds' investments in inverse floaters, and the liquidity of the Funds' investments.  Additionally, Lead Plaintiffs have alleged that Defendants misrepresented the extent of the National Fund's investments in "municipal securities."

### A.   The Funds' Capital Preservation Investment Objectives Were Materially False and Misleading In Light of the Funds' Undisclosed "No Guts, No Glory" Style and "High-Risk, High-Return" Strategy

The first paragraph of each Prospectus at issue defines the Funds' investment objective: "The Fund seeks as high a level of current interest income exempt from [taxes] for individual

investors *as is consistent with preservation of capital*."[4]  To highlight the conservative nature of these Funds, this objective makes capital preservation paramount, with the secondary objective of income conditioned on it being "consistent" with capital preservation.  For each Fund, the investment objective is a "fundamental investment policy" that cannot be changed without a shareholder vote.  *Id.*

As its name indicates, "preservation of capital" is a conservative investment objective designed for investors whose primary goal is to prevent loss of principal.  For example, *Forbes Investopedia* defines "preservation of capital" as "[a]n investment strategy whose primary goal is to prevent the loss of an investment's total value."[5]  *Bloomberg* defines it as "[a]n investment with the goal of securing the value of the principle [*sic*] by avoiding speculative situations."[6]  *Standard & Poor's Guide to the Perfect Portfolio* states that preservation of capital strategies are designed for investors who "do not want the principal in [their] accounts to decline in value."[7]  For these investors, "[s]afety is your number one goal.  You sacrifice high returns to keep the

---

[4]      *E.g.*, Cal. Prospectus (10.31.07) at 3 (Larrabee Decl. Ex. A-6); NJ Prospectus (11.28.07) at 3 (Larrabee Decl. Ex. A-10) (emphasis added to both).  While each of the six Funds have capital preservation investment objectives, the wording of the Funds' objectives are slightly different.  The AMT-Free NY Fund promises to "seek[] the maximum current income exempt from federal, New York State and New York City income taxes for individual investors consistent with preservation of capital."  AMT-Free NY Prospectus (12.28.07) at 3 (Larrabee Decl. Ex. A-4).  The AMT-Free Fund promises to "seek[] as high a level of current interest income exempt from federal income taxes as is available from investing in municipal securities, while attempting to preserve capital."  AMT-Free Prospectus (10.26.07) at 3 (Larrabee Decl. Ex. A-2).  The Pennsylvania Fund promises to "seek[] as high a level of current interest income exempt from federal and Pennsylvania personal income taxes as is available from municipal securities, consistent with preservation of capital."  Pa. Prospectus (11.28.07) at 3 (Larrabee Decl. Ex. A-12).  The Rochester Fund promises to "seek[] to provide as high a level of income exempt from federal income tax and New York State and New York City personal income taxes as is consistent with its investment policies and prudent investment management while seeking preservation of shareholders' capital."  Rochester Prospectus (2.21.07) at 3 (Larrabee Decl. Ex. A-14).

[5]      AMT-Free Compl. ¶74; AMT-Free NY Compl. ¶67; Cal. Compl. ¶62; NJ Compl. ¶68; Pa. Compl. ¶71; Rochester Compl. ¶69.

[6]      AMT-Free Compl. ¶74; AMT-Free NY Compl. ¶67; Cal. Compl. ¶62; NJ Compl. ¶68; Pa. Compl. ¶71; Rochester Compl. ¶69.

[7]      AMT-Free Compl. ¶75; AMT-Free NY Compl. ¶68; Cal. Compl. ¶64; NJ Compl. ¶69; Pa. Compl. ¶72; Rochester Compl. ¶70.

value of your portfolio stable.  Your upside is very modest but your downside is also very modest.  Capital protection, not appreciation, is your motto."[8]

To achieve its objective, a preservation of capital portfolio focuses on highly liquid, low-volatility securities.  *Standard & Poor's Guide* warns that "Capital preservation and liquidity go hand in hand. . . .  Any asset that can fall in value should not be included in this conservative strategy. . . . The appropriate [capital preservation] fund would have the characteristics of low positive returns, very low risk, and extremely low price fluctuations. . . .  Any asset that is not guaranteed to maintain its value should not be held."[9]  Similarly, according to the CFA Institute, preservation of capital is "accomplished with a diversified portfolio primarily committed to relatively low volatility, highly liquid and high quality assets."[10]

The Prospectuses' statements that the Funds' portfolios were consistent with the preservation of capital were in each instance materially false and misleading.[11]  The investment strategy actually pursued by Defendants completely disregarded the Funds' conservative investment objectives by concentrating the Funds' assets in excessively risky securities that individually and collectively made each Fund's portfolio fundamentally incompatible with the preservation of capital.  Each Complaint alleges that the relevant Fund (1) was over-concentrated in illiquid securities and (2) used excessive leverage and speculative borrowing strategies, including investment in "inverse floaters."  In addition, the California and Pennsylvania

---

[8]    AMT-Free Compl. ¶75; AMT-Free NY Compl. ¶68; Cal. Compl. ¶64; NJ Compl. ¶69; Pa. Compl. ¶72; Rochester Compl. ¶70.

[9]    AMT-Free Compl. ¶75; AMT-Free NY Compl. ¶68; Cal. Compl. ¶64; NJ Compl. ¶69; Pa. Compl. ¶72; Rochester Compl. ¶70.

[10]   Cal. Compl. ¶63.  The CFA institute is the global, not-for-profit association of investment professionals that awards the Chartered Financial Analyst (CFA) and Certificate in Investment Performance Measurement (CIPM) designations.

[11]   *E.g.*, AMT-Free Compl. ¶102; AMT-Free NY Compl. ¶94; Cal. Compl. ¶69; NJ Compl. ¶95; Pa. Compl. ¶73; Rochester Compl. ¶98.

Complaints allege that those Funds (3) were over-concentrated in below investment-grade securities, many of which were not even rated by an independent ratings agency.  Finally, the California Complaint also alleges that that Fund (4) was over-concentrated in the California real estate development industry, including in speculative "dirt bonds," which are secured only by bare, undeveloped land.

Defendants do not deny that the Funds' investment strategy was very risky, but instead unsuccessfully attempt to turn this vice into a virtue.  They fully embrace the speculative nature of the Funds' investments.  Defendants admit that "[a]ll seven Funds are managed using a common 'Rochester style' of fund management" (Def. Br. at 9), which they candidly acknowledge is a "No Guts, No Glory" (*id.*), "high-risk, high-reward" approach (*id.* at 12) that depends on each Fund "sticking its neck out" (*id.* at 10) by taking "[e]xtreme credit and interest-rate positions" (*id.* at 11) and investing in "rocky road" (*id.*) securities.

Defendants also do not deny that the "No Guts, No Glory" Rochester style was inconsistent with the stated investment objective of preservation of capital.  It would be difficult to do so.  Defendants concede that all seven Funds were managed with the same high-risk approach despite the fact that the Funds had different investment objectives – the National Fund seeks "high yield," while the others seek to preserve capital.  Capital preservation funds have "the characteristics of low positive returns, very low risk, and extremely low price fluctuations."[12]  A capital preservation objective pursued in a "high-risk, high-reward" style is self-negating.

---

[12]        *See, e.g.*, Cal. Compl. ¶64 (quoting *Standard & Poor's Guide to the Perfect Portfolio*); *accord* AMT-Free Compl. ¶75; AMT-Free NY Compl. ¶68; NJ Compl. ¶69; Pa. Compl. ¶72; Rochester Compl. ¶70.

Defendants also do not deny that the Prospectuses failed to disclose that the Funds' portfolios were constructed using the high-risk Rochester style.  The phrases "No Guts, No Glory," "high-risk, high-reward," "sticking its neck out,"  "[e]xtreme credit and interest-rate positions," and "rocky road" do not appear anywhere in any of the Prospectuses.  Nor did the Prospectuses use any similar language to describe the overall risk of any Fund.

Finally, Defendants do not deny that the "No Guts, No Glory" style caused the Funds to lose money in 2008, and specifically to lose money in a manner typical of high yield funds. They concede the Funds' volatility, noting the "unsurprising fact" that the Rochester "investment strategy yield[ed] above-market gains in good times, like 2009, and below-market losses in bad times, like 2008."  Def. Br. at 13-14.  Again, this kind of volatility is the opposite of what a reasonable investor would expect from a fund that claims that its investments are "consistent with the preservation of capital."

Having conceded all of these facts that form the bases of the Complaints, Defendants nonetheless argue that Plaintiffs' allegations regarding the capital preservation objective fail to state a claim because:  (1) a fund's investment objective is not important; (2) investors should have figured out that the Funds were riskier than their stated investment objectives by studying boilerplate warnings, by analyzing each Fund's investment portfolio on their own or by researching trade publications; and (3) investors could have invested in other Oppenheimer funds that Defendants claim were less risky.  None of these arguments has merit.

1. **A Reasonable Investor Would Consider the Funds' Capital Preservation Investment Objectives To Be Important In Deciding Whether To Invest**

Defendants argue that the Funds' capital preservation investment objectives are merely "aspirational expressions of investment goals" and "forward-looking statements" that cannot be the basis of a claim under Sections 11 or 12 of the Securities Act because they would not be "important" to a reasonable investor in deciding whether or not to invest. Def. Br. at 34-35. Defendants' argument rests on a misstatement of the law and a mischaracterization of the allegations in the Complaints.

Two recently-decided cases make clear that investment objectives like the ones at issue here are critically important to investors. In *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, the court considered an investment objective similar to the Funds' capital preservation objective: "The Fund seeks to provide income consistent with preservation of capital and low principal fluctuation." No. 08-CV-11064, 2010 WL 1253114, at *4 (D. Mass. Mar. 31, 2010). The court rejected the argument – also advanced by Defendants here – that the "statements are not actionable because they are merely aspirational and do not promise that specific results will be achieved." *Id.* The court reasoned:

> The defendants' characterization of the statements in the offering materials as "general and indefinite" is misleading. As the plaintiffs assert, the statements in the Fund's prospectuses were more than mere aspirations or avowals of the Fund's goals. Rather, they were key guidelines that established the Trust's investment strategy and laid down the basic ground rules it would follow.

*Id.* (citation omitted). The court concluded that such statements "were, in all likelihood, of *utmost importance to potential investors*." *Id.* at *5 (citing *In re Charles Schwab Corp. Sec.*

*Litig.,* 257 F.R.D. 534, 543-46 (N.D. Cal. 2009) ("*Charles Schwab I*")) (emphasis added).

Similarly, in *Charles Schwab I*, the investment objective of Schwab's ultra short-term bond fund was to offer high current income "with minimal changes in share price." 257 F.R.D. at 543. The court found that the allegations of misstatements in that investment objective stated a claim sufficient to withstand a motion to dismiss. *Id.* at 546.

Even the court in *Yu v. State Street Corp.*, upon which Defendants rely, referred to "capital preservation" as an example of the kind of investment objective upon which investors would reasonably rely. No. 08-CV-9235, 2010 WL 668645, at *5 (S.D.N.Y. Feb 25, 2010). In *Yu*, the court contrasted a fund promising only that it would invest in "high-quality debt" with one whose objective was to be "consistent with the preservation of capital and liquidity," indicating that the latter could "be read as an implicit representation that the Fund posed little or no risk." *Id.*

Although some investment objectives may be little more than vaguely-worded aspirational goals, the pledges contained in the Prospectuses to invest "consistent with capital preservation" are not. As shown above, "capital preservation" has a well-understood meaning that provides a bedrock principle upon which the Funds' investments should have been evaluated. The capital preservation objective operated as a promise to investors that the Funds would place protection of principal above all other goals, and should have served as a touchstone for the Funds' investment strategy by placing a premium on liquidity, low volatility and low risk. As the court noted in *Charles Schwab I*, a fund cannot "purport[] to invest in low-risk government bonds but in fact invest[] in legitimate but high-risk treasure-hunting expeditions." *Charles Schwab I*, 257 F.R.D. at 547.

Defendants' own treatment of the investment objective highlights its importance to investors.  In each Prospectus, not only is the "preservation of capital" objective the very first paragraph after the table of contents, but during the Class Period, it was the only substantive information about each Fund listed on each Prospectus's cover page.[13]  After the Class Period, Defendants removed the reference to "preservation of capital" from the Prospectuses' cover pages, so that they now refer only to seeking income.  However, Defendants have kept the investment objective's placement as the first paragraph after the table of contents.[14]

Moreover, on OppenheimerFunds' investors' website's homepage, Defendants advise investors:  "Before investing in any of the Oppenheimer funds, investors should carefully consider a fund's *investment objectives*, risks, charges and expenses."[15]  Indeed, for the average investor looking for a safe choice and confronted with hundreds of pages of prospectuses, statements of additional information and annual reports, a capital preservation investment objective is likely to be the *single most important statement in the documents*.

> 2.    **Boilerplate Warnings, Disclosure of the Funds' Investments and Statements To the Press Do Not Render Defendants' Misstatements Immaterial as a Matter of Law**

Defendants argue that even if the investment objectives were important to investors, the objectives described were not misleading in the context of other disclosures.  Def. Br. at 35-37.  However, none of the context that Defendants offer – (1) boilerplate warnings in the Prospectuses, (2) a list of the securities in which the Funds invested, and (3) trade publication

---

[13]       *See, e.g.,* Cal. Prospectus (10.31.07) at 1, 3 (Larrabee Decl. Ex. A-6); Pa. Prospectus (11.28.07) at 1, 3 (Larrabee Decl. Ex. A-12).
[14]       *See, e.g.,* Cal. Prospectus (11.27.09) at 1, 3 (Larrabee Decl. Ex. A-6); Pa. Prospectus (11.28.07) at 1, 3 (Larrabee Decl. Ex. A-12).
[15]       *See* OppenheimerFunds Investor Service Center, https://www.oppenheimerfunds.com/investors (emphasis added) (Shuman Decl. Ex. A-1).

commentary – adequately warned investors of the fact that the Funds were operated in a style that was fundamentally incompatible with the stated objective of capital preservation.

### a.      Boilerplate Warnings Are Not Sufficient

Defendants identify three warning statements in the Prospectuses that supposedly negate the materiality of the Prospectuses' misstatements relating to the Funds' investment objectives: (1) "the risk that poor security selection by [the Manager] will cause the Fund to underperform other funds having a similar objective"; (2) "there is no assurance that the Fund will achieve its investment objective"; and (3) the Funds' "risks mean that you can lose money by investing in the Fund."  Def. Br. at 35 (citations and emphasis omitted).  Defendants appear to argue that these warnings trigger the "bespeaks caution" doctrine, putting investors on notice of the risks of the Funds.  However, these warnings are mere boilerplate that were not sufficient to cure the misleading statements concerning the Funds' fundamental investment objectives.

First, the "bespeaks caution" doctrine that Defendants rely on here applies only to affirmative, forward-looking statements and not statements about "present factual conditions." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1123 (10th Cir. 1997).  The capital preservation investment objectives are not forward-looking statements, but rather descriptions of the investment strategies the Funds were supposedly employing when investors purchased shares.  In other words, the Prospectuses "made distinct claims about the posture of the Fund[s], [their] investment strategies and the rules under which [they] would operate." *Evergreen*, 2010 WL 1253114, at *5.  Prospectuses either must disclose the facts as they exist or, as here, they are materially misleading.

Second, courts do not allow generic warnings to cure otherwise misleading statements. "[V]ague, boilerplate language in the prospectuses warning that the Fund is not guaranteed to meet its goals did not disclose the risky nature of the Fund's investments with sufficient clarity as to 'bespeak caution . . .'" *Id.* at \*5 (citing *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 729 (2d Cir. 1998)); *Slayton v. Am. Express Co.*, No. 08-CV-5442, 2010 WL 1960019, at \*11 (2d Cir. May 18, 2010) ("The defendants' caution, referencing the deterioration in the high-yield sector generally, is *vague*, and the pleaded facts do not support the defendants' assertion that this is the *exact* risk that materialized.") (emphasis added).  Instead, the purported warnings must "relate directly to that by which plaintiffs claim to have been misled." *Hunt*, 159 F.3d at 729 (citation omitted).  In *Hunt*, the Second Circuit reversed the trial court's dismissal of claims based on a prospectus's misstatements, finding that the prospectus's "cautionary language . . . warned investors of a different contingency than that which plaintiffs allege was misrepresented." *Id.* (citation omitted).

Here, the cautionary language offered by Defendants warned only that "poor security selection" could cause the Funds to underperform and that the Funds might not achieve their investment objectives.  Def. Br. at 35.  The Prospectuses did not warn that Defendants could abandon (and indeed had abandoned) the capital preservation objective entirely by embarking upon a "high-risk, high-return" strategy.  Thus, the Complaints allege more than that "poor security selection" caused the Funds to suffer their dramatic losses or to massively underperform their peers.  Rather, the Complaints allege that it was the decision by Defendants to use an "investment style" that was fundamentally incompatible with the Funds' stated investment objectives.

b.      **Listing the Funds' Securities Portfolios Is Not Sufficient**

Defendants assert that the Funds' capital preservation investment objectives were not materially misleading because the Prospectuses disclosed that the Funds would invest in "junk bonds, unrated bonds, tobacco bonds, and inverse floaters" and "listed each investment they selected." Def. Br. at 37.  These statements do not make the Funds' departure from their capital preservation investment objectives any less misleading.

First, the Complaints allege that the disclosures relating to these categories of investments are themselves misleading. *See infra* at II.B-C.  For example, the Complaints allege that the Funds exceeded their 15% cap on illiquid investments.  Clearly, the Prospectuses' statements regarding the Funds' investments that are themselves false and misleading cannot cure other misleading statements regarding the capital preservation investment objectives.

Second, neither listing the types of securities that the Funds could purchase (*e.g.*, limited amounts in illiquid securities, inverse floaters, or junk bonds) nor listing the hundreds of securities that the Funds did purchase disclosed that the global strategy employed by the Funds was "high-risk, high-return."  In other words, the documents filed with the SEC for use by investors did not warn that the Funds would invest or had invested in all of these types of securities in such amounts so as to convert what purported to be capital preservation funds into "No Guts, No Glory" funds.  Again, these disclosures are not sufficient as they do not "relate directly to that by which plaintiffs claim to have been misled." *Hunt*, 159 F.3d at 729.[16]

---

[16]      *Tabankin v. Kemper Short-Term Global Income Fund*, No. 93-CV-5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994), upon which Defendants rely (Def. Br. at 36), is inapposite.  That court dismissed the complaint because while the fund promised to use "prudent investment management," the plaintiffs did not allege "facts to show that Kemper used imprudent management." *Tabankin*, 1994 WL 30541, at *4.  The Complaints here all allege (and the Defendants concede) that the Funds actually used high-risk investment strategies.  The Complaints further allege that these strategies were fundamentally incompatible with the stated capital preservation investment objectives.

18

Third, Defendants cannot discharge their obligation to provide truthful, non-misleading descriptions of the Funds' investment objectives by outsourcing to investors the obligation to review the Funds' investments security by security to determine whether they collectively constitute a proper capital preservation portfolio. The securities laws place a burden of truthful disclosure on the issuer, not a burden of independent financial analysis on the investor. *See Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1097 (1990) ("But not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."). No court has held that listing a fund's securities portfolio renders the investment objective immaterial. Such a rule would impose an impossible burden on the average investor, who is incapable of analyzing the risk of a single complex investment, let alone a portfolio consisting of hundreds of bonds and derivatives. If an investor must perform a complex analysis of data to understand the true risk of his investment, Defendants' disclosures are necessarily insufficient to render the alleged misstatements immaterial. *See In re Real Estate Assoc. Ltd. P'ship Litig.,* 223 F. Supp. 2d 1109, 1132 (C.D. Cal. 2002) ("the complexity of the REIT transaction and the length of the Solicitations meant that the calculations and conclusions set forth in the Solicitations were comprehensible only to those with a high level of expertise and familiarity with the REIT transaction").

### c.   Disclosing the Funds' High-Risk Strategy To Trade Publications Is Not Sufficient

Defendants also argue that because of the "extensive press commentary" about Defendants' "high risk, high-return" strategy, the Funds' capital preservation investment objective was not misleading. Def. Br. at 38. Defendants' supposedly candid acknowledgement

of the Funds' riskiness to industry analysts and media does not mitigate the falsity of the capital preservation investment objectives contained in the Prospectuses; it merely confirms it.

Defendants have not demonstrated, moreover, that the Funds' riskiness was a matter of general public knowledge.  Defendants face a high bar in establishing that statements outside a prospectus make omitted information general public knowledge.  "There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them."  *Kronfeld v. Trans World Airlines, Inc*., 832 F.2d 726, 736 (2d Cir. 1987).  A defendant is only "relieved of a duty to disclose when certain developments affecting a corporation become 'matters of general public knowledge.'"  *In re WorldCom, Inc. Sec. Litig*., 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004) (quoting *Seibert v. Sperry Rand Corp*., 586 F.2d 949, 952 (2d Cir. 1978)).  Indeed, Defendants repeated the false statements in each Prospectus issued after the articles were published.

Communications through the media are generally "insufficient to compensate for omissions in the prospectus since an investor is all too apt to look upon those communications as self-serving and to consider the prospectus as a more objective, self-contained statement upon which he may justifiably rely to make an informed investment decision."  *Spielman v. Gen. Host Corp*., 538 F.2d 39, 40-41 (2d Cir. 1976).  This is particularly true in this instance, as Defendants' new acknowledgements that the Funds were high-risk directly contradict the Prospectuses' statements that they were "consistent with preservation of capital."

"[S]poradic press reports or reports published in other contexts may 'not be considered to be part of the information that was reasonably available' to investors."  *In re Worldcom, Inc. Sec.*

*Litig.*, 346 F. Supp. 2d at 688 (quoting *United Paperworkers Int'l Union v. Int'l Paper Co*., 985 F.2d 1190, 1199 (2d Cir. 1993)).  In other words, "[t]he issue is not, as defendants would have the Court believe, merely whether the information was made public, but whether the [plaintiffs] could reasonably have been expected to know this information from sources other than the tender offer materials."  *Fisher v. The Plessey Co., Ltd.*, 559 F. Supp. 442, 446 (S.D.N.Y. 1983).

The handful of articles quoted by Defendants are clearly insufficient to find as a matter of law that investors were expected to know that the Funds were "high-risk, high-return" despite the Prospectuses' description of them as "consistent with preservation of capital."  All but two of Defendants' citations are to trade publications, namely *The Bond Buyer*, which Defendants acknowledge is a "trade paper of the municipal securities industry" (Def. Br. at 10 n.8 (citation omitted)), and *Morningstar* analyst reports that are available only through a subscription.  The two non-trade, but still subscription, sources are a *Barron's* article from 2002 relating solely to the New York Fund (Larrabee Decl. Ex. B-1) and a *Business Week* article from October 2008 published after the Funds had suffered most of their losses (Larrabee Decl. Ex. B-8).[17]  In fact, Defendants point to no articles relating to the New Jersey Fund or the AMT-Free Fund at all. *See infra* at IV.B, C.

Defendants do not cite any case in which a court has found that such a thin record demonstrated that information omitted in a prospectus was a matter of "general public knowledge."  To the contrary, courts have required extensive media coverage to support such a

---

[17]     Defendants also cite a *Wall Street Journal* article.  *See* Def. Br. at 72 & n.134 (citing Diya Gullapalli, *Monthly Mutual Funds Review: Looking for Diamonds Amid the Junk – Seeking Better Returns, Retirees Buy Risky Debt; Scrutinizing the Turbines*, Wall St. J., Mar. 6, 2006 (Larrabee Decl. Ex. B-23)).  However, that article discusses only the high-yield National Fund.  Defendants' admitted failure to treat capital preservation funds differently from a speculative fund only further demonstrates that Defendants failed to adhere to the Funds' conservative preservation of capital objectives.

conclusion. *See Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir. 1978) (finding information to be public knowledge because "difficulties were reported countrywide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions" and "a nationwide consumer boycott was being conducted against Stevens, accompanied by massive media advertising").

> **d.     That Defendants Sold Other, Potentially Less-Risky Funds Is Irrelevant**

Finally, Defendants assert that "[h]ad Plaintiffs truly wanted to forego high income to pursue their desired approach to capital preservation, they could have invested elsewhere," including in Oppenheimer's "less risky" limited term municipal bond funds. Def. Br. at 38. Defendants' argument both misses the point and is based upon a false premise.

First, it is irrelevant that Defendants offered other, supposedly safer investments. Investors are entitled to rely on the truth of statements contained in the operative prospectuses, and are not required to compare a fund's investment objective to that of other funds offered by the same issuer. Defendants' reliance on *Yu v. State Street* on this point, Def. Br. at 38 n.70, is misplaced. In that case, the court looked to the investment objective of the "more conservative" capital preservation fund not because the plaintiff was required to compare funds' investment objectives, but because the two funds were described on the same page in a single prospectus. *Yu,* 2010 WL 668645, at *5 ("Consider, for example, language from the same page of the prospectus describing the apparently more conservative Tax Free Money Market Fund."). Here, none of the Prospectuses at issue mention Oppenheimer's supposedly "less risky" limited term municipal bond funds. Nor do they inform investors that there were any municipal bond funds that were safer than the Funds at issue here. Instead, in describing the overall risk of each Fund,

Defendants gave the same description:  "In the OppenheimerFunds spectrum, the Fund is more conservative than some types of taxable bond funds, such as high yield bond funds, but has greater risk than money market funds."[18]  After the Class Period, this statement was removed entirely from the Prospectuses.[19]

Second, Defendants' argument is based upon the false premise that if investors had reviewed the prospectuses of these limited term funds, they would have found them to be obviously less risky.  That is not the case.  For example, compared to the California Fund, the Limited Term California Municipal Fund had:

- **A similar investment objective**: "The Fund seeks as high a level of income exempt from federal income tax and California individual income taxes as is consistent with its investment policies and prudent investment management."[20]

- **Similar investments**:  80% invested in California municipal securities; investment in junk bonds; investment in unrated bonds that the manager "believes to be comparable to investment-grade securities"; investment in illiquid securities; investment in tobacco bonds; investment in inverse floaters.[21]

- **Identical risk description**:  "In the OppenheimerFunds spectrum, the Fund is more conservative than some types of taxable bond funds, such as high yield bond funds, but has greater risk than money market funds."[22]

---

[18]   AMT-Free Compl. ¶102; AMT-Free NY Compl. ¶71; Cal. Compl. ¶67; NJ Compl. ¶72; Pa. Compl. ¶74.
[19]   *See, e.g.*, Pa. Prospectus (11.27.09) (Shuman Decl. Ex. A-2).
[20]   Limited Term California Municipal Fund October 24, 2006 Prospectus at 3 (Shuman Decl. Ex. A-3).
[21]   *Id.* at 4.
[22]   *Id.* at 8.

Apparently, one of the main differences between the limited term municipal bond funds and the Funds that are at issue in this litigation is that the former were "managed to limit volatility," Def. Br. at 38 n.70, while the latter were managed in Rochester's undisclosed "No Guts, No Glory," "high-risk, high-reward" style.  This difference was never disclosed to investors in any of the Funds' Prospectuses or related documents.  The existence of these limited term funds did nothing to disclose the risks of the "preservation of capital" Funds.

**B.      Defendants' Statements Regarding Inverse Floaters Were Materially False and Misleading**

**1.      The Prospectuses Failed to Adequately Disclose Inverse Floater Volatility**

**a.      The Prospectuses Failed To Disclose the Inverse Floaters' Leverage Ratios**

The inverse floaters that the Funds typically held were created by various Trusts.  The Trust holds a long-term municipal bond and divides its fixed coupons into payments on two floating rate securities that the Trust issues: (i) a floater, and (ii) an inverse floater.[23]  The holder of the inverse floater receives a residual interest (a coupon payment) that represents the difference between:  a) long-term interest paid by the underlying fixed-rate security; and b) the short-term interest paid out on the floater, with that interest being determined by a reference to a short-term market rate.  The inverse floater's interest rate, therefore, moves inversely with changes in a referenced short-term interest rate.

An inverse floater's leverage ratio is the only objective measure of the inverse floater's coupon payment sensitivity to changes in short-term interest rates.  For example, if an inverse

---

[23]      *E.g.,* AMT-Free Prospectus (10.26.07) at 5 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 8 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 9 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 8 (Larrabee Decl. Ex. A-14).

floater's leverage ratio is 2:1, its coupon payment will decline by a factor of two for every basis point increase in the *short-term* interest rate.  Such an inverse floater would pose substantially less coupon risk than an inverse floater with a leverage ratio of, for example, 9:1.  *See infra* at II.B.1.a.

Additionally, and more importantly, an investor needs to know the leverage ratio in order to assess the inverse floater's *price volatility* as affected by changes in *long-term* interest rates.  For example, if the leverage ratio is 2:1, the price of the inverse floater will decrease at more than twice the rate of the underlying bond.  However, such an inverse floater would pose substantially less price risk than an inverse floater with a leverage ratio of, for example, 9:1.  A relatively small increase in the long-term interest rate could easily result in this 9:1 floater taking on a *negative* value, meaning that the Fund now *owes* more than the value of the underlying bond.  Such price risk has enormous implications for the stability of the Funds' NAVs.  If the Funds hold many inverse floaters with high leverage ratios, there is an exponentially greater risk of sharp declines in the Funds' NAVs.  The effect of highly-leveraged inverse floaters is to magnify, many times over, the risks inherent in virtually all long-term bonds.

Lead Plaintiffs allege that the Funds failed to disclose the extent to which the inverse floaters were leveraged, such that a small upward movement in interest rates could result in a disproportionately large loss for the Funds, and that such omissions made the Funds' risk disclosures materially false and misleading.[24]  Defendants do not deny that the leverage ratios were not disclosed.  Instead, they claim that they had no duty to make such disclosures.  Rather,

---

[24]     AMT-Free Compl. ¶¶65, 100a; AMT-Free NY Compl. ¶¶59, 92a ; Cal. Compl. ¶¶142, 151; Nat'l Compl. ¶¶61, 90a; NJ Compl. ¶¶60, 93a; Pa. Compl. ¶¶122, 133a ; Rochester Compl. ¶¶60, 96a.

Defendants say, it was enough that the Prospectuses contained the facts needed to calculate leverage ratios.  It was up to investors to find those facts and "do the math."  Def. Br. at 45-46.

But this is not the easy task Defendants make it out to be.  To begin with, finding the facts takes some doing.  The November 28, 2007 New Jersey Fund Prospectus is illustrative. The disclosures concerning inverse floaters first appear on page 8.  NJ Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-10).  The information required to determine the Fund's inverse floater leverage ratio cannot be found until page 132 of the New Jersey Statement of Additional Information ("SAI") (11.28.07), which was only supplied upon request.  *See, e.g.*, NJ Prospectus (11.28.07) back page ("The following additional information about the fund is available without charge upon request: STATEMENT OF ADDITIONAL INFORMATION . . .").  Once having requested and received the SAI, the investor would then have to locate the inverse floater on page 132 of the New Jersey Fund SAI (11.28.07), Larrabee Decl. Ex. A-11, the underlying municipal bond on page 107 of the SAI, and the footnote on page 120 of the SAI.  Further, the investor would have to grapple with the problem posed by the Fund's use of different names for the same underlying bond on different pages.  *See infra* at II.B.1.a.

Because it is not disclosed, the investor would have to figure out the formula for calculating the leverage ratio.  Then, even if the investor knew the formula, the calculations required are not as simple as Defendants claim – nor as easy, given that each Fund contained dozens of inverse floaters, derived from dozens of different municipal securities, each requiring a separate leverage calculation.  Thus, to "do the math" and calculate *each* inverse floater ratio, investors, for each inverse floater, would have to: (1) locate the inverse floater; (2) identify the underlying municipal bond; (3) subtract the inverse floater dollar size from the municipal bond

dollar size to find the floater dollar size; and then (4) divide the calculated floater dollar size by the inverse floater dollar size.  The investor would have to repeat this analysis for each of the Fund's other inverse floaters.[25]

The difficulty of this process is further illustrated by the attempt to calculate the leverage ratio for the New Jersey Fund's inverse floater called "Puerto Rico Electric Power Authority ROL."  This inverse floater can be found on a table on page 132 of the New Jersey Fund SAI, which represents its coupon rate to be 7.930 percent, its maturity date to be 7/1/31, and its value to be $1,924,950.  NJ SAI (11.28.2007) at 132.  The chart could have but does not include the inverse floater's leverage ratio.  To figure this out, the investor first must know the inverse floater's underlying municipal security.  One would think that the underlying security would be called "Puerto Rico Electric Power Authority ROL," but there is no such security included on the Fund's list of municipal bonds and notes beginning on page 107 of the SAI.  There is, however, a security with a similar name – "Puerto Rico Electric Power Authority, Series UU" – on page 118 of the list of municipal securities.  A footnote on page 120 of the SAI identifies this municipal security as underlying an *unspecified* inverse floater.  Based on this information, the investor might assume, with no way of knowing for sure, that the municipal security identified as Puerto Rico Electric Power Authority, Series UU on page 118 of the SAI corresponds to the inverse floater on page 132 of the SAI.  The difference in the names obviously poses a problem even to financial experts, and a Fund dedicated to full disclosure could have easily resolved or prevented any confusion with just a few words of explanation.  Having identified what is presumably the

---

[25]    The investor could not simply add the total value of the bonds and inverse floaters held by the Funds to generate some meaningful "average" leverage ratio, as Defendants claim.  Def. Br. 45.  Any such mumber is useless in gauging the price volatility of an inverse floater, because the inverse floater's volatility also hinges upon other factors, such as maturity date and coupon payment that are unique to each underlying bond.

security underlying the Puerto Rico Electric Power Authority ROL inverse floater, the investor would next have to subtract from the principal amount of the municipal bond, which is $20,500,000 according to page 118 of the SAI, the inverse floater value, which is $2,050,000 according to the chart on page 132 of the SAI. This yields the value of the floater, which is $18,450,000. Finally, the investor would have to divide $18,450,000 by $2,050,000 to come up with the leverage ratio of 9:1. This means that this inverse floater's coupon payment must decrease by a factor of nine for each basis point increase in the short-term interest rate. *Salomon Smith Barney Guide to Mortgage-Backed and Asset-Backed Securities* 51 (Lakhbir Hayre ed., 2001). If a Fund investor must perform such a difficult analysis of data to gain an understanding of the true risk of his investment, Defendants' dispersed and confusing disclosures are necessarily insufficient to render the alleged misstatements immaterial. *See In re Flag Telecom Holdings Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009) ("This Court cannot rule that the scattered disclosures in various amendments, annexes and exhibits to the Prospectus and Registration Statement were sufficient as a matter of law to disclose the material facts to reasonable investors."); *SEC v. Mozilo*, No. 09-CV-3994, 2009 WL 3807124, at *10 (C.D. Cal. Nov. 3, 2009) (denying defendants' motion to dismiss where an investor would have to "decipher complex raw data to understand that [defendants'] prime category included borrowers with FICO scores below 620"); *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d at 1132 ("the complexity of the REIT transaction and the length of the Solicitations meant that the calculations and conclusions set forth in the Solicitations were comprehensible only to those with a high level of expertise and familiarity with REIT transaction").

This common sense notion of proper disclosure is reinforced by SEC regulation. SEC Rule 421, Presentation of Information in Prospectuses, requires that information in a prospectus "shall not . . . be set forth in such fashion as to obscure any of the required information or any information necessary to keep the required information from being incomplete or misleading" and that "[y]ou must present the information in a prospectus in a clear, concise and understandable manner." 17 C.F.R. § 230.421 (1998). The Prospectuses' disclosures regarding leverage ratios come nowhere close to meeting these requirements.

Defendants try to get around this by citing *Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988), and *Ash v. LFE Corp.*, 525 F.2d 215, 218 (3d Cir. 1975), for the proposition that investors could have figured out the leverage ratio themselves, but these cases are inapposite. First, the calculations involved in *Field* and *Ash* were "elementary mathematics" and "simple arithmetical computation[s]." 850 F.2d at 949; 525 F.2d at 218.[26] In contrast, calculation of the leverage ratio in this case would require the knowledge and abilities of an experienced financial expert. Second, the information required to complete the calculations in *Field* and *Ash* were "state[d] in clear language" and were "disclosed prominently and candidly." 850 F.2d at 949; 525 F.2d at 219. In this case, Defendants did not afford the Funds' investors such disclosures. Instead, investors were called upon, first, to request additional information and, then, to piece together buried and scattered information from distinct parts of the Funds' Prospectuses and SAIs, using an arcane formula the average investor has no reason to know in the first place.

---

[26] Specifically, in *Field*, the plaintiff complained that the per share price received by certain selling shareholders was not disclosed – but the total price and total shares had been, so that the per share price could be calculated by a single operation of simple division. *Field* at 949. Similarly, in *Ash*, the plaintiff contended that the Directors' financial interest in seeing a particulaR pension plan passed by shareholder vote had not been disclosed – but their current pensions, and the pensions they would receive under the proposed plan, were both provided. *Ash* at 218.

Thus, Defendants' disclosures regarding inverse floater leverage ratios were insufficient as a matter of law.

> **b.      The Prospectuses' Vague Disclosures of Potential Risks Regarding Inverse Floater Volatility Were Insufficient As a Matter of Law**

Because Defendants did not disclose the inverse floaters' leverage ratios, investors were left without an objective measure of the volatility of each of the Funds' inverse floaters and were, therefore, forced to resort to the Funds' disclosures about inverse floater volatility in general.[27]

Defendants contend that these disclosures are sufficient, Def. Br. at 39, but in fact they are classic examples of the boilerplate warnings that courts typically deem inadequate. *See supra* at II.A.2.  Further, such disclosures were misleading because they failed to disclose the magnitude of the risks described, which in this case would have required the identification of each inverse floater's leverage ratio.  For example, it is one thing to disclose that inverse floaters are subject to interest rate risk.  It is quite another to disclose that with each basis point increase in short-term interest rates the inverse floater's coupon payment must decrease by a factor of nine, as was the case with the Puerto Rico Electric Power Authority ROL.  *Supra* at II.B.1.a.  *See Grossman*, 120 F.3d at 1120 ("not every risk disclosure will be sufficient to immunize statements relating to the disclosures; rather, 'the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions …which the plaintiffs challenge.'") (citation omitted); *Evergreen*, 2010 WL 1253114, at *5 ("the vague, boilerplate language in the prospectuses warning that the Fund is not guaranteed to meet its goals did not disclose the risky

---

[27]      AMT-Free Compl. ¶65; AMT-Free NY Compl. ¶59; Cal. Compl. ¶142; Nat'l Compl. ¶61; NJ Compl. ¶60; Pa. Compl. ¶¶113-34; Rochester Compl. ¶60.

nature of the Fund's investments with sufficient clarity as to 'bespeak caution'"); *Hunt*, 159 F.3d at 729 ("The cautionary language, however, must relate directly to that by which the plaintiffs claim to have been misled."); *White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 986 (E.D. Wis. 2002) ("boilerplate language which warns generally that 'junk bonds' involve greater risks and limited liquidity . . . are inadequate to support a motion to dismiss") *Slayton*, 2010 WL 1960019, at *11 ("The defendants' caution, referencing the deterioration in the high-yield sector generally, is *vague*, and the pleaded facts do not support the defendants' assertion that this is the *exact* risk that materialized.") (emphasis added).

Moreover, Defendants' statements that inverse floaters *may* have *additional* risks, *tend* to under perform, or *can be* more volatile were not satisfactory disclosures but concealed the crucial fact that inverse floaters are *actually* and *necessarily* more volatile than conventional bonds. These disclosures are misleading because, by suggesting that some of the Funds' inverse floaters *might* have the same price stability as otherwise comparable bonds when in fact they are inherently and therefore always more volatile, Defendants falsely and misleadingly made the Funds appear to be safer investments than they really were. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'") (quoting *In re Prudential Sec. Inc. P'ship Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).[28]

---

[28]     Defendants also cite two disclosures concerning municipal securities in order to claim that interest rate risk and volatility of inverse floaters was properly disclosed. Def. Br. at 43. As explained, *infra* at II.B.6, inverse floaters are not municipal securities. Indeed, Defendants' discussion of inverse floaters was contained in a separate section of the Prospectus entitled "Other Investment Techniques and Strategies." *See, e.g.,* AMT-Free SAI (10.26.07) at 10 (Larrabee Decl. Ex. A-3); AMT-Free NY SAI (12.28.07) at 18 (Larrabee Decl. Ex. A-5); Cal. SAI (10.31.07) at 16 (Larrabee Decl. Ex. A-7); Nat'l SAI (11.28.07) at 10 (Larrabee Decl. Ex. A-9); NJ SAI (11.28.07)

Defendants' response to this is that the difference between "may" or "can be," on the one hand, and "does" and "is" on the other, is immaterial. Def. Br. at 44. But the cases they cite in support of this argument, Def. Br. at 44, are not on point. In both *In re RAC Mortgage Inv. Corp. Sec. Litig.*, 765 F. Supp. 860 (D. Md. 1991), and *In re Thornburg Mortgage, Inc. Sec. Litig.*, No. 07-CV-0815, 2010 WL 378300 (D.N.M. Jan. 27, 2010), defendants prominently disclosed material risks to investors. *In re RAC Mortgage*, 765 F. Supp. at 863 ("*The front page of both prospectuses stated in bold type*" the full risk disclosures for potential investors.) (emphasis added); *In re Thornburg Mortgage, Inc.*, 2010 WL 378300, at *42 ("SEC Form 8-K for Thornburg Mortgage, Inc. *at 2* . . . disclosed that TMI had additional margin calls that it had not yet met, and that it was working to do so.") (emphasis added).

In contrast, here the Funds' investors had to sift through contradictory, buried and piecemeal disclosures to even begin to understand the magnitude of the risks associated with the Funds' investments in inverse floaters. Where material "disclosures should have appeared, but did not appear, in several key sections of the [p]rospectus" a court "cannot rule that scattered disclosures … were sufficient as a matter of law." *In re Flag Telecom Holdings*, 618 F. Supp. 2d at 324-25.[29]

---

at 23 (Larrabee Decl. Ex. A-11); Pa. SAI (11.28.07) at 17 (Larrabee Decl. Ex. A-13); Rochester SAI (2.21.07) at 29 (Larrabee Decl. Ex. A-15). Nothing in that section would tell an investor to *also* look at disclosures related to municipal securities to find information on inverse floaters, and nothing in the "Municipal Securities" section refers investors to the "Inverse Floaters" section.

[29]     Defendants' reliance on *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5, 9 (2d Cir. 1996); *Blackmoss Inv., Inc. v. ACA Capital Holdings, Inc.*, No. 07-CV-10528, 2010 WL 148617, at *8 (S.D.N.Y. Jan. 14, 2010), and *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 176-77 (S.D.N.Y. 1996), is also misplaced. These decisions held disclosures to be sufficient when they were not buried and given adequate prominence. *Olkey*, 98 F.3d at 5 (disclosure "is too prominent and specific to be disregarded"); *Blackmoss Invs., Inc.*, 2010 WL 148617, at *8 (disclosures were prominent and included in the beginning of the prospectus); *Sheppard*, 938 F. Supp. at 176 ("Such disclosures were not buried or given inadequate prominence in the prospectus; rather, they constituted an integral part of the information presented to potential investors.").

In addition, *In re RAC Mortgage* is also irrelevant because it dealt only with a general disclosure about a diversified fund, not a specific disclosure regarding a specific investment. 765 F. Supp. at 864. In other words, plaintiffs were disputing broad disclosures concerning numerous and different securities.[30]  In contrast, Lead Plaintiffs here argue that Defendants' disclosures concerning specific securities were insufficient. Defendants' disclosures that inverse floaters – *a specific type of security* – *may* involve *additional* risks and that inverse floaters *can be* more volatile than conventional fixed-rate bonds did not warn investors of the magnitude or true likelihood of the risks Defendants subjected the Funds to by investing in inherently risky derivative instruments. In short, there was no "maybe" about it; inverse floaters were, and always had been, more volatile than other investments. The 2008 Prospectus Supplements further demonstrate that Defendants had previously failed to disclose the whole truth regarding the risks associated with inverse floaters. For example, during the Class Period, Defendants disclosed that "The Fund's investments in inverse floaters *may* involve *additional* risks."[31]  In sharp contrast, the 2008 Prospectus Supplements stated, "The Fund's investments in inverse floaters involve *certain* risks." By the standard of that declaration, the earlier suggestion that some of the Funds' inverse floaters may have additional risks clearly implied that "then again, they might not." Thus, the Funds' statements prior to October 2008 falsely and misleadingly

---

[30]     Indeed, the court in *RAC Mortgage* found that the use of "may" was proper "because of the managed and diversified nature of RAC's portfolio." *Id.* In other words, the court in *RAC Mortgage* found that there was in fact some possibility that the stated risk would not come to pass and that, therefore, use of "may" was proper. Likewise, the court in *Thornburg* found that the context of the statements at issue "makes it clear that they are beliefs and estimates, and not assertions of fact*." In re Thornburg Mortgage*, 2010 WL 378300, 51 (D.N.M. 2010). Indeed, in *Thornburg*, the statements complained of specifically referred to "*additional* margin calls." *Id.* (emphasis added). Obviously, the statement that a company "may" experience "additional" margin calls hardly disguises the fact that it *is* experiencing *some* margin calls.

[31]     *E.g.*, AMT-Free Prospectus (10.26.07) at 5 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 8 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 9 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 8 (Larrabee Decl. Ex. A-14) (emphasis added in all).

made inverse floaters appear to be a more conservative investment than they were.  The Funds failed to state at the time of the offerings that the risks were already present, *i.e.*, inverse floaters are inherently risky and are more volatile than conventional bonds.  Accordingly, the Funds' investments in these derivative securities contradicted their investment objective of "preserving capital."

Finally, "warnings of specific risks …do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the *magnitude* of the risks described."  *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99-CV-12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001) (emphasis added); *Rodney v. KPMG Peat Marwick*, 143 F.3d 1140, 1145 (8th Cir. 1998) (defendant's cautionary statement failed to alert investors to "the enhanced risks created by the violations of the Fund's own basic investment policies" through investing in inverse floater portions of collateralized mortgage obligations); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009) (motion to dismiss Section 11 and 12(a)(2) claims denied where defendants disclosed the effect of gold farming generally but failed to disclose the scope and impact of gold farming).

Thus, Defendants did not warn investors of the magnitude of risk to which they subjected the Funds by investing in inherently risky inverse floaters.  A reasonable investor would have considered significant to their investment decision the fact that changes in interest rates could result in dramatic losses in the Funds' NAVs.[32]

---

[32]    In 2008 the Funds' NAVs dropped dramatically: AMT-Free Fund: 33.2%, AMT-Free Compl. ¶6; AMT-Free New York Fund: 32.93% (all share classes), AMT-Free NY Compl. ¶6; California Fund: 46%, Cal. Compl. ¶26; National Fund: 53.05-53.06% (depending on share class), Nat'l Compl. ¶6; New Jersey Fund: 38.05-38.14% (depending on share class), NJ Compl. ¶6; Pennsylvania Fund: 37.9%, Pa. Compl. ¶11; Rochester Fund: 28.7%, Rochester Compl. ¶6; s*ee also* Introduction, *supra*.

### 2.    The Prospectuses' Disclosures Regarding the Collapse of the Trusts Were Insufficient

Inverse floater arrangements are essentially a mechanism by which the Funds purchased long-term municipal securities with money raised from short-term, floating interest rate loans collateralized by the underlying long-term municipal security.  The Funds failed to disclose that under the terms of the inverse floater arrangements, third parties could force the sale of the underlying municipal security collateral at disadvantageous times and under circumstances wholly beyond the control of the Funds or the Manager.[33]

Defendants respond that it was sufficient for the Funds to disclose that they "may [dispose of securities prior to maturity] for liquidity purposes, or because of other factors affecting the issuer," and that the Trusts through which the inverse floaters were created "could be collapsed."  Def. Br. at 48-49.  These arguments miss the point.  Both of these "disclosures" tell an investor only that the Funds, *at their own discretion,* may dispose of securities and jettison the Trust arrangements.  The Funds nowhere disclosed (until October 2008) that they could be *forced by a third party* to collapse the Trusts, and to sell the underlying securities (as well as other collateral), in a short and likely disadvantageous period of time.  *See generally McMahan & Co. v. Wherehouse Entm't, Inc.,* 900 F.2d 576, 579 (2d Cir. 1990) (describing the difference between language of entitlement and language of obligation).

A comparison of the Funds' November 2007 disclosures and their October and November 2008 Prospectus Supplements' disclosures on the topic highlights this discrepancy in

---

[33]     AMT-Free Compl. ¶¶70, 86; AMT-Free NY Compl. ¶¶63, 78; Cal. Compl. ¶¶147, 155; Nat'l Compl. ¶¶65, 76; NJ Compl. ¶¶64, 79; Pa. Compl. ¶129-30 & 132; Rochester Compl. ¶¶65, 81.

what they told investors.  In November 2007, the Funds told investors that *the Funds* could

collapse the Trusts:

> Certain inverse floaters are created when the Fund purchases a fixed-rate municipal security and subsequently transfers it to a broker-dealer (the sponsor). The sponsor sells the municipal security to a trust. The trust creates the inverse floater, *pursuant to an arrangement that enables the Fund to withdraw the underlying bond to collapse the inverse floater* (upon the payment of the value of the short-term security and certain costs).

(emphasis added).[34]

In contrast, in the October and November 2008 Prospectus Supplements the Funds

disclosed for the first time that *third parties* could collapse the Trusts:

> Under inverse floater arrangements, if the remarketing agent that offers the short-term securities for sale is unable to sell them, or if the holders tender (or put) them for repayment of principal and the remarketing agent is unable to remarket them, *the remarketing agent may cause the trust to be collapsed*, and in the case of floaters created by the Fund, the Fund will then be required to repay the principal amount of the tendered securities.  During times of market volatility, illiquidity or uncertainty, the Fund could be required to sell other portfolio holdings at a disadvantageous time to raise cash to meet that obligation.

(emphasis added).[35]

Defendants themselves acknowledge this difference in what their documents conveyed

but, strangely, deny its importance, stating that "the Supplement merely disclosed a new way in

which the previously disclosed risk of collapse could materialize in the wake of the credit crisis."

Def. Br. at 28.  But, surely, identifying all parties with the authority to cause the collapse of a

---

[34]     AMT-Free Prospectus (10.26.07) at 5 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 7 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 9 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 8 (Larrabee Decl. Ex. A-14).
[35]     Prospectus Supplement at 2 (Larrabee Decl. Ex. A-1).

Trust is a material point.  It is one thing to say the Funds have the right to collapse Trusts or sell securities in order to raise cash.  An investor can reasonably take such a disclosure to mean that, if the Funds need to raise money for some reason, the Manager will carefully determine which of the Funds' holdings should be disposed of and when, so as to cause the least damage to investors while still raising suitable capital.  It is quite another thing to reveal that a counterparty, that has no interest in or duty to the Funds, can force the liquidation of Fund securities and at times that are unfavorable to the Funds.

Defendants also claim that it was unnecessary to disclose the possibility of the remarketing agent's causing a Trust to collapse because "[n]o such disclosure had been warranted before the crisis because that specific scenario had never been a realistic possibility. . . ." *Id.*  But the likelihood of such a possibility is a factual issue that is not appropriately resolved on this motion to dismiss.  *In re Westar Energy, Inc. ERISA Litig.*, No. 03-CV-4032, 2005 WL 2403832, at *22 (D. Kan. Sept. 29, 2005) ("a question of fact [is] inappropriate for disposition at this stage of the pleadings"); *Resolution Trust Corp. v. Heiserman*, 839 F. Supp. 1457, 1464 (D. Colo. 1993) ("a question of fact [is] inappropriate for consideration on a motion to dismiss").[36]

The undisclosed risk inherent in the remarketing agents' right to collapse the Trusts was exacerbated by the undisclosed fact that the floaters were redeemable every seven days.[37] [38]  In

---

[36]    Even without discovery, Lead Plaintiffs have put forward sufficient evidence of a factual dispute to withstand a motion for summary judgment on this issue – *i.e.*, if the need to collapse the Trust was not a "realistic possibility," then why would the remarketing agent have bargained for and won the right do so, and why was it a common, almost universal, element in the structure of Trusts?  Moreover, if it were not a realistic possibility, how is it then that the specific scenario in fact occurred when third parties *did* collapse the Trusts?

[37]    AMT-Free Compl. ¶68; AMT-Free NY ¶61; Cal. Compl. ¶145; Nat'l Compl. ¶63; NJ Compl. ¶62; Pa. Compl. ¶129; Rochester Compl. ¶63.

[38]    This seven-day tender option allows tax-exempt money market funds, to which the floaters were typically sold, to classify the floaters as short-term instruments under Rule 2a-7 of the Investment Company Act of 1940, enabling tax-exempt money market funds to buy the floaters.  Sylvan G. Feldstein & Frank J. Fabozzi, *The*

effect, this meant that the Funds had borrowed ultra-short-term money at a floating rate to make ultra-long-term investments in fixed-rate securities.  This was an extremely dangerous strategy because of the risk – which in this case materialized – that the rate the Fund paid for the short-term loans would exceed the long-term rate the Fund received on the long-term investment, creating a negative position.

### 3.    The Prospectuses' Disclosures Concerning Collateral Were Misleading

Defendants also failed to disclose that the Funds could be required to put up additional collateral to secure their short-term borrowings.[39]  Defendants assert that "the potential need for additional collateral in an inverse floater trust is not material."  Def. Br. at 54.  But collateral is, by its very definition, an asset that is placed at risk of a forced sale by the inverse floater arrangements.  Defendants themselves acknowledge that they bought securities intended to be held until maturity.  Def. Br. at 58.  Any sale of such securities before maturity carries the risk – which materialized here – that those securities will have to be disposed of at a discount from either par or carrying value, or both.  In short, there is a material difference to investors between a bond that the Funds owned free of any restrictions and one that was used as collateral for a loan from a third party.  Thus, the extent to which Funds' assets were used as collateral is a material fact to investors.  As noted above, an "omission is material if there is a substantial likelihood that a reasonable investor would consider the information significant when making an investment decision."  *Wolfson*, 539 F.3d at 1262.

---

*Handbook of Municipal Bonds* 297 (2008).  Indeed, Defendants acknowledge that the Funds' inverse floaters typically were sold to money market funds.  Def. Br. at 16.

[39]    AMT-Free Compl. ¶89; AMT-Free NY Compl. ¶81; Cal. Compl. ¶156; Nat'l Compl. ¶79; NJ Compl. ¶82; Pa. Compl. at ¶¶130, 132; Rochester Compl. ¶84.

Prior to the release of the Prospectus Supplements, Defendants had disclosed only that some of the Funds' assets were used as collateral, but they had failed to disclose the risk that third parties with no duty to the Funds could require the Funds to designate additional assets as collateral.[40]   In short, the inverse floaters were short-term loans that were secured not by designated assets only but by as much of the portfolio as might be required to support a Fund's investment in the underlying long-term security in a variety of circumstances.  Such risks are material.

The designation of certain of the Funds' assets as collateral in the Funds' various statements of investments was likewise misleadingly incomplete.  An investor confronted with this information would naturally conclude that only the assets denoted as collateral were at risk of forced sale.  In reality, virtually all of the Funds' assets could become collateral at any time, pursuant to agreements the Funds had already entered into, and for no additional benefit to the Funds.  Thus, the statements regarding collateral were both material and misleading, and they rendered other statements misleading as well.

Defendants also contend that they had "no duty" to disclose the collateralization risk because the inverse floater arrangements "contain[ed] dozens – if not hundreds – of individual provisions."  Def. Br. at 54.  But the fact that inverse floaters may be complicated does not relieve the Fund of its responsibility for disclosing their material risks.  The standard for disclosure is not simplicity, it is materiality.  Further, Lead Plaintiffs do not allege that Defendants should have disclosed every contract provision related to the inverse floaters.

---

[40]      AMT-Free Compl. ¶¶101a-b; AMT-Free NY Compl. ¶¶93a-b; Cal. Compl. ¶158; Nat'l Compl. ¶¶91a-b; NJ Compl. ¶¶94a-b; Pa. Compl. ¶¶134a-b; Rochester Compl. ¶¶97a-b.

Rather, they allege that Defendants should have disclosed the material risks presented by the collateral arrangements, which could have been done in one paragraph.

### 4. The Prospectuses' Disclosures Regarding the Shortfall and Forbearance Agreements Were Insufficient

The disclosures related to the shortfall and forbearance agreements were, like the Funds' other disclosures, insufficient to warn an investor of the true risks related to inverse floaters. Under the shortfall and forbearance agreements, the Funds were liable for the shortfall between the amount due to holders of the short-term floaters and the value of the Trust's underlying bond in the event the Trusts were collapsed.[41]  Defendants failed to disclose that the Funds had not segregated sufficient readily marketable securities or cash to meet their obligations under the shortfall and forbearance agreements, thereby creating the risk of being forced – in adverse market conditions – to sell illiquid assets at prices well below their value as stated in the Funds' financial statements.

Defendants attempt to defeat this allegation by arguing that the shortfall and forbearance agreements were disclosed.  Again, Defendants miss the point.  Lead Plaintiffs' core allegation is *not* that Defendants failed to disclose the terms of the shortfall and forbearance agreements. Rather, they allege that the Funds failed to disclose that the Funds had not segregated the cash or readily marketable securities required to meet their obligations under the shortfall and forbearance agreements.

Defendants next argue that these allegations lack sufficient factual support, because "Plaintiffs do not identify any particular floater arrangement that allegedly was unsupported by

---

[41]        AMT-Free Compl. ¶72; AMT-Free NY Compl. ¶65; Cal. Compl. ¶155; Nat'l Compl. ¶67; NJ Compl. ¶66; Pa. Compl. ¶¶130, 132; Rochester Compl. ¶67.

sufficient cash. . . ." Def. Br. at 53.  But Lead Plaintiffs more than meet the notice pleading standard.  They have alleged that: (a) the Funds did not segregate cash or readily marketable securities sufficient to meet the Funds' respective obligations under the shortfall and forbearance agreements; (b) third parties forced the collapse of inverse floater trusts; (c) as a result of that insufficiency, the Funds were forced to sell still more of their portfolios to raise the necessary capital; and (d) "[b]ecause many of the Fund[s'] assets were illiquid, or had been overvalued by the Fund[s], they could be sold only at steep discounts compared to the values reported by the Fund[s], if at all."[42]  These factual allegations are more than sufficient to provide Defendants notice of Lead Plaintiffs' claims; they are "facially plausible" in that they allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 570.

Public (but not readily available) records support Lead Plaintiffs' claims.  Specifically, by way of example, Lead Plaintiffs have found public data on three of the National Fund's top fifteen holdings.  The National Fund held approximately $73 million[43] of each of the following bonds as of its July 31, 2008 statement of investments: the Southern CA Public Power Authority Natural Gas1 bond; the Puerto Rico Sales Tax Financing Corp. Series A1 bond; and the Long Beach, CA Bond Finance Authority Natural Gas1 bond.  Each of those bonds was denoted as a bond used to create an inverse floater, and none of them was marked as illiquid.  Yet between their dates of issue, which ranged from July to October 2007, and the date of the July 31, 2008 statement of investments, two of those bonds traded only twice in the secondary market and the

---

[42]        AMT-Free Compl. ¶86; AMT-Free NY Compl. ¶78: Cal. Compl. ¶145; Nat'l Compl. ¶76; NJ Compl. ¶79; Pa. Compl. ¶130; Rochester Compl. ¶81.
[43]        The exact figures range from $72.4 to $75.7 million.

other did not trade at all.[44]  Those same bonds, when finally and properly evaluated by the

National Fund in January 2009, were all marked as illiquid, and were all valued at significantly

less than in the July statement of investments.[45]  These are just some examples of the Funds'

failure to disclose that they had not segregated liquid assets to satisfy their obligations and the

resulting risk – which materialized – that the Funds would have to sell illiquid assets at a steep

discount from their stated value on the Funds' financial statements.

Finally, the specific transactions at issue are recorded in Defendants' files, to which Lead

Plaintiffs do not yet have access, and Lead Plaintiffs are not required at this stage to plead facts

that are solely in the possession of the Defendants.  *Asp v. Toshiba Am. Consumer Prods., LLC*,

616 F. Supp. 2d 721, 736 (S.D. Ohio 2008) ("Plaintiff is not required to plead facts that are

solely in Toshiba's possession."); *In re Caere Corporate Sec. Litig.*, 837 F. Supp. 1054, 1059-60

(N.D. Cal. 1993) ("Of course, plaintiffs are not required to plead facts which are 'in the exclusive

possession of the defendants.'") (citation omitted).

>    **5.      The Prospectuses' Statements Regarding Limitations On Investments
>            In Inverse Floaters Were Materially Misleading**

Defendants claimed that the Funds each adhered to limits on inverse floater investments,

which were defined by reference to total Fund assets.  Specifically, the National Fund claimed

that the value of its investments in inverse floaters would not exceed 35% of the Fund's total

asset value.[46]  Similarly, the other six Funds each stated that the value of their investments in

---

[44]      Municipal Securities Rulemaking Board, Security Details,
http://emma.msrb.org/SecurityView/SecurityDetailsTrades.aspx?cusip=842471AZ7;
http://emma.msrb.org/SecurityView/SecurityDetailsTrades.aspx?cusip=74529JAS4;
http://emma.msrb.org/SecurityView/SecurityDetailsTrades.aspx?cusip=54241ABD4.
[45]      The new values ranged from 48% to 67% of what the Fund had said the bonds were worth in July 2008.
[46]      Nat'l Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-8).

inverse floaters would not exceed 20% of their total asset value.[47]  The accuracy of these percentage limitations therefore depends on the proper valuation of Fund assets.  Lead Plaintiffs have alleged that Defendants overvalued Fund assets.[48] [49]  It follows *a fortiori* that the extent of the Funds' investments in inverse floaters was understated.

There is another reason that Defendants' statements regarding limitations on inverse floaters were materially false and misleading.  When one is told that an investment in a particular type of security will not exceed twenty percent of assets, the logical conclusion is that the most one can lose from such an investment is twenty percent of assets.  Here, the Funds' exposure to losses related to inverse floaters was much greater than twenty percent of their respective assets, because of the inverse floaters' leverage, the accompanying shortfall and forbearance agreements, and the ability of third parties to collapse the Trusts.  Second, and relatedly, even accepting Defendants' analysis and limiting the statement to a percentage of assets, the statement is still misleading because it fails to disclose that inverse floaters can have a *negative value*, and some of them ultimately did.  *Infra* at II.B.6.  This fact renders the Funds' disclosures regarding assets meaningless, because an investor simply cannot gauge how much he or she stands to lose

---

[47]   *E.g.*, AMT-Free Prospectus (10.26.07) at 5 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 7 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 8 (Larrabee Decl. Ex. A-6); NJ Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 7 (Larrabee Decl. Ex. A-14).

[48]   *See* AMT-Free Compl. ¶¶82-84; AMT-Free NY Compl. ¶¶75-76; Cal. Compl. ¶¶166-72; Nat'l Compl. ¶¶73-74; NJ Compl. ¶¶76-77; Pa. Compl. ¶¶105-12; Rochester Compl. ¶¶77-79.

[49]   Defendants claim that Lead Plaintiffs' statement that the Funds "may have" adhered to their purported asset limits is a "concession" that the Funds did in fact adhere to those limits.  Def. Br. at 47.  Read in context, this hypothetical statement is in no way a concession.  This is evidenced by the very next sentence in which Lead Plaintiffs clearly allege that "Defendant's statement that the inverse floater concentration was limited to 20 percent of its assets was materially false and misleading because the actual percentage was higher."  AMT-Free Compl. ¶100a; AMT-Free NY Compl. ¶92a; Cal. Compl. ¶151; Nat'l Compl. ¶59 (35% of assets in this instance); NJ Compl. ¶93a; Pa. Compl. ¶133a; Rochester Compl. ¶96a.

if (as happened) the Funds' bets on interest rates go wrong.  Informing investors of this potential

loss is the essence of why such disclosures are required in the first place.

### 6. The National Fund Prospectus Falsely Stated That the National Fund Mainly Invests In Municipal Securities

"WHAT DOES THE FUND MAINLY INVEST IN?"  That is the rhetorical question

Defendants ask on the first page of the National Fund Prospectuses.[50]  The answer they give is

"municipal securities," defined as "fixed-income securities primarily issued by states, cities,

counties and other governmental entities to finance the development of local communities."  *Id.*

"MAINLY" means that "as a fundamental policy, the Fund invests at least 80% of its net assets

(plus borrowings for investment purposes) in municipal securities."  *Id.*  All of the Prospectuses

contained similar definitions of "municipal securities."[51]

With respect to the National Fund, these statements are false and misleading because

Defendants, by their own admission, invested up to 35% of the National Fund's assets in risky

inverse floaters, leaving only 65% – rather than 80% as stated – available for investments in

safer municipal securities.[52]  Defendants now try to avoid this result by claiming that inverse

floaters *are* "municipal securities," Def. Br. at 54-55, even though they never characterized

inverse floaters as municipal securities in any of the Prospectuses.  As set forth below, inverse

---

[50]      *See, e.g.*, Nat'l Prospectus (11.28.07) at 3 (Larrabee Decl. Ex. A-8).

[51]      *E.g.*, AMT-Free Prospectus (10.26.07) at 3 (Larrabee Decl. Ex. A-2) (same); AMT-Free NY Prospectus (12.28.07) at 3 (Larrabee Decl. Ex. A-4) (same); Cal. Prospectus (10.31.07) at 3 (Larrabee Decl. Ex. A-6) ("A municipal security essentially is a loan by the buyer of the security to the issuer of the security.  The issuer promises to pay back the principal amount of the loan and normally pays interest exempt from federal personal income taxes."); Nat'l Prospectus (11.28.07) at 3 (Larrabee Decl. Ex. A-8) (same); NJ Prospectus (11.28.07) at 3 (Larrabee Decl. Ex. A-10) (same); Pa. Prospectus (11.28.07) at 3 (Larrabee Decl. Ex. A-12) (same); Rochester Prospectus (2.21.07) at 3 (Larrabee Decl. Ex. A-14) ("A municipal security essentially is a loan by the buyer of the security to the issuer of the security.  The issuer promises to pay back the principal amount of the loan and normally pays interest exempt from federal personal income taxes.").

[52]      Nat'l Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-8).

floaters are fundamentally different and far riskier than the municipal securities that were represented to – but did not – comprise 80% of the National Fund portfolio.

Municipal securities are considered one of the more conservative asset classes available to investors.[53]  These securities are considered conservative because typically they are most often *direct* obligations of states, cities, counties, and agencies sponsored by them.[54] [55]  Further, municipal securities are fixed-income securities or securities that typically pay constant coupons. Defendants themselves stated this in the Funds' various Prospectuses.[56]  In other words, purchasing a true municipal security – such as a bond – is tantamount to loaning money to a governmental entity which is very likely to repay the loan along with promised coupon payments.  Regardless of changes in interest rates, if the buyers of a municipal security hold it to maturity, they will, in all likelihood, receive a stream of regular (or fixed) payments as well as the bond contract's promised principal at maturity.

In contrast, inverse floaters not only lack the characteristics that make municipal securities conservative investments, they possess additional features that *enhance* their risk.

---

[53]     *See, e.g.*, Municipal Securities Rulemaking Board, The Municipal Securities Rulemaking Board and Financial Industry Regulatory Authority Issue Joint Investor Education Notice: Risks and Other Investment Consideration are Reviewed, June 30, 2009, *available at* http://www.msrb.org/msrb1/Press/Release /MSRBFINRAIssueJointNotice.asp (last accessed Apr. 27, 2010) ("[Municipal securities] have historically been considered relatively conservative investments.") (Shuman Decl. Ex. A-4).

[54]     *See, e.g.*, Glossary of Municipal Securities Terms, http://www.msrb.org/msrb1/glossary/glossary_db. asp?sel=m (last accessed April 27, 2010) (Shuman Decl. Ex. A-5).

[55]     The Prospectuses similarly depict municipal securities as securities that are issued by state governments or their political subdivisions to raise money for a variety of public or private purposes, including financing public facilities, state or local governments, or specific projects undertaken by those governments.  *E.g.*, AMT-Free Prospectus (10.26.07) at 10 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 14 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 14 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 13 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 13 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 13 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 13 (Larrabee Decl. Ex. A-14).

[56]     *E.g.*, AMT-Free Prospectus (10.26.07) at 3 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 3 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 3 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 3 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 3 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 3 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 3 (Larrabee Decl. Ex. A-14).

Specifically, inverse floaters are leveraged bets against rises in interest rates, and those bets, unlike investments in unleveraged municipal securities, expose the holders of inverses floaters to the risk of severe losses.[57]  Further, unlike municipal securities, most inverse floaters are neither issued nor created by – and therefore are not obligations of – any municipality.[58]  The enhanced risk posed by the inverse floaters created by the Funds is illustrated by the New Jersey Fund's inverse floater Puerto Rico Electric Power Authority ROL.  This inverse floater had a *negative $3,782,925* value according to the New Jersey Fund's Form N-Q filed on December 19, 2008.[59]  In such a scenario, the holder of an inverse floater, unlike the holder of a conventional municipal security, has no recourse against a municipality (or, indeed, anyone), because an inverse floater is not an obligation of a municipality.  Any bond that can have a negative value is a far cry from what most investors think of when they consider a guaranteed obligation of a municipality.

Thus, Defendants' false statement that the Fund would invest 80% of Fund assets in relatively safe municipal securities, when in fact the Fund was investing up to 35% of Fund assets in far riskier inverse floaters, led investors to believe that the Fund was less risky than it actually was.

When Defendants invested up to 35% of the National Fund's assets in inverse floaters, they could not possibly have, as represented, invested 80% in municipal securities.  Defendants' argument simply illustrates how their skewed view of the world has misled investors, and their

---

[57]     AMT-Free Compl. ¶4; AMT-Free NY Compl. ¶4; Cal. Compl. ¶18; Nat'l Compl. ¶4; NJ Compl. ¶4; Pa. Compl. ¶7; Rochester Compl. ¶4.

[58]     *E.g.,* AMT-Free Prospectus (10.26.07) at 5 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 7 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 8 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 8 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 7 (Larrabee Decl. Ex. A-14).

[59]     New Jersey Municipal Fund, Form N-Q (12.19.08) (Shuman Decl. Ex. A-6).

belated attempt to characterize inverse floaters as plain vanilla municipal securities exemplifies their strategy of using obfuscation to conceal the true risk of their investment strategy.[60]

      7.      **Lead Plaintiffs Adequately Allege That the Prospectus Statements About the Inverse Floaters Were False and Misleading When Made**

          a.      **The Prospectus Supplements Disclosed Important New Information; They Were Not Just More Detailed Descriptions of Previously Disclosed Risks**

Lead Plaintiffs have alleged that statements and omissions in the Prospectuses were materially false and misleading at the time they were made.  The omission of leverage ratios was misleading on the dates the respective Prospectuses were issued, as were the omissions regarding the detrimental terms of the inverse floater arrangements and the statements regarding the liquidity of Funds' assets.  Some of these risks were disclosed, for the first time, in the October and November 2008 Prospectus Supplements.

Defendants now contend that the October and November 2008 Prospectus Supplements were not disclosures at all but rather were, collectively, a more detailed description of the risks previously identified in the Prospectuses.  Def. Br. at 47.  This argument does not withstand scrutiny.  The Prospectus Supplements revealed that a third-party remarketing agent could force the collapse of the Trusts, thus preventing the Fund manager from exercising its own discretion on behalf of Fund investors.[61]  This is a material fact that Class members had no way of knowing before.  The Prospectuses at issue, therefore, would have been materially misleading regardless

---

[60]      Defendants' reliance on the SEC Office of Economic Analysis, *Report on Transactions in Municipal Securities*, July 1, 2004, at B-7, *available at* http://www.sec.gov/news/studies/munireport2004.pdf, is misguided. Def. Br. at 55.  First, the document does not purport to supply a definition for municipal securities.  Instead, the document is a report on municipal securities' transaction data. *Id.* at 1.  Second, the report acknowledges that derivative instruments are routinely *excluded* from estimating the value of outstanding municipal securities. *Id.* at B-7.  Indeed, the authors of that document themselves excluded derivative instruments from their calculations of the outstanding value of municipal securities. *Id.*

[61]      Prospectus Supplement at 1 (Larrabee Decl. Ex. A-1).

of whether the Prospectus Supplements were issued or not.  Indeed, much of the damage caused by the inadequate disclosures occurred *before* the Prospectus Supplements were issued. Defendants cannot simply issue a belated disclosure, then avoid the facts contained in that disclosure by claiming Lead Plaintiffs' allegations are somehow predicated upon it.

The cases Defendants cite, Def. Br. at 49, are irrelevant because they address situations in which Defendants simply amplified previous disclosures, which is not the case here.  *See In re RAC Mortgage*, 765 F. Supp. at 864 (the "fact [that a statement in a later disclosure is clearer] alone does not render statements . . . false or misleading") (citing *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 211 (2d Cir. 1980)).

Further, Defendants' cases are distinguishable on their facts, as explained by the court in *In re Flag Telecom Holdings*.  At issue in *Greenapple* was the adequacy of the company's disclosure of its accounting methods.  As *In re Flag Telecom Holdings* explains, the *Greenapple* court found the disclosures adequate because they "concisely yet accurately define[d] . . . and explain[ed] the accounting strategy, which [was] again called to the reader's attention in the passage found in the text dealing with [one of the relevant assets]."  *In re Flag Telecom Holdings*, 618 F. Supp. 2d at 325 (citing *Greenapple*, 618 F.2d at 210).  Similar prominent disclosures were present in *In re RAC Mortgage* where "[t]he *front* page of both prospectuses stated in *bold type*" the full risk disclosures for potential investors.  765 F. Supp. at 863 (emphasis added).  Here, the alleged cautionary disclosures were not placed to attract the reader's attention, but rather were buried piecemeal throughout separate documents, and do not refer the reader from one disclosure (or even one document) to the next.  Again, Defendants misapply case law to divert the Court's attention from their inadequate disclosures.

**b.      Lead Plaintiffs Have Not Pleaded Falsity By Hindsight**

Defendants also argue that Lead Plaintiffs' references to the 2008 Prospectus

Supplements constitute "pleading by hindsight." Def. Br. at 32, 50. This is not the case. Lead

Plaintiffs offered the 2008 Prospectus Supplements to demonstrate that previous disclosures

were either materially false or incomplete, and do not contend that the 2008 Prospectus

Supplements render the previous disclosures misleading. This situation is the opposite of *Yu v.

State Street Corp.*, on which Defendants rely. Def. Br. at 50. There, plaintiffs took a "backward-

looking assessment of the infirmities of mortgage-related securities." *Yu*, 2010 WL 668645, at

*6. Here, Lead Plaintiffs claim that the disclosures contained materially misleading

misstatements and omissions at the time they were made. Defendants cannot be permitted to

issue a disclosure of previously undisclosed risks which have since materialized, and then claim

Lead Plaintiffs have pleaded falsity by hindsight.

**8.      The Fact That the National Fund Describes Itself as Speculative Does
        Not Immunize Defendants From Liability for Materially False and
        Misleading Statements and Omissions Regarding Inverse Floaters and
        Liquidity**

**a.      Warnings That the Fund Was Speculative Were Misleading**

Defendants' disclosures that the National Fund was "speculative" were misleading

because they failed to disclose the full extent of the risks arising from the Fund's investment

strategy. Defendants disclosed that "[s]ince the Fund may invest in lower rated securities

without limit, the Fund's investments should be considered speculative."[62] With respect to

liquidity, the Prospectus stated, "the high yield, lower-grade fixed income securities and the

small issues that the Fund buys may be less liquid than the investment grade securities and the

---

[62]      Nat'l Prospectus (11.28.07) at 4 (Larrabee Decl. Ex. A-8).

small issues that the Fund may buy tend to be less liquid than larger issues." *Id.* With these disclosures, Defendants informed investors that the Fund could invest in lower-rated securities and therefore was speculative. Undoubtedly, this led investors to believe that the *only* reason the Fund was speculative was because it could invest in lower-rated securities. These disclosures, however, told only a fraction of the story and concealed the other material risks arising from the Fund's investment in illiquid securities and highly leveraged inverse floaters with undisclosed provisions that put the Fund's assets at risk. *See supra* at II.B.1.a.

Defendants, of course, had a duty to disclose all of the material risk factors of the Fund. *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 97 (10th Cir. 1971) ("The misleading, misrepresented, or untruthful character of [a misstatement] may appear from the nature of the statement considered alone, or, when the facts are fully disclosed, from the half truths, omissions or absence of full candor concealed therein."); *In re Ford Motor Co. Sec. Litig.*, 184 F. Supp. 2d 626, 632 (E.D. Mich. 2001) ("When a company chooses to speak on an issue though, it is required to provide complete and non-misleading information.") (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001)). Defendants could have accomplished this with a simple sentence or a short paragraph, but they did not.

**b.      The "Speculative" Risk Warnings Were Incomplete, Vague and, Therefore, Did Not Bespeak Caution**

The "speculative" Fund disclosures were inadequate as a matter of law because they were boilerplate warnings. As noted in Section B.1.6, cautionary statements must be substantive and tailored to the challenged disclosures to adequately warn investors. *Grossman*, 120 F.3d at 1120; *Hunt*, 159 F.3d at 729. The Fund's warnings were insufficient as a matter of law because they were neither substantive nor tailored to the risks that materialized in this case.

50

*Slayton*, 2010 WL 1960019, is instructive.  There, defendants argued (in the context of the PSLRA's safe-harbor provision) that their disclosure that "potential deterioration in the high-yield sector … could result in further losses" warned of the exact risk that the company would incur losses in the next quarter on its specific high-yield investments.  *Id.* at *11.  The court held that the disclosure, "referencing the deterioration in the high-yield sector generally, is *vague*, and the pleaded facts do not support the defendants' assertion that this is the *exact* risk that materialized."  *Id.* (emphasis added).

In the present case, Defendants' warnings were even less tailored to the exact risks that materialized than the warnings in *Slayton* because they failed to include or refer to many of the potential risks: (1) the Fund had substantial investments that were illiquid but not identified as such (Nat'l Compl. ¶84a); (2) the Fund was unable to meet its obligations relating to inverse floaters because of the false and misleading statements regarding illiquidity (*id.* ¶84c); (3) the Fund exceeded its limits on inverse floater investments (*id.* ¶90a); (4) inverse floaters are *certain* to be volatile (*id.* ¶90b); (5) the Fund did not segregate cash or readily marketable short-term debt instruments sufficient to cover its obligations under the inverse floaters (*id.* ¶90c); and (6) the Manager failed to monitor the Fund's potential exposure to the shortfall and forbearance agreements (*id.* ¶90d).  Defendants' warnings had nothing to do with the risks that ultimately materialized because they only warned that the Fund was "speculative" because of investments in "lower rated securities."

Finally, the disclosure that the securities that "the Fund may buy tend to be less liquid" does not remedy Defendants' failure to identify all of its illiquid assets (Nat'l Compl. ¶¶81, 84a) or their failure to disclose that the Fund had exceeded its purported 15% limit on investments in

illiquid assets (*id.* at ¶84b).  Lead Plaintiff has demonstrated, through detailed analysis, the

falsity of these statements.  *Id.*  For example, based on a review of just the Fund's top 109 out of

1,441 holdings, the aggregate value of illiquid securities held as of July 31, 2008 represented at

least 29 percent of the value of the Fund's net assets.  *Id.*  When combined with the 2.11 percent

of the Fund's net assets that are correctly marked as illiquid holdings in the Certified Shareholder

Report for the period ending July 31, 2008, the Fund held at least 31.11 percent of its net assets

in illiquid securities as of July 31, 2008, even before its smaller, and likely less liquid, holdings

are taken into account.  *Id.*  Thus, Defendants misled investors and failed to identify illiquid

assets or abide by the illiquid asset limit.  The broad warning concerning the illiquidity of lower-

rated securities does not immunize Defendants from their false and misleading statements.

## C.    Defendants' Statements Regarding the Liquidity of Assets Were Materially False and Misleading

The Prospectuses purported to identify all of the Funds' assets that were illiquid[63] and

stated that "The Fund[s] will not invest more than 15% of [their] net assets in illiquid securities. .

. . The Manager monitors holdings of illiquid securities on an ongoing basis to determine

whether to sell any holdings to maintain adequate liquidity."[64]  Lead Plaintiffs allege that these

statements were materially false and misleading because the Prospectuses did not identify all of

the Funds' assets that were illiquid and because the Funds exceeded their purported 15% limit on

---

[63]     *E.g.*, AMT-Free Prospectus (10.26.07) at 15 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 16 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 16 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 15 (Larrabee Decl. Ex. A-14).

[64]     *E.g.*, AMT-Free Prospectus (10.26.07) at 15 (Larrabee Decl. Ex. A-2; AMT-Free NY Prospectus (12.28.07) at 16 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 16 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 15 (Larrabee Decl. Ex. A-14).

illiquid assets.[65]  This failure to disclose the illiquidity of specific holdings and the extent of the

Funds' illiquid holdings concealed the material risk that if the holders of floaters issued by the

Trusts exercised their right to tender those floaters for payment at par value, the Funds would be

unable to raise capital quickly through the sale of readily marketable securities, and would

consequently be forced to sell illiquid securities at a steep discount.  *See infra* at II.B.4.

Redemptions and write-downs of collateral securities also could create the need to quickly sell

illiquid securities.

Additionally, the failure to designate illiquid securities as such meant that the Funds were

not applying an illiquidity discount to their asset valuation, which necessarily resulted in the

improper inflation of the Funds' NAVs.[66]  Consequently, the failure to identify illiquid assets and

designate them as such resulted in materially false and misleading statements regarding the

Funds' NAVs.

Lead Plaintiffs' allegations regarding illiquidity are based on counsel's extensive review

of the trading activity of each of the Funds' holdings, which revealed that Defendants did not

designate as illiquid *sui generis* assets that were not traded on an exchange, and that in many

cases went for months or years without being bought or sold in private transactions.[67]

Defendants, however, claim the allegations are insufficient because determinations of liquidity

are "discretionary judgments" – by which they mean opinions.  Def. Br. at 59.  Since Defendants

---

[65]      AMT-Free Compl. ¶¶91-94 (at least 30.05%); AMT-Free NY Compl. ¶¶83-86 (at least 28.59%); Cal.
Compl. ¶¶106-14; Nat'l Compl. ¶¶81-84 (at least 29%); NJ Compl. ¶¶84-87 (at least 25.21%); Pa. Compl. ¶¶77-95
(at least 27.5%); Rochester Compl. ¶¶86-90 (at least 30.13%).
[66]      *E.g.,* AMT-Free Compl. ¶107; AMT-Free NY Compl. ¶99; Cal. Compl. ¶172; Nat'l Compl. ¶97; NJ
Compl. ¶100; Pa. Compl. ¶107; Rochester Compl. ¶103.
[67]      AMT-Free Compl. ¶¶59-62; AMT-Free NY Compl. ¶¶53-56; Cal. Compl. ¶¶115-22; Nat'l Compl. ¶¶55-
58; NJ Compl. ¶¶54-57; Pa. Compl. ¶¶86-95; Rochester Compl. ¶¶54-57.

*believed* their opinions regarding liquidity, they contend, such statements were not false.

Defendants also contend that Lead Plaintiffs use the wrong definition of liquidity.  Def. Br. at 57.

These arguments fail because Defendants themselves represented that the liquidity determinations were statements of fact, not opinions or "discretionary judgments," and because Lead Plaintiffs have, for all intents and purposes, used the same definition of liquidity that Defendants used in the Prospectuses.[68]

1.      **Defendants' Liquidity Determinations Were Statements of Purported Fact, Not Opinions or Discretionary Judgments**

Defendants contend that their statements regarding liquidity involved "discretionary judgments" and, citing *Virginia Bankshares*, contend that Lead Plaintiffs must allege "with particularity that the statements were both objectively and subjectively false or misleading."  Def. Br. at 59-60.  However, illiquidity is not a subjective concept.  Rather, it has a well-understood objective meaning: "an asset which may not be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the mutual fund has valued the investment on its books."  Exchange Act Release No. 33-6927; IC-18612, 57 Fed. Reg. 9828 (Mar. 20, 1992) (Shuman Decl. Ex. A-7).

The notion that liquidity is an unenforceably vague concept is wholly inconsistent with the language of the Prospectuses.  The Prospectuses state that "the Manager monitors holdings of illiquid securities on an ongoing basis *to determine* whether to sell any holdings to maintain adequate liquidity."[69]  Defendants thus represented that liquidity is a sufficiently clear concept to

---

[68]      *See* AMT-Free Compl. ¶¶91-94; AMT-Free NY Compl. ¶¶83-86; Cal. Compl. ¶¶115-22; Nat'l Compl. ¶¶81-84; NJ Compl. ¶¶84-87; Pa. Compl. ¶¶77-85; Rochester Compl. ¶¶86-90.

[69]      *E.g.*, AMT-Free Prospectus (10.26.07) at 15 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 16 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 16 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-10); Pa.

enable Defendants to manage the Funds' liquidity levels – which is essential to achievement of the Funds' investment objectives.  Nowhere do the Prospectuses say that the Manager will use discretionary judgment in making these liquidity determinations, or that liquidity is merely a matter of opinion.  The Funds simply promised investors that the Funds would not invest more than 15% in illiquid assets.  They did not tell investors that that promise is empty because "illiquid" is in the eye of the beholder.  Defendants, therefore, are wrong to claim that Lead Plaintiffs must show that Defendants subjectively did not believe that the securities they identified as liquid were in fact illiquid.

Finally, although it is conceivable that, in some cases, whether a security can be disposed of promptly at value may be a close call, that is not the case here.  For example, Defendants as a matter of course labeled assets as liquid when the securities did not trade at all during the Class Period and a single investor – in some cases the Funds themselves – owned 85% to 90% or more of their outstanding amounts.[70]  In those cases, Defendants cannot reasonably claim that a sufficient number of dealers were standing ready to make a market in the bonds or that enough potential buyers were available for quick purchases so that the securities could have been sold promptly at the values placed upon them.

### 2.    Assets That the Funds Designated as Liquid Were Really Illiquid By Defendants' Own Definition

Defendants next argue that Lead Plaintiffs have *post hoc* equated liquidity with a single factor, namely trading activity.  Def. Br. 58.  But Lead Plaintiffs merely adopt the Funds' own

---

Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 15 (Larrabee Decl. Ex. A-14) (emphasis added for all).

[70]      AMT-Free Compl. ¶¶51-62; AMT-Free NY Compl. ¶¶45-56; Cal. Compl. ¶¶106-12; Nat'l Compl. ¶¶47-58; NJ Compl. ¶¶46-57; Pa. Compl. ¶¶87, 89-90; Rochester Compl. ¶¶50-57.

definitions of liquidity, which, like Lead Plaintiffs' definition, is by reference to trading activity and price changes.

Defendants stated repeatedly in Prospectuses issued during the Class Period that "[i]nvestments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price."[71]  They also stated that "[a] security may be considered illiquid if it lacks a readily available market or if its valuation has not changed for a certain period of time."[72]  Finally, Defendants stated that "[t]he Manager takes into account the trading activity for such securities and the availability of reliable pricing information, among other factors."[73]

Each of these three statements focuses on the same criteria upon which Lead Plaintiffs focus – the trading activity of the security.[74]  Having repeatedly assured investors that the Manager focused on trading activity in making the liquidity determinations, Defendants cannot

---

[71]     *E.g.*, AMT-Free Prospectus (10.26.07) at 15 (Larrabee Decl. Ex. A-2); AMT-Free NY Prospectus (12.28.07) at 16 (Larrabee Decl. Ex. A-4); Cal. Prospectus (10.31.07) at 16 (Larrabee Decl. Ex. A-6); Nat'l Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-8); NJ Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-10); Pa. Prospectus (11.28.07) at 15 (Larrabee Decl. Ex. A-12); Rochester Prospectus (2.21.07) at 15 (Larrabee Decl. Ex. A-14).

[72]     *E.g.*, AMT-Free SAI (10.26.07) at 157 (Larrabee Decl. Ex. A-3); AMT-Free NY SAI (12.28.07) at 130 (Larrabee Decl. Ex. A-5); Cal. SAI (10.31.07) at 143 (Larrabee Decl. Ex. A-7); Nat'l SAI (11.28.07) at 171 (Larrabee Decl. Ex. A-9); Pa. SAI (11.28.07) at 136 (Larrabee Decl. Ex. A-13); Rochester SAI (2.21.07) at 164 (Larrabee Decl. Ex. A-15).

[73]     *E.g.,* AMT-Free SAI (10.26.07) at 15 (Larrabee Decl. Ex. A-3) ("[T]he Manager determines the liquidity of certain of the Fund's investments and monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to meet percentage restrictions."); AMT-Free NY SAI (12.28.07) at 23 (Larrabee Decl. Ex. A-5) (same); Cal. SAI (10.31.07) at 22 (Larrabee Decl. Ex. A-7) (same); Nat'l SAI (11.28.07) at 16 (Larrabee Decl. Ex. A-9) (same); NJ SAI (11.28.07) at 27 (Larrabee Decl. Ex. A- 11) (same); Pa. SAI (11.28.07) at 22 (Larrabee Decl. Ex. A-13) (same); Rochester SAI (2.21.07) at 39 (Larrabee Decl. Ex. A- 15) ("[S]ecurities have been determined to be liquid . . . by the Manager under guidelines approved by the Board of Trustees.  Those guidelines take into account the trading activity for such securities and the availability of reliable pricing information, among other factors.").

[74]     Indeed, trading activity is the *only* factor that appears in all three of Defendants' proffered definitions, and the other factors Defendants proffer (ease of disposal, availability of pricing information, and frequency of valuation change) are actually cited as the *results* of an active trading market.

now escape Lead Plaintiffs' use of that factor by pointing to other criteria that the Managers could also have considered but never mentioned or revealed to investors.[75] [76]

In support of their argument, Defendants now (for the first time) contend that the SEC has "made clear" that liquidity "depends" on criteria other than trade frequency including "the number of dealers willing to purchase or sell the security and the number of other potential purchasers"; "dealer undertakings to make a market in the security"; and "the nature of the security and the nature of the marketplace trades (*e.g.*, the time needed to dispose of the security, the method of soliciting offers, and the mechanics of transfer)."  Def. Br. at 57 (citing *Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145*, Inv. Co. Act Rel. No. 17452, 55 Fed. Reg. 17933) (Apr. 30, 1990).

However, the SEC release cited by Defendants states only that the above factors are "[e]xamples of factors that would be reasonable" to consider.  *Resale of Restricted Securities*, 55 Fed. Reg. at 17933.  The only inquiry the SEC has mandated in determining liquidity of which Lead Plaintiffs are aware is whether an asset can be disposed of during the ordinary course of

---

[75]     As Lead Plaintiffs have alleged, Defendants' newly proffered criteria work against them as well. Defendants were not able to easily dispose of the securities at issue, and did not have access to reliable pricing data, as evidenced by their eventual disclosure that not one of their assets was priced according to trade data.  The remarkable losses they realized when they sold those assets is further evidence.  *See, e.g.*, AMT-Free Compl. ¶¶51-62; AMT-Free NY Compl. ¶¶45-56; Cal. Compl. ¶¶106-12; Nat'l Compl. ¶¶47-58; NJ Compl. ¶¶46-57; Pa. Compl. ¶¶77-85; Rochester Compl. ¶¶50-57.

[76]     Defendants try to minimize the importance of actual trading activity to the liquidity determination, stating that just because an item has not been sold does not mean it could not be sold.  They cite as examples artwork and jewelry, Def. Br. at 58, but these assets are classic examples of *illiquid* assets.  *See, e.g.*, ING, *ING Glossary*, http://www.ing-usa.com/us/individuals/planningtools/glossary/index.htm#i (last accessed May 17, 2010) ("Illiquid Asset - An asset that is generally considered not easily converted to cash.  This typically includes things like art and collectibles and some real estate.") (Shuman Decl. Ex. A-8); Rediff.com Business, *Wary of markets? Check these investment options*, http://business.rediff.com/report/2010/apr/26/perfin-wary-of-markets-check-these-investment-options.htm (last accessed May 17, 2010) ("Some alternative assets such as art, jewelry and antiques have no regular income.  Also, they are highly illiquid and relatively less traded.  They are also extremely complex.  It is difficult to determine their prices at times.") (Shuman Decl. Ex. A-9).

business in seven days at approximately the value its owner has placed upon it. *Id.* Defendants cannot state that, as a matter of law, Lead Plaintiffs' allegations are deficient because they do not take into account the factors Defendants would like to bring forward at this late date. Moreover, Defendants have not shown that these "additional" criteria would actually support a finding that the seldom-traded securities were liquid. How many traders were trading them? Defendants do not say. Indeed, even if, as Defendants insist, it is appropriate to consider criteria not enumerated by the Funds in any of their Prospectuses, determining the actual criteria of liquidity and what weight they should be given is a factual question for the jury to decide, with the aid of expert testimony.[77]

Further, even if Defendants' newly proffered criteria were to be used now in the determination of liquidity, the necessary conclusions would be the same. The number of dealers willing to trade a security, the extent of any market making in that security, the frequency of trades in the security, and the nature of the marketplace are all objectively verifiable facts. Thus, regardless of the definition used for "liquidity," assertions regarding liquidity are statements that investors reasonably understand (and were led to understand by the various formal documents of the Funds) to be based upon underlying, objectively verifiable facts. Therefore, Lead Plaintiffs need not allege anything regarding Defendants' subjective states of mind. It is sufficient to

---

[77]    On the facts, Defendants still have the worst of the argument. Defendants claim that Lead Plaintiffs misapprehend the nature of the municipal bond market, and seek to persuade this Court that it is entirely normal for a municipal bond to go for months or even years without a single trade. But Defendants' own portfolios also contained municipal bonds that *did* trade as a liquid security would. For example, the National Fund's second largest holding as of July 31, 2008 was the NJ Tobacco Settlement Financing Corp. 5% Bond. This bond traded 3,754 times in 2008 (including 1,305 trades from August to November of 2008, squarely in the middle of Defendants' proffered "liquidity crisis"). Municipal Securities Rulemaking Board, Security Details, http://emma.msrb.org/SecurityView/SecurityDetailsTrades.aspx?cusip=888808DF6. This belies Defendants' assertion.

allege, as Lead Plaintiffs have here, that the empirical conditions that would have supported an assertion of liquidity were not present.

### D. Defendants' Statements Regarding the Value of the Funds' Investments and the Funds' Net Asset Values Were Materially False and Misleading

Although Defendants assert that the Funds "accurately and truthfully disclosed the process they used to value securities," Def. Br. at 61,[78] they carefully avoid citing the relevant language that appeared in each of the Prospectuses that they issued, and which Lead Plaintiffs have cited in their Complaints.  The AMT-Free Fund's SAI dated November 28, 2005, for example, represented the following with respect to the calculation of net asset value:

> SECURITIES VALUATION.  The Fund calculates the net asset value of its shares as of the close of The New York Stock Exchange (the Exchange), normally 4:00 P.M. Eastern time, on each day the Exchange is open for business.  *Securities listed or traded on National Stock Exchanges or other domestic exchanges are valued based on the last sale price of the security traded on that exchange prior to the time when the Fund's assets are valued. Securities traded on NASDAQ are valued based on the closing price provided by NASDAQ prior to the time when the Fund's assets are valued.*  In the absence of a sale, the security is valued at the last sale price on the prior trading day, if it is within the spread of the closing "bid" and "asked" prices, and if not, at the closing bid price.  Securities traded on foreign exchanges are valued based on the last sale price on the principal exchange on which the security is traded, in the country that is identified by the portfolio pricing service, prior to the time when the Fund's assets are valued.  In the absence of a sale, the security is valued at the official closing price on the principal exchange.  … *Securities (including restricted securities) for which market quotations are not readily available are valued at their fair value.*  Foreign and domestic securities whose values have been materially affected by what the Manager identifies as a significant event occurring before the Fund's assets are valued but after the close of their respective exchanges will be fair valued.  *Fair value is determined in good*

---

[78]      Under the standard applicable to a motion to dismiss, of course, the Court cannot make a factual finding on this assertion.

> *faith using consistently applied procedures under the supervision of the Board of Trustees.*
>
>                        ***

AMT-Free SAI (11.28.05) at 73 (emphasis added).  With respect to valuation of the AMT-Free

Fund's securities, the SAI further represented:

> Long-term debt securities having a remaining maturity in excess of 60 days are valued based on the mean between the "bid" and "asked" prices determined by a portfolio pricing service approved by the Fund's Board of Trustees or obtained by the Manager from two active market makers in the security on the basis of reasonable inquiry.
>
> Securities (including restricted securities) not having readily-available market quotations are valued at fair value determined under the Board's procedures.  *If the Manager is unable to locate two market makers willing to give quotes, a security may be priced at the mean between the "bid" and "asked" prices provided by a single active market maker (which in certain cases may be the "bid" price if no "asked" price is available).*
>
> In the case of municipal securities, when last sale information is not generally available, the Manager may use pricing services approved by the Board of Trustees.  The pricing service may use "matrix" comparisons to the prices for comparable instruments on the basis of quality, yield and maturity.  Other special factors may be involved (such as the tax-exempt status of the interest paid by municipal securities).  *The Manager will monitor the accuracy of the pricing services.  That monitoring may include comparing prices used for portfolio valuation to actual sales prices of selected securities.*

AMT-Free SAI (11.28.05) at 73 (emphasis added).  The language in the AMT-Free Fund's other

Prospectuses, and in the Prospectuses for the other Funds,[79] was substantially the same: in

essence, they represented that the Funds used actual trade-related data both in calculating the net

---

[79]    *E.g.,* AMT-Free SAI (10.26.07) at 73 (Larrabee Decl. Ex. A-3); AMT-Free NY SAI (12.28.07) at 80 (Larrabee Decl. Ex.A-5); Cal. SAI (10.31.07) at 82 (Larrabee Decl. Ex.A-7); Nat'l SAI (11.28.07) at 74 (Larrabee Decl. Ex. A-9); NJ SAI (11.28.07) at 89 (Larrabee Decl. Ex. A-11); Pa. SAI (11.28.07) at 82 (Larrabee Decl. Ex. A-13); Rochester SAI (2.21.07) at 89 (Larrabee Decl. Ex. A-15).

asset values of the Funds and in valuing the Funds' constituent securities.  Notably, even when the Funds' assets were valued using so-called "fair-value" techniques, the Funds represented that reference would be made to "actual sales prices of selected securities."  *Id.*

As Defendants later disclosed to investors – only because they were required to do so by the Financial Accounting Standards Board's SFAS 157[80] – the Funds' *entire portfolios*, or substantially all of them, were actually valued throughout the Class Period based either on "unobservable inputs" or "inputs other than quoted prices that are observable for the asset (such as quoted prices for similar assets and market-corroborated inputs such as interest rates, prepayment speeds, credit risks, etc.)."[81]  *In other words, Defendants did not reference any trading data whatsoever in valuing any, or substantially any, of the assets of the Funds as of the date these disclosures were made – not actual prices, "bid" and "ask" prices, or any other kind of prices – and essentially none of the Funds' holdings traded on the NASDAQ or any other national securities exchange.*[82]

In the absence of such a market check, Lead Plaintiffs allege that the Funds' assets were overvalued, since their purported values failed to account for their illiquidity, among other things.[83]  When the Funds ultimately sold their assets, they were forced to accept the true "fair value," which was far less than the "fair value" Defendants had represented.[84]

---

[80]      Issued in September 2006, SFAS 157, among other things, requires entities to disclose the valuation inputs they use to measure the "fair value" of their assets.  *See, e.g.*, AMT-Free Compl. ¶83.

[81]      AMT-Free Compl. ¶83; AMT-Free NY Compl. ¶76; Cal. Compl. ¶¶170-71; Nat'l Compl. ¶74; NJ Compl. ¶77; Pa. Compl. ¶¶107-12; Rochester Compl. ¶¶78-79.

[82]      AMT-Free Compl. ¶83; AMT-Free NY Compl. ¶76; Cal. Compl. ¶¶170-71; Nat'l Compl. ¶74; NJ Compl. ¶77; Pa. Compl. ¶¶107-12; Rochester Compl. ¶¶78-79.

[83]      AMT-Free Compl. ¶¶103-08; AMT-Free NY Compl. ¶¶95-100; Cal. Compl. ¶¶166-72; Nat'l Compl. ¶¶93-98; NJ Compl. ¶¶96-101; Pa. Compl. ¶¶107-12; Rochester Compl. ¶¶99-104.

[84]      AMT-Free Compl. ¶100c; AMT-Free NY Compl. ¶92c; Cal. Compl. ¶159; Nat'l Compl. ¶90c; NJ Compl. ¶93c; Pa. Compl. ¶111; Rochester Compl. ¶81.

Thus, this case is precisely the opposite of *Yu v. State Street Corp.*, No. 08-CV-8235, 2010 WL 668645 (S.D.N.Y. Feb. 22, 2010), cited by Defendants.  *See* Def. Br. at 63-64.  Here, contrary to Defendants' assertions, Lead Plaintiffs *have* alleged that the Funds did not follow the pricing methodology they represented they would follow.  Not once did Defendants use "bid" and "ask" prices, or any other actual prices, to value the Funds' assets.  The stated values of the Funds' assets, and the Funds' net asset values, were necessarily false, because they did not "correspond to the values that the offering document led investors to expect."  *Yu*, 2010 WL 668645, at *8.  A reasonable investor would have "consider[ed] it important" that, contrary to the Funds' representations, no "bid" and "ask" prices, or any other actual prices, were used to value the Funds' assets.  *TSC Indus.*, 426 U.S. 438.

That Lead Plaintiffs have not alleged that the Funds' valuations "were not honestly believed when made," *see* Def. Br. at 63, is irrelevant, and is no defense.  Defendants might have "honestly believed" that their valuation model was the most reliable one to use, but it is not the one they represented to investors that they used.  Here, as in *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 376 F. Supp. 2d 385, 396 (S.D.N.Y. 2005), cited by Defendants, "plaintiffs allege more" than simply that the Funds were guilty of poor judgment.  Indeed, even assuming, *arguendo,* that the Funds exercised *good* judgment (and they obviously did not), this fact does not change what Lead Plaintiffs have alleged: that the Funds' representations regarding the valuation models they used, and, consequently, the valuations themselves, were false and misleading.

Finally, Defendants assert, with no support, that Lead Plaintiffs must "allege facts showing that overvaluation is more likely than proper valuation."  Def. Br. at 64-65.  There is no

such standard.  As noted, the standard that applies here, as in any Section 11 case, is one of "facial plausibility"; Lead Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 570.  Here, Lead Plaintiffs have adequately alleged that Defendants did not follow their own valuation methodology, and that their statements regarding that methodology, and the values of the Funds' assets, were false and misleading.

### III.   LEAD PLAINTIFFS' CLAIMS DO NOT SOUND IN MISMANAGEMENT

Defendants argue that Lead Plaintiffs allege *only* that Defendants mismanaged the Funds and exercised poor judgment, and that such allegations do not state a Securities Act claim.  Def. Br. at 66 (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478-79 (1977)).  As shown in detail, although the Complaints also support the conclusion that Defendants mismanaged the Funds, the Complaints allege that the Prospectuses contained materially false and misleading misstatements.  These materially false and misleading misstatements, not mismanagement, are what give rise to the Securities Act claims.  Defendants' argument must fail, therefore, because they can cite no authority for the false proposition that they are excused from liability for their misstatements and omissions because they *also* mismanaged the Funds.  The securities laws provide no such affirmative "mismanagement" defense and courts have rejected attempts to create one.

*Santa Fe Industries v. Green* is not to the contrary.  The court in *Santa Fe* held that a breach of fiduciary duty *without* any deception, misrepresentation or nondisclosure did not violate the Exchange Act.  430 U.S. at 476.  Thus, *Santa Fe* does not "'preclude an action . . . based on a material nondisclosure or misrepresentation simply because the undisclosed facts

involved might also support a breach of fiduciary duty claim.'" *Lane v. Page*, 581 F. Supp. 2d 1094, 1106, 1114 (D.N.M. 2008) (holding that *Santa Fe* was not an obstacle for plaintiff's claims as long as they met the requirements of the federal securities laws) (internal citation omitted).[85]

The other cases Defendants rely upon are distinguishable because, in those cases, the courts found either that plaintiffs had not pleaded Section 11 misstatements or had not properly pleaded scienter under the Exchange Act. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 293 (7th Cir. 1981) (holding that "plaintiffs failed to present sufficient evidence to support a reasonable jury finding of the element of deception required" by the Exchange Act); *In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 753 (E.D. Va. 2004) (holding that, among other things, plaintiff failed "to raise a strong inference that Defendants acted intentionally, consciously, or recklessly" as required under the Exchange Act); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 688 (D. Colo. 2007) (holding that plaintiff failed to allege with particularity any false or misleading statements or omissions under the Exchange Act). Thus, it is inconsequential that the facts alleged in the Complaints that demonstrate the falsity of Defendants' statements could *also* state a claim for mismanagement. *See Lane*, 581 F. Supp 2d at 1114 (finding that an "overlap" between state law claims and the federal securities law claims "is not fatal or relevant to" the federal claims).

In contrast, Lead Plaintiffs do not, as Defendants assert, rest their claims on allegations that Defendants mismanaged the Funds by engaging in risky transactions. Def. Br. at 67. Rather, they rest their claims on allegations that Defendants made statements regarding the Funds' investment objectives and the features, risk profile, liquidity, and value of the assets held

---

[85]     Unlike the present case, *Santa Fe* came to the Supreme Court "on the premise that the complaint failed to allege material misrepresentation or material failure to disclose." 430 U.S. at 474.

that were materially false and misleading because they were wholly inconsistent with the Funds'

actual investment strategies, portfolio holdings, and valuation methodologies.  In other words,

Lead Plaintiffs do not complain that the Funds "failed to attain their stated goals and used overly

risky strategies in pursuit of them," Def. Br. at 66, but rather that the Funds' stated capital

preservation investment strategy and goals, and the stated limits placed on illiquid and high-risk

investments to achieve those goals, were materially false and misleading as evidenced by their

actual investment strategy – *i.e., preservation of capital could not have been the Funds' goal*

*given the risky strategies Defendants actually pursued.*

Similarly, the Complaints do not allege only that Defendants mismanaged the Funds by

over-investing in illiquid assets.  Rather, the Complaints allege that Defendants' statements in

the Prospectuses that the Funds would limit investments in illiquid assets to no more than 15% of

total net assets[86] were materially false and misleading because more than 15% of the Funds'

assets were illiquid.  The Complaints allege that these statements were materially false and

misleading because each of the Funds invested more than 15% of its net assets in securities that

were illiquid under any objective standard for liquidity.[87]  Therefore, allegations of Defendants'

conduct – investments in illiquid assets – are contrary to the statements in the Prospectuses and

thus demonstrate their falsity.  *See also supra* at II.C.  This has nothing to do with

mismanagement.  The same is true for the other misstatements that Lead Plaintiffs allege.  *Supra*

at II.

---

[86]     *See* AMT-Free Compl. ¶62; AMT-Free NY Compl. ¶83; Cal. Compl. ¶¶14, 106, 111, 114; Nat'l Compl.
¶¶81-82; NJ Compl. ¶¶84-85; Pa. Compl. ¶¶5, 59, 77; Rochester Compl. ¶¶86, 88.

[87]     *See* AMT-Free Compl.  ¶¶59-62; AMT-Free NY Compl. ¶¶53-56; Cal. Compl.  ¶¶116, 118-21, 124; Nat'l
Compl.  ¶¶55-58; NJ Compl.  ¶¶54-57; Pa. Compl. ¶¶86-95; Rochester Compl.  ¶¶54-57.

IV.     **LEAD PLAINTIFFS' CLAIMS REGARDING INVESTMENT OBJECTIVES
        AND INVERSE FLOATERS ARE TIMELY**

Defendants argue that Lead Plaintiffs' claims arising from the Prospectuses' materially

false and misleading statements regarding inverse floaters and investment objectives are time-

barred because investors should have discovered the misstatements more than a year before the

first complaint was filed.  The facts allowing such a discovery, however, were deeply hidden.

To discover that the Funds were pursuing a strategy inconsistent with their stated goal of

preserving capital, investors would have had to learn that the Funds had, contrary to the

statements in the Prospectuses, invested in risky securities in such amounts to render the Funds'

portfolios incompatible with a preservation of capital objective.  This involves a technical

analysis that is beyond the reach of a reasonable investor, who, moreover, had no reason in the

first place to think such an analysis was necessary.  To discover that the inverse floaters were

more risky than represented in the Prospectuses, investors would have had to learn specific terms

of the inverse floater arrangements that were disclosed only after the Class Period, as discussed

in detail above.  Investors had *no way* of discovering these terms before Defendants' belated

disclosure.  And again, investors had no reason to believe that it was necessary for them to

search for these true terms underlying the inverse floater arrangements.

Defendants nevertheless claim that a handful of news articles should have triggered

notice and enabled investors to discover the misstatements.  This argument fails because the

news articles were not sufficiently widespread and – more to the point – do not even mention the

true facts underlying the Prospectuses' misstatements.

A.      **The Tenth Circuit's Inquiry Notice Standard**

Actions under Sections 11 and 12(a)(2) of the Securities Act must be "brought within one

year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ." 15 U.S.C. § 77m.[88]  The Tenth Circuit has adopted an inquiry notice standard for determining when the one-year limitations period begins to run, stating: "[I]nquiry notice . . . triggers an investor's duty to exercise reasonable diligence and [] the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998).

"[T]he issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact." *Allred v. Chynoweth*, 990 F.2d 527, 529 (10th Cir. 1993) (citing *Maughan v. S.W. Servicing Inc.*, 758 F.2d 1381, 1387 (10th Cir. 1985)).  Accordingly, determination by the court of this issue is not appropriate "unless the evidence is so clear that there is no genuine factual issue." *Maughan v. S.W. Servicing*, 758 F.2d 1381, 1388 (10th Cir. 1985).

Circuits that have adopted the same standard as *Sterlin* have cautioned against "drawing the inquiry notice line" at too early a date. *In re Merck & Co. Inc. Sec., Deriv., & ERISA Litig.*,

---

[88]    Defendants also assert that certain of Lead Plaintiffs' claims are barred by the statute of repose. Def. Br. n. 127.  But the statute of repose – as Defendants acknowledge – begins from the date the security is bona fide *offered.* *Id.*  In the case of an open-end mutual fund, whose shares do not trade in an aftermarket but rather are purchased directly from the Fund, the securities are *continuously* bona fide offered.  Indeed, the Fund's Offering Documents state as much.  For example, the November 28, 2005 Statement of Additional Information for the New Jersey Fund states that "Under its General Distributor's Agreement with the Fund, the Distributor acts as the Fund's principal underwriter *in the continuous public offering* of the Fund's classes of shares" while the Manager's duties include "the composition of proxy materials and registration statements for *continuous public sale* of shares of the Fund." NJ SAI (11.28.05) at 151, 156 (emphases added) (Shuman Decl. Ex. A-10).  Other courts have recognized that "it would be unreasonable to read § 13 as starting the short period for an action at a date before the action could have been brought – a construction which might lead in some extreme cases to a running of the statute of limitations before the claim had even arisen." *Diskin v. Lomasney & Co.*, 452 F.2d 871, 876 (2d Cir. 1971).  Here, obviously, no investor could have brought an action before buying the security at issue. *See also In re Bestline Prods. Sec. & Antitrust Litig.*, No. MDL 162-Civ-JLK, 1975 WL 386, at *1-2 (S.D. Fla. Mar. 21, 1975) (recognizing that such an interpretation is "simply at odds with the remedial purposes of the Securities Act of 1933").

543 F.3d 150, 164 (3d Cir. 2008) (noting that the Third Circuit, among others, uses the same standard for inquiry notice as the Tenth Circuit), *aff'd Merck & Co., Inc. v. Reynolds*, ___ S. Ct. ___, No. 08-CV-905, 2010 WL 1655827, at *4 (Apr. 27, 2010) (review limited to construction of the two-year statute of limitations for claims under Section 10(b) of the Securities Exchange Act of 1934, 28 U.S.C. § 1658(b)(1)).  In *Merck*, the Third Circuit emphasized that once on inquiry notice "a plaintiff either was or should have been able, in the exercise of reasonable diligence, to file an adequately pled securities fraud complaint as of an earlier date." *Id*. at 164 (quoting *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt., L.P.*, 435 F.3d 396, 401 (3d Cir. 2006)).

Likewise, the Seventh Circuit has instructed: "The facts constituting [inquiry] notice must be sufficiently probative of fraud – sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated – not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997) (emphasis added). Moreover, the revelation of facts related tangentially to the fraud is insufficient; facts constituting inquiry notice "can be established only where the triggering data 'relates directly to the misrepresentations and omissions' alleged." *Merck*, 543 F.3d at 165 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005)); *see also In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 577 (E.D. Pa. 2009) (holding that statute of limitations on Section 11 claim did not begin to run on date that company announced results of a clinical trial upon which many of plaintiff's claims were based, but instead inquiry notice was triggered approximately six weeks later when securities analysts issued negative reports, stating: "[T]he alleged fraud would

likely have come to light only after the negative analyst reports were issued . . . .").  Finally, the court in *Merck* cautioned against encouraging the premature filing of securities actions by broadly interpreting the inquiry notice standard, stating: "Surely, Congress did not envision a statute of limitations that would open the floodgates to a rush of premature securities litigation . . . ."  *Merck*, 543 F.3d at 164-65; *see also Sterlin*, 154 F.3d at 1202 ("the applicable statute of limitations should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims").

Thus, two conditions must be met before the limitations period begins to run: (a) investors must be put on constructive notice of the possibility of misstatements; and (b) facts must emerge that would have enabled investors, after the exercise of reasonable diligence, to discover facts underlying the falsity of the misstatements.  *Id.* at 1204-05.  Here, neither of those conditions were met.

**B.**   **Defendants Have Failed to Demonstrate That a Reasonably Diligent Investor Would Have Discovered the Falsity of Defendants' Statements With Respect to the Funds' Investment Objectives**

Defendants argue that a handful of articles in *The Wall Street Journal*, *Barron's*, *Morningstar* and *The Bond Buyer* put investors on notice that the Funds' statements regarding their goal of preserving capital were false.  Def. Br. at 72.  This argument lacks merit because: (1) Lead Plaintiffs cannot be charged with knowledge of articles in specialty publications, and (2) even if Lead Plaintiffs had read the articles, and even if the articles had triggered inquiry notice, the articles did not provide the facts required for a reasonably diligent investor to discover the false statements.

To trigger inquiry notice, press reports must be widespread, prominent, and accessible.

*Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 432 (2d Cir. 2008). *Staehr* is instructive.

There, the court rejected defendants' argument that articles in industry newsletters were

sufficient to put investors on inquiry notice of their claims:

> We have never affirmed the dismissal of a complaint as time-barred based on a story that appeared only in a specialty publication, as opposed to mainstream press reports that are more likely to come to the attention of an investor of ordinary intelligence. We are reluctant to affirm such a dismissal where, as here, the specialty publication coverage is relatively minimal and we do not know the publications' circulation or the extent to which a reasonable investor would be aware of the limited coverage.

*Id.*

Here, the articles Defendants claim put Lead Plaintiffs on notice were hardly

"mainstream press reports."  On the contrary they appeared in *Morningstar* and *The Bond Buyer*,

both of which are subscription-only industry publications.  Such subscriptions are expensive: *The

Bond Buyer* would have run Lead Plaintiffs $2,849 per year.[89]  *Barron's* is also a subscription-

only financial journal and though the cost, at $99.00 per year, is much less, it is nevertheless

substantial.[90]  Moreover, with a Class Period weekly circulation of just over 300,000, and weekly

circulation in some states below 300, *Barron's* can hardly be considered the type of widespread

publication that forms the basis for constructive notice.[91]  *Morningstar* and *The Bond Buyer* are

even less widely circulated.[92]

---

[89]     *See* The Bond Buyer, Subscribe, https://secure.bondbuyer.com/subscribe/default.html?&source= WW_201004&stype=WEB (Shuman Decl. Ex. A-11).
[90]     *See* Barron's Subscription, https://order.barrons.com/sub/f2 (Shuman Decl. Ex. A-12).
[91]     *See* Barron's Magazine, Circulation by region, state, and printing plant, http://www.barronsmag.com/ advertising/2009_Distibution_122908.pdf (Shuman Decl. Ex. A-13).
[92]     *See* Morningstar: 2010 Media Kit, at 4, *available at* http://advisor.morningstar.com/uploaded/pdf/ AdvisorRateCard.pdf (reporting 70,000 average monthly visits to Morningstar.com) (Shuman Decl. Ex. A-14); The

Stripping away these publications, the only article with national circulation that Defendants can muster in their "virtual library of secondary source material," Def. Br. at 5-6, is a single article in *The Wall Street Journal*.  Def. Br. at 72 (citing Diya Gullapalli, *Monthly Mutual Funds Review: Looking for Diamonds Amid the Junk – Seeking Better Returns, Retirees Buy Risky Debt; Scrutinizing the Turbines*, Wall St. J., Mar. 6, 2006 (Larrabee Decl. Ex. B-23)).  The only Fund this article mentions, however, is the National Fund, which was the only one of the Funds whose investment objective was *not* capital preservation, and which investment objective Lead Plaintiffs do *not* allege was misleading.[93]  Accordingly, Defendants can point to *no* press report which would have put Lead Plaintiffs on notice of the facts underlying their investment objective claims.

The articles at issue, moreover, would not have put investors on notice even if investors had read them.  None mention what Defendants acknowledge for the first time in their motion to dismiss: that all of these Funds were managed in the same "Rochester style" of "No Guts, No Glory" despite the fact that one of the Funds is a high-yield fund and the rest are preservation of capital funds.  The *Barron's* article only mentions the Rochester Fund and in it Defendants reassure rather than warn investors by stating that the Rochester Fund is sufficiently hedged and diversified to avoid risk inconsistent with its capital preservation objective.[94]  In this regard, the *Barron's* article states, "Rochester Fund Municipals has more than 1,000 issues 'so we have a much wider diversification than any individual investor could possibly achieve.'"  *Id.*  The

---

Bond Buyer, About Us, http://www.bondbuyer.com/aboutus (reporting daily circulation of 40,000) (Shuman Decl. Ex. A-15).

[93]     The Lead Plaintiff in that case asserts that the National Fund Prospectus contained other materially false and misleading statements and that its status as speculative fund does not immunize it from liability for these materially false and misleading statements.  *See supra* at II.B.8.

[94]     *Jennifer Ablan, No Plain Vanilla: Rochester Fund gets higher yields from an exotic muni mix, Barron's,* May, 6, 2002 (Larrabee Decl. Ex. B-1).

*Barron's* article also states that inverse floaters are hedged "with high-coupon callable bonds" which purportedly were "an effective counterweight to inverse floaters." *Id.* The message is clear: the Fund may invest in inverse floaters but has taken the precautions required to offset its risk and thereby avoid straying from its capital preservation objective.

Defendants identify no articles placing investors on notice that the Funds had exceeded their stated limits on investment in illiquid assets, that under the inverse floater arrangements third parties could force the Funds to sell assets, or that the Funds' NAVs were overstated. Nor do Defendants cite a single case to support their remarkable proposition that articles of such limited circulation can put a reasonably diligent investor on sufficient inquiry notice to start the running of a statute of limitations. Indeed, the one relevant case Defendants do cite – although not for this proposition – demonstrates that facts must be much more widely disseminated than they were here before a reasonably diligent investor is presumed to be aware of them. There, the relevant facts were included in a detailed discussion in the prospectuses, in articles appearing in national publications such as *USA Today*, *Time Magazine* and *The Wall Street Journal*, and in multiple press releases issued by the National Association of Securities Dealers (NASD). *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 217 (3d Cir. 2007). Such is not the case here and, indeed, in *Staehr*, the Second Circuit noted that even in *DeBenedictis*, it took far more than news reports in isolation to trigger inquiry notice. *Staehr*, 547 F.3d at 431 ("we do not read *DeBenedictis* as holding that the non-specific articles and press releases were sufficient, without more, to trigger inquiry notice"). Rather, news reports have significance in instances where those reports in conjunction with some other source of information, such as the company itself by means of its own SEC filings, provides facts sufficient to put a reasonably diligent investor on

notice, and the news reports "simply '[a]lso contribut[ed] to a duty of inquiry.'" *Id.* (citation

omitted). Here, Defendants cannot seriously contend that their own Prospectuses, in conjunction

with the news reports they cite, put Lead Plaintiffs on notice. On the contrary, the Prospectuses

contradicted the news reports on their face. *Cf. Grubka v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d

1259, 1267 (D. Colo. 2006) (offering documents themselves put plaintiff on inquiry notice of his

claims) (cited in Def. Br. at 70); *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 163 (4th Cir.

1993) (prospectus warned of the very events defendants were alleged to have concealed) (cited in

Def. Br. at 70).[95]

Finally, it is notable that in these cases, after the supposed disclosures, Defendants put

out new Prospectuses repeating the false statements regarding the Funds' preservation of capital

objectives. There is no basis to argue the cited articles triggered inquiry notice.

### C.    Defendants Have Failed to Demonstrate That a Reasonably Diligent Investor Would Have Discovered the Falsity of Defendants' Statements With Respect to the Inverse Floaters

Defendants rely on disclosures in the Prospectuses as well as articles in *The Wall Street

Journal* and *The New York Times* in arguing that Lead Plaintiffs would have discovered the true

magnitude of risks resulting from the Funds' investment in inverse floaters if they had acted

diligently. Defendants are in error.

The disclosures in the Prospectuses miss the mark because they do not disclose the false

statements that form the basis for Lead Plaintiffs' claim – namely, that the Funds were far more

illiquid than they were represented to be; that third parties could force the Funds to sell assets at

---

[95]     The other cases Defendants rely upon are equally inapposite. Both *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 466 (7th Cir. 1990), and *Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1344 (8th Cir. 1980), were cases in which the plaintiffs had received direct communications from the defendants which provided them with sufficient information to discover the wrongful conduct at issue.

disadvantageous times, and that the Funds' assets were overvalued, resulting in artificial inflation of the Funds' NAVs.  These disclosures only began to appear in the October 21, 2008 Prospectus Supplements.  Thus, Defendants' previous references to the Funds' investments in inverse floaters were insufficient to put investors on notice of those facts.  *See Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (the "storm warning[] … must be such that it relates directly to the misrepresentations and omissions the plaintiffs later allege").  Indeed, Defendants are hard pressed to claim that these facts had been properly disclosed prior to October 21, 2008.  If that were the case, it begs the question as to why Defendants even bothered to make a supplemental disclosure.

Moving beyond the Prospectuses' purported disclosures, one is left with just two newspaper articles, from 2002 and from 2006.  Def. Br. at 74.  These articles, however, could not put a reasonably diligent investor on notice of the relevant facts.  Moreover, the two articles discuss inverse floaters in the most general terms and *no* reference is made to any of the Funds.

Even if any of the Funds had been mentioned, the articles are vague and ambiguous about inverse floater risk.  One of the articles, for example, states that "[f]inancial professionals say changes in derivatives make them less risky than in the past – and perhaps less risky than holding some typical bonds."[96]  One fund manager is quoted as saying:

> There is no such thing as a good or bad derivative – there are some people who use derivatives badly.  I think a number of our funds are *less risky* – less interest-rate sensitive – than they would be without the use of certain derivatives.

*Id.* (emphasis added).

---

[96]     Michael A. Pollock, *Monthly Mutual Funds Review – Fundamentals: Your Bond Fund May Hold a Surprise – Derivatives Gain Big Role for Ability to Lift Returns; Are They "Devil's Spawn"?*, Wall St. J., Mar. 6, 2006 (Larrabee Decl. Ex. B-24).

Indeed, the most that reasonably diligent investors could have taken away from this article is that certain unnamed mutual funds employed certain undefined types of inverse floaters in certain equally undefined circumstances that "*could* plunge" and "*can* add more volatility to mutual share prices." Def. Br. at 74 (quoting Exhibit B-24) (emphasis added). These articles were not sufficiently specific to put investors on notice. *See Sterlin*, 154 F.3d at 1204 (*Barron's* article only served to put plaintiff on inquiry notice because it "*related directly* to [p]laintiff's claim . . . .") (emphasis added).

## V.    LEAD PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION

Defendants' attempt to dismiss the Complaints for failure to allege loss causation (Def. Br. at 75-77) suffers from two fatal defects: (1) Lead Plaintiffs are not required to affirmatively plead loss causation; and (2) Defendants' theory that the form of loss causation required in stock drop securities fraud actions is the only valid form of loss causation has been rejected by every court to have considered the issue.

First, loss causation is not an element of a Section 11 or 12(a)(2) claim that must be pleaded. *See* 15 U.S.C. §§ 77k and 77l; *see also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("Under sections 11 and 12(a)(2), plaintiffs do not bear the burden of proving causation."); *Lyne v. Arthur Andersen & Co.*, 772 F. Supp. 1064, 1067 (N.D. Ill. 1991) (holding that "loss causation is not a necessary element of a *prima facie* section 11 cause of action").

Although Defendants may raise the lack of causation ("negative causation") as an affirmative defense, the courts routinely hold that it is not grounds for dismissal on a 12(b)(6) motion. *See, e.g.*, *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1092 (D. Colo. 2004) (since the plaintiff does not have the burden of proving loss causation, the defendants' negative

causation arguments that "speak to the merits of the case and turn on competing factual assertions" are not appropriate at the motion to dismiss stage); *Adams Golf*, 381 F.3d at 277 (holding that even if a defendant could prove negative causation, a complaint will not be dismissed based on an affirmative defense); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. at 572 (holding that because loss causation need not be proven under Sections 11 and 12, an affirmative defense of negative causation is not grounds for a Rule 12(b)(6) motion to dismiss).[97]

Second, even if the Court chooses to consider Defendants' negative causation arguments on this motion, their arguments should be rejected. In support of their arguments, Defendants note that the price of mutual fund shares (as opposed to the price of an individual security trading on a secondary market) is determined by the aggregate value of the underlying assets in the mutual fund's portfolio, and not by investor expectations and the market information that influences them. Def. Br. at 75. Therefore, Defendants argue, misstatements and omissions regarding a mutual fund cannot cause a decline in the price of mutual fund shares. *Id.* at 76.

As an initial matter, Defendants' argument fails because the Complaints allege not only that Defendants misrepresented the mechanism by which they determined the value of the assets in the Funds, but also the values of those assets themselves.[98] Therefore, even if Defendants are correct that, in some instances, as in the case of an S&P 500 index mutual fund, the assets'

---

[97]     The two cases cited by Defendants for the proposition that "a negative causation defense may be considered on a dismissal motion, where the absence of loss causation is apparent on the face of the complaint" are distinguishable. In *Blackmoss Inv. Inc.*, unlike here, the plaintiff failed to allege any material misstatements and/or omissions, and the company's stock continued to trade higher than the offering price after partial disclosures, thereby severing the causal relationship between the alleged misstatements and the stock decline. *See* 2010 WL 14867, at *20-22, *29-30. Similarly, in *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429 (S.D.N.Y. 2003), the court found that defendants had no duty to disclose any of the omitted information, and therefore, plaintiffs failed to allege material misstatements and/or omissions. *See id.* at 435-37.

[98]     *See* AMT-Free Compl. ¶¶103-08; AMT-Free NY Compl. ¶¶95-100; Cal. Compl. ¶¶166-72; Rochester Compl. ¶¶99-104; NJ Compl. ¶¶96-101; Nat'l Compl. ¶¶93-98; Pa. Compl. ¶¶51, 105-12.

values are determined by objective and independent markets, it does not change the fact that here the *values of the assets themselves were overstated*. *Supra* at II.D. And if Defendants are also correct that the prices of the Funds' shares were determined by "summing up the value of the [Funds'] assets," Def. Br. at 75, the Funds' share prices were therefore inflated because of Defendants' misrepresentations.

Moreover, even in the absence of such allegations, Defendants' arguments must be rejected, since Defendants' position would preclude all Section 11 or 12(a)(2) claims involving mutual funds because all such claims are predicated on misstatements and/or omissions. Not surprisingly, Defendants cite no case that supports their argument. In fact, the only two cases they cite, Def. Br. at 75 n.142, flatly rejected Defendants' narrow view of loss causation. *See Charles Schwab I*; *Evergreen*.

In *Charles Schwab I*, the court rejected arguments similar to those raised by Defendants here, in denying a motion to dismiss, stating:

> Defendants' narrow formulation of loss causation would effectively insulate mutual fund companies from claims for a wide range of material misrepresentations regarding fund policies, risks and investment decisions. Defendants would immunize a scheme that purported to invest in low-risk government bonds but in fact invested in legitimate but high-risk treasure-hunting expeditions. *Loss causation, however, is not limited to the common "corrective disclosure-price drop" scenario.*

> As courts in other circuits have explained, a plaintiff may establish loss causation by alleging "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered"; that defendants' "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of" the security.

\*      \*      \*

> Here, plaintiffs certainly alleged that the subject of the fraudulent statements caused their losses – that defendants misrepresented or failed to disclose portfolio risks, the materialization of which caused (or exacerbated) the losses. Similarly, if defendants misrepresented the scope of the fund's risks, and the undisclosed risks exacerbated the losses, then plaintiffs' resulting undervaluation of risks might be deemed to have caused some portion of their losses.

257 F.R.D. at 547 (internal citations omitted) (emphasis added).

Recently, the court in *In re Charles Schwab Corp. Sec. Litig.*, No. 08-CV-01510, 2010 WL 1463490, at \*6 (N.D. Cal. Apr. 8, 2010) ("*Charles Schwab II"*), also denied defendants' motion for summary judgment on loss causation grounds, holding that "if a mutual fund holds itself out as investing no more than 25 percent in a single industry but then, as actually planned, invests fifty percent in a single industry, there is no escape by blaming the industry rather than the promoter. The materialization of the concealed risk causes the loss." *Id*. Nor can Defendants escape liability here, as it was the mischaracterization of the undisclosed risks alleged in the Complaints that caused Lead Plaintiffs' losses.

Additionally, in *Evergreen*, the court, citing *Charles Schwab I* with approval, rejected the same loss causation argument, finding it sufficient that the *Evergreen* plaintiffs "demonstrate[d] that there is a colorable claim of loss causation" by alleging that defendants falsely represented the riskiness of the funds' investments, which "artificially inflated the NAV throughout the Class Period," and that when those risks materialized, the funds' "NAV declined in value, resulting in losses." *Evergreen*, 2010 WL 1253114, at \* 7; *see also Ray v. Citigroup Global Markets*, *Inc.*,

482 F.3d 991, 995 (7th Cir. 2007) (outlining three possible ways to demonstrate loss causation, including the "materialization of the risk" standard).

As in *Charles Schwab I* and *II* and *Evergreen*, Lead Plaintiffs allege that the materialization of the undisclosed risks created by the highly-leveraged inverse floaters and over-investment in illiquid assets caused Lead Plaintiffs' losses.

Defendants also argue that Lead Plaintiffs cannot plead loss causation because other factors may have impacted the market's determination of the Funds' values. *See* Def. Br. at 75-77. However, courts do not dismiss Section 11 and 12(a)(2) claims simply because multiple factors may have contributed to investors' losses. *See, e.g., In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (holding that a plaintiff is not required to show "that a misrepresentation was the *sole* reason for the investment's decline in value" and that additional factors may play a role in a damages assessment) (emphasis in original and internal citation omitted).

In any event, consideration of additional factors contributing to losses is not appropriate at the motion to dismiss phase. *See, e.g., Silverman v. Motorola, Inc.*, No. 07-CV-4507, 2008 WL 4360648, at *15 (N.D. Ill. Sept. 23, 2008) (observing that there is always a chance that "other forces can contribute to a decline in value of the plaintiff's securities," but that plaintiff need not "'affirmatively rule out those other factors in its complaint . . . .'") (citation omitted). For these reasons, Defendants' attempt to use the current global economic situation and the credit crisis to shield them from liability, *see* Def. Br. at 76, must also fail. *See, e.g., Freudenberg v. E\*Trade Fin. Corp.,* No. 07-Civ-8538, 2010 WL 1904314, at *19 (S.D.N.Y. May 11, 2010) (rejecting a fraud by hindsight defense in a Section 10(b) case, stating, "The

'current financial crisis' is not necessarily an absolute defense if it is alleged that defendants have misled the public as to the quality of their holdings."); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 (C.D. Cal. 2008) (the court will not be "distracted" by the impact of the economic crisis on the company).  At a later stage of the litigation, Defendants may raise this affirmative defense, but even then, it is Defendants who will face a heavy burden.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 383 (S.D.N.Y. 2006) ("In raising this defense, the defendant has a 'heavy burden' of proving that the decline in stock price was caused by factors other than the misstatement(s) in the registration statement.  'Defendants' heavy burden reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases.'") (internal citation omitted).

Thus, although not required, Lead Plaintiffs have adequately alleged loss causation.

## VI.   LEAD PLAINTIFFS ADEQUATELY PLEAD SECTION 12(a)(2) CLAIMS UNDER THE SECURITIES ACT

Lead Plaintiffs assert Section 12(a)(2) claims against Defendants Oppenheimer Distributor (the underwriter and distributor of the Funds), OppenheimerFunds (the Manager and investment advisor of the Funds), and the Funds themselves (the registrants and issuers).

Liability under Section 12(a)(2) is found for direct sellers who pass title of the subject securities, and indirect sellers who "successfully solicit[] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner."  *Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1307 (10th Cir. 1998) (quoting *Pinter v. Dahl,* 486 U.S. 622, 647 (1988)).[99]  Notably, the "*Pinter* court did not adopt a restrictive, literal meaning of

---

[99]     The Tenth Circuit has observed that "*Pinter's* definition of a statutory seller under § 12(a)(1) has been applied to § 12(a)(2) as well."  *Maher*, 144 F.3d at 1307 n.10.

'seller,' but held that a 'seller' did not necessarily have to be the 'owner' of the securities."

*Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1222 (D. Colo. 1998).

### A.    Oppenheimer Distributor Is a Statutory Seller Under Section 12(a)(2)

Defendants concede that the Funds' underwriter and distributor (here Oppenheimer

Distributor) is subject to Section 12(a)(2) liability as a statutory seller of Oppenheimer securities.

*See* Def. Br. at p. 78 ("Aside from [Oppenheimer Distributor], it is apparent that Defendants are

not securities sellers [within the meaning of section 12(a)(2)].").  Indeed, given that

Oppenheimer Distributor was the Funds' underwriter and distributor, it necessarily passed title of

the Funds' securities to Lead Plaintiffs and others.  *See Charles Schwab I*, 257 F.R.D. at 548

(defendants "virtually concede" and the court held that an underwriter/distributor of a mutual

fund is a proper party with regard to a Section 12(a)(2) claim).

### B.    The Funds and OppenheimerFunds Are Also Statutory Sellers Under Section 12(a)(2)

The Funds were the registrants and issuers for the securities at issue.  The Funds, by

virtue of their status as the issuers, are statutory sellers.  *See Citiline Holdings, Inc. v. iStar Fin.*

*Inc.,* No. 08-CV-3612, 2010 WL 1172647, at *3 (S.D.N.Y. Mar. 26, 2010) ("an issuer is a

statutory seller for the purposes of Section 12(a)(2)"); *Charles Schwab I*, 257 F.R.D. at 548

(defendants "virtually concede" and the court held that the issuer of a mutual fund is a proper

party with regard to a Section 12(a)(2) claim).

Lead Plaintiffs also allege that the Funds are indirect sellers because they "offered and

sold a security," "actively solicited the Fund[s'] shares through the Prospectus, advertising and

other marketing efforts to serve their own financial interests," "controlled a person who offered

and sold," "offered, solicited, distributed and/or sold," and "solicited" the Funds' shares.[100]   Lead

Plaintiffs' allegations are virtually indistinguishable from those required by the Tenth Circuit in

*Maher*, *i.e.*, that plaintiffs, at minimum, allege defendants "solicit[ed] the purchase, motivated at

least in part by a desire to serve [their] own financial interests or those of the securities owner."

*See Maher,* 144 F.3d at 1307 (quoting *Pinter*, 486 U.S. at 647).

Lead Plaintiffs allege that OppenheimerFunds (as the Manager and investment advisor) is

an indirect statutory seller given its solicitation of the securities to Lead Plaintiffs and all Class

members for its own financial gain.   Lead Plaintiffs allege that OppenheimerFunds "offered and

sold a security," "actively solicited the Fund[s'] shares through the Prospectus, advertising and

other marketing efforts to serve their own financial interests," "controlled a person who offered

and sold," "offered, solicited, distributed and/or sold," and "solicited" the Funds' shares.   Lead

Plaintiffs' allegations are more than sufficient at this stage of the proceedings.   Defendants are

statutory sellers, despite their misleading arguments to the contrary.

First, Defendants attempt to analogize this case to the situation where an issuer sells

securities through a "firm commitment underwriting."   *See* Def. Br. at 78.   In a firm commitment

underwriting, the shareholder does not purchase from the seller, but rather from the underwriter.

*Pinter*, 486 U.S. at 625 n.1; *see, e.g., Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d

363, 370 (5th Cir. 2001) (distinguishing between issuers who may be liable as direct sellers and

on issuer who may not be liable as direct sellers where there has been a firm commitment

underwriting).   *Lone Star* and others have indicated that shareholders cannot ordinarily hold

issuers liable under Section 12 as a seller absent additional allegations regarding the issuer.   *See,*

---

[100]      *See, e.g.*, AMT-Free Compl. at ¶¶129-30; AMT-Free NY Compl. at ¶¶120-21; Cal. Compl. at ¶¶200-03;
Nat'l Compl. at ¶¶118-19; NJ Compl. at ¶¶121-22; Pa. Compl. at ¶171; Rochester Compl. at ¶¶125-26.

*e.g., Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003).  However, the post-*Lone Star* SEC Rule 159A and associated guidance clearly state that any issuer, notwithstanding the underwriting arrangement, can be liable for purposes of Section 12(a)(2).  *See* SEC Rule 159A, 17 C.F.R. § 230.159A ("For purposes of Section 12(a)(2) of the Act only, in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, *seller* shall include the issuer of the securities sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person"); Securities Offering Reform, Release Nos. 33-8591, 34-52056, IC-26993, FR-75, *available at* http://www.sec.gov/rules/final/33-8591.pdf (July 19, 2005) (the "Adopting Release").[101]  The Adopting Release states, in part:

> The issuer is selling its securities to the public, although the form of underwriting of such offering, such as a firm commitment underwriting, may involve the sale first by the issuer to the underwriter and then the sale by the underwriter to the public.  We believe that an issuer offering or selling its securities in a registered offering pursuant to a registration statement containing a prospectus that it has prepared and filed, or by means of other communications that are offers made by or on behalf of or used or referred to by the issuer, can be viewed as soliciting purchases of the issuer's registered securities.  *Therefore, we are adopting a rule providing that under Section 12(a)(2) an issuer in a primary offering of securities, regardless of the form of the underwriting arrangement, will be a seller and will be considered to offer or sell the securities to a purchaser in the initial distribution of the securities.*

*Id.* at 188-89 (footnote omitted) (emphasis added) (Shuman Decl. Ex. A-16).  Through Rule 159A, the SEC has made it abundantly clear that issuers are liable under Section 12(a)(2),

---

[101]     The Adopting Release specifically notes that one of the cases relied upon by Defendants, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003), caused "unwarranted uncertainty" relating to Section 12(a)(2) seller liability.  *See* Adopting Release at n.420.

regardless of the method of underwriting used.  In any case, there are no allegations by

Defendants or Lead Plaintiffs that a firm commitment underwriting existed.  Thus, Defendants'

"firm commitment underwriting" analogy is inapplicable to this case.

Second, Defendants argue that Lead Plaintiffs "raise only conclusory allegations that the

Section 12 Defendants 'offered and sold,' 'controlled a person who offered and sold,' 'offered

solicited, distributed and/or sold,' or 'solicited' Fund shares" and that such "conclusory

allegations … cannot survive" unless they are "supported by factual allegations at the pleading

stage."  Def. Br. at 78-79.  Defendants incorrectly cite two cases for this proposition, including

*In re Metropolitan Securities Litigation*, an Eastern District of Washington case that found that a

plaintiff's limited allegation "that the Individual Defendants 'used the prospectus to solicit the

purchase of these securities,'" was insufficient to state a Section 12(a)(2) claim.  *See In re Metro.*

*Sec. Litig.*, 532 F. Supp. 2d 1260, 1295-96 (E.D. Wash. 2007).  However, Lead Plaintiffs'

allegations of Defendants' solicitation for the purpose of serving their own financial interests are

hardly conclusory, and precisely what courts in this District require.  In *Schaffer v. Evolving Sys.,*

the court found allegations similar to those alleged here met the pleading requirements to state a

claim under Section 12(a)(2).  In *Schaffer*, Judge Brimmer stated that plaintiffs need only "'at a

minimum allege facts' that the defendants 'solicited' the purchase of Evolving System stock."

*Schaffer,* 29 F. Supp. 2d at 1223 (quoting *Maher*, 144 F.3d at 1307).  Lead Plaintiffs' allegations

that the Funds and OppenheimerFunds "solicited" the purchase of the Funds' securities to "serve

their own financial interests" are adequate in this District.

Defendants also cite *Maher* for the "holding" that a "bald and factually unsupported

allegation that [the Defendants] 'solicited' the plaintiff's securities purchases is not, standing

alone, sufficient" to state a Section 12 claim.  Def. Br. at 79.  Defendants' quotation is not the

holding of *Maher* and is actually found in a lengthy string cite the *Maher* court used to

distinguish the conflicting holding in *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir.

1996).  Consistent with the other cases cited above, the *Maher* court actually held that a plaintiff

need only "at a minimum allege facts indicating that [defendants] solicited his purchase of [the

securities at issue]."  *Maher,* 144 F.3d at 1307.  In *Maher*, the plaintiff's Section 12(a)(2) claim

was dismissed because the plaintiff failed to make the basic, required factual allegation that

defendants solicited his purchase of the security for their own financial interest.  *Id.*  Here, as

stated above, Lead Plaintiffs made the required allegations.

Recently, in *Charles Schwab I*, the court correctly held that named defendants there

including the issuer/registrant (analogous to OppenheimerFunds) and the underwriter/distributor

(analogous to Oppenheimer Distributor) were statutory sellers under Section 12(a)(2) based upon

allegations similar to those made by Lead Plaintiffs.  *Charles Schwab I*, 257 F.R.D. at 548-50.

The *Charles Schwab I* plaintiffs pleaded that defendants "offered and sold" the fund's shares and

that defendants "actively solicited the sale of the fund's shares."  *Id*. at 549.  These allegations

virtually mirror those made by Lead Plaintiffs with regard to the Funds, OppenheimerFunds and

Oppenheimer Distributor.

Thus, Lead Plaintiffs' Section 12(a)(2) allegations are adequate, especially on this

Motion given that the question of whether certain Defendants are statutory sellers under Section

12(a)(2), and in particular "whether or not [D]efendants actually solicited [Lead] [P]laintiffs'

sales is a factual question which should generally be left for the jury; at this stage [Lead]

[P]laintiffs need only satisfy Rule 8(a)'s lenient pleading standards." *Charles Schwab I*, 257 F.R.D. at 550.[102]

## VII. LEAD PLAINTIFFS ADEQUATELY PLEAD SECTION 15 "CONTROL PERSON" CLAIMS UNDER THE SECURITIES ACT

To state a *prima facie* case of control person liability, a plaintiff must allege: (1) a primary violation of the securities laws; and (2) "control" over the primary violator by the alleged controlling person. *Maher*, 144 F.3d at 1305.

The Tenth Circuit has stated that control person liability is remedial in nature and is to be "construed liberally." *Maher*, 144 F.3d at 1306.  Control person liability "has been interpreted as requiring *only some indirect means* of discipline or influence short of actual direction to hold the 'controlling person liable.'" *Id.* at 1305 (citing *Richardson v. MacArthur*, 451 F.2d 35, 41-42 (10th Cir. 1971)) (emphasis added);[103] *see also First Interstate Bank v. Pring*, 969 F.2d 891, 898 (10th Cir. 1992) ("the language of the statute leads us to join those circuits that hold that a plaintiff need not prove that the defendant actually or culpably participated in the primary violation"), *rev'd on other grounds sub nom. Central Bank v. First Interstate Bank*, 511 U.S. 164 (1994).  Control person liability, moreover, is a factual question not ordinarily subject to resolution on a motion to dismiss and dismissal is appropriate only when a plaintiff does not plead any facts from which it can be inferred that the defendant was a control person.  *Ribozyme*

---

[102]    Lead Plaintiffs' allegations exceed the Rule 8(a) pleading standards applicable to stating a Section 12(a)(2) claim.  *See Charles Schwab I*, 257 F.R.D. at 550; *see also In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 681 (E.D. Tex. 2004) (holding that plaintiffs' complaint "has certainly given fair notice that Plaintiffs intend to prove Defendants' seller status, and the Court will not resolve this claim under 12(b)(6) on a fact-intensive 'seller' status issue").

[103]    The Tenth Circuit has also noted that Section 15 of the Securities Act and Section 20(a) of the Exchange Act are interpreted similarly, although worded differently.  *Maher*, 144 F.3d at 1305 n.7 (citations omitted).

*Pharms. Inc. Sec. Litig*, 119 F. Supp. 2d 1156, 1167 (D. Colo. 2000) (citing *Maher*, 144 F.3d at 1305).

Lead Plaintiffs have adequately stated Section 15 "control person" claims against: (1) the Officer Defendants; (2) OppenheimerFunds; and (3) the Trustee Defendants.[104]

The Officer Defendants are liable as control persons by virtue of their positions as "senior officer[s]" of the Funds.[105]  The Officer Defendants "were in a position to, and did, control the Fund[s'] operations and disclosures made by the Fund[s] in the registration statements issued during the Class Period."[106]  In addition, Defendant John V. Murphy acted as Chairman, CEO, Director and President of OppenheimerFunds – a primary violator.[107]  Defendant Brian W. Wixted was Treasurer and Principal Financial Accounting Officer of the Funds – also a primary violator.[108]  Defendant Ronald H. Fielding was Vice President and a Senior Portfolio Manager of the Funds.[109]  Allegations against such Officer Defendants are routinely held to be adequate where, as here, their positions demonstrate participation in a company's operations.  *In re Ribozyme Pharms., Inc. Sec. Litig.*, 119 F. Supp. 2d at 1167 (it could be reasonably inferred that defendant was a control person when he had been CEO, President and Director); *Adams v.*

---

[104]     Lead Plaintiffs have also adequately stated "control person" claims against MassMutual, which Lead Plaintiffs address in their separate joint brief in opposition to MassMutual's Motion to Dismiss, submitted concurrently herewith.

[105]     *See* AMT-Free Compl. at ¶137; AMT-Free NY Compl. at ¶128; Cal. Compl. at ¶212; Nat'l Compl. at ¶126; NJ Compl. at ¶129; Pa. Compl. at ¶181; Rochester Compl. at ¶133.

[106]     *See* AMT-Free Compl. at ¶137; AMT-Free NY Compl. at ¶128; Cal. Compl. at ¶212; Nat'l Compl. at ¶126; NJ Compl. at ¶129; Pa. Compl. at ¶181; Rochester Compl. at ¶133.

[107]     *See* AMT-Free Compl. at ¶18; AMT-Free NY Compl. at ¶16; Cal. Compl. at ¶39; Nat'l Compl. at ¶19; NJ Compl. at ¶16; Pa. Compl. at ¶29; Rochester Compl. at ¶18.

[108]     *See* AMT-Free Compl. at ¶31; AMT-Free NY Compl. at ¶28; Cal. Compl. at ¶40; Nat'l Compl. at ¶32; NJ Compl. at ¶29; Pa. Compl. at ¶32; Rochester Compl. at ¶26.

[109]     *See* AMT-Free Compl. at ¶32; AMT-Free NY Compl. at ¶29; Cal. Compl. at ¶52; Nat'l Compl. at ¶33; NJ Compl. at ¶30; Pa. Compl. at ¶43; Rochester Compl. at ¶27.

*Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108-09 (10th Cir. 2003) (all named defendant executive officers found to be control persons at pleading stage).

Lead Plaintiffs have also properly pleaded that the Trustee Defendants are control persons. All the Trustee Defendants signed the Registration Statements of the Funds either individually or through agents.[110] The Trustee Defendants, by virtue of their positions and as signatories of the registration statements, "were in a position to, and did control the Fund[s'] operations and disclosures made by the Fund[s] in the registration statements during the Class Period."[111] Specifically, Section 6 of the Securities Act requires that registration statements shall be signed by, among others, "the majority of [the Funds'] board of directors or persons performing similar functions (or, if there is no board of directors or persons performing similar functions, by the majority of the persons or board having the power of management of the issuer)." 15 U.S.C. § 77f. A Trustee Defendant, therefore, can influence the registration statement and its contents, among other ways, by correcting it or refusing to sign it. Moreover, OppenheimerFunds carries out its duties as Manager of the Funds subject to the policies established by the Board of Trustees, under an investment advisory agreement.[112]

In the corporate context, the status of being an outside director, without more, may not be sufficient to allege control person liability. *Adams*, 340 F.3d at 1108. However, if outside directors are also alleged to have signed registration statements, they are deemed control persons at the pleading stage. The Trustee Defendants are akin to outside directors. *See Charles Schwab*

---

[110]   *See* AMT-Free Compl. at ¶¶18-30; AMT-Free NY Compl. at ¶¶16-27; Cal. Compl. at ¶¶38-39, 41-51; Nat'l Compl. at ¶¶19-31; NJ Compl. at ¶¶16-28; Pa. Compl. at ¶29-31, 33-42; Rochester Compl. at ¶¶18-25.

[111]   *See, e.g.*, AMT-Free Compl. at ¶137; AMT-Free NY Compl. at ¶128; Cal. Compl. at ¶212; Nat'l Compl. at ¶126; NJ Compl. at ¶129; Pa. Compl. at ¶181; Rochester Compl. at ¶133.

[112]   *See* AMT-Free Compl. at ¶15; AMT-Free NY Compl. at ¶13; Cal. Compl. at ¶35; Nat'l Compl. at ¶15; NJ Compl. at ¶12; Pa. Compl. at ¶25; Rochester Compl. at ¶15.

*I*, 257 F.R.D. at 555 (similar to the role of a director, the court held that "it makes sense that the authority to sign and certify the contents of a registration statement implies the authority to effectuate changes to that statement by withholding certification").  Here, the Trustee Defendants' status as trustees is alleged, plus they are alleged to have signed the Registration Statements of the Funds.  *See In re Storage Tech. Corp. Sec. Litig.*, 630 F. Supp. 1072, 1079 (D. Colo. 1986) (allegations that outside directors were directors of the company and signed registration statements sufficient for control person liability at pleading stage).

Lastly, there should be little dispute that Lead Plaintiffs have adequately alleged that OppenheimerFunds is a control person.  OppenheimerFunds is a control person by virtue of its position as the Funds' Manager responsible for, among other things, choosing the Funds' investments and handling their day-to-day business.[113]  Allegations of such day-to-day management control of a primary violator are sufficient to show control person liability.  *See Adams*, 340 F.3d at 1108 (allegations that person had the "power to direct or cause the direction of the management" would be sufficient to allege control person liability); *Maher*, 144 F. 3d at 1305-06.

Thus, Lead Plaintiffs' allegations adequately state claims at this stage in the proceedings under Tenth Circuit law.

## VIII.   LEAD PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION UNDER INVESTMENT COMPANY ACT SECTION 13(a)

Defendants assert that Lead Plaintiffs have no private right of action under ICA Section 13(a)(3) arising from their failure to obtain shareholder authorization before deviating from the

---

[113]      *See* AMT-Free Compl. at ¶15; AMT-Free NY Compl. at ¶13; Cal. Compl. at ¶35; Nat'l Compl. at ¶15; NJ Compl. at ¶12; Pa. Compl. at ¶25; Rochester Compl. at ¶15.

Funds' fundamental investment policies.  Def. Br. at 82.[114]  Defendants are wrong because:  (i) Section 13(a) contains "rights-creating" language; (ii) the "related statutory scheme" shows that a private right of action was intended; and (iii) the legislative history confirms that Congress intended to afford such a right of action.

### A.    The Analytical Framework

In analyzing whether, under the standard set forth in *Alexander v. Sandoval*, 532 U.S. 275 (2001), Congress intended to create a private right of action, this Court must "examine the statute for 'rights-creating language'" and "language identifying 'the class for whose *especial* benefit the statute was enacted.'"  *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1267 (10th Cir. 2004) (citations omitted).[115]  The Court also must "consider the relation between the specific provision at issue and the related statutory scheme."  *Id.*  If the "statutory text and structure have not conclusively resolved the issue," the Court may "turn to the legislative history and context within which a statute was passed."  *Univ. of Colo. Hosp. Auth. v. Denver Publ'g Co.*, 340 F. Supp. 2d 1142, 1144 (D. Colo. 2004).

### B.    Section 13(a)'s "Rights-Creating Language" and the "Related Statutory Scheme" Show Congress's Intent To Create a Private Right of Action

Section 13(a) expressly provides for and protects the voting rights of mutual fund shareholders, thereby clearly containing an "implication of an intent to confer rights" (the right

---

[114]     *See*, *e.g.*, Rochester Compl. at ¶¶40, 45, 71-78, 98, 139-45.  In pertinent part, Section 13(a) protects investor suffrage rights by prohibiting an investment company from "deviat[ing] from any investment policy which is changeable *only if authorized by shareholder vote*, or . . . any policy recited in its registration statement" absent shareholder approval "*by the vote of a majority of its outstanding voting securities.*"  15 U.S.C. §§ 80a-13(a) & 13(a)(3) (emphasis added).

[115]     Prior to *Sandoval*, courts consistently found, recognized or assumed an implied private right of action under Section 13(a).  *See*, *e.g.*, *Karpus v. Hyperion Capital Mgmt., Inc.*, No. 96-CV-4671, 1996 WL 668860, at *2 (S.D.N.Y. Nov. 18, 1996); *Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 916 F. Supp. 1343, 1348-50, 1357 (D.N.J. 1996).

to vote on changes in the character of an investment company's business) "on a particular class of persons" (investment company shareholders). *See Sandoval*, 532 U.S. at 289 (citation and quotation marks omitted).  The Ninth Circuit has confirmed that Section 13(a) contains rights-creating language when it held that investors have *direct* claims to protect "their voting rights under [S]ections 80a-13(a)(2) and (3)." *Lapidus v. Hecht*, 232 F.3d 679, 681 n.4, 683-84 (9th Cir. 2000) (court assumed, without resolving the question, that a private right of action existed when it considered whether Section 13(a) claims were direct or derivative in nature); *see also Green v. Brown*, 398 F.2d 1006, 1010 (2d Cir. 1968) (referencing "the policy of the [ICA] to give shareholders an opportunity to pass upon changes in investment policy").

The "related statutory scheme" also plainly reflects Congress' intent to provide and protect investment company shareholders' suffrage rights by giving them a right of action.  In ICA Section 1 ("Findings and declaration of policy"), Congress described the need to nationalize the regulation of investment companies in the "interest of investors" because, *inter alia*, such interest is "adversely affected . . . when investment companies . . . change the character of their business . . . without the consent of their security holders." *See* 15 U.S.C. §§ 80a-1(a), 1(b) & 1(b)(6).  Significantly, Congress expressly stated in the same section that the ICA should be given expansive effect:  "the policy and purposes of [the ICA] *shall be interpreted . . . to mitigate and, so far as is feasible, to eliminate the conditions . . . which adversely affect the national public interest and the interest of investors*." *See* 15 U.S.C. § 80a-1(b) (emphasis added).

Additional provisions of the ICA further demonstrate Congress' intent to confer private rights of action against investment companies.  For example, Section 44 broadly provides for

concurrent federal *and state* court jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this subchapter or the rules, regulations, or orders thereunder."  15 U.S.C. § 80a-43.  Had Congress intended that only the SEC be able to enforce the ICA as Defendants suggest, there would have been no reason for Section 44 to confer concurrent jurisdiction on state courts.  *See Fogel v. Chestnutt*, 668 F.2d 100, 112 (2d Cir. 1981), *cert. denied*, 459 U.S. 828 (1982) ("[I]t seems . . . highly unlikely that Congress intended that . . . enforcement should be solely the task of the SEC and of the criminal law, and that injured investors should have no recourse in a federal court."); s*ee also* 15 U.S.C. § 80a-32 (mandating that investment companies provide the SEC with documents relating to litigation, thereby indicating that Congress anticipated that private litigants would be filing state or federal cases against investment companies pursuant to the ICA).[116]

## C.    The Sudan Act Confirms Congress' Intent

Subsection (c) of Section 13, added by the Sudan Accountability and Divestment Act of 2007 (the "Sudan Act"), Pub. L. No. 110-174, 121 Stat. 2516 (2007), confirms Congress' intent to provide a private right of action under Section 13(a).

Section 13(c) precludes any "person" from bringing "any civil, criminal, or administrative action" based upon an investment company's divesting from, or avoiding investing in, securities related to business operations in Sudan.  15 U.S.C. § 80a-13(c)(1).  Since

---

[116]      In support of their contrary argument, Defendants rely principally on *Olmsted v. Pruco Life Ins. Co.,* 283 F.3d 429, 433 (2d Cir. 2002).  However, that court evaluated whether a right of private action existed under ICA Sections 26(f) and 27(i) (which were enacted in 1996 and concerned the sale of variable insurance contracts), not under Section 13(a).  *See also Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007) (not addressing Section 13(a)).  Moreover, as the *Olmsted* court observed, Sections 26(f) and 27(i) did "not mention investors" and thus (unlike Section 13(a)) did not imply "an intent to confer rights on a particular class of persons."  *Olmstead*, 283 F.3d at 433 (citation omitted).  *Mutchka v. Harris*, 373 F. Supp. 2d 1021 (C.D. Cal. 2005), is equally inapposite as that court found that no private right of action existed under Section 36(a) because Congress expressly afforded a private right of action under subdivision (b) of the same section, which "suggest[ed] that omission . . . of [the] right to enforce other sections was intentional."  *Id.* at 1026-27 (citation omitted).

the term "person" had long been defined by the ICA to include "a natural person or a company," its use in Section 13(c) highlights that Congress recognized that non-governmental persons and entities, such as investment company security holders, have the right to bring civil actions under Section 13. *See* 15 U.S.C. § 80a-2(a)(28).[117]  Judge Susan Illston, from whose court the California Fund action was transferred and before whom that action will ultimately be tried, recently affirmed this reading of Section 13(c), stating that, "[i]f there were no private right of action under Section 13(a), there would be no need to restrict the actions that could be filed under Section 13." *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 609 F. Supp. 2d 938, 944-45 (N.D. Cal. 2009) (appeal pending) ("[I]f Congress intended for Section 13(c) to operate as a stand alone 'safe harbor' provision, Congress easily could have added Section 13(c) as an entirely new provision of the ICA rather than amending Section 13, or could have stated that there was no private enforcement of Section 13 whatsoever").[118]

**D.**     **The Investment Company Act's Legislative History Confirms That Congress Intended a Private Right of Action**

A review of the legislative history of the ICA confirms that Congress intended to confer a private right of action under Section 13(a).  The ICA legislative history demonstrates that "[o]ne of the abuses that provoked the [enactment of the ICA] was a practice of attracting investors based on an announced policy and then, after having investors' money in hand, radically

---

[117]     Significantly, Congress even augmented the definition of "person" in the Sudan Act to "include[] the Federal Government and any State or political subdivision of a State" without excluding natural persons or companies from the definition.  *See* 15 U.S.C. § 80a-13(c)(3).

[118]     The court in *Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*, No. 10-CV-1399, 2010 WL 1404208 (S.D.N.Y. Apr. 6, 2010), disagreed with the court in *Northstar*.  However, the *Western Investment* court seemingly misconstrued *Northstar* by assuming the *Northstar* court held that, by virtue of adding § 13(c), "the amending Congress" created a private right of action under § 13(a).  *See id.* at *4.  In fact, the *Northstar* court simply concluded that § 13(c) *confirmed* that a right had been intended previously.  Moreover, it appears that neither the parties nor the court in *Western Investment* considered the "related statutory scheme" or legislative history of the ICA.

changing investment policy." *Charles Schwab II*, 2010 WL 1261705, at *1, 4-5 (citing S. Rep. No. 76-1775, at 7 (1940) and H. Rep. No. 76-2639, at 9 (1940)).  Thus, Congress sought to protect investors by enacting Section 13(a) to require shareholder approval as a prerequisite to a deviation from existing policies.  *Id.* at *1.

Congress' intent to facilitate a private right of action under Section 13(a)(3) is also evinced by the 1970 amendments to the ICA.  The early decisions concerning  Sections 8(b)(2) and 13(a)(3) assumed a private right of action but dismissed complaints on the ground that policy changes effected without shareholder approval were actionable only if the policies were expressly characterized as "fundamental."  *See, e.g.*, *Green v. Brown*, 276 F. Supp. 753, 755-56 (S.D.N.Y. 1967), *rev'd on other grounds*, 398 F.2d at 1008-11; *Leighton v. One William St. Fund, Inc.*, No. 64-CV-2547, 1965 U.S. Dist. LEXIS 9430, at *6-8 (S.D.N.Y. July 2, 1965). Some of these decisions suggested that Congress clarify the scope of these Sections.  *See Green*, 398 F. 2d at 1011.  Congress thereafter amended Sections 8(b)(2) and 13(a)(3) in 1970 to prohibit, absent shareholder approval, changes in *any* policy recited in the registration statement as being changeable only if authorized by shareholder vote.  *See* Pub. L. No. 91-547, §§ 3(c) & (d), 84 Stat. 1414-15 (1970).  These 1970 amendments (and additional ones passed in 1975), coming after implied rights of action had been found under the ICA, constitute confirmation of Congress' intent to confer such rights under the statute.  *See Fogel*, 668 F.2d at 110-12.  Had Congress not intended Section 13(a) to confer a private right of action, it easily could have made that clear as part of the 1970 and 1975 amendments.  That it chose not to do so demonstrates Congressional intent for the existence of such a right.  *See Northstar*, 609 F. Supp. 2d at 945.

IX.    **THE COURT HAS JURISDICTION OVER THE CLAIMS AGAINST DEFENDANT YEUTTER AND THE CLAIMS ARISING OUT OF THE 2005 AND 2006 REGISTRATION STATEMENTS**

Defendants argue that the AMT-Free, AMT-Free New York, and California Lead Plaintiffs lack standing to bring claims based on the 2005 and 2006 Registration Statements and against Defendant Yeutter, a Trustee Defendant who signed those Registration Statements only, because those Lead Plaintiffs did not begin to purchase their shares until after the effective date of the 2007 Registration Statements, which Defendant Yeutter did not sign.  This argument lacks merit.

Lead Plaintiffs have constitutional standing to assert their claims.  They allege that:  (1) they suffered injury in fact by having purchased fund shares pursuant to Prospectuses that did not adequately disclose risks that ultimately materialized; (2) their injuries are traceable to the actions of Defendants who made those misrepresentations and omissions; and (3) those injuries are redressible by this litigation.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  That Lead Plaintiffs did not purchase shares issued pursuant to the 2005 and 2006 Registration Statements neither undermines their standing nor deprives the Court of jurisdiction over the claims involving those Registration Statements and Defendant Yeutter.

*In re Thornburg Mortgage, Inc. Sec. Litig.*, No. 07-CV-815, 2010 WL 445047 (D.N.M. Jan. 27, 2010), is instructive.  There, the lead plaintiffs sued several underwriters of Thornburg's securities under Sections 11 and 12(a)(2) of the Securities Act.  Certain underwriters sought dismissal on the ground that no lead plaintiff had purchased securities traceable to the offerings they underwrote.  The court rejected the underwriters' argument, holding that it had jurisdiction over the entire action because the lead plaintiffs had constitutional standing to pursue claims

against the remaining defendants. *Id.* at *13-14. The court also held that it could exercise supplemental jurisdiction over the claims against the underwriters, because the claims involving their offerings were part of the same common nucleus of operative fact, were related to the same series of SEC filings by the same issuer, and were therefore part of the same case or controversy. *Id.* at *14. The court reserved until later proceedings the issue of whether the lead plaintiffs could pursue class claims against these underwriter defendants. *Id.* at *15.

As in *Thornburg*, Lead Plaintiffs here have constitutional standing to sue on their claims, providing a sufficient basis for the Court to exercise jurisdiction over all Defendants and the claims arising out of all Registration Statements. Each of those claims arises out of substantially similar, if not identical, misrepresentations and omissions of material fact in the offering documents for shares of the Funds. These claims share a common nucleus of operative fact, are part of the same case or controversy, and are appropriately before the Court.

Whether Lead Plaintiffs' claims arising from their purchases pursuant to the 2007 Registration Statements are sufficiently typical to allow them to represent other investors who purchased shares pursuant to the 2005 and 2006 Registration Statements is an issue that should be decided on class certification, not a motion to dismiss for lack of standing. *See Hicks v. Morgan Stanley & Co.*, No. 01-CV-10071, 2003 WL 21672085, at *5 (S.D.N.Y. July 16, 2003) (concluding that plaintiff "can be appointed to represent a class that includes a claim for which he has not suffered an actual injury (but others in the class have) but where he undeniably suffered an injury and thus has standing with respect to a closely related claim"); *Maywalt v. Parker & Parsley Petro. Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993) (holding that plaintiffs who invested in two partnerships could represent investors in third partnership); *In re ML-Lee*

*Acquisition Fund II, L.P.*, 848 F. Supp. 527, 560-61 (D. Del. 1994) (concluding that purchasers of one mutual fund had standing and could represent purchasers of a second, "substantially identical" fund).  The Court therefore should reject Defendants' standing argument on this motion to dismiss.[119]

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motion should be denied.

---

[119]     If the Court is inclined to dismiss Lead Plaintiffs' claims against Defendant Yeutter and those arising out of the 2005 and 2006 Registration Statements, Plaintiffs respectfully request leave to amend to designate additional plaintiffs with respect to those claims.  *See In re Washington Mut., Inc. Sec. Litig.*, 259 F.R.D. 490, 504 (W.D. Wash. 2009).

Dated: June 4, 2010

Respectfully submitted,

s/ Kip B. Shuman
Kip B. Shuman
Rusty E. Glenn
**THE SHUMAN LAW FIRM**
885 Arapahoe Avenue
Boulder, CO 80302
Telephone:  (303) 861-3003
Fax:  (303) 484-4886
kip@shumanlawfirm.com
rusty@shumanlawfirm.com

*Liaison Counsel*

Steven J. Toll
Lisa M. Mezzetti
Daniel S. Sommers
S. Douglas Bunch
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, NW
Suite 500 West Tower
Washington, D.C.  20005
Telephone:  (202) 408-4600
Fax:  (202) 408-4699
stoll@cohenmilstein.com
lmezzetti@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Attorneys for Lead Plaintiff Leonard
Klorfine in the AMT-Free Fund cases,
Lead Plaintiffs Stuart and Carole Krosser
in the Rochester Fund cases, and Lead
Counsel for the Class*

Sanford P. Dumain
Peter E. Seidman
Roland W. Riggs
Christopher J. Orrico
**MILBERG LLP**
One Pennsylvania Plaza
48th Floor
New York, NY 10119
Telephone: (212) 594-5300
Fax: (212) 868-1229
sdumain@milberg.com
pseidman@milberg.com
rriggs@milberg.com
corrico@milberg.com

*Attorneys for Lead Plaintiff John Vazquez
in the AMT-Free New York Fund cases,
Lead Plaintiff Victor Sasson in the New
Jersey Fund cases, Lead Plaintiff Peter
Unanue in the Rochester National Fund
cases, and Lead Counsel for the Class*

Alan W. Sparer
Marc Haber
Kevin H. Lewis
James S. Nabwangu
**SPARER LAW GROUP**
100 Pine Street, 33rd Floor
San Francisco, CA 94111
Telephone:  (415) 217-7300
Fax:  (415) 217-7307
asparer@sparerlaw.com
mhaber@sparerlaw.com
klewis@sparerlaw.com
jnabwangu@sparerlaw.com

*Attorneys for Lead Plaintiff Joseph
Stockwell in the California Fund cases
and Lead Counsel for the Class*

Jeffrey S. Abraham
**ABRAHAM FRUCHTER &
TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY  10119-2900
Telephone:  (212) 279-5050
Fax:  (212) 279-3655
jabraham@aftlaw.com

*Additional Counsel for Lead Plaintiff
Leonard Klorfine in the AMT-Free
Fund cases, Lead Plaintiff Victor
Sasson in the New Jersey Fund cases,
and Lead Plaintiff Peter Unanue in the
Rochester National Fund cases*

Sherrie R. Savett
Gary E. Cantor
Glen L. Abramson
Eric Lechtzin
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-3000
Fax:  (215) 875-4604
ssavett@bm.net
gcantor@bm.net
gabramson@bm.net
elechtzin@bm.net

*Attorneys for Lead Plaintiff Dharamvir Bhanot in
the Pennsylvania Fund cases and Lead Counsel for
the Class*

Charles J. Piven
**BROWER PIVEN**
A Professional Corporation
488 Madison Avenue, 8th Floor
New York, NY  10022
Telephone:  (212) 501-9000
Fax:  (212) 501-0300
piven@browerpiven.com

*Additional Counsel for Lead Plaintiff John Vasquez
in the AMT-Free New York Fund cases and Lead
Plaintiff Dharamvir Bhanot in the Pennsylvania
Fund cases*

Daniel C. Girard
Aaron M. Sheanin
Christina H.C. Sharp
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA  94108
Telephone:  (415) 981-4800
Fax:  (415) 981-4846
dcg@girardgibbs.com
ams@girardgibbs.com
chc@girardgibbs.com

*Additional Counsel for Lead Plaintiff
Joseph Stockwell in the California
Fund cases*

Joseph J. Tabacco, Jr.
Nicole C. Lavalle
Matthew D. Pearson
**BERMAN DEVALERIO**
425 California Street, Suite 2100
San Francisco, CA  94104
Telephone:  (415) 433-3200
Fax:  (415) 433-6382
jtabacco@bermandevalerio.com
nlavalle@bermandevalerio.com
mpearson@bermandevalerio.com

*Additional Counsel for Lead Plaintiffs
Stuart and Carole Krosser in the
Rochester Fund cases*

Howard P. Longman
**STULL, STULL & BRODY LLP**
6 East 45th Street
New York, NY  10017
Telephone:  (212) 687-7230
Fax:  (212) 490-2022
jasondag@ssbny.com

*Additional Counsel for Lead Plaintiff Victor Sasson
in the New Jersey Fund cases*

## Certificate of Service

I hereby certify that the foregoing was filed with this Court on June 4, 2010 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

                         s/  Rusty E. Glenn
                         Rusty E. Glenn