**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Master Docket No. 09-md-02063-JLK-KMT (MDL Docket No. 2063)

**IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION**

This document relates to:     *In re California Municipal Fund*

> 09-cv-01484-JLK-KMT (Lowe)
> 09-cv-01485-JLK-KMT (Rivera)
> 09-cv-01486-JLK-KMT (Tackmann)
> 09-cv-01487-JLK-KMT (Milhem)

> *In re Oppenheimer Pennsylvania Municipal Fund*

> 09-cv-01483-JLK-KMT (Woods)
> 09-cv-01368-JLK-KMT (Egts)
> 09-cv-01765-JLK-KMT (Wunderly)

---

**OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE
CONSOLIDATED COMPLAINTS FOR THE CALIFORNIA AND PENNSYLVANIA
MUNICIPAL FUNDS**

---

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................... 1

ARGUMENT .............................................................................................. 3

I.   THE CALIFORNIA AND PENNSYLVANIA COMPLAINTS ALLEGE      3
     MATERIAL MISSTATEMENTS AND OMISSIONS IN VIOLATION OF
     SECTIONS 11 AND 12(A)(2)

     A.   The California Prospectuses Failed To Disclose Material Facts About   3
          The Fund's Concentration Of More Than 25% Of Its Assets In The
          California Real Estate Industry

     B.   The California And Pennsylvania Prospectuses Falsely Stated That    9
          The Funds Would Invest No More Than 25% In Junk Bonds

          1.   Lead Plaintiffs' Allegations ........................................... 9

          2.   Defendants Concede Critical Facts For The Junk Bond Claims   12

          3.   Defendants' Arguments Are Unavailing .......................... 13

               a.   Defendants' Boilerplate Warnings Are Not Sufficient   13

               b.   Scienter Is Not An Element Of The Securities Act    14
                    Claims

               c.   Defendants' Attempts To Dispute Well-Pleaded Factual   16
                    Allegations Are Improper

                    i.    A Trier Of Fact Will Decide Whether    16
                          Defendants Properly Rated The California
                          Fund's Dirt Bonds

                    ii.   Defendants' Assertion That The Pennsylvania    17
                          Complaint Erroneously Equates Unrated Bonds
                          With Junk Ignores Plaintiff's Well-Pleaded
                          Allegations

     C.   The Prospectuses Made False And Misleading Statements About The   21
          California Fund's Illiquid Investments

II.  THE SECURITIES ACT CLAIMS ARE TIMELY .................................. 22

     A.   The Tenth Circuit's Inquiry Notice Standard ......................... 22

|      | B.   | The Pennsylvania Lead Plaintiff's Claims Concerning Inflated Ratings Of Unrated Bonds And Concentration In Junk Bonds Are Timely | 23 |
|      | C.   | The California Lead Plaintiff's Claims About Concentration In Dirt Bonds And Tobacco Bonds Are Timely | 26 |
|      |      | 1.   Dirt Bond Claims | 26 |
|      |      | 2.   Illiquidity Claims Concerning Tobacco Bonds | 27 |
| III. |      | THE CALIFORNIA COMPLAINT STATES CLAIMS FOR VIOLATION OF THE UCL AND BREACH OF FIDUCIARY DUTY | 28 |
|      | A.   | SLUSA Does Not Preempt The California State Law Claims | 28 |
|      | B.   | The State Law Claims Are Direct, Not Derivative | 31 |
|      | C.   | The UCL Claim Should Not Be Dismissed | 33 |
|      |      | 1.   The UCL Claim Does Not Arise From Securities Transactions | 33 |
|      |      | 2.   The California Lead Plaintiff Has Standing To Assert The UCL Claim And Has Alleged A Basis For Restitution | 34 |
|      | D.   | The Breach Of Fiduciary Duty Claim Should Not Be Dismissed | 35 |
|      | E.   | The Declaration Of Trust's Exculpation Of The Independent Trustees For Their Own Negligence Is Void Under California Law | 37 |
|      |      | 1.   California Law Controls According To Its "Governmental Interests" Conflict Of Laws Analysis | 37 |
|      |      | a.   The Exculpatory Provision Is Invalid Under California Law | 38 |
|      |      | b.   Massachusetts Does Not Have A Substantial Interest In The Application Of Its Law | 39 |
|      |      | c.   California's Interest Would Be More Impaired By Application Of Massachusetts Law | 40 |
|      |      | 2.   The Declaration Of Trust's Choice Of Law Provision Does Not Control | 40 |
| CONCLUSION |      |  | 41 |

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Allred v. Chynoweth*, 990 F.2d 527 (10th Cir. 1993) — 23

*Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1 (Cal. Ct. App. 2001) — 40, 41

*Anderson v. Merrill Lynch*, 521 F.3d 1278 (10th Cir. 2008) — 28, 30

*Appert v. Morgan Stanley*, No. 08-CV-7130, 2009 WL 3764120 (N.D. Ill. Nov. 6, 2009) — 30

*Barron v. Igolnikov*, 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010) — 30

*Benne v. IBM Corp.*, 87 F.3d 419 (10th Cir. 1996) — 37

*Bernhard v. Harrah's Club*, 16 Cal. 3d 313 (Cal. 1976) — 37, 39, 40

*Blackmoss Investments, Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) — 7

*Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21 (D. Mass. 1996) — 31

*Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988) — 36

*Bowen v. Ziasun Techs, Inc.*, 116 Cal. App. 4th 777 (Cal. Ct. App. 2004) — 33, 34

*Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223 (Cal. 2006) — 34

*Clark v. B. H. Holland Co.*, 852 F. Supp. 1268 (E.D.N.C. 1994) — 36

*Cohen v. Kite Hill Cmty. Ass'n*, 142 Cal. App. 3d 642 (Cal. Ct. App. 1983) — 38

*Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663 (Cal. Ct. App. 2006) — 35

*Copperstone v. TCSI Corp.*, No. C 97-3495 SBA, 1999 WL 33295869 (N.D. Cal. Jan. 19, 1999) — 6

*Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163 (Cal. 2000) — 34

*Credit Suisse First Boston Corp. v. ARM Fin. Group*, No. 99 Civ. 12046 (WHP), 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) — 6

*Dietrich v. Bauer*, 76 F. Supp. 2d 312 (S.D.N.Y. 1999) — 34

*Forbes v. McDonald*, 54 Cal. 98 (Cal. 1880)    38

*Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100 (D. Mass. 2006)    32

*Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332 (7th Cir. 1997)    23

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997)    13

*Hall v. Superior Court*, 150 Cal. App. 3d 411 (Cal. Ct. App. 1983)    41

*Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160 (Del. Ch. 1987)    36

*Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998)    13, 14

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005)    32

*In re Ambac Fin. Group, Inc.* Sec. Litig., No. 08 Civ. 411 (NRB), 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010)    16

*In re BP Prudhoe Bay Royalty Trust Sec. Litig*, No. C06-1505 MJP, 2007 WL 3171435 (W.D. Wa. Oct. 26, 2007)    6, 7

*In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009) ("*Charles Schwab I*")    29, 30, 32, 33, 35

*In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA 2010 WL 1463490 (N.D. Cal. Apr. 8, 2010) ("*Charles Schwab II*")    8

*In re Columbia Entities Litig.*, 2005 U.S. Dist. LEXIS 33439 (D. Mass. Nov. 30, 2005)    31

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4138 (HB), 2000 WL 10211 (S.D.N.Y. Jan. 6, 2000)    32

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. 08-11064-NMG, 2010 WL 1253114 (D. Mass. Mar. 31, 2010)    14, 15, 16

*In re Executive Telecard, Ltd. Sec. Litig.*, 913 F. Supp. 280 (S.D.N.Y. 1996)    25

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311 (S.D.N.Y. 2009)    6

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006)    16

*In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*, 543 F.3d 150 (3d Cir. 2008) .......... 23

*In re ms55, Inc.*, 420 B.R. 806 (Bankr. D. Colo. 2009) .......... 31

*In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242 (N.D. Okla. 2003) .......... 14

*Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124 (D. Mass. 1996) .......... 36

*Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95 (Cal. 2006) .......... 37

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (Cal. 2003) .......... 35

*Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000) .......... 31, 32

*LaSala v. Bordier & Cie*, 519 F.3d 121 (3d Cir. 2008) .......... 29, 30

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) .......... 23

*Loy v. Lorm Corp.*, 52 N.C. App. 428 (1981) .......... 36

*Merrill Lynch v. Dabit*, 547 U.S. 71 (2006) .......... 29

*Mitchell v. Dilbeck*, 10 Cal. 2d 341 (Cal. 1937) .......... 38

*Neubauer v. Goldfarb*, 108 Cal. App. 4th 47 (Cal. Ct. App. 2003) .......... 38

*Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688 (Cal. Ct. App. 2007) .......... 33

*Phillips v. Morgan Stanley Dean Witter High Income Advantage Trust III*, 2002 WL 31119441 (S.D.N.Y. Sep. 25, 2002) .......... 9

*Potter v. Janus Inv. Fund*, 483 F. Supp. 2d 692 (S.D. Ill. 2007) .......... 28

*Rosales v. Citibank*, 133 F. Supp. 2d 1177 (N.D. Cal. 2001) .......... 35

*Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294 (3d Cir. 2005) .......... 30

*Scanlan v. W.C. Caniff & Sons, Inc.*, No. 94-6772-C, 1996 WL 490170 (Mass. Super. Ct. Aug. 9, 1996) .......... 32

*Scognamillo v. Credit Suisse First Boston LLC*, No 03-2061, 2005 WL 2045807 (N.D. Cal. Aug. 25, 2005), *aff'd* 254 Fed. Appx. 669 (9th Cir. 2007) .......... 34

*SEC v. Mozilo*, 2009 U.S. Dist. LEXIS 104689 (C.D. Cal. Nov. 3, 2009) .......... 12, 13, 25

*Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305 (6th Cir. 2009), *cert. denied*, 78 U.S.L.W. 3687 (May 24, 2010) — 30

*Shearson Lehman Bros., Inc. v. Greenberg*, No. CV-93-0609-R, 1993 WL 144856 (C.D. Cal. Mar. 15. 1993), *aff'd*, No. 93-55535, 1995 WL 392028 (9th Cir. 1995) — 34

*Smyth v. Marshall Field*, 1993 WL 818732 (Mass. Super. Ct. Nov. 17, 1993), *aff'd*, 666 N.E. 2d 1008 (Mass. App. Ct. 1996) — 31

*Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388 (9th Cir. 1988) — 34

*Stegall v. Ladner*, 394 F. Supp. 2d 358 (D. Mass. 2005) — 32

*Sterlin v. Bioimune Sys.*, 154 F.3d 1191 (10th Cir. 1998) — 22, 23

*Stoody-Broser v. Bank of AmericaCorp.*, No. C 08-02705 JSW, 2009 WL 2707393 (N.D. Cal. Aug. 25, 2009) — 30

*Strigliabotti v. Franklin Res., Inc.*, No. C 04-00883 SI, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005) — 33

*Tunkl v. Regents of the Univ. of Cal*, 60 Cal. 2d 92 (Cal. 1963) — 38

*Van Dusen v. Barrack*, 376 U.S. 612 (1964) — 37

*White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982 (E.D. Wis. 2002) — 14

*Williams v. Deutsche Bank Sec., Inc.*, No 04 Civ. 7588 (GEL), 2005 WL 1414435 (S.D.N.Y. June 13, 2005) — 34

*Yoder v. Honeywell Inc.*, 104 F.3d 1215 (10th Cir. 1997) — 37

## STATUTES

15 U.S.C. §77m — 22

17 C.F.R. §240.10b-10(a)(8) — 19

Cal. Bus. & Prof. Code
§17200 — 33
§17203 — 33
§17204 — 34

Cal. Civ. Code §1668 — 38

Investment Company Act of 1940 — 1, 30

Securities Act of 1933
  §11 .................................................................................... 1, 3, 22, 29
  §12(a)(2) ........................................................................... 1, 3, 22, 29
  §15 ................................................................................................... 1

Securities Litigation Uniform Standards Act of 1998 ............... 28, 29, 30

## RULES

Fed. R. Civ. P. 12(B)(6) ............................................................... 17

Municipal Securities Rulemaking Board Rule G-15(a)(i)(C)(3) .......... 19

SEC Rule 10b-10(a)(8) .................................................................. 19

## OTHER

Automatic Effectiveness of Registration Statements Filed by Certain ..... 8
Unit Investment Trusts, Release Nos. 33-6401, IC-12423, 47 Fed. Reg.
20290, 1982 WL 136116 (May 12, 1982)

Exchange Act Release No. 33-6927, IC-18612, 57 Fed. Reg. 9828 ........ 21
(Mar. 20, 1992)

Fitch Ratings, *Default Risk and Recovery Rates on U.S. Municipal* ....... 19
*Bonds* (Jan. 9, 2007)

Laura Levenstein, Cong. Test., Mar. 12, 2008 .............................. 19

Registration Form Used by Open-End Management Companies; ........... 4, 8
Guidelines, Exchange Act Release No. 33-6479, IC-13436,
1983 WL 35814 (Aug. 12, 1983)

Registration Form, 48 Fed. Reg. 37928 ............................................. 9

*Restatement (Second) of Conflict of Laws* §309 (1971) ..................... 31

Standard & Poor's, *A Complete Look at Monetary Defaults During the* .... 19
*1990s* (June 2000)

# INTRODUCTION

Lead Plaintiffs Joseph Stockwell ("California Lead Plaintiff") and Dharamvir Bhanot ("Pennsylvania Lead Plaintiff") purchased shares of the Oppenheimer California Municipal Fund ("California Fund") and the Oppenheimer Pennsylvania Municipal Fund ("Pennsylvania Fund"), respectively.  The Prospectuses by which these Funds were sold falsely stated that the Funds' investment objective was the preservation of capital.  In truth, the Funds' undisclosed high risk investment strategies caused Lead Plaintiffs to experience substantial losses far greater than those sustained by investors in other municipal bond funds in their peer groups.  Lead Plaintiffs sue the Funds and their affiliates, trustees and executives (collectively, "Defendants") for making untrue statements and omissions of material fact in the Prospectuses in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 and for deviating from the Funds' fundamental investment policies in violation of the Investment Company Act of 1940 ("ICA").  The California Lead Plaintiff also brings claims for violations of California's Unfair Competition Law ("UCL") and for breach of fiduciary duty.  While the California and Pennsylvania Complaints include allegations similar to those in the other Oppenheimer Municipal Bond Fund actions, they also address conduct that is unique to these two Funds, Defendants' investment strategies, and the misrepresentations in the California and Pennsylvania Prospectuses. Defendants' attempts to treat these claims as a mere "afterthought" are unavailing.[1]

First, the California Complaint alleges that Defendants failed to disclose the risks inherent in investing more than 25% of the California Fund's assets in the California real estate

---

[1]Defendants' arguments regarding the California and Pennsylvania Complaints' allegations common to the other Funds are addressed in Lead Plaintiffs' Opposition To Defendants' Joint Motion To Dismiss that are also filed today.

industry in violation of its fundamental policy against concentration in any one industry. Defendants' suggestion that they made adequate disclosures is belied not only by applicable SEC rules and guidelines, but also by their own disclosures in a Prospectus issued at the end of the Class Period acknowledging previously undisclosed risks.

Second, the Complaints allege that the Prospectuses falsely stated that the California and Pennsylvania Funds would invest no more than 25% of their respective assets in junk bonds— those rated non-investment grade by national ratings organizations—and that Defendants would self-rate unrated bonds using criteria similar to those used by the ratings organizations to ensure that the Funds remained below those limits.  Defendants' motion to dismiss relies on boilerplate disclosures that failed to address the misrepresentations, argues that Lead Plaintiffs are required to plead facts demonstrating Defendants' intent to deceive even though scienter is not an element of a Securities Act claim, and attempts to raise factual disputes to the well-pleaded allegations. None of Defendants' arguments provides a valid basis for dismissal.

Third, the California Complaint alleges that the California Fund misrepresented the extent of its illiquid investments including those in tobacco bonds.  Defendants' attempt to dispute the illiquidity allegations are flawed for the same reasons discussed in Lead Plaintiffs' Opposition To Defendants' Joint Motion To Dismiss.  Finally, the Securities Act claims are timely because Lead Plaintiffs, like all other reasonably diligent investors, were not placed on inquiry notice of their claims until Defendants began to reveal the truth only a matter of months before these actions were filed.

Defendants' remaining challenges to the California Lead Plaintiffs' state law claims all lack merit.  Contrary to Defendants' contention, the federal securities laws do not preempt the state law claims, because they are premised exclusively on Defendants' deviations from the

California Fund's fundamental investment policies without a shareholder vote.  These claims are

not based on securities transactions, and Defendants' misrepresentations and omissions are not

factual predicates.  The state law claims allege a direct harm personal to shareholders—the

deprivation of the right to vote on changes to the California Fund's investment policies—not a

derivative harm belonging to the Fund itself.  As the California Lead Plaintiff lost investment

principal for which he is entitled to restitution, he has standing to sue for violation of the UCL.

Finally, the Funds' trustees may not resort to a provision of the California Fund's Declaration of

Trust to exculpate them from their own misconduct, because that provision is invalid under

applicable California law.

## ARGUMENT

**I.    THE CALIFORNIA AND PENNSYLVANIA COMPLAINTS ALLEGE MATERIAL MISSTATEMENTS AND OMISSIONS IN VIOLATION OF SECTIONS 11 AND 12(A)(2)**

### A.    The California Prospectuses Failed To Disclose Material Facts About The Fund's Concentration Of More Than 25% Of Its Assets In The California Real Estate Industry

The California Prospectuses falsely stated that the California Fund would not concentrate

more than 25% of its holdings in any industry.  Cal. Compl. ¶¶84, 86, 88.  In fact, the California

Fund held more than 25% of its assets in the California real estate development industry, but

never admitted either to doing so, or to the risks inherent in its strategy.  Instead, Defendants

used unreasonable industry classifications in violation of SEC guidelines to conceal that the

California Fund was overexposed to the risks of a downturn in the California real estate market.

SEC guidelines allow mutual funds to define their own industry classifications, but require that "such classifications must be reasonable …."[2]  The SEC guidelines also require prospectuses for a tax-exempt bond fund like the California Fund to disclose any time "a substantial amount of [its] assets . . . are invested in securities which are related in such a way that an economic, business, or political development or change affecting one such security would likewise affect the other securities."[3]

Until October 2007, the California Prospectuses purported to comply with these SEC guidelines by identifying the categories of industries that the Fund used in connection with its policy against concentration.  Despite having invested more than 25% of the Fund's assets in California real estate development, however, that industry was not among Defendants' categories. Cal. Compl. ¶¶84-88.  Instead, the Prospectuses described different kinds of bonds as industries, including "special assessment" and "special tax bonds," sometimes referred to as "dirt bonds," which are secured only by bare, undeveloped land.  In the October 2007 Prospectus, Defendants simply ceased identifying industry categories, and in the November 2008 Prospectus, Defendants affirmatively disclaimed that dirt bonds were part of any industry. *Id.* ¶93.

The California Fund's unreasonable industry classifications violated the SEC guidelines and concealed that more than 25% of its holdings were in bonds subject to the same economic risk, namely a downturn in California's real estate market. *Id.* ¶89.  The Prospectuses failed to disclose that Defendants had violated the Fund's industry concentration policy, and that real

---

[2] Registration Form Used by Open-End Management Companies; Guidelines, Exchange Act Release No. 33-6479, IC-13436, 1983 WL 35814, at *74 (Aug. 12, 1983).

[3] *Id.*

estate projects underlying the bonds were so related that economic changes affecting one of the Fund's investments would affect many others in the same way.  *Id*.

The November 2008 Prospectus acknowledged that the prior disclosures were inadequate.  That Prospectus disclosed for the first time what the SEC had always required:  that the California Fund concentrated more than 25% of its holdings in dirt bond projects "that are related in such a way that economic, business or political developments tend to have the same impact on each similar project.  For example, *a change that affects one project . . . would likely affect all similar projects, thereby increasing market risk*."  *Id.* ¶93 (emphasis added).  The November 2008 Prospectus stated for the first time that "market or economic changes that affect a security issued in connection with one project also would affect securities issued in connection with similar types of projects."  *Id.*  The Prospectus also acknowledged that dirt bond projects "are exposed to real estate development-related risks and can have more taxpayer concentration risk than general tax-supported bonds," and are at greater risk of "default if development failed to progress as anticipated or if larger taxpayers failed to pay the assessments, fees and taxes as provided in the financial plans of the projects."  *Id.*

It is no surprise that the SEC requires disclosure of this information.  These previously undisclosed material risks were precisely the sort of information that investors in an ostensibly conservative capital preservation fund would have expected to receive.  Although certain Annual Reports had stated that more than 25% of the California Fund's holdings were "dirt bonds," Defendants did not disclose until the November 2008 Prospectus that those dirt bonds were similar projects subject to similar risks.  Of course by that time, those risks already had

manifested themselves.[4]  Disclosure of these risks only *after* they had come to pass is the

strongest possible evidence that the California Prospectuses were false and misleading in ways

that truly mattered.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322

(S.D.N.Y. 2009) (denying motion to dismiss where cautionary language in prospectus and

registration statement failed to disclose specific material risks); *Copperstone v. TCSI Corp.*, No.

C 97-3495 SBA, 1999 WL 33295869, at *13 n.11 (N.D. Cal. Jan. 19, 1999) (denying dismissal

because cautionary language failed to "directly address the alleged risks").

Defendants' arguments to the contrary are unavailing.  First, Defendants contend that the

Prospectuses were not materially misleading because they disclosed the risks of the California

Fund's dirt bond investments "in great detail."  Cal. & Pa. Br. at 8-9.[5]  As the November 2008

California Prospectus makes clear, these generalized disclosures omitted the specifics required

by the SEC and critical for investors:  that the Fund's concentrated investments in California real

estate development projects would be adversely affected in the same way by the same economic,

business and political developments.  *See, e.g., Credit Suisse First Boston Corp. v. ARM Fin.

Group*, No. 99 Civ. 12046 (WHP), 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001)

("[W]arnings of specific risks like those in the ARM Prospectus do not shelter defendants from

liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks

described"); *In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, No. C06-1505 MJP, 2007 WL

3171435, at *5 (W.D. Wash. Oct. 26, 2007) ("In order to be meaningful, a cautionary statement

---

[4]Defendants did not admit that the Fund had invested more than 25% in a single industry.  Rather, Defendants attempted to define away the problem by stating that dirt bonds were not part of any industry.  *Id.* ¶93.

[5]References to the motion to dismiss the California and Pennsylvania complaints are cited as "Cal. & Pa. Br."  References to the Joint Motion To Dismiss are cited as "Def. Br."

must be more than a recitation of mere generalized risks or mere boilerplate language which could be applicable to any business venture").[6]

Second, Defendants argue that because the industry concentration policy does not apply to "municipal securities in general or to California Municipal Securities," it also does not apply to dirt bonds, as they are municipal securities.  Cal. & Pa. Br. at 9-10.  This argument, if taken to its logical conclusion, would eliminate the industry classification requirement for municipal bond funds altogether.  That the Fund does not consider municipal securities in general or California Municipal Securities in particular to be a single industry for purposes of concentration is not surprising.  "The Fund invests mainly in California municipal securities," and could not achieve its fundamental policy of investing at least 80% of its assets in California municipal securities if *all* such bonds were part of a single industry subject to the investment cap.  Declaration of Matthew L. Larrabee ("Larrabee Decl.") Ex. C-1 at 3.  Moreover, exempting all municipal securities from any industry concentration restriction still would not cure Defendants' failure to disclose, as required by the SEC, the risks of investing heavily in securities vulnerable to the same economic conditions.

Moreover, Defendants' own practice makes clear that they applied the concentration limit to discrete subsets of municipal securities that were subject to the same risk factors.  The California Prospectuses list many categories of industries and identify the percentage of assets invested in each category, even though those investments consist exclusively of municipal

---

[6]Unlike *Blackmoss Investments, Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010), cited by Defendants, the challenged California Prospectuses failed to disclose all material facts, as evidenced by Defendants' publication of substantial additional disclosures about the risks of over-concentrating in dirt bonds in the November 2008 Prospectus.

securities.  *See* Cal. Compl. ¶¶84-88.  If those securities were exempt from the industry concentration policy, Defendants would not have classified them in industries.

Excluding municipal securities from any industry would allow funds to exempt themselves from their own governing concentration policies.  The court in *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2010 WL 1463490 (N.D. Cal. Apr. 8, 2010) ("*Charles Schwab II*"), recently rejected just such an interpretation of SEC concentration rules:

> "When the fund has a policy of *not* to concentrate, however, such that no more than 25 percent can be invested in a single industry or group of industries, then defining a segment of the economy *not* to be in any industry at all is a remarkable proposition:  *One*, it defies common sense, for all of commerce must fit in some industry sector somewhere and, *Two*, it would automatically allow one hundred percent of all the fund to be invested in the 'non-industry,' thus, defeating the 25-percent rule.  Can it be that the SEC has ever blessed such a not-in-any industry definition?  No such authority has been submitted."  (*Id.* at *5)

In fact, the SEC recognizes that, "with respect to investment companies investing in tax-exempt bonds," concentration refers to securities "the interest on which is paid from revenues of similar type projects."[7]  The SEC requires tax-exempt bond funds to disclose their concentration policies and risks including "the type or types of projects and briefly discuss any economic, business, or political developments or changes which would most likely affect all projects of that type or types."[8]  Defendants cannot evade liability by refusing to acknowledge that the California Fund's dirt bonds are subject to the investment concentration policy.

Third, Defendants claim that they had an absolute right to select the California Fund's industry classifications, as long as the classifications were "reasonable" and not "so broad that the primary economic characteristics of the companies in a single class are materially different."

---

[7] Automatic Effectiveness of Registration Statements Filed by Certain Unit Investment Trusts, Release Nos. 33-6401, IC-12423, 47 Fed. Reg. 20290, 20292 n.9, 1982 WL 136116 (May 12, 1982).

[8] Registration Form, 1983 WL 35814, at *74.

Cal. & Pa. Br. at 10 (quoting Registration Form, 48 Fed. Reg. 37928, 37956).  The November

2008 Prospectus implicitly acknowledges that excluding the California real estate development

industry was neither reasonable nor consistent with SEC guidelines.[9]  The primary economic

characteristics of the California Fund's investments in dirt bonds and other securities were not

materially different.  As a result, the Prospectuses were false and misleading because they failed

to inform investors that more than 25% of the Fund's holdings were invested in the California

real estate development industry, and failed to describe the risks posed by such concentration.

### B.   The California And Pennsylvania Prospectuses Falsely Stated That The Funds Would Invest No More Than 25% In Junk Bonds

#### 1.   Lead Plaintiffs' Allegations

The Complaints allege that the California and Pennsylvania Prospectuses falsely stated

that:  (1) the Funds would invest no more than 25% of their assets in below-investment grade

securities ("junk bonds"); and (2) the Manager, Defendant OppenheimerFunds, Inc., would

assign to unrated bonds ratings comparable to what they would receive from national ratings

organizations (such as Moody's, Standard & Poor's, or Fitch), using criteria similar to those used

by the ratings agencies.  *See* Cal. Compl. ¶¶95-97; Pa. Compl. ¶¶96-101.

During the class period, the California Fund was 78% concentrated in junk bonds and

bonds rated only one step above junk, with 60% of its holdings in unrated bonds.  Cal. Compl.

¶¶99-100.  The Pennsylvania Fund was 70% concentrated in junk bonds and bonds rated only

one step above junk, with 17% of its holdings in unrated bonds.  Pa. Compl. ¶¶61, 73, 103-04,

147.  Defendants acknowledged that approximately 20% of the Funds' holdings were rated

---

[9]*Phillips v. Morgan Stanley Dean Witter High Income Advantage Trust III*, No. 01 Civ. 8139 (DC), 2002 WL 31119441 (S.D.N.Y. Sep. 25, 2002), is off point.  Unlike here, the plaintiff in *Phillips* did not argue that the trust improperly concentrated in a single industry or challenge the trust's industry classifications as unreasonable.

below investment grade.  Cal. Compl. ¶100; Pa. Compl. ¶104.

Because so many of the Funds' holdings were rated junk, rated one step above junk, or self-rated, the true extent of the Funds' junk bond holdings depended on the accuracy of the Manager's self-rating system.  If the Manager applied looser criteria than the ratings agencies, the Funds necessarily would have invested more than 25% of their assets in junk bonds.  Cal. Compl. ¶99; Pa. Compl. ¶¶102-04.  The Prospectuses' statements to the contrary would be false.

The Complaints allege that this is precisely what transpired:  the Manager failed to assign ratings to unrated securities in a manner "comparable to rated investment grade securities" and failed to "use criteria similar to those used by the ratings agencies ...."  Cal. Compl. ¶102; Larrabee Decl. Ex. A-7 at 10 (Cal. SAI (10/31/07)); *see also* Pa. Compl. ¶102.  As a result, the California and Pennsylvania Funds held more than 25% of their respective assets in junk bonds, despite disclosures to the contrary.

Although Defendants have not disclosed the Manager's credit rating methodology,[10] the California and Pennsylvania Lead Plaintiffs, through their counsel, undertook detailed analyses of the Funds' holdings.  Cal. Compl. ¶102; Pa. Compl. ¶¶102-04.  These reviews revealed that the Funds' total respective investments in junk bonds would have exceeded the permitted 25% if the Manager had used criteria similar to the national ratings agencies, because the ratings

---

[10]Defendants claim that the "ratings standards are detailed in an appendix to the SAIs entitled 'Ratings Definitions.'"  Cal. & Pa. Br. at 5 (citing Cal. SAI (10/31/07) at A-1 to A-7; Pa. SAI (11/28/07) at A-1 to A-7).  The cited "standards" are little more than brief descriptions of the risks associated with a particular ratings class.  For example, the California SAI's summary of Standard & Poor's BB-rating (the highest junk rating) is that such bonds "face major ongoing uncertainties or exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation."  Larrabee Decl. Ex. A-7, App. A at A-3 (Cal. SAI (10/31/07)); *id.*, Ex. A-13, App. A at A-3 (Pa. SAI (11/28/07)).  The SAIs provide no information about the criteria the Manager used to rate the bonds.

agencies would have considered a significantly higher portion of the Funds' assets to be junk. *See id.* As a result, Defendants understated the overall risk of the Funds' portfolios.

As discussed in Part I.A., *supra*, the California Fund invested heavily in dirt bonds. The California Complaint alleges that national rating agencies will not assign investment grade ratings to dirt bonds unless they are both well seasoned (that is, have an established payment history) and have a very high value-to-lien ratio of at least 10:1. Cal. Compl. ¶103. The California Complaint alleges that as of July 31, 2008, well over 25% of the Fund's holdings either were dirt bonds that lacked a value-to-lien ratio of at least 10:1, or were rated junk by a national rating agency. *Id.* In other words, more than 25% of the California Fund's assets were below investment grade according to the criteria used by the ratings agencies.

As discussed in Part I.B.3.c.ii, *infra*, the Pennsylvania Fund also invested heavily in unrated, illiquid bonds to which the national ratings agencies would not have assigned investment grade ratings. For example, the Fund invested $3,905,000 in unrated bonds issued by Northumberland County IDA, which did not trade on the secondary market and therefore were illiquid. Pa. Compl. ¶90.[11] Although the Pennsylvania Fund consistently reported that less than 5% of its bonds were illiquid, in actuality, as much as 46% of the Fund's holdings were illiquid. *Id.* ¶¶85-86. These bonds typically were rated junk or were unrated. *Id.* ¶¶89-90. Despite the high proportion of illiquid bonds and their low credit quality, Defendants assigned investment grade ratings to the vast majority of the Pennsylvania Fund's unrated bonds. *Id.* ¶¶102-04. Thus, contrary to the Prospectuses' representations, the Manager did not use the same criteria and methodology for the Fund's unrated bonds as the ratings agencies.

---

[11]Other examples appear both in Part I.B.3.c.ii., *infra*, and in Paragraphs 89-90 of the Pennsylvania Complaint.

By failing to use criteria similar to the ratings agencies, Defendants understated the Funds' junk bond holdings and overstated the quality of their portfolios. Defendants reported that as of July 31, 2008 the California and Pennsylvania Funds held approximately 60% and 56% of their respective assets in bonds rated BBB or below. Larrabee Decl. Ex. C-5 at 14 (7/31/08 Annual Report); Shuman Decl. Ex. B-1 at 15 (Pa. Annual Report (9/25/08)). Around the same time, *Morningstar* reported that the California and Pennsylvania Funds actually held 78% and 70% of their assets, respectively, in bonds rated BBB and below—30% and 20%, respectively, more than Defendants reported. Cal. Compl. ¶100; Pa. Compl. ¶¶61, 73, 147. This failure to report the Funds' mix of bonds accurately was itself a misstatement of material fact.

## 2. Defendants Concede Critical Facts For The Junk Bond Claims

Defendants do not deny that an extraordinary percentage of the California and Pennsylvania Funds' assets were concentrated in junk bonds and self-rated bonds. Defendants also admit to seeking out these bonds in keeping with their "rocky road" Rochester style of investing. Cal. & Pa. Br. at 2. However, the Prospectuses for these capital preservation funds did not disclose this "No Guts, No Glory," "high-risk, high-reward" strategy. Def. Br. at 9. On the other hand, Defendants willingly told *The Bond Buyer*:

> "'We buy a lot of bonds that you wouldn't ever sell to Aunt Gladys and her 10 muni bond portfolio, from airports to tobacco, to bonds that are currently callable two points less than where we bought them or *very illiquid unrated dirt deals in California*.'" (Larrabee Decl. Ex. B-12 at 2 (emphasis added)).

Defendants do not deny that their representations about the limits on the investments in junk bonds and the criteria used to rate unrated bonds were material. Nor could they. The quality of the assets in a fund's investment portfolio is the exact type of information that "a

reasonable investor would consider . . . significant when making an investment decision." *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008).

Finally, Defendants acknowledge that the heavy concentration in junk and near-junk bonds played a significant role in the California and Pennsylvania Funds' extreme losses.  In fact, Defendants now admit that in 2008 "investors became unwilling to invest in anything other than the safest of investments, causing liquidity to evaporate, particularly in high-yield bonds," and as a result "the Funds' investments fell markedly in value."  Def. Br. at 12.

### 3.    Defendants' Arguments Are Unavailing

#### a.    Defendants' Boilerplate Warnings Are Not Sufficient

Defendants argue that their disclosures were adequate because the California and Pennsylvania Prospectuses stated that the Funds would invest in junk bonds, identified the percentages of their junk bond holdings, explained that junk bonds are risky, and disclosed that "a rating assigned by the Manager 'does not constitute a guarantee of the quality of a particular issue.'"  Cal. & Pa. Br. at 2, 6 n.12.

Defendants miss the point.  The Prospectuses falsely stated that the Funds would not invest more than 25% of their assets in junk bonds and that the Manager assigned ratings for unrated bonds using criteria similar to the ratings agencies.  Defendants' boilerplate risk disclosures are insufficient because they do not relate to these specific misstatements. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997) ("[T]he cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge") (citation and quotation marks omitted); *Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language . . .

-13-

must relate directly to that by which plaintiffs claim to have been misled").

Defendants failed to warn that the Funds would concentrate their assets in junk bonds and inaccurately rate the bonds to make them appear safer. Their generic warnings—that junk bonds are risky and that the Manger's rating does not constitute a guarantee—do not cure these misrepresentations. *See White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 986 (E.D. Wis. 2002) ("[B]oilerplate language which warns generally that 'junk bonds' involve greater risks and limited liquidity . . . are inadequate to support a motion to dismiss"); *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. 08-11064-NMG, 2010 WL 1253114, at *5 (D. Mass. Mar. 31, 2010) ("*Evergreen*") ("[V]ague, boilerplate language in the prospectuses warning that the Fund is not guaranteed to meet its goals did not disclose the risky nature of the Fund's investments with sufficient clarity as to 'bespeak caution …'") (citing *Hunt*, 159 F.3d at 729).

Finally, Defendants' disclosure of the "percentages of their portfolios that junk bonds represented" (Cal. & Pa. Br. at 3), are inadequate *because these are the very statements that the California and Pennsylvania Complaints allege were false.* Cal. Compl. ¶¶102-04; Pa. Compl. ¶¶102-04. It is axiomatic that one misstatement cannot cure another.

### b.      Scienter Is Not An Element Of The Securities Act Claims

Defendants assert that their statements about the criteria the Manager used to self-rate bonds were false or misleading only if they did not subjectively believe the ratings the Manager assigned. Cal. & Pa. Br. at 5-6. Defendants are improperly attempting to import an element of scienter into these Securities Act claims where none exists. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1262 (N.D. Okla. 2003). All Plaintiffs must plead is that the Prospectuses

-14-

contained untrue statements or omissions of material fact, not that Defendants subjectively believed those statements to be false.

The Complaints allege that Defendants falsely promised the Funds would invest no more than 25% of their respective assets in junk bonds, and the Manager would self-rate bonds using criteria similar to those used by the ratings agencies.  In each report, Defendants inaccurately stated the percentages of the Funds' assets that were held in each ratings category.[12]  These representations were false statements of fact, not opinion.  Reasonable investors would understand that at least 75% of the Funds' holdings would be in investment grade securities.  In truth, over 25% of the Funds' portfolios were junk bonds, and the Manager failed to use criteria similar to the ratings agencies.  Defendants' subjective beliefs are irrelevant.

Defendants argue that the statement, "the Manager will use its judgment to assign a rating that it believes is comparable to that of a rating organization" is an opinion that is actionable only if Defendants did not subjectively believe their ratings.  This argument fails.  Although the rating for any specific bond may be a matter of opinion, the challenged statements falsely describe an objective, material fact, as the Manager did not use the same criteria as the independent ratings agencies.  The statement is actionable independent of the Manager's subjective beliefs.  *See Evergreen*, 2010 WL 1253114, at *5 (finding actionable "the statements in the offering materials [which] made distinct claims about the posture of the Fund, its investment strategies and the rules under which it would operate").

---

[12]*E.g.*, Larrabee Decl. Ex. C-5 at 14 (Cal. Annual Report (7/31/08)); *id.*, Ex. C-6 at 17 (Pa. Annual Report (1/31/08)).

### c.   Defendants' Attempts To Dispute Well-Pleaded Factual Allegations Are Improper

#### i.   A Trier Of Fact Will Decide Whether Defendants Properly Rated The California Fund's Dirt Bonds

Defendants argue that the California Complaint uses an improper method for evaluating whether the unrated dirt bonds should have been assigned investment grade ratings. *See* Cal. & Pa. Br. at 11-12. Defendants' argument is flawed.

First, Defendants are improperly disputing the well-pleaded factual allegations in a complaint. *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 466 (S.D.N.Y. 2006) ("The role of the court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof") (citation and quotation marks omitted).  The proper method for rating dirt bonds and the percentage of those bonds that should have been rated as junk are complex factual disputes that will be the subject of competing expert testimony.  Ultimately, a fact finder will determine whether the Manager used criteria similar to those used by the ratings agencies.  *See In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411 (NRB), 2010 WL 727227, at *24 (S.D.N.Y. Feb. 22, 2010); *Evergreen*, 2010 WL 1253114, at *5 ("[T]o the extent that there is a factual dispute concerning whether the 144A securities were illiquid, that dispute is not subject to resolution at this stage in the proceedings").

Second, the California Lead Plaintiff's allegation that the Manager inaccurately rated the securities does not depend exclusively on the ratings methodology.  Industry analysts also disputed the Manager's self-ratings.  For instance, in the summer of 2008, *Morningstar* reported that 78% of the California Fund's assets were rated BBB and below.  Cal. Compl. ¶ 100.  At the same time, Defendants represented that less than 60% of the California Fund was rated BBB and

below.  Larrabee Decl. Ex. C-5 at 14 (Cal. Annual Report (7/31/08)).  *Morningstar*'s analysis

provides independent confirmation that Defendants failed to apply the same criteria used by the

ratings agencies and failed to rate their securities comparably.

Finally, Defendants contest the allegation that they inflated credit ratings as implausible,

because the bonds did not suffer high default rates.  Cal. & Pa. Br. at 6 n.13.  This argument

conflates the price of the California Fund's bonds with their default rates.  In other words, the

steep declines in the price of the California Fund's bonds show that the portfolio consisted

largely of junk bonds.  As Defendants themselves acknowledge, junk bonds are "subject to

greater price fluctuations" than investment-grade securities.  *Id.* at 2.  When the California

Fund's NAV, which largely is based on the total value of its bonds, fell precipitously, it

performed like a junk bond fund, which is exactly what it was.

ii.    **Defendants' Assertion That The Pennsylvania
Complaint Erroneously Equates Unrated Bonds With
Junk Ignores Plaintiff's Well-Pleaded Allegations**

Defendants' inaccurate attempt to recast the Pennsylvania Complaint as simply equating

unrated bonds to junk is unpersuasive.  Cal. & Pa. Br. at 3-4.  Whether the majority of the Fund's

unrated bonds were equivalent to junk is a factual dispute that cannot be resolved on a Rule

12(b)(6) motion.  *See* Part I.B.3.c.i., *supra*.  Even if Defendants' factual challenges were proper,

the well-pleaded allegations of the Pennsylvania Complaint, with all inferences drawn in

Plaintiff's favor, are more than adequate to survive, as Defendants ignore the Pennsylvania Lead

Plaintiff's allegations explaining why the disclosures regarding unrated bonds were misleading.

Contrary to Defendants' argument, the Pennsylvania Lead Plaintiff does not challenge as

misleading the disclosure that the Pennsylvania Fund "can invest a significant portion of its

-17-

assets in unrated securities."  Cal. & Pa. Br. at 3.  Instead, the Pennsylvania Complaint alleges that the disclosures regarding unrated bonds were misleading because:  (1) the Manager failed to assign ratings to unrated securities in a manner consistent with the criteria used by national ratings agencies; (2) the Prospectuses omitted to disclose the ratings grade assigned to the unrated bonds and the percentage of unrated bonds that comprised each ratings grade; and (3) the Fund's compliance with its 25% limit on investments in junk bonds depended on the Manager assigning inflated ratings to unrated bonds even though the ratings agencies normally consider unrated bonds to be non-investment grade.  Pa. Compl. ¶¶102-04.

First, the Manager's inflated ratings of unrated bonds fly in the face of Defendants' promise to use the same criteria used by the ratings agencies.  Defendants incorrectly assert that "[t]he fact that a rating agency has not rated a bond says nothing about the bond's quality."  Cal. & Pa. Br. at 4.  In fact, the ratings agencies themselves generally equate unrated bonds as comparable to junk bonds.[13]  For example, according to Standard & Poor's, the company's municipal junk bond index, "The High Yield Index," includes municipal bonds that either "are **non-rated** or whose ratings are BB+ S&P and/or BA-1 Moody's or lower."[14]

Similarly, Moody's Senior Managing Director Laura Levenstein testified before Congress that unrated bonds pose a substantially greater credit risk than rated bonds:

---

[13]Defendants rely on extraneous materials, including the SEC's *Report on Transactions in Municipal Securities*, in an attempt to prove a disputed issue of fact:  "The fact that a rating agency has not rated a bond says nothing about its quality."  Cal. & Pa. Br. at 4.  The Pennsylvania Lead Plaintiff cites certain authorities below only to demonstrate that Defendants' assertion *is disputed* and is not suitable for judicial notice.  The Pennsylvania Lead Plaintiff's authorities support the precise opposite conclusion—contrary to the inflated ratings the Manager assigned to the Pennsylvania Fund's unrated bonds, the absence of an investment grade rating by a ratings agency says a great deal about the likelihood of a bond's lower credit quality and greater risk of default and resulting price volatility.

[14]Shuman Decl. Ex. B-2, available at  http://www.kennyweb.com/kwnext/mip/pi/pidirectorycurrent.html (last visited on June 1, 2010)) (this junk bond "index does not contain bonds that are prefunded or are escrowed to maturity") (emphasis added).

> "There is evidence to suggest that, in general, ***issuers in the unrated municipal bond market may have higher levels of credit risk than rated issuers***. While Moody's has not verified this data, *Income Securities Advisor*, an independent investment advisory and research firm, reported 1,311 defaults on unrated, tax-exempt bonds during the period from 1980 through October 2004—a significantly higher number of defaults than the number of defaults for Moody's-rated issuers."[15]

By comparison, only 41 out of 29,000 Moody's-rated issuers of municipal bonds reported defaults in the period from 1970-2006. *Id*. at 9, 10 n.16.

Fitch Ratings also equates the risks of unrated bonds to junk bonds, stating that "below-investment-grade and nonrated municipal bonds are approximately 10 times more likely to default than investment-grade-rated municipal bonds."[16] Industry studies of municipal bond defaults provide further support for equating unrated bonds with junk.[17]

Finally, self-regulating organizations, including the Municipal Securities Rulemaking Board ("MSRB"), recognize the comparatively greater risks associated with unrated bonds and require broker dealers to disclose to their customers if bonds are unrated. *See* MSRB Rule G-15(a)(i)(C)(3) ("The following information, as applicable, regarding the status of the security *shall* be included: … (f) Unrated securities. *If the security is unrated by a nationally recognized statistical rating organization, a disclosure to such effect*").[18]

---

[15] Shuman Decl. Ex. B-3 at 10 (Laura Levenstein, Cong. Test., Mar. 12, 2008 (footnotes omitted; first emphasis added)).

[16] Shuman Decl. Ex. B-4 at 2 (Fitch Ratings, *Default Risk and Recovery Rates on U.S. Municipal Bonds* (Jan. 9, 2007)).

[17] *See* Shuman Decl. Ex. B-5 at 5 (Standard & Poor's, *A Complete Look at Monetary Defaults During the 1990s* (June 2000), available at http://www.kennyweb.com/kwnext/mip/paydefault.pdf (last visited June 1, 2010)) (rated bonds accounted for less than 15% of the 917 municipal bond defaults throughout the 1990s). The term "rated" as used in that report includes a small number of bonds with initial ratings that were below investment grade. *See id.* at 9, 17.

[18] Shuman Decl. Ex. B-6, available at http://www.msrb.org/msrb1/rules/ruleg15.htm (last visited June 1, 2010) (emphasis added); *see also* SEC Rule 10b-10(a)(8); 17 C.F.R. §240.10b-10(a)(8) (comparable SEC rule that applies to non-government debt securities).

-19-

Despite these guidelines, nothing in the Prospectuses disclosed that the Pennsylvania Fund would purport to comply with the limit on junk bonds by assigning investment grade ratings to nearly all of the Fund's unrated bonds.  Only after the bond-by-bond analysis of the portfolio undertaken by the Pennsylvania Lead Plaintiff's counsel (which, as discussed in Section II.C. of Lead Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss, was not required of the Fund's investors), could anyone determine that the Manager needed to assign investment grade ratings to most of the Fund's unrated bonds to comply with the 25% limit and had done so.  Pa. Compl. ¶¶103-04.

For example, the Fund represented that as of July 31, 2007, approximately 81.9% of its total assets were investment grade municipal securities, and only 18.1% of its assets were assigned junk ratings.  *Id.* ¶103.  However, the Pennsylvania Lead Plaintiff's bond-by-bond analysis reveals that only 63% of the Fund's assets had investment grade ratings from independent ratings agencies, and that approximately 37% of its assets were either rated junk or unrated.  *Id.*  Thus, Defendants failed to disclose that, to exceed the 75% investment grade threshold, the Manager had assigned investment grade ratings to the majority of the Fund's unrated bonds, which then comprised 16.78% of its total assets.  *Id.*  The Pennsylvania Complaint also alleges that Defendants had to artificially inflate the investment grade ratings of the Fund's unrated bonds in 2008 to achieve its investment grade requirement.  *Id.* ¶104 (as of July 31, 2008, the Fund was only able to report compliance with the 25% limit on junk bond holdings by assigning investment grade ratings to the vast majority of its unrated bonds, which comprised 17.02% of its total assets).

The Fund also had large holdings of illiquid, unrated bonds that would not have been considered investment grade by ratings agencies, including $12,000,000 of bonds issued by

Pennsylvania Economic Development Finance Authority; $3,905,000 of bonds issued by

Northumberland County IDA, $3,840,000 of bonds issued by Montgomery County, PA IDA, and

$3,600,000 of bonds issued by Lehigh County, PA GPA.[19]  Pa. Compl. ¶¶89-90.

Thus, the Manager's assignment of investment grade ratings to the majority of unrated

bonds, which was not consistent with the criteria used by national ratings agencies, rendered the

Pennsylvania Fund's disclosures concerning unrated bonds materially misleading.

### C.     The Prospectuses Made False And Misleading Statements About The California Fund's Illiquid Investments

The California Complaint alleges that the Prospectuses falsely stated that the California

Fund would not invest more than 15% of its net assets in illiquid securities.  In reality, it

exceeded the cap on illiquid securities throughout the Class Period.  Cal. Compl. ¶106.

According to the SEC, an illiquid asset is one that "may not be sold or disposed of in the

ordinary course of business within seven days at approximately the value at which the mutual

fund has valued the investment on its books."[20]  As discussed in the Opposition to the Joint

Motion to Dismiss, a review of the California Fund's portfolio reveals that significantly more

than 15% of its holdings were illiquid.  Opp. to Def. Br., Section II.C.  These bonds were illiquid

because they were thinly traded and the California Fund owned such large positions, making it

difficult to liquidate the securities promptly at their reported price.  *See id.*

The California Complaint alleges that the California Fund's "investments in Tobacco

Bonds further contributed overall illiquidity in excess of the 15% cap."  Cal. Compl. ¶125.  The

---

[19]Defendants' contention that "bonds issued in smaller offerings tend to be unrated more often than bonds issued in larger offerings" (Cal. &. Pa. Br. at 4), does not validate assigning investment grade ratings to "smaller offerings."  Such offerings typically do not have the same revenue base or level of importance underlying the project and, thus, are more likely to have both greater price volatility and risk of default.

[20]Exchange Act Release No. 33-6927; IC-18612, 57 Fed. Reg. 9828 (Mar. 20, 1992).

tobacco bonds were illiquid or at significant risk of illiquidity for the same reasons as all other bonds identified in the California Complaint. For example, as of July 2008, the California Fund held $18,568,564 in the California County Tobacco Securitization Agency bond. According to trading activity reports, its trading was thin in 2006 (less than 2.6% of the maturity issue), and the security posted no trades at all in 2007 and 2008. Despite such minimal trading activity, Defendants failed to classify the bond as illiquid. *Id.* ¶131.

Defendants' arguments for the dismissal of these allegations are identical to those made against the other claims regarding illiquidity, and are without merit for the same reasons discussed in Lead Plaintiffs' Opposition To Defendants' Joint Motion To Dismiss.

## II.     THE SECURITIES ACT CLAIMS ARE TIMELY

Defendants assert that the Securities Act claims are time-barred because, more than one year before filing suit, the Prospectuses placed Lead Plaintiffs on notice of their claims. Cal. & Pa. Br. at 14. In effect, Defendants argue that the investing public never should have believed the Prospectuses' representations that the Funds complied with their prohibitions against concentrating in junk, dirt and tobacco bonds. This argument is flawed. As shown above, Defendants' disclosures were misleading. Reasonably diligent investors could not have discovered the truth more than a year before the filing of the initial complaints.

### A.     The Tenth Circuit's Inquiry Notice Standard

As discussed in Lead Plaintiffs' Opposition To Defendants' Joint Motion To Dismiss, Section 11 and 12(a)(2) claims must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ." 15 U.S.C. §77m. "[I]nquiry notice . . . triggers an investor's duty

to exercise reasonable diligence and . . . the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Sterlin v. Bioimune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998). "[W]hen a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact." *Allred v. Chynoweth*, 990 F.2d 527, 529 (10th Cir. 1993) (citation and internal quotation marks omitted).

Inquiry notice "can be established only where the triggering data 'relates directly to the misrepresentations and omissions' alleged." *In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*, 543 F.3d 150, 165 (3d Cir. 2008) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005)). "The facts constituting [inquiry] notice must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated—not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997).

### B. The Pennsylvania Lead Plaintiff's Claims Concerning Inflated Ratings Of Unrated Bonds And Concentration In Junk Bonds Are Timely

The initial Pennsylvania Fund action was filed on April 28, 2009. Therefore, to prevail on this motion to dismiss, Defendants must establish that investors in the Pennsylvania Fund who exercised reasonable diligence should have discovered the facts concerning the untrue statements and omissions of material fact about the Pennsylvania Fund's concentration in junk bonds before April 28, 2008. Defendants fail to make such a showing.

Defendants erroneously assert that the Pennsylvania Lead Plaintiff's junk bond claim is based on simply equating all unrated bonds to junk. Cal. & Pa. Br. at 15. Defendants further

assert that because the Pennsylvania Fund had disclosed that its aggregate junk bond and unrated bond holdings exceeded 25% of its total assets, the Pennsylvania Lead Plaintiff would have had sufficient information to bring these claims more than a year before the initial complaint was filed. *Id*. As shown above, this is not the basis of the junk and unrated bond claims. Accordingly, Defendants' inadequate disclosures and misleading statements could not have triggered inquiry notice more than a year before the initial complaint was filed.

The Pennsylvania Lead Plaintiff alleges that Defendants represented that the Manager would assign ratings to unrated bonds that were "comparable" to "securities rated by a ratings agency in the same category." Pa. Compl. ¶102. As shown above, the ratings agencies generally equate unrated bonds to below investment grade ratings. Unbeknownst to investors, the Fund could comply with its 25% restriction on junk bonds only if the Manager improperly assigned inflated investment grade ratings to nearly all of the Fund's unrated bonds. *Id.* ¶¶102-04.[21]

Investors had no reason to inquire as to whether Defendants failed to use the same criteria as the ratings agencies and whether such failure caused the Pennsylvania Fund to concentrate its assets in junk bonds, until late 2008, when shares of the Fund suffered massive declines, while comparable mutual funds did not experience such losses. *Id.* ¶146 (chart comparing 37.92% decline in NAV of the Pennsylvania Fund with 9.82% average decline of 23 other Pennsylvania

---

[21]Throughout the Class Period, Defendants represented in the Pennsylvania Prospectuses that the Pennsylvania Fund invested at least 75% of its assets in investment grade bonds, stating: "The Fund can invest up to 25% of its assets in municipal securities that at the time of purchase are not 'investment grade.'" Pa. Compl. ¶¶96-98. While the Pennsylvania Prospectuses stated that the Pennsylvania Fund would not be required automatically to sell bonds whose ratings were subsequently reduced (*see id.*), it was equally clear that the Pennsylvania Fund could never hold more than 25% of its total assets in junk bonds. Specifically, the Pennsylvania Prospectuses stated: "[T]he Fund can also hold up to 25% of its total assets in lower-grade securities sometimes called 'junk bonds.'" *Id.* ¶¶99-101. Moreover, at all relevant times, Defendants represented that the Fund complied with this 25% limit on its investments in junk bonds. *See, e.g.*, Larrabee Decl. Ex. C-6 at 17 (Semi-Annual Report (1/31/08) (representing that 22.8% of total assets were below investment grade)).

municipal bond funds during 2008).  The Pennsylvania Fund's publicly disclosed investment strategies did not explain the magnitude of these declines.  In fact, an explanation for the Fund's losses did not emerge until November 28, 2008, when Defendants issued an updated Prospectus modifying their prior disclosures regarding investments in inverse floaters, illiquid securities, and use of leverage, which began to reveal the true risks of investing in the Fund.  *Id.* ¶¶139-42.

The Pennsylvania Lead Plaintiff confirmed that Defendants failed to assign ratings to junk bonds in accordance with the criteria used by the ratings agencies and caused the Fund to concentrate more than 25% of assets in junk bonds only after undertaking a laborious bond-by-bond analysis of the portfolio (encompassing multiple reporting periods and utilizing multiple data sources beyond the Prospectuses).  Of course, an investor's duty to exercise reasonable diligence does not encompass performing such complex data analyses.  *See SEC v. Mozilo*, No. 09-CV-3994-JFW, 2009 U.S. Dist. LEXIS 104689, at *30 (C.D. Cal. Nov. 3, 2009) (finding it difficult to determine as a matter of law whether disclosed information was "readily" or "reasonably available" to investor, when investor would need "to decipher complex raw data to understand" purported disclosure of allegedly concealed facts); *In re Executive Telecard, Ltd. Sec. Litig.*, 913 F. Supp. 280, 285 (S.D.N.Y. 1996) ("A reasonable investor may not be required to look behind the report [for accounting errors].  At least a trial juror may so find").

Even assuming *arguendo* that other news sources triggered inquiry notice, the earliest such article to suggest that the Pennsylvania Fund's concentration in junk bonds caused the decline in the NAV was published by *Morningstar* on October 21, 2008 (less than one year before the Pennsylvania action was filed).  That article observed that the Pennsylvania Fund was "the worst performing fund in the Pennsylvania municipal category and trails its typical peer by nearly 19 percentage points," and noted that "nearly 70% of the fund was in bonds rated BBB

-25-

and below (including nonrated bonds) as of June 30, 2008, a far greater position than the category median of 19%." Pa. Compl. ¶147.[22]

Accordingly, the Section 11 and 12(a)(2) claims concerning the Pennsylvania Fund's failure to abide by its promise to assign ratings to unrated bonds using the same criteria as the ratings agencies, and its resulting concentration in junk bonds are timely because they were filed less than one year after the Pennsylvania Lead Plaintiff was on inquiry notice.

### C.   The California Lead Plaintiff's Claims About Concentration In Dirt Bonds And Tobacco Bonds Are Timely

The initial California Fund action was filed on February 6, 2009.  Therefore, to prevail on this motion to dismiss, Defendants must establish that investors exercising reasonable diligence should have discovered before February 6, 2008 that the California Prospectuses included misrepresentations about the Fund's concentration in the California real estate development industry and the extent of its illiquid holdings.  Defendants fail to make such a showing.

### 1.   Dirt Bond Claims

The California Prospectuses stated that as a "fundamental investment policy" the California Fund would not "invest 25% or more of its assets in any one industry."  Cal. Compl. ¶¶6, 81.  Defendants contend that the California Fund's January 2007 disclosure—that more than 25% of its assets were in dirt bonds—bars the California Lead Plaintiff's concentration claim filed two years later.  But nothing in this disclosure acknowledges that dirt bonds all were vulnerable to the same risks.  On the contrary, as the California Complaint alleges, Defendants' used unreasonable industry classifications in violation of SEC guidelines to obscure that more

---

[22]Part IV.B. of Lead Plaintiffs' Opposition To Defendants' Joint Motion To Dismiss explains why statements in subscription-based specialty publications like *Morningstar* are insufficient to trigger inquiry notice.

than 25% of its assets were invested in bonds subject to a downturn in California's real estate industry. *Id.* ¶¶82-83. The California Complaint also alleges that the Prospectuses failed to disclose that a downturn in the California real estate industry would cause many of the securities in purportedly different industries to lose value simultaneously. *Id.* ¶¶8, 83.

Investors had no reason to inquire as to whether Defendants had failed to disclose these material facts until November 2008, when Defendants issued a Prospectus that revised the California Fund's definition of a "single industry," and disclosed, for the first time, that the Fund had invested far more than 25% of its assets in similar projects subject to the same economic risks. *Id.* ¶93. The November 2008 Prospectus also disclosed that the Fund's dirt bonds were similar projects, such that "a change that affects one project . . . would likely affect all similar projects, thereby increasing market risk." *Id.* Until Defendants made this disclosure, the California Lead Plaintiff could not have discovered in the exercise of reasonable diligence that their prior statements were false. The California Complaint, filed less than three months later, is therefore timely.[23]

### 2.    Illiquidity Claims Concerning Tobacco Bonds

Defendants argue that the California Lead Plaintiff was on notice of his claims about the illiquidity of the Fund's tobacco bonds, "because the Fund had disclosed all along that it invested more than 15% of its assets in tobacco bonds." Cal. & Pa. Br. at 16. This argument fails. The California Complaint does not allege that the California Fund exceeded its stated cap on illiquid

---

[23]Even if other news sources triggered a duty to inquire, the earliest article to suggest that losses in the California Fund were associated with its concentration in dirt bonds was published by *Bloomberg* on June 12, 2008 (less than one year before the first action was filed). Cal. Compl. ¶¶71, 90. That article stated: "The $1.9 billion Oppenheimer California Municipal Fund owns more than $665 million of dirt bonds sold in California. . . . The fund lost about 14 percent the past year, compared with an average gain of 1.3 percent for the 419 municipal bond mutual funds tracked by Bloomberg." *Id.* ¶71.

securities solely due to tobacco bonds. The claim rests on Defendants' failure to disclose that more than 15% of its assets were illiquid due to the lack of an active trading market, the size of the California Fund's position, market volatility, *and* its tobacco bonds which "further contributed overall illiquidity in excess of the 15% cap." Cal. Compl. ¶¶114, 125. The combination of these factors—not any one individually—forms the basis of this claim.

Defendants' misrepresentations about illiquid assets could not have been discovered until the California Lead Plaintiff undertook a detailed review of the Fund's extensive holdings in thinly-traded bonds. The California Complaint filed in February 2009 was timely.[24]

## III.   THE CALIFORNIA COMPLAINT STATES CLAIMS FOR VIOLATION OF THE UCL AND BREACH OF FIDUCIARY DUTY

### A.   SLUSA Does Not Preempt The California State Law Claims

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA") requires dismissal of "(1) a 'covered class action,' (2) that is based on a state law, (3) alleging a misrepresentation or omission of a material fact or use of any manipulative or deceptive device or contrivance, (4) in connection with' the purchase or sale of a covered security . . . . [A]ll of these elements must be present for preclusion to apply." *Anderson v. Merrill Lynch*, 521 F.3d 1278, 1281 (10th Cir. 2008) (quoting *Potter v. Janus Inv. Fund*, 483 F. Supp. 2d 692, 696 (S.D. Ill. 2007) (internal quotation marks omitted)). Defendants argue that the claims for violation of the UCL and breach of fiduciary duty must be dismissed under SLUSA because they allege misrepresentations or

---

[24]In their primary brief, Defendants contest the timeliness of the Securities Act claims concerning their misrepresentations about the California Fund's fundamental investment policy and its investments in inverse floaters. Even if the Court were to accept all of Defendants' arguments, it would not be grounds to dismiss the Securities Act claims in their entirety. Nowhere do Defendants dispute the timeliness of the Securities Act claims concerning: (1) the California Fund's concentration in junk bonds and unrated bonds; (2) its investments in securities that were illiquid due to the lack of an active trading market, the size of the California Fund's position, and market volatility; and (3) the value of the California Fund's assets and its NAV.

omissions.[25]  Cal. & Pa. Br. at 17-19.  This argument fails.  The state law claims are based

exclusively on deviations from the California Fund's fundamental investment policies without

the required shareholder vote and not on misstatements or omissions of material fact.

SLUSA preemption applies where "a misrepresentation in connection with a securities

trade is a 'factual predicate' of the claim, even if misrepresentation is not a legal element of the

claim. . . .  To be a factual predicate, the fact of a misrepresentation must be one that gives rise to

liability, not merely an extraneous detail."  *LaSala v. Bordier & Cie*, 519 F.3d 121, 141 (3d Cir.

2008).  The inclusion of other "extraneous allegations [in a complaint] does not operate to

require that the complaint must be dismissed under SLUSA."  *Id.*; *see also In re Charles Schwab

Corp. Sec. Litig.*, 257 F.R.D. 534, 551 (N.D. Cal. 2009) ("*Charles Schwab I*") ("When applying

SLUSA, courts ignore extraneous allegations and focus on the gravamen of the complaint").

*Charles Schwab I* is instructive.  That action alleged that the defendants violated Sections

11 and 12(a)(2) of the Securities Act by making misrepresentations about the investment policies

and risk profile of the Schwab YieldPlus Fund in registration statements and prospectuses.  The

plaintiffs also brought claims for breach of contract and breach of fiduciary duty arising out of

unlawful deviations from the fund's industry concentration policy without a shareholder vote.

The court rejected the defendants' argument that SLUSA preempted those claims, holding that

they "are not, in substance, predicated on misrepresentations or omissions."  *Id.*

As in *Charles Schwab I*, the state law claims alleged here are premised exclusively on

Defendants' deviations from the California Fund's fundamental investment policies without a

_____

[25]The California Lead Plaintiff does not contest that this is a covered class action based on state law
involving a covered security, as those terms are defined in *Merrill Lynch v. Dabit*, 547 U.S. 71, 82 n.6 (2006).
Defendants concede that the California Complaint does not allege the use of any manipulative or deceptive device or
contrivance.

shareholder vote.  This conduct gives rise to claims for violation of the UCL and breach of

fiduciary duty, because it violated the ICA.  Cal. Compl. ¶¶224-39.  Misrepresentations are not

factual predicates of—and do not give rise to liability on—either claim.  Even if these deviations

had been disclosed, they violated the ICA, giving rise to the state law claims.

Nonetheless, Defendants argue that SLUSA mandates dismissal because the state law

claims are purportedly based on the same factual circumstances as the Securities Act claims.

Defendants cite several cases holding that the mere allegation of a misrepresentation or

omission—whether or not such an allegation is a factual predicate of the claim—is fatal under

SLUSA.  Unlike here, however, the misrepresentation allegations in the complaints dismissed in

those actions were expressly incorporated into the state law claims.[26]  Defendants' authorities are

inapplicable, because, as even Defendants recognize, the UCL and fiduciary duty claims here

explicitly disclaim any misrepresentation or omission allegations contained in other parts of the

California Complaint, and those allegations are not factual predicates of the state law claims.

Cal. & Pa. Br. at 18 (citing Cal. Compl. ¶¶224, 235).

---

[26]*See, e.g., Anderson*, 521 F.3d at 1287-88 (dismissing under SLUSA where the complaint alleged misrepresentations and "[a]ll of the substantive counts listed in Plaintiffs' Complaint incorporate these allegations by reference"); *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310 (6th Cir. 2009) (same), *cert. denied*, 78 U.S.L.W. 3687 (May 24, 2010); *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 299-300 (3d Cir. 2005) (same; subsequently refined and limited by *LaSala*, 519 F.3d at 141); *but see Charles Schwab I*, 257 F.R.D. at 551 (declining to dismiss under SLUSA where misrepresentation allegations were "incorporated by reference into the state claims but are really irrelevant thereto").

Defendants' remaining authorities are also inapposite.  In each case, a misrepresentation or omission was a factual predicate of the preempted state law claims, whether pled as such or not.  *See Appert v. Morgan Stanley*, No. 08-CV-7130, 2009 WL 3764120 (N.D. Ill. Nov. 6, 2009) (SLUSA preempted breach of contract claim for which misrepresentation of fees and concealment of disguised profits were factual predicates); *Barron v. Igolnikov*, No. 09 Civ. 4471(TPG), 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010) (dismissing fiduciary duty and negligence claims arising out of asset managers' failure to warn clients about Madoff scheme and failure to provide proper accounting statements); *Stoody-Broser v. Bank of AmericaCorp.*, No. C 08-02705 JSW, 2009 WL 2707393, at *4 (N.D. Cal. Aug. 25, 2009) ("The Court finds that the gravamen of the complaint, and the predicate facts upon which the claims are made, set forth a scheme premised on inherent misrepresentations and omissions made by the trustee").

**B.       The State Law Claims Are Direct, Not Derivative**

Defendants are wrong to argue that the state law claims should be dismissed as derivative claims belonging to the California Fund.  *See* Cal. & Pa. Br. at 19-21.  These claims are direct. They belong to and may be brought by shareholders in a class action.

A claim is derivative where "the right flows from the breach of a duty owed by the defendants to the corporation."  *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996) (citation omitted); *Smyth v. Marshall Field*, No. 91-7803-F, 1993 WL 818732, at *3 (Mass. Super. Ct. Nov. 17, 1993) ("If the harm is to the business entity, then it is a derivative claim"), *aff'd*, 666 N.E. 2d 1008 (Mass. App. Ct. 1996).[27]  "To bring a direct action under Massachusetts law, a plaintiff must allege an injury distinct from that suffered by shareholders generally or a wrong involving one of his or her contractual rights as a shareholder, *such as the right to vote*."  *Lapidus v. Hecht*, 232 F.3d 679, 683 (9th Cir. 2000) (emphasis added); *In re Columbia Entities Litig.*, No. 04-11704-REK, 2005 U.S. Dist. LEXIS 33439, at *15 (D. Mass. Nov. 30, 2005).

As in this case, the shareholder injuries alleged in *Lapidus* arose out of a mutual fund trust manager's violation of the ICA by amending investment restrictions without a shareholder vote.  The plaintiffs alleged that the trust manager violated "their contractual rights as shareholders to vote on proposed changes to the short sale and senior security restrictions spelled out in the registration statement filed with the SEC."  *Lapidus*, 232 F.3d at 683.  The Ninth Circuit found these allegations were "sufficient to satisfy the injury requirement for a direct

---

[27]All parties agree that Massachusetts law applies to determine whether these claims are direct or derivative, because the California Fund is a Massachusetts business trust.  *See In re ms55, Inc.*, 420 B.R. 806, 819-22 (Bankr. D. Colo. 2009); *Restatement (Second) of Conflict of Laws* §309 (1971); Cal. & Pa. Br. at 19 n.25. However, this does not mean that Massachusetts law controls other issues in dispute, including the enforceability of an exculpatory provision contained in the Declaration of Trust.  *See* Part III.E., *infra*.

action under Massachusetts law." *Id.*

The state law claims here likewise arise out of Defendants' interference with shareholder voting rights.  The California Complaint alleges that Defendants breached their fiduciary duties and violated the UCL by causing the Fund to deviate from its investment objective and industry concentration policy "without obtaining a vote of a majority of the Fund's outstanding shares in accordance with the ICA."  Cal. Compl. ¶¶227, 238.  Defendants' conduct caused shareholders "to suffer an individual injury distinct from any injury to the Fund itself." *Id.* ¶238.  The harm is direct, not derivative. *See Charles Schwab I*, 257 F.R.D. at 554.

Defendants' argument to the contrary—that the state law claims are derivative because the harm at issue is the decline in the California Fund's NAV—ignores the allegations of the California Complaint, which specify that the harm resulted from Defendants' derogation of shareholder voting rights.  Tellingly, Defendants cite only the allegations of the federal ICA claim (Count IV), not the UCL or breach of fiduciary duty claims (Counts V and VI), in describing the harm alleged in the state law claims.  Defendants' authorities are unpersuasive because they do not address derogations of shareholder voting rights.[28]

Finally, Defendants tacitly concede that a plaintiff need not make a demand to assert direct claims.  Cal. & Pa. Br. at 21.  As the claims here are direct, not derivative, the California Lead Plaintiff was not required to make a pre-filing demand.

---

[28]*See Stegall v. Ladner*, 394 F. Supp. 2d 358, 364-67 (D. Mass. 2005) (allegations relating to diminution in mutual fund's total assets were derivative); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 112 (D. Mass. 2006) (same); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885 (SWK), 2005 WL 2677753, at *4 (S.D.N.Y. Oct. 19, 2005) (same); *Scanlan v. W.C. Caniff & Sons, Inc.*, No. 94-6772-C, 1996 WL 490170, at *4-*5 (Mass. Super. Ct. Aug. 9, 1996) (allegations of diminution of corporation's net worth by fraudulent conveyances were derivative); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4138 (HB), 2000 WL 10211 (S.D.N.Y. Jan. 6, 2000) (allegations of undisclosed, self-dealing transactions by a mutual fund's portfolio manager and heavy investment in risky micro-cap stocks were derivative causes of action under ICA).

C.      **The UCL Claim Should Not Be Dismissed**

1.      **The UCL Claim Does Not Arise From Securities Transactions**

The UCL allows individuals to recover money or property lost as a result of a business practice that is unlawful, unfair or deceptive.  Cal. Bus. & Prof. Code §§17200, 17203. Defendants argue that the UCL does not apply to securities transactions.  Cal. & Pa. Br. at 22-23 & n.28.  In doing so, Defendants misstate the basis of the claim and the law.  The UCL claim is not based on a securities transaction—that is, the purchase or sale of a security—and does not relate to misrepresentations in the California Prospectuses.  It is based on Defendants' unlawful acts consisting of causing the Fund to deviate from its investment objective and industry concentration policy without a shareholder vote.  Cal. Compl. ¶227.

Defendants rely on *Bowen v. Ziasun Techs, Inc.*, 116 Cal. App. 4th 777 (Cal. Ct. App. 2004), for the proposition that the UCL does not apply to securities transactions.  However, *Bowen*'s limitation on the UCL "does not encompass all situations where securities are somehow implicated but not purchased or sold."  *Strigliabotti v. Franklin Res., Inc.*, No. C 04-00883 SI, 2005 WL 645529, at *10 (N.D. Cal. Mar. 7, 2005); *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 715 (Cal. Ct. App. 2007) (allowing UCL claim to proceed because the challenged conduct did "*not arise from any stock transactions between the parties*").

*Charles Schwab I* rejected the broad interpretation of *Bowen* Defendants espouse here. The plaintiffs alleged that Schwab violated the UCL by deviating from the fund's industry concentration policy in violation of the ICA.  *See Charles Schwab I*, 257 F.R.D. at 552-3.  The court held that these claims "do not concern fraud in the sale of securities," finding *Bowen* to be inapposite.  *Id*. at 553.  As in *Charles Schwab I*, the UCL claims here are premised on Defendants' violations of the ICA, not on misrepresentations or omissions in the purchase or sale

of securities.  This conduct is actionable under the UCL.[29]

### 2.      The California Lead Plaintiff Has Standing To Assert The UCL Claim And Has Alleged A Basis For Restitution

The UCL provides "an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices." *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 173 (Cal. 2000).  A person "'who has suffered injury in fact and has lost money or property as a result of'" an unlawful business act or practice has standing to sue under the UCL to obtain restitution or injunctive relief.  *Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 228 (Cal. 2006) (quoting Cal. Bus. & Prof. Code §17204).  The California Lead Plaintiff alleges that he has lost a substantial amount of money as a result of Defendants' unlawful conduct, and he seeks return of those funds including lost principal.  Therefore, he has standing under the UCL.

Defendants argue that the California Lead Plaintiff lacks standing to obtain restitution, because Defendants did not obtain any monetary benefit from him.  Cal. & Pa. Br. at 23-24.  The *Charles Schwab I* court recently rejected this exact argument, concluding that "although

---

[29]Like *Bowen*, Defendants' other authorities involve allegations of misrepresentations that induced or took place during a securities transaction, and are therefore inapposite to the allegations here.  *See Williams v. Deutsche Bank Sec., Inc.*, No 04 Civ. 7588 (GEL), 2005 WL 1414435, at *10 (S.D.N.Y. June 13, 2005) (refusing to allow UCL claim arising out of "a securities transaction induced by misrepresentations by a securities brokerage"); *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 324, 351 (S.D.N.Y. 1999) (refusing to allow UCL claim arising out of "fraudulent schemes . . . to substantially increase price of Scorpion stock . . ."); *Scognamillo v. Credit Suisse First Boston LLC*, No 03-2061, 2005 WL 2045807, at *12 (N.D. Cal. Aug. 25, 2005) (refusing to allow UCL claim arising out of fraud relating to merger agreement), *aff'd*, 254 Fed. Appx. 669 (9th Cir. 2007); *Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388, 392 n.4 (9th Cir. 1988) (refusing to allow Hawaii UCL claim arising out of "deceptive practices in the purchase and sale of securities"); *Shearson Lehman Bros., Inc. v. Greenberg*, No. CV-93-0609-R, 1993 WL 144856 (C.D. Cal. Mar. 15. 1993), *aff'd*, No. 93-55535, 1995 WL 392028, at *1, *3 (9th Cir. 1995) (affirming dismissal of UCL claim where complaint alleged "misleading business practices" relating to Shearson's "internal account forms, the format of its monthly statements, and its communications with its customers").

*damages* such as lost investment profits are not recoverable [under the UCL], the lost *principal* paid for the shares is recoverable." 264 F.R.D. at 539. The court explained that "'the object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest,' and therefore restitutionary awards are available for 'money that once had been in the possession of the person to whom it [is] to be restored.'" *Id.* at 539-40 (quoting *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 697 (Cal. Ct. App. 2006)).

The California Lead Plaintiff can pursue his UCL claim because he, like the *Charles Schwab I* plaintiffs, seeks restoration of money acquired by means of Defendants' unlawful conduct. *Id.* at 539; Cal. Compl. ¶234. The California Lead Plaintiff and other investors paid money to Defendants when they purchased shares of the California Fund. That Defendants no longer have those monies is not germane to whether the investors are entitled to their return under the UCL. *See Rosales v. Citibank*, 133 F. Supp. 2d 1177, 1181 (N.D. Cal. 2001) ("[W]here a measurable amount has been taken from a person in the course of an unfair business practice, that loss can be restored to the victim. . . . The fact that Citibank no longer has those funds that it allowed to be removed from Mr. Rosales' account does not change the analysis").[30]

### D.     The Breach Of Fiduciary Duty Claim Should Not Be Dismissed

The Trustee Defendants move to dismiss the breach of fiduciary duty claim, arguing that they were obliged only to "act in good faith and with loyalty," and their violations of investors' voting rights do not breach either obligation. Cal. &. Pa. Br. at 24. Defendants are wrong.

---

[30]Defendants incorrectly cite to *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (Cal. 2003). *Korea Supply* held that disgorgement of profits was not an available remedy under the UCL. *Korea Supply* did not consider the issue here: Whether under the UCL a plaintiff is entitled to restitution of monies he paid to a defendant who no longer has possession of those funds.

A shareholder's right to vote is so fundamental to the notion of corporate governance that actions impeding the right constitute a breach of fiduciary duty:

> "That a shareholder is entitled to notice of the date, time, and place of an annual shareholder's meeting is a proposition so fundamental as to require no citation of authority. . . . At a minimum, [the failure to provide notice] constituted a breach of their fiduciary duty as A & S's officers and deprived Helmsman of its right to become informed of, and to vote upon, the transactions approved or ratified at those meetings." (*Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 166 (Del. Ch. 1987))

Similarly, the court in *Clark v. B. H. Holland Co.* held that the failure to hold a statutorily required vote "'constitutes a breach of a director's fiduciary duty as well as a breach of the majority stockholders' duty to the minority.'" 852 F. Supp. 1268, 1275 (E.D.N.C. 1994) (quoting *Loy v. Lorm Corp.*, 52 N.C. App. 428, 435 (1981)); *see also Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659-60 & n.2 (Del. Ch. 1988) (The shareholder franchise "is critical to the theory that legitimates the exercise of power by some (directors and officers) over vast aggregations of property that they do not own. . . . [C]ourts have long exercised a most sensitive and protective regard for the free and effective exercise of voting rights").[31]

The right to vote on changes to a fund's fundamental investment policies is so basic that it is guaranteed by both the ICA and the California Fund's Declaration of Trust. *See* Larrabee Decl. Ex. C-8, Art. 5th, §1. Violating the terms of a trust agreement constitutes a breach of fiduciary duty. *See Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1129 (D. Mass. 1996) (finding genuine issues of material fact on plaintiff's "claims that the Local 42 Trustees breached their fiduciary duties by mismanaging fund assets, [and] terminating the fund without paying outstanding obligations in violation of the trust provisions").

---

[31]Defendants rely on Massachusetts law but fail to cite any Massachusetts court decision holding that depriving shareholders of their statutorily guaranteed voting rights does not constitute a breach of fiduciary duty. Research has uncovered no Massachusetts case addressing the issue at all.

Thus, the Trustee Defendants' derogation of shareholder voting rights is actionable.

### E.     The Declaration Of Trust's Exculpation Of The Independent Trustees For Their Own Negligence Is Void Under California Law

Defendants argue that the state law claims are barred by a provision of the California Fund's Declaration of Trust that exculpates the Trustee Defendants from responsibility for their negligent conduct.  Cal. & Pa. Br. at 25-26.  That provision is void under California law.[32]

### 1.     California Law Controls According To Its "Governmental Interests" Conflict Of Laws Analysis

California applies a "governmental interests" analysis to resolve conflict of laws issues. *See Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 100 (Cal. 2006).  This analysis has three steps:  (1) "the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different"; (2) if such a difference exists, the court "examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists"; (3) if there is a true conflict, the court "carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law 'to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state.'" *Id.* at 107-08 (quoting *Bernhard v. Harrah's Club*, 16 Cal. 3d 313, 320 (Cal. 1976)).  The court then applies the law of the state whose interest would be more impaired by application of the other state's law.  *See id*. at 108.  Under this analysis, California law must be applied.

---

[32]Because this case was transferred from the Northern District of California, California's choice of law and conflict of laws analyses apply to determine the validity of the exculpatory provision. *See Benne v. IBM Corp.*, 87 F.3d 419, 423 (10th Cir. 1996) ("[W]hen a district court grants a venue change pursuant to 28 U.S.C. § 1404, the transferee court is *obligated* to apply the law of the state in which the transferor court sits") (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)); *Yoder v. Honeywell Inc*., 104 F.3d 1215, 1219 (10th Cir. 1997).

### a.   The Exculpatory Provision Is Invalid Under California Law

Defendants claim that Massachusetts law allows exculpatory provisions that bar causes of

action based on negligence.  Cal. & Pa. Br. at 26.  The exculpatory provision is unenforceable

under California law.  In California, contracts that "exempt anyone from responsibility for his

own . . . violation of law, whether willful or negligent, are against the policy of the law."  Cal.

Civ. Code §1668.  This public policy "applies with added force when the exculpatory provision

purports to immunize fiduciaries from the consequences of betraying their trusts."  *Cohen v. Kite

Hill Cmty. Ass'n*, 142 Cal. App. 3d 642, 654 (Cal. Ct. App. 1983) (citing *Mitchell v. Dilbeck*, 10

Cal. 2d 341 (Cal. 1937); *Forbes v. McDonald*, 54 Cal. 98 (Cal. 1880)).

California also refuses to enforce provisions that "affect 'the public interest.'"  *Cohen*,

142 Cal. App. 3d at 654-55 (quoting *Tunkl v. Regents of the Univ. of Cal*, 60 Cal. 2d 92, 96 (Cal.

1963)).  Consistent with this policy, courts invalidate exculpatory clauses involving alleged

breaches of fiduciary duty.  *See, e.g., Neubauer v. Goldfarb*, 108 Cal. App. 4th 47, 56 (Cal. Ct.

App. 2003) ("[W]e conclude the [exculpatory] agreement does not cancel out the Goldfarbs'

fiduciary duties as directors and majority shareholders").  In determining what "affect[s] the

public interest," courts consider:  (a) whether the matter is suitable for public regulation; (b)

whether the party provides an important service to the public; (c) whether the party seeking

exculpation possesses a bargaining advantage against members of the public who seek such

service; (d) and whether one party is subject to the other's control and the risk of his or her

carelessness.  *See Cohen*, 142 Cal. App. 3d at 655 (citing *Tunkl*, 60 Cal. 2d at 98-101).

These factors argue against the enforceability of the exculpatory provision.  First, mutual

funds are highly regulated.  Second, the Trustee Defendants provide an important service by

overseeing the management of investors' assets.  Third, the provision is part of a Declaration of

Trust that investors were not parties to and could not alter, demonstrating Defendants' inherent

bargaining advantage.  Fourth, investors' assets are entirely under the control of Defendants and

are subject to the risks of Defendants' carelessness.  Because California would not enforce the

exculpatory provision, there is a conflict between the laws of California and Massachusetts.

### b.       Massachusetts Does Not Have A Substantial Interest In The Application Of Its Law

Next, the Court must determine whether each jurisdiction has a real interest in the

application of its own law.  The Class consists primarily of California citizens because

Defendants actively solicited business from California investors with offers of investments free

from California taxes.  California has a strong interest in protecting the rights of its citizens

against the acts of non-resident faithless fiduciaries who might otherwise be shielded by an

exculpatory provision that would be invalid under California law.  That the California citizens

did business with a Massachusetts trust does not weaken that interest.  California could not

adequately protect its citizens if its policy against exculpatory provisions did not reach outside

the state.  *See Bernhard*, 16 Cal. 3d at 322 ("California cannot reasonably effectuate its policy if

it does not extend its regulation" to out-of-state businesses who target California residents).

On the other hand, Massachusetts' interest in exculpating the Trustee Defendants is

insubstantial.  First, as Defendants concede, Massachusetts law disfavors exculpatory provisions.

Cal. & Pa. Br. at 26.  Second, even if Massachusetts had an interest in exculpating negligent

conduct by its own residents, that interest would not apply here because no evidence in the

record shows the Trustee Defendants to be Massachusetts residents.

Because Massachusetts does not have a significant interest in the application of its law,

there is no true conflict, and California's law voiding exculpatory provisions should be applied.

### c.   California's Interest Would Be More Impaired By Application Of Massachusetts Law

Finally, even if Massachusetts had a limited interest in shielding trustees from liability, California's interest in protecting its citizens would be more impaired.  Massachusetts' interest would only be impaired to the extent that Massachusetts trusts targeted California residents.  *See Bernhard*, 16 Cal. 3d at 323 (finding that Nevada's interest in protecting its businesses "will not be significantly impaired when as in the instant case liability is imposed only on those [businesses] who actively solicit California business").  Application of Massachusetts law would significantly restrict California's ability to protect its residents from out-of-state trusts that solicit business from California citizens and then provide services negligently.  California's strong policy against such exculpatory provisions should be enforced.

### 2.   The Declaration Of Trust's Choice Of Law Provision Does Not Control

Defendants favor application of Massachusetts law, apparently because the Declaration of Trust contains a Massachusetts choice of law provision.  *See* Cal. & Pa. Br. at 26; Larrabee Decl. Ex. C-8, Art. 9th, §7.  However, the California Lead Plaintiff is not a party to the Declaration of Trust and therefore did not agree to be bound by Massachusetts law.  The choice of law provision is not referenced in the California Prospectuses or SAIs, and there is no evidence that investors knew about it.  Research has uncovered no authority enforcing a choice of law provision against a non-party to a contract under these circumstances.

Even if the Massachusetts choice of law provision were controlling as to California Fund investors generally, it would not be effective for the exculpatory provision.  "'[A]n agreement designating [a foreign] law will not be given effect if it would violate a strong California public

-40-

policy . . . [or] 'result in an evasion of . . . a statute of the forum protecting its citizens.'"  *Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 2 (Cal. Ct. App. 2001) (quoting *Hall v. Superior Court*, 150 Cal. App. 3d 411, 416-17 (Cal. Ct. App. 1983) (internal quotation marks omitted).  Because application of Massachusetts' law would undermine a strong California public policy, California courts would not enforce a Massachusetts choice of law provision against the California Lead Plaintiff and the Class even if they had agreed to it in a contract.

## CONCLUSION

For the foregoing reasons and those stated in the accompanying omnibus brief, the California and Pennsylvania Lead Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss the California and Pennsylvania Complaints.

Dated:  June 4, 2010                         Respectfully submitted,

                                             _____*/s/ Alan W. Sparer*_____

                                             Alan W. Sparer
                                             Marc Haber
                                             Kevin H. Lewis
                                             James S. Nabwangu
                                             **SPARER LAW GROUP**
                                             100 Pine Street, 33rd Floor
                                             San Francisco, CA  94111
                                             Telephone: (415) 217-7300
                                             Facsimile:   (415) 217-7307
                                             asparer@sparerlaw.com

                                             ***Attorneys for California Lead Plaintiff Joseph Stockwell in the California Fund Cases and Lead Counsel for the Class***

Sherrie R. Savett
Gary E. Cantor
Glen L. Abramson
Eric Lechtzin
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
gcantor@bm.net

*Attorneys for Pennsylvania Lead Plaintiff*
*Dharamvir Bhanot, Additional Plaintiffs*
*William E. Miles, Jr. and John P.*
*Galganovicz in the Pennsylvania Fund Cases*
*and Lead Counsel for the Pennsylvania Fund*
*Class*

Charles J. Piven
Yelena Trepetin
**BROWER PIVEN**
A Professional Corporation
1925 Old Valley Road
Stevenson, MD 21153
Telephone: (410) 332-0030
Facsimile: (410) 685-1300
piven@browerpiven.com

David A.P. Brower
**BROWER PIVEN**
A Professional Corporation
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300
brower@browerpiven.com

*Additional Counsel for Lead Plaintiff*
*Dharamvir Bhanot in the Pennsylvania Fund*
*Cases*

Daniel C. Girard
Aaron M. Sheanin
Christina H.C. Sharp
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
ams@girardgibbs.com

*Additional Counsel for California Lead*
*Plaintiff Joseph Stockwell in the California*
*Fund Cases*

Jeffrey A. Chase
Barbara A. Grandjean
**JACOBS CHASE FRICK KLEINKOPF &**
**KELLEY, LLC**
1050 Seventeenth Street, #1500
Denver, CO 80265-2078
Telephone: (303) 685-4800
Facsimile: (303) 685-4869
jchase@jcfkk.com

*Local Counsel for Lead Plaintiff Joseph*
*Stockwell in the California Fund Cases*

Kip B. Shuman
Rusty E. Glenn
**THE SHUMAN LAW FIRM**
885 Arapahoe Avenue
Boulder, CO 80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886
kip@shumanlawfirm.com

*Liaison Counsel*

-42-

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with this Court on June 4, 2010 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at San Francisco, California on June 4, 2010.

/s/ *Philip Layzer*
PHILIP LAYZER