**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Master Docket No. **09-md-02063-JLK-KMT** (MDL Docket No. 2063)

**IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION**

This document relates to all the MDL actions.

---

**DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR
JOINT MOTION TO DISMISS THE CONSOLIDATED COMPLAINTS
IN THE ROCHESTER FUNDS GROUP SECURITIES LITIGATION**

---

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

ARGUMENT.......................................................................................................4

I.   PLAINTIFFS FAIL TO PLEAD THAT DEFENDANTS MADE
     ANY UNTRUE STATEMENTS OF MATERIAL FACT...........................4

     A.   Plaintiffs' Investment Objective Allegations Fail To State a Claim..................4

          1.   Plaintiffs' Interpretation of Capital Preservation
               Is Unreasonable When Considered in Context .......................5

          2.   An Investment Objective Is Not a Promise to Investors.......................8

     B.   Plaintiffs' Inverse Floater Allegations Fail To State a Claim..........................10

          1.   Plaintiffs Fail To Establish a Duty To Disclose the
               Allegedly Omitted Information about Inverse Floaters .......................10

          2.   Plaintiffs' Allegations Fail Because Defendants
               Disclosed the Allegedly Omitted Information .....................................13

          3.   Plaintiffs' Claims Based on the October 2008 Supplement
               Fail Because Defendants Disclosed the Underlying Risks .................18

          4.   Plaintiffs' Allegations about Collateral Requirements and
               Shortfall and Forbearance Agreements Fail To State a Claim............21

          5.   The Funds Did Not Violate Their Inverse Floater Asset Limits..........22

     C.   Plaintiffs' Illiquid Assets Allegations Fail To State a Claim...........................23

     D.   Plaintiffs' Securities Valuation Allegations Fail To State a Claim.................25

II.  PLAINTIFFS' INVESTMENT OBJECTIVE AND
     INVERSE FLOATER CLAIMS ARE TIME-BARRED ...........................27

     A.   Plaintiffs Were on Notice of Their Investment Objective Claims ..................27

     B.   Plaintiffs Were on Notice of Their Inverse Floater Claims ............................29

     C.   Plaintiffs Were on Notice That the National Fund
          Invested More Than 20% of Its Assets in Inverse Floaters ............................30

III. PLAINTIFFS' LOSSES DID NOT RESULT FROM
     ALLEGED MISREPRESENTATIONS OR OMISSIONS ........................31

IV.  PLAINTIFFS FAIL TO ALLEGE "SELLER" LIABILITY
     UNDER SECTION 12(a)(2) .......................................................................35

V.   PLAINTIFFS FAIL TO ALLEGE "CONTROL" UNDER SECTION 15.................36

VI.   THERE IS NO PRIVATE RIGHT OF ACTION UNDER
       SECTION 13(a) OF THE INVESTMENT COMPANY ACT....................................38

VII.  CERTAIN CLAIMS ASSERTED AGAINST TWO
       INDIVIDUAL TRUSTEES MUST BE DISMISSED..................................................40

**CONCLUSION**..............................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (10th Cir. 2003)........................................................................................37

*Akerman v. Oryx Commc'ns, Inc.*,
    609 F. Supp. 363 (S.D.N.Y. 1984)..................................................................................34

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)........................................................................................................39

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
    505 F. Supp. 2d 662 (D. Colo. 2007)..............................................................................22

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................................13

*Batwin v. Occam Networks, Inc.*,
    No. 07-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008)..............................................37

*Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*,
    435 F.3d 396 (3d Cir. 2006)..............................................................................................4

*Benzon v. Morgan Stanley Distribs., Inc.*,
    420 F.3d 598 (6th Cir. 2005)...........................................................................................11

*Borow v. nView Corp.*,
    829 F. Supp. 828 (E.D. Va. 1993)..................................................................................17

*Castillo v. Dean Witter Discover & Co.*,
    No. 97-1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998) ............................................31

*Cetel v. Kirwan Fin. Group, Inc.*,
    460 F.3d 494 (3d Cir. 2006)..............................................................................................4

*Chiarella v. United States*,
    445 U.S. 222 (1980)........................................................................................................11

*Davis v. Bailey*,
    No. 05-0042, 2005 WL 3527286 (D. Colo. Dec. 22, 2005) ...........................................39

*DeBenedictis v. Merrill Lynch & Co.*,
    492 F.3d 209 (3d Cir. 2007)......................................................................................28, 29

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978)..............................................................................18

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009)............................................................................12

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).........................................................................................31

*Epirus Capital Mgmt. LLC v. Citigroup, Inc.*,
    No. 09-2594, 2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010) ...........................25

*Faircloth v. Lundy Packing Co.*,
    91 F.3d 648 (4th Cir. 1996)..............................................................................39

*Fait v. Regions Fin. Corp.*,
    No. 09-3161, 2010 WL 1883487 (S.D.N.Y. May 10, 2010) .....................23, 25

*Fin. Planning Ass'n v. SEC*,
    482 F.3d 481 (D.C. Cir. 2007) .........................................................................36

*First Boston Corp. v. ARM Fin. Group, Inc.*,
    No. 99-12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ...........................17

*Fogel v. Chestnut*,
    668 F.2d 100 (2d Cir. 1981)..............................................................................39

*Fouad v. Isilon Sys.*,
    No. 07-1764, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) .......................36

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005)..............................................................26

*Gabelli Global Multimedia Trust, Inc. v. Western Inv. LLC*,
    No. 10-0557, 2010 WL 1253164 (D. Md. Apr. 1, 2010)...................................39

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002).........................................................................................39

*Graham v. Barriger*,
    No. 08-9357, 2009 WL 3852461 (S.D.N.Y. Nov. 17, 2009)...........................37

*Greenapple v. Detroit Edison Co.*,
    618 F.2d 198 (2d Cir. 1980)........................................................................14, 18

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997)................................................................5, 11

*Halebian v. Berv*,
  631 F. Supp. 2d 287 (S.D.N.Y. 2007)...................................................39

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997).................................................................12

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009)..............................................10, 34, 36

*In re Donald J. Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993)....................................................................7, 16

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig*,
  No. 08-11064, 2010 WL 1253114 (D. Mass. Mar. 31, 2010).........9, 34

*In re Giant Interactive Group, Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009)....................................................17

*In re Juniper Networks, Inc. Sec. Litig.*,
  542 F. Supp. 2d 1037 (N.D. Cal. 2008) .................................................41

*In re MBIA Inc., Sec. Litig.*,
  No. 05-3514, 2007 WL 473708 (S.D.N.Y. Feb. 14, 2007).................28

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  289 F. Supp. 2d 429 (S.D.N.Y. 2003)....................................................35

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)...................................................................11

*In re New York Community Bancorp, Inc., Sec. Litig.*,
  448 F. Supp. 2d 466 (E.D.N.Y. 2006) .....................................................7

*In re RAC Mortgage Inv. Corp. Sec. Litig.*,
  765 F. Supp. 860 (D. Md. 1991). ............................................................16

*In re Ribozyme Pharms., Inc. Sec. Litig.*,
  119 F. Supp. 2d 1156 (D. Colo. 2000)...................................................37

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
  441 F. Supp. 2d 579 (S.D.N.Y. 2006).....................................................33

*In re Sofamor Danek Group, Inc.*,
  123 F.3d 394 (6th Cir.1997)............................................................................12

*In re Sonus Networks, Inc. Sec. Litig.*,
  No. 04-10294, 2006 WL 1308165 (D. Mass. May 10, 2006).............................36

*In re Storage Tech. Corp. Sec. Litig.*,
  630 F. Supp. 1072 (D. Colo. 1986) ..............................................................37, 41

*In re Thornburg Mortgage Inc. Sec. Litig.*,
  No. 07-0815, 2010 WL 378300 (D.N.M. Jan. 27, 2010)...................................16

*In re Thornburg Mortgage Inc.*,
  683 F. Supp. 2d 1236 (D.N.M. 2010) ..............................................................19

*In re Thornburg Mortgage Inc. Sec. Litig.*,
  No. 07-0815, 2010 WL 445047 (D.N.M. Jan. 27, 2010)...................................41

*In re Washington Mut., Inc. Sec. Litig.*,
  259 F.R.D. 490 (W.D. Wash. 2009) ................................................................41

*Jones v. Bock*,
  549 U.S. 199 (2007)........................................................................................35

*Krouner v. American Heritage Fund*,
  899 F. Supp. 142 (S.D.N.Y. 1995)...................................................................18

*Lapidus v. Hecht*,
  232 F.3d 679 (9th Cir. 2000)............................................................................38

*Morrison v. National Australia Bank Ltd.*,
  No. 08-1191, 2010 WL 2518523 (U.S. June 24, 2010) ....................................33

*Mutchka v. Harris*,
  373 F. Supp. 2d 1021 (C.D. Cal. 2005) ............................................................38

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
  No. 08-5653, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010).............................23

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
  No. 08-8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010)........................23, 25

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005).........................................................................................36

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
   609 F. Supp. 2d 938 (N.D. Cal. 2009) ....................................................38, 40

*Olkey v. Hyperion 1999 Term Trust Inc.*,
   98 F.3d 2 (2d Cir. 1996)..........................................................................7, 16

*Olmsted v. Pruco*,
   283 F.3d 429 (2d Cir. 2002)..............................................................3, 38, 39

*Oxford Asset Mgmt.Ltd. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002)....................................................................11

*Pine River Irrigation Dist. v. United States*,
   656 F. Supp. 2d 1298 (D. Colo. 2009) .........................................................34

*Pinter v. Dahl*,
   486 U.S. 622 (1988)....................................................................................35

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
   *Commerce*, No. 08-8143, 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010)............19

*Plumbers' Union Local No. 12*,
   658 F. Supp. 2d 299 (D. Mass. 2009) ............................................................41

*Resnik v. Swartz*,
   303 F.3d 147 (2d Cir. 2002)........................................................................12

*Rodney v. KPMG Peat Marwick*,
   143 F.3d 1140 (8th Cir. 1998)......................................................................17

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003)........................................................................36

*Schaffer v. Evolving Systems*,
   29 F. Supp. 2d 1213 (D. Colo. 1998) ...........................................................36

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996)........................................................................36

*Staehr v. Hartford Fin'l Servs. Group, Inc.*,
   547 F.3d 406 (2d Cir. 2008)........................................................................28

*Sterlin v. Biomune Sys.*,
   154 F.3d 1191 (10th Cir. 1998)....................................................................28

*Tabankin v. Kemper Short-Term Global Income Fund*,
No. 93-5231, 1994 WL 319185 (N.D. Ill. June 23, 1994) .................................................. 17

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
692 F. Supp. 2d 387 (S.D.N.Y. 2010) ............................................................................. 23

*Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*,
No. 10-1399, 2010 WL 1404208 (S.D.N.Y. Apr. 5, 2010) ................................... 8, 38, 40

*Yu v. State Street Corp.*,
686 F. Supp. 2d 369 (S.D.N.Y. 2010) ...................................................................... 9, 20, 27

## STATUTES

15 U.S.C § 77k ....................................................................................................................... 11, 31

15 U.S.C. § 77m .............................................................................................................................. 27

15 U.S.C. § 77*l* ..................................................................................................................... 11, 31

15 U.S.C. § 78j .............................................................................................................................. 11

15 U.S.C. § 80a-13(c)(2)(A)(1) .................................................................................................... 40

15 U.S.C. § 80a-24(e) .................................................................................................................... 30

15 U.S.C. § 80a-29(h) .................................................................................................................... 39

15 U.S.C. § 80a-35(b) .................................................................................................................... 39

15 U.S.C. § 80a-43 .......................................................................................................................... 39

20 U.S.C. § 1681(a) ........................................................................................................................ 39

42 U.S.C. § 2000d .......................................................................................................................... 39

*Comprehensive Iran Sanctions Accountability and Divestment Act of 2010*,
Pub. L. No. 111-195, 124 Stat. 1312 ................................................................................. 40

## OTHER AUTHORITIES

Proposed Rule, *Off-the-Page Prospectuses for Open-End Mgmt. Inv. Cos.*,
Inv. Co. Act Rel. No. 19342, 58 Fed. Reg. 16141 (Mar. 25, 1993)..................................17

Proposed Rule, *Improving Descriptions of Risk by Mutual Funds and Other Inv. Cos.*,
Inv. Co. Act Rel. No. 20974, 60 Fed. Reg. 17172 (Apr. 4, 1995) ....................................17

Notice of Proposed Rulemaking, *Registration Form Used by Open-End Mgmt. Inv. Cos.*, Inv.Co. Act. Rel. 22528, 62 Fed. Reg. 10898 (Mar. 10, 1997) ...............................18

Final Rule, *Registration Form Used By Open-End Mgmt. Inv. Cos.*,
Inv. Co. Act. Rel. 23064, 63 Fed. Reg. 13916, 13929 (Mar. 13, 1998)............................18

Proposed Rule, *Inv. Co. Advertising: Target Date Retirement Fund Names and Marketing*, Inv. Co. Act Rel. No. 29301, 75 Fed. Reg. 35920 (June 23, 2010) ...............13

H.R. Conf. Rep. No. 104-369 ................................................................................................20

H.R. Rep. No. 111-512 .........................................................................................................40

H.R. Rep. No. 73-85 .............................................................................................................32

## INTRODUCTION

The Funds' Registration Statements clearly describe their longstanding investment approach, their specific holdings, and all of the associated risks. There is no disagreement that the Funds consistently have been managed for more than two decades pursuant to a common "Rochester style" of management that is self-described as "contrarian," "value based," and "yield-driven." Nor is there any dispute that this investment approach has long focused on "under-appreciated" municipal securities – including inverse floaters, tobacco bonds, dirt bonds, unrated bonds, and junk bonds – and has used a "no guts-no glory" style that has produced market-leading returns in good times and market-trailing returns in bad. Plaintiffs' theory that investors were surprised when this volatile Rochester style resulted in dramatic declines in the extraordinary 2008 global credit crisis – followed in 2009 by equally dramatic recoveries of 40% or more – therefore has all of the credibility of Claude Rains' professed "shock" that there was gambling going on at Rick's Café in *Casablanca*.

Plaintiffs' arguments are based on the assertion that investors were unaware of the actual investing strategy of the Rochester Funds. This "reasonably ignorant investor" argument depends in the first instance upon Plaintiffs' tactic of wishing away (as "mere boilerplate") specific Fund disclosures about their strategies, risks, and investments. But plain English statements about where the Funds invest (*e.g.*, derivatives, inverse floaters, tobacco bonds, unrated bonds, illiquid bonds, and junk bonds); why they are making those investments (*e.g.*, for "high current income," as "opportunities for value," to "capture market inefficiencies," or to "create highly attractive, yield-driven total returns over the long term"); and the principal risks of this approach (*e.g.*, volatility, leverage, interest rate risk, illiquidity,

and poor security selection by the portfolio managers) cannot be so easily dismissed.  If these disclosures could be disregarded, then the SEC disclosure regime for mutual funds – centered on Form N-1A – would be a legal nullity.

Plaintiffs cannot save their argument by belittling the volume and legal importance of news articles about the Funds.  Plaintiffs mischaracterize the information in those articles as some kind of secret shared among industry insiders while the Registration Statements left investors in the dark about the true nature of the Funds.  But this attack is both nonsensical and flatly inconsistent with the Funds' disclosures:  The Registration Statements disclosed each and every element of the Rochester style and the risks of this approach to seeking tax-free income, and the voluminous press accounts only reinforce these disclosures.  Far from revealing any secret, the press reports reflected the clarity with which the risks and rewards of the Rochester Funds were disclosed in language that no reasonable investor could miss.

This reality has forced Plaintiffs to distort the Funds' basic goal – to "seek as high a level of income exempt from [taxes] as is consistent with capital preservation" – by wrenching two words out of context and misconstruing them as an inviolate promise not to invest in any asset that might lose its value.  Investment objectives, however, do not represent such guarantees.  Nor can two words excerpted from an investment objective be viewed in isolation from the rest of a fund's prospectus.  Plaintiffs seek to do so, however, because they cannot dispute that the Funds fully disclosed their actual investment strategies.  Because these strategies cannot be reconciled with Plaintiffs' construction of the investment goal, they are left to urge the Court to condemn the investment approach on the basis that the disclosed strategies and investments are "antithetical" to the purported investment objective and thus

2

"self-negating."  But Plaintiffs have it precisely backwards: it is their tortured construction of the Funds' goal that is self-defeating.  The Funds *disclosed* their allegedly "antithetical" investment strategies and risks, including the risks of volatility and potential investor loss; their search for "antithetical" yield, value, and high income; and the fact that they earned above-market returns in some periods and weathered "antithetical" volatility in others.

Plaintiffs' claims are also premised on a profound misstatement of the securities laws governing the duty of disclosure.  Plaintiffs repeatedly argue, particularly in defending their inverse floater claims, that the Funds' failure to disclose one factual detail or another (including Plaintiffs' own invention, an inverse floater "leverage ratio") states a claim, for the sole reason that the omitted fact would have been material to a reasonable investor.  But even if Plaintiffs had advanced plausible allegations of a material, omitted fact or risk – which they have not – their argument is contrary to law.  Regardless of the importance of a fact, a duty to disclose that fact arises only if:  (1) disclosure is required by a legal or regulatory requirement like Form N-1A; or (2) disclosure is necessary to cure an otherwise materially misleading statement.  At no point have Plaintiffs alleged or argued either.

Finally, Plaintiffs' arguments are legally wrong.  For example, Defendants have counted 48 decisions since the Second Circuit's decision in *Olmsted v. Pruco*, 283 F.3d 429 (2d Cir. 2002), which address the existence of an implied private right of action under the Investment Company Act.  All but one of these has found no implied private right of action under any section of that statute.  The one outlier decision, which Plaintiffs urge this Court to embrace, is based on a misreading of the Sudan Act of 1970 that Congress itself has just corrected, eliminating any basis for Plaintiffs' purported claim under the ICA.  Plaintiffs'

3

remaining arguments are similarly flawed – they (1) take untenable positions in defending both their valuation and liquidity claims, ignoring clear law providing that no claim arises from disclosure of a fund's business judgment absent allegations that the fund did not believe the judgment at the time it was made; and (2) ignore the language of the Securities Act governing loss causation.

Defendants respectfully submit that a thorough review of the Funds' actual disclosures, read in light of the relevant federal securities laws, will confirm that Plaintiffs have failed to allege a claim.  For the reasons described below, and in Defendants' separate California and Pennsylvania brief, Plaintiffs' claims should be dismissed with prejudice.

## ARGUMENT

**I.     PLAINTIFFS FAIL TO PLEAD THAT DEFENDANTS MADE ANY UNTRUE STATEMENTS OF MATERIAL FACT.**

### A.     Plaintiffs' Investment Objective Allegations Fail To State a Claim.

Plaintiffs argue that the Funds' investment objectives were false because the high-risk, high-reward strategy the Funds pursued was inconsistent with the objective.  This claim fails for two reasons.  First, Plaintiffs' argument hinges entirely on a strained misinterpretation of the goal, which makes no sense in light of the actual language of the objective itself, the surrounding disclosures, and the Funds' past performance.[1]  Second, Plaintiffs' claims fail as a matter of law because investment objectives are aspirational expressions of goals, not actionable promises to investors.

---

[1]     *See, e.g., Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (a reasonable investor is responsible for reading "prospectuses, reports, and other information related to the investments" and has "knowledge of 'publicly available news articles and analyst's reports'") (citing *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 (3d Cir. 2006)).

4

1.      Plaintiffs' Interpretation of Capital Preservation
        Is Unreasonable When Considered in Context.

Plaintiffs claim that the Funds' investment objectives made capital preservation "paramount," and they interpret the objectives to mean that the Funds' "primary goal is to prevent loss of principal." Opp. Br. at 9.  This goal, they assert, was such an overriding commitment to "safety" that it constituted a promise to investors not to invest in "any asset that is not guaranteed to maintain its value." *Id*. at 9-10.  This construction is neither legally nor logically defensible.  As a matter of law, any interpretation of an investment objective, just like the interpretation of any other part of a registration statement, must consider the language in context.  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121 (10th Cir. 1997). Ignoring, as Plaintiffs urge, everything but the words "capital preservation" would distort and falsify the plain meaning of the Funds' investment objectives.

The investment objective states:  "The Fund seeks as high a level of current interest income exempt from [taxes] as is consistent with preservation of capital."  Plaintiffs' construction reads tax-exempt income maximization out of the goal entirely and ignores the remainder of the Registration Statements, which are overwhelmingly devoted to describing the Funds' investment strategies for maximizing income and the associated risks.  For example, the following disclosures are flatly inconsistent with Plaintiffs' interpretation of the Funds' objective and would not exist if Plaintiffs' construction of the goal were correct:

- The Funds look for securities that offer "high current income," including unrated bonds, inverse floaters, junk bonds, and other opportunities for value.[2]  They also seek out securities "of smaller issues that might be

---

[2]     *See* AMT-Free Prospectus (10/26/07) at 3-5, 13; AMT-Free NY Prospectus (12/28/07) at 3-8; Cal. Prospectus (10/31/07) at 3-8, 15; NJ Prospectus (11/28/07) at 3-8, 14; Pa. Prospectus (11/28/07) at 3-8, 14; Rochester Prospectus (2/21/07) at 3-8, 14.

overlooked by other investors or funds." *See, e.g.*, Cal. Prospectus (10/31/07) at 4.

- The "Rochester style" of management is described in the Funds' management commentaries and annual reports as "contrarian," "value-based, and "yield-driven."[3]  The approach is designed to "capture market inefficiencies" and "create highly attractive, yield-driven total returns over the long term." *Id*. at 7, 13.

- "Municipal securities are subject to changes in value when prevailing interest rates change. . .  The magnitude of these price changes is generally greater for bonds with longer maturities. . .  The Fund currently focuses on longer-term securities to seek higher income.  Therefore, the Fund's share price may fluctuate more when interest rates change."[4]  Indeed, the Funds disclosures show that they held very few short-term securities (*i.e.*, maturities of less than one year).  In fact, some of the Funds' holdings had maturities as long as *fifty* years. *See, e.g.*, Cal. SAI (10/31/07) at 101 (CA County Tobacco Securitization Agency, Maturity Date: 06/01/2057).

- The Funds disclosed that OFI offered municipal bond funds other than the Rochester Funds, that these other funds invest in more investment grade securities than the Rochester Funds, and that these funds generally have "much lower price volatility than longer-term or lower-credit-quality funds." *See*, *e.g.*, Rochester MCSR (6/30/07) at 15.

- The Funds may invest up to 25% of their assets in "junk" bonds (100% for the National Fund) to "seek higher income."[5]

- "[U]sing derivatives can increase the volatility of the Fund's share prices.  Some derivatives may be illiquid, making it difficult for the Fund to sell them quickly at an acceptable price."[6]

- The Funds may invest up to 20% of their assets in inverse floaters "to seek greater income" (35% for the National Fund). *Id*.

---

[3]   *See, e.g.*, Rochester Management Commentaries and Semiannual Report ("MCSR") (6/30/07) at 1, 12 (Larrabee Decl., Ex. A-16).

[4]   AMT-Free Prospectus (10/26/07) at 4; AMT-Free NY Prospectus (12/28/07) at 5; Cal. Prospectus (10/31/07) at 5; NJ Prospectus (11/28/07) at 5; Pa. Prospectus (11/28/07) at 5; Rochester Prospectus (2/21/07) at 5.

[5]   AMT-Free Prospectus (10/26/07) at 4, 13; AMT-Free NY Prospectus (1/26/07) at 4-5; Cal. Prospectus (10/31/07) at 5, 15; Nat. Prospectus (11/28/07) at 3; NJ Prospectus (11/28/07) at 4, 14; Pa. Prospectus (11/28/07) at 4, 14; Rochester Prospectus (2/21/07) at 4, 14.

[6]   AMT-Free Prospectus (10/26/07) at 5; Cal. Prospectus (10/31/07) at 8-9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8-9; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 7-8.

- An inverse floater, in "extreme cases, may pay no income" (*id.*), "can be more volatile" (*id.*), "is more volatile" and "will lose value more quickly" than a similar security.[7]

- The Funds may invest up to 15% of their assets in illiquid securities.[8]

- "[P]oor security selection by [the Manager] will cause the Fund to underperform other funds having a similar objective" and "there is no assurance that the Fund will achieve its investment objective."[9]

On the other hand, the Funds never defined capital preservation or represented that they would strive for a stable NAV. To the contrary, they warned investors of the very risks Plaintiffs complain about, including volatility, as the large volume of national press documenting the Funds' investment approach also attest.[10] *See, e.g.*, *In re New York Community Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 478-79 (E.D.N.Y. 2006) (statement that a bank was "risk-averse" was not materially misleading because of the "numerous disclosures" the bank made "regarding the magnitude of its investment in mortgage-backed securities and the risk associated with such investments"). As such, there is no textual support for plaintiff's one-sided misinterpretation of the Funds' goal.

---

[7]     AMT-Free SAI (10/26/07) at 150, 11; AMT-Free NY SAI (12/28/07) at 123, 19; Cal. SAI (10/31/07) at 135, 18; Nat'l SAI (11/28/07) at 160, 12; NJ SAI (11/28/07) at 131, 24; Pa. SAI (11/28/07) at 129, 19; Rochester SAI (2/21/07) at 154, 30.

[8]     AMT-Free Prospectus (10/26/07) at 15; AMT-Free NY Prospectus (12/28/07) at 16; Cal. Prospectus (10/31/07) at 16; Nat'l Prospectus (11/28/07) at 15; NJ Prospectus (11/28/07) at 15; Pa. Prospectus (11/28/07) at 15; Rochester Prospectus (2/21/07) at 15.

[9]     Plaintiffs argument that these warnings may be disregarded as mere boilerplate, *see* Opp. Br. at 16-17, is wrong as a matter of law. *See, e.g.*, *Olkey v. Hyperion 1999 Term Trust Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) ("The plaintiffs seek to have all of the cautionary language disregarded as boilerplate, but it is too prominent and specific to be disregarded."); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993) ("To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.").

[10]    In response to Plaintiffs' efforts to minimize the press accounts, Defendants have attached as Appendix A a list of 75 additional news articles about the Funds, selected as a sample from a range of national publications. The articles themselves, and dozens more like them, are readily available upon request.

There is also no legal support for Plaintiffs' cramped interpretation. In fact, even the lay guide they cite contradicts their theory. Specifically, the *Standard & Poor's Guide to the Perfect Portfolio* on which Plaintiffs selectively rely, *see* Opp. Br. at 9-10, advises investors: "Remember, just because a fund has 'capital preservation' … in its name does not mean that it is strictly following that goal. Do your due diligence on the fund and learn as much as possible about it as you can before placing any money in it." *S&P Guide* at 153. Thus, as Plaintiffs' own authority recognizes, investors must "do [their] due diligence," which would include reading the rest of the information before reaching a conclusion about the steps the fund will take to try to meet its goals.

Here, the Funds' full disclosures explain exactly how the Funds pursue their goals and therefore serve to define the goal itself.[11] Taken together with the Funds' history of volatility, *see* Consol. Br. at 13-14, no rational investor could come away from the Registration Statements with the perception that the Funds focused exclusively or even primarily on capital preservation. This conclusion is fatal to Plaintiffs' claims, which should be dismissed.

>2.   An Investment Objective Is Not a Promise to Investors.

Defendants also move to dismiss Plaintiffs' claims on the independent ground that, as a matter of law, investment objectives are not actionable statements of fact under the securities laws. *See* Consol Br. at 34-36. Defendants rely primarily on the *Tabankin*, *Alliance*, and *TCW/DW* cases. *See* Consol. Br. at 34-36. Plaintiffs do not dispute that, if

---

[11]   Indeed, it is unclear how a specifically disclosed strategy, especially one confirming an ongoing intent to continue to invest in a particular type of security, could be inconsistent with a fund's investment objective. *See, e.g., Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*, No. 10-1399, 2010 WL 1404208, at *5-6 (S.D.N.Y. Apr. 5, 2010).

applied here, those cases are fatal to their claim.  Instead, they argue that two recent cases, also discussed by Defendants, support their claims.  Plaintiffs are wrong as a matter of law.

Plaintiffs rely first on *In re Evergreen Ultra Short Opportunities Fund Sec. Litig*, No. 08-11064, 2010 WL 1253114 (D. Mass. Mar. 31, 2010).  In that case, the court noted that the fund's objective of providing income consistent with preservation of capital and low principal fluctuation "could be considered 'general and indefinite' when considered alone."  *Id*. at *4. The court thus considered the investment objective in context because it was "surrounded by other more specific statements regarding the Fund's objectives."  *Id*.[12]  *Evergreen* thus squarely supports the reasoning of Defendants' argument.  Plaintiffs also rely on *Yu v. State Street Corp.*, 686 F. Supp. 2d 369 (S.D.N.Y. 2010), arguing that the court referred to "capital preservation" as an example of the kind of investment objective upon which investors would reasonably rely.  *See* Opp. Br. at 14.  But the court actually *rejected* investment objective allegations similar to Plaintiffs' claims here, and held that language in a prospectus must be read in context.  *See id*. at 375-76.  *Yu* therefore also supports dismissal here.

In short, all of the cases cited by the parties support the proposition that an investment objective must be understood in context, and the clear weight of authority has rejected arguments like those advanced by Plaintiffs that attempt to isolate words in the objective from

---

[12]   *Evergreen* does not help Plaintiffs factually.  There, the fund had a goal that included "preservation of capital and low principal fluctuation" and additional disclosures that focused on "minimizing price fluctuation" and "reducing price volatility" by, among other things, maintaining "an average portfolio duration of one year or less."  *Id*. at *4.  In other words, the context in *Evergreen* supported Plaintiffs' construction in that case, while the different context refutes the similar construction Plaintiffs attempt here.

the strategies used to pursue the objective.[13]  No authority cited by any party provides a good

reason for Plaintiffs' claim to survive here.

      **B.**      **Plaintiffs' Inverse Floater Allegations Fail To State a Claim.**

Plaintiffs' inverse floater claims are legally defective in at least three ways.  First, they

are based almost entirely on purported omissions (not misrepresentations), and Plaintiffs have

not and cannot establish the existence of a duty to disclose such omitted information.  Second,

Plaintiffs' allegations cannot be reconciled with the Funds' disclosures, which provided

extensive information about their inverse floater holdings, associated liabilities, and risks,

including the risks of volatility, use of leverage, and illiquidity.  Plaintiffs' assertion that the

Court should disregard these detailed disclosures as "boilerplate" is legally incorrect.  Third,

Plaintiffs cannot conjure up a disclosure claim by drawing semantic distinctions between the

Registration Statement disclosures and the language of the October 2008 Supplement because

the Registration Statements contained no misstatements of material fact.

      1.      <u>Plaintiffs Fail To Establish a Duty To Disclose the</u>
                  <u>Allegedly Omitted Information About Inverse Floaters</u>.

Plaintiffs devote nearly half of their inverse floater argument to criticizing the absence

of a disclosed "leverage ratio" for each of the Funds' inverse floater investments.  In addition,

they argue the Funds failed to disclose the possibility of an inverse floater trust collapse by

remarketing agents, the potential reductions in leverage ratios of inverse floater trusts through

---

[13]      Plaintiffs cite *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009), for the proposition that "allegations of misstatements in that investment objective stated a claim sufficient to withstand a motion to dismiss." Opp. Br. at 14.  But the *Schwab* opinion does not speak at all to the question whether an investment objective can be actionable – the court addressed the allegations only in the context of whether plaintiffs had pled fraud with particularity.  *See Schwab*, 257 F.R.D. at 546.

the addition of collateral, and whether sufficient assets were segregated to meet potential obligations under shortfall and forbearance agreements.  All of these omission claims should be dismissed because Plaintiffs allege no duty to disclose such information.

Plaintiffs base these claims entirely on the assertion that the allegedly omitted information would have been material to a reasonable investor and therefore had to be disclosed.  *See, e.g.*, Opp. Br. at 24-25, 34-35, 38-40.  But this argument fundamentally misstates the applicable legal standard.  It is beyond dispute that an alleged omission, no matter how material, is actionable only if there was a duty to disclose the information.  *See* 15 U.S.C §§ 77k, 77*l*, 78j; *Chiarella v. United States*, 445 U.S. 222, 235 (1980); *Oxford Asset Mgmt. Ltd. v. Jaharis*, 297 F.3d 1182, 1190 (11th Cir. 2002).  Such a duty can arise in only two ways:  (1) a legal or regulatory obligation, such as the requirements of Form N-1A; or (2) an omission caused a statement that was made to be materially misleading.  In other words, absent a statutory or regulatory obligation, a mutual fund has a duty to disclose information only if necessary to prevent another fund statement from being materially misleading.  *See, e.g.*, *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 608, 612 (6th Cir. 2005).[14]

---

[14]    The materiality of a fact is determined by looking at the total mix of information and assessing whether that fact would have been important to a reasonable investor when making an investment decision.  The materiality standard is wholly separate from the test for whether there is a duty to disclose.  A duty arises only from a statutory or regulatory requirement or where another statement was untrue at the time it was made, *see Grossman*, 120 F.3d at 1124.  Although Plaintiffs claim to raise questions of fact regarding materiality, this is not sufficient to survive dismissal because the existence of a duty and the truth or falsity of the Registration Statements can be determined as a matter of law at the pleadings stage.  *See, e.g.*, *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (noting that the question of materiality is a separate and distinct issue from "the existence of either a misstatement or an unlawful omission").

Plaintiffs' inverse floater disclosure allegations, premised on the argument that the Funds were obligated to disclose all information that a reasonable investor would consider important, are therefore deficient as a matter of law.  "There is no general duty on the part of a company to provide the public with all material information."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) (Alito, J.); *see also In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir.1997) ("Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure."); s*ee, e.g.*, *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009).  This point of law bars all of Plaintiffs' inverse floater claims:

- *Leverage Ratios*.  There is no legal requirement to include this information in the Registration Statements, and nothing that was disclosed about inverse floaters was rendered untrue by the absence of these calculations, which investors themselves could perform.

- *Collapse of Trusts by a Remarketing Agent*.  There is no legal requirement to disclose all of the ways an inverse floater trust can be collapsed, and the absence of this information did not render any disclosure about the collapse of inverse floater trusts misleading.

- *Collateral Allegations*.  There is no legal requirement to describe the terms on which the Funds may add collateral to an inverse floater trust, and no statement about the Funds' inverse floater investments was rendered misleading without this detail.

- *Shortfall and Forbearance Agreements*.  There is no legal requirement to disclose whether assets have been segregated to meet obligations under shortfall and forbearance agreements, and no statement about the Funds' investments was rendered misleading without this detail.

Plaintiffs do not attempt to establish a duty to disclose under the proper legal standard for actionable omissions.  Their inverse floater claims regarding leverage ratios, collapse, collateral, and shortfall and forbearance agreements should, accordingly, be dismissed.

2. Plaintiffs' Allegations Fail Because Defendants Disclosed the Allegedly Omitted Information.

Plaintiffs' claims also fail because the Defendants disclosed the allegedly omitted information. As noted in Defendants' moving papers, the Funds disclosed the liabilities associated with their inverse floater holdings and the principal risks of inverse floaters, including the risks of volatility and leverage. Indeed, Plaintiffs do not dispute any of the facts about inverse floaters as described by the Funds – how they are created, collapsed, valued, and accounted for, and what the Funds disclosed about their risks. In light of all of this information, Plaintiffs' claims about volatility and leverage fail, even if there were a duty to disclose the information they seek – which as noted above, there is not.

First, Plaintiffs' "leverage ratio" for individual inverse floaters cannot be the sole means of conveying information about volatility. It is, after all, a metric that Plaintiffs themselves invented after the fact, and its calculation and publication is nowhere required by the industry, the SEC, or case law.[15] Moreover, adding this ratio to the existing disclosures would not provide material new information.[16] There is no dispute that the "leverage ratio" for each inverse floater investment can be calculated using information provided in the Funds'

---

15 In seeking comment on proposed new rules for target-date funds earlier this month, the SEC effectively acknowledged that it is an open question whether any comparable metric could even be created. Specifically, the SEC sought public comment on whether there exists any "methodologies that could accurately convey to investors differences between a fund that uses leverage, either through borrowing or investing in derivative instruments, and a fund that does not use leverage." *Proposed Rule, Inv. Co. Advertising: Target Date Retirement Fund Names and Marketing*, Inv. Co. Act Rel. No. 29301, 75 Fed. Reg. 35920, 35928 (June 23, 2010). As noted *infra*, the SEC has twice before tried and failed to develop a metric to quantify fund risk in a way that would help investors.

16 The Supreme Court has warned against setting "too low a standard of materiality," lest mutual funds "bury the shareholders in an avalanche of trivial information – a result that is hardly conducive to informed decision making." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quotation omitted).

disclosures.  Plaintiffs themselves walk through an accurate calculation of their "leverage ratio," using only Fund disclosures of the dollar amounts of Fund inverse floaters and floaters, as listed in the statement of investments.  *See* Consol. Br. at 45-46; Opp. Br. at 26-28. Plaintiffs grumble about the supposed difficulty of the process, but these after-the-fact concerns do not permit them to sidestep their fundamental failure to demonstrate a legal duty to generate and disclose the calculation.  Moreover, Plaintiffs do not dispute that the total inverse floater-related leverage ratio for each Fund as a whole is easy to calculate.[17]  The requested individual calculations therefore would be cumulative of all the underlying information already provided about the Funds' inverse floater holdings (individual and total dollar value of inverse floater investments, short-term floater liabilities, current market values of the underlying bonds, etc.).  *See* Consol. Br. at 19, 41, 46.  Indeed, these disclosures, coupled with the Funds' direct warnings that inverse floaters "will lose value more quickly" than a similar security[18] and, "in extreme cases, may pay no income," Consol. Br. at 18, warned investors more clearly and completely than would Plaintiffs' individual "leverage ratios" about the volatility risks about which Plaintiffs now complain.  Opp. Br. at 24-26. Plaintiffs' desire to have funds calculate and disclose leverage ratios for individual inverse floaters does not suffice to state a claim.  *See Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 210 (2d Cir. 1980) (finding that "disclosure in a prospectus must steer a middle course").

---

[17]    The total dollar amount of each Fund's inverse floater holdings and floater liabilities are listed in the statement of investments, and the ratio for the Fund is calculated by dividing the two numbers.  *See* Consol Br. at 45-46.  This clearly is the type of simple arithmetic that the law does not require Defendants to do.  *See id.*

[18]    AMT-Free SAI (10/26/07) at 11; AMT-Free NY SAI (12/28/07) at 19; Cal. SAI (10/31/07) at 18; Nat'l SAI (11/28/07) at 12; NJ SAI (11/28/07) at 24; Pa. SAI (11/28/07) at 19; Rochester SAI (2/21/07) at 30.

Second, Plaintiffs argue that the Funds' disclosures about volatility risk were "mere boilerplate."  But they fail to grapple with the actual disclosures the Funds made and, as a result, their assertion is not persuasive.  While a broad statement like "investors may lose money" standing alone may be too general to warn about volatility risk, the Funds' disclosures about volatility risk, which Plaintiffs ignore, are very specific.  For example, the Funds cautioned:

- "The market value of inverse floaters *can be more volatile* than that of a conventional fixed-rate bond having similar credit quality, redemption provisions and maturity."[19] (emphasis added).  The SAIs similarly disclosed that the market value "*is more volatile*."[20] (emphasis added).

- "Inverse floaters all entail some degree of leverage.  An inverse floater that has a higher degree of leverage usually is *more volatile* with respect to its price and income than an inverse floater that has a lower degree of leverage."[21] (emphasis added).

- "An additional risk of investing in municipal securities that are derivative instruments is that their *market value could be expected to vary to a much greater extent* than the market value of municipal securities that are not derivative instruments but have similar credit quality, redemption provisions and maturities."[22] (emphasis added).

---

[19]     AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 8; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 8; Pa. Prospectus (11/28/07) at 8; Rochester Prospectus (2/21/07) at 8.

[20]     AMT-Free SAI (10/26/07) at 150; AMT-Free NY SAI (12/28/07) at 123; Cal. SAI (10/31/07) at 135; Nat'l SAI (11/28/07) at 160; NJ SAI (11/28/07) at 131; Pa. SAI (11/28/07) at 129; Rochester SAI (2/21/07) at 154.

[21]     AMT-Free Prospectus (10/26/07) at 5; AMT-Free NY Prospectus (12/28/07) at 8; Cal. Prospectus (10/31/07) at 9; Nat'l Prospectus (11/28/07) at 8; NJ Prospectus (11/28/07) at 9; Pa. Prospectus (11/28/07) at 9; Rochester Prospectus (2/21/07) at 8.

[22]     AMT-Free SAI (10/26/07) at 17; AMT-Free NY SAI (12/28/07) at 25; Cal. SAI (10/31/07) at 24; Nat'l SAI (11/28/07) at 17; NJ SAI (11/28/07) at 30; Pa. SAI (11/28/07) at 24; Rochester SAI (2/21/07) at 31.

*See* Consol. Br. at 42-44 (quoting volatility disclosures).[23]   These and other explicit and repeated warnings about volatility risk are "substantive and tailored" to the risk and "too prominent and specific" to be characterized as "boilerplate."   *Olkey*, 98 F.3d at 5; *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d at 371-72.   And, of course, the Funds' disclosures about their past performance provide concrete evidence of historical volatility.   *See* Consol. Br. at 13-14.   Plaintiffs' refusal to address the specific content of the disclosures is telling.[24]

Finally, Plaintiffs argue that Defendants should have disclosed the "magnitude of risk" undertaken by investing in inverse floaters.   *See* Opp. Br. at 34.   Prospectively quantifying the "magnitude of risk" in an actively managed portfolio, as a practical matter, is inconceivable, as it would require Funds to assess and predict in real time the movements of markets that are subject to unpredictable fluctuations as severe as those the Funds experienced in the 2008 credit crisis.   Guessing at the magnitude of risks prospectively is, for good reason, not required by the Securities Act.   *See* Consol. Br. at 49-50.   In any event, Plaintiffs' claim is eviscerated by the Funds' disclosure of the amount of the short-term floaters as a liability on the Funds' balance sheets.   *See id.* at 19, 41.   Those disclosed liabilities define the "magnitude of the risk" the Funds faced on their inverse floater investments.   Any potential liability associated with inverse floaters – including the risk of collapse by any means, or adding

---

[23]   Contrary to Plaintiffs' allegations, the Funds did in fact disclose the right of floater holders to redeem every seven days at par value.   *See* Consol. Br. at 17.

[24]   Plaintiffs press the legally deficient argument that "can" be more volatile should have read "is" more volatile.   But they ignore the fact that Defendants did in fact use "is" in the SAI, *see* Consol. Br. at 44, which alone defeats this claim.   "At best, plaintiffs are quibbling about semantics." *In re RAC Mortgage Inv. Corp. Sec. Litig.*, 765 F. Supp. 860, 864 (D. Md. 1991). In any event, Plaintiffs' attempt to distinguish *In re RAC Mortgage* and *In re Thornburg Mortgage* is unavailing, as those courts rejected arguments just like Plaintiffs' here.   *See In re Thornburg Mortgage, Inc.*, No. 07-0815, 2010 WL 378300, at *42 (D.N.M. Jan. 27, 2010).

collateral for inverse floater trusts – was defined by the liabilities of each trust.  Those

liabilities and risks therefore were already disclosed in the Funds' statements of assets and

liabilities.[25]  Accordingly, Defendants clearly disclosed the "hard facts critical to appreciating

the magnitude of the risks described."[26]  They were not, for good reason, obligated to do

more.  *See, e.g.*, *Borow v. nView Corp.*, 829 F. Supp. 828, 838 (E.D. Va. 1993) ("The focus of

the securities laws is on the disclosure of facts; characterizations of or conclusions drawn

from those facts are matters that are left to the judgment of investors."); *Tabankin v. Kemper*

*Short-Term Global Income Fund*, No. 93-5231, 1994 WL 319185, at *2 (N.D. Ill. June 23,

1994) ("Nor can investors state a claim for omission of material information where the offeror

fails to quantify the risks identified.").  Indeed, the SEC itself has twice refused to require that

Funds quantify the magnitude of their risks.[27]

---

[25]     Plaintiffs do not contest Defendants' explanation of why the addition of collateral to an inverse floater trust would have no impact on the net assets of a Fund and thus would not affect NAV or the value of investor shares.  *See id.* at 19-20.

[26]     The cases Plaintiffs cite state only that, if there are "hard facts critical to appreciating the magnitude of the risks described," then those *facts* must be disclosed.  *First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99-12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001) (noting defendant's failure to disclose "the short-term nature" of its institutional spread products); *see also Rodney v. KPMG Peat Marwick*, 143 F.3d 1140, 1144 (8th Cir. 1998) (defendant made a misrepresentation when it "said it could not buy illiquid securities, borrow money, or issue senior securities"); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009) (defendants "failed to disclose the existence of facts known for many months that would negatively affect Giant's business").

[27]     In 1993, the SEC asked for public comment on whether mutual funds should be required to disclose "where the fund fits on a . . . numerical scale from 1 (least risky) to 10 (most risky)."  Proposed Rule, *Off-the-Page Prospectuses for Open-End Mgmt. Inv. Cos.*, Inv. Co. Act Rel. No. 19342, 58 Fed. Reg. 16141, 16145 (Mar. 25, 1993).  After receiving comments, the SEC elected not to proceed with the proposal.  Two years later, the SEC asked for comments on the "relative merits" of requiring mutual funds to disclose "quantitative measures of risk and risk-adjusted performance."  Proposed Rule, *Improving Descriptions of Risk By Mutual Funds And Other Inv. Cos.*, Inv. Co. Act Rel. No. 20974, 60 Fed. Reg. 17172, 17173-74 (Apr. 4, 1995).  After receiving comments on this proposal, the SEC abandoned the proposal, and to this day it has refused to require mutual funds to make quantitative disclosures regarding "aggregate risk

3.      Plaintiffs' Claims Based on the October 2008 Supplement
        Fail Because Defendants Disclosed the Underlying Risks.

Plaintiffs argue that the October 2008 Supplement disclosed new information about inverse floaters, not just more details about previously disclosed risks.  But Plaintiffs do not bother to establish that the Funds had a duty to disclose the information at issue, particularly before the 2008 financial crisis; nor, in any event, do they allege a single *fact* to render their conclusory claims plausible.

First, Plaintiffs are mistaken on the law about subsequent disclosures.  It is well established that disclosures are not rendered misleading by subsequent improvements.  *See, e.g.*, *Greenapple v. Detroit Edison Co.*, 618 F.2d 198 (2d Cir. 1980).[28]  Plaintiffs' attempt to distinguish these cases rests on their assertion that the Funds' risk disclosures can be ignored, because, according to Plaintiffs, they were "buried piecemeal throughout separate documents."  Opp. Br. at 48.  But a quick look at the Registration Statements disproves this hollow claim, as the very first section of the Prospectuses includes various warnings about the "main risks" of investing in the Funds.  These risks are repeated and further explained with specificity throughout the Prospectus, in the SAI, and the Statement of Investments.  *See* Consol. Br. at 16-20, 39-46.

---

exposure."  Notice of Proposed Rulemaking, *Registration Form Used By Open-End Mgmt. Inv. Cos.*, Inv. Co. Act. Rel. 22528, 62 Fed. Reg. 10898, 10911 (Mar. 10, 1997) (the "Commission is not proposing at this time to require funds to use quantitative risk measures"); *see also* Final Rule, *Registration Form Used By Open-End Mgmt. Inv. Cos.*, Inv. Co. Act. Rel. 23064, 63 Fed. Reg. 13916, 13929 (Mar. 13, 1998) ("The Commission did not propose to require a fund to disclose information designed to quantify its expected risk levels.").

[28]   *See also Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (dismissing Rule 10b-5 claim in which plaintiff "simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones"); *Krouner v. American Heritage Fund*, 899 F. Supp. 142, 147 (S.D.N.Y. 1995) (granting motion to dismiss and declining to consider a subsequent prospectus as evidence for a Securities Act claim).

Second, having disclosed the main underlying risks, there is no further duty to explain all of the ways those risks could materialize.  Plaintiffs argue the Funds were obligated to disclose the possibility that *a third party* could cause a collapse of the inverse floater trusts. *See* Opp. Br. at 35-37.  This argument fails, because the existence of the risk – the potential need to sell securities prior to maturity for liquidity reasons and the possibility of trust collapse – was disclosed, even if every factual scenario by which that risk could come to pass was not.  The law does not require funds to guess at and disclose all of the various means by which disclosed risks could materialize.  *See* Consol. Br. at 48-51, 54; *see also In re Thornburg Mortg., Inc.*, 683 F. Supp. 2d 1236, 1257-58 (D.N.M. 2010) (there is no duty to "disclose a contract provision, without alleging that the provision is unique").  All that the Funds needed to disclose was that a collapse could occur and the associated liabilities, which they did.

The importance of focusing on the core risk, as opposed to playing out each possible scenario, is well-illustrated by the undisputed facts here.  The 2008 Supplement was explicitly issued in response to the extraordinary market turmoil affecting all market participants during the unprecedented financial crisis of 2008.  These tumultuous markets, unsurprisingly, affected the likelihood and means of a potential collapse, and the Fund so informed investors.  Plaintiffs effectively argue that Defendants should have predicted the market panic, but courts rightly have rejected such theories based on hindsight.  *See, e.g.*, *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, No. 08-8143, 2010 WL 961596, at *11 (S.D.N.Y. Mar. 17, 2010) (referring to the "mortgage crisis" that defendant bank, "like so many other institutions, could not have been expected to anticipate").

Plaintiffs' last ditch effort to characterize the foreseeability of the credit crisis as a question of fact for the jury, s*ee* Opp. Br. at 37, is inconsistent with the growing number of opinions dismissing complaints alleging failures to anticipate the unforeseeable market events of 2008. *See, e.g.*, *Yu*, 686 F. Supp. 2d at 376 ("Of course, from our vantage point on the other side of the financial crisis, it is conventional wisdom that highly rated, investment grade securities were exposed to risks that the rating agencies did not perceive.").

Third, Plaintiffs do not allege any facts to support their argument that trusts actually were collapsed by third parties.  Nor do they allege how either a collapse or any potential reduction of leverage in an inverse floater – resulting in the use of an existing Fund asset to satisfy a disclosed liability – might have or did damage the Funds.[29]  Plaintiffs' failures are not surprising, as the Funds in fact were able to secure a $3 billion line of credit from Citibank to meet their liquidity needs.  *See* Consol. Br. at 26-27.[30]  Thus, there is absolutely no basis on which to conclude that the theoretical possibility of trust collapse could – or did – have a material impact on the Funds.  Plaintiffs' fall-back argument that discovery is needed to identify transactions that might validate their conclusory allegations is precisely the type of fishing expedition the securities laws are intended to prohibit.  *See, e.g.*, H.R. Conf. Rep. No. 104-369, at 37 (PSLRA discovery stay is intended to weed out "fishing expeditions"

---

[29]     As discussed in the Defendants' opening brief, neither a collapse of the trust nor the addition of collateral would have any affect on the Funds' NAV.  Consol Br. at 19-20, 54 n.102.  Plaintiffs do not contend otherwise.

[30]     Instead, they point to three holdings of the National Fund that, in January 2009, were marked as illiquid and valued lower than they were half a year earlier.  *See* Opp. Br. at 41-42.  But this is unsurprising considering the financial crisis was at its worst in the second half of 2008.  Far from bolstering their claims, these irrelevant allegations merely highlight the absence of relevant factual support for Plaintiffs' conclusory claims.

disguised as legal claims).  Plaintiffs must first allege plausible facts that there was a

misstatement and that it was material, but Plaintiffs have done neither.

> 4.    Plaintiffs' Allegations About Collateral Requirements and
>        Shortfall and Forbearance Agreements Fail To State a Claim.

Plaintiffs argue that Defendants failed to disclose that the Funds could be required to

add collateral to inverse floater trusts and therefore might be required to sell other portfolio

holdings at disadvantageous times to raise cash.  *See* Opp. Br. at 38-39.  This claim fails for

several reasons.  First, as discussed above, Defendants had no duty to make such a disclosure.

Second, the Funds did disclose their liabilities under inverse floater transactions and the

inherent risk that the Funds might need to sell assets at disadvantageous times.  *See* Consol.

Br. at 19-20, 41, 45.  And, as discussed in Defendants' opening brief, the addition of collateral

has no impact on a Fund's disclosed NAV.  *Id.* at 20.

In the same vein, Plaintiffs concede that the Funds disclosed the risks associated with

shortfall and forbearance agreements, but nevertheless complain that the Funds failed to

disclose that they had not segregated sufficient cash to meet their obligations under the

agreements.  *See* Opp. Br. at 40-42.  This theory fails for several reasons.  First, there is no

duty to disclose this information.  Second, the Funds disclosed both their total liabilities under

their inverse floater investments and, for those transactions subject to a shortfall and

forbearance agreement, the Funds disclosed the "maximum exposure under such

agreements."[31]  Third, the assertion is wholly conclusory:  Plaintiffs offer no factual basis for

---

[31]     AMT-Free SAI (10/26/07) at 152 ($77,958,000); AMT-Free NY SAI (12/28/07) at 125
($74,610,000); Cal. SAI (10/31/07) at 137 ($13,500,000); Nat'l SAI (11/28/07) at 164
($757,000,000); NJ SAI (11/28/07) at 133 ($33,960,000); Pa. SAI (11/28/07) at 129
($47,520,000); Rochester SAI (2/21/07) at 157 ($33,750,000).

their conclusion that the Funds had not segregated sufficient assets, and they fail to identify any illiquid assets that had to be sold at fire-sale prices.  And absent at least some such particulars, they also have fallen far short of pleading materiality.  Finally, this claim is plainly an attempt to bootstrap a claim for mismanagement into a disclosure claim.  *See Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007).

<div style="text-align:center">5.      The Funds Did Not Violate Their Inverse Floater Asset Limits.</div>

Plaintiffs also fail to allege any untrue statement of fact concerning the Funds' 20% asset limit on inverse floater investments.  Again resorting to semantics, Plaintiffs argue that the Funds' *exposure* to inverse floaters exceeded the 20% limit, carefully avoiding the fact that the Funds clearly defined the 20% limit as a percentage of total *assets.*  Plaintiffs' reinterpretation of "assets" to mean "exposure" is contrary to the language of the Registration Statements.  The Fund itself is entitled to define this investment limit; it adopted and disclosed an asset-based limit that governs, not Plaintiffs' self-serving view of what an investor may think when "told that an investment in a particular type of security will not exceed twenty percent of assets."  Opp. Br. at 43.  Nor can Plaintiffs reconcile this purported reaction to the disclosed asset limit with the fact that the Funds made additional, and separate, disclosures of the liabilities – the "exposure" – associated with inverse floaters, individually and in the aggregate.  With respect to the actual, asset-based limit, Plaintiffs do not even try to identify any Fund that exceeded the 20% ceiling at any point in time.  The unmistakable

misreading of the limit, and the complete absence of relevant factual allegations, dooms Plaintiffs' claims.[32]

### C.    Plaintiffs' Illiquidity Allegations Fail To State a Claim.

It is undisputed that a representation reflecting a defendant's exercise of professional judgment is not actionable, unless the plaintiff alleges that the statement was not believed by the defendant when made.[33]   *See* Consol. Br. at 59-60.   Rather than contesting this point of law, Plaintiffs defend their illiquidity claims by asserting that the liquidity of each of the Funds' thousands of investments is an objective fact, and that determining whether an investment is liquid does not involve the exercise of judgment.   This argument is untenable. Plaintiffs concede that the SEC defines "illiquid securities" as securities "that cannot be disposed of in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment."   Opp. Br. at 54.   But the Funds were required to assess the liquidity of each security without actually trying to sell it in the marketplace.   Thus, Plaintiffs cannot credibly argue that this assessment of liquidity is not a matter of judgment.

Plaintiffs strain to escape this fatal predicament, but their arguments are easily refuted and several of them actually make Defendants' point:

---

[32]    The National Fund Plaintiff's remaining argument that inverse floaters are not municipal securities is meritless.   *See* Opp. Br. at 44-46.   Plaintiff is unable to support this argument with any authority whatsoever – legal, regulatory, or academic.   For the reasons set forth in Defendants' opening brief, this argument should be dismissed.   *See* Consol. Br. at 55.

[33]    Recent cases have echoed this point.   *See, e.g.*, *N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, No. 08- 5653, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 395 (S.D.N.Y. 2010); *Fait v. Regions Fin. Corp.*, No. 09-3161, 2010 WL 1883487 (S.D.N.Y. May 10, 2010).

- Contrary to Plaintiffs' assertions, Fund disclosures speak directly to the discretionary nature of liquidity determinations, noting that the "Manager determines the liquidity of certain of the Fund's investments," Consol. Br. at 59, and that the Manager may "deem" or "treat" certain securities as illiquid.[34]

- Plaintiffs continue to base their entire argument only on trading activity, despite SEC guidance listing a variety of other criteria for evaluating the liquidity of portfolio securities, and Fund disclosures stating that trading volume must be considered "among other factors." Consol. Br. at 59.

- Plaintiffs seek to dismiss the SEC's liquidity criteria, arguing that each of them (*e.g.*, the nature of the market, the number of interested dealers or market makers) is an objective fact. *See* Opp. Br. at 58. But this misses the point because even if the argument were correct, determining liquidity requires a subjective evaluation of these factors taken together.

- Remarkably, Plaintiffs insist that identifying and evaluating the relevant criteria for liquidity is a jury question, inadvertently but unequivocally confirming that the evaluation must involve discretion and judgment. *See* Opp. Br. at 57-58.

- Even more fundamentally, Plaintiffs base their entire claim on their own illiquidity judgments, which were "based on counsel's extensive review of the trading activity." Opp. Br. at 53. Far from proving the existence of an objective, factual standard for determining illiquidity, this concedes that Plaintiffs offer only another equally subjective point of view.

The inescapable conclusion is that determining the liquidity of a portfolio of municipal securities – which are not traded on an exchange and which trade far less frequently than most securities – is a matter of judgment that turns on a subjective evaluation of a range of factors. Plaintiffs' liquidity claims should therefore be dismissed because Plaintiffs do not and cannot allege that the Funds did not believe their liquidity judgments at the time they made them.

---

[34]   *See* AMT-Free SAI (10/26/07) at 5, 19; AMT-Free NY SAI (12/28/07) at 5, 27; Cal. SAI (10/31/07) at 5, 26; Nat'l SAI (11/28/07) at 5, 20; NJ SAI (11/28/07) at 5, 32; Pa. SAI (11/28/07) at 5, 27; Rochester SAI (2/21/07) at 5.

**D.      Plaintiffs' Valuation Allegations Fail To State a Claim.**

The crux of Plaintiffs' valuation claim is their allegation that the Funds overvalued their securities, because that of course is the only argument that would support the potential recovery of damages.  But Plaintiffs do not and cannot allege that Defendants did not believe the valuations of Fund holdings at the time they were made.  As discussed above, to state a Securities Act claim based on a discretionary judgment like the fair value of a security, Plaintiffs must allege that Defendants did not truly hold the opinion at the time it was made. Recent court decisions consistently and repeatedly have rejected similar securities valuation claims where plaintiffs fail to allege that the valuation determinations were not honestly believed when made.  For example, in *Fait v. Regions Financial Corp.*, No. 09-3161, 2010 WL 1883487 (S.D.N.Y. May 10, 2010), the court found that the fair value of assets that lacked readily available market prices "was not a matter of objective fact" but "judgment and opinion."  *Id.* at *12.  Thus, the question was not whether the valuation was wrong, but whether it reflected the manager's "honest opinion."  *Id.* at *13; *see also Epirus Capital Mgmt. LLC v. Citigroup, Inc.*, No. 09-2594, 2010 WL 1779348, at *5 (S.D.N.Y. Apr. 29, 2010) (dismissing valuation claims that "say nothing about the worth of the assets" at the time in question); *N.J. Carpenters Health Fund*, No. 09-2594, 2010 WL 1257528, at *6 (holding that opinion statements "are not actionable unless it is alleged that the opinions were not truly held.").  While Plaintiffs seek to excuse their failure to allege that the Funds' valuations were

not honestly believed when made as "irrelevant," they cite no authority to support them or to contradict the abundant case law cited by Defendants.[35]  *See* Opp. Br. at 62.

Perhaps for this very reason, Plaintiffs go to great lengths to defend their allegations that the Funds misled investors about the procedures and data they would employ to make their valuation judgments.  Specifically, Plaintiffs assert that the Funds represented that they would use "actual trade-related data" to calculate NAV when in fact they used "unobservable inputs."  Opp. Br. at 60-61.  This claim fails because Defendants never represented that they would value their municipal bond holdings based on "actual trade-related data."  Indeed, to make this argument, Plaintiffs cite a long passage from the Funds' disclosures about securities valuation techniques that simply do not apply to municipal securities – specifically, the valuation of securities traded on "National Stock Exchanges or other domestic exchanges" or on NASDAQ.  Opp. Br. at 59.  As all reasonable investors should know, municipal securities like those held by the Fund are not traded on such exchanges.[36]  Plaintiffs do eventually cite, but then ignore, the valuation disclosures that are relevant, where the Funds clearly told investors that "[i]n the case of municipal securities, when last sale information is not generally available, the Manager may use pricing services approved by the Board of Trustees," which may use "'matrix' comparisons to the prices for comparable instruments."  Consol. Br. at 22,

---

[35]  Plaintiffs' invocation of *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385 (S.D.N.Y. 2005), is misplaced.  The plaintiffs in that case alleged that the funds' NAVs were overstated due to fraudulent conduct, which necessarily means that Defendants did not believe their valuations when made.  *Id*. at 396.

[36]  *See* Consol. Br. at 22.  Plaintiffs rely on sentences from the Registration Statements that often may not be important for the Funds, although they accurately describe valuation techniques that are applied across the full range of Oppenheimer Funds, many of which do invest in exchange-traded securities.  More importantly, Plaintiffs are not excused from directing their attention to the paragraph of the disclosure most relevant to them, which begins "[i]n the case of municipal securities."

61; Opp. Br. at 60.  Plaintiffs' invocation of FASB 157, which requires categorization of the data sources used under the Valuation Procedures, further exposes their confusion about the fact that the Manager was not "fair valuing" the prices of securities on its own, but was relying on an independent pricing service to gather prices or to apply matrix pricing where necessary.  *See* Opp. Br. at 61; Consol. Br. at 23-24.  At the end of the day, Plaintiffs' valuation claim does no more than accuse the Funds of using the very process they disclosed and it fails to points to any untrue statement of material fact.[37]

## II.   PLAINTIFFS' INVESTMENT OBJECTIVE AND INVERSE FLOATER CLAIMS ARE TIME-BARRED.

Plaintiffs' investment objective and inverse floater allegations also should be dismissed because Plaintiffs were on notice of these claims more than one year before they filed suit.  *See* 15 U.S.C. § 77m.  The Funds repeatedly and prominently disclosed the information underlying these claims for years.  Accordingly, the claims are time-barred**.**

### A.   Plaintiffs Were on Notice of Their Investment Objective Claims.

Plaintiffs argue that the investment objectives' reference to "capital preservation" amounted to a promise that the Funds would have "extremely low price fluctuations."  Opp. Br. at 11.  They also argue that a reasonable investor would have had no reason to know that the Funds were not following these conservative guidelines because the disclosures were "mere boilerplate" and because some of the articles cited by Defendants in their Consolidated Brief appeared only in "specialty publications."  Opp. Br. at 69.

---

[37]      Plaintiffs' attempt to distinguish *Yu v. State Street Corporation* is futile.  Both there and here, the values assigned to specific securities "correspond to the values that the offering document led investors to expect," and Plaintiffs cannot show that any stated values were not believed at the time.  *Yu*, 686 F. Supp. 2d at 380; *see also* Consol. Br. at 63-64.

Plaintiffs' claim of ignorance does not withstand scrutiny. Irrespective of the availability of the publications, Plaintiffs were put on notice by the Funds' disclosures – documents that investors are "presumed to have read," and which made plain that the Funds invested in risky securities and were managed pursuant to a "contrarian" and "yield-driven" approach. *See DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 216 (3d Cir. 2007). Moreover, the voluminous press coverage of the Funds, a sample of which is listed in Appendix A and in Defendants' opening brief, make clear that the Funds' disclosures effectively communicated the Funds' strategy and associated risks and did, in fact, put investors on notice. *See supra* at 7, n.10. Plaintiffs' attempts to explain away the press reports are meritless. First, they argue without any legal support that reasonable investors cannot be charged with knowledge of articles in *Barron's*, *Morningstar*, and *The Bond Buyer*, which they label as "subscription-only industry publications." Opp. Br. at 70. But the law is to the contrary. *See Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1204 (10th Cir. 1998) (article in *Barron*'s provides inquiry notice); *In re MBIA Inc., Sec. Litig.*, No. 05-3514, 2007 WL 473708, at *7 (S.D.N.Y. Feb. 14, 2007) (articles in *The Bond Buyer* provide inquiry notice).[38] Nor can Plaintiffs argue that mutual fund investors are unaware of the *Wall Street Journal*, the *New York Times*, or other publications, let alone the many *Morningstar* reports, on which Plaintiffs themselves relied in their own Complaints. *See, e.g.*, Cal. Compl. ¶¶74, 77, 100.

---

[38]   The *Staehr* case cited by Plaintiffs actually supports dismissal. The court in that case declined to find inquiry notice based exclusively on an article published in an industry newsletter. *See Staehr v. Hartford Fin'l Servs. Group, Inc.*, 547 F.3d 406, 432 (2d Cir. 2008). But the court noted that the newsletter would have contributed to inquiry notice if the issuer's disclosures might have alerted a reasonable investor to the possibility of a misstatement. *See id*. at 431. That is precisely what happened here.

Second, Plaintiffs argue that press coverage of the Funds should be ignored because the articles did not identify misstatements and because some articles referred to the Rochester Funds generally rather than to specific funds. *See* Opp. Br. at 71-72. But disclosures for all of the Funds referred to the "Rochester style" of investing, so press coverage of this nature is relevant to a reasonable investor in the Rochester family of funds. *See DeBenedictis*, 492 F.3d at 218-19. Moreover, *Morningstar* regularly reviewed each of the Funds individually, and these fund-specific reports have for years informed investors that the Funds took on more risk than their peers.

Finally, the historical volatility of the Funds' NAVs is an unmistakable reflection of the Funds' aggressive approach; no reasonable fund investor could confuse these Funds for the sort of stable value fund that Plaintiffs describe in hindsight. *See* Consol. Br. at 14. If these Funds did depart from an objective focused only on "preservation of capital" – in the unrealistic and out of context form Plaintiffs urge – they patently did so long ago.

### B.      Plaintiffs Were on Notice of Their Inverse Floater Claims.

Plaintiffs do not respond to most of Defendants' statute of limitations arguments regarding their inverse floater allegations. Specifically, Plaintiffs ignore Defendants' arguments that investors were on notice of the following risks of inverse floaters: volatility risk, interest rate risk, leverage, and shortfall and forbearance agreements. *See* Consol. Br. at 73-75. Plaintiffs do, however, argue that they were not put on notice that third parties could force the Funds to sell assets at disadvantageous times. *See* Opp. Br. at 73-74. But this purported omission relates to the possibility that trusts could be collapsed – a risk that the Funds had disclosed. Thus, Plaintiffs were on notice of all material facts about the Funds'

investments in inverse floaters and the risks associated with them, and their inverse floater claims are therefore time-barred.

> ### C.   Plaintiffs Were on Notice That the National Fund Invested More Than 20% of Its Assets in Inverse Floaters.

Plaintiffs' claims about the National Fund's investments in inverse floaters also are time-barred.  The National Fund's Prospectus stated that the Fund invests at least 80% of its assets in municipal securities.  Nat'l Prospectus (11/28/07) at 3.  Plaintiffs claim that the National Fund violated this limit by investing more than 20% of its assets in inverse floaters, which they claim are not "municipal securities."  Opp. Br. at 44-47.  This argument fails because inverse floaters are municipal securities, but it also is time-barred because the National Fund made clear that the Fund could invest more than 20%, *i.e.*, up to 35%, of its assets in inverse floaters.  *See* Nat'l Prospectus (11/28/07) at 8; Consol. Br. at 71 n.129.  Plaintiffs do not seriously contest this point, which does not appear in their response to Defendants' statute of limitations arguments.  *See* Opp. Br. at 66-75.  This claim should therefore be dismissed.[39]

---

[39]   The Securities Act's 3-year statute of repose also bars claims based on four Registration Statements filed in 2005 (for the AMT-Free, National, NJ, and Rochester Funds) and one filed in January 2006 (for the AMT-Free NY Fund).  *See* Consol. Br. at 68 n.127.  Plaintiffs appear to argue that the statute of repose does not apply to mutual funds, which offer shares continuously.  *See* Opp. Br. at 67 n.88.  But this argument ignores 15 U.S.C. § 80a-24(e), which states that each post-effective amendment to a mutual fund's registration statement should be treated as a new registration statement for section 11 purposes.  Thus, investors must bring suit within 3 years of the effective date of the post-effective amendment pursuant to which they purchased shares.

III.   **PLAINTIFFS' LOSSES DID NOT RESULT FROM ALLEGED MISREPRESENTATIONS OR OMISSIONS.**

Plaintiffs' claims also should be dismissed because they suffered no compensable damages under sections 11(e) and 12(b) of the Securities Act. Those provisions limit compensable damages to the "depreciation in value" of a security that "result[s] from" the alleged misrepresentations or omissions. 15 U.S.C. §§ 77k(e), 77*l*(b). Here, it is undisputed that misrepresentations about the riskiness of a mutual fund's investment strategies can have no impact on the value of the fund's shares. *See* Opp. Br. at 76-77 (acknowledging that misstatements could not impact the price of an index fund). Instead, a mutual fund's shares are priced according to a mathematical formula based on the value of the fund's net assets. *See* Consol. Br. at 75. As a result, any "depreciation in value" of the Funds' shares could have been caused only by market forces affecting the value of the assets and liabilities in the Funds' portfolios. *See, e.g.*, *Castillo v. Dean Witter Discover & Co.*, No. 97-1272, 1998 WL 342050, at *5 (S.D.N.Y. June 25, 1998) (explaining that changes in a mutual fund's share price are "related to the success of the investment strategies of that fund"). Thus, under the plain language of sections 11(e) and 12(b), such losses are not recoverable under the Securities Act.

Because the statutory language is clear, that should be the end of the matter. But Plaintiffs also are wrong to suggest that Congress intended to grant them a remedy under the strict liability provisions of the Securities Act. The Supreme Court has explained that causation in common law fraud cases typically has two parts: (1) the misrepresentation must cause the plaintiff to enter into the transaction ("transaction causation" or "reliance"); and (2) the misrepresentation must have actually caused the plaintiff's loss ("loss causation"). *Dura*

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  When Congress passed the Securities Act, it was willing to do away with reliance because it made the reasonable assumption that statements in a registration statement, whether accurate or misleading, would affect the price at which the securities were offered.[40]  But Congress preserved the second part of the traditional causation requirements by allowing defendants to show that any decline in value "resulted from," for example, market forces, rather than the alleged misstatements.

Plaintiffs, however, ask this Court to do away with causation entirely.  In practical terms, Plaintiffs argue that they can sue for damages under the Securities Act based on a misrepresentation of fact in a registration statement they never read and that had no effect on the value of their investment.  Instead, Plaintiffs believe it is sufficient that the "subject" of the alleged misrepresentation was related to a risk that eventually materialized in the market place, driving down the value of the assets that comprise the Funds' share prices – even though the misstatement itself had no impact on either the price Plaintiffs paid for their securities or the price they received when those securities were sold.  *See* Opp. Br. at 77.  There is no support in the text or legislative history of the Securities Act for this remarkable attempt to eliminate entirely the bedrock concept of causation.  Moreover, "materialization of the risk" is a loss causation concept developed under the Exchange Act to account for situations where a stock price is artificially inflated for failure to disclose a risk that, upon materialization, drove down the stock price.  In the mutual fund setting, statements, good or bad, in the Funds' disclosures cannot create such artificial inflation in the share's price.

---

[40]     *See* H.R. Rep. No. 73-85 at 20 ("Inasmuch as the value of the security may be affected by the information given in the registration statement . . . the civil remedies accorded by this subsection . . . are given to all purchasers.").

In the language of the statute, Congress limited damages under the Securities Act to declines in the prices of securities that "resulted from" a misstatement to ensure that defendants would be strictly liable for only those declines that would not have occurred but for their misstatements. Plaintiffs' claims do not fit this mold, however, because the Funds' investments in inverse floaters, for example, would have declined no matter what the Fund said about them, before or after Plaintiffs' purchases of Fund shares. Even if the Funds had disclosed precisely what Plaintiffs erroneously claim they did not disclose, the only thing that could possibly have changed is that certain investors might not have purchased Fund shares in the first place. But that is, at best, transaction causation and it is well settled that mere transaction causation is not enough to create compensable damages under the Securities Act. *See, e.g.*, *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 589 (S.D.N.Y. 2006). Because investors' losses could not have "resulted from" alleged misrepresentations about the riskiness of the Funds, Plaintiffs' claims should be dismissed.

In recent years, the Supreme Court has repeatedly declined to give the securities laws expansive meaning when Congress itself has declined to provide the outcome that shareholder plaintiffs desire. For example, in *Morrison v. National Australia Bank Ltd.*, No. 08-1191, 2010 WL 2518523 (U.S. June 24, 2010), the Court recently declined to follow decades of circuit court law regarding extraterritorial application of section 10(b) of the Exchange Act and warned of "judicial-speculation-made law – divining what Congress would have wanted if it had thought of the situation before the court." *Id*. at *8. It is just as erroneous to read out of a statute a mandate – such as loss causation – as it is to read into a law remedies or rights that Congress did not clearly place there.

Tellingly, Plaintiffs do not even mention the language of sections 11(e) and 12(b), let alone explain how their claims could lead to damages under the text of those provisions. Instead, they essentially ask the Court to ignore the statutory language in favor of two recent decisions, *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009), and *In re Evergreen Ultra Short Opportunities Fund*, No. 08-11064, 2010 WL 1253114 (D. Mass. Mar. 31, 2009). *See* Opp. Br. at 77-79. But these decisions are fundamentally flawed. The *Schwab* court focused on the wrong question by asking whether the plaintiffs' claims could satisfy the flexible, common-law based loss causation requirement of the Exchange Act, rather than the narrower statutory provisions of the Securities Act. *See Akerman v. Oryx Commc'ns, Inc.*, 609 F. Supp. 363, 369-70 (S.D.N.Y. 1984), *aff'd*, 810 F.2d 336 (2d Cir. 1987) (explaining that loss causation under the Securities Act is narrower that loss causation under the Exchange Act). The *Evergreen* court made the same mistake and then compounded its error by accepting a boilerplate allegation that alleged misrepresentations in the fund's registration statement "artificially inflated the [fund's] NAV" – a theory that even Plaintiffs here have disavowed. *In re Evergreen*, 2010 WL 1253114, at *7. This Court repeatedly has refused to follow erroneous district court decisions, and it should do so here. *See, e.g.*, *Pine River Irrigation Dist. v. United States*, 656 F. Supp. 2d 1298, 1317 (D. Colo. 2009) (Kane, J.) (rejecting two "relatively recent" district court opinions because they "cannot be reconciled with the plain language" of the applicable federal statute).

Moreover, Plaintiffs' alleged disagreement with how the Fund valued some of its investments does not change this result. To begin with, Plaintiffs' valuation allegations fail to state a claim, so they add nothing to Plaintiffs' causation argument. But their valuation

argument on causation also fails on its own terms.  Although their criticisms of the Funds'

valuation processes do not necessarily involve overvaluation as opposed to undervaluation,

Plaintiffs argue that the Funds overstated the value of their assets and that their share prices

were "inflated because of Defendants' misrepresentations."  Opp. Br. at 77.  But the Funds

valued their assets and calculated their NAVs on a daily basis as required by federal law.  *See*

Consol. Br. at 77.  Even assuming that the publication of an inflated NAV price could be

considered a misrepresentation, such a statement occurs on a daily basis, and it would not be

found in the Registration Statements.  Thus, declines in the Funds' share prices could not

"result from" misrepresentations covered by the Securities Act.  Whether Plaintiffs'

"materialization of risk" or "daily NAV price misrepresentation" theories can be used to

circumvent the plain language of the Securities Act is a pure question of law.  The answer

should be "no," and the Court should decide this question now and dismiss Plaintiffs' claims

as a matter of law.[41]

## IV.   PLAINTIFFS FAIL TO ALLEGE "SELLER" LIABILITY UNDER SECTION 12(a)(2).

Plaintiffs do not and cannot allege that OFI or any of the Funds passed title to

investors.  Thus, their only basis for claiming that OFI or the Funds are sellers must be they

"successfully solicited the purchase [of a security], motivated at least in part by a desire to

serve [their] own financial interests or those of the securities' owner."  *Pinter v. Dahl*, 486

U.S. 622, 647 (1988).  Courts of appeals have interpreted this language to require direct and

---

[41]     Plaintiffs' suggestion that Defendants cannot raise causation on a motion to dismiss because it is an affirmative defense is mistaken.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007).  Indeed, courts routinely dismiss Securities Act cases on causation grounds.  *See, e.g., In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).

active participation in the solicitation of the plaintiffs' purchase.  *See, e.g., Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) (dismissing section 12(a)(2) claims where defendants did not "directly communicate with the buyer" or otherwise "assume[] the 'unusual' role of becoming a 'vendor's agent'"); *see also Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996).  As Plaintiffs concede, the Tenth Circuit requires that a plaintiff "at a minimum allege *facts* indicating that [defendants] solicited his purchase."  Opp. Br. 85 (citation omitted and emphasis added).

Here, Plaintiffs allege no *facts* to show that OFI or the Funds directly communicated with investors or otherwise actively solicited their purchases.  Rather, they merely make conclusory allegations that parrot the elements of section 12 liability.  These allegations are insufficient.[42]

## V.     PLAINTIFFS FAIL TO ALLEGE "CONTROL" UNDER SECTION 15.

The Officer Defendants and the Independent Trustees are not "control persons" under section 15 of the Securities Act.  A section 15 claim may not be based on "control person allegations [that] are limited to legal conclusions and therefore are not entitled to the

---

[42]     Rather than pleading the required facts, Plaintiffs rely on a host of inapposite authority. Plaintiffs' reliance on *Schwab* is unavailing because defendants there *conceded* seller status for the issuer.  *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. at 548.  Similarly, *Schaffer v. Evolving Systems*, 29 F. Supp. 2d 1213, 1218 (D. Colo. 1998), is not persuasive because it fails to apply *Iqbal* and *Twombly* and thus does not adequately distinguish *In re Metropolitan*.  *See* Opp. Br. at 78-79.  Lastly, Plaintiffs cannot rely upon Rule 159A.  Rule 159A was promulgated by the SEC in 2005, yet there is a host of cases since then holding that issuers are not sellers.  *See, e.g., Fouad v. Isilon Sys. Inc.*, No. 07-1764, 2008 WL 5412397, *7 (W.D. Wash. Dec. 29, 2008); *In re Sonus Networks, Inc. Sec. Litig.*, No. 04-10294, 2006 WL 1308165, at *10 (D. Mass. May 10, 2006).  Moreover, Rule 159A is in direct conflict with the Supreme Court's interpretation of section 12 in *Pinter* and appears to exceed the SEC's rulemaking authority.  *Cf. Nat'l Cable & Telecomms, Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005); *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 493 (D.C. Cir. 2007).

presumption of truth."  *Graham v. Barriger*, No. 08-9357, 2009 WL 3852461, at *19

(S.D.N.Y. Nov. 17, 2009).

Plaintiffs argue that they have stated a section 15 claim against the Trustee Defendants

based on their allegations that the Trustees signed the Registration Statements.  But courts

have held that allegations that certain directors signed SEC filings and served on the audit

committee "do not present a basis for control liability."  *Batwin v. Occam Networks, Inc.*, No.

07-2750, 2008 WL 2676364, at *25 (C.D. Cal. July 1, 2008).  Likewise, Plaintiffs' reliance on

*In re Storage Tech. Corp. Sec. Litig.*, 630 F. Supp. 1072, 1079 (D. Colo. 1986), and *Schwab*

for the proposition that "control" is established merely by signing a registration statement is

unavailing, because these cases are in direct conflict with controlling precedent.  *See Adams v.

Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003) (holding that a control person

defendant must have "day-to-day" control over a primary violator).  Plaintiffs' do not, and

could not, make "day-to-day" control allegations against the Trustee Defendants.[43]

Plaintiffs fail to allege any fact – other than to state each Individual Defendant's

position at OFI – that would make plausible the assertion the Individual Defendants exercised

"day-to-day" control over the Funds.  *Adams*, 340 F.3d at 1108.  Thus, Plaintiffs' section 15

claims against the Individual Defendants should be dismissed.

---

[43]     Plaintiffs' reliance on *In re Ribozyme Pharms., Inc. Sec. Litig.*, 119 F. Supp. 2d 1156 (D. Colo. 2000), is similarly misplaced because it allowed a control person claim to survive dismissal only because it could be "reasonably inferred" that the defendant had control.  *Id*. at 1167.  No such inference is warranted here.

## VI.    THERE IS NO PRIVATE RIGHT OF ACTION UNDER SECTION 13(a) OF THE INVESTMENT COMPANY ACT.

Plaintiffs' argument that section 13(a) of the Investment Company Act creates a private right of action cannot overcome the text and structure of the Act, the overwhelming weight of relevant case law, or recent congressional action.  Plaintiffs concede that section 13(a) creates no express private right of action and thus must overcome the presumption against the existence of such a right.  *See Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 432 (2d Cir. 2002).[44]  And since *Olmsted*, which recognized that *Sandoval* had displaced the "ancien regime" of policy-based searches for implied private rights of action, at least 47 decisions addressing the issue have found no implied private right of action under any section of the ICA, as opposed to one which has.  This Court should follow this weight of authority.

As an initial matter, Plaintiffs fail to identify "rights creating language" in section 13(a), which states only that "no registered investment company shall" take certain actions without shareholder approval.[45]  This is language directed at regulating an entity, *i.e.*, the fund, not at protecting a class of persons, the investors.  "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer

---

[44]    Plaintiffs argue that *Olmsted* is inapplicable because it did not deal explicitly with section 13(a).  *See* Opp. Br. at 92 n.116.  This argument is meritless because (1) courts have explicitly applied *Olmsted* in the context of section 13(a), *see, e.g.*, *Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*, No. 10-1399, 2010 WL 1404208, at *4 (S.D.N.Y. Apr. 5, 2010); and (2) interpretation of section 13(a) is informed by the use of similar statutory language in other provisions of the same statute, *see, e.g.*, *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027 n.11 (C.D. Cal. 2005) ("the fact that *Olmsted* dealt with different sections of the ICA does not detract from the applicability of its statutory analysis here").

[45]    Contrary to Plaintiffs' assertion, the Ninth Circuit has not held that section 13(a) contains rights creating language.  *See* Opp. Br. at 91.  It merely has assumed the existence of a private right of action without deciding it.  *See Lapidus v. Hecht*, 232 F.3d 679, 681 n.4 (9th Cir. 2000); *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 609 F. Supp. 2d 938, 943 (N.D. Cal. 2009) ("Contrary to plaintiff's assertions, this question is unresolved in the Ninth Circuit.").

rights on a particular class of persons.'"  *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001)

(citation omitted).  The passing references to shareholders do not come close to constituting

the "unmistakable focus" on the benefitted class that is the hallmark of "rights creating"

language.[46]  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002); *see also Halebian v. Berv*, 631

F. Supp. 2d 287, 300 (S.D.N.Y. 2007).  This failure alone is fatal to Plaintiffs' claims,[47] and

they are thus left to point to the ICA's "Findings and declaration of policy" as support for the

policy argument that the ICA was intended to protect the "interest of investors."  *See* Opp. Br.

at 91.  But this is exactly the type of argument that was rejected by *Olmsted*.[48]

Plaintiffs' resort to legislative history is therefore inappropriate, because the text of

section 13(a) and the statutory scheme of the ICA are unambiguous.  *See, e.g.*, *Faircloth v.*

*Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996); *Davis v. Bailey*, No. 05-0042, 2005 WL

3527286, at *5 (D. Colo. Dec. 22, 2005).  Moreover, the legislative history of section 13(a) is

silent about the existence of a private right of action.  Plaintiffs nonetheless argue that since

---

[46]   Examples of rights creating language focusing on the party benefitted, as opposed to the person regulated, are found in Title VI, 42 U.S.C. § 2000d ("No person in the United States shall . . . be subjected to discrimination . . . .") and Title IX, 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex . . . be subjected to discrimination . . . .).  *See Gonzaga*, 536 U.S. at 284 n.3.

[47]   Plaintiffs also fail to uncover any private remedy in section 13(a).  *See Gonzaga*, 536 U.S. at 284 (requiring both a private right and private remedy); *see also* Consol. Br. at 82.  For this additional reason, the ICA's statutory scheme reflects no congressional intent to create an implied private right of action.

[48]   Plaintiffs also leap from the fact that the ICA provides for concurrent jurisdiction in federal and state courts, *see* 15 U.S.C. § 80a-43, to the non-sequitor that private litigants have a right to sue in state courts.  But concurrent jurisdiction is entirely consistent with Congress' explicit provision of private rights of actions in sections *other than* section 13(a).  *See, e.g.*, 15 U.S.C. § 80a-29(h); 15 U.S.C. § 80a-35(b).  Indeed, the solitary case that Plaintiffs cite in support of this proposition, *Fogel v. Chestnut*, 668 F.2d 100 (2d Cir. 1981), has been limited by *Olmsted*.  *See Olmsted*, 283 F.3d at 433 n.3; *Gabelli Global Multimedia Trust, Inc. v. Western Inv. LLC*, No. 10-0557, 2010 WL 1253164, at *5 (D. Md. Apr. 1, 2010).

some courts had implied private rights of action prior to 1970, "had Congress not intended

Section 13(a) to confer private rights of action, it easily could have made that clear in the

1970 and 1975 amendments."  Opp. Br. at 94.  But courts have rejected similar "ratification"

theories.  *See, e.g.*, *Western Inv.*, 2010 WL 1404208, at *6, n.2.

Finally, Plaintiffs argue that the Sudan Act "confirms" congressional intent to create a

private right of action, citing *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 609 F. Supp. 2d

938 (N.D. Cal. 2009).  But Congress itself recently acted to correct the inference made in

*Northstar* and clarified that its adoption of the Sudan Act had no bearing on the issue of a

private right of action.  *See* Comprehensive Iran Sanctions Accountability and Divestment Act

of 2010, Pub. L. No. 111-195, § 205(b), 124 Stat. 1312 (amending the ICA to state that

nothing in 15 U.S.C. § 80a-13(c)(2)(A)(1) "shall be construed to create, imply, diminish,

change, or affect in any way whether or not a private right of action exists under subsection

(a) or any other provision of this Act"); *see also* Consol. Br. at 84 n.154.[49]  This new law not

only effectively overrules *Northstar*, but it confirms that Plaintiffs' efforts to find an implied

right of action are utterly unsupported by any current legal authority.

## VII.    CERTAIN CLAIMS ASSERTED AGAINST TWO INDIVIDUAL TRUSTEES MUST BE DISMISSED.

As an initial matter, Plaintiffs do not dispute that the claims asserted against

Defendant Paul Y. Clinton with respect to the Rochester Fund are time-barred.  Mr. Clinton

should not be a party to this litigation and all claims against him should be dismissed.

---

[49]    The Conference Committee Report states that the bill "is designed to clarify that Congress did not intend, in the Sudan Divestment legislation, to imply the creation of a new private right of action" under the ICA.  H.R. Rep. No. 111-512, at 67.

In addition, the AMT-Free, AMT-Free New York, and California Plaintiffs lack standing to assert claims against Defendant Clayton K. Yeutter, because none of them can trace his respective Fund purchases to any Registration Statement that Mr. Yeutter signed. Those Plaintiffs now contend that they have standing to assert claims against Mr. Yeutter because they have standing to assert claims sharing a "common nucleus of operative facts" against the other Defendants. To support this contention, Plaintiffs cite only one case, *In re Thornburg Mortgage, Inc. Sec. Litig.*, No. 07-0815, 2010 WL 445047 (D.N.M. Jan. 27, 2010), which runs counter to the weight of authority.[50] In *In re Storage Tech. Corp. Sec. Litig.*, 630 F. Supp. 1072 (D. Colo. 1986), the court held that a plaintiff in a putative class action has standing to assert a section 11 claim only with respect to registration statements to which he can link one or more of his purchases, and it dismissed a section 11 claim based on a registration statement that was not connected to any of the plaintiffs' purchases. *See id.* at 1078; *see also In re Washington Mut.*, 259 F.R.D. 490, 504 (because named plaintiff purchased shares pursuant to a single offering document, "the plaintiff class currently has Section 11 standing as to the October 2007 offering only"). To hold otherwise, as *Thornburg* does, "would shunt aside the inevitable risk that 'any plaintiff could sue a defendant against whom the plaintiff has no claim in a putative class action, on the theory that some member of the hypothetical class, if a class were certified, might have a claim.'" *Plumbers' Union Local No. 12*, 658 F. Supp. 2d 299, 304 (D. Mass. 2009).

---

[50] The only case cited in *Thornburg* in support of its reasoning on standing is *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037 (N.D. Cal. 2008). That case, however, is inapposite because the court there held that the lead plaintiffs had standing to assert section 11 claims on behalf of noteholders, even though the lead plaintiffs were all shareholders, because the shareholder plaintiffs' claims were traceable to the same registration statements as the noteholder plaintiffs. *See id.* at 1052.

## CONCLUSION

When examined individually, none of Plaintiffs' claims identifies an untrue statement of material fact or an omission of specific information that Defendants had a duty to disclose. Standing alone, each claim fails, and Plaintiffs cannot compensate for this lack of merit with the sheer quantity of their allegations. For the reasons discussed above, Defendants respectfully request that the Court dismiss all seven of Plaintiffs' Complaints with prejudice. In light of the number of allegations at issue, and the volume of detailed disclosures they implicate, Defendants respectfully request oral argument on their Motion To Dismiss.

Dated:  July 5, 2010                              Respectfully submitted,


                                                  _s/ Stephanie E. Dunn_
                                                  Stephanie E. Dunn
                                                  Perkins Coie LLP
                                                  1899 Wynkoop Street, Suite 700
                                                  Denver, CO 80202-1043
                                                  Tel:  (303) 291-2300
                                                  Fax:  (303) 291-2400
                                                  E-mail:  sdunn@perkinscoie.com

                                                  -And-

                                                  _s/ William K. Dodds_
                                                  William K. Dodds
                                                  Dechert LLP
                                                  1095 Avenue of the Americas
                                                  New York, NY 10036
                                                  Tel:  (212) 698-3500
                                                  Fax:  (212) 698-3599
                                                  E-mail:  william.dodds@dechert.com

                                                  Matthew L. Larrabee
                                                  Dechert LLP
                                                  One Maritime Plaza, Suite 2300

San Francisco, CA 94111
Tel: (415) 262-4500
Fax: (415) 262-4555
E-mail: matthew.larrabee@dechert.com

Michael S. Doluisio
Dechert LLP
Cira Center
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-2325
Fax: (215) 994-2222
E-mail: michael.doluisio@dechert.com

Attorneys for Defendants
OppenheimerFunds, Inc.,
OppenheimerFunds Distributor, Inc.,
Scott Cottier, Ronald H. Fielding,
Daniel G. Loughran, John V. Murphy,
Troy Willis, and Brian W. Wixted

-And-

*s/ Edward T. Lyons, Jr.*
Edward T. Lyons, Jr.
Jones & Keller
1999 Broadway, Suite 3150
Denver, CO 80202
Tel: (303) 573-1600
Fax: (303) 573-8133
E-mail: elyons@joneskeller.com

-And-

*s/ Arthur H. Aufses III*
Arthur H. Aufses III
Yehudis Lewis
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
E-mail: aaufses@kramerlevin.com

43

Attorneys for Defendants
Oppenheimer AMT-Free Municipals,
Oppenheimer AMT-Free New York Municipals,
Oppenheimer California Municipal Fund,
Oppenheimer Rochester Fund Municipals,
Oppenheimer Multi-State Municipal Trust, John
Cannon, Paul Y. Clinton, Thomas W. Courtney,
David K. Downes, Matthew P. Fink, Robert G.
Galli, Phillip A. Griffiths, Lacy B. Herrmann,
Mary F. Miller, Joel W. Motley, Kenneth A.
Randall, Russell S. Reynolds, Jr., Joseph M.
Wikler, Peter I. Wold, Brian F. Wruble, Clayton
K. Yeutter

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of July, 2010, I filed a true and correct copy of the foregoing **DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR JOINT MOTION TO DISMISS THE CONSOLIDATED COMPLAINTS IN THE ROCHESTER FUNDS GROUP SECURITIES LITIGATION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Jeffrey S. Abraham**
  jabraham@aftlaw.com
- **Glen L. Abramson**
  gabramson@bm.net,gelliott@bm.net
- **Arthur H. Aufses , III**
  aaufses@kramerlevin.com
- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net,darby@dyerberens.com
- **Francis A. Bottini , Jr**
  frankb@johnsonbottini.com,paralegal@johnsonbottini.com
- **Stephen D. Bunch**
  dbunch@cohenmilstein.com,efilings@cohenmilstein.com
- **Gary E. Cantor**
  gcantor@bm.net
- **Jeffrey A. Chase**
  jchase@jacobschase.com,vlsanders@jacobschase.com
- **Karen Jean Cody-Hopkins**
  kjch@lilleylaw.com,rbyers@lilleylaw.com
- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com
- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com
- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com,sdunn-efile@perkinscoie.com
- **Robert J. Dyer , III**
  bob@dyerberens.com
- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com
- **John Givens Emerson**
  jemerson@emersonpoynter.com,tanya@emersonpoynter.com
- **Jack G. Fruchter**
  jfruchter@aftlaw.com
- **William H. Garvin , III**
  wgarvin@garvinlawfirm.com

45

- **Paul J. Geller**
  pgeller@rgrdlaw.com,e_file_fl@rgrdlaw.com
- **Daniel Charles Girard**
  dcg@girardgibbs.com,akl@girardgibbs.com
- **Lionel Z. Glancy**
  lglancy@glancylaw.com,info@glancylaw.com
- **Gary S. Graifman**
  ggraifman@kgglaw.com,ccornfield@kgglaw.com
- **Barbara Ann Grandjean**
  bgrandjean@jacobschase.com,mmayer@jacobschase.com
- **John K. Grant**
  johnkg@csgrr.com,jdecena@csgrr.com
- **Marc C. Haber**
  mhaber@sparerlaw.com
- **Patrick John Kanouff**
  pkanouff@davisandceriani.com,gceriani@davisandceriani.com,jboom@davisandceriani.com
- **Christopher J. Keller**
  ckeller@labaton.com,electroniccasefiling@labaton.com
- **Phillip C. Kim**
  pkim@rosenlegal.com
- **Lawrence L. Klayman**
  lklayman@nasd-law.com
- **Peter George Koclanes**
  pkoclanes@shermanhoward.com,cgreen@shermanhoward.com,efiling@sah.com
- **Catherine J. Kowalewski**
  katek@csgrr.com,hdemag@csgrr.com
- **Jeffrey Robert Krinsk**
  jrk@classactionlaw.com,anv@classactionlaw.com
- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,michael.doluisio@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com
- **Nicole C. Lavallee**
  nlavallee@bermandevalerio.com,stuiasosopo@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Eric Lechtzin**
  elechtzin@bm.net
- **Jonathan Krasne Levine**
  jkl@girardgibbs.com,amv@girardgibbs.com
- **Lawrence D. Levit**
  llevit@aftlaw.com
- **Kevin Harvey Lewis**
  klewis@sparerlaw.com

- **Yehudis S. Lewis**
  ylewis@kramerlevin.com
- **Charles Walter Lilley**
  clilley@lilleylaw.com
- **Howard T. Longman**
  Tsvi@aol.com,jasondag@ssbny.com
- **Edward Thomas Lyons , Jr**
  elyons@joneskeller.com
- **Kristin A. Martinez**
  kristin@dyerberens.com
- **Catherine H. McElveen**
  kmcelveen@rpwb.com
- **Lisa M. Mezzetti**
  lmezzetti@cohenmilstein.com,efilings@cohenmilstein.com
- **Robert Nolen Miller**
  rmiller@perkinscoie.com,rmiller-efile@perkinscoie.com
- **Daniel Oakes Myers**
  dmyers@rpwb.com
- **James S. Nabwangu**
  jnabwangu@sparerlaw.com
- **Darren A. Natvig**
  dnatvig@irwin-boesen.com
- **Gordon W. Netzorg**
  gnetzorg@shermanhoward.com,shood@shermanhoward.com,cdias@shermanhoward.com,efiling@shermanhoward.com
- **Matthew D. Pearson**
  mpearson@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Charles J. Piven**
  piven@browerpiven.com
- **Charles Michael Plavi , II**
  cmp@classactionlaw.com,anv@classactionlaw.com
- **Scott E. Poynter**
  scott@emersonpoynter.com,swilson@emersonpoynter.com
- **Andrei V. Rado**
  arado@milberg.com,MAOffice@milberg.com
- **Roland W. Riggs , IV**
  rriggs@milberg.com
- **Darren J. Robbins**
  pilarc@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Samuel H. Rudman**
  srudman@csgrr.com,dgonzales@csgrr.com
- **Sherrie R. Savett**
  ssavett@bm.net,mgatter@bm.net

- **Peter E. Seidman**
  pseidman@milberg.com
- **Christina H.C. Sharp**
  chc@girardgibbs.com,as@girardgibbs.com,sfs@girardgibbs.com,amv@girardgibbs.com,ale@girardgibbs.com
- **Aaron Michael Sheanin**
  amv@girardgibbs.com,ams@girardgibbs.com
- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com
- **Mark David Smilow**
  msmilow@weisslurie.com
- **Alan W. Sparer**
  asparer@sparerlaw.com,nblake@sparerlaw.com,dcorkran@sparerlaw.com,playzer@sparerlaw.com
- **Olimpio Lee Squitieri**
  Lee@sfclasslaw.com,cathy@sfclasslaw.com
- **Joseph J. Tabacco , Jr**
  jtabacco@bermandevalerio.com,stuiasosopo@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Steven J. Toll**
  stoll@cohenmilstein.com,efilings@cohenmilstein.com
- **Kirk Douglas Tresemer**
  ktresemer@coloradolawyers.com
- **Anne Marie Vu**
  avu@milberg.com,MAOffice@milberg.com
- **David C. Walton**
  davew@csgrr.com,hdemag@csgrr.com
- **Joseph H. Weiss**
  jweiss@weisslurie.com,infony@weisslurie.com
- **Douglas S. Wilens**
  dwilens@rgrdlaw.com,e_file_fl@rgrdlaw.com
- **Shawn A. Williams**
  shawnw@csgrr.com,jdecena@csgrr.com

_s/ Stephanie Dunn_
Stephanie E. Dunn
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO  80202-1043
Tel:  303.291.2300
Fax:  303.291.2400
Email:  sdunn@perkinscoie.com

Attorneys for Defendants
OppenheimerFunds, Inc.,
OppenheimerFunds Distributor, Inc.,
Scott Cottier, Ronald H. Fielding,
Daniel G. Loughran, John V. Murphy,
Troy Willis, and Brian W. Wixted