**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
Judge John L. Kane

Master Docket No. **09-md-02063-JLK-KMT** (MDL Docket No. 2063)

IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION

This document relates to all of the MDL actions.
_____

**AMENDED OPINION AND ORDER ON MOTIONS TO DISMISS**
_____

Kane, J.

I issued my initial memorandum Order in these MDL securities fraud class actions

on October 24, 2011 (Doc. 312), denying a Motion to Dismiss filed by Defendant

Massachusetts Mutual Life Insurance Company ("MassMutual") (Doc. 284) and granting

in part and denying in part Oppenheimer Defendants' Joint Motion to Dismiss

Consolidated Complaints (Doc. 285).  *See In re Oppenheimer Rochester Funds Grp. Sec.*

*Litig.*, __ F. Supp.2d __, 2011 WL 5042066 (D. Colo. October 24, 2011).  The Joint

Defendants and MassMutual moved for reconsideration, and on January 18, 2012, I

granted those Motions in limited part to (1) correct the erroneous application in the

October 24 Order of a superseded version of the Southern District of New York's

decision in *TCW/DW North American Govt. Income Trust Securities Litigation*, 941 F.

Supp. 326, 341 (S.D.N.Y. 1996)("Opinion on Reconsideration" appended to superseded

opinion commencing at p. 341) and (2) clarify an error on page five of the Order that

included Rochester National Fund in the list of Defendant Funds whose Prospectuses

articulated "capital preservation" as part of their stated investment objective.  *See* Order

re Mot. for Reconsideration (Doc. 348).

Finding neither correction altered the ultimate conclusion that Plaintiffs have stated viable claims for relief under §§ 11 and 12(a)(2) of the 1933 Act against each of the Defendant Funds, including National Fund, I denied the Joint Motion to the extent it sought reconsideration of the Order on its merits. *See* Order (Doc. 348) at 3-5. Nevertheless, because the clarifications are substantive, I issue this Amended Opinion and Order *nunc pro tunc* to October 24, 2011, and WITHDRAW the original Order.

## I.

Shareholders in seven different Oppenheimer municipal bond funds (the "Funds") brought a total of thirty-two putative securities fraud class actions in federal courts throughout the country naming the individual Funds, Fund managers, and trustees as Defendants.  Shareholders' principal claims are asserted under Sections 11, 12, and 15 of the Securities Act of 1933, 15 U.S.C. § 77k, l, and o, based on allegations that the Funds misrepresented or failed to disclose the nature and degree of risks associated with the extremely risky investment strategies relying on low quality, unrated, and/or illiquid bonds, or on highly-leveraged derivative instruments known as "inverse floaters."  All of the Funds pitched themselves as vehicles for generating high yields of tax-free interest income from municipal bond portfolios that would be carefully assessed and monitored, and six of the seven Funds articulated this objective in terms of generating as much income as is "consistent with preservation of capital."

Plaintiffs contend Fund Prospectuses and offering statements were materially

2

misleading and rendered investors' capital extremely vulnerable to changing market conditions.  When the credit crisis of 2008 struck, Defendants' undisclosed high-risk strategies resulted in an extreme devaluation of the Funds' assets and loss for which Defendants are liable under the 1933 Act.  Because the Funds' daily net asset value (NAV) declined more than similarly-rated municipal bond funds during the same period, Plaintiffs contend their losses resulted from Defendants' acts and not the credit crisis of 2008.

All thirty-two of the putative securities class actions were transferred to me by the Judicial Panel on Multidistrict Litigation in 2009.  Co-Lead Plaintiffs and Lead and Liaison Counsel were appointed,[1] a mandamus petition to the Tenth Circuit challenging those appointments was denied,[2] and in January 2010, the Co-Lead Plaintiffs in seven groupings of the original thirty-two actions filed their Consolidated Class Action Complaints.[3]  The Complaints are before me now on separate Motions to Dismiss filed

---

[1]     *See* Order Appointing Lead Pls. and Lead Counsel by Fund and Appointing Lead Counsel Liaison (Doc. 223).

[2]     Order, No. 09-1557 (10th Cir. January 15, 2010)(Doc. 256).

[3]     Five of the seven operative Complaints in this litigation are sometimes referred to collectively as the "Rochester Funds Group" Consolidated Class Action Complaints and are filed on behalf of shareholders in Oppenheimer's (1) Rochester National Municipals Fund ("Nat'l." Fund) (Doc. 244); (2) New Jersey Municipal Fund ("New Jersey" Fund)(Doc. 245); (3) AMT-Free New York Municipal Fund ("AMT-Free NY")(Doc. 246); (4) Rochester Fund Municipals Fund ("Rochester" Fund)(Doc. 247); and (5) AMT-Free Municipals Fund ("AMT-Free")(Doc. 248).  The remaining Consolidated Class Action Complaints assert claims on behalf of investors in Oppenheimer's "Pennsylvania" (Doc. 249) and "California" (Doc. 250) Municipal Funds.

jointly by the Oppenheimer and Oppenheimer Trustee Defendants (Doc. 285) and by

Defendant Massachusetts Mutual Life Insurance Company (Doc. 284), seeking the

dismissal of claims Defendants contend are common to all seven of the Consolidated

Class Action Complaints.  The Oppenheimer and Oppenheimer Trustee Defendants

address certain additional allegations unique to the California and Pennsylvania

Complaints in a separate Joint Motion to Dismiss (Doc. 286), which I will address in a

separate order.

Having thoroughly considered the issues raised and arguments presented in

support of and in opposition to these Motions, I GRANT the Joint Motion to Dismiss the

Rochester Fund Group Complaints (Doc. 285) in limited part and DENY it in all other

respects.  I DENY Defendant MassMutual's Motion to Dismiss in its entirety.

## I. BACKGROUND.[4]

Investors in seven Oppenheimer municipal bond funds bring these actions against

various fund distributors, managers, and trustees, alleging the Funds' Prospectuses

misrepresented their investment strategies and failed to disclose the nature and magnitude

of the risks attendant their heavy emphasis on bond derivatives and other highly volatile

and illiquid holdings.

---

[4]      The following facts are drawn from the Consolidated Class Action Complaints for
the seven funds at issue in this case, the factual allegations of which are assumed to be true for
purposes of these Motions, as well as from public filings referenced in the Complaints and public
information of which I may take judicial notice.  Because it is the Funds' common allegations of
fact and theories of relief that form the basis for Defendants' Motions, I will use the AMT-Free
Complaint as the template, identifying differences in the other Complaints where appropriate.

According to Plaintiffs, the Funds' Prospectuses were materially misleading because their stated investment objectives and disclosures belied, and at times affirmatively misrepresented, the true nature and scope of the high-risk, high-return investment strategy they employed.  For example, Prospectuses represented portfolio holdings would not exceed a certain minimal percentage of illiquid securities at any given time when in fact illiquid holdings regularly and significantly exceeded those caps. Plaintiffs contend Prospectuses also understated, or omitted, information that misled investors into believing the Funds' investment strategies were much more conservative in the long term than they actually were.  Omitted information included just how leveraged and vulnerable the Funds' inverse floater holdings rendered the long-term municipal bonds backing them, and how, in a time of rising interest rates, those holdings could trigger fire-sales of Fund assets causing a substantial loss of equity and declines in NAV.

In the midst of the credit market downturn in October 2008, Defendants issued Prospectus Supplements that Plaintiffs contend suddenly and for the first time disclosed the true risks their investment strategies posed to investors' value and capital.  According to Plaintiffs, these previously withheld risk disclosures were material and by themselves support an action under the 1933 Act.  Defendants demur, stating it was public knowledge that "Rochester-style" municipal bond Funds employed a "no guts, no glory" aggressive investment strategy and that the 2008 Supplements added nothing new to the mix of information previously disclosed in the Funds' offering documents.  According to Defendants, the 2008 Supplements were sent out merely as a courtesy given the

unprecedented downturn in the credit markets to highlight risks that had already been adequately disclosed.

The parties devote considerable time in their briefs to the complex workings of inverse floaters and Plaintiffs' ultimate ability, or inability, to prove loss causation under the 1933 Act. I find both discussions distracting at this stage of the proceedings. At issue on the Motions to Dismiss are the statements and disclosures in the various Funds' offering statements – including ongoing Prospectuses and supplements – and whether Plaintiffs' factual allegations plausibly establish that those documents included affirmatively misleading statements and disclosures, omitted information that would render the statements and disclosures made materially misleading, or both. While developments in the law suggest Plaintiffs will have to address certain analytical and evidentiary impediments to proving that losses suffered during the relevant class period were actually caused by the misrepresentations and omissions alleged rather than the credit market downturn, I find the issue inappropriate for resolution on motions to dismiss.

A. <u>The Parties and the Various Oppenheimer Municipal Funds</u>.

Lead Plaintiffs represent investors in seven Oppenheimer municipal bond-based mutual funds whose overall investment objectives were to generate high levels of tax-exempt income through investment primarily in under-appreciated or undervalued municipal bond portfolios. Six of the seven Funds tempered this investment objective with specific reference to seeking high yields "consistent with the preservation of

capital." The seventh, Rochester National Fund, stated it would seek high yields by investing in a "diversified portfolio," which it would "carefully assess" and "monitor" for liquidity and other risk.

Shares in each of the seven Funds were offered for sale by OppenheimerFunds, Inc. ("OFI" or "Manager"), which also served as the Funds' manager and investment advisor, and OppenheimerFunds Distributor ("Distributor"), pursuant to the various registration statements, prospectuses, statements of additional information (SAIs), and supplements issued without material change from late 2005 through late 2007. The Consolidated Class Action Complaints for each of these Funds name OFI and Distributor as Defendants, as well as various Fund officers and trustees individually. Massachusetts Mutual Life Insurance Company ("MassMutual"), OFI's parent company, is also named as a Defendant in each of the actions.

## B. Plaintiffs' Substantive Allegations.

According to Plaintiffs, there were four categories of materially misleading representations or omissions in Fund offering statements common to all seven Funds: (1) those related to Fund investment objectives; (2) the true value of Fund assets and liabilities and resulting NAVs; (3) the level of exposure and risks of the Funds' investment in a type of speculative derivative known as "inverse floaters"; and (4) the liquidity of the Funds' investments. Plaintiffs contend that while most of the Funds explicitly articulated "preservation of capital" as an overarching investment objective, in actuality they employed an unabashedly aggressive "No Guts, No Glory," "high-risk,

high-return" objective that, given certain foreseeable market conditions, placed investors' capital at tremendous and undisclosed risk.  When those risks materialized in 2007-08, the Funds' excessive holding in complex and highly leveraged securities triggered cash reserve and payment obligations that required them to sell assets under circumstances most likely to disadvantage the Funds.  This resulted in the Funds significantly underperforming other municipal bond funds in their respective peer groups with the resulting loss in value causing Plaintiffs to suffer substantial loss.  Specifically, the NAVs of the seven Funds fell approximately 30-50% during 2008, while similar municipal bond funds weathered the 2008 credit crisis with losses of only 10-15%.

According to Plaintiffs, statements that Fund portfolios were "diversified" and would be assessed and monitored for liquidity and other risk were rendered materially false and misleading by the fact that in reality, portfolios were concentrated almost exclusively in excessively leveraged and risky bond derivatives fundamentally incompatible with capital preservation.  Plaintiffs contend Defendants "grossly understated" the percentage of Funds' illiquid holdings and overstated asset values.  In addition, the California and Pennsylvania Fund Complaints allege those Funds were over-concentrated in speculative and below investment-grade securities including, in California, the development and real estate-secured "dirt bonds."  In an overall investment context where investing in Oppenheimer municipal bond Funds was pitched as a reliable income generator that would not risk loss of principal, the failure to disclose the real risk of investing in Funds whose returns were heavily dependent on stable or

falling interest rates, as well as a market appetite for the risky securities in which they were invested, resulted in loss directly attributable to those misrepresentations and omissions.

## II. LEGAL STANDARDS.

*Motion to Dismiss.*

A motion to dismiss for failure to state a claim tests the legal sufficiency of a complaint.  In recent years, the Supreme Court issued a pair of decisions revisiting federal pleading standards, holding that to survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, __ U.S. __, __, 129 S.Ct. 1937, 1949 (2009).  The Court defined facial plausibility in  terms of reasonableness.  Even if a judge believes that recovery is "remote and unlikely," all that is required is the pleading of  sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing. *Twombly*, 550 U.S. at 556. *See Iqbal*, 129 S. Ct. at 1949 (A claim has facial plausibility when plaintiff pleads factual content that allows the court to draw the "reasonable inference that the defendant is liable for the misconduct alleged") (citing *Twombly*)).   A "reasonable" inference is one that supports "more than a sheer possibility" that a defendant has acted unlawfully, but need not rise to the level of factual "probability." *See id.*  According to the Court, plaintiffs need only "nudge[] their claims across the line from conceivable to plausible." *Twombly* at 570.

In my view, the use of distinctions such as "plausible" (as opposed to merely

"conceivable" or "a sheer possibility") or "reasonable" (but not necessarily "probable") is clarification to the point of folly.[5]  The pursuit becomes an end in itself as each clarification requires clarification, until we lose sight of the intellectual core.  In the end, the Supreme Court abandoned its pursuit of "chimeras" in *Iqbal* to observe that the determination of whether a plaintiff's factual allegations support a plausible claim for relief "will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.  Accordingly, I resist the dictate to parse what is factually "conceivable" from that which is "reasonable" from that which is "probable," and simply determine whether Lead Plaintiffs' well plead facts, if accepted as true, state claims for relief under the 1933 Act plausible on their face.

In assessing the Consolidated Amended Class Action Complaints for plausibility, I consider the various prospectuses and other offering statements integral to Plaintiffs' claims, even if those documents fall technically outside the pleadings.  *See Tal v. Hogan*, 453 F.3d 1244, 1265 n. 24 (10th Cir. 2006) (citing *Indus. Constructors Corp. v. United States Bureau of Reclamation*, 15 F.3d 963, 964-65 (10th Cir. 1994))(the court may

---

[5]     Nearly a century ago philosopher Ludwig Wittgenstein wrote:

[W]e [attempt to] eliminate misunderstandings by making our expressions more exact; but now it may look as if we were moving towards a particular state, a state of complete exactness. . . as if this were the real goal of our investigation.

* * *

[O]ur forms of expression prevent us in all sorts of ways from seeing that nothing out of the ordinary is involved, by sending us in pursuit of chimeras.

*Philosophical Investigations* §§ 91- 94.

review material submitted as an exhibit to or incorporated or referenced in the complaint

in addition to documents relied upon by plaintiff as an integral basis for his claims). In

securities cases, moreover, a court may take judicial notice of the contents of SEC filings

that are a matter of public record. *See, e.g., In re Morgan Stanley Information Fund*

*Securities Litigation,* 592 F.3d 347, 355 n. 5 (2d Cir. 2010).

*The Securities Act of 1933*.

Section 11 of the Securities Act of 1933 "imposes civil liability on issuers and

other signatories of a registration statement if the registration statement contains material

misstatements or omissions and the plaintiffs acquired the securities without knowledge

of such misrepresentations." *McMahan & Co. v. Wherehouse Entertainment*, 65 F.3d

1044, 1047 (2d Cir.1995). Section 11 provides a cause of action by the purchaser of the

registered security against every person who signed the registration statement, the

security's issuer, its underwriter, and certain other statutorily enumerated parties. *In re*

*Morgan Stanley*, 592 F.3d at 358.

Section 12(a)(2) of the Securities Act provides essentially the same cause of action

as § 11, but applies it to persons who use material misstatements or omissions in "a

prospectus or oral communication" in an offer or sale of a security. *Morgan Stanley*, 592

F.3d at 359 (citing 15 U.S.C. § 77 l (a)(2)). Liability under § 12(a)(2) extends only to

statutory "sellers," specifically defined by the Supreme Court as those who (1) "pass[]

title, or other interest in the security, to the buyer for value," or (2) "successfully solicit

the purchase, motivated at least in part by a desire to serve his own financial interests or

11

those of the securities' owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).

"Controlling person" liability under § 15 of the 1933 Act is contingent on proof of primary liability under §§ 11 or 12, and provides that any person who "controls" another liable under either section shall be held "jointly and severally" liable with that person "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

## III. <u>DISCUSSION</u>.

The Oppenheimer Defendants' Joint Motion, directed to all of the Rochester Group Funds, seeks the dismissal of all seven Consolidated Class Action Complaints on grounds common to each. Specifically, Defendants move to dismiss Plaintiffs' §§ 11 and 12(a)(2) claims on grounds that (1) Plaintiffs' Complaints fail plausibly to establish the existence of any untrue or misleading statements or omissions of material fact in Fund offering statements;[6] (2) Plaintiffs' claims regarding investment objectives and inverse

---

[6]     I note that while neither party raises the specter that Lead Plaintiffs' allegations sound in fraud such that Rule 9(b) pleading standards may also apply, I have some experience with the issue so touch on it here. *See Schwartz v. Celestial Seasonings*, 904 F. Supp. 1191 (D. Colo. 1995)(Kane, J.), *rev'd*, 124 F.3d 1246 (10th Cir. 1999). Citing *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 287-89 (3d Cir.1992), the appellate panel in *Schwartz* assumed without deciding that the Tenth Circuit would join other circuits in holding that a § 11 claim under the 1933 Act is subject to Rule 9(b) when it sounds in fraud, but concluded plaintiff's claim in that case sounded in negligence such that 9(b)'s particularity requirement would not apply. Plaintiffs in the instant cases clearly plead around the issue of fraud, characterizing their claims in terms of negligence and simple failures to disclose. *E.g.* Nat'l Compl. ¶ 3 ("negligently understated" percentage of assets that were illiquid and "negligently overstated" value). Rather than reach an issue that has not been raised, I simply observe that the plausibility standard of *Iqbal* and *Twombly* as I have applied it to Defendants' Motions to Dismiss tends to merge with the particularity standard of Rule 9(b) and declare Plaintiffs' §§ 11 and 12(a)(2) claims would

floaters are time-barred; and (3) the nature of open-end mutual funds' valuation process is such that Plaintiffs cannot establish loss-causation.  Defendants move to dismiss Plaintiffs' § 12(a)(2) claims for the additional reason that neither OFI nor the Funds can be alleged to have been "sellers" of securities, and deny any of the officer or Trustee Defendants can be deemed "control persons" for purposes of § 15 control person liability. Finally, Defendants contend Plaintiffs' claims under § 13(a) of the Investment Company Act must be dismissed because the Act provides no private right of action.

MassMutual moves to dismiss Plaintiffs' "control person" claims against it, arguing Plaintiffs have failed to state any viable primary violation against any entity it ostensibly "controls" and have failed plausibly to demonstrate MassMutual was in a position to control or authorize any such violation if it had been stated.  Alternatively, MassMutual argues Plaintiffs' "control person" claims should be dismissed as untimely.

I address Defendants Motions and the arguments raised seriatim.

A. <u>Plaintiffs' Claims under the Investment Company Act</u>.

Because I agree with the Ninth and Second Circuits' recent decisions holding that no private right of action exists under the ICA, I address Plaintiffs' claims under § 13(a) of the ICA in summary fashion.

In *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 615 F.3d 1106, 1108 (9th Cir. 2010), the Ninth Circuit agreed with the Second Circuit's analysis in *Bellikoff v. Eaton*

---

survive dismissal under either.   *See* A. Benjamin Spencer, *Plausibility Pleading*, 49 B.C. L. Rev. 431, 473-75 (2008) (suggesting that it is difficult to distinguish any meaningful difference between "particularity" under Rule 9(b) and "plausibility" under Rule 8(a)(2)).

*Vance Corp.*, 481 F.3d 110, 114 (2d Cir. 2007) (per curiam) and *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 430 (2d Cir. 2002) that in the absence of an express provision providing for a private right of action, Congress did not intend to create one in the ICA. In the absence of an express private right of action in a given statute, there is a presumption that Congress did not intend to confer one. Accordingly, the party claiming an implied right of action bears a "heavy burden." *Olmsted*, 283 F.3d at 433.

Where a particular statutory provision focuses "on the person regulated rather than the individuals protected, it create[s] no implication of an intent to confer rights on particular classes of person." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (internal quotes omitted)). Plaintiffs contend the ICA's statutory scheme demonstrates an intent to imply a private right of action because the ICA's purpose is to protect the rights of shareholders and investors by prohibiting certain harmful activities by companies. Plaintiffs' reading is overly expansive and, taken to its logical conclusion, overrides the *Sandoval* rule completely. The plain language of § 13(a) describes actions that the regulated parties – i.e., investment companies – are prohibited from taking. It does not focus on the rights or remedies of investors.

Nor does the ICA's overall structure support implying a private right of action under § 13(a). Congress expressly provided the SEC with broad authority to enforce provisions of the Act in § 42. "The express provision of one method of enforcing a substantive rule suggests the Congress intended to preclude others." *Boswell v. Skywest Airlines, Inc.,* 361 F.3d 1263, 1269 (10th Cir. 2004) (quoting *Sandoval*, 532 U.S. at 290).

14

Because the statutory scheme of the ICA provides for thorough SEC enforcement of the Act's provisions, including § 13(a), "it is highly improbable that Congress absentmindedly forgot to mention an intended private action." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 440 U.S. 11, 19 (1979) (quoted in *Northstar*, 615 F.3d at 1117). Moreover, Congress did provide for a private right of action in ICA § 36(b) to allow investors to bring suit for breach of fiduciary duty. Clearly, Congress knew how to create a private right of action in the ICA. It simply chose not to in § 13(a). *Id.* at 1117.

Similarly, the express proscription of a private right of action in ICA § 13(c) (the "Sudan Act") does not support the implication of a private right of action elsewhere. The Sudan Act added a provision to the ICA expressly prohibiting any "person" from bringing a cause of action based on an investment company's decision to divest from, or not to invest in, entities doing business within certain industrial and military sectors in Sudan. 15 U.S.C. § 80a-13(c)(1). Plaintiffs argue the specific prohibition of a private right of action in the Sudan Act would be superfluous unless private enforcement actions were authorized elsewhere in § 13. However, § 13(c) specifically states that nothing in the Sudan Act "shall be construed to create, imply, diminish, change, or affect in any way whether a private right of action exists under subsection (a)," 15 U.S.C. § 80a-13(c)(2)(A)(1), and that, for me, is the end of it. *Accord Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*, 705 F. Supp.2d 281, 285-86 (S.D.N.Y. 2010).

I conclude Congress did not intend to imply a private right of action in § 13(a) of the Investment Company Act. The language in § 13(a) is proscriptive and directed at

15

company behavior rather than investor remedies, and the existence of express rights of action in other sections of the statute suggests Congress did not intend to provide on in § 13(a).  Defendants' Motion to Dismiss Plaintiffs' ICA claims in each of the seven Consolidated Class Action Complaints is GRANTED.

B.  The § 11 and 12(a)(2) claims.

Under *Iqbal*, Plaintiffs must allege sufficient facts to support the reasonable inference that the defendant is liable for the misconduct alleged.  __ U.S. at __, 129 S.Ct. at 1949.  Liability for violating § 11 of the Securities Act arises when a registration statement is shown either to have (1) contained an untrue statement of material fact, (2) omitted a material fact required to be disclosed, or (3) omitted a material fact necessary to make other statements not misleading.  15 U.S.C. §77k.  Liability under § 12(a)(2) requires investor  plaintiffs to demonstrate they purchased shares pursuant to a prospectus that contained misleading statements or omissions.  *Id.* at §77l.  The plain language of both statutes makes clear that a defendant's duty in signing and issuing a registration statement is to disclose not only those facts required by law, but also any other material "facts necessary to make the statements already contained therein not misleading."  *In re Citigroup, Inc. Bond Litig*., 723 F. Supp. 2d 568, 590 (S.D.N.Y. 2010).

By eliding the "omitted facts necessary" standard for determining whether prospectus statements are actionable under §§ 11 and 12(a)(2), Defendants view each of the misstatements identified by Plaintiffs without reference to the others and argue none, standing alone, is actionably untrue or material.  The tactic misfires.

16

1.   <u>Adequacy of Plaintiffs' Factual Allegations - Materially Misleading
Misrepresentations or Omissions</u>.

As set forth above, Plaintiffs' principal allegation against six of the seven Funds is that they were pitched in their registration statements as conservative investments in terms of risk to capital, i.e., that no matter how creative or aggressive the Fund manager, the push for earnings would only be so far as was "consistent with the preservation of capital." While National Fund did not pitch its investment strategy in terms of "preservation of capital," its Prospectus sought to reassure investors by stating its quest for high yields would be tempered by careful selection of a diversified portfolio which would be closely monitored on an ongoing basis for liquidity and risk. The overall pitch was misleading, according to Plaintiffs, because the Funds were managed in almost reckless disregard of that premise and because offering statements failed to disclose additional information necessary to make the pitch not so.

Rather than address this allegation as a whole, Defendants parse the allegations to argue that (1) "preservation of capital" is a forward-looking "aspirational" statement rather than a "fact" that can be misrepresented for liability purposes under §§ 11 or 12(a)(2); and (2) Plaintiffs' allegations regarding inverse floaters, liquidity, and valuation of assets support no cause of action under §§ 11 or 12(a)(2) because the risks attendant each was adequately disclosed.

*a. Plaintiffs' Investment Objective Allegations.*

<u>Whether Plaintiffs' "preservation of capital" objective allegations are immaterial
as a matter of law as "merely forward looking statements."</u>

17

To argue Plaintiffs' "capital preservation" objective allegation fails to state a claim under § 11 and 12(a)(2), Defendants view the allegation in isolation to characterize it as solely a "forward-looking" or "aspirational" expression of an investment goal that cannot, as a matter of law, be construed as "an untrue statement of material fact."  Mot. (Doc. 285) at 34 (emphasis original) (citing *In re Alliance North Am. Gov't Income Trust, Inc. Sec. Litig.*, No. 95-330, 1996 WL 551732, *4 (S.D.N.Y. Sept. 27, 1996) (general, forward looking investment objective, which makes no promise to investors, not the type of statement that a reasonable investor would consider important in deciding whether or not to invest) and *TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 338 (S.D.N.Y. 1996)(finding not misleading a mutual fund's statement that its investment objective "is to earn a high level of current income while maintaining relatively low volatility of principal")).  While it is true that "generalized statements of optimism that are not capable of objective verification are not actionable under the securities laws," *see Grossman v. Novell*, 120 F.3d 1112, 1119 (10th Cir. 1997), the question is whether the statements were "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker that no reasonable investor could find them important to the overall mix of available information."  *See SEC v. Curshen*, 327 Fed. Appx., 872, 879 (10th Cir. 2010)(quoting *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004)).

Defendants are correct that mere corporate puffing or aspirational statements cannot form the basis for a securities claim under section 11 or 12(a)(2).  However,

18

Plaintiffs' allegations, viewed in context, suggest the "capital preservation" pitch went beyond the vague or aspirational to describe an essential feature of the Funds that reasonable investors would consider important, material information.  Whether it was actionably misleading for purposes of §§ 11 and 12(a)(2), requires consideration of the Prospectuses' other statements and disclosures, viewed in context.

In *Grossman*, the Tenth Circuit found statements that a merger had experienced "substantial success," provided a "compelling set of opportunities," was "moving rapidly," and would "reshape customer experience" to be mere corporate "puffing." 120 F.3d at 1121.  Similarly, in *Pirraglia v. Novell Inc.*, 339 F.3d 1182, 1189 (10th Cir. 2003), the court found statements about a product achieving "broad market acceptance" and sales being "fueled by customer demand" to be puffing and non-actionable.  In contrast, the *Grossman* court found statements that the business was "gaining market share," had "not slowed down the effort to create new products," and that the subject merger was "perhaps the smoothest merger in recent history" to go beyond corporate puffing and describe actionable factual conditions.  *Grossman* at 1123.

The Prospectus statements about a "preservation of capital" investment strategy are not nearly as vague as the "puffery" in *Grossman*.  Unlike judgments about how "smoothly" a merger has gone, "preservation of capital" has a set meaning that an investor's principal will be protected from erosion or loss.  Combined with other Prospectus and registration statement representations Plaintiffs allege failed adequately to disclose the risk that Oppenheimer municipal bond fund investors' capital would indeed

be eroded or lost if prevailing market conditions changed, a statement that the Funds would be managed – even if also "aggressively," as Defendants insist Plaintiffs knew – in a manner that was ultimately "consistent with the preservation of capital" would be important to the overall mix of information available to a reasonable investor.  Neither case cited by Defendants compels a different conclusion.

While it is true that the district court in *TCW/DW* ruled that an investment objective "seeking a high level of current income while maintaining relatively low volatility of principal" could not support a claim under § 11, it did so based on a determination that such a statement, standing alone, would not be one that "a reasonable investor would consider important in deciding whether or not to invest."  941 F. Supp. at 338-39 ("Opinion on Reconsideration," appended to original order beginning at 941 F. Supp. 331).  Plaintiffs in the instant cases do not contend that Fund "capital preservation" objectives were materially misleading standing alone, only that they were so given the totality of other actionable or misleading statements and omissions investors would consider important in deciding whether or not to invest.  In this regard, the *TCW/DW* opinion neither contradicts my analysis nor compels a different conclusion.  Moreover, the bigger issue in *TCW/DW* was the prospectus's alleged failure to alert investors of the "maturity extension risk" for fixed-income securities that resulted from the fund having invested heavily in mortgage derivatives.  941 F. Supp. at 331.  The district court rejected defendants' argument that the prospectus adequately disclosed the "nature, causes and consequences of such risk," and declined to "conclude as a matter of law that the

20

consequences of extension risk were disclosed in the prospectus" or that the alleged

omission was "so obviously unimportant to a reasonable investor that reasonable minds

could not differ as to the question of its importance." *Id.* The question there, as here, is

whether risk disclosures made or omitted in a fund's offering statements were "so

obviously" immaterial that no reasonable investor would consider them important.  In the

context of the risk disclosures Plaintiffs allege were made and omitted here, the "capital

preservation" language used in six of the seven Fund Prospectuses does not fall into that

category.

Similarly, the unpublished *Alliance* decision does not turn on a determination that

the subject fund's investment objective, viewed in isolation, was either misleading or not

misleading, but on consideration of whether all the prospectus's offering statements,

"taken together and in context, would have [misled] a reasonable investor."   1996 WL

551732 at *4.  As in *TCW/DW*, the *Alliance* court's assertion that investment objective

statements in a prospectus are not, by themselves, "the type of statement that a reasonable

investor would consider important in deciding whether or not to invest" was not

dispositive.  Rather, it was the determination that the prospectus's other statements,

together with "subsequent letters and reports to investors," specifically disclosed the

information alleged to have been misrepresented, i.e., that the fund was investing more

heavily in Mexican and Argentine securities than was originally anticipated.  *Id.* at **4-5

(objectives statement that fund would invest in government securities issued or

guaranteed by the United States, Canada, and Mexico not inconsistent with heavy

investment in Mexican and Argentine securities viewed in context of other specific statements and disclosures).  In this regard, *Alliance* stands not for the proposition urged by Defendants, but for further inquiry into whether the Funds' other statements and disclosures rendered the "preservation of capital" language misleading to a reasonable investor.  At its core, the parties' dispute on this issue hinges on whether the Prospectuses adequately disclosed the actual investment strategies and risks that ultimately materialized and caused Plaintiffs' alleged loss.

Defendants rely heavily on the Northern District of Illinois's unpublished decision in *Tabankin v. Kemper Short-Term Global Income Fund*, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994), to argue the risks of which Plaintiffs complain were adequately disclosed and cannot support liability under §§ 11 or 12(a)(2) of the Act. *See* Joint Motion (Doc. 285) at 36.  The referenced language from *Tabankin* itself is unremarkable, stating simply that:

> [I]t is not tenable to base a securities fraud claim on a general statement of the Fund's objectives when the Prospectus clearly states that there is no assurance that the objectives will be achieved, goes on to list specific risks associated with the particular Fund, and the plaintiffs' loss results from those very risks.

1994 WL 30541 at *5.  In the dismissal context, however, this language begs the very question necessary to adopt or reject it:  Were the specific risks associated with a particular Fund adequately disclosed?  Plaintiffs' allegations here are that Fund objectives to pursue high yields without loss to capital (or, in the case of National Fund, to pursue high yields while carefully monitoring liquidity and risk), viewed in the context of numerous misleading affirmative assurances and material omissions that would have

revealed the actual and substantial risk of accelerated devaluation and loss, were materially misleading and violated §§ 11 and 12(a)(2) of the Act. The parties' arguments merge around the issue of adequate disclosure, to which I now turn.

<u>Whether the registration statements adequately disclosed<br>how the Funds would pursue their goals.</u>

Inverting their initial argument, Defendants next contend it is Plaintiffs who "wrench" the term "preservation of capital" out of context and argue the phrase is immaterial as a matter of law when viewed in the context of the stated objective as a whole. According to Defendants, the Funds' objective of maximizing interest income "consistent with preservation of capital" cannot be an actionable misstatement given the totality of the disclosures describing the Funds' investment strategies for maximizing income and the associated risks. *See* Mot. Dismiss (Doc. 285) at 35-37; Reply (Doc. 299) at 5. Leaving aside the futility of such an argument under a Rule 12(b)(6) standard where the facts alleged are presumed true,[7] the result is the same as above. The question of whether the Funds' "maximizing income while preserving capital" investment objective was misleading is not categorically resolved by focusing on either aspect of the stated goal to the exclusion of the other. Rather, the question of whether the stated objective

---

[7]     In the AMT-Free Complaint, for example, Plaintiffs contend Prospectus representations that Fund Managers would monitor the liquidity of holdings so as not to exceed a 15% cap were materially false and misleading and support that contention with the specific factual allegation that on July 31, 2008, Defendants represented investments in illiquid securities were limited to 1.91% when in fact 30.05% of Fund assets were illiquid at that time. AMT-Free Compl. (Doc. 248) at ¶ 62. Defendants' response challenging Plaintiffs' definition of "illiquidity" and calculation methodology is not germane on a Motion to Dismiss.

was misleading, to a reasonable investor in context, turns precisely on the nature and adequacy of Defendants' disclosures in light of Defendants' actual practices.  If Plaintiffs allege facts tending to demonstrate that Defendants' stated investment strategies were materially different from the strategies actually pursued, or that the risks of the investment strategies disclosed were materially misleading given the actual and foreseeable risks posed, then Defendants' stated investment objectives cannot be said to have been "immaterial" or "not misleading" to a reasonable investor as a matter of law.

### b. *Plaintiffs' inverse floater allegations.*

According to Plaintiffs, Defendants' heavy investment in highly-leveraged derivative instruments known as inverse floaters contravened both the "capital preservation" investment objectives as well as all seven of the Funds' specific representations regarding caps on such investments and the relative risk to capital they posed.  Plaintiffs claim the Prospectuses obscured how leveraged these floaters were and as a result of this leveraging how hyper-sensitive they were to changes in the bond market.  Plaintiffs contend the Prospectuses failed to disclose how the inverse floaters held by the Funds created tremendous and inadequately disclosed risk to Plaintiffs' capital, including the risk that inverse floaters could take on a negative value in times of rising interest rates and actually devalue the long-term bonds underlying them.  With holdings underwater, the Funds would need to raise or borrow cash to recollateralize holdings and meet payment obligations to third parties, who could force the collapse of floater Trusts and asset sales at a potentially significant loss to the Fund and Fund

investors.  Defendants deny any duty to disclose the information Plaintiffs' contend was

misleadingly omitted and maintain the Funds adequately disclosed inverse floater risks.

Inverse floaters generally

"Inverse floaters" are derivative securities that pay interest income, in the form of

a "coupon," that moves inversely with changes in a prominent and referenced short-term

interest rate.  All of the municipal bond Funds at issue held municipal inverse floaters

either created ("derived") from the long-term municipal bonds also held by the Funds or

purchased, outright, from other sources.

The inverse floaters typically held by the Funds arose from a cluster of interrelated

transactions structured by an investment bank known, in this context, as a "Sponsor."

The Sponsor would create a Trust into which the Fund would place a long-term municipal

bond that it had purchased, and the Trust would issue two classes of securities:  (1)

short-term floating rate securities ("Floaters") that it sold to others; and (2) inverse

floating rate securities ("Inverse Floaters") that it held for the benefit of the Fund.

Floaters paid tax-exempt coupons at a money market rate that varied positively with a

referenced short-term interest rate.  Holders of Floaters had the right to tender or "put"

Floaters for redemption at any time, usually with seven-days' notice, at their original

(full) face value.

The tax-exempt coupon received by the Fund on Inverse Floaters was the

difference between the long-term interest payments generated by the underlying

municipal bond and the short-term interest paid on the Floaters.  Inverse Floater coupons,

25

therefore, move inversely with changes in the referenced short-term interest rate:  If

short-term interest rates fall, the difference between the Floater coupon payments and

interest payments generated by the underlying long-term bond inure to the benefit of the

Fund; if short-term rates rise, more is paid out on Floaters and the coupon on Inverse

Floaters is less.

The attraction – and concomitant risk – of investing in inverse floaters is that the

inverse movement of payment rates is leveraged by application of a multiplier.  A

multiplier of two, for example, moves an inverse floater's coupon rate two times the

referenced short-term market rate.  Thus, while an inverse floater with a 2:1 leverage ratio

poses twice the coupon risk of an unleveraged floater, it poses less risk than an inverse

floater with an even higher leverage ratio.  According to Plaintiffs, Defendant Fund

Inverse Floaters had leverage ratios as high as 9:1,[8] meaning the Inverse Floater's coupon

payment would rise, or decline, by a factor of nine for every basis point decrease or

increase in the short-term interest rate.  As a result, even a small increase in interest rates

would lead to such a precipitous, negative decline in a 9:1 Inverse Floater that the Fund

could end up underwater, i.e., owing more in Floater coupons than it receives on the

underlying bond itself.  Such price risk would have enormous implication for the stability

of a Fund's NAVs.  If the Funds held many Inverse Floaters with high leverage ratios,

there is an exponentially greater risk of sharp declines in the Funds' NAVs.

---

[8]      See Pls.' Response (Doc. 292) at pp. 25-27 (discussing New Jersey Fund SAI and investment in Puerto Rico Electric Power Authority).

The effect of highly-leveraged Inverse Floaters is to magnify, many times over, the risks inherent in holding the long-term bonds backing them.  In addition to the tremendous volatility that necessarily accompanies heavily leveraged securities, the ability of third-party holders of Floaters to tender or "put" them back to the Trust for par value whenever they liked created a situation in which Sponsors could force the Trust's collapse so that the underlying municipal bond could be liquidated to meet the Trust's outstanding obligations.  If market rates were rising and bond prices falling, the Fund would be in the difficult position of liquidating the underlying bond at unfavorable prices. According to Plaintiffs, the funding of a long-term bond with short term financing (via the "put"-able Floater) was a strategy starkly incompatible with the objective of generating maximal income "consistent with preserving capital."

Independently of the "preservation of capital" investment objective, Plaintiffs allege all seven of the Funds' Prospectuses were rendered misleading by the Funds' failure to disclose the extent to which Inverse Floaters were leveraged and the threat high leverage ratios and third-party "put" authority posed to overall Fund value and capital. Specifically, Plaintiffs challenge failures to disclose Inverse Floater leverage ratios or multipliers; that third-parties, rather than Fund Managers, could force the collapse of Inverse Floater Trusts by tendering Floaters for par value at any time and without condition; that the Funds might have to further leverage their securities or sell assets at a loss to recollateralize long-term bonds that were underwater based on the effects of leverage; and that the Funds may not have sufficiently liquid securities or cash to meet

their obligations to pay amounts due Floater holders in the event of a Trust collapse. Plaintiffs contend that by the time those risks were disclosed in October 2008, they had already materialized and the harm had been done.

Inadequate/Misleading Disclosure of Inverse Floater Volatility.

*Leverage Ratios*

Lead Plaintiffs in all seven cases allege the Funds failed to disclose the extent to which inverse floaters were leveraged and that such omissions made the Funds' risk disclosures materially false and misleading.[9]  Defendants deny any duty to disclose the degree of leverage of Inverse Floaters and contend the Funds' offering statements were adequate and included all information necessary for investors to "do[] the math" and determine inverse floater leverage ratios for themselves.  Mot. Dismiss (Doc. 285) at 45-46 (Fund SAIs "disclosed the total dollar amount of each Fund's inverse floaters and floaters, and an investor easily could divide the two numbers to get the overall leverage ratio of the Fund's inverse floater investments.").  Both assertions miss the mark.

Meaningful disclosure of a Fund's volatility and risk is not about mathematical precision or who bears the burden of quantifying it.  Meaningful disclosure, for purposes of §§ 11 and 12(a)(2) liability, is of that information necessary to make other offering statements not misleading.  *See Grossman*, 120 F.3d at 1124.  Each of the Prospectuses, for example, stated inverse floaters "can be" more volatile than conventional fixed-rate

---

[9]     AMT-Free Compl. ¶¶ 65, 100(a); AMT-Free NY Compl. ¶¶ 59, 92(a); Cal. Compl. ¶¶ 142, 151; Nat'l Compl. ¶¶ 61, 90(a); NJ Compl. ¶¶ 60, 93(a); Pa. Compl. ¶¶ 122, 133(a); Rochester Compl. ¶¶ 60, 96(a).

securities when in fact (and by definition) they are "always" more volatile because they move at a multiple of whatever rate a fixed rate security moves. I conclude the failure to disclose even a general range of inverse floater leverage ratios plausibly left out information reasonable investors would have deemed important to their decision to invest in any of the seven Oppenheimer Rochester-style funds at issue.[10]

That Defendants had no "duty" to disclose leverage ratios is also an inapt defense to Plaintiffs' claims. Once a defendant makes disclosures regarding a particular type of holding's relative risk, its "duty" to do so in a manner that is neither directly misleading nor misleading through omission of other material disclosures is inherent in the securities laws and explicit in §§ 11 and 12(a)(2). *See Grossman*, 120 F.3d at 1125. The line of cases on which Defendants rely does not undermine this fundamental premise.

---

[10] Further, as Plaintiffs demonstrate, the suggestion that a specific or even approximate leverage ratio of a particular Fund's inverse floater is "easily" determined from already disclosed information is somewhat facile. Plaintiffs use the New Jersey Fund's Prospectus and its "Puerto Rico Electric Power Authority ROL" inverse floater to illustrate how investors would have had to go about assessing the magnitude or range of leverage of the inverse floaters the Fund created or purchased. *See* Opp'n Br. (Doc. 292) at 26-28. The Fund's disclosures concerning inverse floaters first appear on page eight of the Prospectus. Nov. 2007 NJ Prospectus (Larabee Decl. vol.3 (Doc. 285-11 Ex. A-10)) at 8. Nothing in the Prospectus itself discusses or reveals the specific degree to which New Jersey Fund inverse floaters will be leveraged. Instead, the investor would have to request the Fund's SAI to find any specific information identifying the Floater, the Inverse Floater, the underlying bond, and the monetary value of each. *See* New Jersey Fund Prospectus back page ("The following additional information about the fund is available without charge upon request: STATEMENT OF ADDITIONAL INFORMATION . . . "). Once having requested and received the SAI, the investor would have had to locate the inverse floater and its coupon rate from a table on page 132, determine the underlying municipal bond from the Fund's list of municipal bonds beginning on page 107 - 118, subtract the Inverse Floater value from the principal amount of the municipal bond to yield the value of the Floater, and then divide the Floater by the Inverse Floater to come up with the leverage ratio of approximately 9:1.

For example, *In re Burlington Coat Factory Sec. Litig.* was a Rule 10-b5 securities fraud action premised in relevant part on claims that defendants' forward-looking earnings projections were rendered fraudulent based on their failure, at a later date, to correct or update them.  114 F.3d 1410, 1432 (3d Cir. 1997)(Alito J.).  It is wholly distinguishable in that it involved strictly forward-looking statements and a company's duty to update an "ordinary, run-of-the-mill" earnings forecast that, "although reasonable at the time made, became misleading when viewed in the context of subsequent events." *Id.* at 1431.  Given that the securities laws do not require, but seek to encourage, the disclosure of internal earnings projections by limiting liability to forecasts that were unreasonable when made, the Third Circuit reasoned that a judicially created rule triggering a "duty of continuous disclosure of all material information every time a single specific earnings forecast is disclosed" was unwarranted and would be counterproductive. *Id.* at 1433.  The court concluded defendants had no "duty to update" a voluntarily disclosed earnings projection that was not unreasonable at the time it was made, and in the absence of such a duty, plaintiffs' allegations of fraud premised on a failure to update earnings failed under Rule 9(b) pleading standards to state a viable 10b-5 claim.

The *In re Burlington* case is inapposite for a number of reasons.  The inverse floater risk disclosures at issue were not forward-looking earnings projections but risk disclosures and statements of then-present fact.  Moreover the "duty" is not any duty to update forward-looking projections, but the duty (1) to disclose present information truthfully and accurately, and (2) to disclose additional information that, if omitted, would

render past statements misleading.  Further, the fact a company has "no general duty to provide the public with all material information," Defs' Reply (Doc. 299) at 12 (citing *Burlington*), is no defense to a breach of duty under the securities laws to disclose material information that it volunteers to disclose in a non-misleading manner.

Phrased in terms of "duty," §§ 11 and 12(a)(2) provide that the disclosure of material information in connection with an offer or sale of securities triggers a concomitant duty to disclose, or not to omit, other material facts necessary to make the original statements or disclosures, "in the light of the circumstances under which they were made," not misleading.  15 U.S.C. § 77l(a)(1).  Because Lead Plaintiffs here premise their claims of liability on Defendants' affirmative disclosures regarding the extent to which Funds would invest in inverse floaters, the degree those inverse floaters would be leveraged, and the concomitant risks to income and capital of such an investment strategy, Defendants' legal "duty" to disclose additional material information that would render those disclosures not misleading flows from the 1993 Act itself and cannot be avoided.

### *Actual Disclosures Misleadingly Sanguine*

Because Defendants did not disclose (and failed even to mention) the extent to which individual Funds' inverse floaters were leveraged, Plaintiffs contend they were left without an objective measure of their volatility and had to rely on the Funds' general inverse floater disclosures to make this important assessment.  Plaintiffs contend these disclosures were both inadequately vague and affirmatively misleading because they suggested the Funds' inverse floaters were far less risky than they actually were.

31

For example, the disclosure that "[a]n inverse floater that has a higher degree of leverage usually is more volatile with respect to its price and income than an inverse floater that has a lower degree of leverage" (*see* AMT-Free Prospectus (10/26/07) at 5) is true by definition and relates little or no substantive information.  However, because an inverse floater with a higher degree of leverage is *always* more volatile with respect to income than a floater with a lower degree of leverage, the disclosure is also affirmatively misleading.  Similarly, the statement "[a]s short-term interest rates rise, inverse floaters produce less current income (and, in extreme cases, may pay no income)," *see id.*, discloses a fact operationally true by the definition of inverse floaters generally, it may also mislead reasonable investors by suggesting that the worst that can happen with inverse floaters in "extreme cases" is that they may pay no income when, in fact, in "extreme cases" inverse floaters may obtain negative values triggering equity crises, Trust collapses, fire-sales of Fund assets, and a loss of investors' capital.

While Fund Prospectuses disclosed certain "[a]dditional risks" of investing in Inverse Floaters, Plaintiffs maintain none of these rose to the level necessary to shield Defendants from liability under §§ 11 or 12(a)(2).  These "additional risks" included that the market value of Inverse Floaters "can be more volatile than that of a conventional fixed-rate bond" and that Inverse Floaters "tend to underperform fixed rate bonds in a rising long-term interest rate environment."  *E.g.* AMT-Free Prospectus (Doc. 285-3) at 5. Plaintiffs maintain boilerplate disclosures that Inverse Floaters "may" have additional risks, "tend" to underperform, or "can be" more volatile are both insufficiently vague to

shield Defendants from liability and actively misleading because they conceal the "crucial fact inverse floaters are *actually* and *necessarily* more volatile" and will underperform fixed-rate bonds in a rising interest rate environment.  To suggest Inverse Floaters may be "as" stable as, or perform "as well or better than," fixed rate bonds in a rising interest rate environment is, according to Plaintiffs, affirmatively false and misleading.

Defendants contend Fund SAIs went further than Prospectuses did, disclosing that inverse floater market value "is" more volatile and that their market value "could be expected to vary to a much greater extent" than the market value of municipal securities that are not derivative instruments but have similar credit quality, redemption provisions, and maturities.  Reply (Doc. 299) at 7, 15 (SAI citations omitted).  According to Defendants, these warnings were "substantive and tailored" to the risk and "too prominent and specific" to be characterized fairly as "boilerplate."  *Id.* (citing *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) and *In re Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993)).  I cannot agree that Defendants' warnings about inverse floater volatility risk were so "substantive," "tailored to the risk," and "prominent" as to negate any plausible inference that they were misleading or rendered other Prospectus statements materially so.  *See In re Flag Telecom Holdings*, 618 F. Supp.2d 311, 324-25 (S.D.N.Y. 2009) (declining to substitute court's reasoning for that of factfinder where investors would have to "cobble together" scattered disclosures regarding extent that presales were to finance project).

*Trust Collapses and Associated Risk to Capital.*

33

Defendants also challenge the viability of Plaintiffs' allegations regarding the collapse of the derivative-creating Trusts and resulting risk to capital, arguing that these, too, were adequately disclosed. As Plaintiffs point out, the inverse floater arrangements were essentially a mechanism by which the Funds purchased long-term municipal securities with money raised from short-term, floating interest rate loans collateralized by that long-term security. Plaintiffs contend the Funds failed to disclose that under the terms of the Floater "put" provisions, third parties could essentially trigger a collapse of inverse floater trusts and fire-sale of assets under circumstances wholly beyond the control of the Funds or the Manager.[11] According to Plaintiffs, the October 2008 Fund Supplements constituted the first time the true risks related to the inverse floater trust collapses and loss of capital were disclosed to investors, and by then it was too late.

Defendants contend Plaintiffs' allegations fail to state a claim because (1) the October 2008 Supplement merely explained in greater detail how previously disclosed risks, including the possibility of collapses and forced sales, could materialize in "unprecedented" economic conditions and (2) Defendants had no duty to quantify Fund risk or disclose "every scenario" that could lead to disadvantageous sales. Defendants point to disclosures in pre-2008 Fund SAIs stating that while Managers do "not usually intend to dispose of securities prior to their maturity, [they] may do so for liquidity purposes, or because of other factors affecting the issuer that cause the Manager to sell

---

[11]    AMT-Free Compl. ¶¶ 70, 86; AMT-Free NY Compl. ¶¶ 63, 78; Cal. Compl. ¶¶ 147, 155; Nat'l Compl. ¶¶ 65, 76; NJ Compl. ¶¶ 64, 79; Pa. Compl. ¶¶ 129-30; Rochester Compl. ¶¶ 65, 81.

the particular security." Mot. Dismiss (Doc. 285) at 48-49 (citations omitted). Because Fund Prospectuses also disclosed the risk that inverse floater trusts could be "collapsed," and that in the event of such a collapse Funds would have to "pay the value of the short-term bonds," *see id.* at 49 (citations omitted), Defendants maintain the registration statements together warned of the same risks that the 2008 Supplement merely described in greater detail in light of the then-current financial crises. "[A]lthough 'the quality of the disclosure could have been improved,'" Defendants continue, "this 'does not render what was done deceptive or misleading.'" *Id.* (quoting *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 211 (2d Cir. 1980)).

What is significant, according Plaintiffs, is that the 2008 Supplements disclosed for the first time that the risk of collapse and disadvantageous asset sales posed by the Funds' inverse floater trusts were not within Fund managers' control, but could be forced upon them by repurchasing agents and third-party holders of other Trust derivatives, i.e. Floaters. According to Plaintiffs, the pre-2008 disclosures suggested nothing other than that Fund managers, at their own discretion, could "dispose" of securities before maturity or act to "collapse" inverse floater Trusts. Not until the 2008 Supplements did the Funds finally disclose that third parties, independently and completely outside the control of Fund managers, could "force" collapses and asset sales by tendering their short-term securities for par value when the Trusts held little or no equity, or even a negative value.

Defendants' response to this is three-fold. First, they reiterate they had no "duty" to quantify Fund risks or to foresee "every scenario" that could lead to disadvantageous

sales of Fund assets.  As previously stated, Defendants' duty under the 1933 Act is to disclose information to reasonable investors in a manner that is not misleading, and the lack of a duty to disclose "every scenario" that could lead to a trust collapse does not negate or alter that duty.  Next, Defendants deny the distinction between Fund and third-party collapses is material, and argue SAI disclosures of the dollar amount of short-term floaters as a liability on Fund balance sheets together with the fact that "collapses" may be necessary, gave investors all the information necessary to assess the "magnitude" of risk associated with inverse floaters, "including the risk of collapse by any means, or [the need for] adding collateral for inverse floater trusts."  Reply (Doc. 299) at 16-17 (citing *Tabankin*).  I have already rejected this argument in the context of undisclosed leverage ratios and find it unpersuasive in this context as well.  *See* § III.B.1.b, *supra*, at pp. 27-28.

Finally, Defendants contend the third-party collapse scenario is entirely "theoretical" because Plaintiffs have alleged "no facts" tending to show that Trusts were actually collapsed by third parties or how such a collapse "might have or did damage the Funds." Reply (Doc. 299) at 20.  Allowing Plaintiffs to discover such facts, Defendants maintain, would be tantamount to "precisely the type of fishing expedition the securities laws are intended to prohibit." *Id.*  I disagree.  It is certainly plausible from allegations such as the undisclosed 9:1 leverage ratio of the New Jersey Fund's Puerto Rico Electric Power Authority ROL inverse floater, for example, that even in a moderately-rising interest rate market inverse floaters could obtain a negative value, causing severe liquidity

problems for Trusts that could then not maintain their collateral or payment obligations without collapsing those Trusts and selling assets as a loss.  Whether Plaintiffs can marshal evidence to support that inference is a matter for another day.

<u>Disclosures regarding Inverse Floater Asset and Investment Limits</u>.

In disclosures related to inverse floaters, each of the Funds set limits on the percentage of "total assets" that could be invested in inverse floaters.  Six of the seven Rochester-style Funds told investors they could "invest up to 20% of . . . total assets" in inverse floaters.  *E.g.* 10/26/07 AMT-Free Fund Prospectus (Larrabee Decl. Ex. A-2) p. 5. The Rochester National Fund (Larrabee Decl. Ex. A-9), stated it could "invest up to 35% of its total assets" in inverse floaters.  Plaintiffs contend these statements were false or at a minimum misleading because in actuality, the Funds exposed a much higher percentage of Fund assets to risk at the height of the inverse floater investment frenzy.  Defendants emphasize semantics, denying "exposing" more than 20-35% of assets to the effects of inverse floater volatility is the same as investing more than 20-35% of assets in inverse floaters, and arguing Plaintiffs' factual allegations support no inference that Funds "invested" more than the maximum percentage of assets in inverse floaters.

Defendants' point regarding word-play is well taken, but their indignation at Plaintiffs' "self-serving" reinterpretation of inverse floater asset risk limitations is overplayed.  The National Fund Prospectus, for example, articulates the inverse floater investment limit as follows:   "The Fund can invest up to 35% of its total assets (*which includes the effects of leverage*) in inverse floaters." *See id.* (emphasis mine).  By

including the accelerated "effects" of leverage in the 35% limitation, the statement plausibly suggests a limit on the percentage of assets Managers would expose to risk, not just the percentage of total assets that could be invested without regard to leverage effects.

Similarly, Plaintiffs decry Defendants' efforts throughout the Fund Prospectuses to characterize inverse floaters as typical "plain vanilla" municipal securities when in fact they were highly leveraged derivatives that are "fundamentally different and far riskier." Pls' Response (Doc. 292) at 44-45.  For example, the National Fund states that it "attempts" to invest 100% of its assets in municipal securities and as a "fundamental policy . . . invests at least 80% of its net assets (plus borrowing for investment purposes) in municipal securities."  Nat'l Prospectus (11.28.07) at 3.  By investing up to 35% of Fund assets in inverse floaters, Plaintiffs contend the Fund left only 65% – rather than 80% as stated – of Fund assets available for investing in "safer" municipal securities.  *Id.* Defendants dispute the municipal securities/inverse floaters distinction and deny Plaintiffs can state a claim under § 11 or 12(a)(1) based on these allegations.

Again, I agree Plaintiffs draw a somewhat false distinction between municipal securities and inverse floaters but see Plaintiffs' allegation in a broader light.  Because inverse floaters, based on their leveraging, could obtain *negative* value and actually *decrease* the value of the municipal securities underlying them, they are fundamentally different from municipal securities generally, the value of which in the absence of leveraging cannot become negative.  Against this backdrop, according to Plaintiffs, Fund

Prospectuses' emphasis on investment in "municipal securities" and definitions of those securities in standard terms,[12] "exemplifie[d] [Defendants'] strategy of using obfuscation to conceal the true risk of their investment strategy."  Resp. (Doc. 292) at 47.

Whatever the merits of Defendants' rebuttals viewed piecemeal, at this stage of the proceedings I cannot agree that Plaintiffs' inverse floater asset limit allegations, viewed in their entirety, support no plausible § 11 or 12(a)(2) claim.  They are part of the overall tapestry of statements/disclosures woven by Defendants that Plaintiffs claim obscured and misled investors into a false and overly sanguine understanding of the risks Fund investment strategies posed to their capital.

*c. Plaintiffs' illiquid assets allegations.*

Each Fund Prospectus defined illiquid securities as assets that "do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price" and stated no Fund would "invest more than 15% of its net assets in illiquid securities."[13]  Prospectuses further represented that Fund Managers would

---

[12]      Each Fund Prospectus begins by announcing the Fund's overall investment objective as being the generation of tax-exempt income "from municipal securities," and prominently displays a definition of "municipal securities" as being "fixed-income securities primarily issued by states, cities, counties and other governmental entities to finance the development of local communities" (AMT-Free, AMT-Free NY, Pa, Nat'l, NJ) or "essentially a loan by the buyer of the security to the issue of the security [where] [t]he issuer promised to pay back the principal amount of the loan and normally pays interest exempt from federal individual income taxes." (Cal. Fund).  Each Fund states that it may hold both "short and long-term" municipal securities and a certain percentage of leveraged derivatives, but every Prospectus speaks in terms of fixed income payments from government-issued securities.

[13]      AMT-Free Prospectus (Larrabee Decl. Ex. A-2) at 15; AMT-Free NY (A-4) at 16; Cal. Fund (A-6) at 16; Nat'l Fund (A-8) at 15; NJ Fund (A-10) at 15; and Pa. Fund (A-12) at 15.

"monitor[] holdings of illiquid securities on an ongoing basis to determine whether to sell

any holdings to maintain adequate liquidity."  *Id.*  Based on these representations,

Defendants issued periodic SAIs (Statements of Investments), which they incorporated by

reference into Prospectuses, purporting to identify, with specificity, which assets of a

particular Fund were illiquid.  *See id.*

Plaintiffs contend the Prospectus statements and SAIs were materially false and

misleading because the Funds did not monitor holdings for illiquidity on an ongoing

basis, regularly exceeded the 15% illiquidity limit, and actively misrepresented the

percentage of assets that were illiquid at any given time.  According to Plaintiffs, these

failures, together with the erroneous (too-low) illiquidity disclosures, concealed the

material risk that if the holders of floaters exercised their redemption rights, Funds would

be unable to raise capital quickly through the sale of readily marketable (liquid)

securities, and would be forced to sell illiquid securities at a steep discount.  Plaintiffs

also contend the underrepresentation of illiquid securities meant Funds were not applying

an illiquidity discount to their asset valuation when they should have done so, necessarily

resulting in the improper inflation of each Fund's NAV.[14]

Defendants contend Plaintiffs' illiquidity allegations fail to state a claim because

liquidity determinations are subjective assessments involving the exercise of judgment,

not objective facts that can be misrepresented or support liability under §§ 11 or 12(a)(2).

---

[14]      *See* AMT-Free Compl., ¶ 107; AMT-Free NY Compl. ¶ 99; Cal. Compl. ¶ 172;
Nat'l Compl. ¶ 97; NJ Compl. ¶ 100; Pa. Compl. ¶ 107; Rochester Compl. ¶ 103.

40

While this is generally true, it does not vitiate claims, like Plaintiffs', premised on allegations that Defendants did not do what they said they would do in their Fund Prospectuses, and misled investors accordingly.

It is clear from the Fund Prospectuses that Defendants told investors they would "monitor holdings" on an "ongoing basis" and sell them to maintain liquidity "at or below 15%." Plaintiffs, in their Class Action Complaints, purport to have undertaken an "extensive review" of the trading activity of each of the Funds' holdings, revealing Defendants' failure to monitor or designate as illiquid entire categories of "sui generis" assets – i.e., assets derived or held exclusively by the Fund – even though these assets were illiquid under any definition because they were never traded on an exchange at all and "in many cases went for months or years without being bought or sold in private transactions." Pls.' Resp. (Doc. 292) at 53. As an example, Plaintiffs in the AMT-Free case allege that a minimum of 30.05% of the Fund's assets were illiquid on July 31, 2008, despite Defendants' SAIs representing that number as 1.91%. AMT-Free Compl. ¶ 62.

These allegations support a plausible inference that the Prospectuses' illiquidity statements were inaccurate and materially misleading to reasonable investors. If a security's designation as liquid or illiquid is purely subjective and solely within the business judgment of Defendants to determine, then the statements conveyed no meaningful information, and certainly no meaningful assurances, to prospective investors. Yet the statements clearly suggest something real is being warranted: Each Prospectus defined "illiquidity" in concrete terms and assured investors that liquidity would be

41

"monitored" on an "ongoing basis" and maintained at less than 15%. If Defendants' position is accepted, the statements communicated nothing substantive to potential investors and for that reason alone were plausibly misleading. The allegations that Funds like AMT-Free regularly exceeded the 15% limit and/or misrepresented the percentage of illiquid assets being held also support a plausible claim and warrant further investigation.

### d. Fund representations regarding valuation and daily NAV.

Finally, Defendants challenge Plaintiffs' valuation-related allegations and deny they plausibly support entitlement to relief under §§ 11 or 12(a)(2).

In their Amended Consolidated Class Action Complaints, Plaintiffs allege both that Defendants negligently overstated the value of Fund assets and materially misled investors by representing valuations would be calculated based on observable sales and trade information, either from actual sales of Fund assets or comparable ones. Rather than rely on actual or market-based prices or trades as represented, Plaintiffs contend Defendants valued Funds throughout the class period based on "unobservable inputs" or "inputs other than quoted prices that are observable for the asset (such as quoted prices for similar assets and market-corroborated inputs such as interest rates, prepayments speeds, credit risk, etc.)."[15] In the absence of any actual market check, Plaintiffs contend Defendants assigned Fund values based on purely subjective and self-serving criteria, and

---

[15]     AMT-Free Compl. ¶ 83; AMT-Free NY Compl. ¶ 76; Cal. Compl. ¶¶ 170-71; Nat'l Compl. ¶ 74; NJ Compl. ¶ 77; Pa. Compl. ¶¶ 107-12; Rochester Compl. ¶¶ 78-79. Plaintiffs contend that in 2009, in accordance with new federal accounting standards, Defendants for the first time disclosed that Fund portfolios in their entirety were valued based on "unobservable inputs," rather than observable inputs such as sale prices. AMT-Free

therefore overstated value by failing to account for volatility and illiquidity.  As a result, when Funds ultimately sold assets, investors were forced to accept the actual "fair value" the market would pay, which was less than the "value" Defendants had assigned using their undisclosed, subjective internal valuation techniques.  *See* Pls.' Response (Doc. 292), pp. 59-61.

Defendants argue Fund holdings valuations fall squarely within the business judgment rule and deny Plaintiffs can state a claim under §§ 11 or 12(a)(2) in the absence of allegations of dishonesty or bad faith.  Reply (Doc. 299), pp. 25 (citing *Fait v. Regions Fin. Corp.*, 712 F. Supp.2d 117 (S.D.N.Y. 2010)).  Defendants further deny their valuations of Fund holdings either contradicted or rendered misleading anything represented in their offering statements.  Defendants contend the Funds' offering statements explicitly disclosed the distinction between municipal securities, which do not trade on exchanges and therefore cannot be valued on "actual" sales or trade data, and other securities that do.  Because offering statements disclosed that municipal securities could be valued by Fund Managers using any "pricing services approved by the Board of Trustees," Mot. Dismiss at 22, Defendants conclude Plaintiffs' valuation allegations fail as a matter of law to state a claim for relief.

Defendants' arguments notwithstanding, the fact Lead Plaintiffs have failed to allege Fund valuations "were not honestly believed when made" does not, by itself, preclude liability based on Plaintiffs' valuation allegations.  Plaintiffs' allegations are not simply that Defendants' valuations were wrong or inflated, but that Defendants'

represented valuations would be informed by externally referenced, observable sales data when in fact they were not.  *See* Mot. Dismiss (Doc. 285) at 63.  The cases on which Defendants rely in support of the business judgment rule – none of which I find particularly incisive in any event – compel no different conclusion.[16]

Further, Defendants' contention that Prospectus assurances regarding externally referenced valuation procedures simply did not apply to municipal securities is not well taken.  Municipal securities were the *sine qua non* of holdings in the Oppenheimer "Municipal" Funds at issue and it is disingenuous to suggest, as Defendants do in their briefing, that "any investor who read [Fund] disclosures would have known that the Funds' municipal securities, like municipal securities in the market in general, were not valued using daily trading prices" so that the pages of assurances related to valuation based on trading prices would not apply.  Mot. Dismiss (Doc. 285) at 61.  The Funds are mutual funds and mutual fund shares are bought and sold at prices that are publicly reported; the fact mutual funds are not traded on exchanges does not render them incapable of being valued using external, observable inputs and data.

---

[16]     The alleged misstatements at issue in *Fait*, for example, were "overstatements" of the value of goodwill associated with an acquisition and the "understatement" of anticipated loan loss reserves deemed "opinions or judgments about future events, not statements of fact."  712 F. Supp.2d at 121.  Because opinions and judgments about future events cannot constitute actionable misrepresentations unless demonstrably false when made, *see id.* (citing *In re Lehman Bros. Sec. & Erisa Litig*, 684 fs2d 485 (S.D.N.Y. 2010)), the court held plaintiffs' allegations failed to state a claim under §§ 11 or 12(a)(2).  My determination that the misleading statements and omissions at issue here were statements of fact rather than forward-looking "opinions and judgments" distinguishes *Fait* and precludes the conclusion Defendants would have me make relying on it.

A look at the Funds' actual valuation representations is informative.  The overarching tenor of these disclosures was one of outwardly observable inputs into a valuation process that was objective and sales based.  The AMT-Free Fund's 11/28/05 SAI, for example, represented the following with respect to its NAV calculation process and methodology:

> SECURITIES VALUATION.  The Fund calculates the net asset value of its shares as of the close of The New York Stock Exchange (the Exchange), normally 4:00 P.M. Eastern time, on each day the Exchange is open for business.  *Securities listed or traded on National Stock Exchanges or other domestic exchanges are valued based on the last sale price* of the security traded on that exchange prior to the time when the Fund's assets are valued.  *Securities traded on NASDAQ are valued based on the closing price provided by NASDAQ* prior to the time when the Fund's assets are valued.  *In the absence of a sale, the security is valued at the last sale price* on the prior trading day, if it is within the spread of the closing "bid" and "asked" prices, and if not, at the closing bid price.  *Securities traded on foreign exchanges are valued based on the last sale price* on the principal exchange on which the security is traded, in the country that is identified by the portfolio pricing service, prior to the time when the Fund's assets are valued.  *In the absence of a sale, the security is valued at the official closing price on the principal exchange* . . . . Securities (including restricted securities) for which market quotations are not readily available are valued at their fair value.  Foreign and domestic securities whose values have been materially affected by what the Manager identifies as a significant event occurring before the Fund's assets are valued but after the close of their respective exchanges will be fair valued.  Fair value is determined in good faith using consistently applied procedures under the supervision of the Board of Trustees.

AMT-Free SAI (11/28/05) at 73 (emphasis mine).  With respect to the actual valuation of AMT-Free shares, the SAI stated:

> *Long-term debt securities having a remaining maturity in excess of 60 days are valued based on the mean between the "bid" and "asked" prices determined by a portfolio pricing service approved by the Fund's Board of*

*Trustees or obtained by the Manager from two active market makers in the security on the basis of reasonable inquiry.*

Securities (including restricted securities) not having readily-available market quotations are valued at fair value determined under the Board's procedures. *If the Manager is unable to locate two market makers willing to give quotes, a security may be priced at the mean between the "bid" and "asked" prices provided by a single active market maker (which in certain cases may be the "bid" price if no "asked" price is available).*

In the case of municipal securities, when last sale information is not generally available, the Manager may use pricing service approved by the Board of Trustees. The pricing service may use "matrix" comparisons to the prices for comparable instruments on the basis of quality, yield and maturity. Other special factors may be involved (such as the tax-exempt status of the interest paid by municipal securities). The Manager will monitor the accuracy of the pricing services. That monitoring may include comparing prices used for portfolio valuation to actual sales prices of selected securities.

*Id.* (emphasis mine). The language in the Prospectuses for the other Funds was substantially the same.[17]

Defendants latch onto one sentence in the first excerpt and the third-party pricing service disclosures for municipal securities in the second to posit that Managers' "good faith" opinions and whatever inputs the Boards' approved pricing services relied on formed the outer limit of their obligations with regard to valuing Fund shares on a daily basis. Because municipal securities are not traded on the NASDAQ or New York Stock Exchange, Defendants contend none of the sale price valuation techniques apply to the Funds and deride Plaintiffs' "confusion" in asserting they do. Reply (Doc. 299) at 26-27.

---

[17]     AMT-Free NY SAI (12/28/07) at 80; Cal. SAI (10/31/07) at 82; Nat'l SAI (11/27/07) at 74; NJ SAI (11/28/07) at 89; Pa. SAI (11/28/07) at 82; Rochester SAI (2/21/07) at 89.

Again, Defendants' indignation is overstated.  Mutual fund shares are bought and sold at actual prices and are therefore amenable to valuation on external and observable criteria. When viewed in their entirety, the SAI/Prospectus statements repeatedly reference "actual" sales and comparisons to "actual" sale prices, and clearly suggest portfolio holdings, which were comprised "mainly" of municipal securities, would be valued consistent with available external information.  Even the section on third-party pricing and matrix-comparisons refers to "actual sales," stating Fund Managers would "monitor the accuracy" of the third-party valuation services by comparing prices used for portfolio valuation to "actual sales prices of selected securities."  *Id.* at 73.

Lead Plaintiffs' valuation allegations, while somewhat weaker as a basis for liability than their other allegations overall, are neither so deficient nor precluded by operation of the business judgment rule from supporting a claim for relief under §§ 11 or 12(a)(2).  Defendants' arguments to the contrary are rejected.

## 2. Loss Causation.

The statutorily prescribed measure of damages under §§ 11 or 12(a)(2) is "the difference between the amount paid for the security" and the security's value "as of the time such suit was brought."  15 U.S.C. §§ 77k(e), 77l(b).  Excluded from damages, under the same statutory provisions, is that portion or all of the depreciation in a security's value that the defendant proves was the result of something "other than" the misleading statements or omissions underlying a plaintiff's claims.  *Id.*  Although lack of causal connection between the alleged misstatement and a diminution in a security's

47

value is an affirmative defense under the §§ 11 and 12(a)(2), Defendants argue it may be considered on a dismissal motion "where the absence of loss causation is apparent on the face of the complaint." Mot. Dismiss (Doc. 285) at 75.

Defendants contend declines in mutual fund value are *always* the result of things "other than" prospectus representations because open-end mutual funds are not traded on secondary markets.  That is, because share prices for open-end mutual funds are determined not by actual trade prices but by a daily summing up of fund assets and liabilities, neither investor expectations nor the information that shapes those expectations can "impact" a mutual fund's NAV.  Citing *In re State Street Bank and Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp.2d 584 (S.D.N.Y. 2011), Defendants conclude no causal connection between the Fund Prospectuses and Plaintiffs' losses has been or could be alleged.  Mot. Dismiss (Doc. 285) at 75.

Defendants' loss causation argument urges a categorical exclusion of mutual funds from Congress's intended reach under §§ 11 and 12(a)(2) of the 1933 Act on grounds that are both hypertechnically narrow and sweepingly broad.  On one hand, the argument focuses too narrowly on NAV as an objective reflection of the value of a typical mutual fund's long-term holdings on a given day, while ignoring that in this case, the Funds' underlying assets, hence the Funds' NAV, are alleged to have taken a hit when long-term and derivative holdings had to be liquidated for reasons obscured or undisclosed in Fund offering statements.  Unlike typical and transparent mutual fund holdings, the value of which simply move in concert with daily market forces, Plaintiffs allege the Funds'

48

unconventional and negatively-leveraged holdings moved both with and counter to market forces resulting in rapid and accelerated declines in equity and collateralization, derivative trust collapses, fire-sales of immature or illiquid assets, and declines in NAV that *were* related to Fund disclosures that obscured or misrepresented these risks.  *See* M. Bullard, *Dura, Loss Causation, and Mutual Funds:  A Requiem for Private Claims?*, 76 U. Cin. L. Rev. 559, 575-77 (2008)(rejecting use of strict or strong loss causation standards in private mutual fund litigation under the Securities Acts and urging recognition of the fact that the value of a mutual fund is reflected by "more than" its daily share price (NAV)).

*State Street* neither supports the assertion that diminution in mutual fund asset value can "never" be causally related to fund registration statements nor does it relieve Defendants of their burden of proving they are not causally related in this particular case. Plaintiffs' claims are not premised on "the common 'corrective disclosure-price drop' scenario" in which a security's value declines after negative or corrective disclosures unrelated to misrepresentations or omissions in offering statements.  They are premised on allegations that misstatements and omissions in Fund Prospectuses concealed the price-volatility and risk associated with aggressive and highly leveraged investment strategies that resulted in an exponential devaluation of Fund assets and collateralization in times of rising interest rates.

Defendants' attempts to characterize them otherwise notwithstanding, Plaintiffs' allegations that Defendants' 2008 Supplements "for the first time disclosed" the true risks

49

associated with their investment strategies are not allegations that the Supplements

"caused" Fund NAVs to fall.  Having already determined Plaintiffs' inverse floater,

valuation, and illiquidity allegations give rise to a plausible inference that Defendants'

Prospectuses and other disclosures regarding risk, value, and illiquidity monitoring were

materially misleading, I now conclude that Plaintiffs' losses are plausibly linked to those

misleading statements and omissions.  Whether and to what extent Defendants may

ultimately prove Plaintiffs' losses are unrelated to those misleading statements and

omissions is something I leave for another day.

　　　Further, the argument that purveyors of mutual funds, who offer fund shares for

sale pursuant to materially misleading statements or omissions, are immune from suit

under §§ 11 or 12(a)(2) because NAV is a rote mathematical calculus that cannot be

impacted by those statements, is sweepingly broad.  It strikes me as one for lawmakers to

make express as a matter of policy, not for trial courts to declare on motions to dismiss.

Unless and until Congress defines mutual fund offering statements out of the category of

registration statements to which the 1933 Act applies, I will take the statute's language at

face value and consider Defendants' loss causation arguments within its confines.

　　　I note that *State Street* is the only decision to date that stands for the sweeping

proposition that open-end mutual funds are categorically excluded from Congress's reach

under the 1933 Act because their value is not specifically determined by trading on an

open market.  Other courts have firmly rejected the proposition.  *E.g. In re Charles*

*Schwab Corp. Sec. Litig. ("Charles Schwab I")*, 257 FRAT 534, 547 (N.D. Cal. 2009) (if

a defendant misrepresents the scope of a fund's risks and the undisclosed risks are plausibly alleged to have exacerbated the losses, "then plaintiffs' resulting undervaluation of risks might be deemed to have caused some portion of their losses"); *accord In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp.2d 86 (D. Mass. 2010) (citing *Schwab*).   Moreover, the *State Street* decision at issue was the third substantive opinion written in that case regarding the sufficiency of plaintiffs' complaint under 12(b)(6) pleading standards.   It is dense and provocative, endorsing a restrictive view of liability under the 1933 Act requiring that plaintiffs plead proximate, rather than merely transaction, causation in order to state a claim for relief.   The holding glosses over the statutory elements establishing a prima facie case of liability under §§ 11 and 12(a)(2) (requiring only transaction causation and leaving the question of proximate or "loss" causation as an affirmative defense) and is simplistic, in my view, in its literal focus at the pleading stage on the mathematical construct of NAV as the sole measure of "value" as it relates to securities collected and held in an open-end mutual fund.

NAV, for such funds, is a mathematical convention for assessing the daily sale or purchase "price" of a share of a fund's collective holdings on any given day.   It is a substitute for the actual sale or purchase "price" of a security that trades individually on secondary markets on a daily basis and no more.   The fact that the pro rata "price" of a mutual fund's aggregate holdings is set by mathematical formula rather than the actual market does not mean that the underlying *value* of those aggregated holdings cannot be squandered or diminished (and thereby reflected in NAV) by actions or materializations

51

of risk about which purchasers of fund shares have been misled. *See* Jill E. Fisch, *Cause for Concern: Causation and Federal Securities Fraud*, 94 Iowa L. Rev. 811, 821 (2009) (explaining that a loss causation analysis is particularly difficult in the securities fraud context because of the many factors that can affect the value of a securities investment)(analyzing loss causation in 1934 Act context).

As intriguing as I may find the *State Street* court's persistence in testing plaintiffs' pleadings and in contrasting pleading requirements in 1934 and 1933 Act cases, I am unconvinced by its holding that mispresentations in open-end mutual fund prospectuses are categorically excluded from investors' reach under the 1933 Act or that Plaintiffs' allegations in this case fall outside its purview. If I am ultimately persuaded *State Street* applies and constitutes the better-reasoned of the various decisions reaching Defendants' loss-causation argument, it will be after Plaintiffs have had an opportunity to marshal evidence to counter an affirmative defense premised upon it. I will not follow the *State Street* court's lead and apply its holding preemptively.

The issue of loss causation is a seminal one in this litigation. Its consideration will involve complex legal and factual determinations, including whether NAV is the sole reflection of "value" for purposes of determining damages in §§ 11 and 12(a)(2) cases; whether declines in a mutual fund's NAV can ever be attributed to misstatements or omissions in fund registration statements; and, if so, what portion of that decline in these cases is attributable to materially misleading statements and omissions or to market forces and events unrelated, and unaffected by, them. On a motion to dismiss I need not delve

so deeply into questions whose answers ultimately turn on matters of fact and expertise far beyond the pleadings in these cases.

3. Whether §§ 11, 12(a)(2) claims are time-barred.

Actions under §§ 11 and 12(a)(2) of the Securities Act must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ."  15 U.S.C. § 77m.  For purposes of this Motion, Defendants use the February 6, 2009 filing date as the one year date because it is the earliest for all of the Funds.  Accordingly, the question for purposes of Defendants' statute of limitations argument is whether Plaintiffs had discovered, or, in the exercise of reasonable diligence should have discovered, the untrue or misleading statements or omissions forming the basis of their claims before February 6, 2008.

The Tenth Circuit has adopted an "inquiry notice" standard for determining when the one-year limitations period begins to run, meaning the time to exercise reasonable diligence to discover the facts underlying a claim is not triggered until there are "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale [of the subject securities]."  *Sterling v. Bagman SYS.*, 154 F.3d 1191, 1201-02 (10th Cir. 1998) (internal quotations omitted).

The Tenth Circuit in *Sterling* described the inquiry notice standard as an attempt to strike a balance between two competing policies underlying securities laws:  While

Plaintiffs should file suit soon after they are put on notice of their claims, the statute of limitations "should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims."  154 F.3d at 1202 (citing *Anixter v. Home-Stake Prod. Co. ("Anixter I")*, 939 F.2d 1420, 1440 (10th Cir.), *amended on reh'g*, 947 F.2d 897 (10th Cir. 1991)).  The Court explicitly rejected a more rigid standard where inquiry notice serves as the point at which the one-year limitations period begins to run, finding that standard "could lead to valid suits being barred because the plaintiff, although on inquiry notice, could not reasonably have discovered within one year sufficient facts to file a [plausible] suit."  *Id.* (delaying the accrual of the statute of limitations until plaintiffs reasonably should have discovered the facts underlying the alleged fraud ensures plaintiffs are given the opportunity to "adequately develop the facts and determine whether those facts merit bringing suit, thus giving meaning to the term 'inquiry'").

Defendants contend the volatility in the Funds' performance over the years reflected risks inherent in the Funds' strategy and had been consistently disclosed to investors, including Plaintiffs, from the Funds' inception.  Defendants point to "press reports" and "numerous articles" from the *New York Times, Wall Street Journal*, *Barron's*, *Morningstar*, and *The Bond Buyer* claiming investors had been warned "for years" about the Funds' investment strategies and affinity for risk to argue any claims premised on that risk and those strategies should have been filed "long ago."  Mot. (Doc. 285) at 72.  Defendants contend Plaintiffs adopted a "wait and see" approach, reaping the

benefits of the strategy when it accelerated income, and only suing once things went south.

Defendants' arguments, again, are not without merit on the margins but sweep too broadly.  If Plaintiffs "knew" from the beginning "all of the facts" regarding the risk and volatility inherent in Defendants' investment strategies, then they could not have been "misled" and their claims would be subject to dismissal irrespective of any limitations problem.  I have already rejected this argument in the context of Defendants' 12(b)(6) challenge to the adequacy of Plaintiffs' factual allegations above and need not revisit it here.  Nor will I parse the facts Plaintiffs' purportedly "knew" (i.e., that Funds invested in inverse floaters, which were "riskier" than the municipal bonds underlying them) from those they did not (that Funds flouted their liquidity representations and third parties could force the collapse of inverse floater trusts resulting in fire-sales of assets) and deem Plaintiffs' claims "untimely" to the extent they rely on the former.  The question of whether Defendants' statements and omissions regarding investment objectives, inverse floater leverage and risk, and liquidity were "misleading" requires considering Plaintiffs' allegations in context and in toto.

With regard to the specific question of whether the publications invoked by Defendants would have put a reasonably diligent investor on actual or inquiry notice of the facts underlying Plaintiffs' claims before February 9, 2008, that question, too, is inappropriate for resolution on a motion to dismiss.  Even if Lead Plaintiffs had read the articles, and even if the articles had triggered inquiry notice, the articles cannot be said to

have provided "all" the facts required for a reasonably diligent investor to discover the materially misleading nature of Defendants' statements regarding preservation of capital, risk, and liquidity.

To trigger inquiry notice, press reports must be widespread, prominent, and accessible. *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 432 (2d Cir. 2008). Plaintiffs dispute that any of the articles can be fairly characterized as such, and the dispute is not amenable to resolution on a motion to dismiss. Moreover, the articles at issue cannot be said, as a matter of law, to have put investors on notice of the specific facts regarding inverse floater leverage ratios, third parties' roles in forcing trust collapses, and liquidity that form the basis of Plaintiffs' plausible claims under the 1933 Act. Defendants do not even seriously contend that they do, opting instead to merge this argument into their already rejected assertion that Defendants' disclosures, generally, placed Plaintiffs on notice of all the facts material to their claims. *E.g.* Reply (Doc. 299) at 29-30 (arguing that by disclosing "the possibility that [inverse floater] trusts could be collapsed . . . Plaintiffs were on notice of all material facts about the Funds' investments and the risks associated with them, and their inverse floater claims are therefore time-barred").

There is no basis to argue that the cited articles triggered inquiry notice or otherwise render Plaintiffs' Complaints untimely as a matter of law.[18]

---

[18]     Defendants' alternative arguments that individual Trustee Defendants Paul Y. Clinton (Rochester Fund class action) and Clayton K. Yeutter (California Fund class action) have dispositive individual statute of limitations and standing defenses are poorly developed and

### 4. Whether OFI or the Funds were "Sellers" of Securities for purposes of § 12(a)(2) Liability.

Lead Plaintiffs assert § 12(a)(2) claims against OFI, OppenheimerFunds

Distributor, and the Funds themselves.  Liability under § 12(a)(2) is established for direct

sellers who pass title of the subject securities and indirect sellers who "successfully

solicit[] the purchase, motivated at least in part by a desire to serve [their] own financial

interests or those of the securities owner."  *Maher v. Durango Metals, Inc.*, 144 F.3d

1302, 1307 (10th Cir. 1998)(quoting *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).[19]

Defendants concede the Funds' Distributer passed title of Fund securities to Lead

Plaintiffs and others and is subject to § 12(a)(2) liability as a statutory seller, but move to

dismiss Plaintiffs' claims against OFI and the Funds themselves on grounds Plaintiffs

have failed to allege "facts" from which these Defendants' status as indirect sellers under

*Pinter* may be inferred.

According to Defendants, indirect seller status under *Pinter* requires "direct and

active participation in the solicitation of the plaintiffs' purchase" so that in the absence of

factual allegations tending to show that OFI or the Funds communicated "directly" with

potential investors "or otherwise actively solicited their purchases," Plaintiffs' § 12(a)(2)

claims against them must fail.  Reply at 36 (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d

---

will be addressed, if necessary, at a later date.  *Compare*  Joint Mot. Dismiss at 85-86 *with* Response at 95 *and* Reply at 40-41.

[19]      In *Maher* the Tenth Circuit applied the *Pinter* standard to a claim brought under § 12(a)(1), but acknowledged the *Pinter* definition of  a statutory seller under § 12(a)(1) "applie[s] to § 12(a)(2) as well."  144 F.3d at 1307, n.10 (citation omitted).

854, 870 (5th Cir. 2003) and *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir.

1996)).   With regard to the Funds themselves, the argument is foreclosed as a matter of

logic and by SEC Rule 159A, providing that issuers of securities are statutory sellers for

purposes of § 12(a)(2).   *See Citiline Holdings, Inc. v. iStar Financial Inc.*, 701 F. Supp.2d

506, 512 (S.D.N.Y. 2010) (citing 17 C.F.R. § 230.159A).   It is undisputed that the Funds

were the registrants and issuers for the open end mutual fund shares at issue.   With regard

to OFI, moreover, I agree with Plaintiffs that the analogy to cases like *Pinter* involving

sales by an issuer through "firm commitment underwriting"[20] is flawed and that factual

allegations beyond Plaintiffs' assertions that OFI "actively solicited the Fund[s'] shares

through the Prospectus, advertising and other marketing efforts to serve [its] own

financial interests" and "controlled a person who offered and sold" are unnecessary at the

pleading stage to establish the kind of relationship between defendant and plaintiff that

gives rise to statutory seller status.   There is no indication that a firm commitment

underwriting was involved in this case, and if Defendants' two-paragraph rebuttal in their

Reply brief is any indication, they likely acknowledge the tenuousness of their argument.

The Motion to Dismiss Plaintiffs' § 12(a)(2) claims against OFI and the Funds on

---

[20]       In a firm commitment underwriting, the shareholder does not purchase from the seller, but rather from an underwriter, so that suing the seller is an attempt to "'recover against [the] seller's seller.'"   *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370 (5th Cir. 2001)(quoting *Pinter*).   Because liability under § 12 is focused on those from whom a shareholder "purchases," courts may limit liability in firm commitment underwriting scenarios to issuers who, despite having sold securities to an underwriter who then sells to the public, sufficiently promote or "solicit" the public as to essentially become the vendor's agent.   *Id.* (holding shareholders cannot hold issuers liable under § 12 in firm commitment underwriting scenarios absent additional allegations regarding the issuer).

grounds Plaintiffs have failed adequately to plead that either is a statutory "seller" for purposes of § 12(a)(2) liability is DENIED.

C. <u>Plaintiffs' § 15 "Control Person" Liability Claims</u>.

All but two of the Complaints contend that the Officer Defendants, the Trustees, and OppenheimerFunds International (OFI) are liable under section 15 of the Securities Act as "control persons" of the Funds.[21]  In addition, Lead Plaintiffs assert § 15 "control person" claims against Massachusetts Mutual Life Insurance Company ("MassMutual"), a parent of OFI, whose Executive Vice President, defendant John V. Murphy, is also a Trustee, President, and Chief Executive Officer of six of the seven Funds at issue.[22]  To state a prima facie claim of control person liability under the 1933 Act, a complaint must establish (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person."  *Maher*, 144 F.3d at 1305 (citations omitted). Defendants deny the Class Action Complaints support the existence of a primary violation in the first instance and, even if they do, that Plaintiffs' allegations support an inference of "control person" liability on the part of MassMutual or any of the Officer or

---

[21]     AMT-Free Compl. ¶¶ 136-40; AMT-Free NY Compl. ¶¶ 127-31; Cal. Compl. ¶¶ 211-12; Roch. Nat'l Compl. ¶¶ 125-29; NJ Compl. ¶¶ 128-32; Pa. Compl. ¶¶ 181-82; Roch. Compl. ¶¶ 132-36.  The Pennsylvania Complaint asserts a § 15 claim against the Officer Defendants, the Trustees, OFI, and the Distributor as control persons of OFI or the Distributor. The California Complaint asserts a § 15 claim against OFI as a control person of the Fund and of the Distributor, and against the Officer Defendants and the Trustees as control persons of the Fund, OFI "and/or the Distributor."

[22]     AMT-Free Compl. ¶ 17; AMT-Free NY Compl. ¶ 15; Nat'l Compl. ¶ 17; NJ Compl. ¶ 15; Pa. Compl. ¶ 48; Roch. Compl. ¶ 17; Cal. Compl. ¶ 37.

Trustee Defendants.

I have already concluded Lead Plaintiffs have successfully plead primary violations of the 1933 Act by OFI, Oppenheimer Distributor, and the individual Funds. Thus, the only question on Defendants' Motions to Dismiss Plaintiffs' claims under § 15 of the 1933 Act is whether Plaintiffs have plead sufficient facts from which it can reasonably be inferred either that MassMutual or any of the Officer or Trustee Defendants were "control persons" of these Defendants at the time of the violations.

"Control" for purposes of the prima facie case in this circuit does not require plaintiff to show the defendant "actually or culpably participated in the primary violation." *Maher*, 144 F.3d at 1305 (noting the express rejection of decisions suggesting otherwise and citing *First Interstate Bank v. Pring*, 969 F.2d 891, 897 (10th Cir. 1992), *rev'd on other grounds sub nom. Central Bank v. First Interstate Bank*, 511 U.S. 164 (1994)). Rather, control person liability under the 1933 and 1934 Acts in the Tenth Circuit is "remedial" in nature and to be "liberally construed," requiring only "some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Richardson v. MacArthur*, 451 F.2d 35, 41-42 (10th Cir. 1971) (applying "control person" provision of 1934 Act, internal quotations omitted), *cited in Maher* at 1305. Agreeing the SEC's definition of "control" in 17 C.F.R. § 230.405 "reflects this remedial purpose," the Court in *Maher* concluded a plaintiff satisfies the "control" element of a prima facie case by alleging facts indicating a defendant had "'possession, direct or indirect, of the power to direct or cause the direction of the management and

60

policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *Id.* Once the plaintiff establishes the prima facie case, "the burden shifts to the defendant to show lack of culpable participation or knowledge." *Maher*, 144 F.2d at 1305.

Lead Plaintiffs contend their factual allegations are sufficient to demonstrate that each of the moving Defendants possessed the requisite power to direct or cause the direction of management necessary to survive dismissal under *Iqbal* and *Twombly* pleading standards. As "senior officer[s]" of the Funds, the Officer Defendants "control[led] the Fund[s'] operations and disclosure made by the Fund[s] in the registration statements issued during the Class Period."[23] Defendant John V. Murphy, moreover, served as Chairman, CEO, Director, and President of alleged primary violator OFI during the relevant time period, and Defendant Brian Wixted was Treasurer and Principal Financial Accounting Officer of the Funds during the relevant time periods. MassMutual possessed the authority to control OFI both as OFI's parent company and through the actions of John Murphy, its Vice President. In addition, Plaintiffs allege that OFI's Form ADV (Uniform Application for Investment Advisor Registration), which is filed with the SEC, states that MassMutual "has the power to direct or cause the direction of the management or policies of the Manager, whether through ownership of securities,

---

[23]      *See* AMT-Free Compl. at ¶ 137; AMT-Free NY Compl. at ¶ 128; Cal. Compl. at ¶ 212; Nat'l Compl. at ¶ 126; NJ Compl. at ¶ 129; Pa. Compl. at ¶ 181; Rochester Compl. ¶ 133.

by contract or otherwise."[24]  These allegations are sufficient under *Maher* and *Adams v.*

*Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108-09 (10th Cir. 2003) to support an inference that

the Officer Defendants and MassMutual had the direct or indirect means of influencing

the content of the registration statements at issue in this litigation.

In *Adams*, the Tenth Circuit specifically agreed that while corporate status may be

insufficient by itself to support an inference of control person authority, where that status

relates directly to the underlying (primary) violation, it would, in fact, support a claim

under the Act.  *See id.*, 340 F.3d at 1109 (where the two identified, actionable claims for

securities fraud in the case related specifically to reports of the company's financial

performance, defendant's status as chief financial officer was sufficient to support

inference that defendant had "at least indirect control over [company's] financial

reporting").   Plaintiffs allegations that the Officer Defendants oversaw the preparation

and content of Fund offering statements are sufficient to bring their "control person"

claims against those Defendants within *Adams* purview.

With regard to the Trustee Defendants, Plaintiffs point to their actions in

personally signing the Fund registration statements at issue as evidence of their ability to

influence or control statement content and Fund management and investment strategy.

*See Charles Schwab I*, 257 FRAT at 555 ("authority to sign and certify the contents of a

registration statement implies the authority to effectuate changes to that statement by

withholding certification").  Because individual Trustees could influence the registration

---

[24]        *See supra*, n. 21.

statement and its contents by correcting it or refusing to sign it, Plaintiffs contend they "were in a position to, and did, control the Fund[s'] operations and disclosures made by the Fund[s] in the registration statements during the Class Period."[25]   Additionally, Plaintiffs contend the Trustees had power to control or influence primary violator OFI because OFI, as Manager of the Funds, carried out its duties subject to policies established by the Board of Trustees under an investment advisory agreement.[26]

While officer or outside director status may not be sufficient standing alone to support an inference of "control" in every case, it is not true that *Adams* or *Maher* require additional "'day to day' control" allegations to state a claim under § 15 of the Act. *C.f.* Defs' Reply (Doc. 299) at 37 (citing *Adams* at 1108).  The question is whether the Trustee Defendants in this case had at least indirect control over the subject of the primary violation.  Under the reasoning of *Schwab*, the Trustee Defendants' authority to sign or not sign the registration statements at issue is sufficient indicia of "control" over the representations and disclosures that went out to potential investors to support "control person" liability at the pleading stage of this litigation.  The Tenth Circuit's decision in *Adams* does not contravene (and in fact supports) this reasoning.

Defendants' Joint Motion to Dismiss Plaintiffs' "control person" claims against the Officer and Trustee Defendants is DENIED.  Defendant MassMutual's separate Motion

---

[25]     *See id.* n. 20, *supra*.

[26]     *See* AMT-Free Compl. at ¶ 15; AMT-Free NY Compl. at ¶ 13; Cal. Compl. at ¶ 35; Nat'l Compl. at ¶ 15; NJ Compl. at ¶ 12; Pa. Compl. at ¶ 25; Rochester Compl. at ¶ 15.

to Dismiss Plaintiffs' "control person" claims against it (Doc. 284) is also DENIED.[27]

Based on all of the foregoing, Defendants' Joint Motion to Dismiss the Consolidated Complaints in the Rochester Funds Group Securities Litigation (Doc. 285) is GRANTED with respect to Plaintiffs' claims under Section 13(a) of the Investment Company Act but DENIED in all other respects.  Counsel are ORDERED to CONFER with regard to the content and consequence of the rulings herein, and SUBMIT a Joint Status Report on or before November 18, 2011, regarding how best and further to proceed to the discovery phase of this litigation.

This Amended Opinion and Order SUPERSEDES the Order originally entered on October 24, 2011 (Doc. 312), which is WITHDRAWN.

Dated January 20, 2012, *nunc pro tunc* to October 24, 2011.

<u>s/John L. Kane</u>
SENIOR U.S. DISTRICT JUDGE

---

[27]     I note MassMutual also argued Plaintiffs' "control person" liability claims were subject to dismissal as untimely because Plaintiffs neglected to name as a party Defendant in their original Complaints and only added them when they filed their Consolidated Complaints in January 2010.  *See* Mot. Dismiss (Doc. 284) at 2.  I am unpersuaded, and agree that for pleading purposes, Plaintiffs' claims against MassMutual relate back to the filing of their initial complaints under Fed. R. Civ. P. 15(c).  Further, Plaintiffs' allegations are sufficient to support an inference that MassMutual, by virtue of its Form ADV and Defendant Murphy's status as a Vice President of MassMutual and Fund Trustee, knew or should have known at the time of the February 2009 filing that but for a mistake, MassMutual could or would have been a party to the case.