# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Master Docket No. 09-md-02063-JLK-KMT (MDL Docket No. 2063)

## IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION

This document relates to all the MDL actions.

---

## LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON "LEVERAGE RATIO" CLAIMS AND MOTION IN THE ALTERNATIVE FOR RELIEF UNDER FED. R. CIV. P. 56(d)

---

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

I.   INTRODUCTION .................................................................................... 1

II.   RESPONSE TO STATEMENT OF MATERIAL UNDISPUTED FACTS ........... 1

III.   STATEMENT OF ADDITIONAL DISPUTED FACTS ........................................ 4

IV.   STANDARD ............................................................................................ 5

V.   ARGUMENT ......................................................................................... 7

    A.   Defendants' Efforts to Adjudicate This Case Piecemeal
        Should Be Rejected............................................................................... 7

    B.   Defendants Are Not Entitled to Judgment as a Matter of Law ......................... 12

        1.   Materiality Is Measured Objectively ................................................. 13

        2.   Defendants Failed to Adequately Disclose the Funds' Inverse Floater
            Leverage Ratios ......................................................................... 15

    C.   Defendants Have Not Shown That All Material Facts Are Undisputed ............ 17

        1.   Defendants Ignore Evidence That Contradicts Their Claims ......................... 17

        2.   Defendants' Proffered Evidence Is Insufficient ............................................. 19

VI.   ALTERNATIVELY, PLAINTIFFS SEEK RELIEF PURSUANT TO FED. R.
      CIV. P. 56(D) ............................................................................................ 23

    A.   Rule 56(d) Standard ............................................................................. 24

        1.   Probable Facts Are Not Available to Plaintiffs ................................................. 25

        2.   Why the Facts Cannot Be Presented Currently ................................................. 27

        3.   Plaintiffs Have Taken Steps to Obtain the Information ................................... 28

4.   Additional Time Will Enable Plaintiffs to Rebut Defendants' Motion ........... 29

VII.   CONCLUSION ..................................................................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adams Golf, Inc. Sec. Litig.*,
    618 F. Supp. 2d 343 (D. Del. 2009) ............................................................ 14

*In re AT&T Corp. Sec. Litig.*,
    No. 01-1883, 2004 U.S. Dist. LEXIS 29588 (D.N.J. Sept. 2, 2004) ........... 13

*Baltimore Cnty. v. AT&T Corp.*,
    735 F. Supp. 2d 1063 (S.D. Ind. 2010) ....................................................... 20

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................. 13, 20

*Boyer v. Taylor*,
    No. 06-694, 2012 WL 1132786 (D. Del. Mar. 30, 2012) ........................... 12

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................... 11

*City Consumer Servs., Inc. v. Horne*,
    578 F. Supp. 283 (D. Utah 1984) .............................................................. 6, 7

*In re Dana Corp.*,
    574 F.3d 129 (2d Cir. 2009) ......................................................................... 6

*E.E.O.C. v. Moreland Auto Grp., LLLP*,
    No. 11-01512, 2012 WL 2282225 (D. Colo. June 18, 2012) ...................... 24

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) .................................................................. 15

*Hicks v. City of Watonga*,
    942 F.2d 737 (10th Cir. 1991) .................................................................... 14

*Jama v. City & Cnty. of Denver*,
    No. 08-01693, 2010 WL 3075584 (D. Colo. Aug. 4, 2010) ....................... 24

*JDB Med., Inc. v. Sorin Grp., S.p.A.*,
  Nos. 07-350, 07-591, 2008 WL 791938 (D. Colo. Mar. 20, 2008) ........................... 11

*Jones v. Nelson*,
  484 F.2d 1165 (10th Cir. 1973) ............................................................. 5, 18

*Levy v. Worthington*,
  No. 11- 00978, 2011 WL 5240442 (D. Colo. Oct. 31, 2011) .................................... 27

*Luizzi v. Pro Transp., Inc.*,
  No. 02-5388, 2010 WL 3023928 (E.D.N.Y. Aug. 2, 2010) ........................................ 6

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011) ........................................................................ 9

*McGill v. Am. Land & Exploration Co.*,
  776 F.2d 923 (10th Cir. 1985) ............................................................. 5, 6

*Mitchell v. Tex. Gulf Sulphur Co.*,
  446 F.2d 90 (10th Cir. 1971) ................................................................. 15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ........................................................................... 6

*In re Ribozyme Pharms., Inc. Sec. Litig.*,
  209 F. Supp. 2d 1106 (D. Colo. 2002) ......................................................... 6

*SEC v. Seaboard Corp.*,
  677 F.2d 1301 (9th Cir. 1982) ................................................................ 15

*SEC v. Thrasher*,
  152 F.Supp.2d 291 (S.D.N.Y. 2001) ........................................................ 15, 26

*In re SLM Corp. Sec. Litig.*,
  No. 08-1029, 2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ......................................... 9

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*,
  464 B.R. 606 (Bankr. S.D.N.Y. 2012) .......................................................... 7

*Tucker v. Am. Int'l Grp., Inc.*,
  No. 09-1499, 2011 WL 6020851 (D. Conn. Dec. 2, 2011) ......................................... 7

*United States v. Schlisser*,
  168 F. App'x 483 (2d Cir. 2006) ................................................................ 20

*United States v. Tomasetta*,
  No. 10-1205, 2012 WL 1080293 (S.D.N.Y. Mar. 30, 2012) ....................................... 21

*Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*,
  616 F.3d 1086 (10th Cir. 2010) ............................................................ 24, 25

*Vita-Herb Nutriceuticals, Inc. v. Probiohealth LLC*,
  No. 11-1463, 2012 WL 3903454 (C.D. Cal. Sept. 6, 2012) ........................................ 11

*Weir v. Anaconda Co.*,
  773 F.2d 1073 (10th Cir. 1985) ................................................................ 25

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56...................................................................................*passim*

*Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management*,
  http://www.treasury.gov/resource-center/fin-mkts/Documents/hedgfund.pdf ............ 22

Michael J. de la Merced & Andrew Ross Sorkin,
  *Report Details How Lehman Hid Its Woes*, N.Y. Times, Mar. 11, 2010 ............... 22

Robert L. Hetzel, *The Great Recession* (Cambridge Univ. Press 2012) ........................... 22

## I.      INTRODUCTION

Defendants claim they are entitled to summary judgment on the question of whether the leverage ratios of inverse floaters are material to reasonable investors. However, Defendants' evidence on this point is merely deposition testimony elicited through "pop quizzes" on arcane terminology.  Defendants proffer this evidence while ignoring other testimony that flatly contradicts their argument, in order to advance a theory that is founded on a mischaracterization of Plaintiffs' claims.  Although investors may not know how to define or compute an inverse floater's leverage ratio, they certainly cared about the adverse effects of leverage, including the extraordinary volatility of the Funds' investments in inverse floaters (and, hence, NAV).  Defendants' motion should be denied.

## II.     RESPONSE TO STATEMENT OF MATERIAL UNDISPUTED FACTS

Defendants' "Statement of Undisputed Facts" is an argumentative and hyperbole-laden discussion of inverse floaters, Plaintiffs' allegations, and this Court's Amended Order on Defendants' Motion to Dismiss (Dkt. No. 359) ("Amended Order").  *See* Defendants' Motion for Partial Summary Judgment on "Leverage Ratio" Claims ("Motion" or "Mot.") at 2-7.  Defendants fail to cite to the record for many of their assertions, and do not set forth plain, numbered sentences describing what they claim are the undisputed facts, in violation of Sections III.1 and III.2 of this Court's Pretrial and Trial Procedures Rules.  Defendants also insert prejudicial adjectives at every turn and

attempt to characterize documents that already speak for themselves, in violation of Rule III.7.

Defendants' failure to follow this Court's clear rules regarding the required substance and format of their brief and statement of facts is sufficient grounds to deny their motion, and has made it difficult for Plaintiffs to fully respond.  However, Plaintiffs endeavor to provide a response in accordance with Rule III.4.  Plaintiffs provide this response subject to, and without waiving, any arguments.

Plaintiffs do not dispute the following facts set forth in Defendants' Statement of Facts:

1.  Defendants' first two paragraphs under Roman numeral one, beginning "An inverse floater is a derivative …"  Mot. at 2-3.

2.  Defendants have not misquoted the Funds' prospectuses.  *Id.* at 2-7.

3.  The excerpts set forth by Defendants at page 6 of their brief from the AMT-Free and California Complaints have not been misquoted.  *Id.* at 6.

Plaintiffs dispute and deny all other "facts" set forth in Defendants' brief for lack of evidentiary support.  This includes, without limitation, any and all implications that Defendants' disclosures were adequate or truthful.  By way of example, Defendants' brief states that the Funds "disclosed the amount of their assets that could be invested in inverse floaters."  Mot. at 5.  While Plaintiffs do not dispute that the Prospectuses contain the language cited by Defendants, the truth or falsity of that language is still under investigation by Plaintiffs' expert and at issue in this case.  This is also true of the Funds'

purported disclosures regarding the aggregate value of the floaters and inverse floaters and the underlying municipal bonds. Whether Defendants properly valued the referenced bonds is a question of fact that has been hotly disputed throughout this litigation, yet Defendants have not even attempted to proffer evidence on the issue.

Plaintiffs further dispute and, where applicable, deny all adjectives, arguments, characterizations, hypotheticals, and inferences set forth by Defendants. By way of example only, these items include Defendants' claim that the Funds made "extensive" disclosures regarding inverse floaters, or that (assuming the Funds' disclosures are accurate) investors could "readily" compare the "value of a Fund's inverse floater holdings to its total assets." Mot. at 5-6. Indeed, as to this latter point the Court has already stated its disagreement with Defendants. *See* Amended Order at 29 n.10.

Finally, Plaintiffs dispute and deny the entirety of Roman numerals two and three set forth in Defendants' Statement of Undisputed Facts.[1] Those sections are dedicated to Defendants' characterizations of and resulting legal arguments concerning, respectively, Plaintiffs' allegations and the Amended Order**.** Defendants' efforts to construe the Complaints and the Amended Order as part of their "undisputed facts" are entirely improper. *See* Pretrial and Trial Procedures, Judge John L. Kane, at 7. The Complaints and the Amended Order each speak for themselves and legal arguments derived from

---

[1] As set forth above, Lead Plaintiffs acknowledge that Defendants' citations to the California and AMT-Free Complaints (Mot. at 6) are correct.

those documents are not "undisputed facts."  Similarly, Defendants' unfounded

aspersions as to the drafting of the Complaints (for example, the assertion that Plaintiffs

"concocted" leverage ratios), are far from being either factual or undisputed, and

Defendants have proffered no evidence to support their claims.

## III.    STATEMENT OF ADDITIONAL DISPUTED FACTS

Pursuant to Rule III.5, Lead Plaintiffs respectfully draw this Court's attention to

additional disputed facts integral to the analysis of Lead Plaintiffs' "leverage ratio"

allegations[2]:

1.    The Prospectuses failed to disclose and/or misrepresented the extraordinary volatility of the Funds' investments in inverse floaters.  AMT-Free NY Compl. ¶¶ 42(e), 57-66; Lead Plaintiffs' Motion for Class Certification ("Class Cert.") (Dkt. No. 379) at 4-5.

2.    The Prospectuses failed to disclose the high amount of leverage inherent in the Funds' investments in inverse floaters.  AMT-Free NY Compl. ¶¶ 59-60, 92b[3]; Class Cert. at 4-5.

3.    The Prospectuses failed to disclose and/or misrepresented that due to their inherent leverage, inverse floaters not only "can" be volatile but are certain to be volatile.  AMT-Free NY Compl. ¶¶ 59-60, 92b; Class Cert. at 4-5.

4.    Because of their highly leveraged nature, the Funds' holdings of inverse floaters could trigger substantial declines in NAV.  AMT-Free NY Compl. ¶¶ 61-66, 92c; Class Cert. at 4-5.

---

[2] Lead Plaintiffs are aware that it is ordinarily insufficient for a party to simply point to his or her own allegations in order to claim that there are disputed facts.  Lead Plaintiffs respectfully submit that in this case, that doctrine is inapplicable because discovery is substantially incomplete, *see* 23-29, *infra*, and as a result Lead Plaintiffs have yet to procure sufficient evidence on these points.
[3] For purposes of brevity, Lead Plaintiffs cite to the AMT-Free NY Complaint, although all the Complaints allege these disputed facts.

5.      The Funds at times exceeded the permissible limits for holding inverse floaters.  AMT-Free NY Compl. ¶¶ 88-89, 92a.

6.      The Prospectuses failed to disclose that, even during periods of time when the value of the inverse floaters held by the Funds were within each Fund's stated percentage limit, the potential losses related to those inverse floaters exceeded those limits, in part because of the highly leveraged nature of the inverse floaters.  AMT-Free NY Compl. ¶¶ 88-89, 92a.

7.      The Prospectuses' disclosures about inverse floaters contained material omissions because they failed to disclose how inverse floaters created the risk of forced liquidation.  AMT-Free NY Compl. ¶¶ 61-66, 92c; Class Cert. at 4-5.

8.      The Funds did not segregate cash or readily marketable short-term debt instruments sufficient to cover their obligations under the inverse floaters, and, therefore, faced the risk of selling, and indeed, ultimately were forced to sell other illiquid securities at fair market values that were significantly lower than the inflated values reported in the Funds' financial statements. AMT-Free NY Compl. ¶ 92c.

9.      The Funds' Manager did not monitor the Funds' potential exposure to inverse floaters' shortfall and forbearance agreements.  AMT-Free NY Compl. ¶ 92d.

## IV.   STANDARD

The Tenth Circuit has "reiterate[d] . . . that summary judgment is a drastic remedy that should be granted only with caution."  *McGill v. Am. Land & Exploration Co.*, 776 F.2d 923, 926 n.5 (10th Cir. 1985).  As such, where there exists "any issue as to a material fact dispositive of right or duty, the case is not ripe for summary judgment." *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir. 1973).  Indeed, "[s]ince summary judgment is an extreme remedy" that "cut[s] off the rights of the non-moving party to present a case to the jury," a court "should only grant summary judgment 'on the basis

that no genuine issue remains for trial because it is quite clear what the truth is.'" *Luizzi v. Pro Transp., Inc.*, No. 02-5388, 2010 WL 3023928, at *3 (E.D.N.Y. Aug. 2, 2010) (citing *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009)).  Where admissible evidence from the nonmovant "'make[s] it arguable' that the claim has merit," summary judgment is "inappropriate."  *In re Dana Corp.*, 574 F.3d at 151.  For these reasons, "it is the rare case where a Rule 56 motion should be filed," and rarer still that one should be granted. *In re Ribozyme Pharms., Inc.  Sec. Litig.*, 209 F. Supp. 2d 1106, 1109 (D. Colo. 2002).

A Rule 56 motion requires a movant to prove that no genuine dispute of material fact exists and also demonstrate that he or she prevails as a matter of law.  *Id*.  In approaching this sequential analysis, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence [because these are], jury functions, not those of a judge.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).  Against the favorable light cast on its opponent, the moving party "must show entitlement to summary disposition beyond all reasonable doubt."  *City Consumer Servs., Inc. v. Horne*, 578 F. Supp. 283, 288 (D. Utah 1984).  Therefore, "if the facts support an inference that would permit the non-movant to prevail, summary judgment is inappropriate."  *McGill*, 776 F.2d at 926 n.5.  "If reasonable minds can differ as to the import or the weight of the evidence … a summary judgment cannot be entered."  *In re Ribozyme Pharms.*, 209 F. Supp. 2d at 1010.

Partial summary judgment requires an additional showing – that the claims are truly distinct and severable from the rest of the case.  Though Rule 56 allows a court to "narrow issues before trial," the technique remains inappropriate for cases where "the resolution of an issue may be so dependent on the facts to be proved at trial that it may be impossible or improvident to attempt to resolve it on a motion for summary judgment." *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 464 B.R. 606, 612 (Bankr. S.D.N.Y. 2012) (citing *Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir. 1975)).[4]  At its core, partial summary judgment is appropriate for free-standing unaffiliated claims or parts thereof that, beyond all reasonable doubt, need no further adjudication.  It does not, and cannot, "serve as a substitute for trial when there are disputed facts." *City Consumer Servs., Inc.*, 578 F. Supp. at 288.

Given this high burden, Defendants have not even approached the standard for an award of partial summary judgment, and the Motion should be denied.

## V.    ARGUMENT

### A.    Defendants' Efforts to Adjudicate This Case Piecemeal Should Be Rejected

The crux of Defendants' argument is that their failure to disclose the leverage ratios of inverse floaters is immaterial as a matter of law, because no reasonable investor

---

[4] While recent 2010 amendments to Rule 56 codified the ability to move "for summary judgment 'on all or part of the claim,'" the procedure continues to be improper where claims are "so intertwined … that partial summary judgment practice would not be appropriate." *Tucker v. Am. Int'l Grp., Inc.*, No. 09-1499, 2011 WL 6020851, at *9 n.24 (D. Conn. Dec. 2, 2011); *see also* Rule 56 advisory committee's note (2010) (discussing changes in language).

cares about leverage ratios.  Mot. at 11-14**.**  Defendants proffer testimony of the named plaintiffs, each of whom, according to Defendants, testified that he or she does not monitor or inquire about "leverage ratios" in making investments.  Defendants' argument misses the point.  Plaintiffs do not allege that Defendants have some independent duty to disclose leverage ratios in the abstract.  Rather, Defendants have a duty to disclose all material information regarding the risks of investing in the Funds.  Here, Defendants' duty arises from their other disclosures, including the Funds' stated investment objectives and statements regarding the risks and limits on investing in inverse floaters.  Those statements were rendered false and misleading by Defendants' omissions, including (but not limited to) their failure to disclose the amount of leverage that the Fund employed through inverse floaters, and, thus, the out-sized risks the Funds had taken through those investments.  As this Court explained, both the Complaints and the Prospectuses must be read holistically.  *See* Amended Order at 16.  Indeed, in addressing "leverage ratios" in particular the Court instructed:

> Meaningful disclosure of a Fund's volatility and risk is not about mathematical precision or who bears the burden of quantifying it. Meaningful disclosure, for purposes of §§ 11 and 12(a)(2) liability, is of that information necessary to make other offering statements not misleading. Each of the Prospectuses, for example, stated inverse floaters "can be" more volatile than conventional fixed-rate securities when in fact (and by definition) they are "always" more volatile because they move at a multiple of whatever rate a fixed rate security moves. I conclude the failure to disclose even a general range of inverse floater leverage ratios plausibly left out information reasonable investors would have deemed important to their decision to invest in any of the seven Oppenheimer Rochester-style

funds at issue. That Defendants had no "duty" to disclose leverage ratios is also an inapt defense to Plaintiffs' claims. Once a defendant makes disclosures regarding a particular type of holding's relative risk, its "duty" to do so in a manner that is neither directly misleading nor misleading through omission of other material disclosures is inherent in the securities laws and explicit in §§ 11 and 12(a)(2).

\*\*\*

Because **Lead Plaintiffs here premise their claims of liability on Defendants' affirmative disclosures regarding the extent to which Funds would invest in inverse floaters, the degree those inverse floaters would be leveraged, and the concomitant risks to income and capital of such an investment strategy,** Defendants' legal "duty" to disclose additional material information that would render those disclosures not misleading flows from the 1993 Act itself and cannot be avoided.

Amended Order at 27-31 (citation omitted, emphasis added).

Nor is this Court alone in its analysis. "Courts evaluate materiality holistically. . . . [It] cannot be determined by analyzing each relevant fact in isolation, as Defendants suggest." *In re SLM Corp. Sec. Litig.*, No. 08-1029, 2012 WL 209095, at \*6-7 (S.D.N.Y. Jan. 24, 2012) (citing *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1317 (2011).[5] Thus, "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive." *Matrixx*, 131 S. Ct. at 1318 (alteration in original; citation and internal quotations omitted).

---

[5] Indeed, as the *SLM Corp.* court explained, facts external to the pleadings - and not addressed by Defendants here - are often an important part of the materiality analysis. 2012 WL 209095, at \*5-7 (listing various factors to be considered in the analysis, including defendants' characterizations of the information, SEC guidelines, the subject of the omitted or misrepresented facts, and the involvement of individual defendants in promulgating the materially false or misleading information).

Here, Plaintiffs' "leverage ratio" allegations cannot be adjudicated in isolation, without reference to the very misstatements Plaintiffs allege were false and misleading in part ***because of*** the omission of those leverage ratios.  This is so because the duty to disclose leverage ratios is intertwined with the other misstatements and omissions upon which these cases hinge.  The Complaints explain that the leverage ratio is material in that it is a proxy for the volatility of inverse floaters which, in turn, contributed to the volatility of the Funds' NAV, and because it is one reason that the potential losses that could be experienced by the Funds as a result of their investments in inverse floaters far exceeded the purported limits of those investments.  The majority of the Complaints' primary allegations regarding leverage ratios are as follows:

> Different inverse floaters – whether created or purchased by the Fund – have different degrees of leverage, which is determined by the ratio of the dollar size of the floater to the dollar size of the inverse floater. The sum of the floater and inverse floater equals the dollar value of the underlying municipal bond. As the ratio of the floater's dollar size to the inverse floater's dollar size increases, so does the leverage – ***and, thus, the price volatility*** – of the inverse floaters.  Notably, not one of the Prospectuses that the Fund issued during the Class Period discussed or even revealed the range (or average) of the leverage of the inverse floaters that the Fund created or purchased.[6]

***

---

[6] Similarly, the California Complaint (like Defendants, *see* Mot. at 4), describes the effect on the volatility of inverse floaters in terms of the ratio of the value of the underlying bond to the value of the inverse floater. Cal. Compl. ¶¶ 143-44.  This is not a matter of using a different definition of "leverage ratio" (a term that is not contained in any Complaint except Pennsylvania's).  It is merely a different way of describing the effect of leverage on an inverse floater.

> [The Prospectus] failed to disclose that, although the Fund may have limited its investment in inverse floaters to 20 percent of its assets, **the inverse floaters were highly leveraged, and could cause the Fund to be forced to sell far more than 20 percent of its assets and, therefore, the Fund's exposure was many times greater than 20 percent of the Fund's asset value.**

AMT-Free NY Compl. ¶¶ 59, 91a. (emphases added).[7]

Simply put, the leverage ratio is one method by which Defendants could (and should) have disclosed the degree to which the Funds' investments in inverse floaters were volatile, led to price volatility in the Funds, and were inconsistent with the Funds' investment objectives. Because the leverage ratio allegations are intertwined with other allegations for which Defendants have proffered no evidence, they cannot be adjudicated piecemeal - Defendants are simply inviting the Court to waste precious judicial resources.[8] *See generally JDB Med., Inc. v. Sorin Grp., S.p.A.*, Nos. 07-350, 07-591, 2008 WL 791938, at *2 (D. Colo. Mar. 20, 2008) (declining to award summary judgment

---

[7] Some Complaints also add that "[t]his omission is material because the impact of the leverage from the inverse floaters is not simply a matter of the balance sheet or a source of funding. Rather, the leverage affects not only inverse floater price volatility but also the volatility of the Fund's NAV and the investors' exposure to risk, which can be extreme." *See, e.g.*, AMT-Free Compl. ¶ 66.

[8] Defendants may argue that Rule 56 allows for the entry of judgment as to any "part of a claim." Although this is true, the Rule must be read to give effect to its purpose. The purpose of Rule 56 is to narrow the issues in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses"). It is not to seek the piecemeal adjudication of every fact in the case by the Court rather than the jury. Thus, where courts are "not inclined to consider piecemeal summary judgment motions over the [course of the litigation]," *Vita-Herb Nutriceuticals, Inc. v. Probiohealth LLC*, No. 11-1463, 2012 WL 3903454, at *5 (C.D. Cal. Sept. 6, 2012), denial is appropriate.

as to damages because "[t]he plaintiffs' claims for damages are interrelated and present concatenated issues of fact and law.  The piecemeal resolution of the issues raised in the motion for summary judgment will not simplify significantly or extenuate the evidence at trial.") (cited with approval at *Nielsen v. Alcon, Inc.*, No. 08-2239, 2011 WL 4529762 (N.D. Tex. Sept. 2, 2011)).

This is particularly true in the instant case, where discovery is nowhere near complete.[9]  *See infra* at 23-29; *Boyer v. Taylor*, No. 06-694, 2012 WL 1132786, at *5 (D. Del. Mar. 30, 2012) (denying summary judgment because "there are many issues pending in this case and it is far from clear that discovery is complete. … [P]laintiffs' summary judgment motion presents the type of piecemeal adjudication disfavored by federal courts") (citing collected cases at *Remediation Constructors, Inc. v. United States*, 68 Fed. Cl. 162, 166 (Fed. Cl. 2005)).

In sum, Defendants are seeking to have this Court, rather than the jury, adjudicate this dispute fact-by-fact and to have facts resolved in their favor before Plaintiffs have had the opportunity to take the discovery necessary to prove their claims.  This attempt to "stack the deck" is improper, and Defendants' Motion should be denied.

### B.    Defendants Are Not Entitled to Judgment as a Matter of Law

---

[9] Although Lead Plaintiffs also seek relief under Rule 56(d), *see infra* at 23-29 the case law cited above makes clear that prematurity is also grounds for the outright denial of Defendants' motion under these circumstances.  Lead Plaintiffs respectfully submit that this is the better course of action given Defendants' strategic decision to bring this motion while simultaneously engaging in dilatory discovery tactics.

### 1.     Materiality Is Measured Objectively

Defendants' Motion is predicated on the idea that no Lead Plaintiff cared about leverage ratios.  As set forth below, Defendants have failed to make that showing.  Even if they had, however, they would *still* not be entitled to judgment as a matter of law, because the question of materiality is not a subjective one.  Rather, the standard is objectively measured against the hypothetical "reasonable investor."  *See Basic Inc. v. Levinson*, 485 U.S. 224, 240 n.18 (1988) ("We find no authority in the statute, the legislative history, or our previous decisions, for varying the standard of materiality depending on who brings the action . . . ."); *see also* Dkt. No. 407 at 93.

Defendants dismiss this notion by claiming in a footnote that "it is difficult [] to conceive how Plaintiffs could attempt to pursue any claim [] based on the theory that a 'reasonable' investor would have views that differed from the admissions of all purported class representatives."  Mot. at 11 n.7.  This is sophistry.  First, as set forth below, Plaintiffs have not "admitted" anything.  Second, the question of materiality in the context of the federal securities laws is complicated and, more often than not, the subject of expert testimony.  *See, e.g., In re AT&T Corp. Sec. Litig.*, No. 01-1883, 2004 U.S. Dist. LEXIS 29588, at *47-49 (D.N.J. Sept. 2, 2004) (declining to grant summary judgment where parties' experts disagreed as to whether "the facts defendants misrepresented, omitted or stated in a misleading manner in the Prospectus would have been material to investors" because "the contradictory expert reports provide material

disputes of fact that … should be determined by a trier of fact."); *In re Adams Golf, Inc. Sec. Litig.*, 618 F. Supp. 2d 343, 350 (D. Del. 2009) (denying motion for summary judgment in part because "plaintiffs' expert concluded that gray marketing posed a 'material risk' to Adams Golf"). Expert testimony is even more pertinent where, as here, the question hinges upon one difficult-to-understand characteristic of an arcane and complicated derivative instrument.[10]

Nor do Defendants' cases hold differently. As an initial matter, Defendants state that it is "Plaintiffs' burden" to prove materiality. Mot. at 8. That will be true at trial. At summary judgment, however, it is ***Defendants'*** burden to show "beyond a reasonable doubt" that leverage ratios are immaterial as a matter of law. *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Defendants have failed to show that the testimony they cite should be dispositive of the issue. Defendants cite a Central District of Illinois case for the unremarkable proposition that "the actual Plaintiffs' own testimony is both persuasive and revealing." Mot. at 8 (citing *Branch-Hess Vending Servs. Emps.' Pension Trust v. Guebert*, 751 F. Supp. 1333, 1340 (C.D. Ill. 1990)). But the *Branch-Hess*

---

[10] Far from showing that Plaintiffs "invented" leverage ratios, the disparity pointed to by Defendants (Mot. at 6) between the California Complaint and the AMT-Free New York Complaint simply highlights the point. Both sets of counsel consulted experts in drafting those sections of the respective Complaints. And, both Complaints allege leverage ratios that show volatility - California's reflects the change in price that an inverse floater will experience if the value of the underlying bond changes; the AMT-Free New York Complaint reflects the change an inverse floater will undergo if interest rates change. AMT-Free Compl. ¶ 65; Cal. Compl. ¶ 142.

opinion was issued after a bench trial, at which time it was entirely proper for the Court to weigh evidence and make such determinations.   Here, such a weighing would be improper.   This is particularly true as to the question of materiality, which is "normally a jury question."   *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).   Evidence that is "persuasive" or even "revealing" is not proof beyond a reasonable doubt, which is the standard Defendants must meet.[11]

### 2.     Defendants Failed to Adequately Disclose the Funds' Inverse Floater Leverage Ratios

Defendants also reiterate the same argument they made at the motion to dismiss stage, claiming that they adequately disclosed the inverse floater leverage ratios because each Prospectus "disclosed the value of the underlying bonds used as collateral for the inverse floater trusts; the value of the short term floaters; and the residual value of the inverse floaters."   Mot. at 15.   Defendants then claim that an investor could do the math

---

[11]   The remainder of Defendants' cases, Mot. at 8 n.4, fare no better.   *Mitchell v. Tex. Gulf Sulphur Co.*, 446 F.2d 90, 97 (10th Cir. 1971), did not even address the impact of a plaintiff's testimony on a materiality analysis.   Indeed, the *Mitchell* court measured materiality by reference to "the magnitude and probability of the occurrence of the event, set against the size and total activity of the subject company" - plainly objective and external factors.   The remainder of Defendants' cases hold only that, in a case of insider trading, the tippee's response to information provides insight into its materiality.   *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997); *SEC v. Thrasher*, 152 F.Supp.2d 291, 300 (S.D.N.Y. 2001).   Plaintiffs here are not tippees - the crux of the case is that they did ***not*** receive the material information they should have.   What they hypothetically might have done if they received such information is irrelevant.

on his or her own to determine an overall average inverse floater leverage ratio for all inverse floaters in a particular Fund. *Id.*

First, this Court already clearly rejected Defendants' argument at the motion to dismiss stage. Now at summary judgment, Defendants have offered no new evidence on this point. Neither the words in the Prospectuses nor their meanings have changed, and none of the testimony proffered by Defendants addresses this issue. Indeed, the relevant section of Defendants' brief does not cite anything other than the Prospectuses. Mot. at 15-16. Thus, this Court's previous analysis should likewise remain unchanged. As the Court stated, Defendants' contention that "the Funds' offering statements were adequate and included all information necessary for investors to 'do [] the math' and determine inverse floater leverage ratios for themselves …. miss[es] the mark." *Id.* Further, as Plaintiffs previously explained, an "average" leverage ratio is meaningless. *See* Lead Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss ("Opposition to Motion to Dismiss"), Dkt. No. 292, at 27 n.25. Any such number is useless in gauging the volatility of an inverse floater, because the inverse floater's volatility also hinges upon other factors, such as maturity date and coupon payments, that are unique to each underlying bond. *Id*. As such, Defendants' "average" leverage ratio fails to adequately disclose the inverse floater leverage ratios. Certainly Defendants have not shown otherwise "beyond a reasonable doubt."

**C.      Defendants Have Not Shown That All Material Facts Are Undisputed**

**1.      Defendants Ignore Evidence That Contradicts Their Claims**

As set forth above, the leverage ratios of inverse floaters are important in this case because they provide some measure (albeit incomplete) of the volatility and risk of those instruments, which in turn led to volatility and risk in the Funds' overall NAVs. Defendants have presented testimony showing only that Lead Plaintiffs are unfamiliar with the term "leverage ratio."      But Defendants ignore testimony that clearly demonstrates that the volatility and risk stemming from the leverage ratios of inverse floaters, which would have been brought to investors' attention had the leverage ratios been disclosed, are plainly important to *all* Lead Plaintiffs.  For example, many of the Lead Plaintiffs testified that they invested in the Funds because they wanted safety.[12] *None* testified that they invested in the Funds because they wanted highly leveraged derivative instruments and the risks attendant thereto.

Indeed, apart from testifying generally that they were not seeking volatile and risky Funds, many of the Lead Plaintiffs articulated their understanding that leverage could lead to volatility in an investment.  *See, e.g.*, Doluisio Decl. Ex. 2 at 76:19-77:6

---

[12] *See* Doluisio Decl. Ex. 1 at 6:23-7:6 (Klorfine thought the AMT-Free Fund "was a safe place to put money."); Ex. 4 at 68:16-22 (Sasson thought the New Jersey Fund was "rock solid."); Ex. 3 at 40:13-16 (Stockwell put his "sleep-at-night money" into the California Fund); Ex. 5 at 39:19-25 (Bhanot testified that he thought the Pennsylvania Fund was "very, very stable, and its main goal is to preserve the capital investment" and "would be very, very limited fluctuation."); Ex. 6 at 112:13-113:1 (Miles thought the Pennsylvania Fund was "safe" and "pledged to maintain the capital."); Ex. 7 at 14:17-19 (Galganovicz thought the Pennsylvania Fund would "provide … minimal volatility, not tax liability and preservation of capital.")

(Vazquez discussing that leverage can lead to greater losses or volatility).  Mr. Klorfine testified that he understood leverage could be "toxic."  *Id.*, Ex. 1 at 10:1.  Mr. Stockwell testified that "to [him] the issue is one of how is leverage being used in the fund.  What is the impact of using that leverage?"  *Id.*, Ex. 3 at 221:16-18.  Mr. Unanue testified that whether he cares about the leverage ratio of inverse floaters would "really depend on how much is invested in inverse floaters."  *Id.*, Ex. 10 at 247:6-10.  Defendants have not even attempted to establish how leverage was "being used" or its impact, have not addressed "how much [was] invested in inverse floaters," and certainly have not shown that leverage was not "toxic."  They have simply ignored these statements and summarily concluded that nobody cares about leverage *ratios.*

It defies common sense to argue that although Mr. Klorfine knew that leverage could be "toxic," Mr. Stockwell wanted to know about "the impact of using" it, and Mr. Unanue explicitly testified that he might care about the leverage ratios of inverse floaters depending on how much of the Fund was invested in inverse floaters, none of them cared about the leverage ratios of inverse floaters in their respective Funds or the risks resulting from those leverage ratios.  This testimony makes plain that, viewed in context, Defendants' failure to disclose leverage ratios was a material omission that each Lead Plaintiff cared about.  Because all inferences must be drawn in favor of Lead Plaintiffs, and because it is not the Court's role to weigh competing evidence, *Jones*, 484 F.2d at 1168**,** this alone is sufficient cause to deny Defendants' Motion.

### 2.      Defendants' Proffered Evidence Is Insufficient

Even if the leverage ratio allegations could be properly adjudicated without reference to other allegations, Defendants' evidence would be insufficient to carry the day, because it is barely probative at all, let alone "proof beyond a reasonable doubt." Defendants' "evidence" is nothing more than a series of answers to "pop quizzes" sprung upon Lead Plaintiffs at their depositions and, as set forth above, addresses an incorrect legal standard in any event.

The testimony proffered by Defendants does not show that Lead Plaintiffs did not care what the leverage ratio of the Funds' inverse floaters was, merely that they were generally unfamiliar with the term "leverage ratio."  The record shows that Defendants' counsel asked, with no context, whether Plaintiffs knew "what a leverage ratio" was, or had ever attempted to calculate such a ratio on their own.  *See generally,* Larrabee Decl. Exs. A-L.   In some cases, Defendants' counsel did not even tie the term to inverse floaters, but simply asked about it in the abstract or, in Mrs. Krosser's case, with respect to equity investments in Facebook or Apple.  Doluisio Decl. Ex. 8 at 116:1-120:25  Mr. Miles's testimony is particularly illustrative.  Mr. Miles testified that "Maybe I have seen [an inverse floater leverage ratio] and not recognized that's what it was."  Doluisio Decl. Ex. 6 at 227:15-17.

Six of the seven Complaints do not even include the term "leverage ratio."  In the seventh, the Pennsylvania Fund Complaint, the term was part of a lengthy mathematical

description of how leverage leads to volatility.  Pa. Compl. ¶ 123.  Thus, it is hardly surprising that the various Lead Plaintiffs were unfamiliar with the term.  "Leverage ratio" was used primarily by the parties and by the Court at the motion to dismiss stage as shorthand for the allegations outlined above.  While all Lead Plaintiffs dutifully reviewed those papers as well as their respective pleadings, they were not required to memorize each term found therein.  "Litigation is more than an exercise in playing 'Gotcha.'" *Baltimore Cnty. v. AT&T Corp.,* 735 F. Supp. 2d 1063, 1098 (S.D. Ind. 2010).

Nor is it relevant that Lead Plaintiffs do not know how to calculate leverage ratios (or at least, did not know how to do so when questioned in the abstract and without context at a deposition).  Plaintiffs in securities cases are not required to be experts in the workings of arcane derivative instruments.  "[T]he securities laws protect the gullible and unsophisticated as well as the experienced investor." *United States v. Schlisser*, 168 F. App'x 483, 486 (2d Cir. 2006) (upholding the above quote as part of jury instructions on materiality).  Defendants' argument amounts to nothing more than the idea that complicated concepts (as determined *ex ante* by them) need not be disclosed to unsophisticated investors.  This is offensive to the very purpose of the securities laws. Further, as the *Basic* court astutely noted, such a holding would mean that Defendants' disclosure obligations change depending on the sophistication of the reader.  *Basic*, 485 U.S. at 240 n.18.  Plainly, that cannot be the case.

Moreover, Lead Plaintiffs, like all other reasonable investors, are entitled to review published reports of third parties, consult with financial advisors, and otherwise avail themselves of the expertise of specialists, who *do* know what leverage ratios are and what risks they portend. *See generally United States v. Tomasetta*, No. 10-1205, 2012 WL 1080293, at *3 (S.D.N.Y. Mar. 30, 2012) ("Testimony regarding the disclosures that an analyst was interested in and why … is helpful to the jury and has been admitted in securities fraud trials.") (citing *United States v. Ferguson*, 676 F.3d 260, 274 n.10 (2d Cir. 2011), as "favorably citing the use of security analyst testimony to prove materiality")). Defendants have proffered ***literally nothing*** to show that those sources would view leverage ratios as immaterial.[13]   Indeed, although Defendants asked the various financial advisors they deposed about leverage generally, not once did they ask any of them how to calculate, or what significance they might attribute to, "leverage ratios."

---

[13] Defendants' stance on this issue is so self-contradictory it borders on frivolity.  In opposing Plaintiffs' Motion for Class Certification, Defendants argued that:  1) all Plaintiffs "relied entirely" on their financial advisors; and 2) various Morningstar and other reports fully disclosed the risks of the Funds.  Defendants' Memorandum in Opposition to Lead Plaintiffs' Motion for Class Certification ("Class Cert. Opposition"), Dkt. No. 392, at 34-43.  But moving for summary judgment (in a brief that was filed the same day as that opposition to class certification), Defendants utterly ignore the same sources of information they claim Plaintiffs relied on.  Defendants decline to cite evidence showing, for example, whether the average financial advisor or Morningstar analyst views leverage ratios as material; whether the Funds' Morningstar ratings or categorizations would have been different had the leverage ratios been disclosed; whether the leverage ratios had any impact on the Funds' NAV movements; or anything else that might illuminate the situation.  Instead, Defendants focus solely on Lead Plaintiffs' knowledge and decision-making process, to the exclusion of all other possible evidence.

A simple review of recent news articles further belies Defendants' position. Lehman Brothers, for example, collapsed when it was finally forced to acknowledge billions in losses that it had hidden by "reverse engineer[ing] the firm's net leverage ratio for public consumption."  Michael J. de la Merced & Andrew Ross Sorkin, *Report Details How Lehman Hid Its Woes*, N.Y. Times, Mar. 11, 2010.[14]  Likewise, at least one academic work has been written suggesting that the proper name for the recent financial crisis is "The Great Leverage Collapse."  *See* Robert L. Hetzel, *The Great Recession* (Cambridge Univ. Press 2012).  Nor is this the first time that leverage has created problems for investors.  After Long Term Capital Management famously flirted with bankruptcy in the late 90s as a result of its overuse of leverage, an interagency task force was formed to apprise the President of any policy implications.  The letter from Al Gore to then-President Clinton transmitting that report, which was signed by the chairs of the SEC, Federal Reserve, and CFTC, as well as by the Secretary of the Treasury, stated:

> The principal policy issue arising out of the events surrounding the near collapse of LTCM is how to constrain excessive leverage.  By increasing the chance that problems at one financial institution could be transmitted to other institutions, excessive leverage can increase the likelihood of a general breakdown in the functioning of financial markets.  This issue is not limited to hedge funds; other financial institutions are often larger and more highly leveraged than most hedge funds.

*See*, *Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management*, http://www.treasury.gov/resource-center/fin-mkts/Documents/hedgfund.pdf, at 2.   It is

---

[14]  *Available* at http://www.nytimes.com/2010/03/12/business/12lehman.html?pagewanted=all (last accessed November 14, 2012).

preposterous to argue, as Defendants do here, that no reasonable investor cares whether, or to what degree, their investments employ the same techniques that caused some of the most well-publicized financial catastrophes in recent history, including the downfall of one of the world's best-known investment banks and the near-bankruptcy of a hedge fund so severe that it warranted the formation of a Presidential task force.

In sum, Defendants have proffered, at most, testimony tending to show that Lead Plaintiffs were unfamiliar with the term "leverage ratio" at the time they were deposed. They have conspicuously *failed* to provide any evidence that Lead Plaintiffs did not care about the amount of leverage employed by the Funds, or about the resultant volatility and risks. However, even if Defendants had made that showing, they would not have met the correct legal standard, because the question is whether an objective "reasonable investor" would have viewed leverage ratios as immaterial. Defendants provide no evidence that financial analysts, industry experts, or other sources of information typically looked to by courts in making this determination would deem "leverage ratios" to be immaterial. Defendants' evidence is a far cry from showing beyond a reasonable doubt that no reasonable investor cares about leverage ratios; their motion should be denied.

## VI.   ALTERNATIVELY, PLAINTIFFS SEEK RELIEF PURSUANT TO FED. R. CIV. P. 56(D)

Even if Defendants had carried their initial burden, their Motion cannot be adjudicated at this time because Defendants have not provided Plaintiffs with discovery

necessary for their opposition.   Plaintiffs should not be prejudiced by Defendants' dilatory discovery behavior.   In the event that the Court is not persuaded by Plaintiffs' arguments in opposition to Defendants' Motion, *supra*, Plaintiffs move that the Court defer consideration of Defendants' Motion until 30 days following the completion of fact discovery pursuant to Fed. R. Civ. P. 56(d).

### A.    Rule 56(d) Standard

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."[15]   The Tenth Circuit has held that a party seeking to defer a ruling on summary judgment under Rule 56(d) must provide an affidavit "explain[ing] why facts precluding summary judgment cannot be presented." *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010) (quoting *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir.1992)).   "The theory behind this rule is that summary judgment should not be granted when the non-moving party has not had the opportunity to obtain discovery that is essential to adequately refute the motion." *Jama v. City &*

---

[15] Fed. R. Civ. P. 56(d) took effect and replaced Fed. R. Civ. P. 56(f) in December 2010. *See* Committee Note to 2010 Amendments. Rule 56(f) case law has been applied to the current Rule 56(d). *E.E.O.C. v. Moreland Auto Grp., LLLP,* No. 11-01512, 2012 WL 2282225, at *2 n.1 (D. Colo. June 18, 2012).   For consistency, Plaintiffs refer to the current citation, Rule 56(d), for authority under the prior citation, Rule 56(f).

*Cnty. of Denver*, No. 08-01693, 2010 WL 3075584, at *2 (D. Colo. Aug. 4, 2010) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n.5 (1986)).

Although there is no requirement in Rule 56 that a Court refrain from entering summary judgment until discovery is complete, "sufficient time for discovery is especially important when relevant facts are exclusively in the control of the opposing party." *Weir v. Anaconda Co*., 773 F.2d 1073, 1081 (10th Cir. 1985) (citing 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2741 (1983)). The Tenth Circuit has further held that to meet its burden, the party seeking to obtain a stay pursuant to Rule 56(d) must identify each of the following: "(1) 'the probable facts not available,' (2) why those facts cannot be presented currently, (3) 'what steps have been taken to obtain these facts,' and (4) 'how additional time will enable [the party] to' obtain those facts and rebut the motion for summary judgment." *Valley Forge Ins. Co.*, 616 F.3d at 1096 (citations omitted). Here, Plaintiffs satisfy each of these four requirements. *See generally* Affidavit of Roland W. Riggs in Support of Application for a Stay Pending Additional Discovery Pursuant to Fed. R. Civ. P. 56(d) ("Riggs Aff.").

### 1.    Probable Facts Are Not Available to Plaintiffs

Plaintiffs have yet to receive the full discovery to which they are entitled on any of their claims. As to inverse floaters and their leverage ratios, Plaintiffs have yet to receive complete document production concerning the following from Defendants:

- any emails to or from Defendants regarding inverse floaters;

- any documents held by custodians identified by Defendants as likely to be in possession of information relevant to inverse floaters; and

- any documents of any kind from defendant MassMutual relevant to Plaintiffs' claims.

*See generally* Riggs Aff.  Further, it was only on November 2, 2012 that Plaintiffs received term sheets regarding inverse floaters and were able to provide them to their expert.  Additionally, Plaintiffs have not had the opportunity to depose any defendant or any custodian of any document produced to them.  *Id.* ¶ 20.

The above information goes to the very heart of whether the leverage ratios of the Funds' inverse floaters were material.  Indeed, as Defendants themselves point out, "a major factor in determining whether information was material is the importance attached to it by those who knew about it."  Mot. at 8 n.4 (quoting *Thrasher,* 152 F. Supp. 2d at 300 (additional citations omitted)).  Here, it is undisputed that ***no*** plaintiff "knew about" the information at issue, and Defendants' out-of-context, hypothetical deposition questions do not change that fact.  Rather, it was ***Defendants' employees*** who were aware of the leverage ratios of the Funds' inverse floaters, and whatever those employees said about those leverage ratios will clearly shed light on their materiality.  Defendants are in exclusive control of that information, have unjustifiably delayed in providing it to Plaintiffs, and now seek to avail themselves of summary judgment on the grounds that Plaintiffs do not have it.  This sort of gamesmanship should not be permitted.

Additionally, Plaintiffs may (after a further investigation) determine that it is necessary to provide expert testimony regarding what the leverage ratios of the inverse floaters were, and how those leverage ratios caused the volatility experienced by the Funds, which plainly goes to materiality.  Plaintiffs cannot even make this determination yet, because - due to Defendants' dilatory practices - Plaintiffs' expert has not completed his investigation.

### 2.    Why the Facts Cannot Be Presented Currently

Defendants have not produced the discovery listed above even though Plaintiffs served Defendants with the relevant requests for production more than nine months ago. *See, e.g.,* Riggs Aff. at Ex. A.  As the Tenth Circuit and courts in this District have held, "common sense indicates that such facts are likely to be in the exclusive control of Defendants, and a 'movant's exclusive control of such information is a factor weighing heavily in favor of relief' under Rule 56(d).'" *Levy v. Worthington*, No. 11- 00978, 2011 WL 5240442, at *2 (D. Colo. Oct. 31, 2011) (citing *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000)).  This is precisely the situation here.  Defendants possess the information Plaintiffs require and have yet to produce it.  *See* Riggs Aff. ¶ 19. Additionally, Plaintiffs' expert has not yet completed his review of the data that has been provided by Defendants or produced his report to Plaintiffs, and should not be hurried into doing so, well before the deadlines established in the Case Management Order, merely to rebut Defendants' premature Motion.

### 3.    Plaintiffs Have Taken Steps to Obtain the Information

Plaintiffs first served Defendants with requests for production and interrogatories on February 9, 2012.  With respect to the requests relevant to this motion, Defendants agreed "to undertake a reasonable search for responsive documents from a reasonable number of custodians limited by reasonable search terms, subject to mutual agreement by the parties after an appropriate meet and confer."  Riggs Aff. ¶ 16.  Plaintiffs took Defendants at their word and initiated the meet and confer process.  The parties have exchanged approximately twelve meet and confer letters regarding Defendants' search for production of responsive documents, held numerous phone calls, exchanged numerous emails and have met in person once in an effort to address Defendants' delay or refusal to produce the above categories of discoverable information.  *See* Riggs Aff. at Ex. C.

To date, Plaintiffs' efforts have led to the production of only a small portion of the requested documents.[16]  That the balance of Defendants' production remains outstanding is attributable primarily to Defendants' reluctance to compromise and propensity for delay, as well as the inherent complexities of electronic discovery.  Defendants recently agreed to expand their electronic search beyond email, but continue to resist producing

---

[16] Although Defendants claim to have produced 3.5 million pages worth of information to Plaintiffs, nearly all of those documents were part of Defendants' "core" production, a set of documents Defendants selected for production that consisted primarily of transactional data regarding purchases made by the various Funds during the Class Periods (and even this information is as yet incomplete).  Defendants have produced only 4,231 documents, totaling approximately 72,893 pages, containing non-transactional data.

responsive hard copy documents, and quarrel with Plaintiffs over Plaintiffs' proposals for electronic discovery.  Plaintiffs have agreed on a date with Defendants, irrespective of the outcome of this Motion, to raise these and other discovery issues with the Court if they remain unresolved.

> **4.     Additional Time Will Enable Plaintiffs to Rebut Defendants' Motion**

Though their persistent efforts, Plaintiffs have made some progress in their meet and confer discussions with Defendants regarding the above list of documents. Moreover, Plaintiffs believe that, upon receipt of this information and after expert analysis, they will be in a position to accurately demonstrate how the leverage ratios of the Funds' inverse floaters led to their extraordinary volatility and were thus material to investors.  Absent this information, Plaintiffs remain unable to mount a complete defense.

## VII.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, the Court should defer ruling on Defendants' Motion until 30 days after fact discovery is complete, pursuant to Rule 56(d).

Dated: November 16, 2012                    Respectfully submitted,

                                            s/Kip B. Shuman
                                            Kip B. Shuman
                                            Rusty E. Glenn
                                            **THE SHUMAN LAW FIRM**
                                            885 Arapahoe Avenue
                                            Boulder, CO 80302
                                            Telephone:  (303) 861-3003

Fax:  (303) 484-4886
kip@shumanlawfirm.com
rusty@shumanlawfirm.com

*Liaison Counsel*

Steven J. Toll
Lisa M. Mezzetti
Daniel S. Sommers
S. Douglas Bunch
Stefanie M. Ramirez
Genevieve Fontan
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, NW
Suite 500 West Tower
Washington, D.C.  20005
Telephone:  (202) 408-4600
Fax:  (202) 408-4699
stoll@cohenmilstein.com
lmezzetti@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com
sramirez@cohenmilstein.com
gfontan@cohenmilstein.com

*Attorneys for Lead Plaintiff Leonard
Klorfine in the AMT-Free Fund cases,
Lead Plaintiffs Stuart and Carole
Krosser in the Rochester Fund cases,
and Lead Counsel for the Class*

Sanford P. Dumain
Peter E. Seidman
Roland W. Riggs
Christopher J. Orrico
**MILBERG LLP**
One Pennsylvania Plaza
48th Floor
New York, NY 10119
Telephone: (212) 594-5300
Fax: (212) 868-1229
sdumain@milberg.com
pseidman@milberg.com
rriggs@milberg.com
corrico@milberg.com

*Attorneys for Lead Plaintiff John
Vazquez in the AMT-Free New York
Fund cases, Lead Plaintiff Victor Sasson
in the New Jersey Fund cases, Lead
Plaintiff Peter Unanue in the Rochester
National Fund cases, and Lead Counsel
for the Class*

Alan W. Sparer
  Marc Haber
  James S. Nabwangu
**SPARER LAW GROUP**
100 Pine Street, 33rd Floor
San Francisco, CA 94111
Telephone:  (415) 217-7300
Fax:  (415) 217-7307
asparer@sparerlaw.com
mhaber@sparerlaw.com
klewis@sparerlaw.com
jnabwangu@sparerlaw.com

*Attorneys for Lead Plaintiff Joseph Stockwell in the California Fund cases and Lead Counsel for the Class*

  Daniel C. Girard
  Amanda M. Steiner
  Christina H.C. Sharp
  Lesley A. Vittetoe
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA  94108
Telephone:  (415) 981-4800
Fax:  (415) 981-4846
dcg@girardgibbs.com
as@girardgibbs.com
chc@girardgibbs.com
lav@girardgibbs.com

*Additional Counsel for Lead Plaintiff Joseph Stockwell in the California Fund cases*

Joseph J. Tabacco, Jr.
Nicole C. Lavalle
Matthew D. Pearson

Sherrie R. Savett
Gary E. Cantor
Glen L. Abramson
Eric Lechtzin
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-3000
Fax:  (215) 875-4604
ssavett@bm.net
gcantor@bm.net
gabramson@bm.net
elechtzin@bm.net

*Attorneys for Lead Plaintiff Dharamvir Bhanot in the Pennsylvania Fund cases and Lead Counsel for the Class*

Charles J. Piven
**BROWER PIVEN**
A Professional Corporation
488 Madison Avenue, 8th Floor
New York, NY  10022
Telephone:  (212) 501-9000
Fax:  (212) 501-0300
piven@browerpiven.com

*Additional Counsel for Lead Plaintiff John Vazquez in the AMT-Free New York Fund cases and Lead Plaintiff Dharamvir Bhanot in the Pennsylvania Fund cases*

Howard P. Longman
**STULL, STULL & BRODY LLP**
6 East 45th Street

**BERMAN DEVALERIO**

425 California Street, Suite 2100
San Francisco, CA  94104
Telephone:  (415) 433-3200
Fax:  (415) 433-6382
jtabacco@bermandevalerio.com
nlavalle@bermandevalerio.com
mpearson@bermandevalerio.com

*Additional Counsel for Lead Plaintiffs Stuart and Carole Krosser in the Rochester Fund cases*

New York, NY  10017
Telephone:  (212) 687-7230
Fax:  (212) 490-2022
jasondag@ssbny.com

*Additional Counsel for Lead Plaintiff Victor Sasson in the New Jersey Fund cases*

Jeffrey S. Abraham
**ABRAHAM FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY  10119-2900
Telephone:  (212) 279-5050
Fax:  (212) 279-3655
jabraham@aftlaw.com

*Additional Counsel for Lead Plaintiff Leonard Klorfine in the AMT-Free Fund cases, Lead Plaintiff Victor Sasson in the New Jersey Fund cases, and Lead Plaintiff Peter Unanue in the Rochester National Fund cases*

Lawrence L. Klayman
Jahan K. Manasseh
**KLAYMAN & TOSKES, P.A.**
2424 North Federal Highway
Suite 450
Boca Raton, FL 33431
Telephone:  (561) 997-9956
Fax:  (561) 361-9178

*Additional Counsel for Lead Plaintiffs Stuart and Carole Krosser*

## Certificate of Service

I hereby certify that the foregoing was filed with this Court on November 16, 2012 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

*s/ Rusty E. Glenn*
Rusty E. Glenn