# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge John L. Kane

Master Docket No. 09-md-02063-JLK-KMT (MDL Docket No. 2063)

## IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION

This document relates to the following Actions:

*In re AMT-Free Municipals Fund*
09-cv-1243-JLK (*Prince*)
09-cv-1447-JLK (*Connel*)
09-cv-1510-JLK (*Amato*)
09-cv-1619-JLK (*Furman*)

*In re AMT-Free New York Municipal Fund*
09-cv-1621-JLK (*Isaac*)
09-cv-1781-JLK (*Kurz*)

*In re Rochester National Municipal Fund*
09-cv-550-JLK (*Bock*)
09-cv-706-JLK (*Stokar*)
09-cv-927-JLK (*Tackmann*)
09-cv-1042-JLK (*Krim*)
09-cv-1060-JLK (*Truman*)
09-cv-1482-JLK (*Laufer*)
09-cv-1908-JLK (*Lariviere*)

*In re Rochester Fund Municipals*
09-cv-703-JLK (*Begley*)
09-cv-1479-JLK (*Bernstein*)
09-cv-1481-JLK (*Mershon*)
09-cv-1622-JLK (*Stern*)
09-cv-1478-JLK (*Vladimir*)
09-cv-1480-JLK (*Weiner*)

*In re New Jersey Municipal Fund*
09-cv-1406-JLK (*Unanue*)
09-cv-1617-JLK (*Baladi*)
09-cv-1618-JLK (*Seybold*)
09-cv-1620-JLK (*Trooskin*)

*In re Pennsylvania Municipal Fund*
09-cv-1483-JLK (*Woods*)
09-cv-1368-JLK (*Egts*)
09-cv-1765-JLK (*Wunderly*)

---

## LEAD PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT AND APPROVAL OF NOTICE PLAN

## TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................... 1

II.   BACKGROUND FACTS AND PROCEDURAL HISTORY ................................... 6

    A.    Initial Events and Claims.................................................................... 6

    B.    Summary of Motion Practice ............................................................. 9

       1.    Motions to Dismiss, to Reconsider, and for Interlocutory Appeal ..................... 9

       2.    Motion for Class Certification ................................................. 11

       3.    Motions for Partial Summary Judgment.............................................. 13

       4.    Discovery Motions.................................................................. 14

    C.    Discovery Conducted ...................................................................... 15

    E.    Expert Analyses of Liability and Damages........................................... 16

    F.    Settlement Negotiations and the Proposed Settlement............................ 18

    G.    The Allocation Mediation................................................................. 19

       1.    The Terms of the Settlement .................................................... 21

III.   PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE .... 22

    A.    The Proposed Settlement Was the Result of Arm's-Length Negotiations............. 25

    B.    Serious Questions of Law and Fact Placed the Outcome of the Litigation in

       Doubt ...................................................................................... 26

       1.    Defendants Contest the Claims of Misrepresentation ......................... 27

       2.    Defendants Have Viable Loss Causation Defenses............................. 28

3.   The Amount of Damages Is Vulnerable to Findings that the Class Periods

Should Be Shortened ....................................................................... 28

4.   The Amount of Damages Is Susceptible to Findings that the Funds Did

Not Violate Their Investment Policies ............................................... 29

5.   The Amount of Damages Is Susceptible to Findings that the Investment

Objectives Contain No Enforceable Risk Limit ................................. 29

6.   Defendants' and Lead Plaintiffs' Pending Motions Could Be Decided

Against the Classes ......................................................................... 30

C.   The Value of an Immediate Recovery Outweighs the Possibility of

Future Relief after Protracted and Expensive Litigation ........................... 31

D.   Lead Plaintiffs' Counsel Believe That the Settlement Is Fair and Reasonable ...... 33

IV.   CERTIFICATION OF THE CLASSES IS PROPER ........................................... 35

A.   The Settlement Satisfies Rule 23(a) ............................................................ 37

1.   The Proposed Classes Are Sufficiently Numerous............................. 37

2.   There Are Questions of Law and Fact Common to the Classes ......................... 38

3.   The Claims of Lead Plaintiffs Are Typical......................................... 39

4.   The Lead Plaintiffs Are Adequate Representatives of the Classes ................... 40

B.   Rule 23(b)(3) Is Satisfied ......................................................................... 41

1.   Common Questions of Law and Fact Predominate ............................ 42

2.   A Class Action Is a Superior Method of Adjudication....................... 44

V.   THE PROPOSED FORM AND METHOD OF CLASS NOTICE IS

ADEQUATE AND SATISFIES THE REQUIREMENTS OF RULE 23................. 45

VI.   ESTABLISHMENT OF A FINAL APPROVAL AND FAIRNESS HEARING . 50

VII.   CONCLUSION ..................................................................................................... 52

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adamson v. Bowen,*
  855 F.2d 668 (10th Cir. 1988) .................................................................................. 40

*Alpern v. UtiliCorp United, Inc.,*
  84 F.3d 1525 (8th Cir. 1996) ................................................................................... 43

*Alvarado Partners, L.P. v. Mehta,*
  130 F.R.D. 673 (D. Colo. 1990) .............................................................................. 35

*Ashley v. Regional Transp. Dist. & Amalgamated Transit Union Div. 1001*
  *Pension Fund Trust,*
  No. 05-cv-01567-WYD-BNB, 2008 WL 384576 (D. Colo. Feb. 11, 2008) .............. 23

*Ashley v. Regional Transp. Dist. & Amalgamated Transit Union Div. 1001*
  *Pension Fund Trust,*
  No. 05-cv-01567-WYD-BNB, 2008 WL 384579 (D. Colo. Feb. 11, 2008) .............. 49

*Devlin v. Scardelleti,*
  536 U.S. 1 (2002) .................................................................................................... 32

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship,*
  100 F. 3d 1041 (1st Cir. 1996) ................................................................................ 26

*Clay v. Pelle,*
  No. 10-CV-01840-WYD-BNB, 2011 WL 843920 (D. Colo. Mar. 8, 2011) .............. 38

*Consol. Edison, Inc. v. Ne. Utils.,*
  332 F. Supp. 2d 639 (S.D.N.Y. 2004) ..................................................................... 50

*DeJulius v. New England Health Care Employees Pension Fund,*
  429 F.3d 945 (10th Cir. 2005) ................................................................................ 46

*DG v. Devaughn,*
  594 F.3d 1188 (10th Cir. 2010) ................................................................... 36, 39, 40

*Eisen v. Carlisle & Jacquelin,*
  417 U.S. 156 (1974) ................................................................................................ 46

*Espinoza v. 953 Assocs. LLC*,
   No. 10 Civ. 5517(SAS), 2011 WL 5574895 (S.D.N.Y. Nov. 16, 2011) .................... 44

*Gottlieb v. Wiles*,
   11 F.3d 1004 (10th Cir. 1993) ............................................................. 32, 46

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995) ......................................................................... 43

*Horton v. Leading Edge Mktg.*,
   No. 04-cv-00212-PSF-CBS, 2007 WL 2472046 (D. Colo. Aug. 28, 2007)............... 47

*In re Cendant Corp. Sec. Litig.*,
   264 F.3d 201 (3d Cir. 2001)................................................................. 34

*In re Initial Pub. Offering Sec. Litig.*,
   243 F.R.D. 79 (S.D.N.Y. 2007) ............................................................ 23

*In re Initial Public Offering Sec. Litig.*,
   226 F.R.D. 186 (S.D.N.Y. 2005) .......................................................... 23

*In re Initial Public Offering Sec. Litig.*,
   260 F.R.D. 81 (S.D.N.Y. 2009) ........................................................... 37

*In re Integra Realty Resources, Inc.*,
   354 F.3d 1246 (10th Cir. 2004) ........................................................... 46

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   246 F.R.D. 156 (S.D.N.Y. 2007) .......................................................... 34

*In re Motor Fuel Temperature Sales Practices Litig.*,
   271 F.R.D 221 (D. Kan. 2010).............................................................. 36

*In re Motor Fuel Temperature Sales Practices Litig.*,
   258 F.R.D. 671 (D. Kan. 2009)....................................................... 24, 36, 46

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ............................................................ 42

*In re Prudential Securities, Inc. L.P. Litig.*,
   MDL No. 1005, 1995 WL 798907 (S.D.N.Y. 1995) .................................... 34

*In re Qwest Commc'n Int'l., Inc. Sec. Litig.*,
    625 F. Supp. 2d 1133 (D. Colo. 2009) ....................................................... 49

*In re Sprint Corp. ERISA Litig.*,
    443 F. Supp. 2d. 1249 (D. Kan. 2006) ....................................................... 26

*In re State Street Bank and Trust Co. Fixed Income Fund Inv. Litig.*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011).......................................................... 28

*In re Urethane Antitrust Litig.*,
    251 F.R.D. 629 (D. Kan. 2008)................................................................... 46

*Jones v. Nuclear Pharmacy, Inc.*,
    741 F.2d 322 (10th Cir. 1984) ................................................... 22, 23, 24, 25

*Lane v. Page*,
    No. CIV 06-1071, 2011 WL 395472 (D. N.M. Jan. 10, 2011)............................. 35, 40

*Lucas v. Kmart Corp.*,
    234 F.R.D. 688 (D. Colo. 2006) ........................................................... *passim*

*McNeely v. Nat'l Mobile Health Care, LLC*,
    No. CIV 07-933-M, 2008 WL 4816510 (W.D. Okla. Oct. 27, 2008) ................. *passim*

*Realmonte v. Reeves*,
    169 F.3d 1280 (10th Cir. 1999) ............................................................. 38, 39

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
    314 F.3d 1180 (10th Cir. 2002) ......................................................... 23, 25, 40

*Schwartz v. Celestial Seasonings, Inc.*,
    178 F.R.D. 545 (D. Colo. 1998) ................................................................. 42

*Seijas v. Republic of Argentina*,
    606 F.3d 53 (2d Cir. 2010)........................................................................ 44

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
    209 F.R.D. 159 (C.D. Cal. 2002) ............................................................... 45

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982).................................................................. 32, 50

*Wilkerson v. Martin Marietta Corp.*,
    171 F.R.D. 273 (D. Colo. 1997) ................................................................... 23, 32, 33

**STATUTES**

15 U.S.C. § 77…………………………………………………………………*passim*

28 U.S.C. § 1407 .............................................................................................. 33

Securities Act of 1933 § 11…………………………………………………*passim*

Securities Act of 1933 § 12(a)(2)…………………………………………...*passim*

Securities Act of 1933 § 15…………………………………………………*passim*

**OTHER AUTHORITIES**

5 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE §23.165(3) (3d ed. 2010)............. 24

Ellen M. Ryan and Laura E. Simmons, *Securities Class Action Settlements: 2012
    Review and Analysis,* at 11 (Cornerstone Research 2013)........................................... 34

**RULES**

D.C. Colo. L. Civ. R. 7.1 .................................................................................. 1

Fed. R. Civ. P. 23.................................................................................*passim*

## I.    INTRODUCTION

Court-appointed Lead Plaintiffs[1] in the above-captioned actions respectfully submit this unopposed[2] motion requesting that the Court preliminarily approve the $89.5 million all cash aggregate settlement of the six coordinated class action lawsuits (the "Actions") against Defendants.[3]   This motion is predicated on six separate Stipulations and Agreements of Settlement, dated March 4, 2014 (each a "Stipulation"; collectively, the "Stipulations" or the "Settlement"), which together resolve all claims against the Defendants asserted in the Actions.   Although six separate Stipulations are submitted herewith, the proposed Settlement is global.   Defendants reserve the right to terminate this global Settlement if any of the six Actions does not obtain final approval.

Accordingly, Lead Plaintiffs request an Order: (1) preliminarily approving the terms of the proposed $89.5 million Settlement; (2) conditionally certifying the six separate Classes[4] for settlement purposes only; (3) approving the form and method for

---

[1] Leonard Klorfine, John Vazquez, Peter Unanue, Victor Sasson, Dharamvir Bhanot, Stuart Krosser, and Carole Krosser (collectively, "Lead Plaintiffs"), are each a proposed class representative for one of the six Funds for which preliminary approval of the Settlement is sought.  The six proposed classes are hereinafter referred to as the "Classes."

[2] Pursuant to D.C. Colo. L. Civ. R. 7.1A, Lead Plaintiffs' Counsel has conferred with Defendants' Counsel.  While Defendants' Counsel consent to the relief sought in this motion, they do not agree to any particular language set forth within this motion.

[3] Unless otherwise defined, all capitalized terms have the same meanings as set forth in the Stipulations, which are submitted herewith.

[4] The cases pending before this Court relate to the following six Oppenheimer municipal bond funds (the "Funds"): the AMT-Free Municipals Fund, the AMT-Free New York Municipal Fund, the New Jersey Municipal Fund, the Pennsylvania Municipal Fund, and Rochester Fund Municipals (collectively, the "Capital Preservation Classes"), and the Rochester National Municipal Fund (the "National Fund Class" and along with the Capital Preservation Classes, the

providing notice to the Classes (the "Notice Plan"); and (4) scheduling a final hearing for approval of the proposed Settlement, the plan for distributing proceeds ("Distribution Plan"), and the application for an award of attorneys' fees and for the reimbursement of expenses.  Lead Plaintiffs submit that the Settlement represents an excellent recovery.  As explained below, the $89.5 million Settlement has been allocated among the Actions in a fair and efficient manner.  Should this Court approve the Settlement, the Settlement proceeds will be divided among the Actions as follows:

| Fund Name | Settlement Allocation |
|---|---|
| Oppenheimer AMT-Free Municipals Fund | $17,109,000 |
| Oppenheimer AMT-Free New York Municipal Fund | $ 4,241,000 |
| Oppenheimer Rochester National Municipal Fund | $26,850,000 |
| Oppenheimer New Jersey Municipal Fund | $ 3,374,000 |
| Oppenheimer Pennsylvania Municipal Fund | $ 4,341,000 |
| Rochester Fund Municipals | $33,585,000 |
| **Total for All Six Funds** | **$ 89,500,000** |

The Settlement was achieved after four years of hard-fought litigation that included substantial briefing on Defendants' motions to dismiss, motions for partial summary judgment, and motion to compel, and Lead Plaintiffs' motion for class certification and motion to compel.  In addition, the Settlement was reached only after extensive discovery.  Lead Plaintiffs and many of their financial advisors and brokers were deposed and produced documents to Defendants.  Defendants produced millions of

---

"Classes").   The California Municipal Fund action is not a part of this Settlement.   The California Municipal Fund cases include: 09-cv-01484-JLK-KMT, 09-cv-01485-JLK-KMT, 09-cv-01486-JLK-KMT, and 09-cv-01487-JLK-KMT.

pages of electronic documents to Lead Plaintiffs.  Many of these documents are highly technical and were reviewed and analyzed by Lead Plaintiffs' experts.  Millions of other pages were reviewed and coded by Lead Plaintiffs' Counsel and other delegated counsel working under the supervision of Lead Plaintiffs' Counsel.[5]  It is fair to say that the Actions had reached an advanced stage in the litigation process prior to settlement.

Counsel for the Settling Parties, along with one of Plaintiffs' experts, met on December 18, 2012, in an all-day meeting that was geared towards a frank discussion of the substantive issues of liability, causation, damages and Defendants' defenses.  That meeting, along with continued discussions thereafter, led to a May 6 and May 7, 2013 formal mediation presided over by former U.S. District Court Judge, the Honorable Layn R. Phillips (ret.).  The Settling Parties submitted detailed mediation briefs prior to the mediation.  Lead Plaintiffs' experts were consulted both prior to and during the mediation.  Although a settlement was not reached during the mediation, the Settling Parties continued their efforts over the following months.  Judge Phillips continued to play an active role in all post-mediation negotiations.  The Settlement presented herein was eventually reached following these extensive negotiations.  On August 26, 2013, the Settling Parties executed a Memorandum of Understanding which set forth the basic terms of the Settlement.

Lead Plaintiffs were able to negotiate a significant cash settlement totaling $89.5

---

[5] "Lead Plaintiffs' Counsel" as used herein refers to Milberg LLP, Cohen Milstein Sellers & Toll PLLC, Berger & Montague, P.C. and The Shuman Law Firm.

million for the benefit of the Classes.  The Settling Parties had (and continue to have) widely divergent views on liability, causation, and the range of potential recoverable damages at trial.  Indeed, serious questions of law and fact remain disputed.  For example, Lead Plaintiffs' omnibus motion for class certification is still pending, as is Defendants' motion for partial summary judgment on Lead Plaintiffs' "capital preservation" claims.  Defendants continue to contest loss causation and maintain that they made no material misstatements or omissions.  However, with Judge Phillips' guidance, the Settling Parties were able to reach a satisfactory resolution.  The proposed Settlement should be preliminarily approved on the grounds that it is fair, reasonable, and adequate given the difficult issues of liability and damages that confronted Lead Plaintiffs.

Lead Plaintiffs further seek approval of a comprehensive Notice Plan designed to reasonably notify Class Members of their rights to participate in, object to, or opt-out of the Settlement.  The proposed Notice Plan is highly efficient because it creates a single, uniform notice to be disseminated to Class Members regardless of the particular Fund in which they may have acquired shares.  Not only will this significantly reduce the costs of notice, but Class Members that purchased shares in more than one Fund will receive only a single notice and claim form.  In addition, a single notice is appropriate because of the global nature of the Settlement for all six Funds and the fact that the Settlement is contingent upon approval of the Stipulation for each Fund.

Notice will be disseminated by mail and publication.[6]  In order to make claims submission effective and simple for Class Members, the Notice will use transactional data provided by Defendants and other brokers when feasible to pre-fill as many Proof of Claim forms as possible.   The mailed notice will clearly and concisely state in plain, easily understood language: (1) the nature of the Actions; (2) the definition of the Classes; (3) the Classes' claims, issues, and defenses thereto; (4) the Settlement and reasons for it; and (5) each Class Member's right to appear, object or seek exclusion. Consistent with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Notice will also describe the application that Lead Plaintiffs' Counsel will make for attorneys' fees and for the reimbursement of litigation expenses.[7]  The Publication Notice will also be printed in *Investor's Business Daily*, transmitted over a business wire and be posted on a website dedicated to the Settlement. The Notice Plan satisfies all the statutory and due process requirements, and gives absent Settlement Class Members reasonable

---

[6] The proposed Notice of Pendency and Proposed Settlements of Class Actions and Notice of Motion for Awards of Attorneys' Fees and Reimbursement of Expenses (collectively "Notice"), Proof of Claim form ("Proof of Claim"), Record of Fund Transactions ("ROFT"), and the Summary Notice of Pendency and Proposed Settlements of Class Actions and Summary Notice of Motion for Awards of Attorneys' Fees and Reimbursement of Expenses ("Publication Notice"), are appended as Exhibits 1 to 4 to the [Proposed] Order Preliminarily Approving Settlements and Providing for Notice ("Preliminary Approval Order") which is submitted herewith.

[7] Lead Plaintiffs' Counsel intend to seek an award of attorneys' fees of 30% of the Settlement Fund and no more than $4.5 million plus accrued interest in the reimbursement of out-of-pocket expenses.  The request for attorneys' fees and the reimbursement of expenses is not before this Court at this time.  However, prior to the final settlement approval hearing Lead Plaintiffs' Counsel will submit information demonstrating that the amount requested is fair, reasonable and adequate and consistent with fee awards approved in this District.

notice of their rights.

## II.     BACKGROUND FACTS AND PROCEDURAL HISTORY

### A.     Initial Events and Claims

The initial complaints in these cases were filed beginning on February 25, 2009. Altogether, thirty-two putative class actions against Defendants involving the seven "Rochester Funds" were filed.   Those cases were consolidated into seven separate lawsuits representing each of the seven Funds at issue, which were coordinated for pre-trial purposes.   As noted above, the proposed Settlement before the Court resolves six out of the seven consolidated cases.   The seventh lawsuit involving the California Municipal Fund is not a party to the Settlement.

After significant briefing and oral argument, on November 18, 2009, the Court appointed Leonard Klorfine, John Vazquez, Peter Unanue, Victor Sasson, Dharamvir Bhanot, and Stuart and Carole Krosser as Lead Plaintiffs on behalf of the Classes in the Actions.   Dkt. No. 223.   Milberg LLP was appointed Lead Plaintiffs' Counsel for the AMT-Free New York Municipal Fund, New Jersey Municipal Fund, and Rochester National Municipal Fund Classes.   Cohen Milstein Sellers & Toll PLLC was appointed Lead Plaintiffs' Counsel for the AMT-Free Municipals Fund and Rochester Fund Municipals Classes.   Berger & Montague, P.C. was appointed Lead Plaintiffs' Counsel for the Pennsylvania Municipal Fund Class.   The Shuman Law Firm was Court-appointed as sole Plaintiffs' Liaison Counsel.   *Id.*

On January 15, 2010, Lead Plaintiffs filed separate Consolidated Class Action Complaints (the "Amended Complaints") asserting claims under Sections 11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C. §§ 77k, 77l and 77o) and Section 13(a) of the Investment Company Act. *See* Dkt. Nos. 244-250. The Defendants in the Actions are OppenheimerFunds, Inc. ("OFI"), OppenheimerFunds Distributor, Inc., Oppenheimer AMT-Free Municipals Fund, Oppenheimer AMT-Free New York Municipal Fund, Oppenheimer New Jersey Municipal Fund, Oppenheimer Pennsylvania Municipal Fund, Oppenheimer Rochester National Municipal Fund, and Rochester Fund Municipals (collectively with OFI, "Oppenheimer"), John V. Murphy, Brian W. Wixted, Ronald H. Fielding, Daniel G. Loughran, Scott Cottier and Troy E. Willis (collectively with Oppenheimer, the "Oppenheimer Defendants"), Brian F. Wruble, John Cannon, Paul Y. Clinton, Thomas W. Courtney, David K. Downes, Matthew P. Fink, Robert G. Galli, Phillip A. Griffiths, Lacy B. Herrmann, Mary F. Miller, Joel W. Motley, Russell S. Reynolds, Jr., Joseph M. Wikler, Peter I. Wold, Clayton K. Yeutter, and Kenneth A. Randall (collectively, the "Trustee Defendants"), Massachusetts Mutual Life Insurance Company ("MassMutual"), and Oppenheimer Multi-State Municipal Trust (the Oppenheimer Defendants, the Trustee Defendants, MassMutual, and Oppenheimer Multi-State Municipal Trust are collectively referred to as "Defendants"). The Actions are brought on behalf of all persons or entities who acquired shares of the Funds traceable to the registration statements at issue. The proposed Class Periods are as follows:

| Fund Name | Class Period |
|---|---|
| Oppenheimer AMT-Free Municipals Fund | 5/13/2006-10/21/2008 |
| Oppenheimer AMT-Free New York Municipal Fund | 5/21/2006-10/21/2008 |
| Oppenheimer Rochester National Municipal Fund | 3/13/2006-10/21/2008 |
| Oppenheimer New Jersey Municipal Fund | 4/24/2006-10/21/2008 |
| Oppenheimer Pennsylvania Municipal Fund | 9/27/2006-11/26/2008 |
| Rochester Fund Municipals | 2/26/2006-10/21/2008 |

Lead Plaintiffs allege that the Funds' Registration Statements and related offering materials contained materially false and misleading statements and/or omitted material information necessary to make those statements not misleading.   The Amended Complaints allege that the Defendants misled investors about the overall level of risk that the six Funds would undertake.   Thus, for example, while five of the six Funds were sold and marketed as having a conservative "capital preservation" investment objective, Lead Plaintiffs alleged that those Funds' actual investments were not consistent with the stated objective, and in fact, were managed in a manner that violated the capital preservation objective.[8]   Lead Plaintiffs also allege that the Funds' Prospectuses were materially false and misleading because they: (1) overstated the liquidity of the Funds' holdings and/or understated the risks associated with liquidity[9]; (2) failed to disclose the risks and volatility associated with complex derivative instruments known as "inverse floaters" that

---

[8] AMT-Free Compl. ¶ 39; AMT-Free NY Compl. ¶ 35; NJ Compl. ¶ 70; Pa. Compl. ¶ 70; Rochester Compl. ¶ 71; Plaintiffs for the Rochester National Fund included an investment objective claim but did not have a capital preservation claim.  Nat'l Compl. ¶¶ 22-23.

[9] AMT-Free Compl. ¶¶ 91-94; AMT-Free NY Compl. ¶¶ 83-86; Nat'l Compl. ¶¶ 81-84; NJ Compl. ¶¶ 84-87; Pa. Compl. ¶¶ 77-95; Rochester Compl. ¶¶ 86-90.

were heavily invested in by the Funds[10]; (3) failed to disclose that the Funds deviated from their stated leverage restrictions[11]; and (4) overstated the value of the Funds' assets and therefore, misrepresented the funds' net asset values ("NAVs").[12]   After these concealed risks are alleged to have materialized, each Fund grossly underperformed its respective peer group.   The NAVs of the six Funds fell 30-50% during 2008, while similar municipal bond funds that did not employ Defendants' allegedly excessively risky strategies weathered the credit crisis with substantially smaller losses during the same time periods.[13]

### B.     Summary of Motion Practice

#### 1.     Motions to Dismiss, to Reconsider, and for Interlocutory Appeal

On April 5, 2010, Defendants filed multiple motions to dismiss Lead Plaintiffs' Amended Complaints.   *See* Dkt. Nos. 284-286.   Lead Plaintiffs filed oppositions on June 4, 2010 (Dkt. Nos. 291-292), and Defendants filed their replies on July 5, 2010 (Dkt. Nos. 299-300).   The Court denied Defendants' motions to dismiss October 24, 2011 with respect to Lead Plaintiffs' claims for relief under Sections 11, 12(a)(2) and 15 of the 1933

---

[10] AMT-Free Compl. ¶¶ 63-73; AMT-Free NY Compl. ¶¶ 63, 78; Nat'l Compl. ¶¶ 65, 76; NJ Compl. ¶¶ 64, 79; Pa. Compl. ¶¶ 129-30 & 132; Rochester Compl. ¶¶ 65, 81.

[11] AMT-Free Compl. ¶¶ 85-87, 95-100; AMT-Free NY Compl. ¶¶ 87-92; NJ Compl. ¶¶ 88-94; Pa. Compl. ¶¶ 114-34; Rochester Compl. ¶¶ 91-97.

[12] AMT-Free Compl. ¶ 83; AMT-Free NY Compl. ¶ 76;  Nat'l Compl. ¶ 74; NJ Compl. ¶ 77; Pa. Compl. ¶¶ 107-12; Rochester Compl. ¶¶ 78-79.  Plaintiffs for the Pennsylvania Fund have also alleged that the Pennsylvania Fund invested approximately one-third of its assets in junk and unrated bonds during the class period despite a 25% ceiling on junk bonds.  Pa. Compl. ¶¶ 61, 96-104.

[13] AMT-Free Compl. ¶ 87; AMT-Free NY Compl. ¶ 79;  Nat'l Compl. ¶ 77; NJ Compl. ¶ 80; Pa. Compl. ¶¶ 11, 146-48; Rochester Compl. ¶ 82.

Act, and granted Defendants' motion to dismiss with respect to Lead Plaintiffs' claims under Section 13(a) of the Investment Company Act. Dkt. No. 312. The Motion to Dismiss Order was subsequently withdrawn and amended on January 20, 2012. Dkt. No. 359. Later, on March 20, 2013, the Court denied Defendants' motion to dismiss the state law claims asserted in the Pennsylvania Fund case. Dkt. No. 428.

On November 14, 2011, Defendants filed two motions to reconsider and one motion for interlocutory appeal. Specifically, (1) Mass Mutual filed a motion for reconsideration of this Court's order on the application of the relation-back doctrine as it applies to the statute of limitations; (2) Defendants filed a motion to correct application of a single case citation and to clarify the National Fund's investment objective and to reconsider the Motion to Dismiss Order based on these corrections and clarifications; and (3) Defendants filed a motion to certify for interlocutory appeal this Court's ruling on loss causation. Dkt. Nos. 313, 315 and 316. On December 5, 2011, Lead Plaintiffs opposed those motions (Dkt. Nos. 321, 322 and 323), and on December 22, 2011, Defendants filed three reply briefs in support of their motions (Dkt. Nos. 324, 325 and 326). On January 17, 2012, this Court denied Defendants' motion to certify the issue of loss causation for interlocutory appeal. Dkt. No. 332. And, on January 18, 2012, the Court denied Mass Mutual's motion to reconsider, and though the Court clarified certain aspects of its Motion to Dismiss Order, it also denied the request to change the substance of its Order based on those clarifications. Dkt. No. 348.

Defendants thus left no stone unturned in their attempts to obtain an outright dismissal of Lead Plaintiffs' claims, or to severely limit those claims.   For example, Defendants argued that the Funds' investment objectives were merely aspirational and therefore not actionable; that the Funds did not fail to identify illiquid securities; and that the risks of inverse floaters were disclosed to investors.  *See* Defs.' Joint Mot. to Dismiss (Dkt. No. 285) at 34-39.   Defendants have also maintained there were no misrepresentations or omissions of material fact in any of the Offering Documents and no cognizable damages.   Dkt. No. 285 at 33-46.   Defendants asserted among other things that: (1) the Amended Complaints were time barred by the 1933 Act's statute of limitations (Dkt. No. 285 at 68-73); (2) Lead Plaintiffs would be unable to prove loss causation based on evidence that the Fund's NAV decline resulted not from purported misstatements or omissions but from the 2008 world-wide credit crisis  (Dkt. No. 285 at 24-25; 75-77); and (3) the Individual Defendants are not "sellers" subject to liability under the 1933 Act (Dkt. No. 285 at 80-82).

Although Lead Plaintiffs believe that the Classes' claims would eventually prevail on the merits, Lead Plaintiffs acknowledge that Defendants have asserted several colorable defenses during motion practice and settlement discussions which could have substantially limited any eventual recovery if the cases were not settled.

### 2.      Motion for Class Certification

Lead Plaintiffs' omnibus motion for class certification was filed on July 24, 2012. Dkt. No. 379.  Defendants filed their opposition to class certification on September 14,

2012.  Dkt. Nos. 384-387, 392 (Capital Preservation Classes), 395 (National Fund Class).  On October 26, 2012, Lead Plaintiffs filed their reply brief in support of class certification.  Dkt. No. 407.  Defendants, once again, left no stone unturned.  Over Lead Plaintiffs' objection, on November 28, 2012, Defendants filed a sur-reply in support of their opposition to class certification.  Dkt. No. 415.  Lead Plaintiffs filed a response to the sur-reply, which was subsequently opposed by Defendants (Dkt. Nos. 423, 424).  Briefing on class certification was comprehensive.

In conjunction with class certification, Defendants deposed all the Lead Plaintiffs and many of Lead Plaintiffs' financial advisors and brokers.[14]  Defendants also obtained Lead Plaintiffs' relevant documents and those of the third-party advisors and brokers.  The Settling Parties held countless meet and confers relating to the scope of discovery and inquiry into Lead Plaintiffs' investment history, net worth, and other areas Lead Plaintiffs believed were extraneous.

In opposing Lead Plaintiffs' motion for class certification, Defendants contended that individual inquiries made certification of the putative classes improper.  Among other things, Defendants argued that evidence specific to particular named plaintiffs demonstrated that class members knew or should have known of their claims more than one year before the actions were filed.  Similarly, Defendants argued that putative class members' understanding of the Funds' risks could only be determined through individual

---

[14] Two additional named plaintiffs for the Oppenheimer Pennsylvania Municipal Fund, William E. Miles, Jr. and John Galganovich, were also deposed, as was Mr. Galganovich's broker.

inquiries into whether each putative class member: (i) read the Fund's public disclosures and marketing materials, as well as materials from third parties, including Morningstar; and (ii) discussed the risks of the Funds with other individuals, including their brokers. Dkt. No 392 at 31-37; 47-51. Lastly, Defendants argued that many of the Lead Plaintiffs' claims were not typical or that they were inadequate class representatives. *Id.* at 52-54; 66-72; Dkt. No. 395 at 18-21.

Lead Plaintiffs' motion for class certification is pending.

### 3.    Motions for Partial Summary Judgment

Concurrently with their opposition to class certification, Defendants filed two motions seeking partial summary judgment. The first motion sought summary judgment as to certain Lead Plaintiffs' investment objective claims on the grounds that those Lead Plaintiffs testified that statements in the Prospectuses regarding, for example, liquidity or junk bonds were at odds with their understanding of capital preservation. Dkt. No. 390. Defendants' second motion for partial summary judgment argued that the testimony of certain Lead Plaintiffs indicated that they did not care about leverage ratios and that, as such, leverage ratios were immaterial as a matter of law. Dkt. No. 391. Both motions for partial summary judgment were based on testimony elicited from Lead Plaintiffs at their depositions. Lead Plaintiffs filed oppositions to the motions for partial summary judgment (Dkt Nos. 412, 413), and Defendants filed reply briefs (Dkt. Nos. 419, 420, 421, 422).

The Court denied the Defendants' motion for partial summary judgment on the

leverage ratio claims on March 22, 2013.  Dkt. No. 429.  The motion for partial summary judgment based on the capital preservation claims is still pending.

### 4.      Discovery Motions

Prior to taking discovery of the Lead Plaintiffs, the Settling Parties held multiple meet and confers designed to narrow the areas of inquiry that would be permitted.  All but two of the disputes were resolved informally.  Defendants filed a motion to compel in order to obtain Lead Plaintiffs' documents related to the types of securities underlying their claims (*e.g.*, inverse floaters, liquidity of municipal bonds, and valuation of municipal bonds), and Lead Plaintiffs' investment histories going back to January 1, 2000.  Dkt. No. 367.  The Settling Parties agreed to expedited briefing on the motion so that class discovery and briefing would not be delayed.  Lead Plaintiffs opposed the motion to compel (Dkt. No. 370) and Defendants submitted a reply brief (Dkt. No. 373).  Oral argument was held on May 9, 2012.  The motion was granted in part, and denied in part.  The Court denied the motion to compel investment histories and documents related to the majority of Lead Plaintiffs' investment types, but granted the motion as it related to documents related to derivative instruments.

Lead Plaintiffs also filed a motion to compel in order to obtain credit ratings assigned by independent rating agencies in Defendants' possession.  Dkt. 432.  This dispute over credit ratings was resolved a little over a month after Lead Plaintiffs filed their motion to compel.

### C.      Discovery Conducted

The Settling Parties held a post-Motion to Dismiss Order meeting in New York

City on December 14, 2011, in an attempt to arrive at a comprehensive case schedule and

to streamline discovery.  At the meeting it was agreed that discovery would be conducted

in a series of phases.  The first phase related to class certification.  That phase included

all class-related discovery and included Lead Plaintiffs' depositions and the production of

their documents.    Defendants also served third-party subpoenas on most of Lead

Plaintiffs' financial advisors and brokers.  That phase of discovery was completed prior

to September 2012.  The second phase of discovery related to Defendants' production of

"core documents" in their possession and control.    These documents consisted of

underlying transactional documents reflecting the thousands of bonds held, bought or

sold by the Funds during the Class Periods.  Lead Plaintiffs' Counsel and their expert

reviewed these documents.   A majority of the documents produced in phase two of

discovery were of a highly technical nature.   Phase two of discovery was largely

completed in March 2012, but disputes regarding Defendants' production remain and will

be litigated absent a settlement.  Phase three of discovery consisted of the production of

"non-core" documents by Defendants.   These documents included reports, marketing

materials, internal risk guidelines and compliance materials, Trustee Board meeting

minutes, minutes of various pertinent committees, monthly risk assessments, risk

management reports, daily performance reports, internal investment strategy notes and

presentations, analyst papers, and internal e-mails relating to the foregoing. The large number of documents produced in phase three required Lead Plaintiffs' Counsel to create teams to review and code the documents. Phase three discovery was continuing at the time the proposed Settlement was reached. All told, the Settling Parties exchanged millions of pages of documents. In addition, the parties served written discovery in the form of interrogatories and requests for production. In each instance the Settling Parties held numerous meet and confers in order to clarify and agree on the scope of production or on the written responses to the discovery requests. The Settling Parties were able to work out their differences without Court intervention, with the exception of the two narrow issues raised in the motion to compel filed by Defendants, noted above, and the resolution of the credit ratings issue after the filing of Lead Plaintiffs' motion to compel. Consequently, as discussed in greater detail below, Lead Plaintiffs and their Counsel were able to make an extensive and well-informed liability and damages assessment before settling the Actions.

### E.   Expert Analyses of Liability and Damages

Early in 2012 Lead Plaintiffs retained consulting experts Gifford Fong Associates ("GFA").[15] Defendants produced critical and detailed financial information that enabled

---

[15] GFA has been providing consulting services and proprietary analytical tools to the legal and financial communities since 1974. H. Gifford Fong is Editor of the Journal of Investment Management, an advisor to the United States Securities and Exchange Commission ("SEC"), and an advisor to the Federal Reserve and United States Treasury. Prior to retaining GFA, Lead Plaintiffs had also consulted with experts in connection with the research for and drafting of their respective consolidated amended complaints.

Lead Plaintiffs' Counsel and consulting experts to conduct thorough merits and damages analyses. Specifically, GFA performed an analysis of all six Funds' portfolios during the Class Periods, including a detailed review of the volatility, leverage, and excessive risk of the Funds compared to similarly-situated municipal bond funds.

In connection with Lead Plaintiffs' liquidity allegations, GFA identified several different methods by which to analyze the liquidity of the Funds' holdings. GFA conducted a thorough two-step analysis in an effort to demonstrate that the Funds exceeded their stated limits on illiquid securities. This required GFA to expend considerable time to locate securities that met various definitions of "illiquid," and designate each of those securities as such.

GFA also conducted an analysis of the Funds' inverse floaters and provided Lead Plaintiffs with a summary of losses from inverse floaters collapsed during and just after each of the Funds' respective Class Periods. This analysis included accounting for the performance of non-collapsed inverse floaters and the losses attributed to those non-collapsed inverse floaters.

Section 11 damages were computed by Candace Preston and Cynthia Jones of Financial Markets Analysis, LLC ("FMA")[16] separately for each class of shares issued by the Funds. Lead Plaintiffs' Counsel provided FMA with discs of transaction data produced by Defendants and FMA separated them by Fund and Fund class, as damage

---

[16] Financial Markets Analysis, LLC is a valuation and economic consulting firm. Candace Preston is a founding principal of Financial Markets Analysis, Inc. with over thirty years of experience in the financial community.

calculations were required for each of the nineteen securities.[17]   FMA started with the

share balance held for each Fund class, by account holder, for the month-end prior to the

beginning of each respective class period in order to implement the first in, first out

("FIFO") method of accounting for share retention from purchases made during the class

period.

### F.      Settlement Negotiations and the Proposed Settlement

On December 18, 2012, Lead Plaintiffs' Counsel and consultants from GFA, OFI

representatives, and Defendants' Counsel met in New York City in order to discuss

merits, damages and defenses.   This meeting included the exchange of materials and

presentations by each side.   The meeting was highly productive because it allowed the

Settling Parties to focus on the outstanding issues in an in-person, privileged setting.   The

meeting required both sides to focus on their strengths and weaknesses and narrow the

issues in dispute.

In the Spring of 2013, the Settling Parties retained Judge Phillips for a formal

mediation.   In anticipation of the confidential mediation sessions held on May 6 and 7,

2013 in New York City, the Settling Parties exchanged separate opening and reply

mediation briefs.   These mediation statements covered the strengths and weaknesses of

---

[17] Section 11 damages were computed separately for each class of stock issued by the following Oppenheimer Rochester Municipal Bond Funds during their respective Class Periods: AMT-Free Municipal (Share Classes A, B, and C); AMT-Free New York Municipal (Share Classes A, B, and C); Rochester Fund Municipals (Share Classes A, B, C, and Y); New Jersey Municipal (Share Classes A, B, and C); Pennsylvania Municipal (Share Classes A, B, and C); and Rochester National Municipals (Share Classes A, B, and C).

the claims and were invaluable in presenting each side's views on liability and damages, thus setting the stage for a productive mediation.   However, despite best efforts, no settlement was reached during the two-day mediation.

Subsequent to the mediation the Settling Parties continued to discuss settlement prospects.   Those negotiations were overseen by Judge Phillips.   After a number of months, the Settling Parties did reach an agreement to globally settle the Actions for $89.5 million.   On August 26, 2013, the Settling Parties executed the Memorandum of Understanding.   Thereafter, the Settling Parties negotiated six separate Stipulations of Settlement and the contents of the Notice.   Those settlement documents are submitted herewith.

### G.    The Allocation Mediation

As noted, the Settling Parties agreed to a total settlement sum of $89.5 million to resolve the Actions.   Five of the Actions alleged that the respective Funds at issue had deviated from a stated investment objective that, in one form or another, claimed to be "consistent with preservation of capital."   The sixth action, involving the Rochester National Fund, likewise alleged a deviation from that Fund's stated investment objective – however, that investment objective did not claim to be consistent with preservation of capital, and instead claimed only to invest "in a diversified portfolio of high-yield municipal securities."   Dkt. No. 244; Nat'l Compl. ¶ 2.   This led to a disparity in the relative merits between the Rochester National Fund case and the five substantially similar, if not identical, Capital Preservation cases.

Consequently, Lead Plaintiffs and Lead Plaintiffs' Counsel believed it was prudent to engage wholly-independent counsel to advocate for the proper allocation of funds between the Capital Preservation cases on the one hand and the National Fund case on the other.   In order to remove any potential for conflict (or even the appearance of a conflict), Lead Plaintiffs' Counsel retained the law firms of Klafter Olsen & Lesser LLP ("Klafter") to represent the interests of the National Fund Class, and Barrack Rodos & Bacine ("Barrack") to represent the interests of the Capital Preservation Classes in allocating the settlement amount between the Actions.   Prior to their retention for this purpose, neither firm had any involvement in any of the Actions.   Lead Plaintiffs' Counsel again called upon Judge Phillips to conduct a mediation on the proper allocation. It was agreed that Judge Phillips would decide the proper allocation in a binding arbitration if the mediation was not successful.

On September 15, 2013, following an exchange of opening and reply mediation statements by Klafter and Barrack, Judge Phillips held a mediation solely on the issue of allocation.   After considering all of the evidence and the arguments submitted by allocation counsel, and attempting to mediate the issue, Judge Phillips determined that the combined $89.5 million settlement fund would be allocated as 30% (or $26,850,000) for the benefit of the National Fund Class, and 70% (or $62,650,000) for the benefit of the Capital Preservation Classes.

Once the allocation between the National Fund Class and the Capital Preservation

Classes was complete, Lead Plaintiffs' Counsel was required to further allocate the $62,650,000 earmarked for the five Capital Preservation cases.  Because the five Capital Preservation cases all arose from almost identical claims and make almost identical allegations, the additional step of retaining five separate, additional sets of allocation counsel was unnecessary.  The five Capital Preservation Funds each were managed by the same team of persons, made the same types of investments and required substantially the same limitations on those investments.  Moreover, discovery did not uncover evidence that one Capital Preservation case was materially stronger than any other Capital Preservation case.  The only material difference between the Capital Preservation cases was the size of the respective Funds and the price history at the end of the respective Class Periods, and therefore the amount of recoverable damages.  Therefore, Lead Plaintiffs' Counsel allocated the $62,650,000 on a *pro rata* basis based on FMA's expert analysis of each of the Funds' respective recoverable damages as computed by FMA using identical procedures and methods.

### 1.    The Terms of the Settlement

The Settlement results in the creation of a common fund in the amount of $89.5 million for the benefit of the Classes.[18]  In exchange for this payment by Defendants, the Classes agree to release all claims, alleged or that could be alleged, that arise out of the facts, disclosures, allegations, and losses set forth in the Amended Complaints or at issue

---

[18] This is not a claims-made settlement; if all the conditions of the Stipulations are satisfied, none of the Settlement Fund will be returned to the Defendants.  Stipulations ¶ 16.

in the Actions, as well as claims relating to the prosecution, defense and settlement of the Actions, as against all Released Defendant Parties, which includes Defendants and certain third parties. Stipulations ¶¶ 1(w); (x). The Settlement is expressly conditioned on the entry of several orders by this Court, including orders preliminarily and then finally approving the Settlement and a bar order that applies to contribution and indemnification claims. *See* Stipulations ¶ 23 and 25(c), Exhibit B.

The terms of the Settlement are embodied in the six Stipulations and a supplemental letter agreement concerning the circumstance under which the level of requested exclusions from the Settlement (the "Opt-Out Threshold") could cause Defendants, if they so elect, to terminate the Settlement. Stipulations ¶ 23(d). As is commonly done, the letter agreement is not being filed in order to keep the Opt-Out Threshold confidential and avoid an intentional trigger by a large shareholder. Other than the Opt-Out Threshold, all substantive provisions of the letter agreement are recited in the Stipulations.

## III.   PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE

Federal Rule of Civil Procedure 23(e) requires court approval of all settlements on behalf of a class. To approve a proposed class action settlement: (1) the Court must preliminarily approve the proposed settlement; (2) members of the class must be given notice of the proposed settlement; and (3) a final hearing must be held. Fed. R. Civ. P. 23(e)(1); *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984). After the final hearing, the Court must consider whether the settlement is fair, reasonable and

adequate.  *Id.* at 324.   During this process, the Court "reviews the proposed terms of settlement and makes a preliminary determination on the fairness, reasonableness and adequacy of the settlement terms."  *See Lucas v. Kmart Corp.* 234 F.R.D. 688, 693 (D. Colo. 2006) (Kane, J); *see also In re Initial Public Offering Sec. Litig.*, 226 F.R.D. 186, 191 (S.D.N.Y. 2005) (same).   Once this determination has been made, the Court may issue notice to the proposed Classes.

The decision to approve a settlement is within the sound discretion of the trial court.  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187 (10th Cir. 2002); *Jones*, 741 F.2d 322 at 324.   Judicial policy favors settlements, and therefore the Court should approve a settlement if it is fair and reasonable.  *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 283-84 (D. Colo. 1997).   However, it is not necessary for the court to decide the merits of the underlying action on a motion for preliminary approval. *Lucas*, 234 F.R.D. at 693 (citing *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 284 (D. Colo. 1997)); *Ashley v. Regional Transp. Dist. & Amalgamated Transit Union Div. 1001 Pension Fund Trust*, No. 05-cv-01567-WYD-BNB, 2008 WL 384576, at *2 (D. Colo. Feb. 11, 2008).

The first step in determining whether to grant preliminary approval of a class settlement is for the Court to determine whether the proposed settlement is "within the range of possible approval."  *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007).   In other words, the court must determine whether there is any

reason **not** to notify the Class and proceed to the fairness hearing. *Lucas*, 234 F.R.D. at 693. The ultimate determination as to whether the proposed settlement is fair, reasonable and adequate is done at the final approval stage, which occurs after notice of the settlement has been given to the class members and they have had an opportunity to voice their view of the settlements. *See* 5 James Wm. Moore, Moore's Federal Practice §23.165(3) (3d ed. 2010).

The standards for preliminary approval of a class settlement are not as stringent as those necessary for final approval. *In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 671, 675-76 (D. Kan. 2009). Rather, Rule 23(e) requires the Court to preliminarily approve the settlement and order notice to class members unless the Court's initial examination "disclose[s] grounds to doubt its fairness or other obvious deficiencies." *Id.* At the time of the final approval hearing, the Court will have before it more extensive submissions enabling it to adjudge whether the Settlement should be finally approved.

Here, the proposed Settlement is well "within the range of possible approval." The Tenth Circuit requires courts to consider the following four factors (the "*Jones* factors") before determining that a proposed settlement is fair, reasonable, and adequate:

(1) whether the proposed settlement was fairly and honestly negotiated;

(2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

(3) whether the value of an immediate recovery outweighs the

> mere possibility of future relief after protracted and expensive litigation; and
>
> (4) the judgment of the parties that the settlement is fair and reasonable.

*Jones*, 741 F.2d 322 at 324; *Rutter & Wilbanks Corp*, 314 F.3d at 1188; *McNeely v. Nat'l Mobile Health Care, LLC*, No. CIV 07-933-M, 2008 WL 4816510, at *10 (W.D. Okla. Oct. 27, 2008); *Lucas*, 234 F.R.D. 688 at 693. Because there is no reason to doubt that the proposed Settlement satisfies each of the foregoing factors, the Court should approve it.

### A.       The Proposed Settlement Was the Result of Arm's-Length Negotiations

"[T]he Court may presume the settlement to be fair, adequate, and reasonable" when it is the result of the arm's-length negotiations of experienced counsel. *Lucas*, 234 F.R.D. at 693 (citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005), *cert. denied sub nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005)). The proposed Settlement outlined below is the product of such extensive, arm's-length negotiations between experienced counsel. Importantly, the case has been litigated over the course of four years, during which time the Settling Parties engaged in extensive discovery and substantive briefing. *See Lucas*, 234 F.R.D. at 693. Negotiations between the Settling Parties spanned several months, and were conducted in an informed and, at times, contentious manner. That the Settling Parties were able to reach an agreement, with the guidance of Judge Phillips, a nationally-recognized mediator, indicates that the Settlement is the result of non-collusive and vigorous

advocacy by the Settling Parties. *See Lucas*, 234 F.R.D. at 693 (citing *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 284 (D. Colo. 1997)).

Moreover, the Settling Parties reached the Settlement only after vigorously litigating Defendants' motions to dismiss; briefing class certification; briefing multiple partial summary judgment motions; taking and defending depositions; and reviewing Defendants' production of millions of pages of documents. In sum, the Settlement was fairly and vigorously negotiated at arm's length, with the benefit of substantial discovery. This weighs heavily in favor of approval. *See In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1260 (D. Kan. 2006) (approving settlement reached after parties had briefed class certification and begun discovery); *see also City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F. 3d 1041, 1043 (1st Cir. 1996) ("When sufficient discovery has been provided and the parties have bargained at arms-length, then there is a presumption in favor of the settlement.").

### B.   Serious Questions of Law and Fact Placed the Outcome of the Litigation in Doubt

The Settling Parties have "reasonably conclude[d] that there are serious questions of law and fact that … could significantly impact" the case, and thus, settlement is a favorable alternative to continued litigation. *Lucas*, 234 F.R.D. at 693-94. "The presence of such doubt tips the balance in favor of settlement because settlement creates a certainty of some recovery, and eliminates doubt, meaning the possibility of no recovery after a long and expensive litigation." *McNeely*, 2008 WL 4816510, at *13 (citing *In re Qwest*

*Commc'n Int'l, Inc. Sec. Litig.*, No. 01-cv-01451-REB-CBS, 2006 U.S. Dist. LEXIS 71039, at *16-18 (D. Colo. Sept. 28, 2006)).   There are risks should this matter be litigated further, including: the risk that the Court may not certify the Classes; the risk that the Court may grant Defendants' pending motion for partial summary judgment; the risk that Defendants will prevail on a subsequent motion for summary judgment; and the risks inherent in proceeding to trial against enormously well-resourced and well-represented Defendants.   Thus, it is in the Classes' best interests to settle the claims at this time as the unresolved factual and legal issues could adversely impact the prospect of recovery.

### 1.   Defendants Contest the Claims of Misrepresentation

Defendants argue that Lead Plaintiffs will not be able to prove the Funds were sold and marketed in a manner which misrepresented: (1) the Funds' investment strategies; (2) the true value of the Funds' assets and liabilities; (3) the level of exposure and risks of the Funds' investment in "inverse floaters"; and (4) the liquidity of the Funds' investments. In particular, Defendants argue, *inter alia*, that they had no duty to characterize or quantify the risks in "inverse floaters," and, because Defendants disclosed their investments in them, the Classes were aware of the investments and must bear the risk for at least a portion of the losses attributable to those securities.   *See* Defs.' Joint Mot. to Dismiss (Dkt. Nos. 285 at 39-46; 68-73).   These arguments could resonate with a jury.

### 2.     Defendants Have Viable Loss Causation Defenses

Lead Plaintiffs also face the risk that Defendants' loss causation defenses would be persuasive.  Defendants have maintained that the Funds' NAVs did not decline as a result of omissions or any purported misstatements but was attributable to the world-wide credit crisis of 2008.  *See* Defs.' Joint Mot. to Dismiss (Dkt. No. 285) at 24-29; 75-77.  In that same vein, Defendants argue that the Fund's portfolio managers were in no position to protect the Funds' NAV or shield against the extreme devaluation of the Funds' assets as a result of the 2008 financial crisis.  Defendants also argue that Section 11 damages are not available in a case involving municipal bond funds and at least one court has accepted Defendants' restrictive view of loss causation.  *See In re State Street Bank and Trust Co. Fixed Income Fund Inv. Litig.*, 774 F. Supp. 2d 584 (S.D.N.Y. 2011).  Defendants' loss causation defenses, if accepted, could extinguish Lead Plaintiffs' Section 11 claims or cause a substantial reduction in the amount of recoverable damages at trial.

### 3.     The Amount of Damages Is Vulnerable to Findings that the Class Periods Should Be Shortened

Lead Plaintiffs will also have to confront certain analytical and evidentiary impediments to proving that losses suffered were attributable to false statements throughout the Class Periods, as a jury could find persuasive Defendants' argument that the Class Periods should be shortened.  According to Defendants, class members knew or should have known of the alleged misrepresentations more than a year before filing suit,

as numerous public sources could have informed class members that the Funds' investment strategies were inconsistent with Lead Plaintiffs' interpretation of the Funds' objectives.  *See* Defs.' Joint Mot. to Dismiss (Dkt. No. 285) at 68-73; Defs.' Opp. to Class Certification (Dkt. No 392) at 63-66; 72-76.  If accepted by a jury, this would greatly diminish the Classes' recoverable damages.

### 4.   The Amount of Damages Is Susceptible to Findings that the Funds Did Not Violate Their Investment Policies

As set forth above, damages could be further reduced to the extent that only a *portion* of the damages were linked to inappropriate investments because the Funds were authorized to invest in some amount of the contested investments.  Along these lines, Defendants have argued that the Funds alerted investors to the fact they would hold certain percentages of riskier investments, and that they studiously stayed within the disclosed limits of such holdings (*e.g.*, that the Funds' portfolios would not exceed 15% of illiquid assets).  *See* Defs.' Joint Mot. to Dismiss (Dkt. No. 285) at 56-59.  Although Lead Plaintiffs' expert's analysis determined that the Funds did indeed exceed their percentage limitations by various amounts at various quarters throughout the Class Periods, there exists a significant risk that the trier of fact could find the Funds did not materially violate their investment policies, including with respect to illiquidity.

### 5.   The Amount of Damages Is Susceptible to Findings that the Investment Objectives Contain No Enforceable Risk Limit

Lead Plaintiffs assert that there are material facts tending to demonstrate that Defendants' stated investment strategies actually pursued were materially misleading

given the actual and foreseeable risks posed.  Although Lead Plaintiffs are confident in the likelihood of their success, establishing liability at trial would by no means be guaranteed.

Moreover, the amount of damages is susceptible to findings that the investment objectives contain no enforceable risk limit distinct from the Funds' stated investment limitations.  According to Defendants, Lead Plaintiffs can neither identify an objective threshold between acceptable and excessive Fund risk based on the Funds' stated investment limitations, nor establish that the unprecedented events of the financial crisis were not the catalyst for the Funds' poor performance.  *See* Defs. Joint Mot. to Dismiss (Dkt. No. 285) at 24-29; 34-38.  GFA, Lead Plaintiffs' expert, has carefully reconstructed the spread durations[19] for the Funds during their respective Class Periods, demonstrating the Funds' spread durations were consistently higher than comparable capital preservation funds.  As a result, Lead Plaintiffs are confident in their ability to delineate an enforceable risk limit which demonstrates that Defendants took extraordinary risks in departing from the Funds' stated investment limitations.  However, there is a possibility that a jury could be swayed by Defendants' arguments which could minimize or eliminate Lead Plaintiffs' losses.

> **6.**  **Defendants' and Lead Plaintiffs' Pending Motions Could Be Decided Against the Classes**

---

[19] Spread duration is a key metric that is widely used by fund managers to quantify and monitor the risks of bond holdings.

Pending before this Court is Lead Plaintiffs' motion for class certification.  Lead Plaintiffs believe that the Classes should be certified despite Defendants' attacks that Lead Plaintiffs' claims were not typical or that they were inadequate class representatives.  Lead Plaintiffs are confident their class representatives have satisfied all the prerequisites for class certification.  However, the risk that this motion could be decided against Lead Plaintiffs, in whole or in part, was certainly a factor weighing in favor of settlement.

Also pending before this Court is Defendants' motion for partial summary judgment on the investment objective claims of Lead Plaintiffs Leonard Klorfine, John Vazquez, and Stuart Krosser.  Defendants argued, among other things, that the investment objectives are not actionable because these Lead Plaintiffs knew or should have known that their respective Funds were not pursuing capital preservation objectives. *See* Defs.' Mot. for Partial Summary Judgment (Dkt. No. 390) at 12-29.  Lead Plaintiffs are confident that Defendants misstated their investment objective claims and improperly asked the Court to adjudicate these claims in isolation.  Still, the possibility of an adverse holding on the motion for partial summary judgment cannot be ignored.

### C.    The Value of an Immediate Recovery Outweighs the Possibility of Future Relief after Protracted and Expensive Litigation

As the Court is aware, litigation of a complex securities class action, such as the Actions, often takes years, can become tremendously expensive, and has an uncertain outcome.  In contrast, the proposed settlement amount of $89.5 million provides the class

members here an immediate and guaranteed form of substantial relief. *See Lucas*, 234 F.R.D. at 694. There is an interest in avoiding continuing complex litigation through approval of this Settlement. *Wilkerson*, 171 F.R.D. at 288.

The monetary value of the Settlement must be compared to "the possibility of some greater relief at a later time, taking into account the additional risks and costs that go hand in hand with protracted litigation." *Gottlieb v. Wiles*, 11 F.3d 1004, 1015 (10th Cir. 1993), *abrogated on other grounds by Devlin v. Scardelleti*, 536 U.S. 1 (2002). The settlement amount of $89.5 million is more than reasonable when weighed against continued time-consuming litigation.

To determine whether the proposed Settlement meets the criteria for a fair, reasonable and adequate settlement, the attorneys for the parties must compare "the terms of compromise with the likely rewards of litigation." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424-25 (1968)).

Here, the Lead Plaintiffs believe their claims are meritorious. However, Lead Plaintiffs' Counsel is also aware of the significant risks and expense of further litigation of the Classes' claims against the Defendants including those associated with continued motion practice, a trial, and the likely subsequent appeals. The principal reasons for the Settlement are the cash benefit to be provided to the Classes now, and the elimination of the risk that no greater recovery (and, perhaps, no recovery at all) might be obtained.

Further, Lead Plaintiffs are also aware of the inherent difficulties and delays that are common in complex litigation such as the present Actions.

Lead Plaintiffs propose this Settlement after having weighed the value of an immediate settlement against the prospect of the proceedings that remained ahead including additional fact and expert discovery, *Daubert* motions, trial preparation and the ultimate trial or trials of these Actions in this Court or the transferor Courts.[20]   Lead Plaintiffs have also considered the specific risks at issue in the present Actions.   Given these inherent uncertainties, the Settlement is eminently reasonable and should be preliminarily approved.

## D.   Lead Plaintiffs' Counsel Believe That the Settlement Is Fair and Reasonable

"Counsels' judgment as to the fairness of the agreement is entitled to considerable weight." *Lucas*, 234 F.R.D. at 695 (quoting *Marcus v.  Kansas Dep't of Revenue*, 209 F. Supp. 2d 1179, 1183 (D.  Kan.  2002)); *Wilkerson*, 171 F.R.D. at 288-89.  Here, Lead Plaintiffs' Counsel are all experienced attorneys with extensive securities class action experience and they have determined the proposed Settlement is fair and reasonable.

Moreover, the proposed Settlement of $89.5 million is well within the range of a fair, reasonable and adequate settlement and represents a suitable recovery of the

---

[20]   Because four of the Actions (those involving the New Jersey, AMT-Free NY, Pennsylvania, and Rochester Funds) were transferred to the Court by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407, there was a possibility of returning these cases to four separate transferor districts, the possibility of trials in at least five different courts, and the added risk of inconsistent verdicts and rulings.

damages suffered by the Classes.   Lead Plaintiffs' Counsel has estimated the likely recovery at trial (or trials) and has taken into consideration the various defense arguments that may have been presented to the jury such as absence of loss causation.   After giving consideration to these and other factors, Lead Plaintiffs' Counsel estimates that the proposed Settlement is approximately 4% of Defendants' most generous damages estimate, and is a reasonable result for the Classes compared to the litigation risks.   *See In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 242 & n.22 (3d Cir. 2001) (noting that approved settlement recoveries in securities class actions typically range from 1.6% to 14% of claimed damages); *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving a settlement that was "between approximately 3% and 7% of estimated damages [and] within the range of reasonableness for recovery in the settlement of large securities class actions"); *In re Prudential Securities, Inc. L.P. Litig.*, MDL No. 1005, 1995 WL 798907 (S.D.N.Y. 1995) (approving settlement of between 1.6% and 5% of claimed damages).

From 1996 to 2012, the median settlement for class actions asserting claims under Section 11 or 12(a)(2) of the 1933 Act, but not Section 10(b) of the Exchange Act, was $3.3 million.   Ellen M. Ryan and Laura E. Simmons, *Securities Class Action Settlements: 2012 Review and Analysis,* at 11 (Cornerstone Research 2013).   This is equivalent to the smallest proposed settlement amount outlined here (the recovery to New Jersey Fund Class of $3.3 million).   Further, more than half of securities class actions have settled for

less than $10 million since the passage of the PSLRA.  *Id*. at 5.  Three of the proposed

settlement amounts, the AMT-Free Municipal, the Rochester Fund, and the National

Fund, surpass $10 million.  Indeed, five out of the six proposed settlement amounts far

surpass the median settlement amount, with only the New Jersey Fund settlement amount

coming in at the median amount.

Lead Plaintiffs respectfully request that the Court grant preliminary approval of

the proposed Settlement.  As discussed above, there will be substantial recovery to the

Classes through this Settlement.   Further, the negotiations of this Settlement were

conducted in an arm's-length nature, involved the use of an independent and highly

experienced mediator, and utilized the knowledge of sophisticated counsel throughout the

litigation.  The proposed Settlement is fair, reasonable and adequate and as such, justifies

the dissemination of the Notice to the Classes and the scheduling of the final approval

hearing.

## IV.    CERTIFICATION OF THE CLASSES IS PROPER

The Tenth Circuit recognizes that it is appropriate to decide federal securities

claims through the use of class action litigation.  *Lane*, 2011 WL 395472 at *16 (citing

*Lerner v. Haimsohn*, 126 F.R.D. 64, 65 (D. Colo. 1989); *T.J. Raney & Sons, Inc. v. Fort

Cobb, Okla. Irrigation Fuel Auth.*, 717 F.2d 1330 (10th Cir. 1983)).  The Tenth Circuit

has also stated that when presented with federal securities cases, "in doubtful class

actions certification of the class is to be favored."  *Alvarado Partners, L.P. v. Mehta*, 130

F.R.D. 673, 676 (D. Colo. 1990) (quoting *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968)).

Pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), one of the Court's functions in reviewing a proposed settlement before the putative class has been certified is to determine whether the action may be maintained as a class action. *See, e.g.*, *In re Motor Fuel* at 278; *Lucas*, 2006 U.S. Dist. LEXIS 21521, at *5 (D. Colo. Mar. 22, 2006). Trial courts have "considerable discretion" in making class certification decisions. *DG v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010). The Tenth Circuit defers to a trial court's certification ruling "if it applies the proper Rule 23 standard and its decision falls within the bounds of rationally available choices given the facts and law involved in the matter at hand." *Id.* In the settlement context, courts need not inquire into trial manageability under Rule 23(b)(3)(D). *In re Motor Fuel Sales Practices Litig.*, 271 F.R.D. at 269.

For the sole purpose of settlement, Lead Plaintiffs move the Court to certify six Classes consisting of:

> All persons and entities who purchased or otherwise acquired shares of the Funds during the respective Class Period for each Fund and who were damaged thereby. Excluded from the Classes are Defendants; members of Defendants' immediate families; Defendants' legal representatives, heirs, successors, or assigns; any entity in which Defendants have or had a controlling interest; and Oppenheimer's officers and directors (collectively, "the Excluded Defendant Parties"). Also excluded from the Classes are any proposed Class Members who properly exclude themselves by filing a valid

and timely request for exclusion in accordance with the requirements set forth in the Notice.  Stipulations ¶ 1(c).

"Class Period" means the inclusive period set forth in each of the six Funds' Stipulations ¶ 1(d).

Certification of the Classes pursuant to Rules 23(a) and (b)(3) will further the interests of class members by allowing this litigation to be settled on a class-wide basis. Lead Plaintiffs previously submitted extensive briefing demonstrating that certification is appropriate under Rules 23(a) and (b)(3), and respectfully incorporate the same as if set forth fully herein.  *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification ("Plaintiffs' Class Cert. Motion") (Dkt. No. 379).  Moreover, as demonstrated below, the relevant requirements of Rule 23 are satisfied because: (1) the Classes are so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the Classes; (3) Lead Plaintiffs' claims are typical of the claims of the Classes; and (4) Lead Plaintiffs and Lead Counsel will fairly and adequately represent the interests of the Classes.  Accordingly, the Court should certify these Classes for settlement purposes.

### A.     The Settlement Satisfies Rule 23(a)

### 1.     The Proposed Classes Are Sufficiently Numerous

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  This does not mean that joinder must be impossible, but "... merely [] difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims."  *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 90

(S.D.N.Y. 2009). While there is no particular number that must be met, numerosity can be presumed where there are forty class members or more. *Id.* (citing *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). Here, the data produced by the Defendants indicates there are tens of thousands of members of each Class. Further, the members of each class are dispersed throughout the respective Funds' geographic markets – in the case of the National, Rochester, and AMT-Free Classes, those markets are the entirety of the United States. In the case of the Pennsylvania, New Jersey, and AMT-Free NY Classes, the class members will be, at minimum scattered throughout the relevant state, with many of those class members residing outside the relevant state. Clearly, joinder of the numerous and geographically-dispersed members of the Classes is both impracticable and – in light of the proposed Settlement – unnecessary. Thus, Rule 23(a)(1) is satisfied.

### 2.     There Are Questions of Law and Fact Common to the Classes

Rule 23(a)(2) requires "questions of law or fact that are common to the class." This requirement may be satisfied by "a single issue common to the class." *Clay v. Pelle*, No. 10-CV-01840-WYD-BNB, 2011 WL 843920, at *2-3 (D. Colo. Mar. 8, 2011) (citing *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1288 (10th Cir. 1999)). Lead Plaintiffs are not required to show commonality for each issue raised in the case. *McNeely*, 2008 WL 4816510, at *6; *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir. 1999). Rather, a

single question of law or fact common to the class is sufficient. *Devaughn*, 594 F.3d at

1195. Here, the questions of law and fact common to the Classes include:

> (1)    whether the 1933 Act was violated by the Defendants' acts as alleged;
>
> (2)    whether the statements made to the investing public via the Registration Statements and Prospectuses misrepresented or omitted material facts;
>
> (3)    whether the Funds' investment policies were violated; and
>
> (4)    whether Defendants' acts caused the alleged damages and, if so, the proper measure of those damages.

These issues are typical of the types of issues that are routinely found to satisfy the

"common questions" of law or fact required for the certification of securities class

actions. *See, e.g.*, *Realmonte*, 169 F.3d at 1286 (finding those who bought stock through

different channels were influenced by defendants' deceptions in the same way). Further,

both the Lead Plaintiffs' and other class members' claims arise from the same facts.

Moreover, any absent class members would have to prove identical facts and answer

identical questions if the claims were pursued individually. Accordingly, the

requirements of Rule 23(a)(2) are satisfied.

### 3.    The Claims of Lead Plaintiffs Are Typical

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are

typical of the claims or defenses of the class." Such is the case here. The typicality

requirement ensures that the interests of all members of the Classes are adequately

represented and the interests of all joined parties are aligned. *Lane v. Page*, No. CIV 06-1071 JB/ACT, 2011 WL 395472, at *12 (D. N.M. Jan. 10, 2011). Like the commonality requirement discussed above, factual differences among class members do not preclude a finding of typicality for the class as a whole. The Court should look to whether class members share the same legal theory – their claims need not be identical. *Id.* at *12; *Devaughn*, 594 F.3d at 1198; *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).

In this case, the claims of the class members all arise from the Defendants' alleged omissions and misrepresentations in the Funds' Registration Statements and Prospectuses. These alleged omissions and misrepresentations injured the class members in the same or in a similar manner. The claims of the Lead Plaintiffs are typical of the Classes and as such, the requirements of Rule 23(a)(3) are met.

### 4.     The Lead Plaintiffs Are Adequate Representatives of the Classes

Rule 23(a)(4) requires that "the representative parties … fairly and adequately protect the interests of the class." In the Tenth Circuit, there are two factors the Court must analyze to determine whether the proposed class representatives and their counsel adequately represent the interests of the Classes. First, the Court must consider whether there is any conflict among the class representatives, class counsel, and the absent class members. Second, the Court must consider whether the class representatives and class counsel will prosecute the action on behalf of the Classes vigorously. *Rutter & Wilbanks Corp.*, 314 F.3d at 1187-88; *Lane*, 2011 WL 395472, at *13. This inquiry should focus on whether the Lead Plaintiffs' Counsel is qualified, experienced and able to handle the

litigation.   Further it should also address whether the class representatives have a sufficient interest in the outcome of the action to ensure vigorous advocacy and whether there are any competing interests between the class representatives and the class or counsel.  *See McNeely*, 2008 WL 4816510, at *7; *see also Amchem*, 521 U.S. at 625.

Here, the interests of Lead Plaintiffs, who are the proposed class representatives, are aligned with the interests of the absent class members because the Lead Plaintiffs' claims are for similar remedies under the same legal theories.  In addition, there are no actual or potential conflicts among the Lead Plaintiffs and the Class Members.  Lead Plaintiffs understand their roles and have fulfilled their duties to the Classes.  Finally, the interests of the Lead Plaintiffs and the Class Members in recovering damages are aligned.

Furthermore, Lead Plaintiffs have retained capable and respected counsel who have substantial experience in the arena of complex and class action litigation on behalf of groups of injured investors throughout the United States.[21]  Lead Plaintiffs' Counsel have and will continue to pursue this action vigorously on behalf of the Classes.  Based on the foregoing, Lead Plaintiffs and Lead Plaintiffs' Counsel have and will continue to fairly and adequately represent the interests of the Classes.

### B.    Rule 23(b)(3) Is Satisfied

Pursuant to Rule 23(b)(3), a group may only be certified as a class if "the court

---

[21] *See* Declarations in Support of Plaintiffs' Class Cert. Motion (Dkt Nos. 380, 381, 383) for résumés of Milberg LLP, Cohen Milstein Sellers & Toll PLLC, and Berger & Montague, P.C., respectively.

finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3); *Amchem*, 521 U.S. at 615-16.  Both criteria are met here.

### 1.    Common Questions of Law and Fact Predominate

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members…"  A class is sufficiently similar to allow certification if the individual issues that exist among class members are of a lesser significance than the common issues in the litigation. *McNeely*, 2008 WL 4816510, at \*6; *Amchem*, 521 U.S. at 623.  In securities cases such as this, predominance is a test that is "readily met." *Id.* at 625.  The issues subject to generalized proof by the class predominate over any issues where individualized proof might be necessary. *McNeely*, 2008 WL 4816510, at \*6.  For this reason, among others, securities cases are ideally suited for class treatment under Rule 23(a) and 23(b).  "In general, class actions are favored in securities fraud actions involving numerous plaintiffs." *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 550 (D. Colo. 1998) (Kane, J).  "Courts have long recognized that [c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (quoting *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 240 (S.D.N.Y. 2006)).

Here, common issues plainly predominate over any individual issues, because each case will be proved with reference to Defendants' conduct, which was common to all class members, and affected all class members in the same or a similar manner. For each of the Lead Plaintiffs' claims, the Lead Plaintiffs and class members will prove the central elements of Section 11 and Section 12 through proof that is common to all class members. For claims under Section 11, the central issue is whether the relevant registration statements contained a material misstatement or omission when they became effective. 15 U.S.C. § 77k(a). Under Section 12, the central issue is whether the prospectuses contained "an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(2). Finally, for a Section 15 claim, the key issue is whether certain Defendants exercised actual power or control over primary violators. 15 U.S.C. § 77o. These elements will be proven through common evidence presented by all class members.

It is well settled that these claims do not require plaintiffs to show reliance. *See Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1541 (8th Cir. 1996) ("[a] claim under § 11 does not require proof of reliance, causation, or scienter, but only materiality and damages"); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 582 (1995) (observing that Section 12 imposes liability without "proof of either fraud or reliance"). Similarly, although the members of each Class will be entitled to claim a different amount of damages, the

calculation of that amount is subject to a simple mathematical formula dependent on the quantity and price of shares purchased. This is no impediment to a finding of predominance. *See, e.g.*, *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010) (noting that it is "well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification"); *Espinoza v. 953 Assocs. LLC*, No. 10 Civ. 5517(SAS), 2011 WL 5574895, at *7 (S.D.N.Y. Nov. 16, 2011) ("The focus of the predominance inquiry is on defendants' liability, not on damages.").

### 2.    A Class Action Is a Superior Method of Adjudication

Pursuant to Rule 23(b)(3), the final inquiry is whether a class action is superior to other forms of adjudication. Rule 23(b)(3) instructs the Court to look at four factors in making this determination: (1) the interest of the class members in controlling individual actions; (2) the extent and nature of ongoing litigation; (3) whether it is desirable or not to concentrate the litigation of the claims in a single forum; and (4) the challenges of managing a class action. Fed. R. Civ. P. 23(b); *Amchem*, 521 U.S. at 616; *McNeely*, 2008 WL 4816510, at *9.

In this instance, the superiority prong of Rule 23(b)(3) is satisfied. First, there is little interest on the part of individual class members in pursuing individual litigation of the securities claims against the Defendants because of the expense and complexity of these claims. Further, when the individual recovery is small, class members have little

motivation to pursue individual claims.  *See id.* at *9.  Class actions give litigants, such as those here, a method to pursue the "vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'"  *Amchem*, 521 U.S. at 617 (quoting Rule 23 Advisory Committee Notes).  Further, should any class member wish to not be a part of any Class, he or she would be permitted to opt-out of the action pursuant to Rule 23(c)(2)(B)(v).  *See, e.g.*, *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 168 (C.D. Cal. 2002).

It is also desirable to concentrate the litigation of these claims in this Court.  The Court has already invested significant time sifting through the legal arguments contained in hundreds of pages of briefing on Defendants' motions to dismiss and issuing a comprehensive order.  Certifying the claims of the proposed Classes is the most efficient and, given this Court's familiarity with the facts and law of the case, the most effective way to adjudicate Class Members' claims against Defendants.  Finally, given that Lead Plaintiffs are requesting class certification for purposes of the Settlement, the Court does not need to decide whether the case, if tried, would present difficult management problems.  *Amchem*, 521 U.S. at 620.

## V.   THE PROPOSED FORM AND METHOD OF CLASS NOTICE IS ADEQUATE AND SATISFIES THE REQUIREMENTS OF RULE 23

The Notice Plan allows for a single, uniform notice to be mailed to class members regardless of which Fund they held.  This will mean that class members who purchased

and/or sold more than one of the Funds will receive a single Notice.  Having just one notice covering all the Actions will also reduce the costs of litigation and allow class members to realize more proceeds from the Settlement Fund.  The proposed Notice and Publication Notice, annexed as Exhibits 1 and 4 to the proposed Preliminary Approval Order and Stipulation, respectively, satisfy due process, the federal rules, and the PSLRA.  Rule 23(c)(2) requires the Court to direct to class members "the best notice practicable" under the circumstances, including "individual notice to all members who can be identified through reasonable effort."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 645 (D. Kan. 2008).  "Such notice is essential in order to ensure that class members who desire to pursue their own claims individually have the opportunity to exercise their right to opt out of the class."  *Gottlieb v. Wiles*, 11 F.3d at 1012.  Actual notice is not required.  *In re Motor Fuel*, 258 F.R.D. at 676.

Lead Plaintiffs propose a Notice Plan with multiple components in order to satisfy Rule 23(c).  First, the Notice will be mailed to all identifiable class members.  For class members whose address cannot be identified, the Publication Notice will be posted on a website dedicated to the Settlement, published on *Investor's Business Daily*, and transmitted over a business wire.  *See, e.g.*, *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 945, 947 (10th Cir. 2005); *In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1261 (10th Cir. 2004) (finding that notice by publication

and mail was sufficient).

Pursuant to Rules 23(c)(2)(B) and 23(e)(1), the Notices are clear and comprehensible to class members. *McNeely*, 2008 WL 4816510, at *14; *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. at 175-76. Substantively, the Notices: describe the action and Settlement Classes; describe the claims, issues, and defenses; notify class members of their rights to appear, object, and opt-out; describe the request for attorneys' fees and reimbursement of expenses; and clearly explain the binding nature of the Settlement. (*See generally* Exhibits 1 and 4 to the proposed Preliminary Approval Order); *see also, e.g., Horton v. Leading Edge Mktg.*, No. 04-cv-00212-PSF-CBS, 2007 WL 2472046 (D. Colo. Aug. 28, 2007).

Consistent with the PSLRA, the Notices also explain the basis of recovery under the Settlement, and what actions must be taken to claim any amount due. The information provided will help recipients determine whether they are class members, and if so summarize how payment will be calculated under the Plan of Allocation. The Notices will outline the structure of the Settlement, and explain to class members their opt-out and objection rights and how to obtain more information. Further, the Notices will inform class members that Lead Counsel intend to seek attorneys' fees of up to 30% of the Settlement Fund, in addition to reimbursement of litigation expenses. Lastly, the Notice will explain the Fairness Hearing, and provide class members with the date and location of the hearing.

Plaintiffs propose that the Court appoint Epiq Class Action & Mass Tort Solutions, Inc. ("Epiq" or "Claims Administrator") to carry out the Notice Plan.  Epiq is an experienced settlement and claims administrator.   Individual notices will be mailed to class members who purchased their Fund shares directly from Oppenheimer, and those notices will be accompanied by a detailed Record of Fund Transactions listing the particular Fund shares the Class Member acquired and sold during each respective class period.  In order to receive a distribution, these class members will not be required to complete a Proof of Claim, but will be provided with a means to dispute the Record of Fund Transactions if they choose to do so.

Oppenheimer does not possess name, address and transaction information for class members who purchased their Fund shares from a broker or other intermediary separate from Oppenheimer.  For this subset of the Classes, Epiq will seek the information from third-party brokers identified by Oppenheimer.  These third-party brokers are directed by the proposed Preliminary Approval Order to provide name, address and transaction information to the Claims Administrator.  The Claims Administrator will then mail individual notice and a Record of Fund Transactions to these Class Members, who will not be required to complete a Proof of Claim, but, again, will be allowed to dispute the Record of Fund Transactions they receive.  For those class members for whom the Claims Administrator has been unable to obtain transaction data (or obtains only incomplete transaction data), the Claims Administrator will mail an individual Notice and

a Proof of Claim, which must be completed.

As noted above, the Publication Notice will be published once in *Investor's Business Daily* and transmitted over PRNewswire.

Courts have found that notice structured similarly to that provided for in this Settlement constituted the "best notice practicable under the circumstances." *E.g., In re Qwest Commc'n Int'l., Inc. Sec. Litig.*, 625 F. Supp. 2d 1133, 1137 (D. Colo. 2009); *Ashley v. Regional Transp. Dist. & Amalgamated Transit Union Div. 1001 Pension Fund Trust*, No. 05-cv-01567-WYD-BNB, 2008 WL 384579, at *4 (D. Colo. Feb. 11, 2008) ("the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort if necessary"). This Court previously approved a notice plan substantially equivalent to that provided for in this Settlement in the *Core Bond Fund* and *Champion Income Fund* cases. *See* 09-cv-1186-JLK-KMT at Dkt. No. 98; 09-cv-386-JLK-KMT at Dkt. No. 107. Consistent with the PSLRA, the Notice also satisfies the separate disclosure requirements by, *inter alia*: stating the amount of the Settlement on both an aggregate and average per share basis; providing a brief statement explaining the reasons why the parties are proposing the Settlement; stating the maximum amount of attorney's fees and expenses (both on an aggregate and per share basis) that Lead Plaintiffs' Counsel will seek; and providing the names, addresses, and telephone numbers of representatives of the Claims Administrator and Lead Plaintiffs' Counsel who will be

available to answer questions from Settlement Class Members.  *See* 15 U.S.C. § 77z-1(a)(7).

In short, the Notice Plan is the "best notice practicable" and satisfies the requirements of Rule 23, the PSLRA and due process.  Therefore, the Court should approve the form and manner of notice set forth herein.  *See Consol. Edison, Inc. v. Ne. Utils.*, 332 F. Supp. 2d 639, 652 (S.D.N.Y. 2004) ("'Due process requires that the notice to class members 'fairly apprise the … members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings.'") (citations omitted); *Weinberger*, 698 F.2d at 70.

## VI.    ESTABLISHMENT OF A FINAL APPROVAL AND FAIRNESS HEARING

Before the Court may evaluate and grant final approval to the proposed Settlement, the Court must also set a final approval hearing date, dates for mailing the Notices and printing the Publication Notice, and deadlines for objecting to or seeking exclusion from the Settlement and filing papers in support of the Settlement.  Lead Plaintiffs propose the following schedule for final approval of the Settlement:

| Date | Event |
|---|---|
| Within 5 days of the date Oppenheimer provides the relevant mailing data. | The Claims Administrator sends a letter to the third-party broker-dealer intermediaries. (Preliminary Approval Order ¶ 11) |

| Date | Event |
|------|-------|
| Within 28 days of the date the Claims Administration sends a letter to the broker-dealer intermediaries. | The broker-dealer intermediaries provide the Class Member information. (Preliminary Approval Order ¶ 11) |
| Not later than 56 days after entry of Preliminary Approval Order. | Mail Notices to all Class Members. (Preliminary Approval Order ¶ 10(a)) |
| Not later than 91 days after entry of Preliminary Approval Order. | Lead Counsel shall file initial papers in support of the Settlements and fees. (Preliminary Approval Order ¶ 10(e)) |
| Not later than 112 days after entry of Preliminary Approval Order. | The requests for exclusion and objections from the Classes are due. (Preliminary Approval Order ¶¶ 5, 12 and 14) |
| Not later than 7 days before the Settlement Hearing date. | Lead Counsel files the reply papers in support of the Settlements and fees, if any. (Preliminary Approval Order ¶ 10(e)) |
| On or after 140 days after entry of Preliminary Approval Order. | The Settlement Hearing takes place. (Preliminary Approval Order ¶ 2) |
| Not later than 28 days after the Settlement Hearing. | The Proof of Claim Forms are due. (Preliminary Approval Order ¶ 10(f)) |

This schedule is similar to those used in numerous class action settlements and provides due process to Class Members with respect to their rights concerning the Settlement.

## VII.   CONCLUSION

Based on the foregoing, Lead Plaintiffs respectfully move this Court to grant their unopposed Motion and: (1) preliminarily approve the Settlement; (2) conditionally certify the Classes; (3) approve the form and manner of giving notice of the Settlement to the Classes; (4) set a date for a Fairness Hearing; and (5) enter the proposed Preliminary Approval Order attached.

Dated: March 5, 2014

Respectfully submitted,

s/ Kip B. Shuman
Kip B. Shuman
Rusty E. Glenn
**THE SHUMAN LAW FIRM**
885 Arapahoe Avenue
Boulder, CO 80302
Telephone:  (303) 861-3003
Fax:  (303) 484-4886
kip@shumanlawfirm.com
rusty@shumanlawfirm.com

***Liaison Counsel***

Steven J. Toll
S. Douglas Bunch
Genevieve Fontan
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, NW
Suite 500 West Tower
Washington, D.C. 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com
gfontan@cohenmilstein.com

*Attorneys for Lead Plaintiff Leonard
Klorfine in the AMT-Free Fund
cases, Lead Plaintiffs Stuart and
Carole Krosser in the Rochester
Fund cases, and Lead Counsel for
the Class*

Charles J. Piven
**BROWER PIVEN**
A Professional Corporation
1925 Old Valley Road
Stevenson, Maryland 21153
Telephone: (410) 332-0030
Fax: (410) 685-1300
piven@browerpiven.com

David A.P. Brower
475 Park Avenue South, 33rd Fl.
New York, NY 10016
Telephone: (212) 501-9000
Fax: (212) 501-0300
brower@browerpiven.com

*Additional Counsel for Lead
Plaintiff John Vazquez in the AMT-
Free New York Fund cases and
Lead Plaintiff Dharamvir Bhanot in
the Pennsylvania Fund cases*

Joseph J. Tabacco, Jr.
Nicole C. Lavalle
Matthew D. Pearson
**BERMAN DEVALERIO**

Sanford P. Dumain
Roland W. Riggs
**MILBERG LLP**
One Pennsylvania Plaza
48th Floor
New York, NY 10119
Telephone: (212) 594-5300
Fax: (212) 868-1229
sdumain@milberg.com
rriggs@milberg.com

*Attorneys for Lead Plaintiff John
Vazquez in the AMT-Free New York
Fund cases, Lead Plaintiff Victor Sasson
in the New Jersey Fund cases, Lead
Plaintiff Peter Unanue in the Rochester
National Fund cases, and Lead Counsel
for the Class*

Sherrie R. Savett
Gary E. Cantor
Glen L. Abramson
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604
ssavett@bm.net
gcantor@bm.net
gabramson@bm.net

*Attorneys for Lead Plaintiff Dharamvir
Bhanot and Additional Named Plaintiffs
William E. Miles, Jr. and John P.
Galganovicz in the Pennsylvania Fund
cases and Lead Counsel for the Class*

Howard P. Longman
**STULL, STULL & BRODY LLP**
6 East 45th Street
New York, NY 10017

425 California Street, Suite 2100
San Francisco, CA  94104
Telephone:  (415) 433-3200
Fax:  (415) 433-6382
jtabacco@bermandevalerio.com
nlavalle@bermandevalerio.com
mpearson@bermandevalerio.com

***Additional Counsel for Lead
Plaintiffs Stuart and Carole Krosser
in the Rochester Fund cases***

Gary S. Graifman
**KANTROWITZ GOLDHAMER &
GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Telephone:  (845) 356-2570
Fax: (845) 356-4335
ggraifman@kgglaw.com

***Additional Counsel for Lead Plaintiff
Victor Sasson in the New Jersey Fund
cases***

Telephone:  (212) 687-7230
Fax:  (212) 490-2022
jasondag@ssbny.com

***Additional Counsel for Lead Plaintiff
Victor Sasson in the New Jersey Fund
cases***

Lawrence L. Klayman
Jahan K. Manasseh
**KLAYMAN & TOSKES, P.A.**
2424 North Federal Highway
Suite 450
Boca Raton, FL 33431
Telephone:  (561) 997-9956
Fax:  (561) 361-9178

***Additional Counsel for Lead Plaintiffs
Stuart and Carole Krosser in the
Rochester Fund cases***

## Certificate of Service

I hereby certify that the foregoing was filed with this Court on March 5, 2014 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.


                                        *s/ Rusty E. Glenn*
                                        Rusty E. Glenn