# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge John L. Kane

Master Docket No. **09-md-02063-JLK-KMT** (MDL Docket No. 2063)

## IN RE: OPPENHEIMER ROCHESTER FUNDS GROUP SECURITIES LITIGATION

This filing relates to:     *In re California Municipal Fund*
         09-cv-1484-JLK (*Lowe*)
         09-cv-1485-JLK (*Rivera*)
         09-cv-1486-JLK (*Tackmann*)
         09-cv-1487-JLK (*Milhelm*)

---

## DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' PROPOSED EXPERT WITNESSES

---

Defendants OppenheimerFunds, Inc., OppenheimerFunds Distributor, Inc., Scott Cottier, Ronald H. Fielding, Daniel G. Loughran, John V. Murphy, Troy E. Willis, Brian W. Wixted, Massachusetts Mutual Life Insurance Co., the Oppenheimer California Municipal Fund (the "Fund"), David K. Downes, Matthew P. Fink, Robert G. Galli, Phillip A. Griffiths, Mary F. Miller, Joel W. Motley, Kenneth A. Randall, Russell S. Reynolds, Jr., Joseph M. Wikler, Peter I. Wold, Brian F. Wruble, and Clayton K. Yeutter (collectively, "Defendants") respectfully request that this Court exclude from trial certain of the opinions of Plaintiffs' experts Steven W. Kohlhagen, H. Gifford Fong, and Neil G. Budnick, pursuant to Rule 702 of the Federal Rules of Evidence, for the reasons set forth below.

## CERTIFICATE OF COMPLIANCE WITH D.C.COLO.LCIVR. 7.1(a)

Counsel for Defendants conferred telephonically with counsel for Plaintiffs. Plaintiffs oppose this motion.

## PRELIMINARY STATEMENT

Defendants move to exclude specific opinions offered by three of Plaintiffs' proposed expert witnesses. The testimony at issue—from Messrs. Kohlhagen, Fong, and Budnick—falls so far short of the Rule 702 standard that there are multiple bases for its exclusion.

First, Messrs. Kohlhagen and Fong have opined on the meaning of the "Investment Objective" and other statements in the California Fund's prospectuses. These opinions invade the province of the jury to interpret the language at issue, particularly as it relates to the Investment Objective, which all parties agree is written in plain English and is therefore well within the competence of an average juror. Plaintiffs' "expert" interpretations are unhelpful and should be excluded.

Second, having offered their respective interpretations of this sentence, both Mr. Kohlhagen and Mr. Fong then opine that the Investment Objective and other statements are false and misleading. This is equally improper. Rendering an opinion that a particular statement is "material," "false," "misleading," or otherwise violates the securities laws threatens the Court's role to define the law and usurps entirely the jury's responsibility to apply the law to the facts. Joined together, these opinions amount to a securities fraud trial by expert.

Third, Messrs. Kohlhagen, Fong, and Budnick offer opinions that fail any form of *Daubert*'s reliability test, because they rest almost entirely on the *ipse dixit* of these experts.  Overwhelmingly, Plaintiffs' experts base their opinions, without explanation, on their "experience."  This is insufficient under current law, which requires a reliable basis for expert opinions offered to the jury.  While it is true that two of Plaintiffs' experts offer "tests" to create some methodology related to their opinions—one test offered by Mr. Fong about how the Fund purportedly should have been managed and one unrelated test of credit quality offered by Mr. Budnick—both are tests invented for this litigation. Neither methodology has any historical basis of any kind; neither has been used by any person or entity before; neither is described in any third party writing of any kind; and both are so subjective they cannot be tested or replicated.  Unsurprisingly, the results of these tests (and the resulting opinions) are wholly unreliable.

This motion thus relates to *ipse dixit* opinions of the sort that have time and again been deemed unhelpful and unreliable, and therefore excluded, because they invade the province of the jury and the court.  Defendants request that the Court exclude Plaintiffs' proposed expert testimony that impermissibly (i) relates to the meaning of statements in the Fund's public filings; (ii) contains legal conclusions about public statements being "material," "false," "misleading," or otherwise in violation of the law, or (iii) relies on unsupported, self-generated methodologies (*i.e.* Mr. Fong's capital preservation fund test and Mr. Budnick's five factor credit rating test).[1]

---

[1]    All exhibits cited in this Motion are attached to the Declaration of Michael S. Doluisio In Support of Defendants' Motion to Exclude Opinions of Plaintiffs'

## LEGAL STANDARD

**I.     EXPERTS MUST NOT INFRINGE ON THE ROLE OF THE COURT OR JURY AND MUST SUPPORT THEIR OPINIONS WITH MORE THAN 'SAY SO.'**

Under Rule 702, expert testimony is only appropriate when:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; ***and***

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added).  In short, Rule 702 requires a District Court to "satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *United States v. Rodriguez–Felix,* 450 F.3d 1117, 1122 (10th Cir. 2006); *see also Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590-91 (1993) ("trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").[2] This essential gatekeeper function is sufficiently critical to fair trials that District Courts

---

Proposed Expert Witnesses, dated June 21, 2016.  Such Declaration is submitted herewith as Exhibit A.  Attached as Exhibit 1 is a chart summarizing the opinions Defendants have moved to exclude.  *See* Ex. 1.

[2]     This analysis is particularly important because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert*, 509 U.S. at 595.  This concern impacts the application of other relevant Rules. For example, when "weighing possible prejudice against probative force under Rule 403" the court "exercises more control over experts than over lay witnesses." *Id.*

must support their Rule 702 rulings with findings that are specific enough to allow for appellate review. *Adamscheck v. Am. Family Mut. Ins. Co.,* 818 F.3d 576, 586-87 (10th Cir. 2016). As the proponent of the expert testimony at issue, Plaintiffs bear the burden of proving that their proffered testimony is admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

> **A.   Experts Must Assist the Trier of Fact and Not Infringe on the Role of the Court or Jury.**

"Rule 702 . . . dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991). The 1972 Rules Committee explained:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

Fed. R. Evid. 702 advisory committee's note to 1972 amendment (quoting Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 418 (1952) (quotation marks omitted)).

Matters within the knowledge of the average person (like reading and interpreting a sentence) are not the subject of proper expert testimony. Indeed, in securities fraud cases like this one, courts have warned that "*[i]t does not take any special competence, for example, to read pertinent public documents (e.g. prospectuses, press releases, and recorded statements) to determine whether certain risks were conveyed to the public*." *In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1188 (D. Nev. 1999) (citing *In*

*re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989) (emphasis added)).

Proper expert testimony in securities cases, therefore, must relate to more complex

matters.  "Federal courts have admitted expert testimony to assist the trier of fact in

understanding trading patterns, securities industry regulations, and complicated terms and

concepts inherent in the practice of the securities industry."  *Highland Capital Mgmt.*

*L.P. v. Schneider*, 551 F. Supp. 2d 173, 178 (S.D.N.Y. 2001).  *Cf. Cook v. Rockwell Int'l*

*Corp.*, 580 F. Supp. 2d 1071, 1149-50 (D. Colo. 2006) (admitting expert testimony

regarding "safety and operating practices at a nuclear production facility" because they

were "highly specialized matters not within the province of an ordinary juror").

Consequently, experts offered to interpret language are frequently barred from

testifying unless the proffering party shows that the relevant language is a term of art or

in code.  *See Valley View Dev., Inc. v. United States ex rel. U.S. Army Corps of*

*Engineers*, 721 F. Supp. 2d 1024, 1048 (N.D. Okla. 2010) (quoting *N. Am. Specialty Ins.*

*Co. v. Myers,* 111 F.3d 1273, 1281 (6th Cir. 1997) ("Absent any need to clarify or define

terms of art, science, or trade, expert opinion testimony to interpret contract language is

inadmissible.")).  Admission of expert testimony regarding the meaning of a statutory

regulation "written in straightforward language," for example, was held to be an abuse of

discretion where "nothing about the regulation suggest[ed] explanation by an expert was

required."  *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.,* 582 F.3d 1131,

1150-51 (10th Cir. 2009) (also noting such testimony displaced the court). Similarly,

expert testimony interpreting and applying contractual language governing allegedly

"material" or "adverse" conduct has been excluded.  This is because

> The meanings of these words are straightforward and well known: "material" means important or significant and "adverse" means unfavorable. No evidence has been offered that these are terms of art in the financial services industry or that they have meanings in that industry that are different from their ordinary meanings. Accordingly, there is no need for expert testimony as to their meanings.

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08-cv-8426, 2012 WL 466785, at *10 (S.D.N.Y. Feb. 14, 2012). This protection of the role of the jury to interpret language that is in plain English holds across a wide range of contexts. *See*, *e.g.*, *United States v. Gibbs*, 190 F.3d 188, 211-12 (3d Cir. 1999) ("[G]overnment agents may testify to the meaning of coded language" but not language that "contains no intrinsic code that a jury would be unable to understand").

Rule 702 protects not only the province of the jury, but also that of the court. As the Tenth Circuit has explained: "Generally, an expert may not state his or her opinion as to legal standards, nor may he or she state legal conclusions drawn by applying the law to the facts." *Okland Oil Co. v. Conoco Inc.,* 144 F.3d 1308, 1328 (10th Cir. 1998); *see also Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) (testimony improper when directing "the jury's understanding of the legal standards"). Numerous cases reflect the distinction between proper expert testimony about issues of fact and improper expert testimony that applies the facts to the law. For example:

> Dr. Benbrook's opinions that Wesson Oil products are not natural go only to the ultimate issue of fact, and are therefore admissible. The same cannot be said, however, regarding his opinion that ConAgra "falsely and deceptively labeled" its products. "False" and "deceptive" are judicially defined terms. Accordingly, his use of these terms constitutes the offering of an improper legal opinion that usurps the role of the court.

*In re ConAgra Foods, Inc.,* 302 F.R.D. 537, 558 (C.D. Cal. 2014); *see also Liberty Media Corp. v. Vivendi Universal, S.A.*, 874 F. Supp. 2d 169, 174 (S.D.N.Y. 2012) (deeming "problematic . . . opinions concerning disclosure requirements and the adequacy of . . . disclosures" and permitting expert to testify about "what circumstances he considers material in evaluating [liquidity] and the jury will evaluate whether the events were indeed material and whether [the] disclosures were adequate."); *Highland Capital Mgmt.*, 551 F. Supp. 2d at 179 ("expert cannot give testimony stating ultimate legal conclusions . . . nor can that testimony track the language of the statute or the law that the defendants are accused of violating."); *Highland Capital Mgmt. L.P. v. Schneider*, 379 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) (excluding expert opinions including "material, non-public" nature of information and noting "[t]here is no reason why a jury in this case could not apply the law to the facts it finds to determine whether there has been a violation of the securities laws").

In short, Rule 702 permits only expert testimony that is *helpful* to the jury in fulfilling *its* function, not testimony that usurps its prerogative or that of the trial court.  It does not permit a party to supplant a jury's common-sense analysis of everyday issues with that of an expert of their choosing.  It also does not permit a party to put forward expert testimony applying the law to the facts, thereby cloaking its preferred verdict with the aura of expert testimony.  Courts have consistently held that such unhelpful "expert" testimony should be excluded.

### B.      Experts Must Support Their Testimony With Something More Than *Ipse Dixit*.

Proper expert testimony must also bear basic indicia of reliability. *Daubert* and its progeny require that the court ensure that expert testimony—scientific or otherwise—is "not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999). While this standard is flexible, the court must still "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[3] *Id.* at 152. *Daubert* noted several possible indicia of reliability that could be appropriate in a given case, including whether a theory has been (i) tested (or can be tested); (ii) subjected to peer review; and/or (iii) accepted by a relevant scientific community. *Daubert*, 509 U.S. at 592-94.

In extending *Daubert* to non-scientific testimony, *Kumho Tire* made clear that experience-based testimony still must be evaluated for reliability. *Kumho Tire*, 526 U.S. at 151 (proper to ask "a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable"). Where a witness relies

---

[3]      For this reason, courts have been more skeptical of opinions (like those at issue here) that have been developed for the first time as litigation offerings. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) ("One very significant fact is whether the expert has developed his opinions expressly for the purposes of testifying . . . ."). Certainly, none of the opinions here have been offered on the basis that they are as intellectually rigorous as any pre-existing expert analysis, nor have they been defended on the ground that they would be accepted by any recognized community of experts.

"solely or primarily on experience," the expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Fredette,* 315 F.3d 1235, 1240 (10th Cir. 2006) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). "[I]t is now clear that [expert] opinions are no longer admissible simply by showing that someone is well-educated or experienced in a given area and that he/she has drawn some conclusions about issues in the case. It does not suffice for an expert to say, in effect, 'trust me, I know.'" *Threet v. Correctional Health Care Mgmt. of Okla.*, No. 07-cv-0943, 2009 WL 3335596, at *4 (W.D. Okla. Oct. 15, 2009) (quoting *Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). To do otherwise would conflate the evaluation of an expert's qualifications with the evaluation of reliability. Rule 702 requires experts to provide more than their *curriculum vitae* and a promise in support of their testimony.

## ARGUMENT

Three of Plaintiffs' proposed experts have offered a variety of opinions that fall far short of satisfying Rule 702. Specifically, their proposed testimony violates fundamental limits on appropriate expert testimony in three ways: (i) two of the experts offer opinions on the meaning of statements in a prospectus that are written in plain English; (ii) these same two experts improperly seek to apply the facts to the law by opining that under their interpretation of the prospectus certain statements are "material," "false," or "misleading"; and (iii) all three offer opinions that lack any reliable support whatsoever—including any reasoned connection between the expert's experience and his

opinions.  For the reasons explained below, these opinions are outside the scope of proper

expert testimony and should be excluded.

## I.     MR. KOHLHAGEN'S PROPOSED TESTIMONY IS INAPPROPRIATE, UNSUPPORTED SECURITIES-FRAUD-BY-EXPERT AND MUST BE EXCLUDED.

Mr. Kohlhagen's[4] efforts to define the Fund's Investment Objective and then deem

that definition (and other portions of the prospectus) "material," "false," or "misleading"

are categorically inappropriate.  Each opinion standing alone violates Rule 702.  Taken

together, these opinions constitute securities-fraud-by-expert.  Nor is Mr. Kohlhagen shy

about this approach.  Paragraph 1 of his report states that he is opining on "*how a*

*reasonable investor would interpret the Fund's public filings*."  Ex. 2, Kohlhagen Rep. at

1.  These opinions are based upon nothing but cursory references to his experience, are

speculative and unreliable, and invade the province of the court and jury.  His opinion

that the Investment Objective is the "single most important piece of information" for a

reasonable investor similarly rests on no support other than his say-so.  All of these

opinions should be excluded.

---

[4]     Mr. Kohlhagen has retired from a career on Wall Street, which included working for many institutions that failed at various points in the global credit crisis.  Ex. 2, Kohlhagen Rep. Ex. A (listing employment at AIG Financial Products and Lehman Brothers, among others).  Although he denies that his compensation is contingent on Plaintiffs' success on the merits, he has offered his analysis and testimony without any payment whatsoever to date, agreeing to defer any compensation until the case is finally resolved.  Ex. 3, Kohlhagen Dep. at 29:17-32:4.

### A.    Mr. Kohlhagen's Testimony Regarding the Meaning of the Investment Objective Must be Excluded as Unhelpful, Unsubstantiated, and Unreliable.

The first opinion set forth in Mr. Kohlhagen's report relates to the meaning of the Fund's Investment Objective.  *See* Ex. 2, Kohlhagen Rep. at 4-5.  The Fund's Investment Objective states that the Fund "seeks as high a level of current interest income exempt from federal and California income taxes for individual investors as is consistent with preservation of capital."  *Id.* (citing prospectuses).  Mr. Kohlhagen has opined that this sentence constitutes a "preservation of capital objective," which "embod[ies] a highly conservative approach to investing shareholder funds."  *Id.*; *see also* Ex. 3, Kohlhagen Dep. at 138:13-139:1.  His opinion about the meaning of the Investment Objective is unnecessary and unhelpful.  It should be excluded.

Mr. Kohlhagen correctly noted at his deposition that "the SEC requires the investment objective . . . be in plain English.  And I think that this investment objective is in plain English."  Ex. 3, Kohlhagen Dep. at 122:10-14; *see also id.* at 138:1-2 ("it's in plain English").  Consequently, there is no reason to doubt the jury's ability to review and interpret the Investment Objective in context, *i.e.*, in connection with the prospectus as a whole.  *See U.S. Aviation Underwriters, Inc.*, 582 F.3d at 1150-51 (abuse of discretion to admit expert testimony to explain meaning of FAA regulation "written in straightforward language" stating it "must be possible to restart an engine in flight"); *Stratosphere*, 66 F. Supp. 2d at 1188 ("It does not take any special competence . . . to read pertinent public documents (e.g., prospectuses . . .) to determine whether certain risks were conveyed to the public.").  *Cf. Bright v. Ohio Nat'l Life Assurance Corp.*, C.A. No. 11-CV-475, 2013

WL 121479, at *2 (N.D. Okla. Jan. 9, 2013) ("If only practical wisdom is needed to understand the industry standard, the jury needs no assistance from an expert."). Therefore, for this reason alone, Mr. Kohlhagen's opinion should be excluded.

But this opinion is also unsupported by anything other than Mr. Kohlhagen's say-so. He offers nothing in support of his overall interpretation of the Investment Objective in context. When referring to one term in the objective, *i.e.*, "preservation of capital," he cites only to Investopedia, which is a freely available investor education website. Ex. 2, Kohlhagen Rep. at 4-5. But recitation of one definition available from a Google search hardly constitutes a methodology reflecting the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *see also Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 948 (N.D. Cal. 2010) (rejecting expert testimony defining "marriage" supported only by "the quotations of others" and without "explanation of the methodology that led him to his definition . . ." as unhelpful and *ipse dixit*). Thus, in sum: (i) on its face, there is nothing about the admittedly plain English language used in the Investment Objective that requires expert testimony and (ii) Mr. Kohlhagen has not offered anything comprising a reliable or intellectually rigorous opinion about its meaning.

The lack of rigor and reliability of Mr. Kohlhagen's testimony is underscored by his repeated admissions that his proffered definition of the Investment Objective cannot be objectively tested.[5]   Indeed, he believes that the meaning of the Investment Objective

---

[5]      At the class certification hearing, Mr. Kohlhagen testified that the Investment Objective is a "promise that [investors are] not likely to lose their money." Ex. 4,

is inherently subjective, based on the personal views of the reader.  *See* Ex. 4, Class Certification Tr. at 81:25-82:19; Ex. 3, Kohlhagen Dep. at 141:4-24 ("I don't think there is a way to measure ex ante.").  Finally, it is also noteworthy that this opinion is devoid of any connection to his prior experience, as the Tenth Circuit requires. *Fredette,* 315 F.3d at 1240; *see also* Ex. 3, Kohlhagen Dep. at 122:23-123:7 (could not identify another person who agreed with his interpretation).

**B.**     **Mr. Kohlhagen's Opinions that the Investment Objective and Other Disclosures are "Material," "False," or "Misleading" Are Improper.**

Mr. Kohlhagen's report describes the opinions Plaintiffs' counsel asked him to render.  The first of these is to opine "whether [the Prospectuses and other offering documents] included misstatements or omissions of material facts. . . . and whether the alleged misstatements or omissions of fact would have been material to an reasonable investor."  Ex. 2, Kohlhagen Rep. at 1. To fulfill this mission, Mr. Kohlhagen offers a report littered with legal conclusions along these lines, including his opinion that the Investment Objective itself is misleading.[6]

---

Class Certification Tr. at 80:2-3.  But he also agreed that there is no possible objective test of his "not likely" standard and that the way to address this inherently subjective approach would be to gather a group of experts to have them debate their views.  *See id.* at 82:4-6 ("How do we measure that?  A:  I think you can't.  That's why it's called an opinion rather than a fact.").  *Cf.*  Fed. R. Evid. 702 advisory committee's note to 2000 amendment (when an expert "reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied").

[6]     *See, e.g.*, Ex. 2, Kohlhagen Rep. at 18 ("Additional Misrepresentations and Omissions Regarding the Fund's Excessively Risky Investment Strategies"); *id.* at 25 ("The Prospectuses thus misleadingly suggested that . . .").  His deposition

All of Mr. Kohlhagen's conclusions regarding claimed "material," "false," or "misleading" statements suffer from at least two flaws.  First, they impermissibly require application of the facts to the law, usurping the role of the jury.  *See, e.g., United States v. Scop*, 846 F.2d 135, 140-42 (2d Cir. 1988) (excluding expert testimony regarding "manipulation," "scheme to defraud," and "fraud" as legal conclusions that "drew directly upon the language of the statute"); *Liberty Media Corp.*, 874 F. Supp. 2d at 174 (excluding "problematic . . . opinions concerning disclosure requirements and the adequacy of  . . . disclosures"); *Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.,* No. 12-cv-7264, 2013 WL 978980, at *7 (S.D.N.Y. Mar. 12, 2013) (excluding opinions that (i) offered "legal conclusions" and (ii) a given statement was "intentionally misleading").  Mr. Kohlhagen's opinions regarding "materiality," [7] for example, invoke a well-established definition under the securities laws.  *See TSC Indus., Inc. v. Northway,*

---

contains similar references.  *See, e.g.*, Ex. 3, Kohlhagen Dep. at 133:3-5 ("Yes, by the time of the class period, the investment objective is misleading.").

[7]  Where experts in securities fraud cases have offered opinions regarding "materiality," it has been on the basis of empirical analysis illustrating the importance of the statement at issue (*e.g.*, an event study reflecting impact on stock price of a given misstatement or omission) or supplying specialized information as a basis for *the jury* to determine what is material.  An event study, of course, is an analysis outside the understanding of the ordinary juror, and therefore is of aid to the jury in determining whether a securities fraud plaintiff has properly pled her claim.  *Compare Miller v. Thane Int'l, Inc.,* No. 03-cv-1031, 2005 WL 5957833, at *6 (C.D. Cal. Mar. 3, 2005) (permitting expert testimony that misrepresentation was material because of stock price decline) *with Liberty Media Corp.*, 874 F. Supp. 2d at 174 (expert may offer "an opinion on what circumstances he considers material in evaluating liquidity and the jury will evaluate whether the events were indeed material").  Mr. Kohlhagen did no study of any kind regarding his materiality opinion (or any other opinion).

*Inc.*, 426 U.S. 438, 449 (1976) (fact material if it would be "viewed by the reasonable investor as having significantly altered the 'total mix' of information" available). It is the function of the court to instruct the jury on this legal definition of materiality. And it is the function of the jury to decide what is, or is not, material under that standard. By offering legal opinions in language that tracks the relevant statute, Mr. Kohlhagen has impermissibly usurped the role of the court and jury.

Second, there can be no actionable misrepresentation or omission under the securities laws unless the statement at issue is false or misleading in the context of the prospectus as a whole. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015) ("An investor reads each statement . . . in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information"). As such, any evaluation of whether a misrepresentation exists inherently turns on interpretation of the prospectus in its entirety. Mr. Kohlhagen's testimony is filled with his explicit and implicit conclusions about what the prospectus means to a "reasonable investor," but is devoid of any basis for his conclusions. *See, e.g.*, Ex. 2, Kohlhagen Rep. at 1 ("I have also been asked to explain and render opinions . . . on what a reasonable investor would conclude from reading the Fund's offering materials . . . ."). His interpretation of the prospectus is founded on nothing beyond his experience—and he fails even to offer an explanation of how that experience supports his interpretations of the prospectus. *See Fredette,* 315 F.3d at 1240 (expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). And perhaps more

importantly, there is no suggestion that the prospectus language could not be interpreted by the jury, no analysis of any particular technical terms, and no examples of industry practice offered on any of these points. Instead, Mr. Kohlhagen impermissibly offers only his own conclusions. For these reasons, Mr. Kohlhagen's opinions that statements in the prospectus are materially false and misleading should be excluded.

### C. Mr. Kohlhagen's Testimony Regarding the Importance of the Investment Objective to Investors Is *Ipse Dixit* and Should Be Excluded.

Mr. Kohlhagen has also opined that a "reasonable investor would consider the Investment Objective the single most important piece of information about the Fund's investment strategy and attendant risks of investing in the Fund." Ex. 2, Kohlhagen Rep. at 5. This opinion is supported by no citation or analysis. *Id.* At his deposition, Mr. Kohlhagen was unable to identify a "single human being who said that the investment objective [is] the most important thing to investors in mutual funds." *See* Ex. 3, Kohlhagen Dep. at 158:7-159-14. The only basis for his opinion otherwise was his "industry experience." *Id.* at 159:13-14. An oblique reference to Mr. Kohlhagen's industry experience is not sufficient to support this testimony or make it helpful to the jury. *Threet*, 2009 WL 3335596, at *4 (W.D. Okla. Oct. 15, 2009) ("[Expert] opinions are no longer admissible simply by showing that someone is well-educated or experienced in a given area and that he/she has drawn some conclusions about issues in the case. It does not suffice for an expert to say, in effect, 'trust me, I know.'"). And, Mr. Kohlhagen's inability to proffer a single example of industry practice or investor behavior to support his assertion of "importance," in this or any other situation, further

supports exclusion. *Davis v. Carroll*, 937 F. Supp. 2d 390, 419 (S.D.N.Y. 2013) (excluding testimony of expert who could not "muster even one example of business being conducted" as described). Mr. Kohlhagen's opinion about the importance of the Investment Objective is pure *ipse dixit,* and should be excluded.

## II. MR. FONG'S OPINIONS SIMILARLY FAIL AS UNHELPFUL *IPSE DIXIT*

### A. Mr. Fong's Opinions About the Meaning of the Investment Objective and Legal Conclusions Should be Rejected for the Same Reasons as Mr. Kohlhagen's Opinions.

Mr. Fong has proffered opinions similar to Mr. Kohlhagen's efforts to define the Investment Objective and thereafter deem it (and other disclosures) false and misleading.[8] These are equally problematic, for similar reasons, and should be excluded.

Mr. Fong's opinion that the Investment Objective "presented the Fund as relatively conservative" is not based on any greater expert analysis than Mr. Kohlhagen's interpretation. Mr. Fong relies on a single citation to an SEC administrative opinion (rather than Investopedia). Ex. 5, Fong Rep. § 6.2 at 8.[9] But citation to an administrative

---

[8]     *See, e.g.*, Ex. 5, Fong Rep. § 1 ("I have been retained . . . to render opinions . . . [including] whether there are material misrepresentations and/or omissions of information . . . [and] whether [certain] aspects of the Fund's investing were . . . adequately discussed and disclosed"); *id.* § 6.2 ("Statement and Meaning of the Capital Preservation Objective"); *id.* § 6.3 ("The Fund Did Not Invest in the Manner Described by Its Investment Objective"); *id.* § 7.1 ("the representations in the Prospectuses . . . were inaccurate and misleading"); Ex. 6, Fong Dep. at 77:5-13 (discussing whether representations were deceptive or misleading). *See* Ex. 1.

[9]     Mr. Fong's misleading suggestion that his experience as a witness in that case is somehow relevant here ignores that he served *as a fact witness* in that case on an issue unrelated to the meaning of the investment objective. Ex. 6, Fong Dep. at

ruling by a regulator involving a different fund and different facts does not create a basis

for a helpful expert opinion on the meaning of a plain English sentence.  Nor does Mr.

Fong claim that the jury is incompetent to interpret the relevant language.  And to the

extent Mr. Fong is making a precedential point, it is for the trial court, not an expert, to

define the relevant legal standards.  *Okland*, 144 F.3d at 1308.  Like Mr. Kohlhagen, Mr.

Fong failed to provide any expert analysis, let alone rigorous intellectual support, for his

opinion about the meaning of the Investment Objective.  As such, it should be excluded.

Also like Mr. Kohlhagen, the absence of any reliable basis for Mr. Fong's

definition of the Investment Objective is underscored by the shifting definition he has

offered over the course of this litigation.  In his report, Mr. Fong opined that the "capital

preservation" portion of the Investment Objective meant that the fund "would seek to

generate income by limiting the use of its various investment strategies such that the

portfolio value would be protected."  Ex. 5, Fong. Rep. § 6.2 at 7.  His report is devoid of

any suggestion that the Investment Objective requires the Fund to be managed like any

other fund or group of funds.  But, at his deposition, Mr. Fong opined that the Investment

---

70:17-25.  Remarkably, at his deposition, Mr. Fong struggled to even recall his role in that case:

> Q:  Tell me about Piper Jaffray?  You said you were a fact witness. What were you testifying about?
>
> A:  I believe – unfortunately this goes back, I think, something like ten years ago.  I believe I was testifying with respect of the availability of risk management tools.

*Id.* at 70:19-23.

Objective "represents that the Fund will have a certain level of risk that's relatively lower than other California municipal bond funds" and consistently maintained that the Fund's Investment Objective only had meaning as compared to other funds. Ex. 6, Fong Dep. at 91:8-13. If Mr. Fong's disclosed opinions had been grounded in expert analysis that could be tested, and if they had been rendered in some context other than this litigation, he could not have shifted his articulations or standards so materially. The jury will not be helped by opinions that merely tell them what to conclude.

Mr. Fong's problematic legal conclusions also extend far beyond the Investment Objective. [10] These are pervasive throughout his report[11] and include his opinions that the Fund's inverse floater and industry concentration disclosures were false or misleading. These are categorically inappropriate, and should be excluded. *See, e.g.*, *Okland*, 144

---

[10]  Mr. Fong's deposition testimony related to the falsity or misleading nature of the disclosures was, at best, unclear. *See* Ex. 6, Fong Dep. at 78:7-19 (stating "I cannot answer it yes or no" when asked if he was "opining that these disclosures were misleading to a reasonable investor").

[11]  *See, e.g.*, Ex. 5, Fong Rep. § 7.1 ("Because essential internal controls were lacking, the representations in the Prospectuses that the Fund would seek as high a level of current income as was *consistent with the preservation of capital* were inaccurate and misleading."); *id.* § 7.4 ("Representations about the Fund's Lipper Category, Benchmarks, and Performance Were False and Misleading"); *id.* § 8.4 ("Credit Profile Tables . . . were Misleading"); *id.* § 8.6 (statement related to credit risk "was inadequate and misleading")'; *id.* § 9.1 ("Oppenheimer was misrepresenting the Fund's concentration policy . . ."); *id.* § 9.2 (the Fund "failed to disclose that it held substantially greater than 25%" of assets in allegedly similar risks); *id.* § 9.4.2 ("The Fund Failed to Disclose the Changes for Two Years"); *id.* § 10.1 ("magnitude and nature of the risks [related to inverse floaters] . . . were either not disclosed or were affirmatively misstated"); *id.* § 10.5 ("Additional Undisclosed Material Facts Regarding Inverse Floaters"); *see also* Ex. 1.

F.3d at 1308; *Scop*, 846 F.2d at 140-42.  For all of the same reasons Mr. Kohlhagen's

securities-fraud-by-expert opinions should be excluded, *see supra* §§ I.A-B, Mr. Fong's

should be as well.

### B. Mr. Fong's Proposed Methodology for Evaluating a Capital Preservation Fund Lacks Any Support Whatsoever.

Mr. Fong devoted a significant portion of his report to evaluating whether the

Fund met his own definition of the "capital preservation investment objective."  To do so,

Mr. Fong created and applied a three-part test to evaluate whether a fund is "seeking to

meet a capital preservation objective."  Ex. 5, Fong. Rep. § 6.3.1 at 11.  This test includes

Mr. Fong's mandates that the Fund "limit duration," "diversify the investment assets,"

and "avoid excessive leverage."  *Id.*  Mr. Fong used this test to conclude that the Fund did

not "invest in the manner described" by the Investment Objective.  *Id.* § 6.3.

Mr. Fong's three-part test for whether a fund is "meet[ing]" a capital preservation

objective is made up out of whole cloth.  The relevant portion of his report contains no

supporting citations whatsoever.  Ex. 5, Fong Rep. § 6.3.1, at 11-12.  And, at his

deposition, Mr. Fong defended his test only by asserting that it was based upon "my

understanding and experience" and his view that this was "common knowledge and

accepted understanding."  Ex. 6, Fong Dep. at 106:25-107:9.  Yet at no point has Mr.

Fong offered any support for the existence of this supposed common knowledge or any

precedent of any kind for application of his test.  Consequently, this test lacks any of the

indicia of reliability the *Daubert* court required —prior testing, peer review, or some

form of common acceptance.  *Daubert*, 509 U.S. at 593-94.  Not surprisingly, this Court

has previously excluded expert opinions along these lines, based upon methodologies supported by nothing other than the expert's assurances.  *See Cook*, 580 F. Supp.2d at 1159 (excluding expert testimony based upon "'evaluation of five indicators'" where "neither [expert] nor Defendants provide[d] any support, other than [the expert's] assurance, for this statement").  Such a "methodology" cannot sustain expert testimony.  Indeed, allowing this testimony would merely serve to compound the threshold problems inherent in Mr. Fong offering his own definition of the Investment Objective:  Mr. Fong now seeks to apply a test of his own making to a definition of his own making.  Mr. Fong's opinion regarding whether the Fund met his definition of a capital preservation objective should be excluded.

## III.   MR. BUDNICK'S FIVE PART CREDIT RATING TEST LACKS ANY FOUNDATION AND SHOULD BE EXCLUDED.

Mr. Budnick has opined that 92% of the special tax and special assessment bonds held by the Fund would "not have been rated investment grade by the Rating Agencies." Ex. 7, Budnick Rep. at 25.  But Mr. Budnick has reached this opinion using a methodology that he created and that has never been used by any rating agency.  He acknowledges as much.  *Id.* at 22 ("It should be noted that this process is not the process used by the Rating Agencies to rate a bond.").  Indeed, this test was specifically created by Mr. Budnick himself for purposes of this case and has never been used by anybody outside of this litigation. His use of a methodology *never relied upon by anyone*—let alone a rating agency—renders his opinion about how a rating agency would have behaved inherently unreliable.

Mr. Budnick created his five part test by selecting five of the factors that Standard & Poor's uses to rate special tax and special assessment bonds. Ex. 8, Budnick Dep. at 175:2-21. Mr. Budnick disregarded—for no apparent reason—the dozens of other factors Standard & Poor's uses, and completely ignored the different methodologies that Moody's and Fitch uses. *See, e.g.*, *id.* at 176:17-20 ("Fitch didn't have any influence").[12]

Mr. Budnick's application of his self-generated test was equally flawed. As he described it, there was no "magic" to the five part test he created—meaning there was "no specific number of these five tests that a bond had to pass in order to be investment grade." Ex. 8, Budnick Dep. at 174:11-15. As such, Mr. Budnick's test generated inconsistent results. For example, he rated as investment grade one bond that failed four of the five tests. *Id.* at 196:2-197:4.[13] Mr. Budnick's rationale for such inconsistencies was that he was using his judgment, even though he could provide no basis for that judgment. *See* Budnick Dep. at 198:10-22; *id.* at 167:22-170:4 (discussing role of judgment in analysis). Mr. Budnick also improperly applied the same test to all of the bonds in the Fund's portfolio without regard for the important differences between special tax and special assessment bonds. *Compare* Ex. 8, Budnick Dep. at 163:22-164:2 (applied the same test to all bonds) *with* Ex. 9, S&P Rating Criteria (cited in Budnick

---

[12]    The Standard & Poor's approach is outlined in a fifteen-page document that describes a much broader set of criteria and emphasizes the judgments that need to be made in rating bonds. *See* Ex. 9 (cited in Budnick Rep. at 11 n.15).

[13]    Exhibit B to Mr. Budnick's report reveals additional inconsistencies. For example, two bonds that failed three of his five tests were rated investment and non-investment grade, respectively. Ex. 7, Budnick Rep. Ex. B (compare rows 340 and 359).

Rep. at 11 n.15; applying different analyses for special assessment bonds versus special tax bonds).

Not surprisingly (because Mr. Budnick created this test himself, specifically for this litigation) his approach lacks third party support of any kind:

- There is no industry guidance discussing how to weigh these five factors, Ex. 8, Budnick Dep. at 178:2-12;

- There are no academic articles discussing this five-part test, *id.* at 179:7-16;

- No rating agency uses this five-part test, *id.* at 179:17-20; and

- In fact, to Mr. Budnick's knowledge, ***no one else in the world has ever used this five part test***, *id.* at 179:21-25.

This Court has previously rejected precisely this type of self-generated, otherwise unsupported methodology:

> *As just described, [the expert's opinion] is based primarily on his evaluation of five "'indicators.'" Although he states that these indicators are "'typically relied upon by development forecasters'"* . . . *neither he nor Defendants provide any support, other than [the expert's] assurance, for this statement*. . . . Fundamentally, therefore, [the expert] and Defendants have failed to show that [the expert's] methodology . . . provides a reliable basis for his expert opinion.

*Cook*, 580 F. Supp. 2d at 1159 (emphasis added).

Mr. Budnick's self-generated, litigation-driven methodology is not a reliable basis for any credit rating opinion and should be excluded for this reason alone.[14] But his

---

[14]   Mr. Budnick's five part methodology should be scrutinized even more heavily because it was generated solely for the purposes of this litigation. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) ("One very significant

methodology is particularly inappropriate in this case, where the relevant issue is how rating agencies would have rated these bonds eight to ten years ago.  Using a test the ratings agencies never employed, and that arbitrarily focuses on a small handful of factors among the dozens the rating agencies recognize, is simply not a reliable indicator of how the rating agencies would behave (now, or in the past).  At most, this flawed opinion might suggest what Mr. Budnick would have done, but that is irrelevant. As a result, he offers nothing beyond speculation about how a rating agency would have behaved. *Goebel v. Denver & Rio Grande W. R.R. Co.,* 215 F.3d 1083, 1088 (10th Cir. 2000) ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate.").  Mr. Budnick's irrelevant, speculative opinion should be excluded.

## CONCLUSION

Defendants have moved to exclude testimony from three of Plaintiffs' proposed experts that plainly does not meet the requirements of Rule 702.  Foregoing a broadside attack, this motion is targeted at specific opinions that are unhelpful and unreliable. Specifically, Defendants ask the Court to exclude opinions from three experts that: (i) define for the jury the meaning of statements in the Fund's public filings; (ii) contain legal conclusions about public statements being "material," "false," "misleading," or otherwise, or (iii) rely on unsupported, self-generated methodologies (*e.g.* Mr. Fong's capital preservation fund test or Mr. Budnick's five factor credit rating test).  *See* Ex. 1

---

fact is whether the expert has developed his opinions expressly for the purposes of testifying . . .").

(summarizing challenged opinions). The testimony described herein does not meet Rule 702 and should be excluded.

Respectfully submitted this 21st day of June, 2016.

**DECHERT LLP**

*/s/ Matthew L. Larrabee*
Matthew L. Larrabee
1095 Avenue of the Americas
New York, New York 10036
Tel:  (212) 698-3500
Fax:  (212) 698-3599
E-mail:  matthew.larrabee@dechert.com

Michael S. Doluisio
Cira Center
2929 Arch Street
Philadelphia, PA 19104
Tel:  (215) 994-2325
Fax:  (215) 994-2222
E-mail:  michael.doluisio@dechert.com

-And-

Lino S. Lipinsky de Orlov
Lauren P. Carboni
DENTONS US LLP
1400 Wewatta Street, Suite 700
Denver, CO 80202
Telephone:  (303) 634-4000
Facsimile:  (303) 634-4400
Email:  lino.lipinsky@dentons.com
Email: lauren.carboni@dentons.com

*Attorneys for Defendants*
*OppenheimerFunds, Inc.,*
*OppenheimerFunds Distributor, Inc.,*
*Scott Cottier, Ronald H. Fielding,*
*Daniel G. Loughran, John V. Murphy,*
*Troy Willis, Brian W. Wixted, and MassMutual*
*Life Insurance Co.*

* * *

Arthur H. Aufses III
Scott Ruskay-Kidd
Adina C. Levine
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
aaufses@kramerlevin.com
sruskaykidd@kramerlevin.com
alevine@kramerlevin.com

Lucas T. Ritchie
Jones & Keller, P.C.
1999 Broadway, Suite 3150
Denver, CO 80202
Tel: (303) 573-1600
Fax: (303) 573-8133
lritchie@joneskeller.com

*Attorneys for Defendants David K. Downes,
Matthew P. Fink, Robert G. Galli, Phillip A.
Griffiths, Mary F. Miller, Joel W. Motley,
Kenneth A. Randall, Russell S. Reynolds, Jr.,
Joseph M. Wikler, Peter I. Wold, Brian F.
Wruble and Clayton K. Yeutter*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of June, 2016, I filed a true and correct copy

of the foregoing **DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS'**

**PROPOSED EXPERT WITNESSES** with the Clerk of Court using the CM/ECF

system which will send notification of such filing to the following email addresses:

**Aaron Michael Sheanin**
amv@girardgibbs.com,ams@girardgibbs.com
**Alan I. Ellman**
aellman@rgrdlaw.com,e_file_ny@rgrdlaw.com
**Alan W. Sparer**
asparer@sparerlaw.com,dcorkran@sparerlaw.com,
nblake@sparerlaw.com,playzer@sparerlaw.com
**Andrei V. Rado**
arado@milberg.com,MAOffice@milberg.com
**Arthur H. Aufses , III**
aaufses@kramerlevin.com,docketing@kramerlevin.com
**Catherine J. Kowalewski**
katek@csgrr.com,hdemag@csgrr.com
**Charles J. Piven**
piven@browerpiven.com
**Charles Michael Plavi , II**
cmp@classactionlaw.com,anv@classactionlaw.com
**Charles Walter Lilley**
clilley@lilleylaw.com
**Christina H.C. Sharp**
chc@girardgibbs.com,amv@girardgibbs.com,as@girardgibbs.com, eak@girardgibbs.com,
vhl@girardgibbs.com
**Christopher J. Keller**
ckeller@labaton.com,electroniccasefiling@labaton.com
**Christopher J. Orrico**
corrico@milberg.com
**Daniel Charles Girard**
dcg@girardgibbs.com,amv@girardgibbs.com,mce@girardgibbs.com
**Darren A. Natvig**
dnatvig@boesenlaw.com,natvigd@comcast.net
**Darren J. Robbins**
pilarc@rgrdlaw.com,e_file_sd@rgrdlaw.com
**David C. Walton**
davew@csgrr.com,hdemag@csgrr.com
**Douglas S. Wilens**
dwilens@rgrdlaw.com,e_file_fl@rgrdlaw.com,e_file_sd@rgrdlaw.com

**Elizabeth A. Kramer**
eak@girardgibbs.com,amv@girardgibbs.com
**Eric Lechtzin**
elechtzin@bm.net
**Francis A. Bottini ,Jr**
sammirati@bottinilaw.com,fbottini@bottinilaw.com
**Gary E. Cantor**
gcantor@bm.net
**Gary S. Graifman**
ggraifman@kgglaw.com,ccornfield@kgglaw.com
**Glen L. Abramson**
gabramson@bm.net,gelliott@bm.net
**Howard T. Longman**
Tsvi@aol.com,jasondag@ssbny.com
**Jack G. Fruchter**
jfruchter@aftlaw.com
**James S. Nabwangu**
jnabwangu@sparerlaw.com
**Jeffrey Allen Berens**
jeff@jberenslaw.com,jeffreyberens@comcast.net
**Jeffrey Robert Krinsk**
jrk@classactionlaw.com,fk@classactionlaw.com,rag@classactionlaw.com
**Jeffrey S. Abraham**
jabraham@aftlaw.com
**John Givens Emerson**
jemerson@emersonfirm.com,tautry@emersonfirm.com
**John K. Grant**
johnkg@csgrr.com
**Jonathan Krasne Levine**
jkl@pritzkerlevine.com,bc@pritzkerlevine.com,sy@pritzkerlevine.com
**Joseph H. Weiss**
jweiss@weisslurie.com,infony@weisslurie.com
**Joseph J. Tabacco, Jr**
jtabacco@bermandevalerio.com,stuiasosopo@bermandevalerio.com,
ysoboleva@bermandevalerio.com
**Karen Jean Cody-Hopkins**
karen@codyhopkinslaw.com
**Kip Brian Shuman**
kip@shumanlawfirm.com,rusty@shumanlawfirm.com
**Kirk Douglas Tresemer**
ktresemer@boesenlaw.com,kdtresemer@comcast.net
**Kristin A. Knudson**
k2esquire@gmail.com
**Lauren Pamela Carboni**
Lauren.Carboni@dentons.com,lisa.king@dentons.com,lpcarboni@gmail.com
**Lawrence D. Levit**

llevit@aftlaw.com

**Lawrence L. Klayman**

lklayman@nasd-law.com

**Lino S. Lipinsky de Orlov**

Lino.Lipinsky@dentons.com,lisa.king@dentons.com,melinda.olivarez@dentons.com

**Lionel Z. Glancy**

lglancy@glancylaw.com,info@glancylaw.com

**Lisa M. Mezzetti**

lmezzetti@cohenmilstein.com,efilings@cohenmilstein.com

**Lucas Trask Ritchie**

lritchie@joneskeller.com,nchapman@joneskeller.com

**Marc C. Haber**

mhaber@sparerlaw.com

**Mark David Smilow**

msmilow@weisslurie.com

**Matthew D. Pearson**

mpearson@bermandevalerio.com,ysoboleva@bermandevalerio.com

**Matthew L. Larrabee**

matthew.larrabee@dechert.com,derek.rosen@dechtert.com,joshua.hess@dechert.com,michael.d
oluisio@dechert.com,michael.viguie@dechert.com,reginald.zeigler@dechert.com

**Michael Lawrence Gallo**

mgallo@sparerlaw.com

**Nicole C. Lavallee**

nlavallee@bermandevalerio.com,stuiasosopo@bermandevalerio.com,
ysoboleva@bermandevalerio.com

**Olimpio Lee Squitieri**

Lee@sfclasslaw.com,cathy@sfclasslaw.com

**Patrick V. Dahlstrom**

pdahlstrom@pomlaw.com

**Paul J. Geller**

pgeller@rgrdlaw.com,e_file_fl@rgrdlaw.com

**Phillip C. Kim**

pkim@rosenlegal.com

**Robert J. Dyer , III**

bob@dyerberens.com

**Roland W. Riggs , IV**

rriggs@milberg.com,mecf@pacernotice.com

**Rusty Evan Glenn**

rusty@shumanlawfirm.com

**Samuel H. Rudman**

srudman@rgrdlaw.com,dgonzales@rgrdlaw.com,e_file_sd@rgrdlaw.com

**Scott Ruskay-Kidd**

sruskaykidd@kramerlevin.com,docketing@kramerlevin.com,elintz@kramerlevin.com

**Scott E. Poynter**

scott@swcfirm.com,kim@swcfirm.com

**Shawn A. Williams**
shawnw@csgrr.com,shawnw@rgrdlaw.com
**Sherrie R. Savett**
ssavett@bm.net,mgatter@bm.net
**Stephen D. Bunch**
dbunch@cohenmilstein.com,efilings@cohenmilstein.com
**Steven J. Toll**
stoll@cohenmilstein.com,efilings@cohenmilstein.com
**Steven Shane Sparling**
ssparling@kramerlevin.com,docketing@kramerlevin.com, mdaneshrad@kramerlevin.com
**William H. Garvin , III**
wgarvin@garvinlawfirm.com
**William K. Dodds**
william.dodds@dechert.com,kate.okeeffe@dechert.com,luis.lopez@dechert.com,
scott.kessenick@dechert.com

*/s/ Lino S. Lipinsky de Orlov*

DN 32303525.7